**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) ) | Chapter 11 |
| MTE HOLDINGS LLC, <br> Debtor.[1] | ) ) ) ) ) | Case No. 19-12269 (KBO) <br><br> Ref. Docket Nos. 6 & 30 |

**REPLY OF RIVERSTONE CREDIT MANAGEMENT, LLC TO THE DEBTOR'S OBJECTION TO THE MOTION FOR AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY TO PERMIT RIVERSTONE TO OBTAIN JUDICIAL VALIDATION AND ENFORCEMENT OF ITS VOTE OF THE PLEDGED EQUITY**

Riverstone Credit Management, LLC ("*Riverstone*" or the "*Agent*"), as administrative agent under that certain Term Loan Credit Agreement dated September 17, 2018 (the "*Credit Agreement*") by and among MTE Holdings, LLC ("*MTE*" or the "*Debtor*"), the Agent, and the lenders party thereto (the "*Lenders*"), by and through its undersigned counsel, respectfully submits this reply in support of its motion [Docket No. 6] (the "*Motion*") for entry of an order granting relief from the automatic stay provided by section 362 of Title 11 of the United States Code (the "*Bankruptcy Code*") to permit the Agent to obtain judicial validation and enforcement against a non-debtor of its properly exercised Pledged Equity Vote[2] in Delaware Chancery Court. In support of the Motion and this reply, the Agent respectfully states as follows:

**PRELIMINARY STATEMENT**

1. It is uncontested that the Pledged Equity Vote occurred prepetition with respect to the corporate governance of non-debtor MDC, such that the Agent believes that the automatic stay does not apply in the first instance. But in an abundance of caution, even if it does, the Agent submits that it has demonstrated cause to lift the automatic stay under Section 362(d)(1) of

---

[1] The location of the Debtor's service address is 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

the Bankruptcy Code for the limited purpose of enabling the Agent to bring an action in Delaware Chancery Court to seek judicial validation and enforcement of the Pledged Equity Vote. The only defendant in that action will be MDC. The Chancery Court Action will resolve, on an expedited basis, any question that the Pledged Equity Vote was valid and provide certainty as to the governance of MDC. Moreover, the Agent submits that it will succeed on the merits of the Chancery Court Action because its actions were permitted by the plain language of the Credit Agreement and the Collateral Agreement.

2. The arguments raised in the Debtor's objection to the Motion [Docket No. 30] (the "*Objection*") do not alter the conclusion that cause exists to lift the automatic stay. Rather, the Debtor mischaracterizes the facts, governing law and otherwise presents overheated rhetoric and "red herrings" as it relates to the relief requested in the Motion. In addition, the Debtor's opposition confirms the hostility and resistance the Debtor and its principals have levied against the Agent and Lenders in response to the Agent's attempt to reasonably exercise valid rights under the Loan Documents that are intended to maximize value of the subsidiary.

3. While in this reply the Agent feels compelled to respond to certain allegations contained in the Objection, the issue before the Court is a limited issue under Section 362(d)(1) and the Court need not resolve all of the allegations asserted in the Objection to grant the limited relief sought in the Motion, for which ample cause exists based on the undisputed facts.

4. As set forth in the Motion, prepetition, at the direction of the Lenders, the Agent exercised remedies available to it under the Credit Agreement and the Collateral Agreement to vote the Debtor's equity interest in its non-debtor subsidiary, MDC (which equity interest was pledged to secure the Debtor's obligations under the Credit Agreement), in order to establish a board of managers and Chief Restructuring Officer at the subsidiary where one did not

previously exist, and to ensure that such board was governed by independent managers with industry expertise. A significant driver of the Agent's action was the Debtor's failure to provide the Agent and Lenders with current financial reporting for August and September 2019 as required under the Credit Agreement, its unwarranted delay in responding to the Agent's forbearance proposal, its stalled response to urgent information requests, and its further refusal to grant the Agent and its advisors access to inspect MDC's books and records as required under the Credit Agreement.

