**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MTE HOLDINGS LLC, | ) | Case No. 19-12269 (KBO) |
| | ) | |
| Debtor.[1] | ) | |
| | ) | Joint Administration Requested |
| | ) | |

**DECLARATION OF MARK SIFFIN,
CHIEF EXECUTIVE OFFICER OF MDC ENERGY LLC
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mark Siffin, hereby declare under penalty of perjury:

1. I am the Chief Executive Officer of MDC Energy LLC ("MDC" or the "Company") and its debtor affiliates as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I have been the Chief Executive Officer of MDC since July 5, 2013. In such capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2. I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these Chapter 11 Cases and in support of the Debtors' Chapter 11 petitions and certain motions and applications filed today.

3. Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: MTE Holdings LLC (7894); MTE Partners LLC (1158); Olam Energy Resources I LLC (0770); MDC Energy LLC (9140); MDC Texas Operator LLC (1087); Ward I, LLC (6817); and MDC Reeves Energy LLC (3644). The Debtors' address is 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240.

affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. I am above 18 years of age, and I am competent to testify.

4. On October 22, 2019 (the "Petition Date"), MTE Holdings LLC ("MTE") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On October 23, 2019, Olam Resources I LLC and MTE Partners LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On November 8, 2019, the remaining Debtors filed chapter 11 petitions. The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. The Company commenced the Chapter 11 Cases to maximize its enterprise value for the benefit of its stakeholders. At present, the Company intends to refinance its existing debt and raise additional capital to continue its drilling and development plan.

## CORPORATE HISTORY AND BUSINESS OPERATIONS

**A.     Debtors' Business Operations**

6. MTE was formed in June 2014 to hold membership interests in MDC and MDC Texas Operator LLC ("MDC Operator") and their subsidiaries. MDC conducts oil and gas exploration, drilling and development operations in the Permian Basin in Texas. MDC Operator acts as operator of the properties owned by MDC and its subsidiaries pursuant to an operating agreement.

7. In the past year, MDC significantly expanded its operations. Specifically, it has:

- successfully drilled and completed 44 permitted horizontal wells and developed associated surface facilities and infrastructure;

- approximately doubled its average net daily production;

- begun generating approximately $120 million in annualized EBITDA – a nearly threefold increase in one year;

- more than doubled its proven reserves of crude oil and natural gas; and

- developed a new platform for water sourcing and disposal to support MDC's own operations and those of third-party producers.

8.  As a result, MDC currently produces, approximately, 20,000 barrels of oil equivalent per day, 11,500 net acres of controlled contiguous blocks, 490 horizontal well drilling locations, and 164 million barrels of oil equivalent of total estimated ultimate recovery. The following depicts the Company's footprint:

<u>Glasscock County TX</u>



3

Reeves County Tx



9. MDC's successful efforts to explore for, develop, and produce oil and gas has generated strong financial growth over the last three years: 2017 EBITDA of $4,400,000; 2018 EBITDA of $35,600,000 (800% increase YoY); 2019 Pro forma EBITDA of $73,000,000 (200% increase YoY; 1,600% increase from 2017 to 2019). During the same time period MDC has grown oil and gas average daily production over 1,200%: 2017 average daily production of 1,740 BOE; 2018 average daily production of 11,400 BOE (650% increase YoY); 2019 YTD average daily production of 21,357 BOE (180% increase YoY; 1,200% increase from 2017 to 2019).

10. The Company has no employees. Pursuant to management services agreements with MDC and MDC Operator, Maefield Development Corporation ("Manager"), a non-debtor affiliate of the Company, provides management and related services to the Company utilizing its own employees. This includes the services of 23 dedicated fulltime employees located at the offices of the Manager in Midland, Texas. The Company reimburses the Manager for the direct costs of providing these services without a mark-up. These employees are also eligible to participate in the healthcare plan provided by the Manager. Typical monthly payroll plus healthcare is approximately $305,000.

**THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE**

A. **The Debtors' Corporate Structure.**

11. The following chart illustrates the Debtors' corporate structure as of the Petition Date:



B.  **The Debtors' Capital Structure.**

12. The following description is intended to provide a synopsis of the Debtors' capitalization and the historical financing transactions that led thereto and is qualified in its entirety by reference to the operative documents and agreements.

1. **The Reserve Based Lending Credit Agreement**

13. MDC funded its operations through a loan based on the amount of oil and gas reserves it had on hand at specified dates. On September 17, 2018, MDC and Natixis, New York Branch (as Administrative Agent and Issuing Bank) ("Natixis") entered into a Reserve Based Lending credit agreement (the "RBL Agreement"). Pursuant to the RBL Agreement, MDC could borrow funds from Natixis and the other lenders to the RBL Agreement (the "MDC Secured Lenders") against its oil and gas reserves in an amount based, in part, on MDC's "Proved

Reserves" attributable to its oil and gas properties, together with, among other things, a projection of MDC's "rate of production and future net income, taxes, operating expenses and capital expenditures." MDC's initial borrowing under the RBL Agreement was $60 million, and it was permitted to borrow and the MDC Secured Lenders committed to provide additional amounts periodically, up to a maximum of $300 million, as MDC's "Borrowing Base" was recalculated to account for its growth in its oil and gas assets. MDC significantly increased its Proved Reserves since September 2018; however, the RBL balance remained at $60 million.

14. Loans under the RBL Agreement were secured by a Pledge and Security Agreement, dated September 17, 2018, between the MDC Secured Lenders and MDC and other security instruments including mortgages and account control agreements that granted the MDC Secured Lenders a security interest in substantially all of the assets of MDC and its subsidiaries.

## 2. The Term Loan Credit Facility

15. On September 17, 2018, MTE Holdings LLC entered into a Term Loan Credit Agreement (as subsequently amended and supplemented, the ("MTE Credit Facility") with a group of lenders ("MTE Lenders" and collectively with the MDC Secured Lenders, the "Lenders") for which Riverstone Credit Management LLC ("Riverstone") acts as administrative agent. As discussed further below, the MTE Credit Facility provided for loan commitments totaling $475 million, but because the MTE Lenders refused to honor the final $65 million borrowing notice, the principal amount outstanding as of the Petition Date is $410 million.

16. The loans under the MTE Credit Facility were secured by a pledge and security interest in MTE's membership interests in MDC, as well as MTE's own membership interests.

**EVENTS LEADING TO THE CHAPTER 11 CASES**

A.  **Riverstone's April 2019 Failure To Fund.**

17.  In the months that followed the execution of the MTE Credit Facility and the RBL Agreement, the prices of oil and gas began to decline precipitously. Confronted with this sharp market reversal, it was critical for MDC to maintain and even increase its drilling operations to maintain the cash flow necessary to meet its projections and satisfy the covenants in the MTE Credit Facility and the RBL Agreement. Indeed, these drilling operations were presented to and understood by the Lenders as the cornerstone of the business plan that they agreed to fund.

18.  Thus, to maintain the necessary drilling program, MTE and MDC continued to borrow the funds to which they were entitled under the respective agreements. By mid-April 2019, MTE had drawn down all of but $65 million of the available funds under the MTE Credit Facility for a total amount drawn down of $410 million. These funds were used to finance MDC's operations.

19.  At this time, MDC has drawn on the initial $60,000,000 under the RBL Agreement, but the MDC Secured Lenders did not fund any further amounts thereunder.

20.  On April 18, 2019, in accordance with the terms of the MTE Credit Facility, MTE sent a borrowing notice (the "April 18 Borrowing Notice") to Riverstone calling for the MTE Lenders to fund the remaining $65 million that was committed and available.

21.  While Riverstone (and the MTE Lenders) knew that these funds were to be used to provide operating capital for MDC's drilling operations, most notably, to pay MDC's trade creditors, Riverstone failed to provide the requested funds within ten days as required by the MTE Credit Facility or at any time thereafter. This material breach of the MTE Credit Facility directly led to a cascade of harm to MTE and MDC by causing a significant liquidity shortfall

and precluding MDC from being able to fund its operations and make orderly payments on its accounts payable, which largely consisted of its trade creditors.

