## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| MTE HOLDINGS LLC, *et al.* | ) Case No. 19-12269 (KBO) |
| Debtors.[1] | ) |
| ———————————————————— | ) (Joint Administration Pending) |
| | ) |
| RIVERSTONE CREDIT MANAGEMENT, LLC, as | ) |
| Administrative and Collateral Agent, | ) |
| | ) |
| Plaintiff, | ) Adv. Pro. No. _____ (KBO) |
| | ) |
| v. | ) |
| | ) |
| MDC ENERGY LLC, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT FOR DECLARATORY RELIEF

Riverstone Credit Management, LLC ("***Riverstone***" or the "***Agent***"), as Administrative

and Collateral Agent[2] for the lenders (the "***Lenders***")[3] under the Credit Agreement, alleges,

based upon knowledge, information, and belief, as follows:

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: MTE Holdings LLC ("***MTE***") (7894); MTE Partners LLC ("***MTE Partners***") (1158); Olam Energy Resources I LLC "***Olam***") (0770); MDC Energy LLC ("***MDC***") (9140); MDC Texas Operator LLC (1087); Ward I, LLC (6817); and MDC Reeves Energy LLC (3644) (collectively, the "***Debtors***"). The Debtors' address is 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240.

[2]    Riverstone is administrative agent under that certain Term Loan Credit Agreement dated September 17, 2018 (the "***Credit Agreement'***) by and among MTE, the Agent, and the lenders party thereto, and the associated September 17, 2018 Collateral Agreement (the "***Collateral Agreement***," and together with the Credit Agreement, the "***Loan Documents***").

[3]    The Lenders are: CPPIB Credit Investments III Inc.; Centaurus Capital LP; New Jutland Partners, LP; Fenwood Road Capital Partners, LP; AG Energy Funding, LLC; Riverstone Credit Partners – Direct, L.P.; Riverstone Credit Partners II – Direct, L.P.; Riverstone Strategic Credit Partners A-1 AIV, L.P.; Melody Business Finance, LLC; The Värde Fund XII (Master), L.P.; Värde Investment Partners (Offshore) Master, L.P.; Värde Investment Partners, L.P.; The Värde Fund VI-A, L.P.; The Värde Skyway Master Fund, L.P.; and The Värde Private Debt Opportunities Fund (Onshore), L.P.

## NATURE OF THE ACTION

1.      This is an action for a declaratory order and judgment pursuant to Section 18-110 of the Delaware LLC Act, 6 *Del. C.* § 18-110, declaring and confirming that the Agent validly and effectively exercised contractual rights on behalf of the Lenders to establish controls and corporate governance protections at MDC.

2.      MTE borrowed in excess of $410 million in loans from the Lenders pursuant to the Credit Agreement.  To secure its obligations to the Lenders, MTE pledged its equity interest in MDC as collateral pursuant to the Collateral Agreement.  MTE has defaulted on its obligations under the Credit Agreement and, as a result of these defaults, the Agent exercised rights under the Loan Documents to vote MTE's equity interests in MDC (the "***Pledged Equity Vote***").  In that capacity, Riverstone, as Administrative Agent and Collateral Agent, executed a written consent on behalf of MTE and amended the MDC LLC Agreement to, among other things, (1) appoint a Chief Restructuring Officer at MDC, (2) appoint a five-member Board at MDC consisting of two independent directors, the current CEO of MTE, the Managing Director of MTE's minority shareholder—Olam, and the Chief Restructuring Officer, and (3) cause MTE to negotiate with an independent financial advisor regarding the provision of advisory services.  A true and correct copy of the Action by Written Consent (the "***Written Consent***") of the Administrative Agent (which includes the Amendment to the MDC LLC Agreement ("***MDC Amendment***")) is attached as Exhibit EE.

3.      The Agent's exercise of contractual rights followed (a) numerous events of default by MTE, including many defaults that were hidden from the Lenders for months, (b) evidence of mounting liabilities and mismanagement at MDC, and (c) months without any meaningful response by MTE to the Agent's and the Lenders' efforts at negotiation and forbearance.

4.      Despite the fact that the Agent's actions are permitted by the plain language of the Loan Documents and are intended to provide independent governance and guidance for MDC from skilled energy industry professionals, representatives of MDC and MTE refused to recognize the Agent's valid actions.  Representatives of MDC and MTE took the position that the Pledged Equity Vote was "void *ab initio*" and refused to permit MDC's new Chief Restructuring Officer to enter the premises at MDC.

5.      On October 22, 2019, MTE filed chapter 11 proceedings in the United States Bankruptcy Court for the District of Delaware.

6.      On October 25, 2019, the Agent filed its *Motion of Riverstone Credit Management, LLC for an Order Granting Relief from the Automatic Stay to Permit Riverstone to Obtain Judicial Validation and Enforcement of Its Vote of the Pledged Equity* [Docket No. 6][4] (the "***Lift Stay Motion***").

7.      On November 6, 2019, MTE filed its *Objection (I) to Motion of Riverstone Credit Management, LLC for an Order Granting Relief from the Automatic Stay to Permit Riverstone to Obtain Judicial Validation and Enforcement of Its Vote of the Pledged Equity and (II) Cross-Motion for Turnover of Property by a Custodian* [Docket No. 30] (the "***Objection***").  In the Objection, MTE did not factually contest that MTE has defaulted on numerous obligations under the Credit Agreement.

8.      On November 8, 2019, minutes after the Agent filed its *Reply of Riverstone Credit Management, LLC to the Debtor's Objection to the Motion for an Order Granting Relief from the Automatic Stay to Permit Riverstone to Obtain Judicial Validation and Enforcement of*

---

[4]      References to "Docket No." shall relate to the Debtors' main case, Case No. 19-12269 (KBO).  Any references to "Adv. Docket No." shall relate to this Declaratory Judgment Action.

*Its Vote of the Pledged Equity* [Docket No. 43] (the "**Reply**"), MDC filed chapter 11 proceedings in the United States Bankruptcy Court for the District of Delaware.

9.      MDC's bankruptcy filing was purportedly authorized by resolutions signed by MTE CEO Mark Siffin as Authorized Officer of MDC.  But, following the Pledged Equity Vote, only the newly constituted board of managers was authorized to take such an action. Accordingly, MDC's bankruptcy filing itself was *ultra vires* and in blatant disregard of the corporate governance changes effected through the Pledged Equity Vote.

10.     Due to the substantial uncertainty and continuing harm to both the Lenders and MDC caused by MDC's failure to recognize the controls and corporate governance protections established by the Agent, to the point of filing chapter 11 proceedings without valid corporate authority, judicial intervention is required in order to confirm and enforce the validity of the Pledged Equity Vote.  With this Complaint, the Agent has moved for expedited proceedings given the need urgent need for certainty as these chapter 11 proceedings move forward, the ongoing mismanagement of MDC by MTE and Mr. Siffin, and the likelihood of irreparable damage to MDC's ability to operate as a going concern if the controls and corporate governance changes implemented by the Pledged Equity Vote are not recognized.