5.  At every turn, the Debtor and Debtor-controlled MDC stymied efforts of the Agent and Lenders to obtain the benefit of rights to which they were entitled under the Credit Agreement. Because of the Debtor's obstructionism and non-cooperation, the Agent's and Lenders' options were limited to those they could unilaterally exercise. The Lenders, after substantial deliberation, pursued the Pledged Equity Vote to ensure experienced and independent decision-makers would have a substantial role in managing and guiding MDC to preserve value. With virtually no visibility into MDC's financial picture, mounting concerns among MDC's vendors, and the recalcitrance of the Debtor's principals, the Lenders exercised the least invasive remedy available to them. The Agent and Lenders sought only to assure that the operating subsidiary was provided with much needed, long overdue independent governance with industry expertise.

**ARGUMENT**

I. **The Automatic Stay Does Not Bar The Agent From Seeking Judicial Validation And Enforcement Of Its Properly Exercised Pledged Equity Vote.**

6.  The Objection suggests that the Agent gives short shrift to the idea that the stay does not apply in the first instance. To be clear, the stay does not apply (nor has it been

3

extended) [3] to bar the Chancery Court Action to be commenced against a **_non-debtor_**. *See, e.g., In re Am. Film Techs., Inc.,* 175 B.R. 847 (Bankr. D. Del. 1994) (the automatic stay affords protection only to debtors, and does not extend to co-tortfeasors, joint obligors, guarantors, sureties, or other non-debtor defendants). MDC is a separate corporate entity from the Debtor, and it is well established that separateness of corporate entities should be respected. *See, e.g., Wenske v. Blue Bell Creameries, Inc.,* No. CV 2017-0699-JRS, 2018 WL 5994971, at *5 (Del. Ch. Nov. 13, 2018) ("[T]here exists a presumption of corporate separateness, even when a parent wholly owns a subsidiary and the entities have identical officers and directors").

7.   Further, even if MDC was a debtor, which it is not, the stay would not apply here. The Pledged Equity Vote occurred prepetition, and no postpetition action is necessary for the board to be vested with power to control MDC. As the Objection acknowledges, the automatic stay does not apply to a creditor's passive retention of estate property obtained prior to the petition date. *See In re Denby-Peterson*, No. 18-3562, 2019 WL 5538570, *8 (3d Cir. Oct. 28, 2019); *WD Equipment, LLC v. Cowen (In re Cohen)*, 849 F.3d 943, 951 (10th Cir. 2017). Rather, it applies only to postpetition use of such property. *Denby-Peterson,* 2019 WL 5538570, at *8. The Agent does not seek any post-petition takeover of the debtor's business, the newly constituted board is tasked with overseeing the management of a **_non-debtor's_** affairs as the consequence of an action that was validly taken prepetition, and the Bankruptcy Court is only being asked here to permit another court to give effect to that action.

---

[3]   The Debtor also fails to acknowledge that there is a procedure and corresponding burden to extend the automatic stay to a non-debtor entity. *See NHI REIT of TX-IL, LLC v. LaSalle Grp., Inc.,* 387 F. Supp. 3d 850, 852 (M.D. Tenn. 2019) (considering plaintiff's motion to stay litigation against debtor and to proceed against remaining non-debtor co-defendants, of whom debtor was the sole member, and holding that extending stay was not appropriate because non-debtor co-defendants "cite[d] no cases where being a sole member of another entity makes extension of the stay appropriate, let alone automatic.") Contrary to the Debtor's contention, its stated intention to intervene in the Chancery Court Action does not provide any basis to apply the automatic stay to the action, and the Debtor's cited authority does not support this position.

## II. Even Assuming The Stay Applies, There Is Sufficient Cause To Allow The Agent To Commence The Chancery Court Action To Validate Corporate Governance Changes It Implemented Prepetition At The Non-Debtor Subsidiary Level And To Preserve Value On An Expedited Basis.

### A. Lifting the Stay Will Not Cause Any Irreparable Injury to the Debtor Because MDC's Board and CRO Will Maximize Value for All Stakeholders.

8. In the Objection, the Debtor argues that its principals are fully engaged in managing the financial and operational situation at MDC, which the Agent agrees is declining precipitously. The undisputed facts, however, demonstrate that the Agent and the Lenders had good reason to believe that MDC has been sorely mismanaged under the Debtor's watch. As set forth in the Motion, over ***thirty*** events of default exist under the Credit Agreement, the overwhelming majority of which relate to MDC's financial and operational performance. *See Reply Declaration of Christopher Abbate In Support of the Motion of Riverstone Credit Management, LLC for an Order Granting Relief From the Automatic Stay to Permit Riverstone to Obtain Judicial Validation and Enforcement of Its Vote of the Pledged Equity* filed contemporaneously herewith (the *"**Abbate Reply Decl.**"*) ¶ 24.