B.     **Riverstone Actions Compel Chapter 11 Filings**.

22.    By late August, instead of providing the Company with the requested waivers for certain technical alleged defaults as it previously represented it would provide, Riverstone provided MTE with a proposed amendment to the MTE Credit Facility that would have placed onerous and unreasonable terms on MTE to obtain the promised waiver of those purported defaults. Under that proposal, within a month, the Company would have to either raise $60 million in equity (a difficult, dilutive, and unnecessary task), break up and sell components of MDC, or merge it with another company. Riverstone also proposed to install its own consultant to provide MDC with "financial help" – all while increasing the costs of borrowing.

23.    MTE responded to the proposal in early September by explaining that it wanted to cooperate and work with the MTE Lenders in good faith to address the issues they raised, but that many of the terms and/or timeframes proposed were unworkable and unacceptable. On September 13, 2019 – nearly five months after the failure to provide the $65 million in funding in breach of the MTE Credit Facility - Riverstone purported to "formally give notice" of five Events of Default under the MTE Credit Facility.

24.    Months after wrongfully refusing to honor the April 18 Borrowing Notice, in late September, and days after the conclusion of the one-year availability period under the MTE Credit Facility, Riverstone notified MTE that the MTE Lenders no longer were obligated to honor any additional funding requests.

25.    Thereafter, on September 29, 2019, MTE, through counsel, responded to Riverstone's claims of Events of Default. MTE denied that any effective Event of Default

9

occurred and once again demanded that the MTE Lenders honor the April 18 Borrowing Notice and provide MTE with the requested $65 million.

26. On October 7, 2019, after MTE explained that its purported Notice of Events of Default was not effective and therefore there was no Event of Default, Riverstone responded to MTE's letter by issuing a new Notice of Event of Default with fourteen additional purported defaults referenced. None of these new purported defaults had ever been noticed or even raised previously, notwithstanding that most of them were several months old.

27. On October 21, 2019, Riverstone sent to the Company a "Notice of Exercise of Voting Rights of Pledged Securities." Based on the same alleged "Events of Default" outlined in its October 7, 2019 letter, Riverstone claimed to have exercised its rights under the collateral agreement among the parties (the "Collateral Agreement") to usurp the Company's voting rights with respect to MDC. Riverstone informed the Company that "[p]ursuant to Section 6.01 and Section 7.01 of the Collateral Agreement," the Company's rights "to exercise all voting and membership rights with respect to the equity interests of MDC Energy . . . are no longer effective and have become vested in the Administrative Agent." Riverstone then informed the Company that the Pledged Securities (the Company's membership interests) in MDC have been deemed registered in the name of Riverstone as the Administrative Agent, and that Riverstone, at the direction of the MTE Lenders, has exercised its voting rights under Section 6.01(b) of the Collateral Agreement. However, Riverstone never took action to foreclose on MTE's membership interests in MDC Energy.

28. Nevertheless, Riverstone informed the Company that it had used its purported newly-acquired "voting rights" to effectuate substantial changes to the management of MDC. First, Riverstone "voted" on behalf of the MTE Lenders to appoint new, purportedly independent

members to the MDC board, Dan Gillett and Steve Pully, each of whom is to be paid $10,000 per month. Riverstone also "voted" on behalf of the MTE Lenders to impose a new "Chief Restructuring Officer," John Echols ("Echols"), who also was given a seat on MDC's board, and who Riverstone specifically "empowered" to renegotiate the RBL Agreement with Natixis. In its effort to hijack MDC, Riverstone "elected" to give Echols broad powers while stripping powers from other officers.

29. Riverstone also "voted" to force MDC to enter into a contract (the "Opportune Agreement") with Opportune LLP ("Opportune"), an entity in which Echols is a partner. In what is tantamount to a takeover, the Opportune Agreement purports to grant Echols sweeping authority to carry out the sale of some or all of MDC's assets.