## THE PARTIES

11.     Riverstone is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York, New York.  Riverstone is a subsidiary of Riverstone Holdings LLC.  During all times relevant to this action, Riverstone served as Agent for the Lenders who entered into the Credit Agreement with MTE.  Riverstone, as Agent for the Lenders, is empowered to take various actions on behalf of the Lenders, including receiving and distributing payments and enforcing the remedies under the Credit Agreement, the Collateral Agreement, and related documents.

01:25577810.1

12.     MDC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Indianapolis, Indiana.  MDC is an oil and gas exploration and production company that operates from Midland, Texas, in the Permian Basin.  MDC serves as the operating company for MTE.  Non-party MTE, in its capacity as the holding company, is the sole member and manager of MDC.  The membership interests of MTE are held by Non-party Olam and Non-party MTE Partners.  MTE relies on MDC to meet all of its financial obligations, including all obligations under the Credit Agreement.

## JURISDICTION AND VENUE

13.     Defendant is a debtor in the above-captioned jointly administered chapter 11 cases styled *In re MTE Holdings LLC*, Case No. 19-12269 (KBO) (Bankr. D. Del.) (the "*Cases*"), pending in the United States Bankruptcy Court for the District of Delaware (the "*Court*").

14.     This Court has jurisdiction over the Cases and this Complaint pursuant to 28 U.S.C. §§ 157(a) and 1334(a), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  Jurisdiction to grant declaratory relief exists pursuant to 28 U.S.C. §§ 2201 and 2202, 11 U.S.C. § 105, and Fed. R. Bankr. P. 7001(9).

15.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), and (O).

16.     Venue of the Cases and this adversary proceeding in this district is proper under 28 U.S.C. §§ 1408 and 1409.

17.     Pursuant to Fed. R. Bankr. P. 7008(a) and Local Rule 7008-1, Plaintiff consents to the Court's entry of a final judgment or order with respect to the adversary proceeding if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

**I.    The Term Loan Credit Agreement and the Collateral Agreement**

18.    On September 17, 2018, Riverstone, as Administrative Agent and Collateral Agent for the Lenders, the Lenders, and MTE, entered into the Credit Agreement.  A true and correct copy of the Credit Agreement is attached as Exhibit A.  On September 17, 2018, Riverstone, as Administrative Agent and Collateral Agent for Lenders, and MTE, entered into the Collateral Agreement.  Under the Collateral Agreement, MTE pledged 100% of its member interests in MDC as collateral securing its obligations under the Credit Agreement.  A true and correct copy of the Collateral Agreement is attached as Exhibit E.

19.    The financing available to MTE under the Credit Agreement included the right to draw down up to $240 million on the Closing Date (the "***Closing Date Loans***") and the aggregate amount of $235 million during a period of twelve months following the Closing Date (the "***Delayed-Draw Loans***").   *See* Ex. A §  2.1, Appendix A.

20.     As of the date of this Complaint, MTE has borrowed $410 million in outstanding principal under the Credit Agreement.

21.    Under the Credit Agreement, MTE must remain in compliance with certain key obligations that were carefully negotiated among MTE, the Lenders, and the Agent.  Among other obligations, MTE agreed to (1) maintain agreed ratios of (a) asset value to debt, and (b) debt to EBITDAX, (2) not incur any accounts payable that become more than 90 days past due, (3) avoid the incurrence of additional indebtedness in the form of mechanics liens, (4) keep current with financial reporting obligations, and (5) ensure that all representations to the Lenders are complete and true.  *See* Ex. A §§ 5.1, 6.1, 6.2, 6.7.

22.    Each of MTE's commitments was intended to assure the Lenders that MTE could actually repay amounts it owes them.  Timely and accurate financial reporting provides the

Lenders with critical information regarding the financial condition and status of MTE and enables the Lenders to track the promised and proper use of funds they advanced.

23.     MTE also agreed in the Credit Agreement that its wholly owned operating company, MDC, would comply with other loan agreements to which it is party, including a September 17, 2018 credit agreement with Natixis, as issuing bank and administrative agent, and BMO Harris Bank as lender (as amended, the "***RBL Credit Facility Agreement***").  *See* Ex. A § 8.1(b).  A true and correct copy of the RBL Credit Facility Agreement is attached as Exhibit B. MDC's compliance with the RBL Credit Facility Agreement was of critical importance to the Lenders because, under Section 9.04(c) of the RBL Credit Facility Agreement, if MDC was in default under such agreement, it could not distribute to MTE, its parent company, the cash necessary for MTE to make payments under the Credit Agreement.

24.     The Credit Agreement also identifies how MTE may use funds advanced by the Lenders.  The Lenders did not agree to advance funds to MTE for general corporate purposes, and the Credit Agreement is not a revolving or liquidity facility intended for such use.  Rather, the Lenders agreed to advance the Delayed-Draw Loans for the specific purpose of developing the assets specified within the Approved Plan of Development (the "***APOD***").  The APOD lists various oil and gas properties and specifically identifies how MDC may make capital expenditures to develop them.  The APOD is a carefully negotiated document that contours the Lenders' and MTE's development risk.  MTE agreed to spend the proceeds of the Delayed-Draw Loans solely in compliance with the APOD.  *See* Ex. A § 2.4.

25.     Sections 8.1 and 8.2 of the Credit Agreement identify certain specific breaches of the Credit Agreement that constitute "***Events of Default***" and entitle the Agent, on behalf of the Lenders, to cease further funding under the Credit Agreement, accelerate the debt, and enforce

any liens and security interests under the Collateral Agreement. Breaches of any of the obligations described in paragraphs 21 through 24 above constitute such an Events of Default.

## II.    MTE's Materially False Certification in the First Amendment

26.    Within months after execution of the Credit Agreement, MTE defaulted under Section 8.1(c) by breaching certain financial covenants and drilling wells not authorized by the APOD.

27.    As of September 30, 2018, MTE had failed to maintain a leverage ratio[5] of less than 4.75 to 1.00, and failed to maintain an interest coverage ratio[6] of greater than 2.00 to 1.00 as required by Credit Agreement Sections 6.7(a) and 6.7(b), respectively. These Credit Agreement covenants exist because excessive debts or the inability to fund interest expenses demonstrate the financial condition of a company and disclose its actual ability to make required payments to its creditors.

28.    Negotiations respecting a potential waiver of these breaches between MTE, the Agent, and its Lenders ensued. In the course of those discussions, the Agent and the Lenders discovered that MTE had drilled wells not authorized by the APOD.

29.    Following months of negotiation, MTE, the Lenders, and the Agent entered into the Limited Waiver and First Amendment to Term Loan Credit Agreement (the "*First Amendment*") dated February 22, 2019, in which MTE admitted (in Recital B) that it had failed to maintain the required leverage and interest coverage ratios required by the Credit Agreement. A true and correct copy of the First Amendment is attached hereto as Exhibit F.