9. At all times prior to the Pledged Equity Vote, MDC has consistently overspent its means and underperformed expectations in terms of production and cash flow. The financial model MTE used in negotiating the Credit Agreement projected approximately 3.2 million barrels of cumulative crude oil production in between October 2018 and June 2019. Based on information provided to the Agent by MTE, MDC's actual crude oil production during that time period fell to almost half of the projection—approximately 1.7 million barrels. *Id.* ¶ 30.

10. The Debtor uses the Objection to inaccurately blame commodity prices as the source of its financial distress, while glossing over its sustained underperformance and refusal to provide required information to the Agent and the Lenders. During the October 2018 to June 2019 time period, MDC's production results were roughly 79% below expectations, while crude

oil prices declined by only 13% during this time. October 25, 2019 Declaration of Christopher ("***Abbate Decl.***") ¶ 23.

**B.    Failing to Lift the Stay Will Cause Significant Harm to the Agent, Lenders and Other Stakeholders.**

11.    While lifting the stay would not prejudice (but rather would benefit) the Debtor, which will continue to own MDC, any failure to lift stay would result in significant harm to the Agent and Lenders. Indeed, every day that the Debtor spends in bankruptcy—seemingly without a path forward[4]—impairs value for all of the Debtor's stakeholders. In balancing the harms, the Court should consider that the Lenders comprise close to, if not all of, the Debtor's creditors and have a first priority lien against the Debtor's primary asset.

(a)    *The Debtor Has Operated Under a Veil of Secrecy for Months.*

12.    The Debtor's refusal to negotiate in good faith with the Agent and Lenders, or provide contractually required information in the face of mounting defaults, prompted the Agent to proceed with the Pledged Equity Vote in order to preserve value at MDC and to ensure that key decisions would be made, and reviewed, by independent professionals. *Id.* To permit the Debtor to effectively undo the exercise of rights under the Credit Agreement and Collateral Agreement and reinstate the Debtor's management team as manager of MDC would cause significant injury to the Agent and Lenders. The Debtor's assertion that the Agent and Lenders acted in an aggressive and unreasonable manner is contradicted by the fact that the Pledged Equity Vote is a valid exercise of the Lenders' contractual rights following numerous attempts by the Agent to meet with the Debtor's principal and come to an agreed resolution. Indeed, the Pledged Equity Vote followed months of attempted negotiations with the Debtor, which included the Agent's submitting a forbearance proposal to the Debtor, providing correspondence to the

---

[4]    Despite having been in chapter 11 since October 22, 2019, the Debtor has neither filed a substantive pleading nor appeared before the Court.

Debtor that detailed the defaults under the Credit Agreement, as well as two in-person meetings and several phone calls between the parties. *See* Abbate Reply Decl. ¶¶ 26, 27, 33, 34.

>  (b)  *The Debtor Has Allowed MDC to Incur Staggering Outstanding Payables and Mechanics Liens.*

13. The Debtor's disregard for its contractual obligations and refusal to negotiate with its creditors is not limited to its performance under the Credit Agreement. Based on the limited information provided to the Agent's advisor in response to the Agent's notice of inspection pursuant to Credit Agreement Section 5.7, the Agent learned of the existence of more than $100 million in aging accounts payable, and more than $50 million in mechanics liens, none of which had previously been disclosed to the Lenders. *Id.* ¶ 31.

14. Moreover as creditors of the holding company Debtor, the Lenders are structurally junior to MDC's creditors, including Natixis under the RBL Credit Facility Agreement, and the holders of the numerous mechanics liens referenced above, to the extent that such liens are determined to be valid.[5] As the Debtor continues to overspend its means and fail to manage this distressed situation, the Lenders are losing significant value every day.

**C.  The Agent is Likely to Succeed on the Merits.**

15. The Agent submits that it will succeed on the merits of the Chancery Court Action,[6] because the Pledged Equity Vote was a valid exercise of the Agent's contractual rights under the Credit Agreement and the Collateral Agreement, satisfying the requirement of "some probability" of success of the merits. *In re Continental Airlines, Inc.*, 152 B.R. 420, 425 (D. Del.