30. Finally, on behalf of the MTE Lenders, Riverstone "voted" to retain a "financial advisor, Evercore Group L.L.C. ("Evercore"), on behalf of MDC. Specifically, Evercore was tasked with providing "financial advisory services in connection with (i) a potential corporate merger involving [MDC], or a possible partial or full divestiture, directly or indirectly, of all or a portion of [MDC's] oil and gas reserves, acreage, water assets/dedications, and/or its midstream infrastructure assets in the Permian Basin, regardless of the form or structure thereof and (ii) its efforts to raise capital, from one or a limited number of investors or other financing sources, through the issuance by [MDC] or one of its affiliates, in a private placement, of equity (including equity-linked) and/or debt or debt-like securities, or through one or more loans or other financing arrangements, in each case in one or a series of transactions, regardless of the form or structure thereof." *Id*.

31. At the time of Riverstone's attempted unlawful "takeover" of MDC's management, the Company and MDC were working diligently on obtaining a refinancing that

would provide sufficient capital to fund MDC's operations. Riverstone's and the MTE Lenders' wrongful actions have placed in jeopardy the Company's and MDC's ability to obtain that critical refinancing. The Company and MDC were also working diligently to comply with numerous information requests being made by Riverstone and the MTE Lenders on an almost daily basis.

C.    **The Debtors Commence the Chapter 11 Cases.**

32.    As a result of Riverstone and the MTE Lenders' wrongful attempt to take control of MDC, on October 22, 2019, MTE filed a petition in the United States Bankruptcy Court for the District of Delaware for protection under Chapter 11 of the Bankruptcy Code. On October 23, 2019, Olam Resources I LLC and MTE Partners LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On November 8, 2019, the remaining Debtors filed chapter 11 petitions.

33.    As a result of the commencement of the Chapter 11 Cases, the automatic stay pursuant to Section 362 of the Bankruptcy Code was triggered and Riverstone and the MTE Lenders are thereby stayed from taking any and all action to collect on its debts or otherwise exercise any rights against the Company or its property, including any further action by any purported appointees of Riverstone and the MTE Lenders at MDC. Further, pursuant to Section 543 of the Bankruptcy Code, any property of the Company that Riverstone and the MTE Lenders purport to exercise or have control over, including all rights arising from the Company's membership interests in MDC, have reverted to the Company (assuming they ever validly transferred to Riverstone or the MTE Lenders, which they did not).

**THE DEBTORS' OFFICERS AND DIRECTORS**

34. As of the Petition Date, MTE was governed by its Managing Member, Olam Energy Resources. MDC is managed by its sole Member, MTE. All current officers of MDC will continue to serve in such capacity after the Petition Date.

### EVIDENTIARY SUPPORT FOR FIRST-DAY MOTIONS

35. Contemporaneously herewith, the Debtors filed a number of motions (the "First Day Motions") and are seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the effective administration of the Chapter 11 Cases. I believe the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to maximize the value of their assets in a manner that will benefit all of the Debtors' stakeholders.

36. Certain of the First Day Motions request authority to pay certain prepetition claims. I understand that Bankruptcy Rule 6003 provides, in pertinent part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a Chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm." Accordingly, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where failure to pay such claims would result in immediate and irreparable harm to the Debtors and their respective estates.

37. I am familiar with the content and substance of the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief. The relief sought in each of the First Day Motions is necessary and appropriate given the circumstances of the Debtors' business. A description of the relief requested and the facts supporting the First Day Motions follows.

A. **Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion").**

38. As with many large chapter 11 cases that are jointly administered, the Debtors share numerous creditors and may not maintain lists of the names and addresses of their respective creditors on a debtor-by-debtor basis. Also, joint administration is preferable because many of the motions, applications, hearings and orders that will arise in the Chapter 11 Cases will affect all Debtors jointly. Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

B. **Debtors' Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Extension Motion").**

39. Pursuant to the Extension Motion, the Debtors seek entry of an order extending the time to file schedules of assets and liabilities and statements of financial affairs.