---

[5]    Under the Credit Agreement, the leverage ratio is the ratio as of the last day of the Fiscal Quarter of (a) Consolidated Total Debt as of such date to (b) Consolidated Adjusted EBITDAX for the Fiscal Quarter period then ending, multiplied by four.

[6]    Under the Credit Agreement, the interest coverage ratio for the Fiscal Quarter ending September 30, 2018 is the ratio as of the last day of the Fiscal Quarter of the Consolidated Adjusted EBITDAX for such Fiscal Quarter multiplied by four to Consolidated Interest Expense for such Fiscal Quarter multiplied by four.

30.     MTE also admitted in Recital B of the First Amendment that it had begun making capital expenditures associated with the drilling of wells identified on Schedule I of the First Amendment that were not authorized by the then-effective APOD in violation of Section 5.13 and Section 6.20 of the Credit Agreement.

31.     MTE requested that the Lenders waive these specified defaults in exchange for MTE's agreement to pay all outstanding fees and certain additional expenses associated with the First Amendment and enter into a new APOD.  The Agent and the Lenders executed the First Amendment to provide a limited waiver of the aforementioned defaults and amended the Credit Agreement to assist MTE in avoiding a future default.[7]

32.     The First Amendment also put a new APOD in place, which remained effective for six months.  After this six-month period, MTE agreed (in Section 4 of the First Amendment) to submit a new APOD for approval by the Lenders in accordance with Credit Agreement Section 5.13.

33.     In connection with signing the First Amendment, the Agent and the Lenders discussed with MTE that MDC's drilling results up to that point had been disappointing, and that the Agent and the Lenders believed MDC's then-current pace of drilling was too fast and likely to result in mistakes.  The agreed new APOD reflected a negotiated understanding that MDC would change its drilling pace to move more deliberately and attempt to apply lessons learned during the fall drilling campaign that had violated the APOD.

34.     Unbeknownst to the Agent and the Lenders at the time of execution of the First Amendment, MTE already defaulted under of other provisions of the Credit Agreement.

---

[7]     Specifically, the Agent and the Lenders agreed to an amendment not to test the leverage ratio or the interest coverage ratio for MTE for the Fiscal Quarter ended December 31, 2018.

35.     To obtain the First Amendment, MTE—through Mr. Siffin—certified that, other than the specified defaults identified under the First Amendment, no default or Event of Default had occurred or was continuing.  *See* Ex. F § 3.1. This was a materially false certification. Contrary to MTE's representations in the First Amendment, MTE *was* in default as of February 22, 2019 because two mechanics liens—one by Wellbore Fishing and one by Wilbanks Trucking Services—in the total amount of $1,057,483.59 had already been filed against MDC and were outstanding.  True and correct copies of these mechanics liens are attached hereto as Exhibit G. The creation of mechanics liens violates Credit Agreement Section 6.2 and constituted an Event of Default under Section 8.1(c).

36.     In addition, an Event of Default had occurred as a result of MTE's subsidiary defaulting on its debt obligations.  MDC had permitted its current ratio[8] to be less than 1.00 to 1.00 as of the last day of the 2018 Fiscal Year in violation of RBL Credit Facility Agreement Section 9.01(b). This created an Event of Default under Credit Agreement Section 8.1(b).[9]

37.     Although MTE provided the Agent with an unaudited balance sheet in February 2019 purporting to show that MDC was in compliance with the RBL Credit Facility Agreement's current ratio requirement for the end of Fiscal Year 2018 (with total current assets of $102,343,144 and total current liabilities of $69,781,756 for a current ratio of 1.47),[10] the Agent and the Lenders would learn almost four months later that MDC was substantially out of compliance with this ratio requirement at the end of 2018.  In July 2019, MTE belatedly

---

[8]     Under the RBL Credit Facility Agreement, the current ratio is the ratio of (i) consolidated current assets (excluding non-Cash assets) of MDC and its subsidiaries to (ii) consolidated current liabilities (excluding non-Cash obligations) of MTE and its subsidiaries.

[9]     The mechanics liens filed against MDC also constituted a violation of Section 9.03 of the RBL Credit Facility Agreement and created a cross default under Section 8.1(b) of the Credit Agreement.

[10]    A true and correct copy of the internal financials that MTE delivered to the Agent on February 19, 2019 is attached as Exhibit H.

provided draft audited financial statements to the Agent and the Lenders showing that MDC's current assets for Fiscal Year 2018 were actually $145,265,527 and its current liabilities were in fact $184,025,219 resulting in a dramatically lower current ratio of 0.79.[11]  A second set of draft audited financial statements provided in October 2019 when the Agent exercised its inspection rights show that MDC's current ratio for Fiscal Year 2018 was even lower— just 0.68.[12]  A true and correct copy of a chart showing the calculation of the current ratio for Fiscal Year 2018 is attached as Exhibit K.

38.    MDC's noncompliance with the RBL Credit Facility Agreement's current ratio requirement as of December 31, 2018 demonstrated that its current liabilities far exceeded its current assets—an indicator of financial distress that would have been highly relevant to the Agent's and the Lenders' decision to enter the First Amendment in the face of MTE's immediate defaults.

39.    MTE was also in default under Credit Agreement Section 8.1(c) because MDC had incurred indebtedness in the form of accounts payable overdue in excess of 90 days, violating Credit Agreement Section 6.1.  At the time of the First Amendment, MDC's accounts payable in excess of 90 days past due totaled at least $4,868,117.[13]  The Agent did not discover this default until it exercised its inspection rights pursuant to Credit Agreement Section 5.7 in October 2019.

---

[11]    A true and correct copy of the draft financials that MTE delivered to the Agent on July 19, 2019 is attached as Exhibit I.

[12]    A true and correct copy of the second set of draft audited financial statements MTE delivered to the Agent in October 2019 when the Lenders exercised their inspection rights is attached as Exhibit J

[13]    A true and correct copy of a summary of the accounts payable over 90 days outstanding as of the date of the First Amendment and all subsequent Borrowing Notices that were still outstanding as of August 31, 2019 is available at Exhibit C.

40.     Despite these clear defaults, MTE certified in the First Amendment that, other than the specified defaults identified under the First Amendment, which did not include any of the foregoing, no default or Event of Default had occurred or was continuing.  This was a materially false certification.

### III.    MTE Submits Borrowing Notices With False Certifications From February 22, 2019 to April 18, 2019

41.     On February 22, 2019, MTE submitted a Borrowing Notice in the amount of $40 million.  Pursuant to Credit Agreement Sections 2.3 and 3.2(f), this Borrowing Notice represented and warranted that MTE was not then in default of any of its obligations.  A true and correct copy of this Borrowing Notice is attached as Exhibit L.