---

[5]  The Agent and Lenders do not hereby concede either the validity or the amount of the mechanics' liens.

[6]  Notwithstanding the Debtor's suggestion to the contrary, the Delaware Chancery Court is the appropriate forum to consider the Debtor's breach of the Credit Agreement. It is proper for the Agent to seek relief in the Delaware Chancery Court for recognition under Section 18-110 of the Delaware LLC Act ("**LLC Act**") of a prepetition corporate governance change that relates to the Agent's voting of a Delaware entity's membership interests under Delaware law. Moreover, the Credit Agreement's New York choice of venue provision does not apply to proceedings brought against non-signatory MDC. *See* November 6, 2019 Declaration of Mark Siffin ("***Siffin Decl.***"), Ex. 2, § 10.15.

1993) (Even a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case).

16. As demonstrated in the Motion, by voting the Debtor's membership interest in MDC, the Agent exercised rights clearly permitted under the Credit Agreement and Collateral Agreement to appoint a Chief Restructuring Officer and a five-member board. Under New York law, which governs the Credit Agreement and Collateral Agreement, when a contract is "complete, clear, and unambiguous, it must be enforced according to its plain meaning." *Littleton Constr. Ltd. v. Huber Constr., Inc.*, 27 N.Y.3d 1081, 1083 (2016) (citations omitted).

    (a)    *The Debtor Cannot Claim that Its Numerous Defaults are Trivial or Inconsequential.*

17. The Debtor does not actually dispute that numerous Events of Default occurred under the Credit Agreement. Rather, the Debtor contends that its numerous defaults under the Credit Agreement were insufficiently consequential to warrant the exercise of remedies by the Agent. This contention is inconsistent with the Credit Agreement, governing New York law, and the undisputed facts which justify granting stay relief.

18. First, the Events of Default constitute violations of key obligations that are of critical importance to the Lenders. For example, as established in the Abbate Reply Decl., the Debtor allowed millions of dollars in mechanics liens to attach to MDC's assets, incurred millions more in aging account payable, concealed these defaults from the Lenders, and in early 2019, drew down approximately $120 million based on false certifications in its Borrowing Notices that it was in compliance with the Credit Agreement. Abbate Reply Decl. ¶¶ 8-15. The Credit Agreement's financial covenants and prohibitions on aging accounts payable and mechanics liens assure the Lenders that the Debtor can actually repay the amounts it owes them and that creditors of the operating company do not exercise their own legal remedies which

could have severe consequences. Timely and accurate financial reporting provides the Lenders with information regarding the financial condition and status of the Debtor and enables the Lenders to track the promised and proper use of the funds that they advanced and assure the financial stability of the operating company which has its own debt obligations and default provisions. MDC's compliance with the RBL Credit Facility Agreement is of critical importance to the Lenders because, under Section 9.04(c) of the RBL Credit Facility Agreement, if MDC is in default under such agreement, in addition to other rights and remedies available to the RBL Lenders, MDC is not permitted to make distributions to its parent company, the Debtor, which distributions are, in turn, the cash necessary for the Debtor to make payments under the Credit Agreement. Abbate Decl. ¶ 11.

19.     Moreover, the Debtor's materiality argument finds no support in the Credit Agreement. Sections 8.1 and 8.2 define certain specific breaches of the Credit Agreement that constitute "Events of Default," and therefore entitle the Agent to exercise remedies. Through these sections, the parties specifically negotiated which breaches of the Credit Agreement would give rise to the Agent's right to exercise remedies. Having now committed numerous specifically defined Events of Default under the Credit Agreement, the Debtor cannot escape the consequences of its actions through arguments that its breaches were immaterial.

        (b)     *There are no "Factual Issues" Precluding a Ruling on the Motion.*

20.     Although the Debtor – again – does not deny that it committed numerous Events of Default, it argues that there are "factual issues" surrounding whether its numerous defaults are "actionable." These purported factual issues are red herrings. For example, the Debtor's claim that the Agent wrongfully failed to fund in April 2019 is belied by the facts. The Debtor was in default when it submitted its April 18, 2019 Borrowing Notice due to numerous mechanics liens,

aging accounts payable, and failure to comply with financial covenants.  *See* Abbate Reply Decl. ¶ 22.  Accordingly, the Debtor was not entitled to receive any funds pursuant to such notice.  Moreover, the Debtor voluntarily withdrew its April 18, 2019 Borrowing Notice, and therefore the Agent and the Lenders had no obligation to fund the requested $65 million.  *Id.* ¶¶ 19-21.