40. The Debtors seek this relief due to the size and complexity of the Debtors' business, the large number of known and potential creditors, and the numerous burdens imposed on the Debtors' management and professional advisors in the early days after the petition filings, it is necessary to seek a further extension for filing the schedules. The Debtors' management and advisors required more time to gather and analyze the Debtors' substantial volume of financial information.

41. By granting the relief sought by this motion, the Court will maximize efficiency in administering these Chapter 11 Cases and ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.

**C.**     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using Existing Centralized Cash Management System, (B) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (C) Maintain Existing Bank Accounts and Check Stock and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").**

42.     Through the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) continue using the Cash Management System (as defined below), (ii) honor, in the reasonable exercise of their business judgment, certain prepetition obligations related to the use of the Cash Management System, and (iii) maintain their existing Bank Accounts (as defined below) and check stock; (b) scheduling a final hearing; and (c) granting related relief.

43.     The Debtors' business requires the collection, transfer, and disbursement of funds through a number of bank accounts at various banks (collectively, the "<u>Bank Accounts</u>").  In the ordinary course of business and prior to the Petition Date, the Debtors maintained a centralized cash management system (the "<u>Cash Management System</u>").  Like other large and complex businesses, the Debtors designed the Cash Management System to efficiently collect, transfer, and disburse funds generated through the Debtors' day-to-day operations and to accurately record such collections, transfers, and disbursements as they are made.  A demonstrative chart of the Cash Management System and a list of the Debtors' Bank Accounts are attached to the Cash Management Motion.

**D.**     **Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Hereto (the "<u>Utilities Motion</u>").**

44.     Pursuant to the Utilities Motion, the Debtors seek entry of a interim and final orders (a) prohibiting utility providers from altering, refusing, or discontinuing services, (b)

determining adequate assurance of payment for future utility services, and (c) establishing procedures for determining adequate assurance of payment for future utility services.

45. In connection with the operation of their businesses, the Debtors obtain electricity, telecommunications and other similar services (collectively, the "Utility Services") from a number of utility providers or their broker (collectively, the "Utility Providers"). The relief requested in the Utilities Motion applies to all Utility Providers.

46. On average, the Debtors spend approximately $75,375.00 per month on the Utility Services. The Debtors propose depositing $ 37,500.00 into a segregated account as additional assurance of payment (the "Adequate Assurance Deposit") is an amount sufficient to cover one-half of the Debtors' average monthly cost based on the historical average payment.

47. Additionally, the Debtors seek approval of procedures to allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient. This ensures that all key stakeholder groups obtain notice of such request before it is honored.

48. Furthermore, the Debtors request that Utility Providers be prohibited from altering, refusing or discontinuing service to the Debtors on account of: (a) unpaid charges for prepetition services, (b) a pending Adequate Assurance Request, or (c) any objections filed in response to the Adequate Assurance Deposit. Utility Services should be preserved on an uninterrupted basis because it is essential to the Debtors' ongoing operations and an orderly liquidation. The Debtors' operations require that it maintain continuous production. Any disruption would result in a significant decline in the Debtors' revenues. This, in turn, jeopardizes the value of the Debtors' estates and impact creditor recoveries. Therefore, it is critical that Utility Services continue uninterrupted during these Chapter 11 Cases. Accordingly,

on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

E.  **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Providing Adequate Protection to the Secured Lender, (III) Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, AND 507; and (IV) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2 (the "<u>Cash Collateral Motion</u>").**

49. Pursuant to the Cash Collateral Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to use the Cash Collateral, (as defined in section 363 of the Bankruptcy Code), in which the MDC Secured Lenders have or assert a security interest in accordance with a budget and under the terms and conditions set forth in the Cash Collateral Motion.

50. The Debtors require the use of Cash Collateral in order to operate and I respectfully submit that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates and of its creditors and other parties in interest, because it will enable the Debtors to continue to operate their businesses and avoid the adverse consequences that would otherwise result while these chapter 11 cases are pending.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: November 8, 2019

                                          */s/ Mark Siffin*
                                          Name:  Mark Siffin
                                          Title:  Chief Executive Officer