42.     MTE's certifications in the February 22, 2019 Borrowing Notice—again made by Mr. Siffin—were materially false.  As described above, MTE concealed from the Lenders that two mechanics liens in the total amount of $1,057,483.59 had been filed against MDC and were outstanding as of February 22, 2019, in violation of Credit Agreement Section 6.2, an Event of Default under Credit Agreement Section 8.1(c).  MTE also concealed from the Lenders that MDC was out of compliance with the RBL Credit Facility Agreement's current ratio requirements—creating a cross-default under Credit Agreement Section 8.1(b).  MTE likewise concealed from the Lenders that MDC had incurred additional indebtedness in the form of accounts payable over 90 days past due in the amount of at least $4,868,117 in violation of Credit Agreement Section 6.1, an Event of Default under Credit Agreement Section 8.1(c).  MTE's materially false statements both in the First Amendment and in the Borrowing Notice were additional defaults under Credit Agreement Section 8.1(d).

43.     On February 27, 2019, in reliance on MTE's representations in the Borrowing Notice, which they did not then know to be false, the Lenders fully funded MTE's request for an additional $40 million.

44.     Just three weeks later, on March 18, 2019, MTE submitted a second Borrowing Notice in the amount of $20 million.  Again, pursuant to Credit Agreement Sections 2.3 and 3.2(f), this Borrowing Notice represented and warranted that MTE was not then in default under any of its obligations.  A true and correct copy of this Borrowing Notice is attached as Exhibit M.

45.     This second Borrowing Notice was also materially false.  As of March 18, 2019, MTE was in default because *thirty-three* mechanics liens—one by Wellbore Fishing, one by Wilbanks Trucking Services, seventeen by Trans Tex Cementing Services LLC, and fourteen by Trans-Tex Dyno Services—all in the collective amount of $3,081,267.07—now existed against MDC's assets.  True and correct copies of these mechanics liens are attached as Exhibits G and N.  MTE's false certification concealed the existence of these thirty-three mechanics liens.  In addition, as of this Borrowing Notice date, MDC defaulted under the RBL Credit Facility Agreement by failing to maintain a current ratio not less than 1.00 to 1.00.  As noted above, although not then disclosed to the Lenders, as of December 31, 2018, MDC's current ratio was 0.68.  MTE was also in default because MDC had additional indebtedness in accounts payable over 90 days past due in the amount of at least $7,447,727 as of March 18, 2019, which the Agent did not discover until the Agent exercised its inspection rights pursuant to Credit Agreement Section 5.7 in October 2019.  *See* Exhibit C.  MTE was also in default because of its materially false statements in the March 18, 2019 Borrowing Notice itself, as well as the false certifications made in the February 22, 2019 Borrowing Notice and the First Amendment.

46.    On March 28, 2019, the Lenders, in reliance on MTE's representations in the second Borrowing Notice, which they did not then know to be false, fully funded MTE's request for $20 million.

47.    Two weeks later, on April 1, 2019, MTE submitted a third Borrowing Notice in the amount of $60 million. A true and correct copy of the April 1, 2019 Borrowing Notice is attached at Exhibit O.  By this point, certain of the Lenders were becoming concerned that MTE was seeking to withdraw more than half of the $235 million in Delayed-Draw Loans, less than two months following execution of the First Amendment in February.  The frantic spending pace was hard to reconcile with MTE's agreement in the First Amendment's APOD that should have *slowed* the pace of spending.  In light of these concerns, the Lenders insisted that MTE agree to include an additional certification in this third Borrowing Notice, specifically that "[a]fter giving effect to the Loans … [MTE] will be in compliance in all material respects with all operating and financial covenants set forth in the Credit Agreement on the date hereof and as of the last day of each Fiscal Quarter ending prior to the Maturity Date."   Ex. O ¶ 6.  That certification was a requirement of the Borrowing Notice for Delayed-Draw Loans.

48.    Accordingly, the April 1, 2019 Borrowing Notice represented and warranted that MTE was not then in default, and that MTE, after receiving the requested loans, would not be in default in future fiscal quarters.  These representations were false.  As of April 1, 2019, MTE was in default (1) because the thirty-three mechanics liens described above remained outstanding against MDC's assets (*see* Exhibits G and N), (2) because MDC had permitted its current ratio to fall to 0.68 in violation of the RBL Credit Facility Agreement, (3) because MDC had accounts payable over 90 days past due in the amount of at least $9,170,162 as of April 1, 2019 (*see* Exhibit C), and (4) because of the materially false certifications it had made to the Lenders, in

the First Amendment and the prior Borrowing Notices, described above.  Moreover, as the Agent and the Lenders would later learn when they received the MTE's unaudited internal financial statements for the quarters ended March 31, 2019 and June 30, 2019, MDC had breached and would continue to breach the RBL Credit Facility Agreement by permitting its current ratio to remain below 1.00 to 1.00 for these quarters.  As of March 31, 2019, MDC's current ratio was 0.91, while it plummeted to 0.64 by June 30, 2019.  *See* Exhibit K.  MTE would also fail to maintain an asset coverage ratio of at least 1.00 to 1.00 for the quarter ended June 30, 2019, which, as explained below, constitutes another Event of Default under the Credit Agreement.

49.     On April 11, 2019, in reliance on MTE's representations in the third Borrowing Notice, which they did not then know to be false, the Lenders fully funded MTE's request for $60 million.

50.     On April 18, 2019, MTE submitted a fourth Borrowing Notice.  A true and correct copy of this Borrowing Notice is attached as Exhibit P.  The April 18, 2019 Borrowing Notice contemplated a $65 million draw, the remainder of the credit facility.[14]  Thus, just eight weeks after the First Amendment, MTE had submitted four Borrowing Notices for an aggregate amount of money that was intended to last MTE for approximately seven months.

51.     In light of the Lenders' discomfort with MTE's April 1, 2019, Borrowing Notice, the Agent believed that MTE's rapid pace of spending, combined with the poor production

---

[14]     As noted above, the Delayed-Draw Loan facility was for an aggregate amount of $235 million, available until September 17, 2019 (the one year anniversary of the Credit Agreement closing date). MTE issued the following Borrowing Notices for Delayed-Draw Loans:

(a)  October 16, 2018: $50 million

(b)  February 22, 2019: $40 million

(c)  March 18, 2019: $20 million

(d)  April 1, 2019: $60 million

(e)  April 18, 2019: $65 million.

results discovered in the process of negotiating the First Amendment and the unknown and uncertain results of MDC's then-current drilling activity, would raise questions among the Lenders.

52.     Upon receipt of the April 18, 2019 Borrowing Notice, the Agent communicated its concern to MTE.  Ultimately, MTE informed the Agent that it would not proceed on its April 18, 2019 Borrowing Notice.