21. Similarly, the Debtor's argument that its numerous defaults were caused by a purported failure to fund by the Lenders is simply not possible given the extent and nature of the Debtor's defaults.  The Debtor's April 18, 2019 Borrowing Notice was for $65 million.  MDC's aging accounts payable and outstanding mechanics liens dwarf this amount by more than double.  Moreover, many of the Debtor's defaults have no connection to the Debtor's available cash.  *Id.* ¶ 31.  For example, the Debtor has consistently failed to provide timely and accurate financial statements in violation of Section 5.1 of the Credit Agreement (the Agent has received no financial statements for August, September, and October), and has refused to comply with the Agent's inspection request in violation of Section 5.7 of the Credit Agreement.  *See* Siffin Decl. Ex. 2 §§ 5.1, 5.7.

    (c)    *The Agent Provided Debtor with Proper Notice as Required Under the Credit Agreement and Collateral Agreement Before Voting the Pledged Equity.*

22. Credit Agreement Section 8.2 provides that the Agent, on behalf of the Lenders, shall have the right to exercise remedies, including under the Collateral Agreement, upon notice to the Debtor of the occurrence of any Event of Default.  *Id.* § 8.2.  Under Collateral Agreement Section 6.01(b), if an Event of Default has occurred and is continuing, the Agent, at its "discretion and without notice," can "[exercise] all voting, corporate, membership, partnership and other rights pertaining to such Pledged Securities."  Siffin Decl. Ex. 3 § 6.01(b).  Under New York law, where sophisticated parties have agreed to notice requirements, courts will enforce them as written and will not require notice beyond what parties have agreed.  *See Key Int'l Mfg*.

*Inc. v. Stillman*, 103 A.D.2d 475, 477 (N.Y. App. Div. 1984), *aff'd as modified*, 489 N.E. 2d 764 (N.Y. 1985) (enforcing unilateral acceleration without prior notice where parties were "sophisticated entrepreneurs" and "contract did not provide for notice").

23. Here, the Agent, on behalf of the Lenders, sent the Debtor a letter reserving rights and notifying the Debtor of its specific defaults on behalf of the Lenders on September 13, 2019. *See* Abbate Reply Decl. Ex. N. After the Debtor did not meaningfully respond to this letter, on October 7, 2019, the Agent sent the Debtor a Notice of Default outlining each of the current and outstanding defaults. *See* Abbate Reply Decl. Ex. O. Accordingly on October 21, 2019, after having given proper notice of the Debtor's numerous Events of Default under the Credit Agreement, the Agent exercised its rights to vote the Pledged Equity.

24. The Debtor attempts to argue that the Agent's delivery on September 13, 2019, and October 7, 2019, of notices of events of default that had occurred several months prior somehow limits or negates the Agent's right to rely on the events of default and exercise remedies under the Credit Agreement. Neither the Credit Agreement nor New York law supports the Debtor's position. Under Section 5.2(a) of the Credit Agreement, the Debtor— not the Agent—is required to give notice of Events of Default within three business days. Siffin Decl. Ex. 2 § 5.2(a). The Debtor failed to provide any notice of default to the Agent, which constitutes an additional Event of Default under Section 8.1(c) of the Credit Agreement. The Credit Agreement does not require that the Agent notify the Debtor of Events of Default on any specific timeline. Section 8.2 of the Credit Agreement provides only that the Agent must give the Debtor notice of an Event of Default prior to exercising its remedies, which—as Debtor admits—the Agent did here. *See id*. § 8.1(c).

25. Moreover, Section 10.9 of the Credit Agreement makes clear that any failure or delay by the Agent in exercising rights under any Loan Document (as defined therein) does not constitute a waiver of such right. *Id*. § 10.9. Under New York law, such "no-waiver" clauses are enforced as written. *See, e.g., Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 137 (S.D.N.Y. 2016)*; Jefpaul Garage Corp. v. Presbyterian Hosp. in City of New York*, 462 N.E.2d 1176, 1178 (N.Y. 1984).