53.     Under any circumstances, MTE was not entitled to draw any funds pursuant to the April 18, 2019 Borrowing Notice because it was then in default (1) due to the thirty-three outstanding mechanics liens described above, (2) because MDC had permitted its current ratio to fall to 0.68 as of December 31, 2018, in violation of the RBL Credit Facility Agreement, (3) because MDC had accounts payable over 90 days past due in the amount of at least $10,544,884 as of April 18, 2019 (*see* Exhibit C), and (4) because of the materially false certifications MTE had made to the Lenders in conjunction with the First Amendment and the subsequent three Borrowing Notices, as described above.

### IV.     MTE's Additional Events of Default

54.     Since April 2019, MTE's defaults have multiplied.  In addition to defaults (1), (2), (3), and (4) described immediately above, MTE also (5) failed to comply with critical financial and performance covenants, (6) failed to provide notices of default to the Agent and the Lenders, (7) failed to deliver audited financial statements and compliance certificates, (8) continued to fund MDC's operations without an effective APOD in place, (9) allowed MDC to incur additional indebtedness, and (10) failed to pay a $150,000 administrative agent fee, all described in more detail below.  In sum, MTE's numerous breaches under the Credit Agreement demonstrate a pattern of disregard for contractual obligations, a willingness to make false

01:25577810.1

statements, and mismanagement that causes the Lenders grave concerns about the value of their collateral, MDC's future, creditworthiness, and willingness to comply with its promises.

### A. Failure to Provide Complete and Accurate Information to the Agent and the Lenders

55.     As described above, MTE made false certifications in the First Amendment regarding its compliance with the Credit Agreement and drew down $120 million between February and April 2019 based on materially false borrowing notices.  MTE has also failed to provide notice to the Lenders of its numerous other defaults as required by Credit Agreement Section 5.2(a), constituting an Event of Default under Credit Agreement Section 8.1(c).

56.     MTE failed to deliver notices of MDC's defaults under the RBL Credit Facility Agreement, as required by Credit Agreement Section 5.1(o).  As described above, MDC was in violation of the RBL Credit Facility Agreement as of December 31, 2018 for failure to comply with the Agreement's current ratio requirements.  Furthermore, on information and belief, Natixis, administrative agent of MDC's RBL Credit Facility Agreement, sent a Reservation of Rights Letter to MDC on May 14, 2019 to inform MDC that it was in default.  MTE's failure to deliver the May 14, 2019 Natixis letter, or any notice of any other defaults by MDC under the RBL Credit Facility Agreement, to the Lenders constitutes an Event of Default under Credit Agreement Section 8.1(c).  A notice of any default under the RBL Credit Facility Agreement is critically important to the Lenders because such defaults prevent MDC from providing cash to MTE to fund payments under the Credit Agreement.

57.     As of April 30, 2019, MTE was also in default under Credit Agreement Section 8.1(c) because MTE failed to deliver audited financial statements with respect to the Fiscal Year 2018 without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit within 120 days of the Fiscal Year end (December 31,

2018) pursuant to Credit Agreement Section 5.1(c).  Audited financial statements provide the Lenders an independent verification with respect to the financial health of MTE and its affiliates. To date, MTE has not provided the Lenders with any audited financial statements for the Fiscal Year 2018.

58.    Moreover, as described above, the draft audited financial statements provided to the Lenders on July 19, 2019 and October 15, 2019 raise additional concerns because they are substantially and materially different than the unaudited balance sheet MTE provided to the Lenders on February 19, 2019, suggesting that MTE may have intentionally provided false information to the Lenders before executing the First Amendment on February 22, 2019.  *See* Exs. H, I, and J.

59.    As of May 15, 2019, MTE was in default under Credit Agreement Section 8.1(c) because of MTE's failure to deliver an executed and completed Compliance Certificate for the Fiscal Quarter ended March 31, 2019, as required by Credit Agreement Section 5.1(e).  In the Compliance Certificate, MTE is required to certify that no Event of Default has occurred or is continuing, and attach detailed calculations demonstrating that MTE's leverage ratio, interest coverage ratio, and total asset coverage ratio are in compliance with requirements.  On August 14, 2019, MTE again failed to deliver an executed and completed Compliance Certificate for the Fiscal Quarter ended June 30, 2019 within forty-five days of the end of the Fiscal Quarter.

60.    MTE is also in default under Credit Agreement Section 8.1(c) because MTE has never delivered Financial Officer Certifications with its monthly financial statements.  "*See, e.g.*, Exhibit AA."  Under Credit Agreement Section 5.1(a), within thirty days after the end of each calendar month, MTE is required to deliver its consolidated balance sheet, consolidated statements of income, stockholders' equity, and cash flows for such month and for the period

from the beginning of the then-current Fiscal Year to the end of such month.  Along with these financial statements, Section 5.1(a) requires MTE to deliver a Financial Officer Certification that such financial statements fairly present, in all material respects, the financial condition of MTE and the results of MTE's operations and cash flows, in each case in conformity with GAAP applied on a consistent basis.

61.    For the month ended February 28, 2019, MTE failed to deliver any financial reports as required by Credit Agreement Section 5.1(a).

62.    MTE's failure to deliver audited financial statements and required certifications for unaudited financial information—coupled with its disregard of its other obligations under the Credit Agreement—causes substantial concern about the fiscal management of MTE and what other defaults MTE might be concealing.

### B.  Mechanics Liens

63.    As noted above, the creation of mechanics liens violates Credit Agreement Section 6.2, constituting an Event of Default under Section 8.1(c).  In addition to the thirty-three mechanics liens described above (*see* Exs. G and N), additional mechanics liens in the total amount of $1,741,182.84 were filed on April 22, 2019, and April 24, 2019.  On April 22, 2019, Creek Pipe Co LLC filed a mechanics lien against MDC's assets in the amount of $95,256.65.  On April 24, 2019, C&J Energy Services filed a mechanics lien against MDC's assets in the amount of $1,645,926.19.  True and correct copies of these mechanics liens are attached as Exhibit Q.  When the Agent exercised its right to inspect MTE's books and records pursuant to Credit Agreement Section 5.7 in October 2019, the Agent discovered the existence of more than $50 million in mechanics liens attached to MDC's assets.  These mechanics liens were outstanding at least as of September 6, 2019.  *See* Exhibits D and R.

64.     The creation of these mechanics liens also constitutes a default under RBL Credit Facility Agreement Section 9.03.  This in turn creates Events of Default under Credit Agreement Section 8.1(b), which provides that it is an Event of Default for MTE and any of its subsidiaries, such as MDC, to default on another loan.

### C. Failure to Meet Ratios in Accordance with Credit Agreement and RBL Credit Facility Agreement

65.     As described above, MTE was in default as of December 31, 2018, under Credit Agreement Section 8.1(b) based on MDC's default under RBL Credit Facility Agreement Section 9.01(b), which requires MDC to maintain a current ratio of not less than 1.00 to 1.00 as of the last day of any Fiscal Quarter.  MDC's current ratio was reported as 0.68 as of December 31, 2018 and 0.91 as of March 31, 2019.  *See* Ex. K.