(d)     *The Agent's Exercise of Voting Rights was Valid.*

26. The Debtor contends that the Agent's exercise of voting rights, through the Pledged Equity Vote, was not valid because a member of a LLC cannot obtain a vested right to vote without the transfer of the underlying membership interests. However, pursuant to Section 6.01(b) and 7.01 of the Collateral Agreement, MTE as the sole member of MDC granted to Riverstone a contractual proxy over MTE's voting rights, which is expressly permitted under the LLC Act: "on any matter that is to be voted on by members, the members may vote in person *or by proxy*, and such proxy may be granted in writing, by means of electronic transmission *or as otherwise permitted by applicable law*." Siffin Decl. Ex. 3 §§ 6.01(b) and 7.01; 6 *Del. C.* § 18-302(d); *see also* 6 *Del. C.* § 18-402(d) (same for managers). Furthermore, exercising that contractual proxy does not require the entire Membership Interest to be transferred to the Agent. MDC's LLC Agreement expressly defines Membership Interest to include "without limitation the right to exercise all voting, consensual and other powers of ownership[.]" *See* Siffin Decl. Ex. 1, Schedule A. Because the LLC Agreement provides that "[t]he Member may assign in whole or in part its Membership Interest in the Company," MTE has the express power

to give—and validly gave—a voting proxy to the Agent under the terms of the Collateral Agreement. *Id.* § 21.[7]

### III. The Debtor's Cross-Motion For Turnover Under Section 543 Is A Red Herring.

27.  Despite taking the position that the voting rights associated with the equity interests of MDC pledged to the Agent did not validly transfer to the Agent, the Debtor seeks in connection with its Objection the turnover of such rights under Section 543 of the Bankruptcy Code. As a preliminary matter, a turnover claim in this context should be properly brought as an adversary proceeding and the Agent should not be required to substantively respond given the procedural posture of the Debtor's argument. *See* Fed. R. Bankr. P. 7001(1) (defining adversary proceedings to include proceedings to recover money or property); *Matter of Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990) ("A turnover action is an adversary proceeding which must be commenced by a properly filed and served complaint.").

28.  Further, if the Agent is a custodian within the meaning of Section 543—which it does not concede—compliance with turnover under Section 543 should be excused because the interests of creditors would be better served by permitting the Agent to continue to possess the voting rights attendant to MDC's equity. 11 U.S.C. § 543(d)(1). The Agent should be excused from the turnover requirement because, as set forth in detail above, the Debtor will not use such rights for the benefit of its creditors (*i.e.*, the Agent and Lenders) and there has been substantial mismanagement of MDC at the hands of the Debtor. *In re Dill*, 163 B.R. 221, 225 (E.D.N.Y. 1994) (listing the factors courts consider in determining whether the assets of a particular debtor should be administered by the existing custodian or returned to the debtor—including

---

[7] The Debtor also argues that the LLC Act requires "that an assignee of a limited liability company interest *only* becomes a member." Objection, ¶ 42 (emphasis in original). But § 18-704 of the LLC Act governs the ability of an assignee to become a member; it does not require an assignee to become a member. Nor does it address the contractual exercise of a proxy of voting power, as occurred here.

13

mismanagement by the debtor—and expressly stating that the interests of the debtor are not part of the criteria).

29.    In sum, the Agent respectfully submits that the issue of turnover is not properly before the Court and, even if it were, the Debtor's claim is without merit. The Agent fully reserves its rights to supplement its response to this claim once properly before the Court.

[*Remainder of Page Intentionally Left Blank*]

The Agent respectfully requests that the Court enter the Proposed Order granting the relief requested in the Motion and granting such other and further relief to which the Agent may be justly entitled.

Dated: November 8, 2019
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Kenneth J. Enos
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
Jaclyn C. Weissgerber (No. 6477)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1256

**VINSON & ELKINS LLP**

David S. Meyer (admitted *pro hac vice*)
Clifford Thau (admitted *pro hac vice*)
Marisa Antos-Fallon (admitted *pro hac vice*)
Jessica C. Peet (admitted *pro hac vice*)
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Tel: 212.237.0000
Fax: 212.237.0100

**BAILEY & GLASSER LLP**

Brian A. Glasser (admitted *pro hac vice*)
Kevin W. Barrett (admitted *pro hac vice*)
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
T: 202.463.2101
F: 202.463.2103

*Attorneys for the Agent*