66.     The Agent did not discover these ratio defaults until July 19, 2019, when—after repeated requests—the Agent received MTE's draft audited financial statements for the year ended December 31, 2018 (*see* Ex. I) and internal quarterly financial statements for the quarter ended March 31, 2019.  A true and correct copy of these internal quarterly financial statements are available at Exhibit S.  This was the first quarterly or annual financial information that MTE provided to the Agent and the Lenders since the First Amendment was executed on February 22, 2019.  MTE then provided another set of draft audited financial statements for Fiscal Year 2018 (*see* Ex. J) and quarterly financial statements for the quarter ended March 31, 2019 on October 15, 2019, which continued to show these ratio defaults.  A true and correct copy of these quarterly financial statements are available at Exhibit T.  The internal financial statements for the Fiscal Quarter ended December 31, 2018, which MTE delivered to the Agent on February 19, 2019 and upon which the Lenders reasonably relied when executing the First Amendment, showed that MDC was in compliance with all of its financial covenants.  *See* Ex. H.

67.     These issues continued into the Second Quarter of 2019.  MDC's current ratio was 0.64 as of June 30, 2019.  The Agent did not discover this default until August 16, 2019, when the Agent received MTE's internal quarterly financial statements for the second quarter.[15]

68.     MTE had also failed to maintain a Total Asset Coverage Ratio of not less than 1.00 to 1.00 for the Fiscal Quarter ending as of June 30, 2019, as required by Credit Agreement Section 6.7(c).[16]  On August 16, 2019, MTE provided the Lenders with an unsigned, uncertified, compliance certificate suggesting that MTE was in compliance with the Total Asset Coverage Ratio for the quarter ended June 30, 2019, showing a ratio of 1.07.  A true and correct copy of the unexecuted compliance certificate is available at Exhibit X.  However, when the Agent and the Lenders closely reviewed the certificate, they determined that MTE had miscalculated the Total Asset Coverage Ratio, and that it was actually 0.97—out of compliance with Credit Agreement Section 6.7(c) and constituting an Event of Default under Section 8.1(c).  A true and correct summary of this calculation is available at Exhibit W.

**D.  Operation Without an Effective APOD**

69.     The APOD agreed to under the First Amendment was only effective until August 22, 2019.  Under the Credit Agreement Section 5.13 and Section 4 of the First Amendment, MTE was required to submit a new APOD acceptable to the Lenders upon the lapse of the First Amendment APOD.  MTE has failed to do so.

70.     Having an APOD in place is required because the APOD governs how MTE is permitted to use the money it takes from the Lenders.

---

[15]     A true and correct copy of the internal quarterly financial statements for the Fiscal Quarter ended June 30, 2019 are available at Exhibit U. A true and correct copy of the quarterly financial statements for the Fiscal Quarter ended June 30, 2019 delivered to the Agent in October 2019 are available at Exhibit V.

[16]     Under the Credit Agreement, the total asset coverage ratio is the ratio as of the last day of the Fiscal Quarter of (a) Total Asset Value as of such date to (b) the Consolidated Total Debt as of such date.

71.    MTE never sent a proposed new APOD to the Lenders.  By email dated August 12, 2019, MTE sent a proposed development schedule to the Agent imbedded in a financial forecast.  MTE did not characterize the schedule as a proposed APOD and the Agent did not consider it to be a proposed APOD.  In any event, execution of this development schedule would have resulted in numerous defaults under the Credit Agreement, and therefore it could not form the basis of a new APOD.

72.    After review of the development schedule, the Agent informed MTE of these facts; specifically that execution of this plan would result in numerous defaults under the Credit Agreement's financial covenants, including failure to meet the Credit Agreement's total asset coverage ratio requirement and (depending on commodity prices) the likely failure to meet the leverage ratio requirement.  The Agent informed MTE that a broader agreement between MTE and the Lenders providing for a waiver of past and future defaults would be required before an APOD could be approved based on the development schedule provided.

73.    Without an approved APOD in place, MTE was prohibited under Credit Agreement Section 6.20 from making capital expenditures.

74.    Nevertheless, since August 23, 2019, in breach of the Credit Agreement, MTE continued to fund MDC's drilling and to make capital expenditures.  MTE's continued capital expenditures violate Credit Agreement Section 6.20, constituting a default under Section 8.1(c).

### E. Incurrence of Additional Indebtedness and Failure to Pay Administrative Agent Fee

75.    MTE has continued to default under Credit Agreement Section 8.1(c) by allowing MDC to maintain accounts payable overdue in excess of 90 days violating Credit Agreement Section 6.1.  In MTE's letter to the Agent dated September 10, 2019, MTE admitted that MDC's aged accounts payable balance over 90 days past due for the Fiscal Quarter ended June 30, 2019

was substantial.  By approximately August 31, 2019, this balance had grown to more than $100 million, which the Agent did not discover until it exercised its right to inspect MTE's books and records under Credit Agreement Section 5.7 in October 2019.  *See* Exhibits BB and CC.

76.    On September 20, 2019, MTE failed to pay the Agent the Administrative Agent Fee of $150,000 on the anniversary of the Closing Date as required by Credit Agreement Section 2.6(d), constituting a default under Section 8.1(a).

**V.    The Agent and the Lenders Attempt to Negotiate with MTE and Learn of Additional Defaults and Mismanagement**

77.    Following MTE's withdrawal of the April 18, 2019 Borrowing Notice, the Agent began to receive calls from Natixis—the Administrative Agent under the RBL Credit Facility Agreement—and others notifying the Agent that mechanics liens had been filed against MDC and its subsidiaries.  Following these calls, the Agent discovered that, as discussed above, numerous mechanics liens had been filed against MDC and its subsidiaries going back as far as February 2019, and were in place even before February 22, 2019, the date of the First Amendment.

78.    In July 2019, MTE finally provided its unaudited Fiscal Year 2018 financial statements to the Agent and the Lenders, along with internal financial statements for Q1 2019. *See* Exs. I and S.  These financial statements demonstrated that, as discussed above, as of December 31, 2018 and continuing at least through the Second Quarter of 2019, MDC was substantially out of compliance with financial covenants in the RBL Credit Facility Agreement, and therefore MTE was in default under the Credit Agreement.

79.    In addition to growing concerns about MTE's ability to abide by the terms of the Credit Agreement, the Agent and the Lenders were also concerned about substantial liquidity and operational issues at MDC, specifically that MDC was overspending its means and

underperforming expectations in terms of production and cash flow. When the Credit Agreement closed, MTE and MDC had $286 million of liquidity between capacity under the RBL Credit Facility Agreement and undrawn term loans. Between October 2018 and June 2019, MDC's capital expenditures exceeded this available liquidity and cash flows by approximately $66 million.

80.  MDC's production and cash flows had also fallen dramatically below expectations. The financial model MTE used in negotiation of the Credit Agreement projected approximately 3.2 million barrels of cumulative crude oil production between October 2018 and June 2019. MDC's actual crude oil production during that time period fell to almost half of the projection—approximately 1.7 million barrels. Similarly, as of August 2018, MDC's projected EBITDAX less interest expense for the period from October 2018 to June 2019 was approximately $145 million, while actual EBITDAX less interest expense during this period was a fraction of this amount—approximately $31 million. Simply put, MDC overspent its means by 23% in order to produce results that were roughly 79% below expectations. While crude oil prices were approximately 13% lower than expected during this period, MDC's underperformance is primarily due to underperformance of the wells that were drilled. *See* Exhibit DD.

81.  Based on MTE's mounting defaults under the Credit Agreement, and feared substantial mismanagement of MDC, the Lenders determined that in order for them to waive the substantial number of outstanding defaults, MTE and MDC would need to take significant corporate actions to increase transparency and compliance with the loans. To that end, on August 26, 2019, the Lenders presented to MTE a proposal under which they would temporarily waive MTE's defaults and potentially fund the remaining $65 million in Delayed-Draw

Loans. This proposal was conditioned on a requirement that MTE engage interim financial advisory help for managing issues such as cash flows and vendor payments, and on MTE entering into one of several proposed transactions with arms-length third parties that would raise capital or otherwise decrease leverage at MTE.

82.     By letter dated September 10, 2019, MTE provided a counter-proposal that was inadequate for a number of reasons, including but not limited to, MTE's unwillingness to retain interim financial help as required by the Lenders.  A true and correct copy of this letter is attached as Exhibit FF.

83.     On September 13, 2019, the Agent sent MTE a letter reserving rights and notifying MTE of its specific defaults on behalf of the Lenders.  A true and correct copy of this Notice is attached as Exhibit Y.

84.     In a further effort to work cooperatively with MTE, the Agent, on behalf of the Lenders, sent MTE drafts of a Limited Forbearance Agreement on September 20 and September 28, 2019.  True and correct copies of these drafts are attached as Exhibits GG and HH, respectively.

85.     MTE did not meaningfully respond to these drafts, but instead sent a letter from litigation counsel, asserting – without any factual basis – that MTE was not in default under the Credit Agreement.

86.     Efforts to negotiate a mutually agreeable forbearance, while a gesture of good faith, do not in any way limit the Agent's ability to exercise its rights under the Credit Agreement, which are expressly preserved during any delay pursuant to Credit Agreement Section 10.9.

87.     MTE failed to make the interest payment of $12,575,761.47 that was due and owing on September 30, 2019.  Accordingly, on October 4, 2019 the Agent debited this amount from an escrow account funded by MTE for this purpose (the "***Capital Reserve Account***").  *See* Ex. A §§ 2.11(a); 7.1(b).  Under Credit Agreement Section 7.1(b), MTE was required to replenish the amount debited from the Capital Reserve Account on or before November 4, 2019.  MTE never deposited any additional funds in this account.

88.     On October 7, 2019, the Agent sent MTE a Notice of Default outlining each of the defaults described herein.  A true and correct copy of this Notice is attached as Exhibit Z.

89.     Evermore concerned about the financial health of MTE, the Agent exercised its right to inspect MTE's books and records pursuant to Credit Agreement Section 5.7.  MTE did not comply with the  inspection notice, permitting the Agent's advisor access to MDC's offices for only a single introductory meeting (and denying the Agent's advisor access after that date), and providing only a limited subset of the information requested by the Agent.  The limited information MTE did provide showed that MDC had accumulated significant accounts payable more than 90 days overdue on or around August 31, 2019, and that MDC had aged payables in violation of the Credit Agreement when MTE executed the First Amendment and submitted all 2019 Borrowing Notices as described above.  *See* Exs. C and BB.

**VI.     Because of MTE's Events of Default, the Agent Exercised Rights Under the Collateral Agreement**

90.     Pursuant to Credit Agreement Section 8.2, upon the occurrence of any Event of Default and upon notice to MTE, the Agent has the right to enforce any and all security interests created by the Collateral Agreement.

91.     Similarly, under Section 6.01(b) of the Collateral Agreement, if an Event of Default has occurred and is continuing, the Agent may exercise "all voting, corporate, membership, partnership and other rights pertaining to" MTE's membership interests in MDC.

92.     Because of the occurrence of the Events of Default under Credit Agreement Section 8.1 set forth in detail above, the Agent had the right to exercise the rights under the pledged equity interests in MDC, including the right to amend MDC's limited liability company agreement to form a board with independent directors and establish other corporate governance protections at MDC.

93.     Accordingly, on October 21, 2019, the Agent voted MTE's membership interests in MDC by executing the Written Consent and the MDC Amendment.  The Written Consent and the MDC Amendment (1) appointed John Echols of Opportune LLP as Chief Restructuring Officer; (2) created a five-member board at MDC, consisting of Dan Gillett and Steve Pully (both independent directors), Mark Siffin, Etienne Locoh, and Mr. Echols; (3) authorized Mr. Echols, as Chief Restructuring Officer, to obtain directors and officers insurance and to negotiate compensation arrangement with the directors; (4) authorized MDC to engage in negotiations with Evercore, an independent financial advisor; and (5) authorized MDC to negotiate amendments to the RBL Credit Facility Agreement.

94.     Notably, in its November 6, 2019 Objection, MTE did not factually contest that MTE committed numerous Events of Default under the Credit Agreement.

95.     The Agent's exercise of rights under Credit Agreement Section 8.2 and Collateral Agreement Section 6.01(b) followed months of negotiation attempting a more consensual resolution.  All this time, MDC was drilling without an approved APOD, had run up its accounts payable balance significantly as of August 31, 2019, had depleted its Capital Reserve Account,

and had remained substantially out of compliance with key financial covenants in the Credit Agreement and RBL Credit Facility Agreement.

96.     Because of MTE's refusal to provide timely and accurate financial information and certifications, the Lenders had (and continue to have) extremely limited levels of visibility into what other defaults have occurred and may be occurring at MDC, against the backdrop of MDC's management running MDC into the ground.  The Lenders determined that without additional controls in place to ensure that MDC was being managed properly, MTE would be unable to satisfy its commitments to its creditors and other stakeholders, and would be unable to operate MDC to preserve the Lenders' collateral.

97.     The Lenders' goal in exercising the Pledged Equity Vote was to preserve value at MDC and MTE, and ensure that key decisions would be made by and reviewed by qualified independent professionals.  The Agent and the Lenders did not seek to assert control over MDC's operations.  Accordingly, none of the members of the five-member Board is affiliated with the Agent or the Lenders.  Mr. Siffin, MTE's longtime CEO, holds a seat on the Board, along with Mr. Locoh, a managing director of Olam.  Mr. Echols, who is associated with Opportune LLP, a well-respected financial consultant specializing in the energy industry, and Messrs. Gillett and Pully—both independent directors who have decades of experience in the energy industry and have extensive experience in corporate governance—also sit on the Board. Mr. Gillet has served on multiple boards of directors of public and private companies, including in the roles as Chairman, Co-Chairman, and Audit Committee member.  Mr. Pully has served on twenty-three boards of directors, including nine public oil and gas companies, three private oil and gas companies, and one private oil service manufacturing company.

98.     On October 21, 2019, following the Lenders' Pledged Equity Vote, Mr. Echols, in his role as Chief Restructuring Officer, attempted to enter MDC's premises in Midland, Texas, to begin performing his duties as Chief Restructuring Officer.  Mr. Echols was denied access. MDC and MTE, accordingly, refused to recognize the actions taken by the Agent as required under the Credit Agreement and the Collateral Agreement.

99.     MDC has also continued to refuse access to the Agent's financial advisor, even though the Agent seeks access to MDC's offices in order to inspect MDC's books and records as required by Credit Agreement Section 5.7 and the Agent's inspection notice.

100.    By letter dated October 22, 2019, MTE took the position that the Agent's exercise of its voting rights of the pledged equity in MDC was "impermissible, ineffective, and void *ab initio*."

101.    Finally, on November 8, 2019, MDC filed chapter 11 proceedings purportedly authorized by resolutions signed by Mr. Siffin as Authorized Officer of MDC.  Because these chapter 11 proceedings were not authorized by MDC's board of managers, they were commenced *ultra vires* and in blatant disregard of the corporate governance changes effected through the Pledged Equity Vote.

102.    Accordingly, the Agent, on behalf of the Lenders, has no choice but to seek relief from this Court in the form of judgment on an expedited basis that the Agent's actions, on behalf of the Lenders, were valid and effective.

## CLAIM FOR DECLARATORY RELIEF

103.    The Agent repeats and re-alleges paragraphs 1 – 102, *supra*, as if fully set forth herein.

01:25577810.1

104.    An actual controversy has arisen and exists between MDC and the Agent regarding the validity and effectiveness of the Agent's Pledged Equity Vote pursuant to Section 18-110 of the Delaware LLC Act (6 Del. C. § 18-110).

105.    There exists a substantial controversy between MDC and the Agent of sufficient immediacy and reality to warrant the issuance of a declaratory judgment under 28 U.S.C. § 2201. A prompt judicial determination of the respective rights and duties of the parties in these respects is necessary and appropriate.

106.    Pursuant to Section 18-110 of the Delaware LLC Act (6 Del. C. § 18-110), the Court may hear and determine contested matters relating to the votes by the members of an LLC and the validity of an appointment of a manger.

107.    Under Section 6.01(b) and Section 7.01 of the Collateral Agreement, the Agent has the power to vote MTE's membership interests in MDC.

108.    On October 21, 2019, Riverstone, as Agent, voted MTE's membership interests in MDC by executing the Written Consent that provided, among other things, for:

(a)    Retention of John Echols as Chief Restructuring Officer of MDC and the engagement of Opportune LLP to assist the Chief Restructuring Officer in carrying out his duties at MDC;

(b)    Amendment of the MDC Energy LLC Agreement to create a Board to manage and control the administration, affairs and operations of MDC and to provide the provisions that govern that Board's operation;

(c)    Appointment of two independent directors, Steve Pully and Dan Gillette, John Echols as Chief Restructuring Officer, and Mark Siffin and Etienne Locoh to that Board;

(d)     Authorization of John Echols, as Chief Restructuring Officer, to obtain directors and officers insurance and to negotiate compensation arrangements with the directors;

(e)     Authorization of MDC to negotiate with Evercore to provide financial advisory services to MDC; and

(f)     Authorization of MDC to negotiate amendments to the RBL Credit Facility Agreement.

109.     As described herein, MDC and its representatives have disputed the validity and effectiveness of the Written Consent and the MDC Amendment as demonstrated by, among other things, refusing Mr. Echols access to the MDC premises and preventing him from commencing his duties as Chief Restructuring Officer and filing a chapter 11 petition in this Court.

110.     Riverstone requests that the Court enter a declaratory order and judgment declaring and confirming that those actions taken pursuant to the Pledged Equity Vote were valid and effective actions, including that:

(a)     Pursuant to the Collateral Agreement, Riverstone, as Agent, has the power to vote MTE's membership interests in MDC;

(b)     The Written Consent was properly adopted and is effective;

(c)     The MDC Amendment was properly adopted and is effective;

(d)     Steve Pully, Dan Gillette, John Echols, Mark Siffin and Etienne Locoh were validly and effectively appointed to the Board of MDC and that Board has the full power and authority to manage and control the administration, affairs and operations of MDC pursuant to the provisions of the MDC Energy LLC Agreement (as amended) and the Delaware LLC Act;

(e)     MDC did not have authority to file the chapter 11 petition; and

01:25577810.1

(f)     The Board has ultimate authority to determine whether to withdraw the chapter 11 petition.

111.    Each day that MDC representatives refuse to recognize the effectiveness of the Written Consent, the MDC Amendment, and the critical corporate governance changes implemented therein will result in significant value destruction at MDC.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Riverstone respectfully requests that the Court:

    (a) Enter judgment in favor of Riverstone, on the Lenders' behalf, against Defendant;

    (b) Issue a declaration stating that:

        i.   Pursuant to the Collateral Agreement, Riverstone, as Agent, has the power to vote MTE's membership rights in MDC;

        ii.  The Written Consent was validly adopted and is effective;

        iii. The MDC Amendment was validly adopted and is effective;

        iv.  Steve Pully, Dan Gillette, John Echols, Mark Siffin and Etienne Locoh were validly and effectively appointed to the Board of MDC and that Board has the full power and authority to manage and control the administration, affairs and operations of MDC pursuant to the provisions of the MDC Energy LLC Agreement (as amended) and the Delaware LLC Act;

        v.   MDC did not have authority to file the chapter 11 petition; and

        vi.  The Board has ultimate authority to determine whether to withdraw the chapter 11 petition.

(c) Grant an Order awarding Riverstone its costs and attorneys' fees incurred in

bringing this action; and

(d) Grant Riverstone, on the Lenders' behalf, such other and further relief as the

Court deems just and proper.

Dated:  November 12, 2019

YOUNG CONAWAY STARGATT
 & TAYLOR LLP

OF COUNSEL:                                      /s/  Edmon L. Morton
                                                Edmon L. Morton (No. 3856)
Clifford L. Thau                                Rolin P. Bissell (No. 4478)
Marisa Antos-Fallon                             James M. Yoch, Jr. (No. 5251)
W. Logan Lewis                                  Alberto E. Chávez (No. 6395)
VINSON & ELKINS LLP                             Rodney Square
666 Fifth Avenue, 26th Floor                    1000 North King Street
New York, New York 10103-0040                   Wilmington, Delaware 19801
(212) 237-0000                                  (302) 571-6600

                                                *Attorneys   for   Plaintiff   Riverstone   Credit
                                                Management LLC*