## **EXHIBIT A**

*Execution Version*

**Term Loan Credit Agreement**

**dated as of**
**September 17, 2018**

**among**

**MTE Holdings LLC**,
**as Company**,

**Riverstone Credit Management LLC**,
**as Administrative Agent**,

**and**

**The Lenders Party Hereto**

# TABLE OF CONTENTS

SECTION 1 DEFINITIONS AND INTERPRETATION ........................................................... 1

   1.1   **Terms Defined Above** ........................................................................... 1

   1.2   **Definitions** ............................................................................................ 1

   1.3   **Accounting Terms** ............................................................................. 32

   1.4   **Interpretation, etc**. .............................................................................. 32

   1.5   **Business Day Adjustment, etc**. ........................................................... 33

SECTION 2 THE CREDITS ....................................................................................................... 33

   2.1   **Commitments** .................................................................................... 33

   2.2   **The Loans** ......................................................................................... 33

   2.3   **Request for Borrowing** ..................................................................... 34

   2.4   **Use of Proceeds** ............................................................................... 34

   2.5   **Notes** ................................................................................................. 34

   2.6   **Interest; Administrative Agent Fee** ................................................. 35

   2.7   **Repayment of Loans** ........................................................................ 36

   2.8   **Voluntary Prepayments** ................................................................... 36

   2.9   **Mandatory Prepayments** .................................................................. 36

   2.10   **Application of Payments** ................................................................... 40

   2.11   **General Provisions Regarding Payments** ......................................... 41

   2.12   **Ratable Sharing** ................................................................................ 42

   2.13   **Increased Costs** ................................................................................ 43

   2.14   **Taxes; Withholding, etc** ................................................................... 44

   2.15   **OID** ................................................................................................... 47

   2.16   **Tax Treatment** ................................................................................. 47

   2.17   **Incremental Facility** ......................................................................... 47

SECTION 3 CONDITIONS PRECEDENT .............................................................................. 50

   3.1   **Closing Date** ..................................................................................... 50

   3.2   **Loan Conditions** ............................................................................... 53

SECTION 4 REPRESENTATIONS AND WARRANTIES ..................................................... 54

   4.1   **Organization; Requisite Power and Authority; Qualification**............ 54

   4.2   **Capital Stock and Ownership** ........................................................... 54

   4.3   **Due Authorization** ............................................................................ 55

   4.4   **No Conflict** ....................................................................................... 55

   4.5   **Governmental Consents** ................................................................... 55

4.6     **Binding Obligation** .................................................................................. 56

4.7     **Financial Information** ............................................................................... 56

4.8     **Projections** ............................................................................................... 56

4.9     **No Material Adverse Effect** ..................................................................... 56

4.10    **No Restricted Junior Payments** .............................................................. 56

4.11    **Adverse Proceedings, etc.** ........................................................................ 56

4.12    **Payment of Taxes** ..................................................................................... 57

4.13    **Properties** ................................................................................................. 57

4.14    **Environmental Matters** ........................................................................... 58

4.15    **No Defaults** ............................................................................................... 59

4.16    **Material Contracts** ................................................................................... 59

4.17    **Governmental Regulation** ........................................................................ 60

4.18    **Margin Stock** ............................................................................................ 60

4.19    **Employee Benefit Plans** ........................................................................... 60

4.20    **Brokers** ..................................................................................................... 61

4.21    **Solvency** .................................................................................................... 61

4.22    **Related Agreements** ................................................................................. 61

4.23    **Disclosure** ................................................................................................. 61

4.24    **Insurance** .................................................................................................. 61

4.25    **Separate Entity** ........................................................................................ 61

4.26    **Security Interest in Collateral** ................................................................ 62

4.27    **Covered Person Transactions** .................................................................. 62

4.28    **Swap Agreements** ..................................................................................... 62

4.29    **Permits, Etc.** ............................................................................................. 62

4.30    **Names and Places of Business** .................................................................. 62

4.31    **Marketing of Production** .......................................................................... 63

4.32    **Right to Receive Payment for Future Production** ................................. 63

4.33    **Existing Accounts Payable** ....................................................................... 63

4.34    **Related Agreement Obligations** .............................................................. 63

SECTION 5 AFFIRMATIVE COVENANTS ............................................................... 64

5.1     **Financial Statements and Other Reports** ............................................... 64

5.2     **Notice of Material Events** ........................................................................ 69

5.3     **Separate Existence** ................................................................................... 70

5.4     **Payment of Taxes and Claims** ................................................................. 70

5.5     **Operation and Maintenance of Properties** ................................................................ 71

5.6     **Insurance** .................................................................................................................... 71

5.7     **Books and Records; Inspections** ................................................................................ 72

5.8     **Compliance with Laws** ............................................................................................... 72

5.9     **Environmental** ............................................................................................................ 72

5.10    **Further Assurances** .................................................................................................... 74

5.11    **Use of Proceeds** ........................................................................................................ 75

5.12    **Non-Voting Representative** ........................................................................................ 75

5.13    **APOD** ........................................................................................................................ 75

5.14    **Title Information** ......................................................................................................... 76

5.15    **Marketing of Production** ............................................................................................ 76

5.16    **Minimum Liquidity** ..................................................................................................... 76

SECTION 6 NEGATIVE COVENANTS ................................................................................ 76

6.1     **Indebtedness** .............................................................................................................. 76

6.2     **Liens** ........................................................................................................................... 77

6.3     **No Further Negative Pledges** .................................................................................... 78

6.4     **Restricted Junior Payments** ...................................................................................... 78

6.5     **Restrictions on Subsidiary Distributions** ................................................................. 79

6.6     **Investments** ................................................................................................................ 79

6.7     **Financial and Performance Covenants** ...................................................................... 80

6.8     **Fundamental Changes; Disposition of Assets; Acquisitions** .................................... 80

6.9     **Limitation on Leases** ................................................................................................. 81

6.10    **Sales and Lease Backs** .............................................................................................. 81

6.11    **Transactions with Covered Persons** ......................................................................... 82

6.12    **Conduct of Business** .................................................................................................. 82

6.13    **Amendments or Waivers of Material Contracts** ........................................................ 82

6.14    **Fiscal Year** ................................................................................................................. 83

6.15    **Deposit Accounts** ...................................................................................................... 83

6.16    **Amendments to Organizational Agreements** ............................................................ 83

6.17    **Sale or Discount of Receivables** ............................................................................... 83

6.18    **Gas Imbalances, Take-or-Pay or Other Prepayments** .............................................. 83

6.19    **Swap Agreements** ...................................................................................................... 83

6.20    **APOD** ........................................................................................................................ 84

6.21    **Anti-Layering** ............................................................................................................ 84

6.22    **RBL Facility Loan Documents** ................................................................ 84

6.23    **Subsidiaries** ....................................................................................... 84

SECTION 7 CAPITAL RESERVE ACCOUNT ............................................... 85

7.1    **Capital Reserve Account** ...................................................................... 85

SECTION 8 EVENTS OF DEFAULT ............................................................... 85

8.1    **Events of Default** ................................................................................. 85

8.2    **Remedies** ............................................................................................. 88

SECTION 9 ADMINISTRATIVE AGENT ........................................................ 88

9.1    **Appointment of Administrative Agent** ................................................. 88

9.2    **Powers and Duties** ............................................................................... 89

9.3    **General Immunity** ................................................................................ 89

9.4    **Administrative Agent Entitled to Act as Lender** .................................. 92

9.5    **Lenders' Representations, Warranties and Acknowledgment** ............... 92

9.6    **Right to Indemnity** .............................................................................. 93

9.7    **Successor Administrative Agent** ........................................................... 93

9.8    **Collateral Documents** .......................................................................... 95

9.9    **Posting of Approved Electronic Communications** ................................ 95

9.10    **Proofs of Claim** ................................................................................. 96

SECTION 10 MISCELLANEOUS ..................................................................... 97

10.1    **Notices** ............................................................................................. 97

10.2    **Expenses** ........................................................................................... 97

10.3    **Indemnity** .......................................................................................... 98

10.4    **Set Off** ............................................................................................... 99

10.5    **Sharing of Payments by Lenders** ....................................................... 99

10.6    **Amendments and Waivers** ............................................................... 100

10.7    **Successors and Assigns; Assignments** .............................................. 102

10.8    **Survival of Representations, Warranties and Agreements** ................. 104

10.9    **No Waiver; Remedies Cumulative** .................................................... 104

10.10    **Marshaling; Payments Set Aside** ................................................... 104

10.11    **Severability** .................................................................................... 104

10.12    **Obligations Several; Independent Nature of Lenders' Rights** ......... 105

10.13    **Headings** ........................................................................................ 105

10.14    **APPLICABLE LAW** ...................................................................... 105

10.15    **CONSENT TO JURISDICTION** ................................................... 105

10.16    **WAIVER OF JURY TRIAL** ........................................................................... 105

10.17    **Confidentiality** ............................................................................................ 106

10.18    **Usury Savings Clause** ................................................................................ 107

10.19    **Counterparts** ............................................................................................... 107

10.20    **PATRIOT Act** ............................................................................................. 108

10.21    **Disclosure** ..................................................................................................... 108

10.22    **Appointment for Perfection** ..................................................................... 108

10.23    **Advertising and Publicity** ......................................................................... 108

10.24    **Acknowledgments and Admissions** ....................................................... 108

10.25    **Entire Agreement** ........................................................................................ 109

| | | |
|---|---|---|
| APPENDICES: | A | Commitments |
| | B | Notice Addresses |
| | C | Permitted Acquisition Assets |
| SCHEDULES: | 1.2 | Related Agreements |
| | 2.4 | Use of Proceeds |
| | 4.1 | Jurisdictions of Organization and Qualification |
| | 4.2 | Capital Stock and Ownership |
| | 4.5 | Governmental Consents |
| | 4.9 | Material Adverse Changes |
| | 4.10 | Restricted Junior Payments |
| | 4.11 | Adverse Proceedings |
| | 4.12 | Payment of Taxes |
| | 4.13 | Title |
| | 4.14 | Environmental Matters |
| | 4.15 | No Defaults |
| | 4.16 | Material Contracts |
| | 4.20 | Broker's Fees |
| | 4.24 | Insurance |
| | 4.27 | Affiliate Transactions |
| | 4.28 | Swap Agreements |
| | 4.29 | Permits |
| | 4.30 | Names and Places of Business |
| | 4.31 | Marketing Contracts |
| | 4.32 | Prepayments |
| | 4.33 | Existing Accounts Payable |
| | 4.34 | Related Agreement Obligations |
| | 5.13 | APOD |
| | 6.1(h) | Closing Date Indebtedness |
| | 6.2(g) | Closing Date Liens |
| | 6.6(b) | Closing Date Investments |
| | 6.11 | Agreements in Existence on Closing Date |
| | 6.15 | Deposit Accounts |
| | 10.7 | Non-Eligible Assignees |
| EXHIBITS: | A | Form of Borrowing Notice |
| | B | Form of Approval Letter |
| | C | Form of Note |
| | D | Form of Compliance Certificate |
| | E | Form of Closing Date Certificate |
| | F | Form of Solvency Certificate |
| | G | Form of Company Collateral Agreement |
| | H | Form of Parent Pledge Agreement |
| | I | Form of APOD Certificate |
| | J | Form of Incremental Facility Activation Notice |
| | K | Form of New Lender Supplement |
| | L | Forms of U.S. Tax Compliance Certificate |
| | M | Form of Assignment Agreement |

This **TERM LOAN CREDIT AGREEMENT**, dated as of September 17, 2018 (together with any amendments, restatements, supplements or other modifications, the "**Agreement**"), is entered into by and among MTE Holdings LLC, a limited liability company organized under the laws of the State of Delaware (the "**Company**"); each of the Lenders from time to time party hereto; and Riverstone Credit Management, LLC, a limited liability company organized under the laws of the State of Delaware ("**Riverstone**") in its capacity as administrative agent and collateral agent for the Lenders (the "**Administrative Agent**").

## W I T N E S S E T H:

In consideration of the mutual covenants and agreements contained herein and the Loans to be made by Lenders, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1
## DEFINITIONS AND INTERPRETATION

1.1    **Terms Defined Above**.  As used in this Agreement, each term defined above has the meaning indicated above.

1.2    **Definitions**.  The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Accepting Lenders**" has the meaning set forth in Section 2.9(h).

"**Administrative Agent**" has the meaning set forth in the preamble hereto.

"**Administrative Agent's Account**" means an account designated by Administrative Agent from time to time as the account into which the Company shall make all payments to Administrative Agent for the benefit of Administrative Agent and the Lenders under this Agreement and the other Loan Documents.

"**Administrative Agent's Office**" means, the "Administrative Agent's Office" as set forth on Appendix B, or such other office as it may from time to time designate in writing to the Company and each Lender.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of the Company or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims) or other regulatory body or any arbitrator pending or threatened against any of the Company or any of its Subsidiaries or any Property of the Company or any of its Subsidiaries.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (a) to vote ten percent (10%) or more of the Capital Stock (on a fully

diluted basis), or (b) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise. Notwithstanding anything to the contrary herein, in no event shall the Administrative Agent, any Lender or any of their respective Affiliates be considered an "Affiliate" of any Group Member. Each officer or director (or Person holding an equivalent position) of a Group Member shall be considered an Affiliate of such Group Member and of each other Group Member.

"**Aggregate Amounts Due**" has the meaning set forth in Section 2.12.

"**Agreement**" has the meaning set forth in the preamble.

"**APOD**" means the Approved Plan of Development of the Company's and its Subsidiaries' Oil and Gas Properties and all related Hydrocarbon Interests, attached as Schedule 5.13, as the same may be updated by the Company and approved from time to time by the Super-Majority Requisite Lenders in accordance with the terms of this Agreement.

"**APOD Certificate**" means a certificate substantially in the form of Exhibit I, to be delivered to the Administrative Agent concurrent with the delivery by the Company of each APOD required to be delivered hereunder.

"**Applicable Office**" means the office through which a Lender's Loan is made.

"**Approval Letter**" means a letter given by Administrative Agent on behalf of the Super-Majority Requisite Lenders in the form of Exhibit B.

"**Approved Counterparty**" means any Person who, at the time of entry into the applicable Swap Agreement, is (a) a Lender, an RBL Facility Lender or an Affiliate thereof or (b) a counterparty consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed).

"**Approved Petroleum Engineers**" means (a) Cawley Gillespie & Associates, (b) Netherland, Sewell & Associates or (c) any other independent petroleum engineers reasonably acceptable to the Requisite Lenders.

"**Asset Sale**" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, license, transfer or other disposition to, or any exchange of Property with, any Person, in one transaction or a series of transactions, of all or any part of any Person's businesses, assets or Properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the Capital Stock owned by such Person, other than any such transaction set forth in Section 6.8(b)(iii).

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in form of Exhibit M or such other form as shall be approved by the Administrative Agent.

"**Attributable Debt**" means as of the date of determination thereof, without duplication, (a) in connection with a sale and leaseback transaction, the net present value (discounted according to GAAP at the cost of debt implied in the lease) of the obligations of the lessee for rental payments

during the then-remaining term of any applicable lease, and (b) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet notes or similar off-balance sheet financing product to which such Person is a party, where such transaction is considered borrowed money indebtedness for Tax purposes but is classified as an operating lease in accordance with GAAP.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, chief operating officer, president, chief financial officer, executive vice president or treasurer, or otherwise designated as an authorized person, in each case, whose signatures and incumbency have been certified by an officer of such Person in a certificate delivered to Administrative Agent.

"**Availability Period**" means the period from and including the Closing Date to and including the date falling twelve (12) calendar months thereafter.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Barrels of Oil**" means actual barrels of oil; provided that no natural gas volumes shall be converted to or counted as "Barrels of Oil".

"**Bloomberg**" has the meaning set forth in the definition of "Reinvestment Yield."

"**BOE**" means Barrels of Oil equivalent, as reasonably determined by the Company and approved by the Requisite Lenders in accordance with the SPE Definitions.

"**Borrowing**" means the making of a Loan.

"**Borrowing Base**" means, at any time, an amount equal to a conforming borrowing base determined in good faith and based on the usual and customary oil and gas lending criteria as they exist at such time by commercial bank lenders that are in the business of valuing and redetermining the value of oil and gas properties in connection with conforming, reserve-based, secured oil and gas loan transactions in the United States, including any redetermination thereof pursuant to customary mechanisms for quarterly or semi-annual scheduled redeterminations thereof and customary adjustments for asset sales and terminations of Swap Agreements.

"**Borrowing Base Deficiency**" means, at any time following any redetermination of or adjustment to the amount of the Borrowing Base pursuant to and in accordance with the RBL Facility Credit Agreement, the amount of excess of (a) the aggregate RBL Facility Credit Exposures of the RBL Facility Lenders over (b) the Borrowing Base then determined to be in effect under the RBL Facility Credit Agreement; provided, that for purposes of determining the existence and amount of any Borrowing Base Deficiency, obligations under any letter of credit will not be deemed to be outstanding to the extent such obligations are Cash collateralized.

"**Borrowing Notice**" means a written notice by the Company of a request for Borrowing, which notice (a) sets forth the principal amount of the Borrowing and the date on which the Borrowing is to be made, (b) certifies that the use of the proceeds of such Loans is in accordance with Section 2.4, (c) is accompanied by a general description of the anticipated costs or other

payments to be covered by the Borrowing, (d) identifies the Properties on the APOD on which the proceeds of such Loans are to be spent, (e) contains the information required by <u>Section 2.3</u>, (f) contains wiring instructions and (g) is substantially in the form of <u>Exhibit A</u>.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the States of New York or Texas or is a day on which banking institutions located in either of such states are authorized or required by law or other governmental action to close and, where used in the context of LIBOR, is also a day on which dealings are carried on in the London interbank market.

"**Called Principal**" means, with respect to any Loans, the principal of such Loan that is to be prepaid pursuant to <u>Section 2.8</u> or <u>Section 2.9</u> or has become or is declared to be immediately due and payable pursuant to <u>Section 8.2</u>, as the context requires.

"**Capital Lease**" means, as applied to any Person, any lease of (or other arrangement conveying the right to use) any Property (whether real, personal or mixed) by that Person as lessee (or the equivalent) that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Reserve Account**" has the meaning set forth in <u>Section 7.1(a)</u>.

"**Capital Reserve Amount**" means (a) prior to or on the date of the initial Borrowing of the Closing Date Loans an amount equal to $15,000,000 and (b) on or prior to each subsequent date on which a Borrowing occurs, an amount equal to the sum of three (3) months of Interest due and payable on the principal amount of all Loans outstanding as of such day (including pursuant to such Borrowing), each as may be determined by the Company and certified to the Administrative Agent by an Authorized Officer of the Company in accordance with <u>Section 3.2</u>.

"**Capital Reserve Bank**" has the meaning set forth in <u>Section 7.1(a)</u>.

"**Capital Stock**" means any stock, shares, partnership interests, membership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, or in general any instruments commonly known as "equity securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Cash**" means money, currency or a credit balance in any demand or deposit account.

"**Cash Equivalents**" means, as at any date of determination, (a) marketable securities (i) issued or directly and unconditionally Guaranteed as to interest and principal by the United States Government, or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a

rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit, bank deposit products or bankers' acceptances maturing within one year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary federal banking regulator), and (ii) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (e) shares of any money market mutual fund that (i) has at least ninety five percent (95%) of its assets invested continuously in the types of Investments referred to in clauses (a) and (b) above, (ii) has net assets of not less than $500,000,000, and (iii) has the highest rating obtainable from either S&P or Moody's.

"**Cash Receipts**" means all Cash or Cash Equivalents received by or on behalf of the Company or any Group Member with respect to the following:  (a) sales of Hydrocarbons from Oil and Gas Properties, (b) Cash representing operating revenue earned or to be earned, (c) any proceeds from Swap Agreements, (d) royalty payments, (e) any COPAS Cash receipts and (f) any other Cash or Cash Equivalents received by or on behalf of the Company or its Subsidiaries in connection with its ownership of Oil and Gas Properties; provided that (i) Loans or the proceeds of Loans, (ii) Cash or Cash Equivalents belonging to or received for the credit of third parties, such as royalty, working interest or other interest owners, that are received for transfer or payment to such third parties, (iii) Cash or Cash Equivalents received from other working interest owners of the Oil and Gas Properties operated by the Company or its Subsidiaries that represent reimbursements or advance payments of joint interest billings to such other working interest owners and (iv) Extraordinary Receipts in each case shall not constitute "Cash Receipts".

"**CERCLA**" has the meaning set forth in the definition of "Environmental Laws."

"**Change of Control**" means, at any time: (a) any Person or group of related Persons (other than the Permitted Holder) shall have acquired beneficial ownership of more than 50% of the Capital Stock of the Company; (b) the termination of employment, death, incapacitation or substantial removal of the Key Man from the daily operations of the Company and the Key Man is not replaced with an individual reasonably acceptable to the Requisite Lenders who has comparable qualifications within 90 days of such termination of employment, death, incapacitation or substantial removal, (c) a "Change of Control" or "Change in Control" (or any equivalent term) shall have occurred under the RBL Facility Credit Agreement or (d) the termination of employment, death, incapacitation or substantial removal of two (2) of any of the five (5) following people from the daily operations of the Company: Paul Cyphers, David Entzminger, Shannon Moss, Larrez Green and Jason Kincaid, and each such terminated or removed Person is not replaced with an individual reasonably acceptable to the Requisite Lenders who has comparable qualifications within 90 days of such termination of employment, death, incapacitation or substantial removal.

"**Closing Date**" means the date on which all of the conditions precedent set forth in Section 3.1 have been satisfied or waived.

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit E.

"**Closing Date Commitment**" means as to each Lender, the amount of commitment of such Lender as set forth on Appendix A.

"**Closing Date Loans**" has the meaning set forth in Section 2.1(a).

"**Closing Date Total Commitments**" means the total aggregate amount of all Closing Date Commitments, being $240,000,000.

"**Collateral**" means, collectively, all of the real, personal and mixed Property (including Capital Stock) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Documents**" means each Control Agreement, the Company Collateral Agreement, the Parent Pledge Agreement and all other instruments, documents and agreements delivered by the Company pursuant to this Agreement or any of the other Loan Documents in order to (a) grant to the Administrative Agent, for the benefit of the Secured Parties, a Lien on any Collateral or (b) set forth the relative priorities of any Lien on any Collateral.

"**Commitment**" means, collectively, any Closing Date Commitment, Delayed-Draw Commitment and Incremental Facility Commitment.

"**Communications**" has the meaning set forth in Section 9.9(a).

"**Company**" has the meaning set forth in the preamble hereto.

"**Company Collateral Agreement**" means the agreement pursuant to which the Company grants Liens over all of its assets, including its membership interests in OpCo, substantially in the form of Exhibit G.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit D.

"**Confidential Information**" has the meaning set forth in Section 10.17.

"**Consolidated Adjusted EBITDAX**" means, for any period, an amount determined for the Group Members on a consolidated basis equal to:

(a)    the sum, without duplication, of the amounts for such period of:

      (i)    Consolidated Net Income, plus

      (ii)    Consolidated Interest Expense, plus

      (iii)    provisions for Taxes based on income, plus

      (iv)    total depreciation expense, plus

      (v)    total depletion expense, plus

(vi)     total amortization expense, <u>plus</u>

(vii)    exploration expense, <u>plus</u>

(viii)   the actual transaction costs, expenses, fees and charges incurred with respect to any acquisition of Property permitted under this Agreement (including legal fees, title and environmental due diligence costs, transition overhead, pre-close overhead paid to the seller as purchase price adjustment and new software implementation costs) in an aggregate amount not to exceed $5,000,000 in any Fiscal Quarter; <u>provided</u> that the total amount added to Consolidated Adjusted EBITDAX during any trailing 12-month period shall not exceed 10% of Consolidated Adjusted EBITDAX over such last trailing 12-month period, <u>plus</u>

(ix)     other non-Cash items reducing Consolidated Net Income (excluding any such non-Cash item to the extent that it represents an accrual or reserve for potential Cash items in any future period or amortization of a prepaid Cash item that was paid in a prior period),

<u>minus</u>

(b)      the sum, without duplication of the amounts for such period of:

(i)      other non-Cash items increasing Consolidated Net Income for such period (excluding any such non-Cash item to the extent it represents the reversal of an accrual or reserve for potential Cash item in any prior period), plus

(ii)     interest income, <u>plus</u>

(iii)    extraordinary or non-recurring gains and other extraordinary or non-recurring income (as determined in accordance with GAAP), to the extent included in the calculation of Consolidated Net Income.

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures of the Group Members during such period with respect to Oil and Gas Properties of the Group Members determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment" (including the portion of liabilities under any Capital Lease that is or should be capitalized in accordance with GAAP or which should otherwise be capitalized in accordance with any other applicable accounting principles) or similar items reflected in the consolidated statement of cash flows of the Company and its Subsidiaries.

"**Consolidated Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of the Company and its Subsidiaries on a consolidated basis with respect to all outstanding Consolidated Total Debt.

"**Consolidated Net Income**" means, for any period:

(a)      the net income (or loss) of the Company and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP,

minus

(b)      the sum of:

(i)      the income (or loss) of any Person (other than a wholly-owned Subsidiary of the Company) in which any other Person (other than the Company or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to the Company or any of its Subsidiaries by such Person during such period, plus

(ii)      the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Company or is merged into or consolidated with the Company or any of its Subsidiaries or that Person's assets are acquired by the Company or any of its Subsidiaries, plus

(iii)      the income of any Subsidiary of the Company to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or Governmental Requirement applicable to that Subsidiary, plus

(iv)      any after Tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan.

"**Consolidated Total Debt**" means, as at any date of determination, the sum of:  (a) the aggregate amount of all Indebtedness of the Company and its Subsidiaries determined on a consolidated basis in accordance with GAAP and (b) the aggregate outstanding amount, without duplication, of Attributable Debt of the Company and its Subsidiaries determined on a consolidated basis.

"**Control Agreement**" means a control agreement, in form and substance satisfactory to the Administrative Agent, entered into with the bank or securities intermediary at which any Deposit Account (including the Capital Reserve Account) or Securities Account is maintained by the Company in accordance with Section 6.15.

"**COPAS**" means the Council of Petroleum Accountants Societies, Inc.

"**Covered Person**" means any Affiliate of any Group Member (other than any other Group Member) or any of their respective officers, members, managers, directors, Capital Stock holders, partners, parents, other interest holders or any family members of any of the foregoing.

"**Declining Lender**" has the meaning set forth in Section 2.9(h).

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Rate**" means any interest payable pursuant to <u>Section 2.6(c)</u>.

"**Delayed-Draw Commitment**" means as to any Lender, the amount of commitment of such Lender as set forth on <u>Appendix A</u>.

"**Delayed-Draw Loans**" has the meaning set forth in <u>Section 2.1(b)</u>.

"**Delayed-Draw Total Commitments**" means the total amount of Delayed-Draw Commitments, being $235,000,000.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Direct Taxes**" means any severance, ad valorem, or other direct taxes on Oil and Gas Properties owned by any Group Member or the production therefrom or the proceeds of such production; <u>provided</u> that federal, state, or local income or franchise taxes shall in no event be considered Direct Taxes.

"**Discounted Value**" means, with respect to the Called Principal of any Loan, the amount obtained by discounting all Remaining Scheduled Payments with respect to such Called Principal from their respective scheduled due dates to the Settlement Date with respect to such Called Principal, in accordance with accepted financial practice and at a discount factor (applied on the same periodic basis as that on which interest on the Loans is payable) equal to the Reinvestment Yield with respect to such Called Principal.

"**Disqualified Capital Stock**" means any Capital Stock that, by its terms (or by the terms of any security or other Capital Stock into which it is convertible or for which it is exchangeable) or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for Capital Stock that is not Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or significant Asset Sale so long as any rights of the holders thereof upon the occurrence of a change of control or significant Asset Sale event shall be subject to (i) the prior repayment in full of all Loans and all other Obligations and (ii) the prior termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Capital Stock that is not Disqualified Capital Stock) (except as a result of a change of control or significant Asset Sale so long as any rights of the holders thereof upon the occurrence of a change of control or significant Asset Sale event shall be subject to (i) the prior repayment in full of all Loans and all other Obligations, and (ii) the prior termination of the Commitments), (c) is or becomes convertible into or exchangeable for Indebtedness or any other Capital Stock that would constitute Disqualified Capital Stock, or (d) has any "debt" like features such as (but not limited to) amortization, any scheduled prepayments or any other prepayment terms, or any financial or other type of covenants other than covenants that are customary to common Capital Stock.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Eligible Assignee**" means (a) any Lender, (b) any Subsidiary or Affiliate of (i) a Lender or (ii) an employee of a Lender, (c) any commercial bank, investment fund, sovereign wealth fund and (d) any other Person approved by the Requisite Lenders in their sole discretion; provided that the term "Eligible Assignee" shall exclude any of the parties listed on Schedule 10.7.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, the Company, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all Governmental Requirements pertaining in any way to health, safety, the environment or the preservation or reclamation of natural resources, in effect in any and all jurisdictions in which the Company is conducting or at any time has conducted business, or where any Property of the Company is located, including without limitation, the Oil Pollution Act of 1990 ("**OPA**"), as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("**CERCLA**"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976 ("**RCRA**"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other environmental conservation or protection Governmental Requirements. The term "oil" shall have the meaning specified in OPA, the terms "hazardous substance" and "release" (or "threatened release") shall have the meanings specified in CERCLA, the terms "solid waste" and "disposal" (or "disposed") shall have the meanings specified in RCRA and the term "oil and gas waste" shall have the meaning specified in Section 91.1011 of the Texas Natural Resources Code ("**Section 91.1011**"); provided, however, that (a) in the event either OPA, CERCLA, RCRA or Section 91.1011 is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment and (b) to the extent the laws of the state or other jurisdiction in which any Property of any Group Member is located establish a meaning for "oil," "hazardous substance," "release," "solid waste," "disposal" or "oil and gas waste" which is broader than that specified in either OPA, CERCLA, RCRA or Section 91.1011, such broader meaning shall apply.

"**Environmental Permit**" means any permit, registration, license, approval, consent, exemption, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto, in each case together with the regulations thereunder.

"**ERISA Affiliate**" means, as applied to any Person each trade or business (whether or not incorporated) that together with such Person would be treated as a single employer under Section 4001(b)(1) of ERISA or Section 414 of the Internal Revenue Code.  Any former ERISA Affiliate of the Company or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of the Company or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Company or such Subsidiary and with respect to liabilities arising after such period for which the Company or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code or Section 302 of ERISA with respect to any Pension Plan (determined without regard to any waiver of the funding provisions therein or in Section 303 of ERISA or Section 430 of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430 of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the filing of a notice of intent to terminate a Pension Plan, the treatment of an amendment to a Pension Plan as a termination under Section 4041 of ERISA, or the incurrence by the Company, any of its Subsidiaries or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan; (d) the withdrawal by the Company, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more non-related contributing sponsors or the termination of any such Pension Plan resulting in liability to the Company, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (e) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might reasonably constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (f) the imposition of liability on the Company, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal of the Company, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any liability or potential liability therefor, or the receipt by the Company, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in insolvency pursuant to Section 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (h) the occurrence of an act or omission which could reasonably be expected to give rise to the imposition on the Company, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, Taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (l) or (m), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (i) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan or the assets thereof, or against the Company, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (j) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of

the Internal Revenue Code; or (k) the imposition of a Lien pursuant to Section 430(k) or 436(f) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Event of Default**" means each of the conditions or events set forth in <u>Section 8.1</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Taxes**" has the meaning set forth in <u>Section 2.14(b)</u>.

"**Exposures**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Loans owned by such Lender.

"**Extraordinary Receipts**" means any Cash received by or paid to or for the account of any Group Member not in the ordinary course of business, including any Pension Plan reversions, judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustment received in connection with any purchase agreement, any proceeds of the settlement, termination, unwinding or liquidation of any Swap Agreement and proceeds of insurance; <u>provided</u>, <u>however</u>, Extraordinary Receipts shall not include Net Insurance/Condemnation Proceeds which are subject to <u>Section 2.9(a)</u>, Net Asset Sale Proceeds which are subject to <u>Section 2.9(a)</u>, Cash received by any Group Member from another Group Member and Cash equity contributions.

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon but excluding the Oil and Gas Properties) now, hereafter or heretofore owned, leased, operated or used by the Company or any of its Subsidiaries.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, any applicable intergovernmental agreement entered into in connection with the implementation of the foregoing and any fiscal or regulatory legislation, rules or official practices adopted pursuant to any such intergovernmental agreement.

"**FDIC**" means the Federal Deposit Insurance Corporation.

"**Financial Officer**" means, for any Person, the President, Chief Financial Officer or other individual designated as an authorized person. Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Company.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of a Financial Officer of the Company that such financial statements fairly present, in all material respects, the financial condition of the Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, in each case in conformity with GAAP applied on a consistent

basis, subject, in the case of interim financial statements, to changes resulting from normal audit and year-end adjustments.

"**Financial Plan**" has the meaning set forth in Section 5.1(h).

"**First Offer**" has the meaning set forth in Section 2.9(h).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is either (i) the only Lien to which such Collateral is subject or (ii) prior to any other Lien to which such Collateral is subject, unless such other Lien would have priority by operation of law; provided that such other Lien is a Permitted Lien.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Company and its Subsidiaries ending on December 31 of each calendar year.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.3, generally accepted accounting principles in the United States of America in effect as of the date of determination thereof.

"**General and Administrative Costs**" means normal and customary expenses and costs incurred in connection with the Oil and Gas Properties of the Company and each other Group Member that are classified as general and administrative costs, including consulting fees, salary, rent, supplies, travel, insurance, accounting, legal, engineering and broker related fees required to manage the affairs of the Group Members but excluding Transaction Costs.

"**Governmental Authority**" means the government of the United States of America, any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Governmental Requirement**" means, at any time, any law, treaty, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement (whether or not having the force of law), whether now or hereafter in effect, including, without limitation, Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"**Group Member**" means the Company and each direct or indirect Subsidiary of the Company.

"**Guarantee**" means, with respect to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, that is (a) an obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; or (b) a liability of such Person for an obligation of another through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (i) or (ii) of this clause (b), the primary purpose or intent thereof is as described in clause (a) above.

"**Hazardous Material**" means any substance regulated by or as to which liability might arise under any applicable Environmental Law and including, without limitation:  (a) any chemical, compound, material, product, byproduct, effluent, emission, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; (b) petroleum hydrocarbons, petroleum products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any components, fractions, or derivatives thereof; (c) explosives, radioactive materials, asbestos containing materials, polychlorinated biphenyls, radon, mold, silica or any silicates and (d) any material which shall be removed from any Property pursuant to any Environmental Law or Environmental Permit or in order to place any Property in a condition that is suitable for ordinary use.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"**Holding Company Status**" means that the Parent Companies will not engage in any business or activity or own any assets or Property other than (a) the ownership of all outstanding Capital Stock in the Company and taking actions in accordance with the Organizational Documents of the Company and its Subsidiaries as the direct or indirect owner of such Capital Stock, (b) maintaining its corporate existence (and incurring fees, expenses and costs with respect thereto), (c) participating in Tax, accounting and other administrative activities as the parent of the

consolidated group of companies, including the Group Members, (d) the execution and delivery of the Loan Documents to which it is a party and the performance of its Obligations thereunder, (e) owning and holding Cash and Cash Equivalents and maintaining Deposit Accounts and other banking services, (f) conducting transactions with its Affiliates permitted pursuant to this Agreement, (g) contributing to the capital of the Company and Guaranteeing Obligations and other obligations of the Company and its Subsidiaries, (h) maintaining insurance, (i) receiving and making Restricted Junior Payments permitted hereby, and (j) activities incidental to the businesses or activities described in clauses (a) through (i) of this definition.

"**Hydrocarbon Interests**" means all rights, options, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"**Hydrocarbons**" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"**Incremental Facility Activation Date**" means any Business Day on which the Company and any Lender shall execute and deliver to the Administrative Agent an Incremental Facility Activation Notice pursuant to Section 2.17(a).

"**Incremental Facility Activation Notice**" means a written notice substantially in the form of Exhibit J.

"**Incremental Facility Closing Date**" means any Business Day designated as such in an Incremental Facility Activation Notice.

"**Incremental Facility Commitment**" means the commitment of an Incremental Facility Lender as set forth in an Incremental Facility Activation Notice.

"**Incremental Facility Lenders**" means (a) on any Incremental Facility Activation Date relating to Incremental Facility Commitments, the Lenders signatory to the relevant Incremental Facility Activation Notice and (b) thereafter, each Lender that is a holder of an Incremental Facility Loan.

"**Incremental Facility Loans**" has the meaning set forth in Section 2.1(c).

"**Incremental Facility Total Commitments**" means the total amount of Incremental Facility Commitments at any time.

"**Indebtedness**", as applied to any Person, means, without duplication, (a) all indebtedness for borrowed money; (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (c) all obligations of such Person evidenced by notes, bonds or similar instruments or upon which interest payments are customarily paid and all obligations in respect of drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (d) any obligation owed for

(i) accounts payable (excluding accounts payables incurred in the ordinary course of business consistent with past practice that are not overdue by more than ninety (90) days or which are being contested in good faith and for which adequate reserves have been maintained in accordance with GAAP) or (ii) all or any part of the deferred purchase price of Property or services which purchase price is (A) due more than six (6) months from the date of incurrence of the obligation in respect thereof or (B) evidenced by a note or similar written instrument; (e) all obligations created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person; (f) all Indebtedness (as defined in other clauses of this definition) secured by any Lien on any Property or asset owned or held by that Person regardless of whether the Indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (g) the maximum amount that can be drawn on any letter of credit or letter of guaranty issued, bankers' acceptances facilities, surety bond and similar credit transactions for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings or drafts; (h) any earn-out obligations or purchase price adjustments under purchase agreements; (i) all Guarantees by such Person of Indebtedness (as otherwise defined herein) of any other Person; (j) all obligations of such Person in respect of any Swap Agreement, whether entered into for hedging or speculative purposes; (k) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (l) all Attributable Debt of such Person, and (m) Indebtedness of any partnership or Joint Venture in which such Person is a general partner or joint venturer, unless such Indebtedness is expressly non-recourse to such Person.  For purposes of <u>clause (j)</u>, the amount of Indebtedness under any Swap Agreements outstanding at any time, if any, shall be the Net Mark-to-Market Exposure of such Person under such Swap Agreements at such time (and after giving effect to any Net Mark-to-Market Gains of such Person under such Swap Agreements).

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), Taxes (other than Taxes for which the Administrative Agent and the Lenders are indemnified pursuant to the provisions of <u>Section 2.14</u>), charges, expenses and disbursements of any kind or nature whatsoever (including the fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (a) this Agreement or the other Loan Documents or the Transactions (including the Lenders' agreement to make Loans or the use or intended use of the proceeds thereof, or any enforcement of any of the Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral)); (b) the statements contained in the proposal letter delivered by any Lender, Administrative Agent or any Affiliate thereof to the Company or any holder of Capital Stock in the Company with respect to the Transactions; or (c) any Environmental Claim against or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land

ownership, or practice of the Company or any of its Subsidiaries or Affiliates and any of their respective Properties.

"**Indemnitee**" has the meaning set forth in <u>Section 10.3(a)</u>.

"**Indemnitee Agent Party**" has the meaning set forth in <u>Section 9.6</u>.

"**Initial Borrowing Date**" means the date on which the initial Borrowing of the Closing Date Loans occurs.

"**Intellectual Property**" means all intellectual property rights, both statutory and common, throughout the world, including but not limited to the following:  (a) patents, together with any foreign counterpart patents, as well as any reissued and reexamined patents and extensions corresponding to the patents, and patent applications, as well as any related continuation, continuation in part, and divisional applications and patents issuing therefrom and any respective foreign counterpart foreign patent applications or foreign patents issuing therefrom; (b) works of authorship and copyrightable works, copyrights and registrations and applications for registrations thereof; (c) any trademark, service mark, trade name, trade dress, brand names, slogans, domain names, registrations and any trademarks or service marks issuing from applications for registrations for the foregoing, and all goodwill associated therewith; (d) all trade secrets, know-how or proprietary property or technology and (e) all other intellectual property rights material to the operation of the Company's or any of its Subsidiaries' business.

"**Interest**" has the meaning set forth in <u>Section 2.6(a)</u>.

"**Interest Coverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (a) Consolidated Adjusted EBITDAX for the four Fiscal Quarters ending on such date to (b) Consolidated Interest Expense for such four Fiscal Quarter period; <u>provided</u> that for the Fiscal Quarters ending September 30, 2018, December 31, 2018, March 31, 2019 and June 30, 2019, the ratio shall be calculated as (x) Consolidated Adjusted EBITDAX for such Fiscal Quarter multiplied by four to (y) (i) for the Fiscal Quarter ending September 30, 2018, Consolidated Interest Expense for such Fiscal Quarter multiplied by four, (ii) for the Fiscal Quarter ending December 31, 2018, Consolidated Interest Expense for the two Fiscal Quarter period then ending multiplied by two, (iii) for the for the Fiscal Quarter ending March 31, 2019, Consolidated Interest Expense for the three Fiscal Quarter period then ending multiplied by 4/3 and (iv) for the Fiscal Quarter ending June 30, 2019, Consolidated Interest Expense for the four Fiscal Quarter period then ending.

"**Interest Payment Date**" means (a) each Quarterly Date and (b) the Maturity Date.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute (except as otherwise provided herein).

"**Investment**" means (a) any direct or indirect redemption, retirement purchase or other acquisition by any Person of, or of a beneficial interest in, any of the Capital Stock or other Property of any other Person; (b) any direct or indirect loan, advance, acquisition, capital contribution or other transfer of funds or Property by any Person to any other Person, including all

Indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business; and (c) any direct or indirect Guarantee of any obligations of any other Person.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions (whether in Cash or Property) thereto.

"**IRS**" has the meaning set forth in Section 2.14(f).

"**Joint Drilling Engagement**" means any transaction or series of related transactions involving a private equity fund, credit fund, hedge fund or other similar entity, either directly, through a portfolio company, or otherwise, engaging in "drillco" arrangements, drilling Joint Ventures, joint development arrangements, drilling participation arrangements, or other similar arrangements.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form.

"**Key Man**" means Mark A. Siffin.

"**Lenders**" means (a) each Person listed on the signature pages hereto as a Lender, (b) any other Person that becomes a party as a lender hereto pursuant to an Assignment Agreement, and (c) New Lenders, but excluding any Person that ceases to be a party as a lender hereto pursuant to an Assignment Agreement.

"**Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (a) Consolidated Total Debt as of such date to (b) Consolidated Adjusted EBITDAX for the four Fiscal Quarter period then ending; provided that Consolidated Adjusted EBITDAX shall be deemed to be, for each Fiscal Quarter ending on or prior to June 30, 2019, Consolidated Adjusted EBITDAX for such Fiscal Quarter multiplied by four.

"**LIBOR**" means, at any time, the greater of (i) for any three month period with respect to a Borrowing, the rate per annum equal to (a) the ICE Benchmark Administration LIBOR rate or the successor thereto if the ICE Benchmark Administration is no longer making a LIBOR rate available for three month deposits, as published by Bloomberg (or such other commercially available source providing quotations of LIBOR as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two (2) Business Days prior to each Quarterly Date, or (b) if such published rate is not available at such time for any reason, then "LIBOR" for such three month period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such three month period in same day funds in the approximate amount of the outstanding Loans, and with a three month term as would be offered by three major banking institutions in immediately available funds in  the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two (2) Business Days prior to the commencement of such three month period and (ii) one and a half percent (1.5%) per annum.

"**Lien**" means (a) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (b) in the

case of Capital Stock, any purchase option, call or similar right of a third party with respect to such Capital Stock.

"**Limited Liability Company Agreement**" means the Third Amended and Restated Limited Liability Company Agreement of MTE Holdings LLC, dated as of September 17, 2018, by and among Olam Energy Resources I LLC and MTE Partners LLC.

"**Loan Document**" means any of this Agreement, the Collateral Documents, and all other certificates, documents, instruments or agreements executed and delivered by the Company for the benefit of Administrative Agent or any Lender in connection herewith or pursuant to any of the foregoing.

"**Loans**" means the Closing Date Loans, the Delayed-Draw Loans and the Incremental Facility Loans made under this Agreement or the principal amount outstanding for the time being thereof.

"**Make-Whole Amount**" means, with respect to any Loans, an amount, as calculated by the Administrative Agent, equal to the excess, if any, of the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of such Loans over the amount of such Called Principal, provided that the Make-Whole Amount shall in no event be less than zero.

"**Make-Whole Expiry Date**" has the meaning set forth in Section 2.11(f).

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (a) the business operations, Properties, assets or condition (financial or otherwise) of the Group Members; (b) the ability of any Group Member to fully and timely perform its Obligations; (c) the legality, validity, binding effect, or enforceability against a Group Member of a Loan Document or a Related Agreement; (d) the Administrative Agent's Liens (on behalf of itself and the Secured Parties) on the Collateral or the priority of such Liens; or (e) the rights, remedies and benefits available to, or conferred upon, Administrative Agent and any Lender under any Loan Document.

"**Material Contract**" means, collectively, (a) any contract or agreement listed in Schedule 4.16, (b) any contract or agreement requiring payments to be made or providing for payments to be received, in each case in excess of $200,000 individually or, if involving a series of related contracts or agreements, in the aggregate, (c) any other contract or other arrangement to which any Group Member is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect, (d) the Related Agreements, and (e) any agreement or instrument evidencing or governing Indebtedness, if the sum of the aggregate principal amount outstanding under any such agreement or instrument plus any amounts available to be drawn thereunder exceeds $200,000 (including, for the avoidance of doubt, any Swap Agreement); provided that the RBL Facility Credit Agreement and the RBL Facility Loan Documents shall not constitute Material Contracts.

"**Maturity Date**" means the earlier of (a) September 17, 2022 and (b) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Moody's**" means Moody's Investor Services, Inc.

"**MTE Partners**" means MTE Partners LLC, a limited liability company organized under the laws of the State of Delaware.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (a) the sum of Cash payments and Cash Equivalents received by any Group Member from such Asset Sale (including any Cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), minus (b) any amounts required to be repaid or prepaid under the RBL Facility Credit Agreement as a result of any Borrowing Base Deficiency that has occurred and is continuing due to such Asset Sale, (c) any bona fide direct costs incurred in connection with such Asset Sale, including income or gains taxes paid or payable by the seller as a result of any gain recognized in connection with such Asset Sale during the Tax period the sale occurs (after taking into account any available Tax credits or deductions and any tax-sharing arrangements) and (d) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by the applicable Group Member in connection with such Asset Sale; <u>provided</u> that upon release of any such reserve, the amount released shall be considered Net Asset Sale Proceeds), and (e) reasonable fees, costs and expenses payable by the Group Members in connection with such Asset Sale in an amount not to exceed three percent (3%) of the consideration paid in connection with such Asset Sale; <u>provided</u> that no proceeds realized in a single transaction or series of related transactions shall constitute Net Asset Sale Proceeds unless the aggregate amount of proceeds received by such Group Member shall exceed $5,000,000 for any single transaction or series of related transactions or $10,000,000 in the aggregate in any Fiscal Year.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (a) any Cash payments or proceeds received by any Group Member (i) under any casualty, business interruption or "key man" insurance policies in respect of any covered loss thereunder, or (ii) as a result of the taking of any assets of any Group Member by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, <u>minus</u> (b) (i) any actual and reasonable costs incurred by any Group Member in connection with the adjustment or settlement of any claims of any Group Member in respect thereof, and (ii) any bona fide direct costs incurred in connection with any sale of such assets as referred to in <u>clause (a)(ii)</u> of this definition, including income taxes paid or payable as a result of any gain recognized in connection therewith (after taking into account any available Tax credits or deductions and any tax-sharing arrangements).

"**Net Mark-to-Market Exposure**" of a Person means, as determined by the applicable swap provider with respect to any Swap Agreement, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from Swap

Agreements.  As used in this definition, "unrealized losses" means the fair market value of the cost to such Person of replacing such Swap Agreement as of the date of determination (assuming such Swap Agreement were to be terminated as of that date), and "unrealized profits" means the fair market value of the gain to such Person of replacing such Swap Agreement as of the date of determination (assuming such Swap Agreement were to be terminated as of that date).

"**Net Mark-to-Market Gain**" of a Person means, as determined by the applicable swap provider with respect to any Swap Agreement, as of any date of determination, the excess (if any) of all unrealized profits over all unrealized losses of such Person arising from Swap Agreements. As used in this definition, "unrealized losses" means the fair market value of the cost to such Person of replacing such Swap Agreement as of the date of determination (assuming such Swap Agreement were to be terminated as of that date), and "unrealized profits" means the fair market value of the gain to such Person of replacing such Swap Agreement as of the date of determination (assuming such Swap Agreement were to be terminated as of that date).

"**New Lender**" has the meaning assigned to such term in <u>Section 2.17(b)</u>.

"**New Lender Supplement**" has the meaning assigned to such term in <u>Section 2.17(b)</u>.

"**Non-U.S. Lender**" means each Lender that is not a United States Person.

"**Notes**" means the promissory notes of the Company described in <u>Section 2.5(a)</u> and being substantially in the form of <u>Exhibit C</u>, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"**Obligations**" means, collectively, all Indebtedness, liabilities and obligations of every nature of the Company and each other Obligor from time to time owed to the Secured Parties,  of whatsoever nature and howsoever evidenced, due or to become due, now existing or hereafter arising, whether direct or indirect, absolute or contingent, which may arise under, out of, or in connection with this Agreement, the other Loan Documents and all other agreements, Guarantees, notes and other documents entered into by any party in connection therewith, and any amendment, restatement or modification of any of the foregoing, including, but not limited to, the full and punctual payment when due of any unpaid principal of the Loans, interest (including, without limitation, interest accruing at any Default Rate and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), fees, reimbursement obligations, Guaranty obligations, penalties, indemnities, legal and other fees, charges and expenses, and amounts advanced by and expenses incurred in order to preserve any Collateral or Lien, whether due after acceleration or otherwise and whether or not primary, secondary, direct, indirect, contingent or otherwise (including obligations of performance).

"**Obligors**" means the Company and the Parent Companies.

"**Oil and Gas Properties**" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all

operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.  Unless the context otherwise requires, the term Oil and Gas Properties refers to Oil and Gas Properties of the Group Members.

"**Olam Energy**" means Olam Energy Resources I LLC, a limited liability company organized under the laws of the State of Delaware.

"**OPA**" has the meaning set forth in the definition of "Environmental Laws."

"**OpCo**" means MDC Energy LLC, a limited liability company organized under the laws of the State of Delaware.

"**Operated Oil and Gas Properties**" means those Oil and Gas Properties of the Group Members that are operated by a Group Member or an Affiliate of a Group Member.

"**Option Agreement**" means that certain RBL Buyout Rights Letter Agreement, dated as of the Closing Date, between the Administrative Agent, the RBL Facility Administrative Agent, the Company and OpCo, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Organizational Documents**" means (a) with respect to any corporation, its certificate or articles of incorporation, amalgamation, formation or organization, as amended, and its bylaws, as amended, (b) with respect to any limited partnership, its certificate of limited partnership or certificate of formation, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its articles of organization or certificate of formation, as amended, and its operating agreement, as amended.  In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state

or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Sources**" has the meaning set forth in Section 10.3(c).

"**Other Taxes**" means any and all present or future stamp, court, intangible, registration, recording, filing, transfer, documentary, excise, property or similar Taxes arising from any payment made hereunder or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a Lien under, or otherwise with respect to or in connection with, any Loan Document.

"**Parent Companies**" means, collectively, Olam Energy and MTE Partners.

"**Parent Pledge Agreement**" means the agreement pursuant to which each Parent Company grants Liens over all of its membership interests in the Company, substantially in the form of Exhibit H.

"**Participant**" has the meaning set forth in Section 10.7(f).

"**Participant Register**" has the meaning set forth in Section 10.7(f).

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act of 2001).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**PDP Asset Coverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (a) the PV10 of the Group Members' Proved Developed Producing Reserves located on Oil and Gas Properties as of such date to (b) the Consolidated Total Debt as of such date.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Title IV of ERISA, Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Permitted Acquisition**" means the acquisition of the Permitted Acquisition Assets by a relevant Group Member subject to the following conditions (the "**Permitted Acquisition Conditions**"):

(a)     the Administrative Agent shall be reasonably satisfied with evidence confirming the environmental condition of the Permitted Acquisition Assets to the extent such evidence has been requested by it; provided that if following receipt of such evidence no further written request for evidence or information in respect of the environmental condition of the Permitted Acquisition Assets is made by the Administrative Agent to the Company within 10 (ten) days of such evidence or information being provided, the Permitted Acquisition Condition in this paragraph (a) shall be deemed to be satisfied;

(b)     the Administrative Agent shall have received (i) customary UCC search certificates and county-level real property record search results reflecting no prior Liens encumbering the

Permitted Acquisition Assets and (ii) reasonably satisfactory evidence that all Liens on the Permitted Acquisition Assets (subject only to Permitted Liens) have been released or terminated;

(c)    the Requisite Lenders shall have received, and satisfactorily completed their review of, all due diligence information regarding the Permitted Acquisition Assets as they shall have requested; provided that the Permitted Acquisition Condition in this paragraph (c) shall be deemed to be satisfied if following receipt of the requested due diligence information regarding the Permitted Acquisition Assets (i) no further written request for information in respect of the Permitted Acquisition Assets is made by the Requisite Lenders to the Company within 10 (ten) days of such information being provided and (ii) the Administrative Agent has not otherwise informed the Company that the Requisite Lenders are not otherwise satisfied with the results of the due diligence information provided;

(d)    the Lenders shall have received title information as the Requisite Lenders may require, satisfactory to the Requisite Lenders, setting forth the status of title to the Permitted Acquisition Assets;

(e)    the Permitted Acquisition Assets to be acquired are Oil and Gas Properties located in the area designated on Appendix C hereto;

(f)    the Administrative Agent shall have received a certificate of a Responsible Officer of the Company certifying:   (A) that attached to such certificate are true and complete fully executed copies of the documentation for the Permitted Acquisition not previously delivered and certified to the Administrative Agent, including any assignments in respect of the Permitted Acquisition Assets, and all exhibits, schedules and amendments, modifications and waivers to the foregoing, (B) that the relevant Group Member is consummating the Permitted Acquisition pursuant to the terms of the a purchase and sale agreement and any other documents as may be required that are reasonably acceptable to the Administrative Agent (without giving effect to any waiver, modifications or consent thereunder unless approved by the Administrative Agent in its reasonable discretion) and (C) the final purchase price for the Permitted Acquisition Assets after giving effect to all adjustments as of the closing date of the Permitted Acquisition contemplated by the purchase and sale agreement;

(g)    both before and after giving effect to such Permitted Acquisition, (i) no Default or Event of Default shall have occurred and be continuing and (ii) the Company is in pro forma compliance with Section 6.7; and

(h)    at least fifteen (15) days prior to the consummation of such Permitted Acquisition (or such later date as the Requisite Lenders may agree in their sole discretion), the Company shall have submitted an updated APOD in form and substance reasonably acceptable to the Super-Majority Requisite Lenders reflecting the acquisition of the subject properties and development of such properties.

"**Permitted Acquisition Assets**" means Oil and Gas Properties set forth in the area designated on Appendix C hereto.

"**Permitted Encumbrances**" means (a) statutory Liens of landlords, banks (and rights of set off), carriers, warehousemen, mechanics, repairmen, workmen, materialmen, vendors and other

similar Liens arising in the ordinary course of business, in each case incurred in the ordinary course of business consistent with past practice (i) for amounts not yet overdue or for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of ninety (90) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts and (ii) in connection with transactions not prohibited by this Agreement; (b) Liens for Taxes, assessments, or other governmental charges or levies and other Liens imposed by law (other than any such Lien imposed pursuant to Section 430(k) or 436(f) of the Internal Revenue Code or by ERISA), in each case incurred in the ordinary course of business consistent with past practice (i) for amounts not yet overdue or for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of ninety (90) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts and (ii) in connection with transactions not prohibited by this Agreement; (c) easements, rights of way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not (i) operate to reduce any net revenue interest of the applicable Group Member in the affected Oil and Gas Properties (ii) increase any working interest of the applicable Group Member in the affected Oil and Gas Properties without a proportionate increase in the corresponding net revenue interest of such Group Member or (iii) otherwise interfere in any material respect with the value or use of the Property to which such Lien is attached or with the ordinary conduct of the business of the Group Members; (d) Liens to operators and non-operators under joint operating agreements arising in the ordinary course of the business of any Group Member to secure amounts owing, which amounts are not yet due or are being contested in good faith by appropriate proceedings, if such reserve as may be required by GAAP shall have been made therefor; (e) Liens arising from precautionary UCC filings with respect to operating leases and other leases which are not Capital Leases and cover assets that are leased by, but not owned by, a Group Member, (f) lease burdens existing on the Closing Date or otherwise permitted hereby constituting monetary obligations payable to third parties which are deducted in the calculation of engineered discounted present value in the Reserve Report including, without limitation, any royalty, overriding royalty, net profits interest, production payment, carried interest or reversionary working interest; (g) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Group Member in the ordinary course of business, consistent with the past practices of such Group Member and as customary in the oil and gas industry, but only to the extent otherwise permitted hereunder; (h) Liens arising under operating agreements, unitization and pooling agreements and orders, farmout agreements, gas balancing agreements and other agreements, in each case that are (i) customary in the oil, gas and mineral production business, and (ii) entered into in the ordinary course of business and that are taken into account in computing the net revenue interests and working interests of any Group Member warranted in the Collateral Documents, to the extent that such Liens do not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by such Group Member and (i) Liens on Cash or securities pledged to secure performance of sureties and bonds and other obligations of a like nature incurred in the ordinary course of business but only to the extent such sureties, bonds and other obligations of a like nature are permitted under this Agreement; provided that the Liens described in clauses (a), (b) and (d) shall remain "Permitted Encumbrances" only for so long as no action to enforce such Lien has been commenced, and provided, further, that no intention to subordinate the First Priority Lien granted

in favor of Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of any Permitted Encumbrance.

"**Permitted Holder**" means Mark A. Siffin, provided that upon the death, incompetency or incapacity of Mark A. Siffin, "Permitted Holder" shall mean Bob Quinn.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Permitted Recipients**" has the meaning set forth in Section 10.17.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Prepayment Amount**" has the meaning set forth in Section 2.9(h).

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Loans of any Lender, the percentage obtained by dividing (a) the Exposure of that Lender, by (b) the aggregate Exposure of all Lenders.

"**Projections**" has the meaning set forth in Section 4.8.

"**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, Cash, securities, accounts and contract rights.

"**Proved Developed Non-Producing Reserves**" has the meaning assigned such term in the SPE Definitions.

"**Proved Developed Producing Reserves**" has the meaning assigned such term in the SPE Definitions.

"**Proved Reserves**" has the meaning assigned such term in the SPE Definitions.

"**Proved Undeveloped Reserves**" has the meaning assigned such term in the SPE Definitions.

"**PV10**" means, in respect of either of the Proved Developed Producing Reserves or the Proved Reserves, respectively, of any Group Member's Oil and Gas Properties, the present value of future cash flows (discounted at 10% per annum) calculated by the Requisite Lenders in their sole judgment (including using the price curve and costs determined in accordance with the definition of Reserve Report) after having reviewed the information from the most recent Reserve Report delivered by the Company pursuant to Section 5.1(q) and taking into account all other factors which the Requisite Lenders deem material.

"**Quarterly Date**" means the last day of each Fiscal Quarter and if such day is not a Business Day, then the next succeeding Business Day after the last day of such Fiscal Quarter.

"**RBL Facility**" means a revolving credit facility entered into by OpCo (including any refinancings thereof) with one or more commercial banks (and whether or not with an administrative agent or collateral agent or other agents or arrangers) that are each in the business of valuing and redetermining the value of oil and gas properties in connection with conforming, reserve-based oil and gas loan transactions in the United States, which revolving credit facility provides for revolving credit loans (including, if applicable, swing lines) or letters of credit that are (i) at all times subject to a Borrowing Base and (ii) subject to the Option Agreement.

"**RBL Facility Administrative Agent**" means the "Administrative Agent" (or any similar defined term) under the RBL Facility, including any permitted successors or assigns pursuant to the RBL Facility Loan Documents.

"**RBL Facility Collateral Agent**" means the "Collateral Agent" (or any similar defined term) under the RBL Facility, including any permitted successors or assigns pursuant to the RBL Facility Documents.

"**RBL Facility Credit Agreement**" means the credit agreement evidencing the RBL Facility among OpCo, the RBL Facility Administrative Agent and the lenders party thereto, as the same may be entered into, amended, restated, supplemented or otherwise replaced from time to time in accordance with the terms hereof.

"**RBL Facility Credit Exposures**" means, on any date of determination, an amount equal to the sum of (a) the aggregate principal amount at such time of the outstanding loans under the RBL Facility plus (b) the sum of (i) the aggregate undrawn amount of all outstanding swingline loans or letters of credit under the RBL Facility at such time plus (ii) the aggregate amount of all disbursements under swingline loans or letters of credit under the RBL Facility that have not yet been reimbursed by or on behalf of the borrowers under the RBL Facility Credit Agreement.

"**RBL Facility Lender**" means a lender pursuant to and as defined under the RBL Facility Credit Agreement.

"**RBL Facility Loan Documents**" means the RBL Facility Credit Agreement and any other "Loan Document" (or any similar defined term) as defined in such loan or credit agreement, as such documents and agreements may be entered into, amended, restated or otherwise supplemented in accordance with the terms hereof.

"**RBL Modification**" has the meaning set forth in Section 6.22.

"**RCRA**" has the meaning set forth in the definition of "Environmental Laws."

"**Recipient**" has the meaning set forth in Section 10.17.

"**Register**" has the meaning set forth in Section 2.5(b).

"**Reinvestment Yield**" means, with respect to the Called Principal of any Loan, 50 basis points (one-half of one percent) over the yield to maturity implied by (a) the yields reported as of 10:00 a.m. (New York, New York time) on the second Business Day preceding the Settlement Date with respect to such Called Principal, on the display designated as "Page PX1" (or such other

display as may replace Page PX1 on Bloomberg Financial Markets ("**Bloomberg**") or, if Page PX1 (or its successor screen on Bloomberg) is unavailable, the Telerate Access Service screen which corresponds most closely to Page PX1 for the most recently issued actively traded U.S. Treasury securities having a maturity equal to the Remaining Life of such Called Principal as of such Settlement Date, or (b) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable (including by way of interpolation), the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the second Business Day preceding the Settlement Date with respect to such Called Principal, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity equal to the Remaining Life of such Called Principal as of such Settlement Date.  Such implied yield will be determined by the Company, if necessary, by (i) converting U.S. Treasury bill quotations to bond equivalent yields in accordance with accepted financial practice and (ii) interpolating linearly between (1) the actively traded U.S. Treasury security with the maturity closest to and greater than such Remaining Life and (2) the actively traded U.S. Treasury security with the maturity closest to and less than such Remaining Life.  The Reinvestment Yield shall be rounded to two decimal places.

"**Rejection Notice**" has the meaning set forth in Section 2.9(h).

"**Related Agreements**" means, collectively the agreements set forth on Schedule 1.2 hereto and each agreement, exhibit, schedule, certificate or document related to the foregoing.

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.  With respect to Riverstone, Related Fund shall also include any swap, special purpose vehicles purchasing or acquiring Liens in collateralized loan obligations or any other vehicle through which Riverstone may leverage its investments from time to time.

"**Release**" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing.

"**Remaining Life**" means, with respect to any Called Principal, the number of years (calculated by the Administrative Agent to the nearest one-twelfth year) that will elapse between the Settlement Date with respect to such Called Principal and the applicable Make-Whole Expiry Date.

"**Remaining Scheduled Payments**" means, with respect to the Called Principal of any Loan, all payments of such Called Principal and Interest thereon that would be due after the Settlement Date with respect to such Called Principal if no payment of such Called Principal were made prior to the applicable Make-Whole Expiry Date with respect to any such Loan (including any Repayment Premium with respect to such Called Principal) and such payments of such Called Principal, Repayment Premium and Interest thereon were assumed to be made on the applicable Make-Whole Expiry Date with respect to such Loan.

"**Repayment Premium**" has the meaning set forth in Section 2.11(g).

"**Requisite Lenders**" means one or more Lenders having or holding Exposures representing more than fifty percent (50%) of the sum of the aggregate Exposures of all Lenders.

"**Reserve Report**" means each report, in form and substance satisfactory to the Requisite Lenders in their sole discretion (including, without limitation, the use of satisfactory methodologies and risk analyses), setting forth the updated estimates of Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves, Proved Undeveloped Reserves and projected production profiles and overall economics of OpCo's and its wholly-owned Subsidiary's Oil and Gas Properties, together with a projection of the rate of production and future cash flows as of such date, based on the following pricing assumptions:

(a)    oil and gas prices will be reasonably determined by the Requisite Lenders based on the Requisite Lenders' then current forward product pricing curve, which prices will be adjusted to reflect location, BTU content and quality differentials and hedging arrangements then in place;

(b)    taking into account the applicable operator's actual experiences with leasehold operating expenses and other costs in determining projected leasehold operating expenses and other costs; and

(c)    identifying and taking into account any "over-produced" or "under-produced" status under gas balancing arrangements.

"**Responsible Officer**" means any officer within the department of the Administrative Agent administering this matter, including any vice president, assistant vice president, senior associate, assistant secretary, assistant treasurer, trust officer or any other officer of the Administrative Agent who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any such matter is referred because of such Person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Agreement.

"**Restricted Junior Payment**" means (a) any dividend or other distribution, direct or indirect, on account of any Capital Stock of any Group Member now or hereafter outstanding, except a dividend payable solely in additional shares of Capital Stock (other than Disqualified Capital Stock) to the holders of that class; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Capital Stock of any Group Member now or hereafter outstanding; (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any Capital Stock of any Group Member now or hereafter outstanding; (d) any payment of management or similar fees; and (e) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any Indebtedness subordinated to the Obligations.

"**Riverstone**" has the meaning set forth in the preamble.

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation.

"**Second Offer**" has the meaning set forth in Section 2.9(h).

"**Section 91.1011**" has the meaning set forth in the definition of "Environmental Laws."

"**Secured Parties**" means the Administrative Agent, each Lender and their respective successors and permitted assigns.

"**Securities Account**" means any "securities account" as defined in the UCC.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Settlement Date**" means, with respect to the Called Principal of any Loan, the date on which such Called Principal is to be prepaid pursuant to Section 2.8 or Section 2.9 or has become or is declared to be immediately due and payable pursuant to Section 8.2, as the context requires.

"**Solvency Certificate**" means a Solvency Certificate of a Financial Officer substantially in the form of Exhibit F.

"**Solvent**" means, with respect to any Person, that as of the date of determination, both (a) (i) the sum of such Person's and its consolidated Subsidiaries' debt and liabilities (including contingent liabilities), on a consolidated basis, does not exceed the fair saleable value of such Person's and its consolidated Subsidiaries' assets, on a consolidated basis; and (ii) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise); and (b) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances.  For purposes of this definition, (a) the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that could reasonably be expected to become an actual or matured liability and (b) the amount of any assets at any time shall be computed as the amount that gives effect to amounts that, in light of all of the facts and circumstances existing at such time, represents the amount that could reasonably be expected to become an asset by reason of indemnity, offset, insurance or any similar arrangement.

"**SPE Definitions**" means, with respect to any term, the definition thereof adopted by the Board of Directors, Society for Petroleum Engineers (SPE) Inc., March 1997.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, Joint Venture or other business entity the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, partnership, limited liability company, association, Joint Venture or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership

interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Super-Majority Requisite Lenders**" means one or more Lenders having or holding Exposures representing more than two-thirds (2/3$^{\text{rds}}$) of the sum of the aggregate Exposures of all Lenders.

"**Swap Agreement**" means any transaction (including an agreement with respect thereto) now existing or hereafter entered by any Person which is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or other financial measures and whether exchange traded, "over-the-counter" or otherwise.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, deduction, withholding or similar charges in the nature of a tax, imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, penalties or additional amounts thereon.

"**Tax Distribution**" means any and all distributions made pursuant to and in accordance with Section 5.4 of the Limited Liability Company Agreement.

"**Tax on the Overall Net Income**" of a Person means any net income, franchise or branch profits Tax imposed on a Person by the jurisdiction (or any political subdivision thereof) in which a Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its Applicable Office) is located or in which that Person (and/or, in the case of a Lender, its Applicable Office) is deemed to be doing business or as the result of a present or former connection between such Person and the jurisdiction (other than a jurisdiction in which such Person is treated as doing business or having a connection as a result of its having executed, delivered, become a party to, engaged in any transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Tax Related Person**" means any Person (including a beneficial owner of an interest in a pass-through entity) who is required to include in income amounts realized (whether or not distributed) by Administrative Agent, a Lender or any other Tax Related Person of any of the foregoing.

"**Total Asset Coverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (a) Total Asset Value as of such date to (b) the Consolidated Total Debt as of such date.

"**Total Asset Value**" means as of the last day of any Fiscal Quarter the sum of (a) (x) the production for all wells as determined on a BOE per day basis multiplied by (y) $25,000 plus (b) (x) the total net acres owned by the Group Members multiplied by (y) $15,000.

"**Transaction Costs**" means the fees, costs and expenses payable by the Group Members in connection with the Transactions.

"**Transactions**" means the transactions contemplated by the Loan Documents.

"**U.S. Tax Compliance Certificate**" has the meaning set forth in <u>Section 2.14(f)(iii)</u>.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Undrawn Funds**" means, as determined by the Administrative Agent, as of any date of determination, an amount equal to, on or after the Initial Borrowing Date, the difference between (A) the Commitments and (B) the aggregate principal amount of Loans made on or after the Initial Borrowing Date; <u>provided</u> that the Undrawn Funds may never be negative.

"**United States Person**" has the meaning in Section 7701(a)(30) of the Internal Revenue Code.

1.3   **Accounting Terms**.   Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and the Company or the Requisite Lenders shall so request, the Requisite Lenders and the Company shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; <u>provided</u> that, until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and the Company shall provide to Administrative Agent and Lenders reconciliation statements requested by Administrative Agent (reconciling the computations of such financial ratios and requirements from then-current GAAP computations to the computations under GAAP prior to such change) in connection therewith.  Financial statements and other information required to be delivered by the Company to Lenders pursuant to Sections <u>5.1(a)</u>, <u>5.1(b)</u>, and <u>5.1(c)</u> shall be prepared in accordance with GAAP as in effect at the time of such preparation.  Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the historical financial statements of the Company.

1.4   **Interpretation, etc**..   Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. References herein to a Schedule shall be considered a reference to such Schedule as of the Closing Date.  The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. Unless otherwise indicated, any definition of or reference to any agreement, instrument or other

document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, replaced or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein); provided, that any reference herein to the RBL Facility Credit Agreement will only refer to the RBL Facility Credit Agreement and any renewals, extensions, modifications, amendments, or restatements permitted by Section 6.22.  The use herein of the phrase "to the knowledge of" with respect to the Company shall be a reference to the knowledge of the officers of the Company. References to a party to any document includes that party's successors and permitted assigns. Headings are for convenience only and do not affect the interpretation of this Agreement.

1.5    **Business Day Adjustment, etc**..  When a day on or by which a payment is due to be made is not a Business Day, that payment shall be made on or by the next Business Day.

SECTION 2
**THE CREDITS**

2.1    **Commitments**.

(a)    Subject to the terms and conditions hereof, on the Closing Date, each Lender agrees, severally and not jointly, to make loans in Dollars to the Company in an aggregate principal amount equal to the Closing Date Total Commitments (the "**Closing Date Loans**"), each in the amount equal to such Lender's Closing Date Commitment.

(b)    During the Availability Period and subject to the terms and conditions hereof, each Lender agrees, severally and not jointly, to make loans in Dollars to the Company in an aggregate principal amount of up to the Delayed-Draw Total Commitments (the "**Delayed-Draw Loans**"), each in an amount of up to such Lender's Delayed-Draw Commitment.

(c)    Following the Availability Period and prior to the Maturity Date, and subject to the sole discretion of each Lender and any other terms or conditions hereof, one or more Lenders may make loans in Dollars to the Company in an aggregate principal amount of up to the Incremental Facility Total Commitments (the "**Incremental Facility Loans**"), each in an amount of up to such Lender's Incremental Facility Commitment.

(d)    Any Closing Date Commitments in respect of the Closing Date Loans hereunder that remain unutilized following the Initial Borrowing Date shall be automatically and irrevocably terminated following the making of such Closing Date Loans.

(e)    Any Delayed-Draw Commitments in respect of the Delayed-Draw Loans hereunder that remain unutilized upon the expiration of the Availability Period shall be automatically and irrevocably terminated immediately upon the expiration of the Availability Period.

(f)    Amounts borrowed under this Section 2.1 and repaid or prepaid may not be reborrowed.

2.2    **The Loans**.  The obligation of the Company to repay to each Lender the aggregate amount of all Loans held by such Lender, together with interest accruing in connection therewith,

shall be evidenced by a Note made by the Company payable to such Lender with appropriate insertions.  Interest on each Loan shall accrue and be due and payable as provided herein.  Each Loan shall be due and payable as provided herein, and shall be due and payable in full on the Maturity Date.

2.3      **Request for Borrowing**.  Company must give to Administrative Agent written or electronic notice of any requested Borrowing by delivering a Borrowing Notice to the Administrative Agent no later than 10:00 a.m., New York, New York time, ten (10) Business Days prior to the date of such Borrowing (<u>provided</u> that the Borrowing Notice for the Closing Date Loans may be delivered one (1) Business Day prior to the Closing Date). Each such written request or confirmation must be made in the form and substance of the Borrowing Notice, duly completed. Each such request shall be deemed a representation, warranty, acknowledgment and agreement by Company as to the matters that are required to be set out in such written confirmation.  Upon receipt of any such Borrowing Notice, Administrative Agent shall give each Lender prompt notice of the terms thereof.  If all conditions precedent to such Loans have been met (as certified by the Company in a certificate of an Authorized Officer delivered to Administrative Agent), each Lender will, on the date requested by the Company in the Borrowing Notice, promptly remit to Administrative Agent, at Administrative Agent's Account, the amount of such Lender's Loans in immediately available funds no later than 2:00 pm New York, New York time.  Upon receipt of all requested funds, the Administrative Agent will make such Loans available to the Company by promptly crediting the amounts so received, in like funds, to such account of the Company as is designated by the Company in the Borrowing Notice. The failure of any Lender to make any Loan hereunder shall not relieve any other Lender of its obligation hereunder, if any, to make its Loan, but no Lender shall be responsible for the failure of any other Lender to make any Loan hereunder.

2.4      **Use of Proceeds**.  The proceeds of (a) the Closing Date Loans shall only be used for the purposes and in the amounts set forth on <u>Schedule 2.4</u> and (b) the Delayed-Draw Loans may only be used in strict accordance with the APOD and as more particularly described in the Borrowing Notice with respect thereto.

2.5      **Notes**.

(a)      Any Lender may request that the Loans made by it be evidenced by a single promissory note of the Company in substantially the form of <u>Exhibit C</u>, dated, in the case of (1) any Lender party hereto as of the date of this Agreement, as of the date of this Agreement or (2) any Lender that becomes a party hereto pursuant to an Assignment Agreement, as of the effective date of the Assignment Agreement, in each case, payable to such Lender or its registered assigns in a principal amount equal to the aggregate principal amount of its Loans as in effect on such date, and otherwise duly completed.  In the event that the aggregate principal amount of any Lender's Loans increases or decreases for any reason (whether pursuant to <u>Section 10.7</u> or otherwise), upon the request of such Lender, the Company shall deliver or cause to be delivered on the effective date of such increase or decrease, a new Note payable to such Lender or its registered assigns in a principal amount equal to the aggregate principal amount of its Loans after giving effect to such increase or decrease, and otherwise duly completed.  The Company's obligation to deliver a Note evidencing Loans for which the Company has previously delivered a Note shall be subject to Company's receipt of such previously-delivered Note or satisfactory indemnity therefor in Company's discretion.  The replaced Note shall be deemed cancelled upon delivery from the

Company to the Lender of such new Note.  The date, amount and interest rate of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be recorded by such Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by such Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Company's rights or Obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

(b)      The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Company, shall maintain at one of its offices a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, the Commitment of and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Company, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender for all purposes of this Agreement, notwithstanding notice or anything in any Loan Document to the contrary.  The Register shall be available for inspection by the Company and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on Annex I and forward a copy of such revised Annex I to the Company and each Lender.

2.6      **Interest; Administrative Agent Fee**.

(a)      Interest.  Each Loan shall at all times bear interest at a rate equal to LIBOR plus nine percent (9.00%) per annum paid in cash ("**Interest**").  Interest accrues from and including (i) initially on the date each Loan is made and (ii) subsequently on an Interest Payment Date, to, but excluding, the following Interest Payment Date.

(b)      Interest Payment Dates.  Interest on each Loan shall be due and payable on each Interest Payment Date.  All Interest payable hereunder shall be computed on the basis of a 360-day year and for the actual number of days elapsed.

(c)      Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws, whether or not allowed in such a proceeding) payable in Cash on demand at a rate that is three percent (3.0%) per annum in excess of the interest rate otherwise payable hereunder with respect to the Loans, provided that if an Event of Default occurs and is continuing for 90 days or longer, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws, whether or not allowed in such a proceeding) payable in Cash on demand at a rate that is five percent (5.0%) per annum in excess of the interest rate otherwise payable hereunder with respect to the Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.6(c) is not a permitted alternative to timely payment and shall not constitute a waiver of

any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

(d)    Administrative Agent Fee.  On the Closing Date and on each anniversary thereafter, the Company will pay to Administrative Agent for its own account, a fee of $150,000.

(e)    Standby Fees.  So long as any Commitments are available on or after the Initial Borrowing Date, the Company agrees to pay to Administrative Agent for the account of each Lender a standby fee, which shall accrue at a rate per annum equal to (i) three percent (3.00%) on such Lender's pro rata portion of the average daily amount of the Undrawn Funds during the period from and including the Closing Date to and including the six (6) month anniversary of the Closing Date and (ii) six percent (6.00%) on such Lender's pro rata portion of the average daily amount of the Undrawn Funds during the period from and including the day after the six (6) month anniversary of the Closing Date to and including the twelve (12) month anniversary of the Closing Date.  Accrued standby fees shall be paid in Cash on each Quarterly Date, commencing on the first such date to occur after the Closing Date.  All standby fees shall be computed on the basis of a year of three hundred sixty (360) days, unless such computation would exceed the Highest Lawful Rate, in which case such standby fees shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

2.7    **Repayment of Loans**.  If any principal or interest amount payable under the Loans remains outstanding on the Maturity Date, such amount will be paid in full by the Company to the Lenders in immediately available funds on the Maturity Date, together with any amounts required to be paid pursuant to Section 2.11(f).

2.8    **Voluntary Prepayments**.  The Company may prepay the Loans on any Business Day in whole or in part (together with any amounts due pursuant to Section 2.6(a), Section 2.11(f) and Section 2.11(g)) in an aggregate minimum amount equal to (a) if being paid in whole, the Obligations and (b) if being paid in part, $1,000,000 and integral multiples of $100,000 in excess of that amount.  All such prepayments shall be made upon not less than three (3) Business Days' prior written notice, in each case given to Administrative Agent by 2:00 p.m. (New York, New York time) on the date required.  Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein; provided that any such notice may state that such notice is conditioned upon the satisfaction of one or more conditions precedent, in which case such notice may be revoked by the Company (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Any such voluntary prepayment shall be applied as specified in Section 2.10.

2.9    **Mandatory Prepayments**.  Subject to Section 2.9(h):

(a)    Asset Sales.  No later than the Business Day immediately following receipt by any Group Member (or any Affiliate on behalf of such Group Member) of any Net Asset Sale Proceeds other than as a result of any sales of Hydrocarbons in the ordinary course of business, the Company shall prepay the Loans in an aggregate amount equal to such Net Asset Sale Proceeds.  Notwithstanding anything in this Section 2.9(a) to the contrary, if the Company delivers

to the Administrative Agent a certificate of a Responsible Officer to the effect that the Group Members intend to apply the Net Asset Sale Proceeds from such Asset Sale (or a portion thereof as specified in such certificate), within twelve (12) months after receipt of such Net Asset Sale Proceeds, to purchase assets useful in the business of the Group Members, then no prepayment shall be required pursuant to this paragraph in respect of the Net Asset Sale Proceeds specified in such certificate, _provided_ that (A) no Default or Event of Default then exists and (B) to the extent any such Net Asset Sale Proceeds have not been so applied by the end of such twelve (12) month period, a prepayment shall be required in an amount equal to such Net Asset Sale Proceeds that have not been so applied; _provided_ _further_ that the Company shall only be required to make such prepayment to the extent that (i) under the RBL Facility Credit Agreement, no Borrowing Base Deficiency, Default or Event of Default exists or would result from the making of such prepayment, (ii) after giving effect to such prepayment (and any Borrowings (as defined in the RBL Facility Credit Agreement) incurred in connection therewith), the Consolidated Total Leverage Ratio (as defined in the RBL Facility Credit Agreement) on a pro forma basis (with Debt (as defined in the RBL Facility Credit Agreement) determined on the date of such prepayment and Consolidated EBITDAX (as defined in the RBL Facility Credit Agreement) determined as of the most recently delivered compliance certificate specified in Section 8.01(c) of the RBL Facility Credit Agreement) is less than or equal to 3.00 to 1.00 and (iii) after giving effect to such prepayment (and any Borrowings (as defined in the RBL Facility Credit Agreement) incurred in connection therewith), unused Commitments (as defined in the RBL Facility Credit Agreement) are greater than or equal to 20% of the Borrowing Base (as defined in the RBL Facility Credit Agreement) in effect at such time; and _provided_ _further_ that, to the extent the Company cannot make such prepayment because it fails to meet any of the conditions in the immediately preceding proviso, (1) the Company shall prepay the outstanding loans under the RBL Facility, if any, in an amount equal to the lesser of such Net Asset Sale Proceeds and the amount of the outstanding loans under the RBL Facility and (2) the Commitments (as such term is defined in RBL Facility Credit Agreement) shall be permanently reduced by an amount equal to such Net Asset Sale Proceeds.

(b)     _Insurance/Condemnation Proceeds_.    No later than the Business Day immediately following receipt by any Group Member (or any Affiliate on behalf of such Group Member), or Administrative Agent as sole loss payee, or promptly thereafter of any Net Insurance/Condemnation Proceeds, the Company shall prepay the Loans in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; _provided_ that (i) so long as no Default or Event of Default shall have occurred and be continuing and (ii) to the extent that the aggregate Net Insurance/Condemnation Proceeds in any Fiscal Year do not exceed $5,000,000 and aggregate Net Insurance/Condemnation Proceeds from the Closing Date through the applicable date of determination do not exceed $10,000,000, the Company shall have the option to invest Net Insurance/Condemnation Proceeds within twelve (12) months after receipt thereof in long term productive assets of the general type used in the business of the Company; _provided_ _further_ that the Company shall only be required to make such prepayment to the extent that (i) under the RBL Facility Credit Agreement, no Borrowing Base Deficiency, Default or Event of Default exists or would result from the making of such prepayment, (ii) after giving effect to such prepayment (and any Borrowings (as defined in the RBL Facility Credit Agreement) incurred in connection therewith), the Consolidated Total Leverage Ratio (as defined in the RBL Facility Credit Agreement) on a pro forma basis (with Debt (as defined in the RBL Facility Credit Agreement) determined on the date of such prepayment and Consolidated EBITDAX (as defined in the RBL

Facility Credit Agreement) determined as of the most recently delivered compliance certificate specified in 8.01(c) of the RBL Facility Credit Agreement) is less than or equal to 3.00 to 1.00 and (iii) after giving effect to such prepayment (and any Borrowings (as defined in the RBL Facility Credit Agreement) incurred in connection therewith), unused Commitments (as defined in the RBL Facility Credit Agreement) are greater than or equal to 20% of the Borrowing Base (as defined in the RBL Facility Credit Agreement) in effect at such time; and provided further that, to the extent the Company cannot make such prepayment because it fails to meet any of the conditions in the immediately preceding proviso, (1) the Company shall prepay the outstanding loans under the RBL Facility, if any, in an amount equal to the lesser of such Net Insurance/Condemnation Proceeds and the amount of the outstanding loans under the RBL Facility and (2) the Commitments (as such term is defined in RBL Facility Credit Agreement) shall be permanently reduced by an amount equal to such Net Insurance/Condemnation Proceeds.

(c)    Issuance of Indebtedness.  No later than the Business Day immediately following receipt by any Group Member (or any Affiliate on behalf of such Group Member) of any Cash proceeds from the incurrence of any Indebtedness (other than Indebtedness that is permitted hereunder) the Company shall prepay the Loans in an aggregate amount equal to one hundred percent (100%) of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(d)    Extraordinary Receipts.  No later than the fifth (5th) Business Day following the date of receipt by any Group Member (or any Affiliate on behalf of such Group Member) of any Extraordinary Receipts, the Company shall prepay the Loans in an aggregate amount equal to such Extraordinary Receipts; provided that (i) so long as no Default or Event of Default shall have occurred and be continuing and (ii) to the extent that the aggregate Extraordinary Receipts in any Fiscal Year do not exceed $5,000,000 and aggregate Extraordinary Receipts from the Closing Date through the applicable date of determination do not exceed $10,00,000, the Company shall have the option to invest Extraordinary Receipts within twelve (12) months after receipt thereof in long term productive assets of the general type used in the business of the Company; provided further that the Company shall only be required to make such prepayment to the extent that (i) under the RBL Facility Credit Agreement, no Borrowing Base Deficiency, Default or Event of Default exists or would result from the making of such prepayment, (ii) after giving effect to such prepayment (and any Borrowings (as defined in the RBL Facility Credit Agreement) incurred in connection therewith), the Consolidated Total Leverage Ratio (as defined in the RBL Facility Credit Agreement) on a pro forma basis (with Debt (as defined in the RBL Facility Credit Agreement) determined on the date of such prepayment and Consolidated EBITDAX (as defined in the RBL Facility Credit Agreement) determined as of the most recently delivered compliance certificate specified in Section 8.01(c) of the RBL Facility Credit Agreement) is less than or equal to 3.00 to 1.00 and (iii) after giving effect to such prepayment (and any Borrowings (as defined in the RBL Facility Credit Agreement) incurred in connection therewith), unused Commitments (as defined in the RBL Facility Credit Agreement) are greater than or equal to 20% of the Borrowing Base (as defined in the RBL Facility Credit Agreement) in effect at such time; and provided further that, to the extent the Company cannot make such prepayment because it fails to meet any of the conditions in the immediately preceding proviso, (1) the Company shall prepay the outstanding loans under the RBL Facility, if any, in an amount equal to the lesser of such Extraordinary Receipts and the amount of the outstanding loans

under the RBL Facility and (2) the Commitments (as such term is defined in RBL Facility Credit Agreement) shall be permanently reduced by an amount equal to such Extraordinary Receipts.

(e)    <u>Tax Refunds</u>.  No later than the Business Day immediately following receipt by any Group Member for its account (or any Affiliate on behalf of such Group Member) or thereafter of any Tax refunds in excess of $1,000,000 in the aggregate in any Fiscal Year, the Company shall prepay the Loans in an aggregate amount equal to the amount of such Tax refunds net of Tax, if any, on such refunds and reasonable costs incurred in obtaining such refund; <u>provided</u> that the Company shall only be required to make such prepayment to the extent that (i) under the RBL Facility Credit Agreement, no Borrowing Base Deficiency, Default or Event of Default exists or would result from the making of such prepayment, (ii) after giving effect to such prepayment (and any Borrowings (as defined in the RBL Facility Credit Agreement) incurred in connection therewith), the Consolidated Total Leverage Ratio (as defined in the RBL Facility Credit Agreement) on a pro forma basis (with Debt (as defined in the RBL Facility Credit Agreement) determined on the date of such prepayment and Consolidated EBITDAX (as defined in the RBL Facility Credit Agreement) determined as of the most recently delivered compliance certificate specified in Section 8.01(c) of the RBL Facility Credit Agreement) is less than or equal to 3.00 to 1.00 and (iii) after giving effect to such prepayment (and any Borrowings (as defined in the RBL Facility Credit Agreement) incurred in connection therewith), unused Commitments (as defined in the RBL Facility Credit Agreement) are greater than or equal to 20% of the Borrowing Base (as defined in the RBL Facility Credit Agreement) in effect at such time; and <u>provided</u> <u>further</u> that, to the extent the Company cannot make such prepayment because it fails to meet any of the conditions in the immediately preceding proviso, (1) the Company shall prepay the outstanding loans under the RBL Facility, if any, in an amount equal to the lesser of such Tax refunds net of Tax, if any, on such refunds and reasonable costs incurred in obtaining such refund and the amount of the outstanding loans under the RBL Facility and (2) the Commitments (as such term is defined in RBL Facility Credit Agreement) shall be permanently reduced by an amount equal to such Tax refunds net of Tax, if any, on such refunds and reasonable costs incurred in obtaining such refund.

(f)    <u>Change of Control</u>.  Immediately upon the occurrence of a Change of Control, the Company shall prepay all Loans in full.

(g)    <u>Prepayment Certificate</u>.  Concurrently with any prepayment of the Loans pursuant to <u>Sections 2.9(a)</u>-<u>(f)</u> the Company shall deliver to Administrative Agent a certificate of a Financial Officer demonstrating the calculation of the amount of the applicable proceeds giving rise to the prepayment.  In the event that the Company shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Company shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and the Company shall concurrently therewith deliver to Administrative Agent a certificate of a Financial Officer demonstrating the calculation of such excess.

(h)    <u>Lender Right to Waive</u>.  Notwithstanding anything in this Agreement to the contrary, each Lender, in its sole discretion, may, but is not obligated to, waive the Company's requirements to make any prepayments pursuant to <u>Sections 2.9(a)</u>-<u>(f)</u> with respect to such Lender's Pro Rata Share of such prepayment.  At least three (3) Business Days prior to any such prepayment, no later than 12:00 p.m. New York, New York time, the Company shall notify the Administrative Agent, in writing, of the amount that is available to prepay the Loans (the

"**Prepayment Amount**").  Promptly after the date of receipt of such notice, the Administrative Agent shall provide written notice (the "**First Offer**") to the Lenders of the amount available to prepay the Loans.  Any Lender declining such prepayment (a "**Declining Lender**") shall give written notice thereof (a "**Rejection Notice**") to the Administrative Agent by 10:00 a.m. New York, New York time no later than two (2) Business Days prior to such prepayment. If a Lender fails to provide such Rejection Notice prior to 10:00 a.m. New York, New York time on such prepayment date, it shall be deemed as accepted. On such date the Administrative Agent shall then provide written notice (the "**Second Offer**") to the Lenders other than the Declining Lenders (such Lenders being the "**Accepting Lenders**") of the additional amount available (due to such Declining Lenders' declining such prepayment) to prepay Loans owing to such Accepting Lenders, such available amount to be allocated on a pro rata basis among the Accepting Lenders that accept the Second Offer.  Any Lenders accepting such additional prepayment pursuant to such Second Offer shall give written notice thereof to the Administrative Agent by 10:00 a.m. New York, New York time no later than one (1) Business Day prior to such prepayment.  If any Lender fails to deliver a notice accepting such additional prepayment prior to 10:00 a.m. New York, New York time on such prepayment date, such Lender shall be deemed to have rejected such additional prepayment; *provided*, that, for the avoidance of doubt, such Lender shall still receive the prepayment in the amount equal its pro rata share of the First Offer. The Company shall prepay the Loans within one Business Day after its receipt of notice from the Administrative Agent of the aggregate amount of such prepayment.  Amounts remaining after the allocation of accepted amounts with respect to the First Offer and the Second Offer to Accepting Lenders shall be retained by the Company.

2.10  **Application of Payments**.  Any payment of any Loan made pursuant to Sections 2.7, 2.8, or 2.9 shall be applied as follows:

first, to pay all unpaid expenses, fees and actual, incurred indemnities of Administrative Agent due hereunder to the full extent thereof;

second, ratably to pay all unpaid expenses, fees and actual, incurred indemnities due hereunder to the full extent thereof;

third, ratably to pay any accrued unpaid Interest (including interest at the Default Rate, if any) until paid in full;

fourth, ratably to pay the Make-Whole Amount and the Repayment Premium, if any, on the Loans until paid in full (including, for the avoidance of doubt, any Make-Whole Amount or Repayment Premium resulting from the prepayment of principal under clause fifth below);

fifth, ratably to prepay the principal amount of all Loans then outstanding until paid in full;

sixth, ratably to pay any other Obligations then due and payable; and

seventh, to the Company.

2.11    **General Provisions Regarding Payments**.

(a)    All payments by the Company of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without recoupment, setoff, counterclaim or other defense, free of any restriction or condition, and delivered to Administrative Agent not later than 2:00 p.m. (New York, New York time) on the date due to Administrative Agent's Account for the account of Lenders; funds received by Administrative Agent after that time on such due date may be deemed to have been paid by the Company on the next Business Day. If the Company has insufficient funds to pay the accrued but unpaid Interest on any date due, the Company hereby authorizes Administrative Agent (at the written instruction of the Requisite Lenders) to debit the Capital Reserve Amount on deposit in the Capital Reserve Account in the amount of any such shortfall; provided that (i) Administrative Agent shall be under no obligation to do so, (ii) this Section 2.11 is not intended to limit the Company's obligation to pay interest on any Interest Payment Date, and (iii) the Company shall be obligated to replenish the Capital Reserve Amount in an amount equal to such debited amount.

(b)    All prepayments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid.

(c)    Administrative Agent shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(d)    Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

(e)    Administrative Agent shall deem any payment by or on behalf of the Company hereunder that is not made in same day funds prior to 2:00 p.m. (New York, New York time) to be a non-conforming payment. Any such payment may not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. Interest and fees shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the applicable rate determined pursuant to Section 2.6(a) from the date such amount was due and payable until the date such amount is paid in full.

(f)    Upon (A) any prepayment of any Loans, whether such prepayment occurs (i) as a result of an acceleration thereof pursuant to Section 8.2 (whether automatic or optional acceleration) following an Event of Default or otherwise or (ii) at the Company's option, which the Company may, upon written notice as provided below, make for all (or any portion) of such Loans or (B) any acceleration of the Loans pursuant to Section 8.2 (whether automatic or optional acceleration) following an Event of Default or otherwise, in the case of each of (A) and (B), solely to the extent occurring on or prior to the date that is twelve (12) months following the Closing

Date (the "**Make-Whole Expiry Date**"), as applicable, the Company shall make a payment to the Administrative Agent in an aggregate amount equal to 100% of the principal amount so prepaid or accelerated plus the Make-Whole Amount with respect to such Loans, determined by the Administrative Agent for the prepayment date (or in the case of an acceleration of the Loans, the date of such acceleration) with respect to such principal amount plus any accrued and unpaid interest thereon.

(g)    (i) Together with any repayment pursuant to the terms of this Agreement, whether such repayment occurs as a result of an acceleration (whether automatic or optional acceleration) following an Event of Default or otherwise or (ii) upon any acceleration (whether automatic or optional acceleration) following an Event of Default or otherwise, then the Company shall pay to the Administrative Agent, for the benefit of all Lenders, in addition to the amount so repaid or accelerated, an amount equal to the percentage set forth in the following chart of the principal amount so repaid or accelerated, together with unpaid interest on the amount so repaid or accelerated (such amount to be calculated by the Administrative Agent) (any such amount herein referred to as the "**Repayment Premium**").

| Date of Repayment | Repayment Percentage |
|---|---|
| From, and including, the Closing Date through, and including, the second anniversary of the Closing Date | 7.875% |
| From, and including, the date immediately succeeding the second anniversary of the Closing Date through, and including, the third anniversary of the Closing Date | 5.000% |
| From, and including, the date immediately succeeding the third anniversary of the Closing Date through, and including, the fourth anniversary of the Closing Date | 2.500% |
| Thereafter | 0.000% |

Any payment required pursuant to this Section 2.11(g) is in addition to, and not a replacement of any amount paid pursuant to Section 2.6(a) and Section 2.11(f). For the avoidance of doubt, this Section 2.11(g) is for the benefit of the Lenders only and is not intended to be the sole remedy for any Default by the Company.

2.12    **Ratable Sharing**. Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans and applied in accordance with the terms hereof), through the exercise of any right of set off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Loan Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Loan Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such

proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase Loans (which it shall be deemed to have purchased from each seller of a Loan simultaneously upon the receipt by such seller of its portion of such payment) in the ratable Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided that, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of the Company or otherwise, those purchases to that extent shall be rescinded and the purchase prices paid for such Loans shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. The Company expressly consents to the foregoing arrangement and agrees that any Lender of a Loan so purchased may exercise any and all rights of banker's lien, set off or counterclaim with respect to any and all monies owing by the Company to that Lender with respect thereto as fully as if that Lender were owed the amount of the Loan held by that Lender.

2.13    **Increased Costs**.  Subject to the provisions of Section 2.13 (which shall be controlling with respect to the matters covered thereby), in the event that any Lender shall determine (which determination shall, absent manifest error, be presumed correct) that any Governmental Requirement, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or Governmental Authority, in each case that becomes effective after the date hereof, or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other Governmental Authority or quasi-Governmental Authority (whether or not having the force of law): (a) subjects such Lender (or its Applicable Office) to any additional Tax (other than (A) any Tax on the Overall Net Income of such Lender, or (B) any Tax for which the Lender is indemnified pursuant to Section 2.14) with respect to this Agreement or any of the other Loan Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its Applicable Office) of principal, interest, fees or any other amount payable hereunder or its deposits, reserves or capital attributable thereto; (b) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender; or (c) imposes any other condition, cost or expense (other than with respect to a Tax matter) on or affecting such Lender (or its Applicable Office) or its obligations hereunder; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its Applicable Office) with respect thereto; then, in any such case, Company shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder.  Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.13, which statement shall be presumed correct absent manifest error.

2.14    **Taxes; Withholding, etc**.

(a)    <u>Payments to Be Free and Clear</u>.  All sums payable by or on account of the Company hereunder and under the other Loan Documents shall (except to the extent otherwise required by law) be paid without any deduction or withholding for any Taxes.

(b)    <u>Withholding of Taxes</u>.  If the Company or the Administrative Agent is required by law to make any deduction or withholding for or on account of any Tax from any sum paid or payable under any of the Loan Documents:  (i) the Company shall notify, in writing, Administrative Agent of any such requirement or any change in any such requirement as soon as the Company becomes aware of it; (ii) the Company or the Administrative Agent, as applicable, shall be entitled to make such deduction or withholding and shall pay (or cause to be paid) any such Tax to the relevant Governmental Authority before the date on which penalties attach thereto; (iii) the sum payable by the Company in respect of which the relevant deduction or withholding is required shall be increased to the extent necessary to ensure that after any such deduction or withholding, Administrative Agent or such Lender, as the case may be, and each of their Tax Related Persons receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required; and (iv) within thirty (30) days after making any such deduction or withholding, the Company shall deliver to Administrative Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant taxing or other authority; <u>provided</u> that no such additional amount shall be required to be paid to any Lender under clause (iii) above for (A) any U.S. federal withholding Tax imposed on amounts payable to a Lender at the time such Lender becomes a party hereto or such Lender changes its Applicable Office, except to the extent that, pursuant to this <u>Section 2.14</u>, amounts with respect to such U.S. federal withholding Taxes were payable to such Lender's assignor (including each of their Tax Related Persons) immediately before such Lender becomes a party hereto or to such Lender immediately before it changes its Applicable Office, (B) any Tax on the Overall Net Income of the Lender or any other Tax Related Person, (C) any U.S. federal withholding Tax imposed under FATCA, or (D) any Tax attributable to the failure of the Lender to comply with <u>Section 2.14(f)</u> ("**Excluded Taxes**").

(c)    <u>Other Taxes</u>.  In addition, the Company shall pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law.  The Company shall deliver to Administrative Agent official receipts, if any, or other evidence of such payment reasonably satisfactory to the Requisite Lenders in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(d)    <u>Indemnification</u>.  The Company shall indemnify Administrative Agent and each Lender, within ten (10) days after written demand therefor, for the full amount of any Taxes paid or incurred by Administrative Agent or such Lender or their respective Tax Related Persons, as the case may be, relating to, arising out of, or in connection with any Loan Document or any payment or transaction contemplated hereby or thereby, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, and all reasonable costs and expenses incurred in enforcing the provisions of this <u>Section 2.14</u>; <u>provided</u>, <u>however</u>, that the Company shall not be required to indemnify (except as set forth in <u>Section 2.14(g)(ii)</u> below) Administrative Agent and Lenders for (i) any Excluded Taxes, or (ii) in duplication of Taxes covered by <u>Sections 2.14(b)</u> or (c).  Notwithstanding the foregoing, any indemnification under this

Section 2.14(d) shall be made on an after-Tax basis, such that after all required deductions and payments of all Taxes (including any Tax on the Overall Net Income), such that after all required deductions and payment of all Taxes and any reasonable costs and expenses, the Administrative Agent, the Lenders and each of their respective Tax Related Persons receives and retains an amount equal to the sum it would have received and retained had it not paid or incurred or been subject to such Taxes or costs and expenses.  A certificate as to the amount of such payment or liability (together with sufficient supporting documentation to substantiate such amount) delivered to the Company by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after written demand therefor, for (i) any Taxes that are required to be indemnified by the Company under Section 2.14 and attributable to such Lender (but only to the extent that the Company has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Company to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.7(f) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)    Administrative Requirements; Forms Provision.  Each Lender that is a United States Person shall deliver to Administrative Agent for transmission to the Company, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of the Company or Administrative Agent (each in the reasonable exercise of its discretion), two executed copies of Internal Revenue Service (the "**IRS**") Form W-9 (or any successor form thereto) that certifies that the Lender is not subject to U.S. federal backup withholding tax and enables the Company and Administrative Agent to determine whether or not the Lender is subject to information reporting requirements.  Each Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to Administrative Agent for transmission to the Company, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of the Company or Administrative Agent (each in the reasonable exercise of its discretion), whichever of the following described in clauses (i) through (iv) below is applicable, accurately completed, valid and in a manner reasonably acceptable to the Company and the Administrative Agent:

(i)    in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest

under any Loan Document, two executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or, in each case, any successor form thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty, and (y) with respect to any other applicable payments under any Loan Document, two executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or, in each case, any successor form thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty.

       (ii)     in the case of a Non-U.S. Lender claiming that its extension of credit will generate U.S. effectively connected income, two executed copies of IRS Form W-8ECI (or any successor form thereto);

       (iii)    in the case of a Non-U.S. Lender eligible to claim the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (A) a certificate substantially in the form of Exhibit L-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Company within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "**U.S. Tax Compliance Certificate**") and (B) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E (or, in each case, any successor form thereto); or

       (iv)    to the extent a Non-U.S. Lender is not the beneficial owner, two executed copies of IRS Form W-8IMY (or any successor form thereto), accompanied by IRS Form W-8ECI (or any successor form thereto), IRS Form W-8BEN (or any successor form thereto), IRS Form W-8BEN-E (or any successor form thereto), a U.S. Tax Compliance Certificate substantially in the form of Exhibit L-2 or Exhibit L-3, IRS Form W-9 (or any successor form thereto), and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are eligible to claim the portfolio interest exemption, such Non-U.S. Lender shall provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit L-4 on behalf of each such direct and indirect partner.

Each Lender required to deliver any forms, certificates or other evidence with respect to U.S. federal income tax withholding matters pursuant to this Section 2.14(f) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms certificates or other evidence obsolete, expired, invalid or inaccurate in any material respect, that such Lender shall promptly deliver to Administrative Agent for transmission to the Company two new copies of IRS Form W-9, IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-8IMY or IRS Form W-8ECI (or any successor form(s) of any of the foregoing), and as applicable, a U.S. Tax Compliance Certificate properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by the Company to confirm or establish that such Lender is not subject to deduction or withholding of U.S. federal income Tax with respect to payments to such Lender under the Loan Documents or is subject to deduction or

withholding at a reduced rate, or notify Administrative Agent of its inability to deliver any such forms, certificates or other evidence. Each Lender agrees that if any form or certificate it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certificate or promptly notify the Administrative Agent in writing of its legal inability to do so.

(g)    (i) If a payment made to a Lender (or any Tax Related Person of any Lender) under any Loan Document is subject to U.S. federal withholding Tax imposed by FATCA, such Lender shall deliver to the Company and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Company or Administrative Agent such documentation prescribed by applicable law and such additional documentation reasonably requested by the Company or Administrative Agent as may be necessary (i) for the Company and Administrative Agent to comply with their obligations under FATCA, and (ii) (1) to determine that such Lender has complied with such Lender's obligations under FATCA, or (2) to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.14(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(ii)    Notwithstanding anything herein to the contrary, the Company hereby agrees that the Administrative Agent shall be entitled to make any withholding or deduction from payments to the extent necessary to comply with FATCA for which the Administrative Agent shall not have liability. The Company agrees to indemnify and hold harmless the Administrative Agent for any losses it may suffer due to actions it takes to comply with FATCA in connection with the performance of the Administrative Agent's duties as the administrative agent with respect to the Loans. The terms of this section shall survive the termination of this Agreement and the resignation or removal of the Administrative Agent

2.15    **OID**. Notwithstanding anything else herein, including Section 2.1, the Company acknowledges and agrees that it will receive proceeds of the Closing Date Loans on the Closing Date net of four percent (4.00%) of the principal amount of total Commitments (which, for the avoidance of doubt, are equal to $475,000,000.00). Such discount will be treated as original issue discount on the Closing Date Loans and the Delayed-Draw Loans for U.S. federal income tax purposes and will reduce the net issue price of the Closing Date Loans and the Delayed-Draw Loans.

2.16    **Tax Treatment**. The Lenders and the Company agree that the Loans shall not be treated as "contingent payment debt instruments" under Section 1.1275-4 of the United States Treasury Regulations (or any corresponding provision of state income tax law) and to file all U.S. federal income tax and state income and franchise tax returns in a manner consistent with the foregoing.

2.17    **Incremental Facility**.

(a)    General. The Company and any one or more Lenders (including New Lenders) may from time to time agree that such Lenders shall increase the Commitments by making available an Incremental Facility Commitment by executing and delivering to the Administrative Agent an Incremental Facility Activation Notice specifying (1) the amount of such

Incremental Facility Commitment, (2) the applicable Incremental Facility Closing Date, (3) the applicable interest for such Incremental Facility Loans, (4) the identity of the Lenders (including potential New Lenders) providing such Incremental Facility Loans and (5) the maturity date for such Incremental Facility Loans, which may not be earlier than the Maturity Date; provided, that, if the total yield (taking into account the upfront fees, any interest rate floors and any call protection or make-whole and any other payments made in connection therewith) of the Incremental Facility Loans shall exceed the total yield for the existing Loans, then the total yield for the existing Loans shall be increased so that the total yield in respect of the existing Loans is the same as the total yield for the Incremental Facility Loans. In addition, without the consent of the Administrative Agent, each increase effected pursuant to this Section 2.17(a) shall be in a minimum amount of at least $25,000,000 and in an amount that is an integral multiple of $5,000,000. Unless consented to by the Requisite Lenders in their sole discretion, (i) such Incremental Facility Loans shall not (1) have a shorter weighted average life to maturity than the existing Loans, (2) provide for any voluntary, or require any mandatory, prepayments other than those set forth in this Agreement and on a pro rata basis or (3) have any covenants or other terms and conditions that are more restrictive to the Group Members than the covenants, terms and conditions contained in this Agreement, (ii) the Incremental Facility Loans shall rank pari passu or junior in right of payment and security with the outstanding Loans, and (iii) to the extent that any Incremental Facility Loan is secured by a Lien junior to the Liens securing the Obligations, such liens shall be subject to a customary intercreditor agreement in form and substance reasonably satisfactory to the Requisite Lenders. No Lender shall have any obligation to participate in any increase described in this Section 2.17(a) unless it agrees to do so in its sole discretion.

(b)    New Lender Supplement.  Any additional bank, financial institution or other entity which elects to become a "Lender" under this Agreement in connection with any transaction described in Section 2.17(a) shall be approved in writing by the Administrative Agent and shall execute a New Lender Supplement (each, a "**New Lender Supplement**"), substantially in the form of Exhibit K, whereupon such bank, financial institution or other entity (a "**New Lender**") shall become a Lender for all purposes and to the same extent as if originally a party hereto and shall be bound by and entitled to the benefits of this Agreement.

(c)    Lenders under the Incremental Facility. No Person other than a Lender may become an Incremental Facility Lender hereunder unless (i) the Company has provided to the then-existing Lenders written notice of its intent to borrow Incremental Facility Loans at least fifteen (15) days prior to delivery of the Incremental Facility Activation Notice and such written notice includes the terms and conditions of such Incremental Facility Loans; and (ii) one or more of the then-existing Lenders have not affirmatively responded with their interest pursuant to the following two sentences, subject to the terms and conditions of this Agreement, to provide an aggregate amount of Incremental Facility Loans equal to or greater than the amount of such Incremental Facility Loans the Company is then seeking (and in such case, New Lenders may only provide Incremental Facility Loans in an amount not to exceed the amount that the aggregate amount of Incremental Facility Loans the Company is then seeking exceeds the amount of such Incremental Facility Loans that the then-existing Lenders were willing to provide subject to the terms and conditions of this Agreement).  Upon receipt of the written notice from the Company of its intent to borrow Incremental Facility Loans, each then-existing Lender shall have fifteen (15) days to provide written notice to the Company of its interest to participate in the Incremental Facility Loans.  If a Lender fails to provide written notice of its interest to participate in the

Incremental Facility Loans within fifteen (15) days of receipt of the Company's notice, it shall be deemed to have no interest in participating the Incremental Facility Loans and shall not be allocated any Incremental Facility Commitment. Each existing Lender that affirmatively confirmed such interest shall be allocated a participation in the Incremental Facility Loans in proportion to its current participation in the existing Loans unless otherwise agreed between such Lender and the Company.

(d)    Conditions to Effectiveness.  Each Incremental Facility Commitment shall be effective upon the occurrence of the relevant Incremental Facility Closing Date and subject to the following conditions precedent:

(i)    no Default or Event of Default shall have occurred and be continuing on the relevant Incremental Facility Closing Date and no Default or Event of Default would occur as a result of the effectiveness of the Incremental Facility Commitment;

(ii)    after giving pro forma effect to the incurrence of such Incremental Facility Loans, (i) to the extent such incurrence occurs prior to the last day of the Fiscal Quarter ending June 30, 2020, the Total Asset Coverage Ratio is not less than 1.00 to 1.00 and (ii) to the extent such incurrence occurs after June 30, 2020, the PDP Asset Coverage Ratio is not less than 1.00 to 1.00;

(iii)    the Administrative Agent shall have received a certificate of a Responsible Officer of the Company certifying that:

(1)    each of the representations and warranties made by any Obligor or Group Member in or pursuant to the Loan Documents is true and correct in all material respects immediately prior to, and after giving effect to, the incurrence of the Incremental Facility Commitment as if made on and as of each such date except (x) to the extent such representations or warranties are made as of a specified date, in which case, such representations and warranties shall be true and correct in all material respects as of such date and (y) to the extent that any representation and warranty is qualified by materiality, Material Adverse Effect or a similar qualification, such representation and warranty shall be true in all respects as so qualified; and

(2)    giving pro forma effect to such Incremental Facility Loans and the application of the proceeds thereof, the Company shall be in compliance with Section 6.7.

(iv)    the Administrative Agent shall have received any customary closing documents or information, including legal opinions, board resolutions, officers' certificates, certificates from independent engineers and reaffirmations agreements, reasonably requested by the Administrative Agent;

(v)    each New Lender shall have executed and delivered to the Administrative Agent a New Lender Supplement and all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations,

including the USA Patriot ACT, in addition to all documentation as the Administrative Agent shall reasonably specify to evidence the New Lender becoming a Lender hereunder;

(vi)    to the extent applicable, this Agreement and the other Loan Documents shall have been amended in accordance with Section 2.17(e);

(vii)    Availability Period shall have expired;

(viii)    to the extent not otherwise required under this Section 2.17(d), the other conditions to each Loan set forth in Section 3.2 hereof shall have been satisfied; and

(ix)    such other conditions, if any, as the Company, the Incremental Facility Lenders and Administrative Agent may agree.

(e)    Amendments.  In addition to the foregoing, each of the parties hereto hereby agrees that this Agreement shall be amended to the extent (but only to the extent) necessary to effectuate any terms and conditions of the Incremental Facility Commitments to the extent these differ from those set forth herein. Any such amendment shall be effected in writing by the Administrative Agent and the Company and furnished to the other parties hereto.

## SECTION 3
## CONDITIONS PRECEDENT

3.1    **Closing Date**.  The obligation of each Lender to make the Loans on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 10.6, of the following conditions on or before the Closing Date:

(a)    Loan Documents; Related Agreements.  Each Lender and Administrative Agent shall have received sufficient copies of each Loan Document originally executed and delivered by the Company and each Related Agreement.

(b)    Notes.  The Administrative Agent shall have received duly executed Notes payable to each Lender that has requested a Note in a principal amount equal to its Commitment dated as of the Closing Date.

(c)    Organizational Documents; Incumbency.  Each Lender and Administrative Agent shall have received (i) sufficient copies of each Organizational Document of each Group Member and each Parent Company, certified as of a recent date by the appropriate Governmental Authority, for each Lender, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of the Company and each Parent Company executing the Loan Documents; (iii) resolutions of the board of directors, the manager(s) or member(s) or similar governing body of the Company and each Parent Company approving and authorizing the execution, delivery and performance of this Agreement, the other Loan Documents and the Related Agreements to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by an Authorized Officer as being in full force and effect without modification or amendment; and (iv) a good standing certificate for each Group Member and each Parent Company from the applicable Governmental Authority in such Person's jurisdiction of incorporation, organization or formation and in each jurisdiction in which such Person is qualified

as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date.

(d)     Title to Oil and Gas Properties.  The Lenders shall have received title information as the Requisite Lenders may require, satisfactory to the Requisite Lenders, setting forth the status of title to the Oil and Gas Properties.

(e)     Governmental Authorizations and Consents.  Except as provided in Schedule 4.5, each Group Member shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are required to be obtained by a Group Member in connection with the Transactions or any transactions contemplated the Related Agreements, and each of the foregoing shall be in full force and effect and in form and substance satisfactory to the Requisite Lenders.  All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the Transactions or any transactions contemplated by the Related Agreements and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(f)     Personal Property Collateral.  In order to create in favor of Administrative Agent, for the benefit of the Lenders a valid and perfected First Priority security interest, in all personal property Collateral of the Company, Administrative Agent shall have received:

(i)     evidence satisfactory to the Requisite Lenders of the compliance by the Company and each Parent Company of their respective Obligations under the Company Collateral Agreement, the Parent Pledge Agreement and the other Collateral Documents to which it is party (including its obligation to deliver UCC financing statements, originals of securities, instruments and chattel paper); and

(ii)     (A) the results of a recent search, by a Person satisfactory to the Requisite Lenders to any personal or mixed property of each Group Member and each Parent Company in the applicable jurisdictions, together with copies of all such filings disclosed by such search and (B) UCC termination statements (or similar documents) of all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements (or equivalent filings) disclosed in such search that do not constitute Permitted Liens;

(g)     Related Agreements.  Administrative Agent shall have received a certificate from an Authorized Officer of the Company certifying that all notices to operators, partners or other necessary parties under, and other actions required by, the Related Agreements have taken place prior to the Closing Date.

(h)     Environmental Reports.  Administrative Agent shall have received reports and other information, in form, scope and substance satisfactory to the Requisite Lenders, regarding environmental matters relating to the Oil and Gas Properties.

(i)     Evidence of Insurance.  Administrative Agent shall have received a copy of the certificate from the insurance broker of the Company or other evidence satisfactory to the

Requisite Lenders that all insurance required to be maintained pursuant to Section 5.6 is in full force and effect, together with all other endorsements and other requirements set forth in Section 5.6.

(j)    Opinion of Counsel to the Company.  The Administrative Agent shall have received an executed copy of a legal opinion of Baker Botts L.L.P., special counsel for the Company, addressed to the Administrative Agent and the Lenders and dated as of the Closing Date and covering such customary matters in financings of this type as the Requisite Lenders may reasonably request and otherwise in form and substance reasonably satisfactory to the Requisite Lenders and subject to customary assumptions, exceptions and limitations.

(k)    Expenses.  The Company shall have paid or shall have made arrangements to pay as set forth in the funds flow memorandum delivered pursuant to Section 3.1(q) to Administrative Agent all amounts payable pursuant to Section 10.2.

(l)    Solvency Certificate.  On the Closing Date, Administrative Agent shall have received a Solvency Certificate from the Company dated as of the Closing Date, in form, scope and substance satisfactory to the Requisite Lenders, that after giving effect to the consummation of the Transactions, the Group Members satisfy clause (a) of the definition of Solvent.

(m)    Closing Date Certificate.   The Company shall have delivered to Administrative Agent an executed Closing Date Certificate, together with all attachments thereto.

(n)    No Litigation.  There shall not exist any Adverse Proceeding that singly or in the aggregate, materially impairs any of the Transactions or transactions contemplated by the Related Agreements.

(o)    Due Diligence.  Lenders shall have received unaudited historical financial statements for the Fiscal Year ended December 31, 2017.  No information or materials are or should have been available to any Group Member as of the Closing Date that are materially inconsistent with the material previously provided to the Requisite Lenders for their due diligence review.  Each Lender shall be satisfied with a due diligence review of each Group Member's Material Contracts, including, but not limited to, satisfactory review of such operating agreements, marketing agreements, transportation agreements, processing agreements and other agreements constituting Material Contracts governing or relating to the Group Member's Oil and Gas Properties.  Each Lender shall be satisfied with a due diligence review of the Company.

(p)    No Material Adverse Effect.   Since December 31, 2017, no event, circumstance or change shall have occurred that has caused or could reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect.

(q)    Funds Flow.  Administrative Agent shall have received at least two (2) days prior to the Closing Date a funds flow memorandum, in form and substance satisfactory to the Requisite Lenders.

(r)    Capital Reserve Account.  The Company shall have established at its expense the Capital Reserve Account in accordance with Section 7.1.

(s)    <u>Capital Structure</u>.  The Requisite Lenders shall be satisfied with the capital structure of the Group Members.

(t)    <u>Initial Borrowing Notice</u>.  Administrative Agent shall have received a fully-executed Borrowing Notice.

(u)    <u>RBL Facility Loan Documents</u>. (i) The Administrative Agent shall have received reasonably satisfactory evidence that the RBL Facility and RBL Facility Loan Documents are in form and substance satisfactory to the Administrative Agent and the Lenders and (ii) the Company shall have delivered a copy of the executed RBL Facility Credit Agreement (and all exhibits and schedules thereto) to the Administrative Agent certified by a Financial Officer as being true, correct and complete.

(v)    <u>KYC Documentation</u>.  The Company shall have delivered to Administrative Agent all documents, including IRS Form W-9, that are necessary for it and the Lenders to comply with their respective know-your-customer procedures.

3.2    **Loan Conditions**.  The obligation of each Lender to make any Loan is subject to each of the following conditions being completed to the satisfaction of the Requisite Lenders:

(a)    <u>Representations and Warranties</u>. The representations and warranties of the Company set forth in this Agreement shall be true and correct on and as of the date of any such Borrowing (unless such representations and warranties are stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date).

(b)    <u>No Default or Event of Default</u>. At the time of and immediately after giving effect to any Borrowing, no Default or Event of Default shall have occurred and be continuing.

(c)    <u>Financial Ratios</u>. The Company shall be in pro forma compliance with <u>Section 6.7</u> upon the making of any Loans, such compliance to be certified by an Authorized Officer of the Company in a certificate delivered to Administrative Agent.

(d)    <u>Projections</u>. The Lenders shall have received monthly projections of the type referred to in <u>Section 4.8</u> for a period of 24 months from the date of the applicable Borrowing Notice, together with a projected schedule of the Group Member's drilling and recompletion activities over such period of time.

(e)    <u>Expenses</u>. The Administrative Agent shall have received evidence of payment or arrangements for payment from the proceeds of the Borrowing of all or any portion of such fees and expenses then due and payable under the Loan Documents and all other filing, recordation or similar fees, taxes necessary for the consummation of the transactions contemplated by the Loan Documents.

(f)    <u>Borrowing Notice</u>. In the case of any Delayed-Draw Loans, a Financial Officer of the Company shall have delivered an executed Borrowing Notice, substantially in the form of <u>Exhibit A</u>, representing and warranting and otherwise demonstrating to the satisfaction of the Requisite Lenders that, as of such date, the Company reasonably expects, after giving effect to making of such Delayed-Draw Loans and based upon good faith determinations and projections

consistent with the Financial Plan, to be in compliance in all material respects with all operating and financial covenants set forth in this Agreement as of the last day of each Fiscal Quarter ending prior to the Maturity Date; provided, however, that to the extent any operating or financial covenant herein contains any qualifying language as to materiality such as "material", "in all material respects," "except as could not reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect" or similar qualifying language, then the phrase "in all material respects" in this Section 3.2(f) shall be disregarded with respect to certifying compliance with respect to such operating and financial covenant; provided, further, that such Borrowing Notice shall be delivered no later than ten (10) days prior to the termination of the Availability Period and the Lenders' Delayed-Draw Commitments shall terminate upon such date.

(g)    Permitted Acquisition. In the case of any Delayed-Draw Loans being used to fund a Permitted Acquisition in accordance with the APOD, the Permitted Acquisition Conditions have been satisfied.

Each Borrowing shall be deemed to constitute a representation and warranty by the Company on the date thereof as to the matters specified in paragraphs (a) through (g) of this Section 3.2.

SECTION 4
**REPRESENTATIONS AND WARRANTIES**

In order to induce Lenders to enter into this Agreement and to make their respective Loans, each Group Member and each Parent Company represents and warrants to Administrative Agent and each Lender, (a) on the Closing Date (b) on each date that a Borrowing Notice is delivered and (c) on the date of each Borrowing, that the following statements are true and correct:

4.1    **Organization; Requisite Power and Authority; Qualification**.  Each Group Member and each Parent Company (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own and operate its Properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents and the Related Agreements to which it is a party and to carry out the Transactions contemplated thereby and, in the case of the Company, to make the borrowings hereunder, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations as now conducted, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect.

4.2    **Capital Stock and Ownership**.  The Capital Stock of each Group Member has been duly authorized and validly issued.  Except as set forth on Schedule 4.2, as of the Closing Date there is no existing option, warrant, call, right, commitment or other agreement to which any Group Member is a party requiring, and there is no other Capital Stock of any Group Member outstanding which upon conversion or exchange would require, the issuance by any Group Member of any additional membership interests or other Capital Stock of any Group Member or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of any Group Member.  Schedule 4.2 sets forth a true, complete and correct list as of the Closing Date, both before and after giving effect to

the Transactions, of the name of each Group Member and indicates for each such Person its ownership (by holder and percentage interest) and the type of entity of each of them, and the number and class of authorized and issued Capital Stock of such Person.  Except as set forth on Schedule 4.2, as of the Closing Date, no Group Member has any equity investments in any other corporation or entity.

4.3   **Due Authorization**.   The execution, delivery and performance of the Loan Documents (including, for the avoidance of doubt, the use of proceeds of (a) the Closing Date Loans for the purposes and in the amounts set forth on Schedule 2.4 (including to the extent such amounts constitute a distribution or dividend on Capital Stock) and (b) the Delayed-Draw Loans for the purposes and in the amounts set forth on the applicable Borrowing Notice and in strict accordance with the APOD) and the Related Agreements have been duly authorized by all necessary corporate, limited liability company or partnership (as applicable) action and, if required, shareholder, member and/or partner action, on the part of each Group Member and each Parent Company that is a party thereto.

4.4   **No Conflict**.   The execution, delivery and performance by each of the Group Members and each Parent Company of the Loan Documents (including, for the avoidance of doubt, the use of proceeds of (a) the Closing Date Loans for the purposes and in the amounts set forth on Schedule 2.4 (including to the extent such amounts constitute a distribution or dividend on Capital Stock) and (b) the Delayed-Draw Loans for the purposes and in the amounts set forth on the applicable Borrowing Notice and in strict accordance with the APOD) and the Related Agreements to which such Group Member or Parent Company is a party do not and will not (a) violate in any material respect any provision of any Governmental Requirement applicable to, or any of the Organizational Documents of, any Group Member or any Parent Company; (b) conflict with, result in a material breach of or constitute (with due notice or lapse of time or both) a material default under any RBL Facility Loan Document or any Material Contract of any Group Member or any Parent Company, other than with respect to agreements evidencing Indebtedness that is being repaid in full on the Closing Date; (c) result in or require the creation or imposition of any Lien upon any of the Properties or assets of any Group Member or any Parent Company (other than any Liens created under any of the Loan Documents in favor of Administrative Agent, on behalf of the Lenders and other Permitted Liens); (d) result in any material default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to any Group Member's or any Parent Company's operations or any of its Properties or (e) require any approval of stockholders, members or partners or any approval or consent of any Person under any RBL Facility Loan Document or any Material Contract of any Group Member or any Parent Company, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Administrative Agent and the Lenders.

4.5   **Governmental Consents**.   Except as set forth on Schedule 4.5, the execution, delivery and performance by each of the Group Members and each Parent Company of the Loan Documents and Related Agreements to which they are parties and the consummation of the Transactions do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority to be made, taken or obtained by a Group Member or Parent Company, except for (a) filings and recordings with respect to the Collateral to be made by the Administrative Agent, or otherwise delivered to the Lenders for filing and/or recordation, as of the Closing Date, (b) filings necessary to maintain perfection of the

Collateral, (c) routine filings related to such Group Member or Parent Company and the operation of its business, and (d) such filings as may be necessary in connection with the Administrative Agent's or Lender's exercise of remedies under the Loan Documents.

4.6     **Binding Obligation**.  Each Loan Document and each Related Agreement has been duly executed and delivered by each Group Member and each Parent Company (or Affiliate of such Persons) that is a party thereto and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether enforcement is sought in equity or at law).

4.7     **Financial Information**.  As of the Closing Date, the Group Members have no contingent liability or liability for Taxes, long term lease or unusual forward or long term commitment including under any farm-in, exploration or other development agreement that has not been disclosed in writing to the Lenders and which in any such case is material in relation to the business, operations, properties, assets or condition (financial or otherwise) of the Company taken as a whole.  All material obligations of the Group Members to make capital expenditures to drill or otherwise develop any Oil and Gas Properties have been disclosed to the Lenders.

4.8     **Projections**.  On and as of the Closing Date, the Projections of the Company and its consolidated Subsidiaries for the period from the Closing Date through and including the date that is four (4) years after the Closing Date, including monthly projections of production and cashflow for each month during the Fiscal Year in which the Closing Date takes place, (the "**Projections**") are based on good faith estimates and assumptions made by the management of the Company and, as of the Closing Date, the management of the Company believed that the Projections were reasonable.

4.9     **No Material Adverse Effect**.   Except as reflected on <u>Schedule 4.9</u>, since December 31, 2017, (a) no event, circumstance or change has occurred that has caused or could reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect and (b) the business of the Group Members has been conducted only in the ordinary course consistent with past business practices.

4.10     **No Restricted Junior Payments**.  Except as reflected on <u>Schedule 4.10</u>, since December 31, 2017, neither the Company nor any of its Subsidiaries or any Affiliate has directly or indirectly declared, ordered, paid or made, or set apart any sum or property for, any Restricted Junior Payment or agreed to do so except as permitted pursuant to <u>Section 6.3</u>.

4.11     **Adverse Proceedings, etc**.  Except as reflected on <u>Schedule 4.11</u> (and, in the case of Environmental Claims, to the knowledge of the Group Members), there are no Adverse Proceedings, individually or in the aggregate, which could reasonably result in a Material Adverse Effect.   No Group Member (a) is in violation of any Governmental Requirement of any Governmental Authority (including, to the knowledge of the Group Members, Environmental Laws) that, individually or in the aggregate, could result in a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or

regulations of any Governmental Authority, domestic or foreign, that relate to any Loan Document, any Related Agreement or any of the Transactions.

4.12    **Payment of Taxes**.  Except as reflected on <u>Schedule 4.12</u>, all income and other material Tax returns and reports of each Group Member required to be filed by any of them have been timely filed (taking into account any extensions obtained in the ordinary course), and all Taxes shown on such Tax returns to be due and payable and all other material Taxes upon any Group Member and upon their respective Properties, assets, income, businesses and franchises which are due and payable have been paid prior to delinquency, except those which are being actively contested by such Person in good faith and by appropriate proceedings, which are reflected on <u>Schedule 4.12</u> to the extent in existence on the Closing Date; <u>provided</u>, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.  The charges, accruals and reserves on the books of the Company and its Subsidiaries in respect of Taxes and other governmental charges are, in the reasonable opinion of the Company or its Subsidiaries (as applicable), adequate.  No Liens for Taxes have been filed and, to the knowledge of the Company, no claim is being asserted in writing with respect to any such Tax or other such governmental charge.

4.13    **Properties**.

(a)    <u>Title</u>.

(i)    Each Group Member has good and defensible title to its Oil and Gas Properties and good title to all its personal Properties (or a valid leasehold interest with respect to all leasehold interests in other real or personal Property), in each case, free and clear of all Liens other than Permitted Liens.  After giving full effect to the Permitted Liens, each such Group Member owns at least the net interests in production attributable to its Hydrocarbon Interests as reflected in the most recently delivered Reserve Report (or internally generated engineering data), and the ownership of such Properties shall not obligate such Group Member to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of its working interest in each Property set forth in the most recently delivered Reserve Report (or internally generated engineering data) that is not offset by a corresponding proportionate increase in such Group Member's net revenue interest in such Property;

(ii)    All leases and agreements necessary for the conduct of the business of each Group Member are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases; and

(iii)    The rights and Properties presently owned, leased or licensed by each Group Member including, without limitation, all easements and rights of way, include all rights and Properties reasonably necessary to permit such Group Member to conduct its business.

(b)    <u>Oil and Gas Properties</u>.  Each Group Member's Oil and Gas Properties have been maintained, operated and developed in a good and workmanlike manner and in conformity

with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of such Group Member's Hydrocarbon Interests and other contracts and agreements forming a part of such Group Member's Oil and Gas Properties. Specifically in connection with the foregoing, (i) no Oil and Gas Property of any Group Member is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of any Group Member's Oil and Gas Properties is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, or otherwise are legally located within, such Group Member's Oil and Gas Properties (or in the case of wells located on Facilities unitized therewith, such unitized Properties).

(c)     Each Group Member owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other Intellectual Property material to its business, and the use thereof by such Person does not infringe in any material respect upon the rights of any other Person. Each Group Member either owns or has valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used or usable in the conduct of its business, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons.

4.14    **Environmental Matters**.  Except for such matters as set forth on <u>Schedule 4.14</u>:

(a)     Each Group Member's operations on the Oil and Gas Properties (and to the knowledge of the Group Members, after reasonable and customary due diligence, all Oil and Gas Properties) are, and within all applicable statute of limitation periods have been, in compliance in all material respects with all applicable Environmental Laws.

(b)     The Group Members have obtained all Environmental Permits required for the operations of their respective Oil and Gas Properties, with all such Environmental Permits being currently in full force and effect, and no Group Member has received any written notice or otherwise has knowledge that any such existing Environmental Permit will be revoked or that any application for any new Environmental Permit or renewal of any existing Environmental Permit will be protested or denied.

(c)     To the knowledge of the Group Members, there are no claims, demands, suits, orders, inquiries, or proceedings concerning any material violation of, or any material liability (including as a potentially responsible party) under, any applicable Environmental Law that is pending or, to the Company's knowledge, threatened against any Group Member or any Group Member's Oil and Gas Properties or as a result of any operations at such Properties.

(d)     To the knowledge of the Group Members, none of the Properties of any Group Member contain or have contained any:  (i) underground storage tanks; (ii) asbestos-containing materials; (iii) landfills or dumps; (iv) hazardous waste management units as defined pursuant to RCRA or any comparable state law; or (v) sites on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or

published pursuant to any comparable state law.  To the knowledge of the Group Members, after reasonable and customary due diligence, none of the Properties contain or have contained any underground storage tanks, landfills or dumps.

(e)    There has been no Release, or to the Company's knowledge, threatened Release of Hazardous Materials at, on, under or from any Group Member's Properties that is required by law to be reported to any Governmental Authority or that would materially adversely affect the Properties (individually or cumulatively with any other Release).  There are no investigations, remediation, abatements, removals, or monitoring of Hazardous Materials required under applicable Environmental Laws at such Properties the failure of which to perform would materially adversely affect the Properties and, to the knowledge of the Group Members, none of such Properties are adversely affected by any Release or threatened Release of a Hazardous Material originating or emanating from any other real Property.

(f)    No Group Member nor, to the knowledge of the Group Members, any operator of any Group Member's Oil and Gas Properties, has received any written notice asserting an alleged liability or obligation under any applicable Environmental Laws with respect to the investigation, remediation, abatement, removal, or monitoring of any Hazardous Materials at, under, or Released or threatened to be Released from any real properties offsite any Group Member's Properties and, to the Company's knowledge, there are no conditions or circumstances that could reasonably be expected to result in the receipt of such written notice.

(g)    To the knowledge of the Group Members, there has been no exposure of any Person or Property to any Hazardous Materials as a result of or in connection with the operations and businesses of any Group Member's Oil and Gas Properties that could reasonably be expected to form the basis for a claim for damages or compensation and there are no conditions or circumstances that could reasonably be expected to result in the receipt of notice regarding such exposure.

(h)    The Group Members have provided to Administrative Agent complete and correct copies of all environmental site assessment reports, investigations, studies, analyses, and correspondence on environmental matters (including matters relating to any alleged non-compliance with or liability under Environmental Laws) that are in the Company's possession or control and relating to any Group Member's Oil and Gas Properties or operations thereon.

4.15    **No Defaults**.

(a)    Except as reflected on Schedule 4.15, no Group Member is in default in the performance, observance or fulfillment of the obligations, covenants or conditions contained in its Material Contracts.

(b)    No Default or Event of Default has occurred and is continuing.

4.16    **Material Contracts**.  Schedule 4.15 (as the same may be updated from time to time in writing by the Company) contains a true, correct and complete list of all the Material Contracts of each Group Member including such agreements relating to the purchase, transportation by pipeline, gas processing, development, marketing, sale and supply of Hydrocarbons, farmout arrangements, joint operating agreements, or operating agreements to which any Group Member

is a party on the Closing Date.  All such Material Contracts, are in full force and effect (other than any Material Contract that has expired or otherwise been amended, amended and restated, refinanced or otherwise modified as permitted pursuant to Section 6.13 of this Agreement and in accordance with its terms).

4.17    **Governmental Regulation**.  No Group Member is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  No Group Member is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18    **Margin Stock**.  No Obligor or Group Member is engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans will be used by such Obligor or Group Member to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

4.19    **Employee Benefit Plans**.  The Company, its Subsidiaries and each of their respective ERISA Affiliates are in compliance in all material respects with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan in all material respects.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status.  No liability to the PBGC (other than required premium payments) or the Internal Revenue Service has been or is expected to be incurred by any Obligor or Group Member or any of their ERISA Affiliates with respect to any Employee Benefit Plan.  No ERISA Event has occurred or is reasonably expected to occur.  Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, or otherwise funded entirely by the participants thereof, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of the Parent Companies, the Company, its Subsidiaries or any of their respective ERISA Affiliates.  The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by the Company, any of its Subsidiaries or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan.  As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of the Company, its Subsidiaries and their respective ERISA Affiliates for a complete or partial withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete or partial withdrawal from all Multiemployer Plans, is zero.  The Company, its Subsidiaries and each of their ERISA Affiliates

have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

4.20    **Brokers**.  No broker's or finder's fee or commission will be payable with respect hereto or any of the Transactions other than as set forth on Schedule 4.20.

4.21    **Solvency**.  Each Group Member is and, upon the request for any Borrowing by the Company on any date on which this representation and warranty is made, will be, Solvent.

4.22    **Related Agreements**.  Except to the extent otherwise expressly set forth herein or in the schedules hereto, and subject to the qualifications set forth therein, each of the representations and warranties given by any Group Member (or Affiliate of any Group Member) in any Related Agreement is true and correct in all material respects as of the date hereof (or as of any earlier date to which such representation and warranty specifically relates).  Notwithstanding anything in any Related Agreement to the contrary, the representations and warranties of each Group Member set forth in this Section 4.22 shall, solely for purposes hereof, survive the termination of such Related Agreement for the benefit of Administrative Agent and the Lenders.

4.23    **Disclosure**.  No representation or warranty of any Group Member contained in any Loan Document or Related Agreement and none of the reports, financial statements, certificates furnished to Administrative Agent and the Lenders by or on behalf of any Group Member for use in connection with the Transactions contains any untrue statement of a material fact or omits to state a material fact (known to the Company, in the case of any document not furnished by it), taken as a whole, necessary in order to make the statements contained herein or therein not misleading as of the time when made or delivered in light of the circumstances in which the same were made; provided, that any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by the Company to be reasonable at the time made.  There are no agreements, instruments or corporate or other restrictions to which any Group Member is subject, and there are no facts known (or which should upon the reasonable exercise of diligence be known) to the Company (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

4.24    **Insurance**.  The Property and the operators of any Oil and Gas Properties of any Group Member are insured in compliance with the requirements of Section 5.6.  Schedule 4.25 sets forth a list of all insurance maintained by or on behalf of the Group Members as of the Closing Date and, as of the Closing Date, all premiums in respect of such insurance have been paid.

4.25    **Separate Entity**.  The Company (a) has taken all necessary steps to maintain the separate status and records of the Group Members, on a consolidated basis, (b) does not commingle any assets or business functions with any other Person (other than any Group Member), (c) maintains separate financial statements from all other Persons (other than the other Group Members), (d) has not assumed or Guaranteed the debts, liabilities or obligations of others (other than any Group Member), (e) holds itself out to the public and creditors as an entity separate from all other Persons (other than the other Group Members), (f) has not committed any fraud or misuse of the separate entity legal status, (g) has not maintained its assets in such a manner that it will be

difficult to ascertain or identify its individual assets from those of its members, and (h) has not held itself out to be responsible for the debts of another Person (other than any Group Member).

4.26   **Security Interest in Collateral**.  The provisions of the Loan Documents create legal and valid Liens on all the Collateral in favor of the Administrative Agent for the benefit of the Administrative Agent and the Secured Parties, and in the case of Liens which may be perfected by filing a financing statement, when financing statements in appropriate form are filed in the appropriate office, such Liens constitute perfected and continuing First Priority Liens on the Collateral, securing the Obligations, enforceable against the Company, except in the case of Permitted Encumbrances, but only to the extent any such Liens would have priority over the Liens in favor of Administrative Agent by operation of law.

4.27   **Covered Person Transactions**.  Except as disclosed in Schedule 4.27, there are no existing or proposed agreements, arrangements, understandings, or transactions between any Group Member on the one hand, and any Covered Person on the other hand.  Except as disclosed on Schedule 4.27, no Covered Person is directly or indirectly indebted to or has any direct or indirect ownership, partnership, or voting interest in any Group Member.  To the knowledge of the Company, no Covered Person is directly or indirectly indebted to or has any direct or indirect ownership, partnership, or voting interest in any other Person with which any Group Member has a business relationship or which competes with any Group Member.  To the knowledge of the Company, none of the Group Members are party to any arrangement or understanding, regardless of whether such arrangement has been formalized, whereby (a) services or the sale of any Property are provided by a Covered Person on terms more favorable than that provided to the applicable Group Member for similar services or (b) any Covered Person provides any Group Member with services related to the gathering and processing of Hydrocarbons.

4.28   **Swap Agreements**.  Schedule 4.28, as of the date hereof (and after the date hereof, each report required to be delivered by the Company pursuant to Section 5.1(p), as of such date), sets forth, a true and complete list of all Swap Agreements of the Group Members, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the Net Mark-to-Market Exposure thereof and the counterparty to each such agreement.

4.29   **Permits, Etc**.  Except as disclosed in Schedule 4.29, each Group Member has, and is in compliance with, all material Governmental Authorizations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person and no condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such Governmental Authorization, and there is no written claim that any thereof is not in full force and effect.

4.30   **Names and Places of Business**.  No Group Member has, during the preceding five years, been known by, or used any other trade or fictitious name, except as disclosed in Schedule 4.30.  The chief executive office and principal place of business of each Group Member is located at the address of such Person set out in Schedule 4.30.  Except as indicated in Schedule 4.30, no Group Member has had any other office or place of business within the past 5 years.  Each such Person's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization,

and Federal Taxpayer Identification Number is stated on <u>Schedule 4.30</u> (or as set forth in a notice delivered pursuant to <u>Section 5.1(m))</u>.

4.31    **Marketing of Production**.  Except for contracts listed and in effect on the date hereof on <u>Schedule 4.31</u>, and thereafter either disclosed in writing to Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Company represents that it or the applicable Group Member is receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and is not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist that are not cancelable by the applicable Group Member on 60 days' notice or less without penalty or detriment for the sale of production from any Group Member's Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the effective date of such agreement.  No Cash Receipts are currently being held in suspense by such purchaser or any other Person.  Except as set forth in <u>Schedule 4.31</u>, none of the Oil and Gas Properties of any Group Member is subject to any contractual or other arrangement whereby payment for production therefrom is to be deferred for a period in excess of (i) thirty (30) days with respect to oil and (ii) sixty (60) days with respect to gas, in each case after the month in which such production is delivered.

4.32    **Right to Receive Payment for Future Production**.  Except as set forth in <u>Schedule 4.32</u>, no Oil and Gas Property is subject to any "take or pay", gas imbalances (in excess of one-half bcf of gas (on an mcf equivalent basis)) or other similar arrangement (a) which can be satisfied in whole or in part by the production or transportation of gas from other properties or (b) as a result of which production from any Oil and Gas Property may be required to be delivered to one or more third parties without payment (or without full payment) therefor as a result of payments made, or other actions taken, with respect to other properties.  Since the date of this Agreement, no material changes have occurred in such overproduction or underproduction except those that have been reported as required pursuant to <u>Section 5.1</u>.  No Cash Receipts in excess of one percent (1% of the Cash Receipts in any Fiscal Year) of the Proved Reserves of any Group Member is subject to any regulatory refund obligation and no facts exist which would reasonably be expected to cause the same to be imposed.

4.33    **Existing Accounts Payable**.  Set forth on <u>Schedule 4.33</u> hereto is a complete and correct list of all existing accounts payable with a value in excess of $100,000, individually, or $250,000, in the aggregate, of each Group Member as of the Closing Date.

4.34    **Related Agreement Obligations**.  Except as set forth on <u>Schedule 4.34</u>, as of the Closing Date, no amounts with a value in excess of $100,000, individually, or $250,000, in the aggregate, are past due under any Related Agreement by any Group Member.

SECTION 5
**AFFIRMATIVE COVENANTS**

The Company covenants and agrees that until payment in full in Cash of the Obligations, the Company shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

5.1     **Financial Statements and Other Reports**.

Unless otherwise provided below, the Company will deliver to Administrative Agent and Lenders:

(a)     Monthly Financial Statements.  As soon as available, and in any event within thirty (30) days after the end of each calendar month (including months which began prior to the date hereof), the consolidated balance sheet of the Company and its consolidated Subsidiaries as at the end of such month and the related consolidated statements of income, stockholders' equity and cash flows of the Company and its consolidated Subsidiaries for such month and for the period from the beginning of the then-current Fiscal Year to the end of such month, setting forth in each case in comparative form the corresponding figures for the prior period, all in reasonable detail, together with a Financial Officer Certification with respect thereto and any other operating reports prepared by management for such period.

(b)     Quarterly Financial Statements.  As soon as available, and in any event within forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year, the consolidated balance sheets of the Company and its consolidated Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income, stockholders' equity and cash flows of the Company and its consolidated Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then-current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a Financial Officer Certification with respect thereto;

(c)     Annual Financial Statements.  As soon as available, and in any event with respect to each Fiscal Year end, within one hundred twenty (120) days after the end of such Fiscal Year, (A) the consolidated balance sheets of the Company and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of the Company and its consolidated Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year, in reasonable detail, together with a Financial Officer Certification with respect thereto; and (B) with respect to such financial statements for any Fiscal Year ended December 31, 2017 and thereafter, a report thereon by independent certified public accountants of recognized regional standing selected by the Company and satisfactory to the Requisite Lenders (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit), which shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Company and its Subsidiaries as at the dates indicated and that the results of their operations and their cash flows for the periods indicated are in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such

financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards;

(d)     Daily Reports.  To the extent the Company is not in compliance with Section 6.7(d) for the Fiscal Quarter most recently ended, promptly upon the receipt thereof, but in any event no later than 5:00 p.m. (New York, New York time) on the next succeeding Business Day after such receipt, a copy or electronic copy of all production, drilling and recompletion reports received by any Group Member or Affiliate of any Group Member;

(e)     Compliance Certificate.    Together with each delivery of financial statements of the Company and its consolidated Subsidiaries pursuant to Sections 5.1(b), and 5.1(c), a duly executed and completed Compliance Certificate;

(f)     Notice of Litigation.  Prompt written notice (but, in any event, within three (3) Business Days) of (i) the receipt by any Group Member of the institution of, or threat of, any Adverse Proceeding not previously disclosed in writing by the Company to Lenders which, if adversely determined, could result in liabilities in excess of $200,000, or (ii) any material development in any Adverse Proceeding previously required to be disclosed hereunder;

(g)     ERISA.  (i) The occurrence of or forthcoming occurrence of any ERISA Event, a prompt written notice (but, in any event, within three (3) Business Days) specifying the nature thereof, what action the Company, its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or, to the knowledge of the Company, threatened in writing by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness (but, in any event, within three (3) Business Days), copies of (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Company, its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service or other Governmental Authority with respect to each Pension Plan; (2) all notices received by Company, its Subsidiaries or their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as the Requisite Lenders shall request;

(h)     Financial Plan.  As soon as practicable and in any event no later than each November 1st, a consolidated plan and financial forecast for following Fiscal Year and each Fiscal Year (or portion thereof) through the final maturity date of the Loans (a "**Financial Plan**"), including (i) a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of the Company and its consolidated Subsidiaries for each such Fiscal Year, together with an explanation of the assumptions on which such forecasts are based, (ii) forecasted consolidated statements of income and cash flows of the Company and its consolidated Subsidiaries for each month of each such Fiscal Year, (iii) forecasts demonstrating projected compliance with the requirements of Section 6.7 through the final maturity date of the Loans, and (iv) forecasts demonstrating adequate liquidity through the final maturity date of the Loans, together, in each case, with an explanation of the assumptions on which such forecasts are based all in form and substance satisfactory to the Requisite Lenders and accompanied by a Financial Officer Certification certifying that the projections contained therein are based upon good faith

estimates and assumptions believed to be reasonable at the time made and at the time of delivery thereof;

(i)    <u>Certificate of Insurer</u>.    Concurrently with the delivery of financial statements pursuant to <u>Section 5.1(c)</u>, a certificate of insurance coverage from each insurer or its authorized agent or broker with respect to the insurance required by <u>Section 5.6</u>, in form and substance satisfactory to the Requisite Lenders;

(j)    <u>Notice of Change in Board of Directors</u>.    Promptly, written notice of any change in the board of directors (or similar governing body) of any Parent Company or the Company;

(k)    <u>Board of Directors Materials</u>.    Promptly following any request therefor, such materials and minutes prepared for and distributed in connection with meetings of or actions taken by the directors or managers of the Parent Companies or the Company that are related to the financial condition of the Parent Companies, the Company or its Subsidiaries or any Indebtedness of the Company or its Subsidiaries (other than any materials or information that are privileged or are governed by a confidentiality agreement prohibiting the sharing of such information with Administrative Agent or the Lenders);

(l)    <u>Notice Regarding Material Contracts</u>.    Promptly, and in any event within five (5) Business Days (i) after any Material Contract of any Group Member is terminated or amended and (ii) after any new Material Contract is entered into, a written statement describing such event, delivered to Administrative Agent, and an explanation of any actions being taken with respect thereto;

(m)    <u>Information Regarding Collateral</u>.    The Company will furnish to Administrative Agent written notice at least thirty (30) days prior to the occurrence of any change in an Obligor's (i) organizational name, (ii) identity or organizational structure or (iii) Federal Taxpayer Identification Number.  The Company agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or other applicable law or otherwise that are required in order for Administrative Agent to continue at all times following such change to have a valid, legal and perfected First Priority Lien in all the Collateral and for the Collateral at all times following such change to have a valid, legal and perfected First Priority Lien as contemplated in the Collateral Documents.  The Company will furnish to Administrative Agent prompt written notice of the Company's or the Parent Companies' knowledge of any Lien or claims made or asserted against any Collateral or interest therein.  The Company also agrees promptly to notify Administrative Agent in writing if any material Collateral is lost, damaged or destroyed;

(n)    <u>Aging Reports</u>.    Together with each delivery of financial statements of the Company and its consolidated Subsidiaries pursuant to <u>Sections 5.1(a)</u>, <u>5.1(b)</u>, and <u>5.1(c)</u>, (i) a summary of the accounts receivable aging report of each Group Member as of the end of such period, and (ii) a summary of accounts payable aging report of each Group Member as of the end of such period, in each case in form and substance satisfactory to the Requisite Lenders;

(o)      Notices under RBL Facility Loan Documents. Promptly, but in any event within (i) five (5) Business Days following the giving or receipt of any statement, notice, or report regarding the existence of a default, event of default, or Borrowing Base Deficiency under the RBL Facility Loan Documents and (ii) fifteen (15) Business Days following the giving or receipt of any other statement, notice or report (including, for the avoidance of doubt, Reserve Reports) delivered under the terms of any RBL Facility Loan Document (to the extent not otherwise furnished or made available hereunder), copies of such notice or report, and promptly following the execution of any amendment, modification or supplement to any RBL Facility Loan Document (to the extent not otherwise furnished or made available hereunder), a copy of any such amendment, modification or supplement.

(p)      Swap Agreements.  As soon as practicable and in any event within five (5) days of the occurrence thereof, written notice of any Group Member's entry into a Swap Agreement or the termination or modification of any Swap Agreement by any party thereto; provided that this clause shall not permit any Group Member to enter into or terminate or modify a Swap Agreement not otherwise permitted by this Agreement;

(q)      Reserve Reports; Engineering Data.

(i)      By March 31st and September 30th of each year, a Reserve Report prepared as of the immediately preceding December 31st and June 30th, respectively, concerning the Group Members' Oil and Gas Properties.  This Reserve Report must be prepared by one or more Approved Petroleum Engineers.  The Requisite Lenders may (at the Lenders' expense so long as no Default or Event of Default then exists, in which case it will be at Company's expense) request additional Reserve Reports from time to time prepared by such Approved Petroleum Engineers.  Each Reserve Report shall distinguish (or shall be delivered together with a certificate from a Financial Officer which distinguishes) those Oil and Gas Properties treated in the report which are a Group Member's Oil and Gas Properties from those properties treated in the report which are not a Group Member's Oil and Gas Properties;

(ii)      with the delivery of each Reserve Report, the Company shall provide to Administrative Agent and the Lenders a certificate from an Authorized Officer certifying that: (A) the factual information provided to the Approved Petroleum Engineers for purposes of the Reserve Report and any other factual information provided to the Approved Petroleum Engineers in connection therewith is true and correct in all material respects (or in the case of any internally generated engineering data prepared by the Company, the information contained in such data and any other information delivered in connection therewith is true and correct in all material respects), (B) each Group Member owns good and defensible title to its Oil and Gas Properties evaluated in such Reserve Report (or such internally generated engineering data), and such Properties are free of all Liens except for Permitted Liens, (C) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments with respect to the Oil and Gas Properties evaluated in such Reserve Report (or such internally generated engineering data) which would require any Group Member to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (D) none of any Group Member's Oil and

Gas Properties have been sold since the date of the last Reserve Report (or the most recently delivered internally generated engineering data), except as set forth on an exhibit to the certificate, which certificate shall list all of such Oil and Gas Properties sold and in such detail as required by the Requisite Lenders, (E) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report (or most recently delivered internally generated engineering data) which the Company could reasonably be expected to have been obligated to list on Schedule 4.31 had such agreement been in effect on the date hereof, and (F) attached thereto is a list of all Persons purchasing Hydrocarbons from any Group Member as of the date of the Reserve Report (or internally generated engineering data);

(r)    Title Information.

(i)    On or before the delivery to Administrative Agent and the Lenders of each Reserve Report (or internally generated engineering data) required by Section 5.1(q), the Company will deliver title information in form and substance acceptable to the Requisite Lenders covering all of the Oil and Gas Properties of each Group Member to the extent that such title information was not previously delivered.

(ii)    If the Company has provided title information under this Section 5.1(r), the Company shall, within sixty (60) days of notice from Administrative Agent that title defects or exceptions exist, either (A) cure any such title defects or exceptions (including defects or exceptions as to priority) that are not permitted by Section 6.2 raised by such information, or (B) deliver title information in form and substance acceptable to the Requisite Lenders so that Administrative Agent or the Lenders shall have received, together with title information previously delivered to Administrative Agent or the Lenders, satisfactory title information on all of the Oil and Gas Properties.

(s)    Oil and Gas Properties.  Within thirty (30) days after the end of each calendar month, with respect to Oil and Gas Properties operated by the Company, or within ten (10) days of being provided the same from the operator of any Oil and Gas Properties, with respect to Oil and Gas Properties not operated by the Company, a report in detail acceptable to the Requisite Lenders with respect to the Oil and Gas Properties of each Group Member during such month:

(i)    setting forth as to each well being drilled, completed, reworked or other similar procedures, the actual versus estimated cost breakdown (for all activities, including dry hole and completion activities) for such well;

(ii)    describing by well and field the net quantities of oil, gas, natural gas liquids, and water produced (and the quantities of water injected);

(iii)    describing by well and field the quantities of oil, gas and natural gas liquids sold during such month out of production from any Group Member's Oil and Gas Properties and calculating the average sales prices of such oil, natural gas, and natural gas liquids;

(iv)    describing of all leases acquired during the preceding Fiscal Quarter indicating the date each lease was acquired;

(v)    specifying any leasehold operating expenses, overhead charges, gathering costs, transportation costs, and other costs with respect to any Group Member's Oil and Gas Properties of the kind chargeable as direct charges or overhead under COPAS 2005 Model Form Accounting Procedure;

(vi)    setting forth the amount of Taxes on each Group Member's Oil and Gas Properties during such month and the amount of royalties paid with respect to such Oil and Gas Properties during such month; and

(vii)    attaching thereto all drill site opinions or division order opinions prepared by or for any operator of any Oil and Gas Properties to the extent not previously delivered.

(t)    <u>Other Information</u>.  (A) Promptly after submission to any Governmental Authority, all material documents and information furnished to such Governmental Authority in connection with any investigation of any Group Member (other than any routine inquiry), (B) promptly upon receipt thereof, copies of all management reports submitted to any Group Member by its auditors in connection with any audit of the books thereof and (C) such other information and data with respect to any Group Member as from time to time may be reasonably requested by the Requisite Lenders.

5.2    **Notice of Material Events**.  The Company will furnish to Administrative Agent prompt written notice (but, in any event, within three (3) Business Days) of the following:

(a)    (i) any condition or event that constitutes a Default or an Event of Default or that notice has been given to any Group Member with respect thereto; (ii) that any Person has given any notice to any Group Member or taken any other action with respect to any event or condition set forth in <u>Section 8.1(b)</u>; or (iii) the occurrence of any event or change that has caused or could reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect, which notice shall be accompanied by a certificate of an Authorized Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Company has taken, is taking and proposes to take with respect thereto.

(b)    the filing or commencement of, or the receipt of a threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against any Group Member not previously disclosed in writing (including in the Schedules hereto) to Administrative Agent that has caused or could reasonably be expected to result in, liability in excess of $200,000 or any material adverse development in any action, suit, proceeding, investigation or arbitration previously disclosed to Administrative Agent;

(c)    the filing or commencement of any action, suit, proceeding, or arbitration by or on behalf of any Group Member claiming or asserting damages in favor of such Group Member valued in excess of $200,000;

(d)    the occurrence of any ERISA Event that, individually, could reasonably be expected to result in liability for any Group Member and its Affiliates in an aggregate amount exceeding $200,000;

(e)    the occurrence of any default under any Material Contract or any Related Agreement;

(f)    the acquisition of any asset or assets with a value in excess of $200,000; provided, that in the case of leases, the value of such leases shall be netted against any leases being disposed of directly in connection with such acquisition;

(g)    beginning with the Fiscal Quarter ending June 30, 2017, the Consolidated Capital Expenditures, excluding the Oil and Gas Properties that are not Operated Oil and Gas Properties, as of the last day of such Fiscal Quarter, taken as a whole for the previous twelve months exceeding the amount set forth in the APOD by more than a twenty percent (20%) variance;

(h)    receipt of any incident of noncompliance or similar notice from a Governmental Authority which would cost $200,000 or more to remediate; and

(i)    any other development that results in, or could result in, either individually or in the aggregate, a Material Adverse Effect.

5.3    **Separate Existence**.  Company will (a) take all necessary steps to maintain the separate entity and records of the Group Members, on a consolidated basis, (b) not commingle any assets or business functions with any other Person (other than any Group Member), (c) maintain separate financial statements from all other Persons (other than the other Group Members), (d) not assume or Guarantee the debts, liabilities or obligations of others (other than any Group Member), (e) hold itself out to the public and creditors as an entity separate from all other Persons (other than the other Group Members), (f) not commit any fraud or misuse of the separate entity legal status, (g) not maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of its partners or Affiliates, (h) not take any action that would reasonably be expected to cause it to become insolvent, (i) not fail to hold appropriate meetings (or act by unanimous written consent) to authorize all appropriate actions, or fail in authorizing such actions to observe all formalities required by the laws of the State of Delaware, or fail to observe all formalities required by its Organizational Documents, (j) not hold itself out to be responsible for the debts of another Person (other than another Group Member) and (k) not elect to be treated (or permit to be treated) as a an entity other than a disregarded entity or partnership for United States federal tax purposes.

5.4    **Payment of Taxes and Claims**.  The Company will, and will cause each Group Member to, file all material Tax returns required to be filed by it in any jurisdiction and pay all material Taxes imposed upon it or any of its Properties or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and pay all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and/or that by law have or could reasonably be expected to cause a Lien to attach any of its Properties, prior to the time when any penalty or fine shall be incurred with respect thereto;

provided, that no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserves or other appropriate provisions, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may cause a Lien to attach to any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim.  No Group Member will file or consent to the filing of any consolidated income tax return with any Person (except that the Company may file a consolidated return with its Subsidiaries).

5.5    **Operation and Maintenance of Properties**.  The Company will, and will cause each Group Member to, at its own expense:

(a)    operate its Oil and Gas Properties and other Properties or cause such Oil and Gas Properties and other Properties to be operated in all material respects in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements of all applicable Governmental Authorities, including, without limitation, applicable pro ration requirements and Environmental Laws, and all Governmental Requirements of every other Governmental Authority from time to time with the authority to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom;

(b)    keep and maintain all Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its Oil and Gas Properties and other Properties, including, without limitation, all equipment, machinery and facilities; and

(c)    promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and Indebtedness accruing under the leases or other agreements affecting or pertaining to its material Oil and Gas Properties and do all other things necessary to keep unimpaired its rights with respect thereto and prevent any forfeiture thereof or default thereunder.

In the event any of the Oil and Gas Properties are not operated by any Group Member or an Affiliate of any Group Member, then the Company shall use its commercially reasonable efforts to cause any third party operator to comply with the provisions of this Section 5.5.

5.6    **Insurance**.  The Company will, and will cause each Group Member to, maintain or cause to be maintained, with financially sound and reputable insurers, casualty insurance, such public liability insurance, and third party property all risk damage insurance, in each case, with respect to liabilities, losses or damage in respect of the assets, Properties and businesses of the Group Members as are customarily carried or maintained under similar circumstances by Persons of established reputation of similar size and engaged in similar businesses, in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Each such policy of insurance shall (a) contain loss payable clauses or provisions in each such insurance policy or policies that are equivalent endorsements in favor of and made payable to Administrative Agent or the RBL Facility Collateral Agent, as applicable,

and (b) name the Administrative Agent and the Lenders, or the RBL Facility Collateral Agent and the RBL Facility Lenders, as applicable, as "additional insureds" and provide that the insurer will endeavor to give no less than 30 days prior written notice of any cancellation to the Administrative Agent or the RBL Facility Collateral Agent, as applicable (10 days for non-payment).  Such endorsement shall be further endorsed to show that each Group Member waives the right (and each Group Member does hereby so waive) and each Group Member shall use reasonable efforts to cause its insurers to waive the right, to subrogate against the Lenders or the RBL Facility Lenders, as applicable.  Each such policy shall be primary and not excess to or contributing with any insurance or self-insurance maintained by any Lender or RBL Facility Lender, as applicable.

5.7    **Books and Records; Inspections**.  The Company will, and will cause each Group Member to, (a) keep adequate books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by Administrative Agent on behalf of all Lenders (including employees of Administrative Agent or any consultants, accountants, lawyers and appraisers retained by Administrative Agent) to visit and inspect any of the Property of any Group Member, to inspect, copy and take extracts from its financial and accounting records, and to discuss its affairs, finances and accounts with its officers and independent accountants, all upon reasonable notice and at such reasonable times during normal business hours (so long as no Default or Event of Default has occurred and is continuing) and as often as may reasonably be requested, and by this provision the Group Members authorize such accountants to discuss with Administrative Agent and such representatives the affairs, finances and accounts of each Group Member.  The Company acknowledges that Administrative Agent, after exercising its rights of inspection, may prepare and distribute to the Lenders certain reports pertaining to the Group Members' assets for internal use by Administrative Agent and the Lenders.

5.8    **Compliance with Laws**.  The Company will, and will cause each Group Member to, will comply, and will use commercially reasonable efforts to cause all other Persons (including any operator), if any, on or occupying any Facilities or any Oil and Gas Properties to comply, with the requirements of all applicable Governmental Requirements of any Governmental Authority (including all Environmental Laws) in all material respects.

5.9    **Environmental**.

(a)    <u>Environmental Disclosure</u>.  The Company will deliver to Administrative Agent and Lenders:

(i)    as soon as practicable but no later than three (3) Business Days following receipt thereof by any Group Member, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of any Group Member or by independent consultants, Governmental Authorities or any other Persons, with respect to significant environmental matters at any Facility or any Oil and Gas Properties of any Group Member or with respect to any material Environmental Claims;

(ii)    promptly but no later than three (3) Business Days from the occurrence thereof, written notice describing in reasonable detail (A) any Release required

to be reported to any federal, state or local Governmental Authority under any applicable Environmental Laws, (B) any remedial action taken by any Group Member or any other Person in response to (1) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims, or (2) any Environmental Claims and (C) any Group Member's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility or any Oil and Gas Property that could reasonably be expected to cause such Facility or such Oil and Gas Property or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii)    as soon as practicable but no later than three (3) Business Days following the sending or receipt thereof by any Group Member or any operator, a copy of any and all written communications with respect to (A) any Environmental Claims, (B) any Release required to be reported to any federal, state or local Governmental Authority, and (C) any request for information from any Governmental Authority that suggests such agency is investigating whether any Group Member may be potentially responsible for any Hazardous Materials Activity; and

(iv)    promptly but no later than three (3) Business Days from discovery, written notice describing in reasonable detail (A) any proposed acquisition of stock, assets, or property by any Group Member that could reasonably be expected to (1) expose any Group Member to, or result in, Environmental Claims or (2) affect the ability of any Group Member to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (B) any proposed action to be taken by any Group Member to modify current operations in a manner that could reasonably be expected to subject any Group Member to any additional material obligations or requirements under any Environmental Laws.

(b)    <u>Hazardous Materials Activities, Etc</u>.  The Company shall, and shall cause each Group Member to, promptly take, and shall, and shall cause each Group Member to, use commercially reasonable efforts to cause each operator promptly to take, any and all actions reasonably necessary to (i) cure any violation of applicable Environmental Laws by such Person, and (ii) make an appropriate response to any Environmental Claim against such Person and discharge any obligations it may have to any Person thereunder.

(c)    <u>Right of Access and Inspection</u>.  With respect to any event described in <u>Section 5.9(a)</u> or if an Event of Default has occurred and is continuing:

(i)    Administrative Agent and its representatives shall have the right, but not the obligation or duty, upon reasonable notice to enter the applicable Oil and Gas Properties at reasonable times for the purposes of observing the applicable Oil and Gas Properties.  Such access shall include, at the reasonable request of Administrative Agent, access to relevant documents and employees of each Group Member and to their outside representatives, to the extent necessary to obtain necessary information related to the event at issue.  If an Event of Default has occurred and is continuing, the Group Members shall conduct such tests and investigations on the Oil and Gas Properties of the affected Group Member or relevant portion thereof, as reasonably requested by Administrative Agent,

- 73 -

including the preparation of a Phase I Report or such other sampling or analysis as determined to be necessary under the circumstances by a qualified environmental engineer or consultant.  If an Event of Default has occurred and is continuing, and if a Group Member does not undertake such tests and investigations in a reasonably timely manner following the request of the Administrative Agent, Administrative Agent may hire an independent engineer, at the Group Members' expense, to conduct such tests and investigations.  Administrative Agent will make all reasonable efforts to conduct any such tests and investigations so as to avoid interfering with the operation of the Oil and Gas Properties.

(ii)    any observations, tests or investigations of the Oil and Gas Properties by or on behalf of Administrative Agent shall be solely for the purpose of protecting the Lenders' interests and rights under the Loan Documents.  The exercise or non-exercise of Administrative Agent's rights under this subsection (c) shall not constitute a waiver of any Default or Event of Default of any Group Member or impose any liability on Administrative Agent or any of the Lenders.  In no event will any observation, test or investigation by or on behalf of Administrative Agent be a representation that Hazardous Materials are or are not present in, on or under any of the Oil and Gas Properties, or that there has been or will be compliance with any Environmental Law, and the Administrative Agent shall not be deemed to have made any representation or warranty to any party regarding the truth, accuracy or completeness of any report or findings with regard thereto.  Neither any Group Member nor any other Person is entitled to rely on any observation, test or investigation by or on behalf of Administrative Agent.  Administrative Agent and the Lenders owe no duty of care to protect any Group Member or any other Person against, or to inform any Group Member or any other Person of, any Hazardous Materials or any other adverse condition affecting any of the Facilities or any other Oil and Gas Properties.  Administrative Agent may, in its sole discretion, disclose to the applicable Group Member, or to any other Person if so required by law, any report or findings made as a result of, or in connection with, its observations, tests or investigations.  If a request is made of Administrative Agent to disclose any such report or finding to any third party, then Administrative Agent shall endeavor to give the applicable Group Member prior notice of such disclosure and afford such Group Member the opportunity to object or defend against such disclosure at its own and sole cost; _provided_, that the failure of Administrative Agent to give any such notice or afford such Group Member the opportunity to object or defend against such disclosure shall not result in any liability to Administrative Agent.  Each Group Member acknowledges that it may be obligated to notify relevant Governmental Authorities regarding the results of any observation, test or investigation disclosed to such Group Member, and that such reporting requirements are site and fact-specific and are to be evaluated by such Group Member without advice or assistance from Administrative Agent.

5.10    **Further Assurances**.  The Company, at its sole expense, will, and will cause each Group Member and each Parent Company to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent or the Lenders to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements, as the case may be, in the Loan Documents, or to correct

any omissions in this Agreement, or to file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Lenders, in connection therewith.

5.11    **Use of Proceeds**.  The proceeds of the Loans will be used only in the manner and for the purposes set forth in <u>Section 2.4</u> and as more particularly described in the applicable Borrowing Notice with respect thereto.  No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any Governmental Requirement of any Governmental Authority, including Regulations T, U and X of the Board of Governors of the Federal Reserve System.

5.12    **Non-Voting Representative**.  The Administrative Agent may from time to time designate an employee or advisor to act as its non-voting representative to attend meetings of the board of managers or board of directors (or other similar managing body) of any Group Member or any Parent Company.  Each Group Member and each Parent Company will (a) give timely advance notice to such representative of all meetings of the managing body of such Person and all proposals to such body for action without a board meeting, (b) allow such representative to attend all such meetings, and (c) subject to the provisions of <u>Section 10.17</u> and any materials withheld based on a conflict of interest that the managing body of such Person believes in good faith exists between such Person and the Administrative Agent with respect to matters addressed by the materials in question, provide such representative with copies of all written materials distributed to such directors or managers (or similar body) in connection with such meetings or proposals for action without a meeting, including, upon request of such representative, all minutes of previous actions and proceedings (which written materials may be forwarded by such representative to the Lenders); <u>provided</u> that, such representative shall not be entitled to participate in discussions or receive materials (i) directly relating to this Agreement or the other Loan Documents or any refinancing thereof or (ii) that relate to any legally privileged material.  In the event the Administrative Agent fails to designate a non-voting representative to attend meetings pursuant to this <u>Section 5.12</u>, each Group Member and each Parent Company will, upon Administrative Agent's written request send materials that would otherwise be provided under this <u>Section 5.12</u> to Administrative Agent's address in compliance with <u>Section 10.1</u> for further distribution to the Lenders.

5.13    **APOD**.

(a)      The Company will, and will cause each Group Member to, develop its Oil and Gas Properties, make Consolidated Capital Expenditures on its Oil and Gas Properties and make any other expenditures that are not made in the ordinary course of business strictly in accordance with the APOD or as otherwise permitted pursuant to an Approval Letter.

(b)      If the Company desires to make any change to, or deviate from, the APOD or is required to update the APOD pursuant to the terms hereof, it shall submit a revised APOD, along with a written narrative describing such changes and an APOD Certificate, to Administrative Agent for review by the Lenders (with copies of such revised APOD and narrative to the Lenders), but in any case the Company shall submit an APOD no less than once yearly.  Any revised plan submitted to Administrative Agent shall not be considered the current APOD until such time as the Super-Majority Requisite Lenders shall have consented to such revised plan in their sole discretion, and no Group Member shall be permitted to spend funds in furtherance of the proposal

set forth in such draft APOD.  The Super-Majority Requisite Lenders shall have no obligation to consent to any APOD.

(c)     Notwithstanding the foregoing clause (b), the Company may amend the APOD to substitute wells to be drilled by Company with wells proposed by non-Company partner in acreage or minerals in which Company owns an interest as reasonably determined by Company to be (a) consistent with the APOD and (b) necessary to avoid loss of value in acreage or minerals in which Company owns an interest, and to the extent the same has been approved by the Super-Majority Requisite Lenders (such approval not to be unreasonably withheld or delayed).  If such Super-Majority Requisite Lender approval is withheld or delayed, Company shall have the right to proceed with the drilling of the well so long as the costs and expenses related to the drilling and development of such well are funded solely with the net proceeds of equity contributions to the Capital Stock of the Company.

5.14    **Title Information**.  Prior to a well being drilled on any Group Member's Oil and Gas Property utilizing proceeds of Loans made hereunder, which is not otherwise the subject of a title opinion previously delivered to Administrative Agent or the Lenders, in addition to (or as a supplement to) any title information delivered pursuant to Section 5.1(r), the Company will provide Administrative Agent or the Lenders with title information with respect to such Oil and Gas Property acceptable to the Requisite Lenders.

5.15    **Marketing of Production**.  All Hydrocarbons produced from the Oil and Gas Properties of any Group Member shall be marketed on an arms-length basis to one of more Persons that are not Affiliates of a Group Member in accordance with the terms and conditions set forth in Section 4.32.  Each agreement for the purchase and sale of Hydrocarbons from any Group Member's Oil and Gas Properties will be in the name of such Group Member.

5.16    **Minimum Liquidity**.  At all times, the Company will cause OpCo to maintain unused Commitments (as defined in the RBL Facility Credit Agreement) of greater than or equal to 20% of the Borrowing Base (as defined in the RBL Facility Credit Agreement) then in effect.

SECTION 6
**NEGATIVE COVENANTS**

The Company covenants and agrees that, until indefeasible payment in full of all Obligations, the Company shall perform all covenants in this Section 6.

6.1    **Indebtedness**.  The Company shall not, and shall not permit any Group Member to, directly or indirectly, create, incur, assume or Guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)     the Obligations;

(b)     subject to Section 6.22, Indebtedness of the Group Members under the RBL Facility; provided that the aggregate principal amount of such Indebtedness does not exceed the lesser of (A) $200,000,000 or (B) the sum of (i) the most recently established Borrowing Base under the RBL Facility Credit Agreement plus (ii) the principal amount of any Borrowing Base Deficiency; provided, further, that the amount permitted under this clause (b) shall not include any

additional amounts in respect of principal to the extent such excess is the result of additional loans advanced or letters of credit issued (other than renewal of outstanding letters of credit in amounts not exceeding the outstanding face amounts) while a Borrowing Base Deficiency has occurred and is continuing;

(c)     Swap Agreements permitted under Section 6.19;

(d)     Capital Leases and other Indebtedness in the form of obligations for the deferred purchase price of Property or services incurred in the ordinary course of business in an aggregate principal amount not to exceed $200,000 at any one time outstanding;

(e)     Indebtedness owing in connection with the financing of insurance premiums in the ordinary course of business;

(f)     Indebtedness consisting of sureties, bonds or letters of credit provided to any Governmental Authority or other Person and assuring payment of contingent liabilities of any Group Member in connection with the operation of the Oil and Gas Properties, including with respect to plugging, facility removal and abandonment of its Oil and Gas Properties and including appeal bonds;

(g)     other Indebtedness reflected in the APOD or approved by the Super-Majority Requisite Lenders pursuant to an Approval Letter;

(h)     Indebtedness existing on the date hereof that is reflected on Schedule 6.1(h);

(i)     contingent obligations as a non-operator under oil and gas operating agreements and contingent obligations under gas sale contracts for make-up volumes on sales of gas, in each case incurred in the ordinary course of business;

(j)     endorsements of negotiable instruments for deposit or collection in the ordinary course of business;

(k)     intercompany Indebtedness between the Company and any Subsidiary or between Subsidiaries; provided that such Indebtedness is not held, assigned, transferred or pledged to any Person other than the Company or one of its wholly owned Subsidiaries; and

(l)     Indebtedness which represents an extension, refinancing or renewal of any of the foregoing; provided that (i) the principal amount of such Indebtedness is not increased (other than by the costs, fees and expenses and by accrued and unpaid interest and premium, if any, paid in connection therewith) and (ii) the terms of any such extension, refinancing or renewal are not materially more restrictive to the obligor thereunder, taken as a whole, than the original terms of such Indebtedness.

6.2     **Liens**.  The Company shall not, and shall not permit any Group Member to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any Property or asset of any kind (including any document or instrument in respect of goods or accounts receivable and any Capital Stock) of any Group Member, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in

effect, any financing statement or other similar notice of any Lien with respect to any such Property, asset, income or profits under the UCC of any State or under any similar recording or notice statute, except (collectively, "**Permitted Liens**"):

        (a)      Permitted Encumbrances;

        (b)      Liens in favor of Administrative Agent for the benefit of the Secured Parties granted pursuant to any Loan Document;

        (c)      Liens securing Indebtedness permitted by <u>Section 6.1(b)</u> and Indebtedness arising under Bank Products as defined in and secured by the RBL Facility Loan Documents;

        (d)      Liens securing obligations under Swap Agreements permitted under <u>Section 6.19</u>;

        (e)      Liens securing Capital Leases and other Indebtedness permitted by <u>Section 6.1(f)</u> but only on the Property under lease or the Property purchased, constructed or improved, as the case may be (including all accessions and improvements thereto, all insurance therefor and all proceeds thereof);

        (f)      Liens on Property of the Company and its Subsidiaries existing on the date hereof that is reflected in <u>Schedule 6.2(f)</u>; and

        (g)      Liens securing Indebtedness permitted by <u>Section 6.1(g)</u> (to the extent the applicable Approval Letter permits such Indebtedness to be secured).

        6.3    **No Further Negative Pledges**.  The Company shall not, and shall not permit any Group Member to, permit to exist or enter into any agreement prohibiting the creation or assumption of any Lien in favor of Administrative Agent for the benefit of the Secured Parties upon any of its Properties, whether now owned or hereafter acquired, to secure the Obligations other than:

        (a)      any Loan Document or any RBL Facility Loan Document;

        (b)      agreements imposing restrictions (i) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, permits and similar agreements entered into in the ordinary course of business consistent with past practice (<u>provided</u> that such restrictions are limited to the Property secured by such Permitted Liens or the Property subject to such leases, licenses or similar agreements, as the case may be, including all accessions and improvements thereto, all insurance therefor and all proceeds thereof); and (ii) relating to any disposition of Property permitted hereunder.

        6.4    **Restricted Junior Payments**.  The Company shall not, nor shall it permit any of its Subsidiaries through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment except:

(a)    each Subsidiary of the Company may make Restricted Junior Payments to the holders of its Capital Stock,

(b)    provided that no Default or Event of Default has occurred and is continuing or would result therefrom, the Company may make Tax Distributions to the holders of its Capital Stock and payments of Indebtedness permitted to be incurred hereunder,

(c)    Restricted Junior Payments pursuant to and in accordance with stock option or other benefit plans as such plans are in effect on the Closing Date for management, employees or directors of the Company and its Subsidiaries, and

(d)    Restricted Junior Payments, provided, that (i) no Default or Event of Default has occurred and is continuing or would result therefrom, (ii) the amount of such Restricted Junior Payments shall not exceed $60,000,000 in the aggregate, (iii) after giving pro forma effect to the applicable Restricted Junior Payment, the Company is in compliance with the financial covenants in Section 6.7 and (iv) such Restricted Junior Payment is used to buy back Capital Stock of the Company from Olam Energy.

6.5    **Restrictions on Subsidiary Distributions**.  Except for the Loan Documents and the RBL Facility Loan Documents, the Company shall not, and shall not permit any Group Member to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary to (a) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by any Group Member, (b) repay or prepay any Indebtedness owed by such Subsidiary to any Group Member or any other Subsidiary of any Group Member, (c) make loans or advances to any Group Member or (d) transfer any of its Property to any Group Member, except as required by law.

6.6    **Investments**.  The Company shall not, and shall not permit any Group Member to, directly or indirectly, make or own any Investment in any Person, except:

(a)    Investments in Cash and Cash Equivalents;

(b)    Investments existing on the date hereof that is reflected in Schedule 6.6(b);

(c)    Investments (i) made by the Company in or to any wholly-owned Subsidiary of the Company or (ii) made by any Subsidiary in or to the Company or any wholly-owned Subsidiary of the Company;

(d)    expenditures on Capital Leases in an aggregate amount for all Group Members up to the amount set forth for such expenditures on the relevant APOD;

(e)    Permitted Acquisitions and other Investments made pursuant to the express terms of the APOD;

(f)    payments on trade and customer accounts receivable which are for goods furnished or services rendered in the ordinary course of business and are payable in accordance with customary trade terms;

(g)    creation of any additional Subsidiaries of any Group Member in compliance with the RBL Facility Credit Agreement; and

(h)    Investments consisting of Swap Agreements to the extent permitted by the terms of this Agreement.

6.7    **Financial and Performance Covenants**.

(a)    Leverage Ratio.  Beginning with the Fiscal Quarter ending September 30, 2018, the Company shall not permit the Leverage Ratio as of the last day of any Fiscal Quarter to be greater than 4.75 to 1.00.

(b)    Interest Coverage Ratio.   Beginning with the Fiscal Quarter ending September 30, 2018, the Company shall not permit the Interest Coverage Ratio as of the last day of any Fiscal Quarter to be less than 2.00 to 1.00.

(c)    Total Asset Coverage Ratio.  Beginning with the Fiscal Quarter ending June 30, 2018 and ending with the Fiscal Quarter ending June 30, 2020, the Company shall not permit the Total Asset Coverage Ratio, as of the last day of any Fiscal Quarter, to be less than 1.00 to 1.00.

(d)    PDP Asset Coverage Ratio.   Beginning with the Fiscal Quarter ending September 30, 2020, the Company shall not permit the PDP Asset Coverage Ratio, as of the last day of any Fiscal Quarter, to be less than 1.00 to 1.00.

6.8    **Fundamental Changes; Disposition of Assets; Acquisitions**.  The Company shall not, and shall not permit any Group Member to,

(a)    merge or consolidate, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), other than (i) the merger or consolidation of any Group Member or any Subsidiary of a Group Member with and into any Group Member or another Subsidiary of any Group Member (except that, with respect to any such merger or consolidation involving the Company, the Company must be the surviving entity), (ii) the merger or consolidation of any other Person with any Group Member; provided that such Group Member shall be the continuing or surviving entity and (iii) any liquidation, wind up or dissolution of a Subsidiary that does not own any Oil and Gas Properties if the Company determines in good faith that such liquidation, wind up or dissolution is in the best interests of the Company and its Subsidiaries, taken as a whole, and not materially disadvantageous to the Lenders; or

(b)    convey, sell, farm-out, lease or sub lease (as lessor or sublessor), exchange, transfer or otherwise dispose of (including through the sale of a production payment or overriding royalty interest) (any such transaction, a "**disposition transaction**"), in one transaction or a series of transactions (including pursuant to any Joint Drilling Engagement), all or any part of its business or Property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, except disposition transactions:

(i)    of Hydrocarbons in the ordinary course of business;

(ii)    of obsolete, worn out, depleted or uneconomic Property or otherwise replaced by Property of at least comparable value and use;

(iii)    in a single transaction or series of related transactions, of Property having a market value less than $100,000, so long as all such disposition transactions do not exceed $300,000 in the aggregate during the term of this Agreement;

(iv)    between or among the Group Members, provided that any Lien therein that secures any Obligations is reaffirmed and granted by the related transferee;

(v)    constituting a Restricted Junior Payment or Investment that is permitted by Section 6.4 or Section 6.6, respectively;

(vi)    constituting the expiration or lapse of oil and gas leases, exploration tenement licenses, and subleases or sublicenses of the Company or any Subsidiary in the ordinary course of business; and

(vii)    resulting from any loss, casualty or other damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Company or any Subsidiary.

(c)    acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and capital expenditures permitted hereunder in the ordinary course of business consistent with past practice) all of the business, Property (including Oil and Gas Properties) of, or Capital Stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, or make any commitment or incur any obligation to enter into any such transaction, except:

(i)    Investments made in accordance with Section 6.6;

(ii)    Investments made in compliance with the APOD; and

(iii)    subject to the satisfaction of the Permitted Acquisition Conditions at the time of such acquisition, any Permitted Acquisition.

6.9    **Limitation on Leases**.  The Company will not, and will not permit any Group Member to, create, incur, assume or suffer to exist any obligation for the payment or rent or hire of Property of any kind whatsoever (real or personal but excluding Capital Leases and leases of Hydrocarbon Interests), under leases or lease agreements which would cause the aggregate amount of all payments made by all Group Members pursuant to such leases or lease agreements, including, without limitation, any residual payments at the end of any lease, to exceed $100,000 in any period of twelve (12) consecutive calendar months during the life of such leases without the approval of Requisite Lenders.

6.10    **Sales and Lease Backs**.  The Company shall not, and shall not permit any Group Member to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any Property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Group Member (a) has sold or transferred or is to sell or

to transfer to any other Person (other than the Company or any of its Subsidiaries) or (b) intends to use for substantially the same purpose as any other Property which has been or is to be sold or transferred by such Group Member to any Person (other than the Company or any of its Subsidiaries) in connection with such lease.

6.11    **Transactions with Covered Persons**. The Company shall not, and shall not permit any Group Member to, with the knowledge of any officer of the Company or Group Member, either directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any Property or the rendering of any service) with any Covered Person, and no Group Member will, with the knowledge of any officer of any Group Member, suffer to exist any arrangement or understanding, regardless of whether such arrangement has been formalized, whereby (a) services or the sale of any Property are provided to a Covered Person on terms more favorable than that provided to the applicable Group Member for similar services or (b) any Covered Person provides any Group Member with services related to the gathering and processing of Hydrocarbons, in each case, other than:

(c)    transactions between or among Group Members;

(d)    customary indemnification and other benefits made available to officers, directors or employees of the Company or any of its Subsidiaries;

(e)    compensation and other out-of-pocket expenses, to the extent not constituting General and Administrative Costs, made available to officers, directors or employees of the Company, in an aggregate amount not to exceed $250,000; and

(f)    transactions under any agreement in existence on the Closing Date and set forth on Schedule 6.11, as the same may be amended, supplemented or otherwise modified from time to time with the consent of the Requisite Lenders.

6.12    **Conduct of Business**. From and after the Closing Date, the Company shall not, and shall not permit any Group Member to, engage in any business other than the businesses contemplated by the current APOD or engaged in by such Group Member on the Closing Date as presently conducted, and all activities and operations incidental thereto, including all general and administrative activities, and the leasing, operation or ownership of any office buildings or other real property related to such business.

6.13    **Amendments or Waivers of Material Contracts**. The Company shall not, and shall not permit any Group Member to, (a) agree to any material amendment, restatement, supplement or other modification to, or waiver of, any Material Contract after the Closing Date, in each case in a manner adverse to the Lenders, without obtaining the prior written consent of the Requisite Lenders to such amendment, restatement, supplement or other modification or waiver, which consent shall not be unreasonably withheld, delayed or conditioned or (b) without the consent of the Requisite Lenders, enter into or cancel any Material Contract (i) that requires payments to be made by the Company or any Group Member equal to or greater than $50,000,000 or (ii) for which breach, nonperformance, cancellation or failure to renew by the Company or any Group Member could reasonably be expected to result in liabilities of the Company or such Group Member equal to or greater than $50,000,000.

6.14    **Fiscal Year**.  The Company shall not, and shall not permit any Group Member to, change its Fiscal Year end from December 31.

6.15    **Deposit Accounts**.  The Company shall not establish or maintain a Deposit Account or Securities Account other than the Deposit Accounts or Securities Accounts covered by a Control Agreement listed in Schedule 6.15, without executing and delivering to Administrative Agent a Control Agreement covering the applicable Deposit Account or Securities Account.  The Company will not deposit Collateral (including the proceeds thereof), Cash Receipts or the proceeds of Loans in a Deposit Account or Securities Account that is not subject to a Control Agreement.

6.16    **Amendments to Organizational Agreements**.  The Company shall not, and shall not permit any Group Member to, materially amend or permit any material amendments to any Group Member's Organizational Documents in each case in a manner adverse to the Lenders without the prior written consent of Requisite Lenders, which consent shall not be unreasonably withheld, delayed or conditioned.

6.17    **Sale or Discount of Receivables**.  Except for receivables obtained by any Group Member out of the ordinary course of business or the settlement of joint interest billing accounts in the ordinary course of business consistent with past practice or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business consistent with past practice in connection with the compromise or collection thereof and not in connection with any financing transaction, the Company will not, and will not permit any Group Member to, discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

6.18    **Gas Imbalances, Take-or-Pay or Other Prepayments**.  The Company will not, and will not permit any Group Member to, allow (a) material prepayments (including payments for gas not taken pursuant to "take or pay" or other similar arrangements) for any Hydrocarbons produced or to be produced from any Oil and Gas Property after the date hereof or (b) any "take or pay", gas imbalances (in excess of 10,000 mcf of gas (on an mcf equivalent basis) in the aggregate) or other similar arrangement that would require the Group Members to deliver Hydrocarbons at some future time without receiving full payment therefor at the time of delivery.

6.19    **Swap Agreements**.  The Company will not, and will not permit any Subsidiary to, enter into any Swap Agreement with any Person other than Swap Agreements in respect of commodities (i) with one or more Approved Counterparties and (ii) the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect other than basis differential swaps on volumes already hedged pursuant to other Swap Agreements) do not exceed, as of the date such Swap Agreement is executed 75% of the reasonably anticipated projected production (as set forth on the most recently delivered Reserve Report (or internally generated engineering data) approved by the Requisite Lenders) from Oil and Gas Properties with Proved Developed Producing Reserves for each month during the period during which such Swap Agreement is in effect for each of crude oil, natural gas liquids and natural gas, calculated separately.  In no event shall any Swap Agreement contain any requirement, agreement or covenant for the Company or any Subsidiary to post collateral or margin to secure their obligations under

such Swap Agreement or to cover market exposures, other than Swap Agreements secured by Liens that also secure the obligations under the RBL Facility Loan Documents.

6.20    **APOD**.  The Company shall not, and shall not permit any Group Member to, deviate from the APOD or make Consolidated Capital Expenditures in any manner not provided for in the APOD, unless permitted pursuant to an Approval Letter.

6.21    **Anti-Layering**.  The Company agrees that it will not, and will not permit any Group Member to, (a) incur, create or permit to exist any Indebtedness that is junior or subordinate (by operation of law, by contract or otherwise) in right of payment or otherwise (including application of proceeds of collateral or other collection actions) to any Indebtedness incurred under the RBL Facility Credit Agreement or (b) create or permit to exist a class or tranche of Indebtedness or other obligations under or related to the RBL Facility Credit Agreement that is junior or subordinate (by operation of law, by contract or otherwise) in right of payment or otherwise (including application of proceeds of collateral or other collection actions) to any other class or tranche of Indebtedness or other obligations under or related to the RBL Facility Credit Agreement, in any case other than (i) the Obligations and (ii) Indebtedness incurred by any Subsidiary that is permitted under <u>Section 6.1</u> and that is subordinate to the Indebtedness under the RBL Facility Credit Agreement only to the extent of the RBL Facility collateral.  This <u>Section 6.21</u> also applies to distinctions between categories of Indebtedness that exist by reason of any Liens or Guarantees securing or in favor of some but not all of such Indebtedness.

6.22    **RBL Facility Loan Documents**.  The Company will not, and will not permit any Group Member to, enter into, modify, amend, refinance, supplement, increase, restate or waive any right or obligation of any such Person under, the RBL Facility Credit Agreement, the Option Agreement or any other RBL Facility Loan Document (each, an "**RBL Modification**"), without the prior written consent of the Super-Majority Requisite Lenders if such RBL Modification would (a) contravene the provisions of this Agreement or the Option Agreement, (b) increase the "Applicable Margin" (or other similar component of the interest rate under the RBL Facility) by more than 375 basis points per annum (excluding increases resulting from the accrual of interest at any default interest rate), (c) add or increase any recurring fees under the RBL Facility Loan Documents by more than 50 basis points per annum, (d) increase the additional margin of interest that may become due in connection with a default, (e) change the redemption, prepayment, repurchase, tender or defeasance provisions set forth in the RBL Facility Loan Documents (other than extensions in the times therefor) in a manner that would require a redemption, prepayment, repurchase, tender or defeasance not originally required pursuant to the terms of the RBL Facility Loan Documents or in a manner otherwise adverse to the Administrative Agent or the Lenders, (f) modify any restricted payment negative covenant to make it more restrictive as to the Company or any of its Subsidiaries, (g) modify any covenant either requiring any Group Member to enter into, or limiting the ability of any Group Member to enter into, any Swap Agreement, (h) directly prohibit or restrict the payment of principal of, interest on, or other amounts payable with respect to this Agreement, (i) materially amend the use of proceeds or purpose of the RBL Facility Loan Documents or (j) result in the loans thereunder not being subject to a Borrowing Base.

6.23    **Subsidiaries**.  The Company (a) shall not have any Subsidiaries other than Subsidiaries that are directly or indirectly wholly-owned by the Company and (b) shall not have

any Subsidiaries that are incorporated or organized under the laws of a jurisdiction other than under the laws of the United States of America or any state thereof or the District of Columbia.

SECTION 7
**CAPITAL RESERVE ACCOUNT**

7.1 **Capital Reserve Account**.

(a) The Company shall maintain at the Company's expense an account (the "**Capital Reserve Account**"), with a minimum balance equal to the Capital Reserve Amount by no later than the date of the first Borrowing of the Closing Date Loans, which account shall be under Administrative Agent's exclusive control with a bank ("**Capital Reserve Bank**") selected by the Company and reasonably acceptable to the Administrative Agent which has entered into a Control Agreement specifying that the Capital Reserve Bank shall comply with all instructions it receives from Administrative Agent with respect to the Capital Reserve Account without further consent from the Company. The proceeds of all Loans made pursuant to this Agreement shall be deposited into the Capital Reserve Account (excluding, for the avoidance of doubt, loans made on the Closing Date) along with any other amount to be directed to such account pursuant to Section 2.

(b) The funds deposited in the Capital Reserve Account, together with all interest thereon, shall be available to fund (i) any accrued but unpaid cash interest on the Loans or (ii) any other principal or premium payment due, in each case if the Company has insufficient funds and at the option of the Requisite Lenders in their sole discretion. If the Administrative Agent (at the direction of the Requisite Lenders) applies amounts in the Capital Reserve Account, the Company shall deposit additional amounts into the Capital Reserve Account within thirty (30) days of the date such debit occurs to the extent necessary to replenish the Capital Reserve Amount.

SECTION 8
**EVENTS OF DEFAULT**

8.1 **Events of Default**. An Event of Default shall exist if any one or more of the following conditions or events shall occur:

(a) <u>Failure to Make Payments When Due</u>. Failure by the Company to pay (i) when due the principal or premium, if any, on any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due any principal of any Loan, by mandatory prepayment or otherwise; or (iii) when due any interest on any Loan or any fee or any other amount due under any Loan Document if such failure under this clause (iii) shall continue unremedied for a period of three (3) days; or

(b) <u>Default in Other Agreements</u>. (i) Failure of any Obligor or Group Member to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 6.1(a)) in an amount individually or in the aggregate of $5,000,000 or more, in each case beyond the grace period, if any, provided therefor; (ii) any "Event of Default" and the Indebtedness attributable thereto exceeds $5,000,000 or (iii) breach or default by any Obligor or Group Member with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above, or (2) any loan agreement, mortgage, indenture

- 85 -

or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, and, in the case of each of the immediately preceding clauses (i), (ii) and (iii) if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redemption) or to require the prepayment, redemption, repurchase or defeasance of, or to cause any Obligor or Group Member to make any offer to prepay, redeem, repurchase or defease such Indebtedness, prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c)    <u>Breach of Certain Covenants</u>.  Failure of any Obligor or Group Member to perform or comply with any term or condition contained in Sections 2.4, <u>5.1</u>, 5.2, <u>5.6</u>, <u>5.8</u> or <u>5.11</u> or the failure of any Obligor or Group Member to perform or comply with any term or condition contained in <u>Section 6</u>; or

(d)    <u>Breach of Representations, etc</u>.    Any representation, warranty, or certification made or deemed made by any Obligor or Group Member in any Loan Document or in any certificate at any time given by any Obligor or Group Member in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)    <u>Other Defaults Under Loan Documents</u>.  Any Obligor or Group Member shall default in any material respect in the performance of or compliance with any term contained herein or any of the other Loan Documents, other than any such term referred to in any other subsection of this <u>Section 8.1</u>, and such default shall not have been remedied or waived within thirty (30) days after the earlier of the knowledge of any Authorized Officer of any Obligor or Group Member, as applicable, of such breach or failure and the date notice thereof is given to the Company by Administrative Agent or any Lender; or

(f)    <u>Involuntary Bankruptcy; Appointment of Receiver, etc</u>.  (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of any Obligor or Group Member in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against any Obligor or Group Member under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over any Obligor or Group Member, or over all or a substantial part of its Property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of any Obligor or Group Member for all or a substantial part of its Property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the Property of any Obligor or Group Member, and any such event described in this clause (ii) shall continue for sixty (60) days without having been dismissed, bonded or discharged; or

(g)     Voluntary Bankruptcy; Appointment of Receiver, etc.  (i) Any Obligor or Group Member shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its Property; or any Obligor or Group Member shall make any assignment for the benefit of creditors; or (ii) any Obligor or Group Member shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of any Obligor or Group Member (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f); or

(h)     Judgments and Attachments.  Any money judgment, writ or warrant of attachment or similar process involving an amount individually or in the aggregate in excess of $5,000,000 (to the extent not fully covered by insurance (less any deductible) as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Obligor or Group Member or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than the date that enforcement proceedings shall have been commenced by any creditor upon such judgment order or five (5) days prior to the date of any proposed sale thereunder); or

(i)     Dissolution.  Any order, judgment or decree shall be entered against any Obligor or Group Member decreeing the dissolution or split up of such Obligor or Group Member, as applicable, and such order shall remain undischarged or unstayed for a period in excess of sixty (60) days; or

(j)     Employee Benefit Plans.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or could reasonably be expected to result in liability of Company, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $5,000,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest on any Collateral under Section 430(k) or 436(f) of the Internal Revenue Code or under ERISA; or

(k)     [Reserved].

(l)     Change of Operator.  The Company or any Group Member shall replace the operator of any of the Company's or such Group Member's Operated Oil and Gas Properties without the consent of the Requisite Lenders; or

(m)     Material Contracts.  Any party to any Material Contract to which any Group Member is a party shall repudiate its obligations thereunder, contest the validity or enforceability of such agreement or otherwise claim that such agreement is invalid (excluding any Material Contract so affected that is replaced by the Company in a manner reasonably satisfactory to the Requisite Lenders within thirty (30) days of such event); or

(n)    <u>Collateral Documents and Other Loan Documents</u>.  At any time after the execution and delivery thereof, (i) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Administrative Agent shall not have or shall cease to have, or it shall be asserted in writing by any Obligor or Group Member, not to have, a valid and perfected First Priority Lien in any Collateral (subject only to Permitted Encumbrances) purported to be covered by the Collateral Documents, in each case for any reason other than the failure of Administrative Agent to take any action within its control, or (ii) any Obligor or Group Member shall contest in writing the validity or enforceability of any Loan Document or any Lien on the Collateral or any purported Collateral in favor of Administrative Agent or deny in writing that it has any further liability under any Loan Document to which it is a party; or

(o)    <u>Borrowing Base Deficiency</u>. Any Borrowing Base Deficiency exists under the RBL Facility Credit Agreement and such Borrowing Base Deficiency is not cured within (i) one hundred eighty (180) days or (ii) if OpCo elects to repay such Borrowing Base Deficiency in six (6) equal and consecutive monthly installments during a period that is not a Quarterly Redetermination Period (as defined in the RBL Facility Credit Agreement) pursuant to Section 3.04(c) of the RBL Facility Credit Agreement, two hundred ten (210) days; or

(p)    <u>Holding Company Status</u>.  The Parent Companies shall cease to maintain Holding Company Status.

8.2    **Remedies**.    (a) Upon the occurrence of any Event of Default described in <u>Section 8.1(f)</u> or <u>8.1(g)</u>, automatically, and (b) upon the occurrence and during the continuation of any other Event of Default, upon notice to the Company to such effect by the Administrative Agent, Administrative Agent, on behalf of the Lenders, may and shall have the right to take any of the following actions (i) terminate all Commitments; (ii) declare to be immediately due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Group Member, the Obligations; or (iii) enforce any and all Liens and security interests created pursuant to Collateral Documents.

SECTION 9
**ADMINISTRATIVE AGENT**

9.1    **Appointment of Administrative Agent**. Riverstone is hereby appointed Administrative Agent hereunder and under the other Loan Documents and each Lender hereby authorizes Riverstone, in such capacity, to act as its agent (including as collateral agent) in accordance with the terms hereof and the other Loan Documents.  Administrative Agent hereby agrees to act upon the express conditions contained herein and the other Loan Documents, as applicable.  The provisions of this <u>Section 9.1</u> are solely for the benefit of Administrative Agent and the Lenders and no Group Member shall have any rights as a primary or third party beneficiary of any of the provisions thereof.  In performing its functions and duties hereunder, Administrative Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Group Member or any Affiliate thereof.

9.2    **Powers and Duties**.  Each Lender irrevocably authorizes Administrative Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies and perform such duties hereunder and under the other Loan Documents as are specifically delegated or granted to Administrative Agent by the terms hereof and thereof, together with such actions, powers, rights and remedies as are reasonably incidental thereto.  Administrative Agent shall have only those duties and responsibilities that are expressly specified herein and the other Loan Documents.  Administrative Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  Administrative Agent shall not have or be deemed to have, by reason hereof or any of the other Loan Documents, a fiduciary relationship in respect of any Lender; and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon Administrative Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein.

9.3    **General Immunity**.

(a)    <u>No Responsibility for Certain Matters</u>.  Administrative Agent shall not be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Loan Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by Administrative Agent to Lenders or by or on behalf of any Group Member to Administrative Agent or any Lender in connection with the Loan Documents and the Transactions or for the financial condition or business affairs of any Group Member or any other Person liable for the payment of any Obligations, nor shall Administrative Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing.  Administrative Agent shall not be responsible for the satisfaction of any condition set forth in <u>Section 3</u> or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to Administrative Agent.  Administrative Agent will not be required to take any action that is contrary to applicable law or any provision of this Agreement or any Loan Document.  Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the component amounts thereof.

(b)    <u>Exculpatory Provisions</u>.  Subject to clause (b)(ii) hereof further limiting the liability of Administrative Agent, neither Administrative Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by Administrative Agent under or in connection with any of the Loan Documents except to the extent caused by Administrative Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order.  Administrative Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Loan Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until Administrative Agent shall have received written instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under <u>Section 10.6</u>) or in accordance with

the applicable Collateral Document, and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), or in accordance with the other applicable Collateral Document, as the case may be, Administrative Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions.  Without prejudice to the generality of the foregoing, (i) Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed in good faith by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected and free from liability in relying on opinions and judgments of attorneys (who may be attorneys for the Company), accountants, experts and other professional advisors selected by it with due care; and (ii) no Lender shall have any right of action whatsoever against Administrative Agent as a result of Administrative Agent acting or (where so instructed) refraining from acting hereunder or any of the other Loan Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under <u>Section 10.6</u>) or in accordance with the applicable Collateral Document.  Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Administrative Agent shall first receive such advice or concurrence of the Lenders (as it deems appropriate) and until such instructions are received, Administrative Agent shall act, or refrain from acting, as it deems advisable.  If Administrative Agent so requests, to the extent that it is not indemnified hereunder, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Requisite Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.  No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions shall require Administrative Agent to:  (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers.  Administrative Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the Liens granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing of any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of Taxes with respect to any of the Collateral.  The actions described in items (i) through (iii) shall be the responsibility of the Lenders and the Company.  Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent.  The Administrative Agent shall not be liable for any error of judgment made in good faith by a Responsible Officer of the Administrative Agent unless it shall be proved that the Administrative Agent was negligent in ascertaining the pertinent facts.  Delivery of any reports, information and documents to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder. In no event shall the Administrative Agent be responsible or liable for special, punitive, indirect, or

consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. Administrative Agent has accepted and is bound by the Loan Documents executed by Administrative Agent as of the date of this Agreement and, as directed in writing by the Requisite Lenders, Administrative Agent shall execute additional Loan Documents delivered to it after the date of this Agreement; provided, however, that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of Administrative Agent.  Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any loan agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which such Administrative Agent is a party).  No written direction given to Administrative Agent by the Requisite Lenders or any Group Member that in the sole judgment of Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Loan Documents will be binding upon Administrative Agent unless Administrative Agent elects, at its sole option, to accept such direction.  Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.  Beyond the exercise of reasonable care in the custody of the Collateral in the possession or control of the Administrative Agent or its bailee, Administrative Agent will not have any duty as to any other Collateral or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by Administrative Agent in good faith. Administrative Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of Taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  Administrative Agent hereby disclaims any representation or warranty to the present and future holders of the Obligations concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.  In the event that Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in Administrative Agent's sole discretion may cause Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause Administrative Agent to incur, or be exposed to, any

environmental liability or any liability under any other federal, state or local law, Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver. Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order. Each Lender authorizes and directs Administrative Agent to enter into this Agreement and the other Loan Documents to which it is a party. Each Lender agrees that any action taken by Administrative Agent or Requisite Lenders in accordance with the terms of this Agreement or the other Loan Documents and the exercise by Administrative Agent or Requisite Lenders of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

(c)    Notice of Default.    Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to Events of Default in the payment of principal, interest and fees required to be paid to Administrative Agent for the account of the Lenders, unless a Responsible Officer of Administrative Agent shall have received written notice from a Lender or the Company, at the Administrative Agent's Office, referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." Administrative Agent will notify the Lenders of its receipt of any such notice, Administrative Agent may (but shall not be obligated to unless otherwise directed by the Requisite Lenders) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interest of the Lenders.

9.4    **Administrative Agent Entitled to Act as Lender**.    The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, Administrative Agent in its individual capacity to the extent it becomes a Lender hereunder. With respect to its participation in the Loans, if any, Administrative Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include Administrative Agent in its individual capacity. Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with any Group Member or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from any Group Member or any of their respective Affiliates for services in connection herewith and otherwise without having to account for the same to Lenders.

9.5    **Lenders' Representations, Warranties and Acknowledgment**.

(a)    Each Lender represents and warrants to Administrative Agent that it has made its own independent investigation of the financial condition and affairs of each Group

Member, without reliance upon Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, in connection with Loans made hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of each Group Member.  Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of the Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and Administrative Agent shall not have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders.

(b)     Each Lender, by delivering its signature page to this Agreement or a joinder agreement and funding its Loans, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by Administrative Agent, Requisite Lenders or Lenders, as applicable.

9.6     **Right to Indemnity**.  Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify Administrative Agent, its Affiliates and its officers, partners, directors, trustees, employees, representatives and agents of Administrative Agent (each, an "**Indemnitee Agent Party**"), to the extent that such Indemnitee Agent Party shall not have been reimbursed by the Company, for and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnitee Agent Party in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as such Indemnitee Agent Party in any way relating to or arising out of this Agreement or the other Loan Documents, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF ADMINISTRATIVE AGENT**; provided, no Lender shall be liable for any portion of such claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Indemnitee Agent Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order.  If any indemnity furnished to any Indemnitee Agent Party for any purpose shall, in the opinion of such Indemnitee Agent Party, be insufficient or become impaired, such Indemnitee Agent Party may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Indemnitee Agent Party against any claim, liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

9.7     **Successor Administrative Agent**.

(a)     Administrative Agent may resign at any time by giving thirty (30) days' prior written notice thereof to the Lenders and the Company.  If at any time Riverstone and/or its Affiliates, do not hold, collectively, an aggregate of at least $50.0 million of the Commitments and/or Loans, Riverstone shall automatically be removed as Administrative Agent hereunder. Upon any such notice of resignation or removal, Requisite Lenders shall have the right, upon five Business Days' notice to the Company, to appoint a successor Administrative Agent which

successor shall be reasonably acceptable to the Company. If no successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within thirty (30) days after (i) the retiring Administrative Agent gives notice of its resignation or (ii) automatic removal of the retiring Administrative Agent, then the retiring Administrative Agent's resignation or removal shall nevertheless thereupon become effective and the Requisite Lenders shall perform all of the duties of Administrative Agent, as applicable, hereunder until such time, if any, as the Requisite Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and the payment of the outstanding fees and expenses of the retiring Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and the retiring Administrative Agent shall promptly (iii) transfer to such successor Administrative Agent all sums, Capital Stock and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Loan Documents, and (iv) execute and deliver to such successor Administrative Agent, at the Company's sole cost and expense, such amendments to financing statements, and take such other actions, as may be reasonably requested in connection with the assignment to such successor Administrative Agent of the security interests created under the Collateral Documents (the reasonable out-of-pocket expenses (including, but not limited to, attorneys' fees and expenses) of which shall be borne by the Company), whereupon such retiring Administrative Agent shall be discharged from its duties and obligations hereunder. After any retiring Administrative Agent's resignation or removal hereunder as Administrative Agent, the provisions of this Section 9.7 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.

(b)    Notwithstanding anything herein to the contrary, Administrative Agent may assign its rights and duties as Administrative Agent hereunder to an Affiliate of Administrative Agent or to any Lender or Affiliate thereof without the prior written consent of, or prior written notice to, the Company or the Lenders; provided that the Company and the Lenders may deem and treat such assigning Administrative Agent as Administrative Agent for all purposes hereof, unless and until such assigning Administrative Agent provides written notice to the Company and the Lenders of such assignment. Upon such assignment such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as Administrative Agent hereunder and under the other Loan Documents.

(c)    Delegation of Duties. Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. Administrative Agent shall not be responsible for the acts or omissions of its sub-agents so long as they are appointed with due care; provided however, that, notwithstanding the appointment of any sub-agent, Administrative Agent shall continue to be responsible for its obligations pursuant to the Loan Documents. The exculpatory, indemnification and other provisions of Section 9.3 and Section 9.6 shall apply to any Affiliates of Administrative Agent and shall apply to their respective activities in connection with the syndication of the term loan facility provided for herein. All of the rights, benefits and privileges (including the exculpatory and indemnification provisions) of Section 9.3 and of Section 9.6 shall apply to any such sub-agent

and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent.  Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory and rights to indemnification) and shall have all of the rights, benefits and privileges of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Company and the Lenders and (ii) such sub-agent shall only have obligations to Administrative Agent and not to any Group Member, Lender or any other Person and no Group Member, Lender or any other Person shall have the rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

   9.8    **Collateral Documents**.

   (a)    <u>Administrative Agent under Collateral Documents; Releases</u>.  Each Lender hereby further irrevocably authorizes Administrative Agent, on behalf of and for the benefit of the Lenders, to be the agent for and representative of Lenders with respect to the Collateral Documents and to enter into such other agreements with respect to the Collateral (including intercreditor agreements) as the Requisite Lenders may deem necessary.  Subject to <u>Section 10.6</u>, without further written consent or authorization from the Lenders, Administrative Agent may execute any documents or instruments necessary to, and take other actions reasonably requested by the Company in connection therewith to release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which Requisite Lenders (or such other Lenders as may be required to give such consent under <u>Section 10.6)</u> have otherwise consented.

   (b)    <u>Right to Realize on Collateral</u>.  Anything contained in any of the Loan Documents to the contrary notwithstanding, the Company, Administrative Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or exercise any other remedy provided under the Loan Documents (other than the right of set-off), it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of the Lenders in accordance with the terms hereof and all powers, rights and remedies under this Agreement and the Collateral Documents may be exercised solely by Administrative Agent, and (ii) in the event of a foreclosure by Administrative Agent on any of the Collateral pursuant to a public or private sale, Administrative Agent or its nominee may be the purchaser of any or all of such Collateral at any such sale and Administrative Agent, as agent for and representative of Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations arising under the Loan Documents as a credit on account of the purchase price for any Collateral payable by Administrative Agent at such sale.

   9.9    **Posting of Approved Electronic Communications**.

   (a)    <u>Delivery of Communications</u>.  The Company hereby agrees, unless directed otherwise by Administrative Agent or unless the electronic mail address referred to below has not

- 95 -

been provided by Administrative Agent to such Person, that it will provide to Administrative Agent all information, documents and other materials that it is obligated to furnish to Administrative Agent or to the Lenders pursuant to the Loan Documents, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Borrowing Notice, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Company and Administrative Agent to an electronic mail address as directed by Administrative Agent.  In addition, the Company agrees to continue to provide the Communications to Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents.

(b)    No Prejudice to Notice Rights.  Nothing herein shall prejudice the right of Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

9.10    **Proofs of Claim**.  The Lenders and the Company hereby agree that after the occurrence of an Event of Default pursuant to Sections 8.1(f) or (g), in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Company, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on the Company) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Loans and any other Obligations that are owing and unpaid and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Lenders, Administrative Agent and other agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, Administrative Agent and other agents and their agents and counsel and all other amounts due Lenders, Administrative Agent and other agents hereunder) allowed in such judicial proceeding; and

(b)    to collect and receive any moneys or other Property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, interim trustee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent any amount due for the compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent and other agents hereunder. Nothing herein contained shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement,

adjustment or composition affecting the Obligations or the rights of any Lenders or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding. Further, nothing contained in this Section 9.10 shall affect or preclude the ability of any Lender to (i) file and prove such a claim in the event that Administrative Agent has not acted within ten (10) days prior to any applicable bar date and (ii) require an amendment of the proof of claim to accurately reflect such Lender's outstanding Obligations.

SECTION 10
**MISCELLANEOUS**

10.1   **Notices**.   Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to the Company or Administrative Agent, shall be sent to such Person's address as set forth on Appendix B or in the other relevant Loan Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent in writing.   Each notice hereunder shall be in writing and may be personally served, sent by facsimile, electronic transmission or United States certified or registered mail or courier service and shall be deemed to have been given when delivered and signed for against receipt thereof, or upon confirmed receipt of facsimile or electronic transmission; provided, no notice to Administrative Agent shall be effective until received by Administrative Agent.

10.2   **Expenses**.   Whether or not the transactions contemplated hereby shall be consummated or the documents related hereto shall be executed, the Company agrees to pay promptly all actual, reasonable, out-of-pocket (a) costs and expenses incurred in connection with preparation of the Loan Documents, Related Agreements and all documents related to the foregoing and any consents, amendment, waiver or other modifications thereto; (b) fees and disbursements of counsel to the Company in furnishing all opinions required hereunder; (c) fees and disbursements of counsel to Administrative Agent and the Lenders in connection with the negotiation, preparation, execution, review and administration of the Loan Documents, the Related Agreements and all documents related to the foregoing and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by the Company; (d) costs and expenses incurred in connection with creating and perfecting Liens in favor of Administrative Agent, for the benefit of the Lenders pursuant hereto, including filing and recording fees, search fees, title insurance premiums and fees, expenses and disbursements of counsel to Administrative Agent and of counsel providing customary opinions that Administrative Agent may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; and (e) fees and disbursements of any auditors, accountants, consultants, engineers or appraisers.   In addition, the Company agrees to pay the following, without limitation:   (i) all actual, reasonable, out-of-pocket costs and expenses (including the fees, expenses and disbursements of counsel and of any appraisers, consultants, engineers, advisors and agents employed or retained by Administrative Agent and its counsel) in connection with the administration by Administrative Agent or the custody or preservation of any of the Collateral; (ii) all other actual, reasonable, out-of-pocket costs and expenses incurred by Administrative Agent after the Closing Date in connection with (A) the review and administration of the Loan Documents, the Related Agreements and all documents related to the foregoing and the transactions contemplated thereby, (B) any consents, amendments, waivers or other modifications to the Loan Documents, the Related Agreements and all documents related to the foregoing and the transactions contemplated thereby

and (C) any other documents or matters requested by the Company (including, in each case, the actual reasonable fees, expenses and disbursements of counsel to Administrative Agent and the Lenders in connection with the negotiation, preparation, execution, review and administration of such documentation); and (iii) after the occurrence and during the continuation of a Default or an Event of Default, all costs and expenses, including attorneys' fees and costs of settlement, incurred by Administrative Agent and Lenders in enforcing any Obligations of or in collecting any payments due from the Company hereunder or under the other Loan Documents or any Related Agreement by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings and (iv) all costs and fees and related expenses in connection with the formation and maintenance of any Person, structure or account necessary or desirable to Administrative Agent or the Lenders for tax planning purposes in connection with the Loans in an amount not to exceed $50,000 in the aggregate per Fiscal Year.

10.3    **Indemnity**.

(a)    In addition to the payment of expenses pursuant to Section 10.2, whether or not any or all of the Transactions shall be consummated, the Company agrees to defend (subject, in the case of any actual conflict of interest, to Indemnitees' selection of counsel), indemnify, pay and hold harmless, Administrative Agent and each Lender, their Affiliates and its and their respective officers, members, shareholders, partners, directors, trustees, employees, advisors, representatives and agents and each of their respective successors and assigns and each Person who controls any of the foregoing (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH INDEMNITEE**; provided, the Company shall not have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities if such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee as determined by a court of competent jurisdiction in a final, nonappealable order. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the Company shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(b)    To the extent permitted by applicable law, the Company shall not assert, and the Company hereby waives, releases and agrees not to sue upon any claim against any Indemnitee, on any theory of liability, for special, indirect, exemplary, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement, any Loan Document or any Related Agreement or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and the Company hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)     The Company hereby acknowledges and agrees that an Indemnitee may now or in the future have certain rights to indemnification provided by other sources ("**Other Sources**").   The Company hereby agrees that (i) it is the indemnitor of first resort (<u>i.e.</u>, its obligations to the Indemnitees are primary and any obligation of the Other Sources to provide indemnification for the same Indemnified Liabilities are secondary to any such obligation of the Company), (ii) that it shall be liable for the full amount of all Indemnified Liabilities, without regard to any rights the Indemnitees may have against the Other Sources, and (iii) it irrevocably waives, relinquishes and releases the Other Sources and the Indemnitees from any and all claims (A) against the Other Sources for contribution, indemnification, subrogation or any other recovery of any kind in respect thereof and (B) that an Indemnitee must seek expense advancement or reimbursement, or indemnification, from the Other Sources before the Company must perform its obligations hereunder.   No advancement or payment by the Other Sources on behalf of an Indemnitee with respect to any claim for which such Indemnitee has sought indemnification from the Company shall affect the foregoing.   The Other Sources shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery which the Indemnitee would have had against the Company if the Other Sources had not advanced or paid any amount to or on behalf of the Indemnitee.

10.4     **Set Off**.   In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuation of any Event of Default each Lender and its/their respective Affiliates is hereby authorized by the Company at any time or from time to time subject to the consent of Administrative Agent (such consent to be given or withheld at the written direction of the Requisite Lenders), without notice to the Company or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts (in whatever currency)) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of the Company (in whatever currency) against and on account of the obligations and liabilities of the Company to such Lender hereunder, and under the other Loan Documents, including all claims of any nature or description arising out of or connected hereto or any other Loan Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder, (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to <u>Section 2</u> and although such obligations and liabilities, or any of them, may be contingent or unmatured or (c) such obligation or liability is owed to a branch or office of such Lender different from the branch or office holding such deposit or obligation or such Indebtedness.

10.5     **Sharing of Payments by Lenders**.   If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest in any of its Loans or other Obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such Obligations greater than its pro rata share thereof as provided herein (other than a voluntary payment of Loans and applied in accordance with the terms hereof), then the Lender receiving such greater proportion shall (a) notify Administrative Agent of such fact, and (b) purchase (for Cash at face value) participations in the Loans and other Obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared

by the Lenders ratably in accordance with the aggregate amount of principal and accrued interest on their respective Loans and other amounts owing them; <u>provided</u> that:

(a)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)      the provisions of this <u>Section 10.5</u> shall not be construed to apply to (i) any payment made by the Company pursuant to and in accordance with the express terms of this Agreement, or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or Obligations to any assignee or Participant, other than to the Company or any Subsidiary thereof (as to which the provisions of this <u>Section 10.5</u> shall apply).

The Company consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Company rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Company in the amount of such participation.

10.6     **Amendments and Waivers**.

(a)      <u>Requisite Lenders' Consent</u>.   Subject to <u>Sections 10.6(b)</u>, <u>10.6(c)</u> and <u>10.6(d)</u>, no amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by the Company therefrom, shall in any event be effective without the written concurrence of (i) in the case of this Agreement, the Company, the Administrative Agent and the Requisite Lenders (or the Administrative Agent acting on the instructions of the Requisite Lenders) or (ii) in the case of any other Loan Document, the Company and Administrative Agent with the consent of the Requisite Lenders.

(b)      <u>Super-Majority Requisite Lenders' Consent</u>.   Subject to <u>Sections 10.6(c)</u> and <u>10.6(d)</u>, no amendment, modification, termination or waiver of <u>Sections 5.13</u>, <u>6.1(b)</u>, <u>6.20</u> or <u>6.22</u> or consent to any departure by the Company therefrom, shall in any event be effective without the written concurrence of the Company, the Administrative Agent and the Super-Majority Requisite Lenders (or the Administrative Agent acting on the instructions of the Super-Majority Requisite Lenders).

(c)      <u>Affected Lenders' Consent</u>.   Without the written consent of each Lender that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)      extend the scheduled final maturity of any Loan of such Lender;

(ii)      waive, reduce or postpone any scheduled repayment due such Lender (but not prepayment);

(iii)    reduce the rate of interest on any Loan of such Lender and any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.6(c)) or any fee payable hereunder;

(iv)    increase the Commitment of such Lender;

(v)    extend the time for payment of any such interest or fees to such Lender;

(vi)    reduce the principal amount of any Loan;

(vii)    release the Liens securing all or substantially all of the Collateral; other than as otherwise permitted by the Loan Documents;

(viii)    amend, modify, terminate or waive any provision of Section 2.10, 2.12, 10.5, or 10.6(c) or amend or modify the Loan Documents in any way that has the effect of amending, modifying, terminating or waiving the application of payments, ratable sharing and sharing of payment provisions in the Loan Documents as in effect on the Closing Date; or

(ix)    amend the definition of "Requisite Lenders", "Super-Majority Requisite Lenders" or "Pro Rata Share";

(d)    Other Consents.  No amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by the Company therefrom, shall amend, modify, terminate or waive any provision of Section 9 as the same applies to Administrative Agent, or any other provision hereof or the other Loan Documents as the same applies to the rights or obligations of Administrative Agent, in each case without the consent of Administrative Agent.

(e)    Execution of Amendments, etc.  Administrative Agent may and, with the concurrence of the applicable Lenders, shall (subject, in each instance, to Section 10 hereof) execute amendments, modifications, waivers or consents on behalf of such Lenders.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on the Company shall entitle the Company to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.6(e) shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by the Company, on the Company.

(f)    Retirement of Loans.  The Company will not, and Company will not permit any of its Subsidiaries or any of the Group Members to, directly or indirectly, offer to purchase or otherwise acquire any outstanding Loans.

(g)    Amendment Consideration.  None of Company or any of its Affiliates or any other party to any Loan Documents will, directly or indirectly, pay any remuneration or grant any security as an inducement for, any amendment or waiver of any of the provisions of this Agreement or any of the other Loan Documents unless each Lender of the Loans (irrespective of

the kind and amount of Loans then owned by it) shall be offered and paid such remuneration and granted such security on the same terms.  For the avoidance of doubt, nothing in this Section 10.6(g) is intended to restrict or limit the amendment requirements otherwise set forth herein.

10.7    **Successors and Assigns; Assignments**.

(a)    Successors and Assigns.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  None of the Company's rights or obligations hereunder nor any interest therein may be assigned or delegated by any such Person without the prior written consent of the Administrative Agent and all Lenders (and any attempted assignment or transfer by any such Person without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of Administrative Agent and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments.  Any Lender may assign to one or more Eligible Assignees all or any portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, and the Loans held by it); provided, however, that (i) each such assignment shall be of a constant, and not a varying, percentage of such Lender's rights and obligations assigned under this Agreement and shall be an equal percentage with respect to both its obligations owing in respect of the Commitments and the related Loans and (ii) each such assignment shall be to an Eligible Assignee.

(c)    Mechanics.  The assigning Lender and the assignee thereof shall execute and deliver to Administrative Agent an Assignment Agreement, together with (i) a $3,500 processing and recordation fee payable to Administrative Agent for its own account, (ii) all requested know-your-customer documentation and a duly executed administrative questionnaire and (iii) such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to Administrative Agent pursuant to Sections 2.14(f) and 2.14(g).

(d)    Notice of Assignment.  Upon its receipt and acceptance of a duly executed and completed Assignment Agreement, any forms, certificates or other evidence required by this Agreement in connection therewith, including pursuant to Section 10.7(c), together with a $3,500 assignment fee payable to the Administrative Agent, Administrative Agent shall record the information contained in such Assignment Agreement in the Register (which shall be conclusive absent manifest error), shall give prompt notice thereof to the Company and shall maintain a copy of such Assignment Agreement.

(e)    Effect of Assignment.  Subject to the terms and conditions of this Section 10.7(e), as of the "Effective Date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the

assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto; provided, anything contained in any of the Loan Documents to the contrary notwithstanding such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); and (iii) if any such assignment occurs after the making of any Loan hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Note to Administrative Agent for cancellation, and thereupon the Company shall issue and deliver a new Note, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the outstanding principal balance under the Loans of the assignee and/or the assigning Lender.

(f)        Participations.  Each Lender shall have the right at any time to sell one or more participations to any Person (other than a natural Person, any Group Member or any of their respective Affiliates) (each, a "**Participant**") in all or any part of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Loans or any other Obligation); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Company, Administrative Agent, and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement.  The Company agrees that each Participant shall be entitled to the benefits of Sections 2.13 and 2.14 (subject to the requirements and limitations therein, including the requirements under Section 2.14(f) and Section 2.14(g) (it being understood that the documentation required under Section 2.14(f) and Section 2.14(g) shall be delivered by the Participant to the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section 10.7(f); provided that such Participant shall not be entitled to receive any greater payment under Section 2.13 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless such greater payment results from a change in law that occurs after the Participant acquired the applicable participation, or is made with the Company's prior written consent.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Company, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other Obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or a portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States

Treasury Regulations.  The entries in the Participant Register shall be presumed correct absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(g)   Independence of Covenants.   All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

10.8   **Survival of Representations, Warranties and Agreements**.  All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Loan.  Notwithstanding anything herein or implied by law to the contrary, the agreements of the Company set forth in Sections 2.13, 10.2 and 10.3, and the agreements of Lenders set forth in Sections 2.12, 9.3(b) and 9.6 shall survive the payment of the Loans, and the termination hereof.

10.9   **No Waiver; Remedies Cumulative**.   No failure or delay on the part of Administrative Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any Default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to Administrative Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Loan Documents.  Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

10.10   **Marshaling; Payments Set Aside**.  Neither Administrative Agent nor any Lender shall be under any obligation to marshal any assets in favor of the Company or any other Person or against or in payment of any or all of the Obligations.  To the extent that the Company makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or Administrative Agent or Lenders enforce any Liens or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

10.11   **Severability**.  In case any provision in or obligation hereunder or any other Loan Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and

enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.12    **Obligations Several; Independent Nature of Lenders' Rights**.  The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.  Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a Joint Venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

10.13    **Headings**.  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

10.14    **APPLICABLE LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

10.15    **CONSENT TO JURISDICTION**.  **ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST THE COMPANY ARISING OUT OF OR RELATING HERETO OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, THE COMPANY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (iii) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE COMPANY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1 IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE COMPANY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (iv) AGREES THAT ADMINISTRATIVE AGENT AND THE LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST THE COMPANY IN THE COURTS OF ANY OTHER JURISDICTION.**

10.16    **WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE**

**LENDER/COMPANY RELATIONSHIP THAT IS BEING ESTABLISHED HEREUNDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THE LOAN DOCUMENTS, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 10.16</u> AND EXECUTED BY EACH OF THE PARTIES HERETO THAT IS PARTY TO SUCH JUDICIAL PROCEEDING), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

10.17  **Confidentiality**. If the Company reasonably believes that any information being furnished by it or any other Group Member to Administrative Agent or a Lender ("**Recipient**") is confidential, the Company may so indicate by notice in writing to the Recipient, identifying the information with specificity (such identified information, the "**Confidential Information**"), in which event the Recipient will maintain the confidentiality thereof; <u>provided</u>, <u>however</u>, that a Recipient may disclose such information (i) to its Affiliates, partners, potential partners and members and its and their respective directors, managers, officers, employees, attorneys, accountants, auditors, advisors, consultants, agents or representatives with a need to know such Confidential Information and who have been advised of and have agreed in writing to be bound by the provisions of this <u>Section 10.17</u> (collectively "**Permitted Recipients**"), (ii) to any potential assignee or transferee of any of its rights or obligations hereunder (including without limitation, in connection with a sale of any or all of the Loans) or any of their agents and advisors (<u>provided</u> that such potential assignee or transferee shall have been advised of and agree to be bound by the provisions of this <u>Section 10.17</u>), (iii) if such information (x) becomes publicly available other than as a result of a breach of this <u>Section 10.17</u>, (y) becomes available to a Recipient or any of its Permitted Recipients on a non-confidential basis from a source other than the Group Members or (z) is independently developed by the Recipient or any of its Permitted Recipients, (iv) to enable it to enforce or otherwise exercise any of its rights and remedies under any Loan Document or (v) as consented to by the Company. Any Person required to maintain the confidentiality of Confidential Information as provided herein shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such Person would accord to its own

confidential information.  Notwithstanding anything to the contrary set forth in this <u>Section 10.17</u> or otherwise, nothing herein shall prevent a Recipient or its Permitted Recipients from complying with any legal requirements (including, without limitation, pursuant to any rule, regulation, stock exchange requirement, self-regulatory body, supervisory authority, other applicable judicial or governmental order, legal process, fiduciary or similar duties or otherwise) to disclose any Confidential Information; <u>provided</u>, <u>however</u>, that in each case, the Recipient or its Permitted Recipients furnish only that portion of such information which it is advised by such Recipient or its Permitted Recipient's counsel is required to be disclosed.  In addition, the Recipient and its Permitted Recipients may disclose Confidential Information if so requested by a governmental, self-regulatory or supervisory authority.  Each Group Member hereby acknowledges and agrees that, subject to the restrictions on disclosure of Confidential Information as provided in this <u>Section 10.17</u>, the Recipient and their respective Affiliates are in the business of making Investments in and otherwise engaging in businesses which may or may not be in competition with the Group Members or otherwise related to their and their Affiliates' respective business and that nothing herein shall, or shall be construed to, limit the Lenders' or their Affiliates' ability to make such Investments or engage in such businesses.

10.18   **Usury Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Company shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and the Company to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Company.  In determining whether the interest contracted for, charged, or received by Administrative Agent or a Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

10.19   **Counterparts**.  This Agreement may be executed in any number of counterparts (including by facsimile or other electronic transmission), each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

10.20   **PATRIOT Act**.  Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Group Member that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies such Group Member, which information includes the name and address of such Group Member and other information that will allow such Lender or Administrative Agent, as applicable, to identify such Group Member in accordance with the PATRIOT Act.

10.21   **Disclosure**.  Each Group Member and each Lender hereby acknowledges and agrees that Administrative Agent and/or its Affiliates and their respective Related Funds from time to time may hold Investments in, and make loans to, or have other relationships with any of the Group Members and their respective Affiliates, including the ownership, purchase and sale of Capital Stock in any Group Member and their respective Affiliates and each Lender hereby expressly consents to such relationships.

10.22   **Appointment for Perfection.**  Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession.  Should any Lender (other than Administrative Agent) obtain possession of any such Collateral, such Lender shall notify Administrative Agent thereof, and, promptly upon Administrative Agent's request therefor shall deliver such Collateral to Administrative Agent or otherwise deal with such Collateral in accordance with Administrative Agent's instructions.

10.23   **Advertising and Publicity**.  No Group Member shall issue or disseminate to the public (by advertisement, including without limitation any "tombstone" advertisement, press release or otherwise), submit for publication or otherwise cause or seek to publish any information describing the credit or other financial accommodations made available by Lenders pursuant to this Agreement and the other Loan Documents without the prior written consent of Administrative Agent and the Requisite Lenders.  Nothing in the foregoing shall be construed to prohibit any Group Member from making any submission or filing which it is required to make by applicable law (including securities laws, rules and regulations), stock exchange rules or pursuant to judicial process; provided, that, (a) such filing or submission shall contain only such information as is necessary to comply with applicable law, rule or judicial process and (b) unless specifically prohibited by applicable law, rule or court order, the Company shall promptly notify Administrative Agent of the requirement to make such submission or filing and provide Administrative Agent with a copy thereof.

10.24   **Acknowledgments and Admissions**.  The Company hereby represents, warrants and acknowledges and admits that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of the Loan Documents;

(b)    it has made an independent decision to enter into this Agreement and the other Loan Documents to which it is a party, without reliance on any representation, warranty, covenant or undertaking by Administrative Agent or any Lender, whether written, oral or implicit,

other than as expressly set out in this Agreement or in another Loan Document delivered on or after the date hereof;

(c)     there are no representations, warranties, covenants, undertakings or agreements by Administrative Agent or any Lender as to the Loan Documents except as expressly set out in this Agreement;

(d)     none of Administrative Agent or any Lender has any fiduciary obligation toward it with respect to any Loan Document or the Transactions;

(e)     no partnership or Joint Venture exists with respect to the Loan Documents between any Group Member, on the one hand, and Administrative Agent or any Lender, on the other;

(f)     Administrative Agent is not any Group Member s agent;

(g)     Vinson & Elkins L.L.P. is not counsel for any Group Member;

(h)     should an Event of Default or Default occur or exist, each of Administrative Agent and each Lender will determine in its discretion and for its own reasons what remedies and actions it will or will not exercise or take at that time; provided, that only the Administrative Agent, in its capacity as such, shall be entitled to take action in accordance with the terms of the Loan Documents on behalf of the Lenders;

(i)     without limiting any of the foregoing, no Group Member is relying upon any representation or covenant by any of Administrative Agent or any Lender, or any representative thereof, and no such representation or covenant has been made, that any of Administrative Agent or any Lender will, at the time of an Event of Default or Default, or at any other time, waive, negotiate, discuss, or take or refrain from taking any action permitted under the Loan Documents with respect to any such Event of Default or Default or any other provision of the Loan Documents; and

(j)     Administrative Agent and the Lenders have all relied upon the truthfulness of the acknowledgments in this Section 10.24 in deciding to execute and deliver this Agreement and to become obligated hereunder.

10.25   **Entire Agreement**.   **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

*[Remainder of Page Intentionally Left Blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Term Loan Credit Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**MTE HOLDINGS LLC**

By: _____
Name: Mark A. Siffin
Title: Authorized Signatory

**RIVERSTONE CREDIT MANAGEMENT,**
**LLC**, as Administrative Agent

By: _____
Name:  Christopher Abbate
Title:    Managing Director

Signature Page to Term Loan Credit Agreement

LENDERS:                                CPPIB CREDIT INVESTMENTS III INC., as
                                        Lender

                                        By:    _____
                                        Name:  Geoff Souter
                                        Title: Authorized Signatory

                                        By:    _____
                                        Name:  Paul Shapiro
                                        Title: Authorized Signatory

                                        By:    _____
                                        Name:  Gary Sun
                                        Title: Authorized Signatory

Signature Page to Term Loan Credit Agreement

**CENTAURUS CAPITAL LP**, as Lender

By:    Centaurus Holdings, LLC, its General
         Partner

By:    _____
Name: John D. Arnold
Title:  Manager of Centaurus Holdings, LLC

**NEW JUTLAND PARTNERS, LP**, as Lender

By:    New Jutland Management, LLC, its General
        Partner

By:   _____
Name: Brian Terp
Title:  Manager

**FENWOOD ROAD CAPITAL PARTNERS, LP**,
as Lender

By:    Fenwood Road Management, LLC, its
       General Partner

By: _____
Name: Timothy J. Detmering
Title:  Manager

**AG ENERGY FUNDING, LLC**, as Lender

By:    Angelo, Gordon & Co., L.P., as its Manager

By:    _____

Name:   Todd Dittmann

Title:    Authorized Person

**RIVERSTONE    CREDIT    PARTNERS    I
DIRECT, LP**, as Lender

By: _____
Name:  Christopher Abbate
Title:   Managing Director

**RIVERSTONE CREDIT PARTNERS II DIRECT, LP**, as Lender

By: _____
Name: Christopher Abbate
Title:   Managing Director

**RIVERSTONE    STRATEGIC    CREDIT PARTNERS A-1 AIV, L.P.**, as Lender

By: _____

Name:  Christopher Abbate

Title:   Managing Director

**VP RATTLESNAKE LLC**, as Lender
By Värde Partners, Inc., its Manager

By: _____
Name:          Markus Specks
Title:         Managing Director

Signature Page to Term Loan Credit Agreement

**MELODY BUSINESS FINANCE, LLC**, as Lender

By: _____
Name: Celine Hannett
Title: Authorized Signatory

Signature Page to Term Loan Credit Agreement

**APPENDIX A**

## COMMITMENTS

| Lender | Total Commitment | Closing Date Commitment | Delayed-Draw Commitment | Pro Rata Share |
|---|---|---|---|---|
| CPPIB Credit Investments III Inc. | $115,000,000.00 | $58,105,263.16 | $56,894,736.84 | 24.210526316% |
| Centaurus Capital LP | $97,000,000.00 | $49,010,526.32 | $47,989,473.68 | 20.421052632% |
| New Jutland Partners, LP | $1,000,000.00 | $505,263.16 | $494,736.84 | 0.210526316% |
| Fenwood Road Capital Partners, LP | $2,000,000.00 | $1,010,526.32 | $989,473.68 | 0.421052632% |
| AG Energy Funding, LLC | $85,000,000.00 | $42,947,368.42 | $42,052,631.58 | 17.894736842% |
| Riverstone Credit Partners I Direct, LP | $17,000,000.00 | $8,589,473.68 | $8,410,526.32 | 3.578947368% |
| Riverstone Credit Partners II Direct, LP | $56,500,000.00 | $28,547,368.42 | $27,952,631.58 | 11.894736842% |
| Riverstone Strategic Credit Partners A-1 AIV, L.P. | $1,500,000.00 | $757,894.74 | $742,105.26 | 0.315789474% |
| VP Rattlesnake LLC | $75,000,000.00 | $37,894,736.84 | $37,105,263.16 | 15.789473684% |
| Melody Business Finance, LLC | $25,000,000.00 | $12,631,578.94 | $12,368,421.06 | 5.263157894% |
| **Total** | **$475,000,000.00** | **$240,000,000.00** | **$235,000,000.00** | **100.000000000%** |

APPENDIX B

**<u>NOTICE ADDRESSES</u>**

**ADMINISTRATIVE AGENT'S OFFICE:**

**Riverstone Credit Management LLC**
712 Fifth Avenue, 36th Floor
New York, NY 10015
Attn: Christopher Abbate, Managing Director
Telephone: (212) 271-2942
Electronic mail: cabbate@riverstonecredit.com
With a copy to: riverstoneagency@cortlandglobal.com

**LENDERS:**

**CPPIB Credit Investments III Inc.**
One Queen Street East, Suite 2500
Toronto, Ontario
Canada M5C 2W5
Attn: Matthew Hare
Telephone: (416) 972-8304
Electronic mail: mhare@cppib.com; ciisettlements@cppib.com

**Centaurus Capital LP**
1717 West Loop South, Suite 1800
Houston, TX 77027
Attn: Stephen Douglas, General Counsel
Telephone: (713) 554-1952
Electronic mail: SDouglas@centaurusenergy.com

With a copy to:

Centaurus Capital LP
1717 West Loop South, Suite 1800
Houston, TX 77027
Attn: Cameron Banks
Telephone: (713) 554-1957
Electronic mail: cameron@centcap.net; capcalls@centcap.net; reporting@centcap.net

**New Jutland Partners, LP**
3530 Bailey Road
Franklin, TN 37064
Attn: Brian Terp
Telephone: (718) 687-3078
Electronic mail: bterp@centaurusenergy.com

**Fenwood Road Capital Partners, LP**
2700 Fenwood Road
Houston, TX 77005
Attn: Timothy J. Detmering
Telephone: (713) 256-1470
Electronic mail: tdetmering@centaurusenergy.com

**AG Energy Funding, LLC**
c/o Angelo Gordon & Co., L.P.
245 Park Ave, 24th Floor
New York, NY 10167
Attn: Chad Hanover
Telephone: (713) 993-4300
Electronic mail: notices.AGEnergyFundingLLC@virtusllc.com;
AGEnergyAcctOps@angelogordon.com; dtaylor@angelogordon.com

**Riverstone Credit Partners I Direct, LP**
**Riverstone Credit Partners II Direct, LP**
**Riverstone Strategic Credit Partners A-1 AIV, L.P.**
712 Fifth Avenue, 36th Floor
New York, NY 10015
Attn: Christopher Abbate, Managing Director
Telephone: (212) 271-2942
Electronic mail: cabbate@riverstonecredit.com; credit@riverstonellc.com

**VP Rattlesnake LLC**
c/o Värde Partners, Inc.
901 Marquette Avenue South, Suite 3300
Minneapolis, MN 55402
Attn:   Seth Litchke
Telephone: 952-374-5160
E-mail: SLitchke@Varde.com

**Melody Business Finance, LLC**
60 Arch Street
Greenwich, CT 06830
Attn: Notices
Telephone: (203) 302-1780
Electronic mail:notices@melody.com

**COMPANY:**

**MTE Holdings LLC**
280 E. 96th Street, Suite 210
Indianapolis, IN  46240
Attn:  Bob Quinn
Telephone: (317) 805-0777
Electronic mail: bquinn@maefield.com

**APPENDIX C**

<u>PERMITTED ACQUISITION ASSETS</u>



**Schedule 1.2**
**Related Agreements**

1. A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

2. A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

3. A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

4. A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

5. A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations on the N/2 Section 17, Block 34, T3S)

6. Term Assignment of N/2 Section 17, Block 34, T3S from Laredo Petroleum to MDC - 25% WI retained by Laredo APO

7. Contract Operating Agreement, dated as of August 27, 2014, by and between MDC Texas Operator LLC, a Delaware limited liability company, and MDC Energy LLC, a Delaware limited liability company doing business in Texas as MDC Texas Energy LLC

**Schedule 2.4**
**Use of Proceeds**


Proceeds from the Closing Date Loans will be used as follows: (i) up to $170,000,000 to repay prior advances and breakage costs under that certain Note Purchase Agreement, dated as of June 26, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Note Purchase Agreement***"), by and among MDC Energy LLC, a Delaware limited liability company, as issuer, the holders from time to time party thereto and The Bank Of New York Mellon, as administrative agent and collateral agent for such holders, (ii) up to $18,600,000 to repurchase Class B Units of the Company issued to Drawbridge Special Opportunities Fund LP, a Delaware limited partnership ("***Fortress***"), pursuant to the Limited Liability Company Agreement, (iii) up to $8,997,934.50 to repay certain existing loans made by iStar Financial Inc., (iv) up to $19,000,000 to pay financing fees, transaction costs and legal costs related to closing of the Agreement and to fund the Capital Reserve Account with the interest reserve and (v) otherwise, in strict accordance with the APOD.

**Schedule 4.1**
**Jurisdictions of Organization and Qualification**

| Group Member | Jurisdiction of Formation | Jurisdiction(s) of Foreign Qualification |
|---|---|---|
| Olam Energy Resources I LLC | Delaware | N/A |
| MTE Partners LLC | Delaware | N/A |
| MTE Holdings LLC | Delaware | N/A |
| MDC Energy LLC | Delaware | Texas |
| MDC Reeves Energy LLC | Delaware | Texas |
| Ward I, LLC | Delaware | Texas |

**Schedule 4.2**
**Capital Stock and Ownership**

| Owner | Group Member | Percentage Owned | Form of Entity | Class of Capital Stock | No. of Capital Stock | Certificated or Uncertificated | Certificate No. |
|---|---|---|---|---|---|---|---|
| Olam Energy Resources I LLC | MTE Holdings LLC | 50% | Limited liability company | Class A Units | 4,000,000 | Uncertificated | N/A |
| MTE Partners LLC | MTE Holdings LLC | 50% | Limited liability company | Class A Units | 4,000,000 | Uncertificated | N/A |
| MTE Holdings LLC | MDC Energy LLC | 100% | Limited liability company | Limited liability company membership interest | N/A | Certificated | 1 |
| MDC Energy LLC | MDC Reeves Energy LLC | 100% | Limited liability company | Limited liability company membership interest | N/A | Certificated | 1 |
| MDC Energy LLC | Ward I, LLC | 100% | Limited liability company | Limited liability company membership interest | N/A | Uncertificated | N/A |

**Warrants**

1. Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of June 26, 2017, between the Company and Apollo Credit Opportunity Fund III AIV I LP ("Credit Opportunity"), as amended by that certain Amendment to Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of the date hereof, between the Company and Credit Opportunity, providing for the purchase of 3.9326% of the Class C Units of the Company

2. Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of June 26, 2017, between the Company and Apollo Center Street Partnership, L.P. ("Center Street"), as amended by that certain Amendment to Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of the date hereof, between the Company and Center Street, providing for the purchase of 0.8824% of the Class C Units of the Company

3. Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of June 26, 2017, between the Company and Apollo Tactical Value SPN Investments, L.P. ("Tactical Value"), as amended by that certain Amendment to Warrant to Purchase Class C Units of

MTE Holdings LLC, dated as of the date hereof, between the Company and Tactical Value, providing for the purchase of 1.1708% of the Class C Units of the Company

4.  Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of June 26, 2017, between the Company and Apollo Moultrie Credit Fund, L.P. ("Moultrie"), as amended by that certain Amendment to Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of the date hereof, between the Company and Moultrie, providing for the purchase of 0.4591% of the Class C Units of the Company

5.  Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of June 26, 2017, between the Company and Apollo Thunder Partners, L.P. ("Thunder"), as amended by that certain Amendment to Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of the date hereof, between the Company and Thunder providing for the purchase of 0.2941% of the Class C Units of the Company

6.  Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of June 26, 2017, between the Company and Apollo Tower Credit Fund, L.P. as nominee for ATCF Subsidiary (DC), LLC ("Tower"), as amended by that certain Amendment to Warrant to Purchase Class C Units of MTE Holdings LLC, dated as of the date hereof, between the Company and Tower, providing for the purchase of 0.7610% of the Class C Units of the Company

**Schedule 4.5**
**Governmental Consents**

None.

**Schedule 4.7**
**Material Adverse Changes**

None.

**Schedule 4.10**
**Restricted Junior Payments**

None.

**Schedule 4.11**
**Adverse Proceedings**

None.

**Schedule 4.12**
**Payment of Taxes**

None.

**Schedule 4.14**
**Environmental Matters**

None.

**Schedule 4.15**
**No Defaults**

None.

**Schedule 4.16**
**Material Contracts**

<u>JOINT OPERATING AGREEMENTS, EASEMENTS AND RELATED CONTRACTS</u>

1) ***Copperhead 23 #1H***

   a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

   b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

   c) H&D Empire LLC Pipeline Easement Agreement (Gas Pipeline)

   d) Forrister Generation Skipping Trusts Pipeline Easement Agreement (Gas Pipeline)

   e) Forrister Generation Skipping Trusts Fresh Water Storage Pit & Easement Agreement

   f) Wagner & Brown Ltd et al Easement & ROW Agreement (Gas Pipeline)

2) ***Yucca #5H***

   a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

   b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

3) ***Yucca #1***

   a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

   b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

4) ***Yucca #2 SWD***

   a) A.A.P.L. Forfm 610-1989 Model Form Operating Agreement (Yucca Block JOA)

   b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

   c) Salt Water Disposal Agreement

5) ***Yucca #3***

   a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

   b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

6) ***Yucca #4***

   a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

   b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

7) ***Diamond Back 17 #1H***

   a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

    c) Isabel Cole Brooks et al Pipeline Easement (Dated 2-14-17)

    d) Isabel Cole Brooks et al Pipeline Easement (Dated 3-18-17)

    e) Isabel Cole Brooks et al Pipeline Easement (Dated 2-20-17)

    f) TX Road & Bridge Permit Approval for CR413 (6" steel Gas Pipeline)

    g) TX Road & Bridge Permit Approval for CR420 (6" steel Gas Pipeline)

8) *Diamond Back #1*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

    c) Isabel Cole Brooks et al Pipeline Easement (Dated 1-31-17)

    d) TX Road & Bridge Permit Approval for CR413 (6" steel Gas Pipeline)

    e) TX Road & Bridge Permit Approval for CR420 (6" steel Gas Pipeline)

9) *Mesquite 10 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

    c) Toyah Farms Pipeline Easement

    d) Freda Blahosky Pipeline Easement

10) *Affirmed 6 #2H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

11) *Citation 14 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

12) *Omaha 11 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

13) *Assault 6 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

14) *War Admiral 24 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*15) Count Fleet #2H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*16) Secretariat 10 #1HR*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*17) Big Brown 15 #1H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*18) Smarty Jones 26 #1H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*19) Pickpocket 21 #1H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*20) Delightful Dasher 11 #1H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*21) Eastex 6 #1H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*22) Imperial Eagle 24 #1H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*23) California Chrome 27 #1H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*24) Gallant Fox 9 #1H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*25) Block C-18, Sections: 2, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 17, 20*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

*26) Block C-9, Sections 10, 11, 13, 23, 24, 26*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

**27) Block DW Washburn, Section 13**

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

**28) Block C-9, Sections 15, 16, 17, 18**

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

**29) Block C-8, Section 27**

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

**30) Block C-9, Sections 10, 11, 13, 23, 24, 26 and Block C-8 Section 27**

a) Water Management Services Agreement

**31) Northern San Saba Gas Pipeline**

a) Toyah Farms Pipeline Easement

b) Isabel Cole Brooks et al Pipeline Easement (Dated 1/17/14)

c) Keith Kraakevik et al Pipeline Easement Agreement

d) Dorris Morrison Letter Agreement for Pipeline Easement Agreement (Gas Pipeline)

e) Keith Kraakevik et al Pipeline Easement Agreement (A)

f) Keith Kraakevik et al Pipeline Easement Agreement (B)

g) Keith Kraakevik et al Pipeline Easement Agreement (C)

h) Tom Kraakevik Letter Agreement for Pipeline Easement Agreement

i) Isabel Cole Brooks et al Pipeline Easement (Dated 2-14-14)

j) Isabel Cole Brooks et al Pipeline Easement (Dated 3-18-14)

k) Isabel Cole Brooks et al Pipeline Easement (Dated 2-20-14)

l) Mason David Hounshell Pipeline Easement

m) Aurora Cisneros Garcia et al Pipeline Easement

n) Freda Blahosky Pipeline Easement

o) Blake O&G Pipeline Easement

p) Fred Corwin Sr & Irene Agnes Klein Liv Trust Pipeline Easement

q) Carol T Crouch et al Pipeline Easement  (A)

r) Carol T Crouch et al Pipeline Easement (B)

    s)  Carolyn Hawkins Byrd Pipeline Easement

    t)  Mary Lynlee Sayles Darby et al Pipeline Easement

    u)  Michael Edward Thomas Pipeline Easement

    v)  Perry Sayles Pipeline Easement

    w) Robert Kinney III Pipeline Easement

    x)  Mary Wyley Williamson Pipeline Easement

*32) David Trimble 13 SWD*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

    b)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

    c)  Salt Water Disposal Agreement

*33) Three Sisters Lease - Wells 1, 3, 4, and 5*

    a)  Salt Water Disposal Agreement

*34) Cotter 6 Lease - Wells 1 and 2*

    a)  Salt Water Disposal Agreement

*35) G Hillger 8 Lease - Wells 1 and 2*

    a)  Salt Water Disposal Agreement

*36) McCauley 6 Lease - Wells 2, 3, and 4*

    a)  Salt Water Disposal Agreement

*37) Laredo 17-1*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations on the N/2 Section 17, Block 34, T3S)

    b)  Term Assignment of N/2 Section 17, Block 34, T3S from Laredo Petroleum to MDC - 25% WI retained by Laredo APO

    c)  Salt Water Disposal Agreement

*38) Hannathon East #1H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations on the N/2 Section 17, Block 34, T3S)

    b)  Term Assignment of N/2 Section 17, Block 34, T3S from Laredo Petroleum to MDC - 25% WI retained by Laredo APO

    c)  Salt Water Disposal Agreement

*39)* Contract Operating Agreement, dated as of August 27, 2014, by and between MDC Texas Operator LLC, a Delaware limited liability company, and MDC Energy LLC, a Delaware limited liability company doing business in Texas as MDC Texas Energy LLC

SOFTWARE CONTRACTS

1) Advanced Reservoir Characterization and Well Spacing Project, dated May 11, 2018 by and among Schlumberger Technology Corporation and MDC Texas Energy LLC

MARKETING CONTRACTS

1) Gas Purchase Agreement, dated June 30, 2012, by and among ETC Field Services LLC (successor in interest to Regency Energy Partners) and MDC Reeves Energy LLC

2) Gas Purchase Agreement, dated January 13, 2016, by and among EagleClaw Midstream Ventures, LLC and MDC Reeves Energy LLC

3) Gas Purchase Agreement, dated August 1, 2012, by and among DCP Midstream, LP and MDC Texas Energy LLC

4) Gas Purchase Agreement, dated April 1, 2002, by and among DCP Midstream, LP and MDC Texas Energy LLC

5) Crude Oil Purchase Agreement, dated September 1, 2013, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Reeves Energy LLC

6) Crude Oil Purchase Agreement, dated November 1, 2008, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Texas Energy LLC

7) Crude Oil Purchase Agreement, dated April 1, 2014, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Texas Energy LLC

8) BML Service Agreement, dated May 14, 2018, but effective as of June 1, 2018, by and among BML Crude Oil Marketing Inc. and MDC Texas Energy LLC

9) BML Service Agreement, dated August 1, 2016 but effective as of September 1, 2016, by and among BML Crude Oil Marketing Inc. and MDC Texas Energy LLC

**Schedule 4.20**
**Broker's Fees**

None.

**Schedule 4.25**
**Insurance**

1.  Markel American & Markel International Insurance Company LTD - Policy Number JCGL100226 (General Liability)

2.  Markel American – Policy Number JUMB100187 (Umbrella)

3.  Travelers Property Casualty Comp – Policy Number BA-4E431886 (Business Automotive Insurance)

4.  The Travelers Indemnity Company - Policy Number YKUB-169L55 (Employer Liability)

5.  Markel American & Markel International Insurance Company LTD - Policy Number JCOW100148 (Control of Well Coverage)

6.  Markel American - Policy Number MKLM5IM0050248 (Equipment Floater, Commercial Application & Inland Marine)

**Schedule 4.27**
**Covered Person Transactions**

1) Contract Operating Agreement, dated as of August 27, 2014, by and between MDC Texas Operator LLC, a Delaware limited liability company, and MDC Energy LLC, a Delaware limited liability company doing business in Texas as MDC Texas Energy LLC

**Schedule 4.28**
**Swap Agreements**

| Swap Agreement (incl. counterparty) | Type | Term | Effective Date | Termination Date | Notional Amount | Net Mark-to-Market Value[1] |
|---|---|---|---|---|---|---|
| 2002 ISDA Master Agreement, dated as of July 26, 2017, between Bank of Montreal (as successor in interest to NextEra Energy Marketing, LLC), and MDC Energy LLC, a Delaware limited liability company, as modified by the Schedule to the 2002 ISDA Master Agreement attached thereto | Costless Collar Option | 24 Months | September 20, 2017 | August 31, 2019 | 93,335 barrels | $587,634.18 |
| 2002 ISDA Master Agreement, dated as of July 26, 2017, between Bank of Montreal (as successor in interest to NextEra Energy Marketing, LLC), and MDC Energy LLC, a Delaware limited liability company, as modified by the Schedule to the 2002 ISDA Master Agreement attached thereto | Costless Collar Option | 24 Months | January 16, 2018 | December 31, 2019 | 141,644 barrels | $345,402.59 |
| 2002 ISDA Master Agreement, dated as of July 26, 2017, between Bank of Montreal (as successor in interest to NextEra Energy Marketing, LLC), and MDC Energy LLC, a Delaware limited liability company, as modified by the Schedule to the 2002 ISDA Master Agreement attached thereto | Costless Collar Option | 24 Months | March 15, 2018 | February 29, 2020 | 225,349 barrels | $907,965.84 |

---

[1] Figures current as of September 10, 2018

**Schedule 4.29**
**Permits**

None.

**Schedule 4.30**
**Names and Places of Business**

Group Member: MTE Holdings LLC

Other Names and Trade Names Used in the Last Five Years: None

Current Jurisdiction of Organization: Delaware

Organizational Number: 5544287

Tax ID Number: 47-1017894

Locations of Chief Executive Office over the last Five Years: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

Current Location of Chief Executive Office: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240


Group Member: MDC Energy LLC

Other Names and Trade Names Used in the Last Five Years: MDC Texas Energy LLC

Current Jurisdiction of Organization: Delaware

Organizational Number: 5554941

Tax ID Number: 46-3569140

Locations of Chief Executive Office over the last Five Years: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

Current Location of Chief Executive Office: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240


Group Member: MDC Reeves Energy LLC

Other Names and Trade Names Used in the Last Five Years: MDC Texas Energy LLC

Current Jurisdiction of Organization: Delaware

Organizational Number: 5758023

Tax ID Number: 47-3814809

Locations of Chief Executive Office over the last Five Years: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

Current Location of Chief Executive Office: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240


Group Member: Ward I, LLC

Other Names and Trade Names Used in the Last Five Years: MDC Texas Energy LLC

Current Jurisdiction of Organization: Delaware

Organizational Number: 5758005

Tax ID Number: 47-4856817

Locations of Chief Executive Office over the last Five Years: 280 East 96th Street, Suite 210,

Indianapolis, Indiana 46240

Current Location of Chief Executive Office: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

**Schedule 4.30**
**Marketing Contracts**

1) Gas Purchase Agreement, dated June 30, 2012, by and among ETC Field Services LLC (successor in interest to Regency Energy Partners) and MDC Reeves Energy LLC

2) Gas Purchase Agreement, dated January 13, 2016, by and among EagleClaw Midstream Ventures, LLC and MDC Reeves Energy LLC

3) Gas Purchase Agreement, dated August 1, 2012, by and among DCP Midstream, LP and MDC Texas Energy LLC

4) Gas Purchase Agreement, dated April 1, 2002, by and among DCP Midstream, LP and MDC Texas Energy LLC

5) Crude Oil Purchase Agreement, dated September 1, 2013, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Reeves Energy LLC

6) Crude Oil Purchase Agreement, dated November 1, 2008, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Texas Energy LLC

7) Crude Oil Purchase Agreement, dated April 1, 2014, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Texas Energy LLC

8) BML Service Agreement, dated May 14, 2018, but effective as of June 1, 2018, by and among BML Crude Oil Marketing Inc. and MDC Texas Energy LLC

9) BML Service Agreement, dated August 1, 2016 but effective as of September 1, 2016, by and among BML Crude Oil Marketing Inc. and MDC Texas Energy LLC

**Schedule 4.32**
**Prepayments**

None.

**Schedule 4.33**
**Existing Accounts Payable**

| Vendor | Amount ($) |
|---|---|
| Alamo Pressure Pumping LLC | $10,062,654.78 |
| CTAP, LLC | $3,865,628.50 |
| B&L Pipeco Services, Inc. | $2,423,838.66 |
| RUSSAW TRANSPORT, LLC | $2,021,202.00 |
| Trans-Tex Cementing Services, LLC | $1,750,232.07 |
| KC PIPE | $1,258,611.42 |
| Predator Drilling, LLC | $1,235,471.66 |
| Precision Drilling Company, LP | $1,223,739.58 |
| DuraChem Production Services, LLC | $1,136,360.55 |
| BUTCH'S RAT HOLE & ANCHOR SERVICE, INC. | $1,118,532.18 |
| CACTUS FUEL, LLC | $1,047,348.87 |
| Fluid Delivery Solutions, LLC | $991,309.28 |
| J6 ENERGY SERVICES | $921,324.03 |
| Chase Harris, Inc. | $904,320.00 |
| MOTLEY SERVICES | $884,100.00 |
| Premier Directional Drilling, LLC | $841,771.60 |
| Patterson-UTI Drilling Company, LLC | $811,618.75 |
| RDUB TRUCKING | $591,053.50 |
| Black Pearl Energy, LLC | $575,325.51 |
| Warrior Energy, LLC | $557,250.00 |
| JW POWERLINE | $553,762.42 |
| Shack Acid & Cement Service, Inc. | $544,175.00 |
| SwiftWater Energy Services, LLC | $503,607.62 |
| BAKER BOTTS L.L.P. | $469,258.32 |
| New Tech Global Ventures, LLC | $467,271.00 |
| Cretic Energy Services, LLC | $465,961.95 |
| Core & Main LP | $402,645.54 |
| JET SPECIALTY, INC. | $399,046.00 |
| Transcend Drilling Company, Inc. | $387,500.00 |
| BAKER HUGHES | $368,008.14 |
| TankLogix, LLC | $358,310.12 |
| TECH MANAGEMENT, LLC | $354,288.87 |
| Rhino Rentals Inc | $353,546.19 |
| Britt Trucking Company | $340,000.00 |
| SIERRA HAMILTON | $325,159.00 |
| Summit Casing Services, LLC | $293,428.52 |
| BIG B CRANE, LLC | $283,500.00 |

| | |
|---|---|
| QES Directional Drilling, LLC | $277,900.00 |
| PROPETRO SERVICES, INC. | $276,487.62 |
| Apergy ESP Systems, LLC | $264,332.00 |
| DILL LAND & CATTLE, LLC | $245,810.75 |
| MCCLINTON ENERGY GROUP, LLC | $227,897.99 |
| GR Energy Services | $217,050.80 |
| WaterBridge Texas Operating, LLC | $212,835.00 |
| FREDA BLAHOSKY TRUST | $209,847.75 |
| Turn Right Tools, LLC | $206,761.41 |
| ETC Field Services, LLC | $202,390.00 |
| Baseline Energy Services, LP | $201,604.80 |
| National Oilwell Varco, L.P. | $196,215.45 |
| BADGER BMB SERVICES, INC | $191,587.48 |
| Isaacs Transport | $180,554.00 |
| BLACKHAWK MEASUREMENT CONSULTING, LLC | $174,176.46 |
| Gravity Oilfield Services, LLC | $170,970.28 |
| BNN WEST TEXAS | $165,669.75 |
| DEL'S INSPECTION SERVICE COMPANY, LLC | $164,454.86 |
| Permian Water Solutions, LLC | $162,160.35 |
| J & M ENERGY SERVICES, LP | $157,879.94 |
| DCC SERVICES, LLC | $156,907.16 |
| JW TRUCKING, LLC. | $146,248.00 |
| Drilformance, LLC | $141,550.50 |
| SHAW INTERESTS, INC. | $140,528.88 |
| Basic Energy Services | $133,317.15 |
| REDHEAD SERVICES, LLC | $125,025.58 |
| Solid Liberty RENTAL Services, LLC | $123,725.41 |
| Impac Exploration Services, Inc. | $121,730.00 |
| Pate Trucking Company, LLC | $114,590.49 |
| Premium Clean | $113,950.00 |
| SMITH INTERNATIONAL, INC. | $113,850.11 |
| Solid LIberty Services, LLC | $110,737.00 |
| Monahans Nipple-Up Service | $106,687.50 |
| HALLIBURTON ENERGY SERVICES, INC. | $105,528.25 |
| Permian Equipment Rentals | $73,036.53 |
| SCHLUMBERGER TECHNOLOGY CORP. | $70,544.44 |
| BASIN ENGINE & PUMP, INC. | $67,787.38 |
| Permian Power Tong, LLC | $64,007.00 |
| BLACKHAWK Services, LLC | $40,817.97 |
| Schlumberger Rod Lift, Inc. | $38,819.55 |
| Forrister Generation - Skipping Trust | $38,421.75 |

| | |
|---|---|
| **Trans-Tex Dyno Services, LLC** | $34,426.91 |
| **QES Pressure Control, LLC** | $22,741.95 |
| **PERMIAN ANCHORS** | $10,980.88 |

**Schedule 4.34**
**Related Agreement Obligations**

None.

**Schedule 5.13**
**APOD**

[See attached.]

**MDC ENERGY LLC**
Schedule 5.13 APOD
September 6, 2018

| Well Name | Spud Date | Targeted Zone | Lateral Length (ft.) | CapEx ($) Estimate | Stages | Fluid Type | Total Fluids (bbls) | Fluids (gals/lat ft) | Proppant Type | Total Proppant (lbs) | Total Proppant (lbs) per Stage | Proppant (lbs/lat ft) | Pump Rate (bpm) | Est. WI % | Net-CapEx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eastex 6 #1H | 2/14/2018 | Wolfcamp A | 8,072 | $ 9,950,000 | 60 | Slickwater | 576,571 | 3,000 | 100 mesh & 40/70 white | 22,399,800 | 375,000 | 2,775 | 80 | 68% | 6,766,000 |
| Affirmed 6 #3H | 2/1/2019 | Wolfcamp A | 6,700 | $ 9,100,000 | 50 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 80 | 68% | 6,188,000 |
| Affirmed 6 #5H | 2/17/2019 | Wolfcamp B | 6,700 | $ 9,100,000 | 50 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 100 | 68% | 6,188,000 |
| Affirmed 6 #7H | 3/5/2019 | Wolfcamp B | 6,700 | $ 9,100,000 | 50 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 100 | 68% | 6,188,000 |
| Affirmed 6 #4H | 3/20/2019 | Bnsg | 6,700 | $ 9,100,000 | 50 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 80 | 68% | 6,188,000 |
| Affirmed 6 #6H | 4/1/2019 | Wolfcamp A | 6,700 | $ 9,100,000 | 50 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 80 | 68% | 6,188,000 |
| Affirmed 6 #8H | 4/30/2019 | Bnsg | 6,700 | $ 9,100,000 | 50 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 80 | 68% | 6,188,000 |
| California Chrome 27 #1H | 5/11/2018 | Wolfcamp A | 4,500 | $ 8,347,350 | 33 | Slickwater | 321,429 | 3,000 | 100 mesh & 40/70 white | 12,487,500 | 375,000 | 2,775 | 80 | 67% | 5,592,725 |
| State California Chrome 27 #7H | 8/10/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 67% | 5,886,562 |
| California Chrome 27 #3H | 8/14/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 67% | 5,886,562 |
| State California Chrome 27 #8H | 8/30/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 67% | 5,886,562 |
| California Chrome 27 #4H | 9/4/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 67% | 5,886,562 |
| State California Chrome 27 #9H | 9/14/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 67% | 5,886,562 |
| California Chrome 27 #5H | 9/24/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 67% | 5,886,562 |
| California Chrome 27 #6H | 10/14/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 67% | 5,886,562 |
| Runaway Ghost 23 #1HM | 7/20/2018 | Wolfcamp A | 8,110 | $ 9,950,000 | 60 | Slickwater | 579,286 | 3,000 | 100 mesh & 40/70 white | 21,004,900 | 350,000 | 2,590 | 80 | 69% | 6,865,500 |
| Coopers Dream #1H | 10/20/2018 | Wolfcamp B | 7,500 | $ 9,500,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 19,425,000 | 350,000 | 2,590 | 100 | 65% | 6,175,000 |
| Repent 23 #1H | 11/1/2018 | Wolfcamp A | 8,110 | $ 9,950,000 | 60 | Slickwater | 579,286 | 3,000 | 100 mesh & 40/70 white | 21,004,900 | 350,000 | 2,590 | 80 | 65% | 6,467,500 |
| Repent 23 #2H | 11/1/2018 | Wolfcamp A | 8,110 | $ 9,950,000 | 60 | Slickwater | 579,286 | 3,000 | 100 mesh & 40/70 white | 21,004,900 | 350,000 | 2,590 | 80 | 65% | 6,467,500 |
| Coopers Dream #2H | 11/10/2018 | Wolfcamp A | 7,500 | $ 9,500,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 19,425,000 | 350,000 | 2,590 | 80 | 65% | 6,175,000 |
| Runaway Ghost 23 #2H | 11/20/2018 | Wolfcamp A | 8,110 | $ 9,950,000 | 60 | Slickwater | 579,286 | 3,000 | 100 mesh & 40/70 white | 21,004,900 | 350,000 | 2,590 | 80 | 65% | 6,467,500 |
| Copperhead 23 #2H | 11/20/2018 | Wolfcamp A | 4,500 | $ 8,785,913 | 33 | Slickwater | 321,429 | 3,000 | 100 mesh & 40/70 white | 11,655,000 | 350,000 | 2,590 | 80 | 65% | 5,710,843 |
| Coopers Dream #3H | 11/30/2018 | Wolfcamp A | 4,500 | $ 8,785,913 | 33 | Slickwater | 321,429 | 3,000 | 100 mesh & 40/70 white | 11,655,000 | 350,000 | 2,590 | 80 | 65% | 5,710,843 |
| Coopers Dream #4H | 12/20/2018 | Wolfcamp A | 4,500 | $ 8,785,913 | 33 | Slickwater | 321,429 | 3,000 | 100 mesh & 40/70 white | 11,655,000 | 350,000 | 2,590 | 80 | 65% | 5,710,843 |
| Copperhead 23 #3H | 12/20/2018 | Wolfcamp B | 4,500 | $ 8,785,913 | 33 | Slickwater | 321,429 | 3,000 | 100 mesh & 40/70 white | 11,655,000 | 350,000 | 2,590 | 100 | 65% | 5,710,843 |
| Gallant Fox 9 #1H | 6/12/2018 | Wolfcamp A | 4,500 | $ 8,245,225 | 33 | Slickwater | 321,429 | 3,000 | 100 mesh & 40/70 white | 12,487,500 | 375,000 | 2,775 | 80 | 75% | 6,183,919 |
| Rocket Wrangler 11 #1H | 4/11/2018 | Wolfcamp A | 7,562 | $ 9,751,388 | 56 | Slickwater | 540,143 | 3,000 | 100 mesh & 40/70 white | 20,984,550 | 375,000 | 2,775 | 80 | 62% | 6,045,861 |

**MDC ENERGY LLC**
Schedule 5.13 APOD
September 6, 2018

| Well Name | Spud Date | Targeted Zone | Lateral Length (ft.) | CapEx ($) Estimate | Stages | Fluid Type | Total Fluids (bbls) | Fluids (gals/lat ft) | Proppant Type | Total Proppant (lbs) | Total Proppant (lbs) per Stage | Proppant (lbs/lat ft) | Pump Rate (bpm) | Est. WI % | Net-CapEx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Omaha 11-2 #2HM | 6/10/2018 | Wolfcamp A | 7,500 | $ 9,700,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 19,425,000 | 350,000 | 2,590 | 80 | 62% | 6,014,000 |
| Omaha 11-3 #3H | 7/1/2018 | Wolfcamp A | 7,500 | $ 9,700,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 19,425,000 | 350,000 | 2,590 | 80 | 62% | 6,014,000 |
| Delightful Dasher 11-2 #2HM | 7/22/2018 | Wolfcamp B | 7,500 | $ 9,700,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 21,090,000 | 380,000 | 2,812 | 100 | 62% | 6,014,000 |
| Count Fleet 11 #4H | 12/20/2018 | Wolfcamp B | 7,500 | $ 9,500,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 21,090,000 | 380,000 | 2,812 | 100 | 59% | 5,605,000 |
| Count Fleet 11 #5H | 1/1/2019 | Wolfcamp B | 7,500 | $ 9,500,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 21,090,000 | 380,000 | 2,812 | 100 | 59% | 5,605,000 |
| Count Fleet 11 #6H | 1/20/2019 | Wolfcamp A | 7,500 | $ 9,500,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 19,425,000 | 350,000 | 2,590 | 80 | 59% | 5,605,000 |
| Count Fleet 11 #1H | 2/1/2019 | Wolfcamp B | 7,500 | $ 9,500,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 21,090,000 | 380,000 | 2,812 | 100 | 59% | 5,605,000 |
| Count Fleet 11 #3H | 2/20/2019 | Wolfcamp B | 7,500 | $ 9,500,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 21,090,000 | 380,000 | 2,812 | 100 | 59% | 5,605,000 |
| Count Fleet 11 #4H | 3/1/2019 | Wolfcamp A | 7,500 | $ 9,500,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 19,425,000 | 350,000 | 2,590 | 80 | 59% | 5,605,000 |
| Pickpocket 21 #2H | 8/10/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 78% | 6,853,012 |
| Pickpocket 21 #3H | 8/20/2018 | Wolfcamp B | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 14,060,000 | 380,000 | 2,812 | 100 | 78% | 6,853,012 |
| Pickpocket 21 #4H | 9/10/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 78% | 6,853,012 |
| Smarty Jones 26 #5H | 7/1/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 70% | 6,150,139 |
| Smarty Jones 26 #6H | 7/20/2018 | Bnsg | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 14,060,000 | 380,000 | 2,812 | 80 | 70% | 6,150,139 |
| Smarty Jones 26 #7H | 8/1/2018 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 70% | 6,150,139 |
| Smarty Jones 26 #2H | 1/1/2019 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 70% | 6,150,139 |
| Smarty Jones 26 #3H | 1/17/2019 | Bnsg | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 70% | 6,150,139 |
| Smarty Jones 26 #4H | 2/2/2019 | Wolfcamp A | 5,000 | $ 8,785,913 | 37 | Slickwater | 357,143 | 3,000 | 100 mesh & 40/70 white | 12,950,000 | 350,000 | 2,590 | 80 | 70% | 6,150,139 |
| Toyah B #2H | 10/15/2018 | Wolfcamp A | 7,500 | $ 9,700,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 19,425,000 | 350,000 | 2,590 | 80 | 100% | 9,700,000 |
| State Toyah Unit #1H | 2/22/2019 | Wolfcamp A | 7,500 | $ 9,500,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 21,090,000 | 380,000 | 2,812 | 80 | 100% | 9,500,000 |
| Imperial Eagle 24 #1H | 3/19/2018 | Wolfcamp A | 7,461 | $ 9,683,935 | 55 | Slickwater | 532,929 | 3,000 | 100 mesh & 40/70 white | 20,704,275 | 375,000 | 2,775 | 80 | 64% | 6,197,718 |
| Sir Barton 24 #1H | 9/10/2018 | Wolfcamp A | 4,500 | $ 8,347,350 | 33 | Slickwater | 321,429 | 3,000 | 100 mesh & 40/70 white | 12,487,500 | 375,000 | 2,775 | 80 | 64% | 5,342,304 |
| Whirlaway 24 #4HM | 9/26/2018 | Wolfcamp A | 7,500 | $ 9,700,000 | 56 | Slickwater | 535,714 | 3,000 | 100 mesh & 40/70 white | 19,425,000 | 350,000 | 2,590 | 80 | 64% | 6,208,000 |
| War Admiral 24 #4H | 10/20/2018 | Wolfcamp A | 6,543 | $ 9,127,150 | 48 | Slickwater | 467,357 | 3,000 | 100 mesh & 40/70 white | 18,156,825 | 375,000 | 2,775 | 80 | 64% | 5,841,376 |
| War Admiral 24 #5H | 11/1/2018 | Wolfcamp A | 6,400 | $ 8,991,200 | 47 | Slickwater | 457,143 | 3,000 | 100 mesh & 40/70 white | 16,576,000 | 350,000 | 2,590 | 80 | 64% | 5,754,368 |
| Imperial Eagle 24 #2H | 11/19/2018 | Wolfcamp A | 6,400 | $ 8,991,200 | 47 | Slickwater | 457,143 | 3,000 | 100 mesh & 40/70 white | 16,576,000 | 350,000 | 2,590 | 80 | 64% | 5,754,368 |

**MDC ENERGY LLC**
Schedule 5.13 APOD
September 6, 2018

| Well Name | Spud Date | Targeted Zone | Lateral Length (ft.) | CapEx ($) Estimate | Stages | Fluid Type | Total Fluids (bbls) | Fluids (gals/lat ft) | Proppant Type | Total Proppant (lbs) | Total Proppant (lbs) per Stage | Proppant (lbs/lat ft) | Pump Rate (bpm) | Est. WI % | Net-CapEx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| War Admiral 24 #6H | 11/20/2018 | Wolfcamp B | 6,400 | $ 8,991,200 | 47 | Slickwater | 457,143 | 3,000 | 100 mesh & 40/70 white | 16,576,000 | 350,000 | 2,590 | 100 | 64% | 5,754,368 |
| A Classic Dash 18 #1HM | 8/10/2018 | Wolfcamp A | 10,000 | $ 11,380,000 | 74 | Slickwater | 714,286 | 3,000 | 100 mesh & 40/70 white | 27,750,000 | 375,000 | 2,775 | 80 | 60% | 6,828,000 |
| Special Effort 18 #1H (aka Yucca #7H) | 8/25/2018 | Wolfcamp A | 10,311 | $ 11,380,000 | 76 | Slickwater | 807,765 | 3,000 | 100 mesh & 40/70 white | 28,614,385 | 375,000 | 3,000 | 80 | 65% | 7,397,000 |
| Alysheba #1H | 5/1/2019 | Wolfcamp A | 10,000 | $ 11,380,000 | 74 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 80 | 60% | 6,828,000 |
| Alysheba #4H | 5/1/2019 | Wolfcamp A | 10,000 | $ 11,380,000 | 74 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 80 | 60% | 6,828,000 |
| Alysheba #2H | 5/20/2019 | Wolfcamp A | 10,000 | $ 11,380,000 | 74 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 80 | 60% | 6,828,000 |
| Alysheba #5H | 5/20/2019 | Wolfcamp B | 10,000 | $ 11,380,000 | 74 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 100 | 60% | 6,828,000 |
| Alysheba #3H | 6/1/2019 | Wolfcamp A | 10,000 | $ 11,380,000 | 74 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 80 | 60% | 6,828,000 |
| Alysheba #6H | 6/1/2019 | Wolfcamp B | 10,000 | $ 11,380,000 | 74 | Slickwater | 478,571 | 3,000 | 100 mesh & 40/70 white | 17,353,000 | 350,000 | 2,590 | 100 | 60% | 6,828,000 |
| American Pharaoh #2H | 11/9/2018 | Wolfcamp A | 7,621 | $ 9,841,805 | 56 | Slickwater | 544,357 | 3,000 | 100 mesh & 40/70 white | 21,148,275 | 375,000 | 2,775 | 80 | 64% | 6,298,755 |
| Seattle Slew 17 #1H | 12/2/2018 | Wolfcamp A | 10,000 | $ 11,380,000 | 74 | Slickwater | 714,286 | 3,000 | 100 mesh & 40/70 white | 25,900,000 | 350,000 | 2,590 | 80 | 64% | 7,283,200 |

| Well Name | Targeted Zone | Lateral Length (ft.) | CapEx ($) Estimate |
|---|---|---|---|
| Larceny (Luxe, Non-Op) | Wolfcamp A | 5,000 | 4,567,200 |
| Eagle Rare 4-3E Unit #1H (Luxe, Non-Op) | Wolfcamp A | 10,177 | 279,450 |
| Widow Jane  19-20E Unit #1H Luxe, Non-Op) | Wolfcamp | 10,129 | 2,181,600 |
| Noah's Mill  19-20W Unit #1H  (Luxe, Non-Op) | Wolfcamp | 10,158 | 2,181,600 |
| Jefferson's Ocean 21-___ Unit #1H  (Luxe, Non-Op) | Wolfcamp | 7,000 | 680,000 |
| Thurmond A137 Allocation A #10H (Carrizo, Non-Op) | Wolfcamp | 8,500 | 609,500 |
| Fleming 13 #10H (Carrizo, Non-Op) | Wolfcamp | 5,000 | 830,000 |
| Iron Eagle Unit A U49H (Centennial, Non-Op) | Wolfcamp | 7,500 | 1,678,900 |
| Iron Eagle Unit A U42H (Centennial, Non-Op) | Wolfcamp | 7,500 | 1,678,900 |
| Iwo Jima Unit 14-26 Unit #1H  (Colgate, Non-Op) | Wolfcamp A | 7,500 | 432,600 |

**Schedule 6.1(h)**
**Indebtedness**

None.

**Schedule 6.2(f)**
**Liens**

None.

**Schedule 6.6(b)**
**Investments**

None.

**Schedule 6.11**
**Agreements in Existence on Closing Date**

1. Contract Operating Agreement, dated as of August 27, 2014, by and between MDC Texas Operator LLC, a Delaware limited liability company, and MDC Energy LLC, a Delaware limited liability company doing business in Texas as MDC Texas Energy LLC

**Schedule 6.15**
**Deposit Accounts**

| Financial Institution Name | Account Holder | Account / Reference Number |
|---|---|---|
| The Bank of New York Mellon | MTE Holdings LLC | 2775888400 |
| The Bank of New York Mellon | MTE Holdings LLC | 2775838400 |
| The Bank of New York Mellon | MDC Energy LLC | 4088118400 |
| Prosperity Bank | MDC Energy LLC | 09 0668 91 |
| Prosperity Bank | MDC Reeves Energy LLC | 08 9632 21 |

**Schedule 10.7**
**Non-Eligible Assignees**

1. The Blackstone Group L.P.;

2. L1 Energy (UK) LLP; and

3. Any affiliates, agents, representatives, or successors of any of the foregoing, other than, for the avoidance of doubt, GSO Capital Partners LP and any funds controlled or managed by them.

**FORM OF BORROWING NOTICE**

[          ], 20[ ]

MTE Holdings LLC, a Delaware limited liability company (the "*Company*"), pursuant to Section 2.3 of the Term Loan Credit Agreement dated as of September 17, 2018 (together with all amendments, restatements, supplements or other modifications thereto, the "*Credit Agreement*"; and, unless otherwise defined herein, each capitalized term used herein shall have the meaning specified in the Credit Agreement), by and among the Company, the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "*Administrative Agent*"), hereby notifies the Administrative Agent that the Company requests a Borrowing as follows:

(a)    Aggregate principal amount of Borrowing requested: $ [          ].

(b)    Date the Borrowing is to be made: [          ], 201[ ].

Attached to this Borrowing Notice are (i) a description of anticipated costs or other payments to be covered by the proceeds of the Borrowing (including as described in Section 3.2(e) of the Credit Agreement) and (ii) if applicable, a list of the Oil and Gas Properties described on the APOD currently in effect on which such proceeds are to be spent.  All capitalized terms not otherwise defined herein shall have the meanings specified in the Credit Agreement.

The undersigned certifies that he/she is the [ ] of the Company, and that as such he/she is authorized to execute this Borrowing Notice on behalf of the Company.  The undersigned further certifies, represents and warrants on behalf of the Company, in such undersigned's capacity as the [ ] of the Company and not in such undersigned's individual capacity, that:

1.    All conditions precedent to the making of the Loans pursuant to this Borrowing Notice have been met.

2.    As of the date of this Borrowing Notice, each representation and warranty of the Company set forth in the Credit Agreement (excluding any representations and warranties that expressly refer to a different date) is true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof).

3.    The Company shall be in pro forma compliance with Section 6.7 of the Credit Agreement upon the making of the Loans contemplated by this Borrowing Notice.

4.    As of the date of this Borrowing Notice, no Default or Event of Default has occurred and is continuing.

[5.    After giving effect to the Loans, pursuant to this Borrowing Notice and based upon good faith determinations and Projections consistent with the Financial Plan, the Company will be in

compliance in all material respects with all operating and financial covenants set forth in the Credit Agreement on the date hereof and as of the last day of each Fiscal Quarter ending prior to the Maturity Date; provided, however, that to the extent any operating or financial covenant in the Credit Agreement contains any qualifying language as to materiality such as "material", "in all material respects," "except as could not reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect" or similar qualifying language, then the phrase "in all material respects" shall be disregarded with respect to certifying compliance with respect to such operating and financial covenant.][1]

6.      The Lenders have received monthly projections for a period including the date hereof through a date at least twenty-four (24) months after the date hereof.

7.      Since December 31, 2017, no event, circumstance or change has occurred that has caused or could reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect.

8.      Both immediately before and after giving effect to the making of the Loans requested pursuant to this Borrowing Notice, the Company is Solvent.

9.      The proceeds of any funds requested pursuant to this Borrowing Notice will only be used in strict accordance with the Credit Agreement, including Section 2.4 thereof.

[10.    The Permitted Acquisition Conditions have been satisfied.][2]

Please wire the proceeds of the Loans requested pursuant to this Borrowing Notice to the following account, which account is a Deposit Account, which is subject to a Control Agreement:

[wiring instructions]

*[Signature Page Follows]*

---

[1] To be included only in Borrowing Notices for Delayed-Draw Loans.  *See* Section 3.2(f).
[2] To be included only in Borrowing Notices for Delayed-Draw Loans.  *See* Section 3.2(g).

**MTE HOLDINGS LLC**

By: _____
Name:
Title:

**EXHIBIT B**

**FORM OF APPROVAL LETTER**

Date: [_____], 20[__]
To: MTE Holdings LLC, as the Company
From: Riverstone Credit Management, LLC, as the Administrative Agent


Ladies and Gentlemen:

Reference is made to the Term Loan Credit Agreement, dated as of September 17, 2018 (as it may be amended, restated, supplemented or otherwise modified, the "***Credit Agreement***"), by and among MTE Holdings LLC, a Delaware limited liability company (the "***Company***"), the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "***Administrative Agent***").  Terms defined in the Credit Agreement shall have the same meanings when used herein.

The Credit Agreement contemplates that certain Approval Letters may be given from time to time in connection therewith in order to specify certain exemptions, requirements, allowances or approvals.  This letter is such an Approval Letter and is given by the Requisite Lenders, and acknowledged by the Administrative Agent, in order so to approve the [_____] that are specified in the schedule attached hereto, which approval shall remain in effect for the time period (if any) specified in such schedule.  This letter [is in addition to/supersedes] all previous Approval Letters dealing with [_____].

This letter is a Loan Document, and all provisions of the Credit Agreement that apply to Loan Documents shall apply hereto.

This letter may be separately executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed shall be deemed to constitute one and the same Approval Letter.

Please execute a counterpart of this letter in the place provided below to evidence your agreement to the foregoing and your continuing ratification of the Credit Agreement and the other Loan Documents in consideration of the approval herein contained.

By signing below, the undersigned Lenders, constituting Requisite Lenders, hereby authorize and direct the Administrative Agent to execute this Approval Letter.

The parties hereto hereby agree that the Administrative Agent shall be entitled to all of its rights, privileges, protections, indemnities and immunities in connection with its execution of this Approval Letter.

Yours truly,

[*Signature Page Follows*]

Acknowledged:                          Riverstone   Credit   Management,   LLC,   as
                                        Administrative Agent


                                        By:_____
                                        Name:
                                        Title:


Lenders**:**                            [ ], as Lender


                                        By:    _____
                                        Name:
                                        Title:

**EXHIBIT C**

**THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. FOR INFORMATION REGARDING THE ISSUE PRICE, THE TOTAL AMOUNT OF ORIGINAL ISSUE DISCOUNT, THE ISSUE DATE, AND THE YIELD TO MATURITY OF THE NOTE, PLEASE CONTACT BOB QUINN 280 E. 96TH STREET SUITE 210, INDIANAPOLIS, IN 46240 (317) 805-0707.**

## FORM OF NOTE

$ [             ]                                                                           [        ], 20[ ]

FOR VALUE RECEIVED, MTE Holdings LLC, a Delaware limited liability company (the "***Company***"), hereby promises to pay to [      ] or its registered assigns (the "***Lender***") at the office of Riverstone Credit Management, LLC (in such capacity, the "***Administrative Agent***") as specified in the Credit Agreement (as defined below), the principal sum of [          ] Dollars [($) ] (or such lesser amount as shall equal the aggregate unpaid principal amount of the Loans made by the Lender to the Company under the Credit Agreement (as hereinafter defined)), in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the Credit Agreement, and to pay interest on the unpaid principal amount of each such Loan, at such office, in like money and funds, for the period commencing on the date of such Loan until such Loan shall be paid in full, at the rates per annum and on the dates provided in the Credit Agreement.

The date and amount of each Loan, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books. Failure to make any such notation shall not affect the Lender's or the Company's rights or obligations in respect of such Loan or affect the validity of such transfer by the Lender of this Note.

This Note is one of the Notes referred to in the Term Loan Credit Agreement, dated as of September 17, 2018 and evidences Loans made by the Lenders thereunder (such Credit Agreement as the same may be amended, restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***") by and among the Company, the Lenders from time to time party thereto (including the Lender) and the Administrative Agent. Capitalized terms used in this Note have the respective meanings assigned to them in the Credit Agreement.

This Note is issued pursuant to the Credit Agreement and is entitled to the benefits provided for in (and subject to the terms of) the Credit Agreement and the other Loan Documents. The Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events, for prepayments of Loans upon the terms and conditions specified therein and other provisions relevant to this Note.

The ownership of an interest in this Note shall be registered in the Register. Notwithstanding anything else in this Note to the contrary, the right to the principal of, and stated interest on, this Note may be transferred only if the transfer is made in accordance with the terms and conditions of the Credit Agreement, is registered in the Register and the transferee is identified as the owner of an interest in the obligation. The Company or its agent shall be entitled to treat the registered Lender of this Note (as recorded on such record of ownership) as the owner in fact thereof for all

purposes and shall not be bound to recognize any equitable or other claim to or interest in this Note on the part of any other person or entity.

THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

*[Signature Page Follows]*

**MTE HOLDINGS LLC**


By:  _____
Name:
Title:

US 5749121v.3

**EXHIBIT D**

### FORM OF COMPLIANCE CERTIFICATE

[        ], 20[ ]

The undersigned hereby certifies that he/she is the [ ] of MTE Holdings LLC, a Delaware limited liability company (the "***Company***"), and that as such he/she is authorized to execute this certificate on behalf of the Company.  With reference to Section 5.1(e) of the Term Loan Credit Agreement, dated as of September 17, 2018 (as it may be amended, restated, supplemented or otherwise modified, the "***Credit Agreement***"), by and among the Company, the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "***Administrative Agent***"), the undersigned represents and warrants as follows (each capitalized term used herein having the same meaning given to it in the Credit Agreement unless otherwise specified):

1.  As of the date hereof, no Default or Event of Default has occurred and is continuing **[or specify Default and describe]**.

2.  The Company and its consolidated Subsidiaries are in compliance with Section 6.7 of the Credit Agreement, and attached hereto as Schedule I are detailed calculations demonstrating such compliance.

*[Signature Page Follows]*

EXECUTED AND DELIVERED as of the date first written above.

**MTE HOLDINGS LLC**


By: _____
Name:
Title:

Schedule I to Compliance Certificate

Calculations for the Fiscal [Year/Quarter] Ending [_____]

## I. Section 6.7(a)   Leverage Ratio.[3]

    (a)     Consolidated Total Debt as of the last day of such Fiscal Quarter    $[_____]

    (b)     Consolidated Adjusted EBITDAX for the four Fiscal Quarters ending on such Fiscal Quarter[4]    $[_____]

Leverage Ratio = (a) divided by (b)    ____ to 1.00

Leverage Ratio shall not be greater than 4.75 to 1.00

**Compliance**    **[Yes][No]**

## II. Section 6.7(b)   Interest Coverage Ratio.[5]

    (a)     Consolidated Adjusted EBITDAX for the four Fiscal Quarters ending on such Fiscal Quarter    $[_____]

    (b)     Consolidated Interest Expense for such four Fiscal Quarter period    $[_____]

Interest Coverage Ratio = (a) divided by (b)[6]    ____ to 1.00

Interest Coverage Ratio shall not be less than 2.00 to 1.00

**Compliance**    **[Yes][No]**

---

[3] Beginning with the Fiscal Quarter ending September 30, 2018.

[4] Provided that Consolidated Adjusted EBITDAX shall be deemed to be, for each Fiscal Quarter ending on or prior to June 30, 2019, Consolidated Adjusted EBITDAX for such Fiscal Quarter multiplied by four.

[5] Beginning with the Fiscal Quarter ending September 30, 2018.

[6] Provided that for the Fiscal Quarters ending September 30, 2018, December 31, 2018, March 31, 2019 and June 30, 2019, the ratio shall be (x) Consolidated Adjusted EBITDAX for such Fiscal Quarter multiplied by four to (y) (i) for the Fiscal Quarter ending September 30, 2018, Consolidated Interest Expense for such Fiscal Quarter multiplied by four, (ii) for the Fiscal Quarter ending December 31, 2018, Consolidated Interest Expense for the two Fiscal Quarter period then ending multiplied by two, (iii) for the Fiscal Quarter ending March 31, 2019, Consolidated Interest Expense for the three Fiscal Quarter period then ending multiplied by 4/3 and (iv) for the Fiscal Quarter ending June 30, 2019, Consolidated Interest Expense for the four Fiscal Quarter period then ending

### III.  Section 6.7(c)  **Total Asset Coverage Ratio.**[7]

    (a)      Total Asset Value as of the last day of such Fiscal Quarter      $[_____]

    (b)      Consolidated Total Debt as of the last day of such Fiscal Quarter      $[_____]

Total Asset Coverage Ratio = (a) divided by (b)      ____ to 1.00

Total Asset Coverage Ratio shall not be less than 1.00 to 1.00

**Compliance**      **[Yes][No]**

### IV.  Section 6.7(d)  **PDP Asset Coverage Ratio.**[8]

    (a)      the PV10 of the Group Members' Proved Developed Producing Reserves located on Oil and Gas Properties as of the last day of such Fiscal Quarter      $[_____]

    (b)      the Consolidated Total Debt as of the last day of such Fiscal Quarter      $[_____]

PDP Asset Coverage Ratio = (a) divided by (b)      ____ to 1.00

PDP Asset Coverage Ratio shall not be less than 1.00 to 1.00

**Compliance**      **[Yes][No]**

---

[7] Beginning with the Fiscal Quarter ending June 30, 2018 and ending with the Fiscal Quarter ending June 30, 2020.
[8] Beginning with the Fiscal Quarter ending September 30, 2020.

**EXHIBIT E**

**FORM OF CLOSING DATE CERTIFICATE**

September 17, 2018

THE UNDERSIGNED HEREBY CERTIFIES AS FOLLOWS:

I am the [ ] of MTE Holdings LLC, a Delaware limited liability company (the "***Company***").

This Closing Date Certificate is delivered pursuant to Section 3.1(m) of the Term Loan Credit Agreement, dated as of the date hereof (as it may be amended, supplemented or otherwise modified, the "***Credit Agreement***"; and, the capitalized terms not otherwise defined herein shall have the meanings specified in the Credit Agreement), by and among the Company, the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "***Administrative Agent***"). I certify to the Administrative Agent and the Lenders, in my capacity as [ ] of the Company and not in my individual capacity, that as of the date hereof:

1.      I have reviewed the terms of the Credit Agreement and the definitions and provisions contained in the Credit Agreement relating thereto, and in my opinion I have made, or have caused to be made under my supervision, such examination or investigation as is reasonably necessary to enable me to express an informed opinion as to the matters referred to herein.

2.      Based upon my review and examination described in paragraph 1 above,

(a)      as of the Closing Date, the representations and warranties contained in each of the Loan Documents are true and correct on and as of the Closing Date (or to the extent such representations and warranties specifically relate to an earlier date, on and as of such earlier date);

(b)      as of the Closing Date, the Company has performed and complied with all covenants, agreements, obligations and conditions contained in the Credit Agreement that are required to be performed or complied with by it on or before the Closing Date including, but not limited to, those set forth in Section 3.1 of the Credit Agreement; and

(c)      all notices to operators, partners or other necessary parties under, and other actions required by, the Related Agreements have taken place on or prior to the Closing Date.

*[Signature Page Follows]*

The foregoing certifications are made and delivered as of the date first written above.

**MTE HOLDINGS LLC**

By: _____
Name:
Title:

**EXHIBIT F**

**FORM OF SOLVENCY CERTIFICATE**

[          ], 20[ ]

THE UNDERSIGNED HEREBY CERTIFIES AS FOLLOWS:

1.      I am the [ ] of MTE Holdings LLC, a Delaware limited liability company (the "***Company***").

2.      Reference is made to that certain Term Loan Credit Agreement, dated as of September 17, 2018 (as it may be amended, restated, supplemented or otherwise modified, the "***Credit Agreement***"), by and among the Company, the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "***Administrative Agent***").  Capitalized terms not otherwise defined herein shall have the meanings specified in the Credit Agreement.  Based upon my review and examination described in paragraph 3 below, I certify, in my capacity as [ ] of the Company and not in my individual capacity, that as of the date hereof, after giving effect to the consummation of the Transactions, the Group Members satisfy clause (a) of the definition of Solvent.

3.      I have reviewed the terms of Sections 3.1(l) and 4.21 of the Credit Agreement, the definition of the term "Solvent" and the other definitions and provisions contained in the Credit Agreement and the other Loan Documents relating thereto, and, in my opinion, have made, or have caused to be made under my supervision, such examination or investigation as is necessary to enable me to express an informed opinion as to the matters referred to herein.

*[Signature Page Follows]*

The foregoing certifications are made and delivered as of the date first written above.

**MTE HOLDINGS LLC**

By: _____
Name:
Title:

**EXHIBIT G**

**FORM OF COMPANY COLLATERAL AGREEMENT**

(See Attached)

**Execution Version**

# Collateral Agreement

**dated as of**
**September 17, 2018**

**among**

**MTE Holdings LLC,**
**as Grantor**

**and**

**Riverstone Credit Management, LLC,**
**as Administrative Agent**

# TABLE OF CONTENTS

**ARTICLE I Definitions** ..................................................................................................1
    Section 1.01    Definitions....................................................................................1
    Section 1.02    Other Definitional Provisions; References .....................................2

**ARTICLE II Grant of Security Interest** ..........................................................................3
    Section 2.01    Grant of Security Interest...............................................................3
    Section 2.02    Transfer of Pledged Securities.......................................................4
    Section 2.03    Grantor Remains Liable under Accounts, Chattel Paper and Payment
                    Intangibles....................................................................................4

**ARTICLE III Acknowledgments, Waivers and Consents** ...............................................5
    Section 3.01    Acknowledgments, Waivers and Consents.....................................5
    Section 3.02    No Subrogation, Contribution or Reimbursement ..........................7

**ARTICLE IV Representations and Warranties** ...............................................................7
    Section 4.01    Representations in Credit Agreement .............................................7
    Section 4.02    Perfected Liens..............................................................................7
    Section 4.03    Legal Name, Organizational Status, Chief Executive Office .........7
    Section 4.04    Prior Names, Addresses .................................................................8
    Section 4.05    Pledged Securities .........................................................................8
    Section 4.06    Instruments and Chattel Paper .......................................................8
    Section 4.07    Accounts .......................................................................................8
    Section 4.08    Governmental Obligors..................................................................9
    Section 4.09    Tangible Assets .............................................................................9
    Section 4.10    Commercial Tort Claims................................................................9

**ARTICLE V Covenants** ...................................................................................................9
    Section 5.01    Covenants in Credit Agreement .....................................................9
    Section 5.02    Maintenance of Perfected Security Interest; Further Documentation............9
    Section 5.03    Maintenance of Records ...............................................................10
    Section 5.04    Further Identification of Collateral ...............................................10
    Section 5.05    Pledged Securities .......................................................................10
    Section 5.06    Instruments and Tangible Chattel Paper .......................................11
    Section 5.07    Commercial Tort Claims...............................................................11

**ARTICLE VI Remedial Provisions** ...............................................................................12
    Section 6.01    Pledged Securities .......................................................................12
    Section 6.02    Collections on Accounts, Etc........................................................13
    Section 6.03    Proceeds ......................................................................................13
    Section 6.04    Remedies.....................................................................................14
    Section 6.05    Private Sales of Pledged Securities...............................................14
    Section 6.06    Deficiency ...................................................................................15
    Section 6.07    Non-Judicial Enforcement ...........................................................15

**ARTICLE VII The Administrative Agent** ......................................................................15
    Section 7.01    Administrative Agent's Appointment as Attorney-in-Fact, Etc .....15
    Section 7.02    Duty of Administrative Agent ......................................................16
    Section 7.03    Financing Statements ...................................................................17

Section 7.04        Authority of Administrative Agent ................................................................17

**ARTICLE VIII Miscellaneous** ................................................................................................**18**
Section 8.01        Waiver ................................................................................................................18
Section 8.02        Notices ...............................................................................................................18
Section 8.03        Payment of Expenses, Indemnities, Etc ...........................................................18
Section 8.04        Amendments in Writing; Conflicts ...................................................................19
Section 8.05        Successors and Assigns .....................................................................................19
Section 8.06        Invalidity ...........................................................................................................19
Section 8.07        Counterparts ......................................................................................................19
Section 8.08        Survival ..............................................................................................................19
Section 8.09        Captions .............................................................................................................19
Section 8.10        No Oral Agreements ..........................................................................................19
Section 8.11        Governing Law; Submission to Jurisdiction .....................................................19
Section 8.12        Acknowledgments .............................................................................................20
Section 8.13        Set-Off ...............................................................................................................21
Section 8.14        Releases ..............................................................................................................21
Section 8.15        Reinstatement ....................................................................................................22
Section 8.16        Acceptance .........................................................................................................22
Section 8.17        Administrative Agent .........................................................................................22

SCHEDULES:

1.    Notice Address of Grantor
2.    Description of Pledged Securities
3.    Filings and Other Actions Required to Perfect Security Interests
4.    Legal Name, Location of Jurisdiction of Organization, Organizational Identification Number, Taxpayor Identification Number and Chief Executive Office
5.    Prior Names, Prior Chief Executive Office, Location of Tangible Assets
6.    Commercial Tort Claims

This **COLLATERAL AGREEMENT** (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of September 17, 2018, is made by MTE Holdings LLC, a Delaware limited liability company (the "**Grantor**"), in favor of Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (as defined below) from time to time parties to the Term Loan Credit Agreement (as defined below) (together with its successors in such capacity, the "**Administrative Agent**").

## R E C I T A L S

A.      Grantor is party to that certain Term Loan Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") dated as of even date herewith, among the Grantor, the lenders from time to time party thereto (the "**Lenders**") and the Administrative Agent.

B.      It is a condition precedent to the obligation of the Lenders to make the Loans (as defined in the Credit Agreement) that the Grantor shall have executed and delivered this Agreement to the Administrative Agent for the ratable benefit of the Lenders.

C.      Now, therefore, in consideration of the premises herein and to induce the Administrative Agent and the Lenders to enter into the Credit Agreement and to induce the Lenders to make the Loans thereunder, the Grantor hereby agrees with the Administrative Agent, for the ratable benefit of the Lenders, as follows:

## ARTICLE I
### Definitions

Section 1.01      Definitions.

(a)      As used in this Agreement, each term defined above shall have the meaning indicated above. Unless otherwise defined herein, capitalized terms used in this Agreement shall have the meanings given to them in the Credit Agreement, and the following terms as well as all uncapitalized terms which are defined in the UCC on the date hereof are used herein as so defined: Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Payment Intangibles, Proceeds, Supporting Obligations, and Tangible Chattel Paper.

(b)      The following terms shall have the following meanings:

"**Account Debtor**" shall mean a Person (other than the Grantor) obligated on an Account, Chattel Paper, or General Intangible.

"**Agreement**" shall have the meaning assigned such term in the preamble hereto.

"**Collateral**" shall have the meaning assigned such term in Section 2.01.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute, and any regulations promulgated thereunder.

"**Credit Agreement**" shall have the meaning assigned such term in the recitals hereto.

"**Excluded Property**" shall have the meaning assigned to such term in Section 2.01.

"**Grantor**" shall have the meaning assigned such term in the preamble hereto.

"**Investment Property**" means the collective reference to (i) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC and (ii) whether or not constituting "investment property" as so defined, all Pledged Notes and all Pledged Securities.

"**Lenders**" shall have the meaning assigned such term in the recitals hereto.

"**Pledged Entity**" means any issuer of a Pledged Security.

"**Pledged Notes**" means all promissory notes, if any, listed on Schedule 2, all intercompany notes at any time issued to the Grantor and all other promissory notes issued to or held by the Grantor (other than promissory notes issued in connection with extensions of trade credit by the Grantor in the ordinary course of business).

"**Pledged Securities**" means: (a) the Capital Stock described or referred to in Schedule 2 (as the same may be supplemented from time to time pursuant to a Supplement); and (b) (i) the certificates or instruments, if any, representing such Capital Stock, (ii) all dividends (cash, Capital Stock or otherwise), cash, instruments, rights to subscribe, purchase or sell and all other rights and Property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Capital Stock, (iii) all replacements, additions to and substitutions for any of the Property referred to in this definition, including, without limitation, claims against third parties, (iv) all other Collateral constituting Capital Stock, (v) the Proceeds, interest, profits and other income of or on any of the Property referred to in this definition, (vi) all security entitlements in respect of any of the foregoing, if any, and (vii) all books and records relating to any of the Property referred to in this definition; provided that the term "Pledged Securities" shall not include any Excluded Property.

"**Secured Documents**" means the collective reference to the Credit Agreement and the other Loan Documents.

"**Security Termination**" means such time as when each of the following shall have occurred: (i) the Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted at such time) and (ii) the Loans and all commitments under the Credit Agreement have been terminated.  For purposes of clarification, "Security Termination" shall have occurred for purposes of this Agreement if the two events provided in clauses (i)-(ii) above have occurred.

"**UCC**" means the Uniform Commercial Code of the State of New York.

Section 1.02    Other Definitional Provisions; References.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.  The gender of all words shall include the masculine, feminine, and neuter, as appropriate.  The words "herein," "hereof," "hereunder" and other words of similar import when used in this Agreement refer to this Agreement as a whole, and not to any particular article, section or subsection.  Any reference herein to a Section shall be deemed to refer to the applicable Section of this Agreement unless otherwise stated herein.  Any reference herein to an exhibit, schedule or annex shall be deemed to refer to the applicable exhibit, schedule or annex attached hereto unless otherwise stated herein.  Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to the Grantor, shall refer to the Grantor's Collateral or the relevant part thereof.

## ARTICLE II
## Grant of Security Interest

Section 2.01    <u>Grant of Security Interest.</u>  The Grantor hereby pledges, assigns and transfers to the Administrative Agent, and grants to the Administrative Agent, for the ratable benefit of the Secured Parties, a security interest in all of the following property now owned or at any time hereafter acquired by the Grantor or in which the Grantor now has or at any time in the future may acquire any right, title or interest and whether now existing or hereafter coming into existence (collectively, the "**Collateral**"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations:

      (1)      all Accounts;

      (2)      all Chattel Paper (whether Tangible Chattel Paper or Electronic Chattel Paper);

      (3)      all Commercial Tort Claims set forth on <u>Schedule 6</u>;

      (4)      all Deposit Accounts other than payroll, withholding tax and other fiduciary Deposit Accounts;

      (5)      all cash;

      (6)      all Documents;

      (7)      all General Intangibles (including, without limitation, rights in and under any Swap Agreements);

      (8)      all Goods (including, without limitation, all Inventory and all Equipment);

      (9)      all Instruments;

      (10)      all Investment Property;

      (11)      all Letter-of-Credit Rights (whether or not the letter of credit is evidenced by a writing);

      (12)      all Pledged Securities;

      (13)      all Supporting Obligations;

      (14)      all books and records pertaining to the Collateral;

      (15)      all other personal property of the Grantor, whether tangible or intangible and wherever located; and

      (16)      to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all collateral security, guarantees and other Supporting Obligations given with respect to any of the foregoing.

Notwithstanding the foregoing, this <u>Section 2.01</u> does not grant a security interest in (a) any lease, license or other agreement or contract or any property subject to a purchase money security interest, Lien securing a Capital Lease Obligation or similar arrangement, in each case permitted to be incurred under the

Credit Agreement, to the extent that a grant of a security interest therein would require a consent not obtained or violate or invalidate such lease, license or agreement or contract or purchase money arrangement, Capital Lease Obligation or similar arrangement or create a right of termination in favor of any other party thereto (other than the Grantor), in each case after giving effect to the applicable anti-assignment provisions of the UCC and other applicable law and other than Proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC or other applicable law notwithstanding such prohibition; (b) motor vehicles and other assets subject to certificates of title (other than to the extent a Lien thereon can be perfected by the filing of a financing statement under the UCC); (c) those assets as to which the Administrative Agent shall determine, in writing, that the cost or other consequence of obtaining a Lien thereon or perfection thereof are excessive in relation to the benefit to the Secured Parties of the security to be afforded thereby (d) any property to the extent that such grant is prohibited by reason of applicable laws, rules, regulations, or ordinances or by any agreement relating to such property, except to the extent that such prohibition is rendered ineffective by Sections 9-406, 9-407, 9-408 or 9-409 of the UCC, is no longer in effect or causes a violation of the Credit Agreement; (e) any application to register any trademark, service mark or other mark prior to the filing under applicable law of a verified statement of use (or the equivalent) for such trademark to the extent the creation of a security interest therein or the grant of a Lien thereon would void or invalidate such trademark; provided that the security interest provided herein in such trademark shall be deemed granted by the Grantor at such time as a verified statement of use (or the equivalent) is filed under applicable law with respect to such trademark and will attach immediately without further action; or (f) the Capital Stock owned by the Grantor in (i) any Subsidiary of the Grantor that is a "controlled foreign corporation" under Section 956 of the Internal Revenue Code (a "**Foreign Subsidiary**") (1) that represents in excess of 65% of the outstanding voting stock of such Foreign Subsidiary or (2) that is not a "First Tier" Foreign Subsidiary owned by the Grantor, (ii) any domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary, and (iii) any direct or indirect domestic Subsidiary of the Grantor that is treated as a disregarded entity for federal income tax purposes and substantially all of the assets of which include the capital stock or other equity interests of one or more Foreign Subsidiaries (collectively, "**Excluded Property**"). Excluded Property shall not be included as "Collateral" for purposes of this Agreement.

Section 2.02    Transfer of Pledged Securities.    All certificates and instruments representing or evidencing the Pledged Securities shall be delivered to and held pursuant hereto by the Administrative Agent or a Person designated by the Administrative Agent and, in the case of an instrument or certificate in registered form, shall be duly indorsed to the Administrative Agent or in blank by an effective indorsement (whether on the certificate or instrument or on a separate writing), and accompanied by any required transfer tax stamps to effect the pledge of the Pledged Securities to the Administrative Agent. Notwithstanding the preceding sentence, all Pledged Securities must be delivered or transferred in such manner, and the Grantor shall take all such further action as may be requested by the Administrative Agent, as to permit the Administrative Agent to be a "protected purchaser" to the extent of its security interest as provided in Section 8-303 of the UCC (if the Administrative Agent otherwise qualifies as a protected purchaser).

Section 2.03    Grantor Remains Liable under Accounts, Chattel Paper and Payment Intangibles. Anything herein to the contrary notwithstanding, the Grantor shall remain liable under each of the Accounts, Chattel Paper and Payment Intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to each such Account, Chattel Paper or Payment Intangible. Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Account, Chattel Paper or Payment Intangible (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Administrative Agent or any such other Secured Party of any payment relating to such Account, Chattel Paper or Payment Intangible pursuant hereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of the Grantor under or pursuant to any

Account, Chattel Paper or Payment Intangible (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Account, Chattel Paper or Payment Intangible (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

**ARTICLE III**
**Acknowledgments, Waivers and Consents**

Section 3.01    <u>Acknowledgments, Waivers and Consents.</u>

(a)    The Grantor acknowledges and agrees that the obligations undertaken by it under this Agreement may involve the provision of collateral security for the obligations of Persons other than the Grantor and that the Grantor's provision of collateral security for the Obligations is absolute, irrevocable and unconditional under any and all circumstances. In full recognition and furtherance of the foregoing, the Grantor understands and agrees, to the fullest extent permitted under applicable law and except as may otherwise be expressly and specifically provided in the Credit Agreement or any other Loan Document, that the Grantor shall remain obligated hereunder (including, without limitation, with respect to the collateral security provided by the Grantor herein) and the enforceability and effectiveness of this Agreement and the liability of the Grantor, and the rights, remedies, powers and privileges of the Administrative Agent and the other Secured Parties under this Agreement and the other Loan Documents shall not be affected, limited, reduced, discharged or terminated in any way:

(i)    notwithstanding that, without any reservation of rights against the Grantor and without notice (except as required by applicable law) to or further assent by the Grantor, (A) any demand for payment of any of the Obligations made by the Administrative Agent may be rescinded by the Administrative Agent, and any of the Obligations continued; (B) the Obligations, the liability of any other Person upon or for any part thereof or any collateral security or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by, or any indulgence or forbearance in respect thereof granted by, the Administrative Agent; (C) the Credit Agreement, the other Loan Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, in accordance with the terms thereof, as the Administrative Agent (or the Requisite Lenders, or all Lenders, as the case may be), and the Grantor, as applicable, may deem advisable from time to time; (D) the Grantor or any other Person may from time to time accept or enter into new or additional agreements, security documents, guarantees or other instruments in addition to, in exchange for or relative to, any Loan Document, all or any part of the Obligations or any Collateral now or in the future serving as security for the Obligations, in each case pursuant to the terms and conditions thereof; (E) any collateral security or right of offset at any time held by the Administrative Agent or any other Secured Party for the payment of the Obligations may be sold, exchanged, waived, surrendered or released; and (F) any other event shall occur which constitutes a defense or release of sureties generally; and

(ii)    without regard to, and the Grantor hereby expressly waives to the fullest extent permitted by law, any defense now or in the future arising by reason of, (A) the illegality, invalidity or unenforceability against the Grantor of the Credit Agreement, any other Loan Document, any of the Obligations or any other collateral security therefor or right of offset with respect thereto at any time or from time to time held by the Administrative Agent or any other Secured Party, (B) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any other Grantor or any other Person against the Administrative Agent or any other Secured Party, (C) the insolvency, bankruptcy arrangement, reorganization, adjustment, composition, liquidation,

disability, dissolution or lack of power of any other Grantor or any other Person at any time liable for the payment of all or part of the Obligations or the failure of the Administrative Agent or any other Secured Party to file or enforce a claim in bankruptcy or other proceeding with respect to any Person; or any sale, lease or transfer of any or all of the assets of the Grantor, or any changes in the shareholders of the Grantor; (D) the fact that any Collateral or Lien contemplated or intended to be given, created or granted as security for the repayment of the Obligations shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other Lien, it being recognized and agreed by the Grantor that it is not entering into this Agreement in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the Collateral for the Obligations; (E) any failure of the Administrative Agent or any other Secured Party to marshal assets in favor of the Grantor or any other Person, to exhaust any collateral for all or any part of the Obligations, to pursue or exhaust any right, remedy, power or privilege it may have against the Grantor or any other Person or to take any action whatsoever to mitigate or reduce the Grantor's liability under this Agreement, any other Loan Document; (F) any law which provides that the obligation of a surety or guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal or which reduces a surety's or guarantor's obligation in proportion to the principal obligation; (G) the possibility that the Obligations may at any time and from time to time exceed the aggregate liability of the Grantor under this Agreement; or (H) any other circumstance or act whatsoever, including any action or omission of the type described in this Section 3.01 (with or without notice to or knowledge of the Grantor), which constitutes, or might be construed to constitute, an equitable or legal discharge or defense of the Grantor for the Obligations, or with respect to the collateral security provided by the Grantor herein, or which might be available to a surety or guarantor, in bankruptcy or in any other instance.

(b)       The Grantor hereby waives to the extent permitted by law:  (i) except as expressly provided otherwise in any Loan Document, all notices to the Grantor, or to any other Person, including but not limited to, notices of the acceptance of this Agreement or the provision of collateral security provided herein, or the creation, renewal, extension, modification, accrual of any Obligations, or notice of or proof of reliance by the Administrative Agent or any other Secured Party upon the collateral security provided herein, or of default in the payment or performance of any of the Obligations owed to the Administrative Agent or any other Secured Party and enforcement of any right or remedy with respect thereto; or notice of any other matters relating thereto; the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the collateral security provided herein and no notice of creation of the Obligations already or hereafter contracted by the Grantor need be given to the Grantor; and all dealings between the Grantor, on the one hand, and the Administrative Agent and the other Secured Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the collateral security provided herein; (ii) diligence and demand of payment, presentment, protest, dishonor and notice of dishonor; (iii) all rights of revocation with respect to the Obligations and the provision of collateral security herein; and (iv) all principles or provisions of law which conflict with the terms of this Agreement and which can, as a matter of law, be waived.

(c)       When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against the Grantor, the Administrative Agent or any other Secured Party may, but shall be under no obligation to, join or make a similar demand on or otherwise pursue or exhaust such rights and remedies as it may have against the Grantor or any other Person or against any collateral security or any right of offset with respect thereto, and any failure by the Administrative Agent or any other Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from the Grantor or any other Person or to realize upon any such collateral security or to exercise any such right of offset, or any release of the Grantor or any other Person or any such collateral security or right of offset, shall not relieve the Grantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Administrative Agent or any other

- 6 -

Secured Party against the Grantor.  For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.  Neither the Administrative Agent nor any other Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or any property subject thereto.

Section 3.02    No Subrogation, Contribution or Reimbursement.  Notwithstanding any payment made by the Grantor hereunder or any set-off or application of funds of the Grantor by the Administrative Agent or any other Secured Party, the Grantor shall not be entitled to be subrogated to any of the rights of the Administrative Agent or any other Secured Party against the Grantor or any collateral security or right of offset held by the Administrative Agent or any other Secured Party for the payment of the Obligations, nor shall the Grantor seek or be entitled to seek any indemnity, exoneration, participation, contribution or reimbursement from the Grantor in respect of payments made by the Grantor hereunder until Security Termination, and the Grantor hereby expressly waives, releases, and agrees not to exercise any such rights of subrogation, reimbursement, indemnity and contribution until Security Termination.  The Grantor further agrees that to the extent that such waiver and release set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement, indemnity and contribution the Grantor may have against the Grantor or against any collateral or security or right of offset held by the Administrative Agent or any other Secured Party shall be junior and subordinate to any rights the Administrative Agent and the other Secured Parties may have against the Grantor and to all right, title and interest the Administrative Agent and the other Secured Parties may have in any collateral or security or right of offset.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, for the benefit of the Secured Parties, may use, sell or dispose of any item of Collateral or security as it sees fit, subject to Section 6.04, without regard to any subrogation rights the Grantor may have, and upon any disposition or sale, any rights of subrogation the Grantor may have shall terminate.

## ARTICLE IV
## Representations and Warranties

To induce the Lenders to enter into the Credit Agreement and to make their respective Loans, the Grantor hereby represents and warrants to the Administrative Agent and each Secured Party that:

Section 4.01    Representations in Credit Agreement.  The representations and warranties set forth in Article IV of the Credit Agreement are true and correct in all material respects (or, to the extent such representations and warranties specifically relate to an earlier date, on and as of such earlier date), provided that each reference in each such representation and warranty to the Grantor's knowledge shall, for the purposes of this Section 4.01, be deemed to be a reference to the Grantor's knowledge.

Section 4.02    Perfected Liens.  The security interests granted pursuant to this Agreement, upon filing of a UCC-1 financing statement in the appropriate filing office and the other actions listed on Schedule 3, will constitute valid perfected First Priority security interests, subject to Permitted Liens that are junior in priority to such First Priority security interests, in all of the Collateral which may be perfected by filing such financing statement in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, as collateral security for the Grantor's Obligations, enforceable in accordance with the terms hereof.

Section 4.03    Legal Name, Organizational Status, Chief Executive Office.  On the date hereof, the correct legal name of the Grantor, the Grantor's jurisdiction of organization, organizational number, taxpayer identification number and the location of the Grantor's chief executive office or principal place of business are specified on Schedule 4.

Section 4.04    Prior Names, Addresses.    Schedule 5 correctly sets forth (a) all names and trade names that the Grantor has used in the last five years and (b) the chief executive office of the Grantor over the last five years (if different from that which is set forth in Section 4.03 above).

Section 4.05    Pledged Securities.

(a)    The shares (or such other interests) of Pledged Securities pledged by the Grantor hereunder constitute, as of the date hereof, all the issued and outstanding shares (or such other interests) of all classes of the Capital Stock of each Pledged Entity owned by the Grantor.  The Grantor is the record and beneficial owner of, and has good title to, the Pledged Securities pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except the security interest created by this Agreement and Liens permitted by Section 6.2 of the Credit Agreement.

(b)    As of the date hereof, all the shares of the Pledged Securities have been duly and validly issued and are fully paid and nonassessable (or, with respect to the Pledged Securities that are Capital Stock in a partnership or limited liability company, has been duly and validly issued).

(c)    As of the date hereof, there are no restrictions on transfer (that have not been waived or otherwise consented to) in the Organizational Documents governing any Pledged Securities or any other agreement relating thereto which would limit or restrict:  (i) the grant of a security interest in the Pledged Securities, (ii) the perfection of such security interest or (iii) the exercise of remedies in respect of such perfected security interest in the Pledged Securities, in each case, as contemplated by this Agreement. Upon the exercise of remedies in respect of the Pledged Securities, a transferee or assignee of such Pledged Securities shall become a holder of Capital Stock of the applicable Pledged Entity entitled to participate in the management thereof and, upon the transfer of the entire interest of the Grantor to any such transferee or assignee, the Grantor shall cease to be a holder of such Capital Stock.

(d)    The Grantor is the record and beneficial owner of the Investment Property pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except (i) the security interest created by this Agreement and (ii) Liens permitted by Section 6.2 of the Credit Agreement.

(e)    As of the date hereof, no Pledged Entity is party to any Organizational Document that includes an election to treat the Capital Stock of the Grantor as a security under Section 8-103 of the UCC.

Section 4.06    Instruments and Chattel Paper.  The Grantor has delivered to the Administrative Agent all Collateral constituting Instruments and Chattel Paper having the outstanding or stated amount of greater than $25,000.  As of the date hereof, no Collateral constituting Chattel Paper or Instruments contains any statement therein to the effect that such Collateral has been assigned to an identified party other than the Administrative Agent, and the grant of a security interest in such Collateral in favor of the Administrative Agent hereunder does not violate the rights of any other Person as a secured party.

Section 4.07    Accounts.  The amount represented by the Grantor to the Administrative Agent and the Lenders from time to time as owing by each Account Debtor or by all Account Debtors in respect of the Accounts, Chattel Paper and Payment Intangibles will at such time be the materially correct amount actually owing by such Account Debtor or Account Debtors thereunder.  The place where the Grantor keeps its records concerning the Accounts, Chattel Paper and Payment Intangibles is the address set forth on Schedule 4.

Section 4.08     Governmental Obligors.  As of the date hereof, none of the Account Debtors on the Grantor's Accounts, Chattel Paper or Payment Intangibles is a Governmental Authority.

Section 4.09     Tangible Assets.  On the date hereof, the material Goods of the Grantor constituting Inventory and Equipment (other than mobile goods and Equipment employed at jobsites in the ordinary course of business in compliance with the terms of the Credit Agreement) are kept at the locations listed on Schedule 4.

Section 4.10     Commercial Tort Claims.

(a)  On the date hereof, except to the extent listed in Section 2.01 above, the Grantor has no rights in any Commercial Tort Claim with potential value in excess of $50,000.

(b)  Upon the filing of a financing statement against the Grantor covering any Commercial Tort Claim referred to in Section 5.07 hereof in the jurisdiction of the chief executive office set forth in Schedule 4 hereto, the security interest granted in such Commercial Tort Claim will constitute a valid perfected security interest in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, as collateral security for the Grantor's Obligations, enforceable in accordance with the terms hereof against all creditors of the Grantor and any Persons purporting to purchase such Collateral from Grantor, which security interest shall be prior to all other Liens on such Collateral except for unrecorded liens permitted by the Credit Agreement which have priority over the Liens on such Collateral by operation of law.

## ARTICLE V
## Covenants

The Grantor covenants and agrees that, from and after the date of this Agreement until Security Termination:

Section 5.01     Covenants in Credit Agreement.  The Grantor shall take, or shall refrain from taking, as the case may be, each action that is necessary to be taken or not taken, as the case may be, so that no Default or Event of Default is caused by the failure to take such action or to refrain from taking such action by the Grantor.

Section 5.02     Maintenance of Perfected Security Interest; Further Documentation.

(a)     The Grantor shall maintain the security interest created by this Agreement as a perfected security interest and shall defend such security interest against the claims and demands of all Persons whomsoever.

(b)  At any time and from time to time, upon the reasonable request of the Administrative Agent, and at the sole expense of the Grantor, the Grantor will promptly and duly give, execute, deliver, indorse, file or record any and all financing statements, continuation statements, amendments, notices (including, without limitation, notifications to financial institutions and any other Person), contracts, agreements, assignments, certificates, stock powers or other instruments, obtain any and all approvals and consents of Governmental Authorities and take or cause to be taken any and all steps or acts that may be necessary or as the Administrative Agent may reasonably request to create, perfect, establish the priority of, or to preserve the validity, perfection or priority of, the Liens granted by this Agreement or to enable the Administrative Agent or any other Secured Party to enforce its rights, remedies, powers and privileges under this Agreement with respect to such Liens or to otherwise obtain or preserve the full benefits of this Agreement and the rights, powers and privileges herein granted.

(c) Without limiting the obligations of the Grantor under Section 5.02(b): (i) upon the reasonable request of the Administrative Agent, the Grantor shall take or cause to be taken all actions (other than any actions required to be taken by the Administrative Agent or any Lender) reasonably requested by the Administrative Agent to cause the Administrative Agent to (A) have "control" (within the meaning of Sections 9-104, 9-105, 9-106, and 9-107 of the UCC) over any Collateral constituting Deposit Accounts, Electronic Chattel Paper, Investment Property (including the Pledged Securities), or Letter-of-Credit Rights, including, without limitation, executing and delivering any agreements, in form and substance satisfactory to the Administrative Agent, with securities intermediaries, issuers or other Persons in order to establish "control", and the Grantor shall promptly notify the Administrative Agent of the Grantor's acquisition of any such Collateral, and (B) be a "protected purchaser" (as defined in Section 8-303 of the UCC); (ii) with respect to Collateral other than certificated securities and goods covered by a document in the possession of a Person other than the Grantor or the Administrative Agent, the Grantor shall obtain written acknowledgment that such Person holds possession for the Administrative Agent's benefit; and (iii) with respect to any Collateral constituting Goods that are in the possession of a bailee, the Grantor shall provide prompt notice to the Administrative Agent of any such Collateral then in the possession of such bailee, and the Grantor shall take or cause to be taken all actions (other than any actions required to be taken by the Administrative Agent or any other Secured Party) necessary or reasonably requested by the Administrative Agent to cause the Administrative Agent to have a perfected security interest in such Collateral under applicable law.

(d) This Section 5.02 and the obligations imposed on the Grantor by this Section 5.02 shall be interpreted as broadly as possible in favor of the Administrative Agent and the other Secured Parties in order to effectuate the purpose and intent of this Agreement.

Section 5.03    Maintenance of Records. The Grantor will keep and maintain, at its own cost and expense records of the Collateral in accordance with sound and prudent business practices. For the Administrative Agent's and the other Secured Parties' further security, the Administrative Agent, for the ratable benefit of the Secured Parties, shall have a security interest in all of the Grantor's books and records pertaining to the Collateral, and the Grantor shall allow inspection of any such books and records by the Administrative Agent, any Lender or by their representatives in accordance with Section 5.7 of the Credit Agreement.

Section 5.04    Further Identification of Collateral. The Grantor will furnish to the Administrative Agent and the Secured Parties from time to time, at the Grantor's sole cost and expense, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Administrative Agent may reasonably request, all in reasonable detail.

Section 5.05    Pledged Securities.

(a) If the Grantor shall become entitled to receive or shall receive any stock certificate or other instrument (including, without limitation, any certificate or instrument representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate or instrument issued in connection with any reorganization), option or rights in respect of the Capital Stock of any Pledged Entity, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares (or such other interests) of the Pledged Securities, or otherwise in respect thereof, the Grantor shall accept the same as the agent of the Administrative Agent and the other Secured Parties, hold the same in trust for the Administrative Agent and the other Secured Parties and deliver the same forthwith to the Administrative Agent in the exact form received, duly indorsed by the Grantor to the Administrative Agent, if required, together with an undated stock power or other equivalent power covering such certificate or instrument duly executed in blank by the Grantor and with, if the Administrative Agent so requests,

signature guaranteed, to be held by the Administrative Agent, subject to the terms hereof, as additional collateral security for the Obligations.

(b)　　In the case of the Grantor which is a Pledged Entity, such Pledged Entity agrees that (i) it will be bound by the terms of this Agreement relating to the Pledged Securities or Investment Property issued by it and will comply with such terms insofar as such terms are applicable to it, (ii) it will notify the Administrative Agent promptly in writing of the occurrence of any of the events described in Section 5.05(a) with respect to the Pledged Securities issued by it and (iii) the terms of Section 6.01(c) and Section 6.05 shall apply to it, *mutatis mutandis*, with respect to all actions that may be required of it pursuant to Section 6.01(c) or Section 6.05 with respect to the Pledged Securities issued by it.

(c)　　Except as set forth in Schedule 2, the Pledged Securities will at all times constitute not less than 100% of the Capital Stock of the Pledged Entity thereof owned by the Grantor. The Grantor will not permit any Pledged Entity of any of the Pledged Securities to issue any new shares (or other interests) of any class of Capital Stock of such Pledged Entity without the prior written consent of the Administrative Agent or as may be permitted by the Credit Agreement.

(d)　　In the case of the Grantor which is a Pledged Entity, the Grantor agrees that (i) it will be bound by the terms of this Agreement relating to the Investment Property issued by it and will comply with such terms insofar as such terms are applicable to it, (ii) it will notify the Administrative Agent promptly in writing of the occurrence of any of the events described in Section 5.05(a) with respect to the Investment Property issued by it and (iii) the terms of Section 6.01(c), shall apply to it, mutatis mutandis, with respect to all actions that may be required of it pursuant to Section 6.01(c) with respect to the Investment Property issued by it.

(e)　　In the case of the Grantor that is a holder of Capital Stock in a Pledged Entity, the Grantor hereby consents to the extent required by the applicable Organizational Document to the pledge by each other Grantor, pursuant to the terms hereof, of the Pledged Securities in such Pledged Entity and to the transfer of such Pledged Securities to the Administrative Agent or its nominee (on behalf of the Secured Parties) and to the substitution of the Administrative Agent or its nominee as a substituted holder of Capital Stock in such Pledged Entity with all the rights, powers and duties of a holder of Capital Stock in such Pledged Entity.

(f)　　The Grantor shall not agree to any amendment of an Organizational Document that (i) in any way adversely affects the perfection of the security interest of the Administrative Agent in the Pledged Securities pledged by the Grantor hereunder or (ii) if the Grantor is a Pledged Entity, causes any such Organizational Document to include an election to treat the Capital Stock of the Grantor as a security under Section 8-103 of the UCC other than any such election in effect on the Closing Date.

Section 5.06　　Instruments and Tangible Chattel Paper. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Tangible Chattel Paper in the outstanding or stated amount of greater than $25,000, such Instrument or Tangible Chattel Paper shall be promptly, but in any event within 3 Business Days, delivered to the Administrative Agent, duly endorsed in a manner satisfactory to the Administrative Agent, to be held as Collateral pursuant to this Agreement.

Section 5.07　　Commercial Tort Claims. If the Grantor shall at any time hold or acquire a Commercial Tort Claim that satisfies the requirements of the following sentence, the Grantor shall, within thirty (30) days after such Commercial Tort Claim satisfies such requirements, notify the Administrative Agent in a writing signed by the Grantor containing a brief description thereof, and granting to the Administrative Agent in such writing (for the benefit of the Secured Parties) a security interest therein and

in the Proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Administrative Agent.  The provisions of the preceding sentence shall apply only to a Commercial Tort Claim that satisfies the following requirements:  (i) the monetary value claimed by or payable to the relevant Grantor in connection with such Commercial Tort Claim shall exceed $50,000 and either (ii) (A) the Grantor shall have filed a law suit or counterclaim or otherwise commenced legal proceedings (including, without limitation, arbitration proceedings) against the Person against whom such Commercial Tort Claim is made, or (B) the Grantor and the Person against whom such Commercial Tort Claim is asserted shall have entered into a settlement agreement with respect to such Commercial Tort Claim.  In addition, to the extent that the existence of any Commercial Tort Claim held or acquired by the Grantor is disclosed by the Grantor in any public filing with the Securities and Exchange Commission or any successor thereto or analogous Governmental Authority, or to the extent that the existence of any such Commercial Tort Claim is disclosed in any press release issued by the Grantor, then, upon the request of the Administrative Agent, the relevant Grantor shall, within thirty (30) days after such request is made, transmit to the Administrative Agent a writing signed by the Grantor containing a brief description of such Commercial Tort Claim and granting to the Administrative Agent in such writing (for the benefit of the Secured Parties) a security interest therein and in the Proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Administrative Agent.

## ARTICLE VI
## Remedial Provisions

Section 6.01    Pledged Securities.

(a)    Unless an Event of Default shall have occurred and be continuing and the Administrative Agent shall have given notice to the relevant Grantor of the Administrative Agent's intent to exercise its corresponding rights pursuant to Section 6.01(b), the Grantor shall be permitted to receive all cash dividends paid in respect of the Pledged Securities paid in the normal course of business of the relevant Pledged Entity, to the extent permitted in the Credit Agreement and by the terms of the applicable Organizational Documents, and to exercise all voting and corporate, membership or partnership rights with respect to the Pledged Securities.

(b)    If an Event of Default shall occur and be continuing, then at any time in the Administrative Agent's discretion and without notice, (i) the Administrative Agent shall have the right to receive any and all cash dividends, payments or other Proceeds paid in respect of the Pledged Securities and make application thereof to the Obligations in accordance with Section 2.10 of the Credit Agreement, and (ii) any or all of the Pledged Securities shall be registered in the name of the Administrative Agent or its nominee, and the Administrative Agent or its nominee may thereafter exercise (x) all voting, corporate, membership, partnership and other rights pertaining to such Pledged Securities at any meeting of shareholders (or other equivalent body) of the relevant Pledged Entity or Pledged Entities or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Pledged Securities as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Pledged Securities upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the organizational structure of any Pledged Entity, or upon the exercise by the Grantor or the Administrative Agent of any right, privilege or option pertaining to such Pledged Securities, and in connection therewith, the right to deposit and deliver any and all of the Pledged Securities with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Administrative Agent may determine), all without liability except to account for property actually received by it, but the Administrative Agent shall have no duty to the Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(c)    The Grantor hereby authorizes and instructs each Pledged Entity issuing any Pledged Securities pledged by the Grantor hereunder (and each Pledged Entity party hereto hereby agrees) to (i) comply with any instruction received by it from the Administrative Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from the Grantor, and the Grantor agrees that each Pledged Entity shall be fully protected in so complying, and (ii) unless otherwise expressly permitted hereby, upon and after receipt of the instruction described in clause (i), pay any dividends or other payments with respect to the Pledged Securities directly to the Administrative Agent.

(d)    After the occurrence and during the continuation of an Event of Default, if the Pledged Entity issuing any Pledged Securities is the subject of bankruptcy, insolvency, receivership, custodianship or other similar proceedings under the supervision of any Governmental Authority, then all rights of the applicable Grantor in respect thereof to exercise the voting and other consensual rights which the Grantor would otherwise be entitled to exercise with respect to the Pledged Securities issued by such Pledged Entity shall cease, and all such rights shall thereupon become vested in the Administrative Agent who shall thereupon have the sole right to exercise, such voting and other consensual rights, but the Administrative Agent shall have no duty to exercise any such voting or other consensual rights and shall not be responsible for any failure to do so or delay in so doing.

Section 6.02    <u>Collections on Accounts, Etc</u>.  The Administrative Agent hereby authorizes the Grantor to collect upon the Accounts, Instruments, Chattel Paper and Payment Intangibles and the Administrative Agent may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default.  Upon the request of the Administrative Agent at any time after the occurrence and during the continuance of an Event of Default, the Grantor shall notify the Account Debtors that the applicable Accounts, Chattel Paper and Payment Intangibles have been assigned to the Administrative Agent for the ratable benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Administrative Agent.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may in its own name or in the name of others communicate with the Account Debtors to verify with them to its satisfaction the existence, amount and terms of any Accounts, Chattel Paper or Payment Intangibles.

Section 6.03    <u>Proceeds</u>.  If required by the Administrative Agent at any time after the occurrence and during the continuance of an Event of Default, any payments in respect of Accounts, Instruments, Chattel Paper and Payment Intangibles, when collected or received by the Grantor, and any other cash or non-cash Proceeds received by the Grantor upon the sale or other disposition of any Collateral, shall be forthwith (and, in any event, within two Business Days) deposited by the Grantor in the exact form received, duly indorsed by the Grantor to the Administrative Agent if required, in a special collateral account maintained by the Administrative Agent, subject to withdrawal by the Administrative Agent for the ratable benefit of the Secured Parties only, as hereinafter provided, and, until so turned over, shall be held by the Grantor in trust for the Administrative Agent for the ratable benefit of the Secured Parties, segregated from other funds of any the Grantor.  Each deposit of any such Proceeds shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.  All Proceeds (including, without limitation, Proceeds constituting collections of Accounts, Chattel Paper, Instruments) while held by the Administrative Agent (or by the Grantor in trust for the Administrative Agent for the ratable benefit of the Secured Parties) shall continue to be collateral security for all of the Obligations and shall not constitute payment thereof until applied as hereinafter provided.  At such intervals as may be agreed upon by the Grantor and the Administrative Agent, or, if an Event of Default shall have occurred and be continuing, at any time at the Administrative Agent's election, the Administrative Agent shall apply all or any part of the funds on deposit in said special collateral account on account of the Obligations in accordance with Section 2.10 of the Credit Agreement.

Section 6.04    Remedies.

(a)    If an Event of Default shall occur and be continuing, the Administrative Agent, on behalf of the Secured Parties, may exercise in its discretion, in addition to all other rights, remedies, powers and privileges granted to them in this Agreement, the other Loan Documents and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights, remedies, powers and privileges of a secured party under applicable law or otherwise available at law or equity.  Without limiting the generality of the foregoing, the Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Administrative Agent or any other Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Administrative Agent or any other Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in the Grantor, which right or equity is hereby waived and released.  If an Event of Default shall occur and be continuing, the Grantor further agrees, at the Administrative Agent's request, to assemble the Collateral and make it available to the Administrative Agent at places which the Administrative Agent shall reasonably select, whether at the Grantor's premises or elsewhere.  Any such sale or transfer by the Administrative Agent either to itself or to any other Person shall be absolutely free from any claim of right by Grantor, including any equity or right of redemption, stay or appraisal which Grantor has or may have under any rule of law, regulation or statute now existing or hereafter adopted.  Upon any such sale or transfer, the Administrative Agent shall have the right to deliver, assign and transfer to the purchaser or transferee thereof the Collateral so sold or transferred.  The Administrative Agent shall apply the net proceeds of any action taken by it pursuant to this Section 6.04, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Administrative Agent and the other Secured Parties hereunder, including, without limitation, reasonable attorneys' fees and disbursements, in accordance with Section 2.10 of the Credit Agreement, and only after such application and after the payment by the Administrative Agent of any other amount required by any provision of law, including, without limitation, Section 9-615 of the UCC, need the Administrative Agent account for the surplus, if any, to the Grantor.  The Grantor agrees that it is subject to the waivers by the Loan Parties set forth in Section 9.3(b) of the Credit Agreement.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(b)    In the event that the Administrative Agent elects not to sell the Collateral in connection with the exercise of remedies provided pursuant to this Section 6.04, the Administrative Agent retains its rights to dispose of or utilize the Collateral or any part or parts thereof in any manner authorized or permitted by law or in equity, and to apply the proceeds of the same towards payment of the Obligations.  Each and every method of disposition of the Collateral described in this Agreement shall constitute disposition in a commercially reasonable manner.  The Administrative Agent may appoint any Person as agent to perform any act or acts necessary or incident to any sale or transfer of the Collateral.

Section 6.05    Private Sales of Pledged Securities.    The Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Securities, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, or

may determine that a public sale is impracticable or not commercially reasonable and, accordingly, may resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  The Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner.  The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Securities for the period of time necessary to permit the relevant Pledged Entity to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Pledged Entity would agree to do so.  The Grantor agrees to use its best efforts to do or cause to be done all such other acts as may reasonably be necessary to make such sale or sales of all or any portion of the Pledged Securities pursuant to this Section 6.05 valid and binding and in compliance with any and all other applicable Governmental Requirements.  The Grantor further agrees that a breach of any of the covenants contained in this Section 6.05 will cause irreparable injury to the Administrative Agent and the other Secured Parties, that the Administrative Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 6.05 shall be specifically enforceable against the Grantor, and the Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants.

Section 6.06    Deficiency.  The Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its Obligations and the fees and disbursements of any attorneys employed by the Administrative Agent or any other Secured Party to collect such deficiency.

Section 6.07    Non-Judicial Enforcement.  The Administrative Agent may enforce its rights hereunder without prior judicial process or judicial hearing, and to the extent permitted by law, the Grantor expressly waives any and all legal rights which might otherwise require the Administrative Agent to enforce its rights by judicial process.

## ARTICLE VII
## The Administrative Agent

Section 7.01    Administrative Agent's Appointment as Attorney-in-Fact, Etc.

(a)    The Grantor hereby irrevocably constitutes and appoints the Administrative Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Grantor and in the name of the Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all reasonably appropriate action and to execute any and all documents and instruments which may be reasonably necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, the Grantor hereby gives the Administrative Agent the power and right, on behalf of the Grantor, without notice to or assent by the Grantor, to do any or all of the following:

(i)    pay or discharge Taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(ii)    execute, in connection with any sale provided for in Section 6.04 or Section 6.05, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

- 15 -

(iii)  (A) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Administrative Agent or as the Administrative Agent shall direct; (B) take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Account, Instrument, General Intangible, Chattel Paper or Payment Intangible or with respect to any other Collateral, and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Administrative Agent for the purpose of collecting any all such moneys due under any Account, Instrument or  General Intangible or with respect to any other Collateral whenever payable; (C) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (D) sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (E) receive, change the address for delivery, open and dispose of mail addressed to the Grantor, and to execute, assign and indorse negotiable and other instruments for the payment of money, documents of title or other evidences of payment, shipment or storage for any form of Collateral on behalf of and in the name of the Grantor; (F) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (G) defend any suit, action or proceeding brought against the Grantor with respect to any Collateral; (H) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Administrative Agent may deem appropriate; and (I) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Administrative Agent were the absolute owner thereof for all purposes, and do, at the Administrative Agent's option and the Grantor's expense, at any time, or from time to time, all acts and things which the Administrative Agent deems necessary to protect, preserve or realize upon the Collateral and the Administrative Agent's and the other Secured Parties' security interests therein and to effect the intent of this Agreement, all as fully and effectively as the Grantor might do.

Anything in this Section 7.01(a) to the contrary notwithstanding, the Administrative Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 7.01(a) unless an Event of Default shall have occurred and be continuing.

(b)  If the Grantor fails to perform or comply with any of its agreements contained herein within the applicable grace periods, the Administrative Agent may, at its option, but without any obligation so to do, to perform or comply, or otherwise cause performance or compliance, with such agreement.

(c)  The reasonable expenses of the Administrative Agent incurred in connection with actions undertaken as provided in this Section 7.01, together with interest thereon at the Default Rate, but in no event to exceed the Highest Lawful Rate, from the date of payment by the Administrative Agent to the date reimbursed by the relevant Grantor, shall be payable by the Grantor to the Administrative Agent on demand.

(d)  The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue and in compliance hereof.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

Section 7.02   Duty of Administrative Agent.  The Administrative Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Administrative Agent deals

with similar property for its own account and the Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which comparable secured parties accord comparable collateral.  Neither the Administrative Agent, any other Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the Administrative Agent and the other Secured Parties hereunder are solely to protect the Administrative Agent's and the other Secured Parties' interests in the Collateral and shall not impose any duty upon the Administrative Agent or any other Secured Party to exercise any such powers.  The Administrative Agent and the other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to the Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.  To the fullest extent permitted by applicable law, the Administrative Agent and the Secured Parties shall be under no duty whatsoever to make or give any presentment, notice of dishonor, protest, demand for performance, notice of non-performance, notice of intent to accelerate, notice of acceleration, or other notice or demand in connection with any Collateral or the Obligations, or to take any steps necessary to preserve any rights against the Grantor or other Person or ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not it has or is deemed to have knowledge of such matters.  The Grantor, to the extent permitted by applicable law, waives any right of marshaling in respect of any and all Collateral, and waives any right to require the Administrative Agent or any other Secured Party to proceed against the Grantor or other Person, exhaust any Collateral or enforce any other remedy which the Administrative Agent or any other Secured Party now has or may hereafter have against the Grantor, the Grantor or any other Person.

Section 7.03    <u>Financing Statements</u>.  Pursuant to the UCC and any other applicable law, the Grantor authorizes the Administrative Agent, its counsel or its representative, at any time and from time to time, to file or record financing statements, continuation statements, amendments thereto and other filing or recording documents or instruments with respect to the Collateral without the signature of the Grantor in such form and in such offices as the Administrative Agent reasonably determine necessary or appropriate to perfect the security interests of the Administrative Agent under this Agreement.  Additionally, the Grantor authorizes the Administrative Agent, its counsel or its representative, at any time and from time to time, to file or record such financing statements that describe the collateral covered thereby as "all assets of the Grantor", "all personal property of the Grantor" or words of similar effect.  A photographic or other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction.

Section 7.04    <u>Authority of Administrative Agent</u>.  The Grantor acknowledges that the rights and responsibilities of the Administrative Agent under this Agreement with respect to any action taken by the Administrative Agent or the exercise or non-exercise by the Administrative Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Administrative Agent and the other Secured Parties, be governed by the Credit Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Administrative Agent and the Grantor, the Administrative Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and the Grantor shall not be under any obligation, or entitlement, to make any inquiry respecting such authority.

# ARTICLE VIII
## Miscellaneous

Section 8.01   <u>Waiver</u>.  No failure on the part of the Administrative Agent or any other Secured Party to exercise and no delay in exercising, and no course of dealing with respect to, any right, remedy, power or privilege under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege; provided, that only the Administrative Agent, in its capacity as such, shall be entitled to take action in accordance with the terms of the Loan Documents on behalf of the Secured Parties.  The rights, remedies, powers and privileges provided herein are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  The exercise by the Administrative Agent or any other Secured Party of any one or more of the rights, powers and remedies herein shall not be construed as a waiver of any other rights, powers and remedies, including, without limitation, any rights of set-off.

Section 8.02   <u>Notices</u>.  All notices and other communications provided for herein shall be given in the manner and subject to (i) the terms of the applicable notice provisions of Section 10.1 of the Credit Agreement; *provided* that any such notice, request or demand to or upon to the Grantor shall be addressed to the Grantor at its notice address set forth on Schedule 1 (or such other notice address as to which such Pledgor may notify the Administrative Agent in writing from time to time).

Section 8.03   <u>Payment of Expenses, Indemnities, Etc.</u>

(a)   The Grantor agrees to pay or reimburse the Administrative Agent and each other Secured Party for all reasonable advances, charges, costs and expenses (including, without limitation, all costs and expenses of holding, preparing for sale and selling, collecting or otherwise realizing upon the Collateral and all attorneys' fees, legal expenses and court costs) incurred by any Secured Party in connection with the exercise of its respective rights and remedies hereunder to the extent the Grantor would be required to do so pursuant to Section 10.2 or 10.3 of the Credit Agreement, including, without limitation, any advances, charges, costs and expenses that may be incurred in any effort to enforce any of the provisions of this Agreement or any obligation of the Grantor in respect of the Collateral or in connection with (i) the preservation of the Lien of, or the rights of the Administrative Agent or any other Secured Party under this Agreement, (ii) any actual or attempted sale, lease, disposition, exchange, collection, compromise, settlement or other realization in respect of, or care of, the Collateral, including all such costs and expenses incurred in any bankruptcy, reorganization, workout or other similar proceeding, or (iii) otherwise enforcing or preserving any rights under this Agreement and the other Loan Documents to which the Grantor is a party.

(b)   The Grantor agrees to pay, and to save the Administrative Agent and the other Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, court costs and attorneys' fees, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement) incurred because of, incident to, or with respect to, the Collateral (including, without limitation, any exercise of rights or remedies in connection therewith) or the execution, delivery, enforcement, performance and administration of this Agreement, to the extent the Grantor would be required to do so pursuant to Section 10.2 or 10.3 of the Credit Agreement.  All amounts for which the Grantor is liable pursuant to this <u>Section 8.03</u> shall be due and payable by the Grantor to the Secured Parties within ten (10) days after demand therefor.

Section 8.04    Amendments in Writing; Conflicts.   None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 10.6 of the Credit Agreement.  In the event of a conflict between any term or provision of this Agreement and the Credit Agreement, the Credit Agreement shall control.

Section 8.05    Successors and Assigns.   The provisions of this Agreement shall be binding upon the Grantor and its successors and assigns and shall inure to the benefit of the Administrative Agent and the other Secured Parties and their respective successors and assigns; provided that such transfers and assignments are permitted by and have been made pursuant to the Credit Agreement.

Section 8.06    Invalidity.   In the event that any one or more of the provisions contained in this Agreement or in any of the Loan Documents to which the Grantor is a party shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or such other Loan Document.

Section 8.07    Counterparts.   This Agreement may be executed in any number of counterparts by facsimile and other electronic means, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or e-mail (in .pdf format) shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 8.08    Survival.   The obligations of the parties under Section 8.03 shall survive Security Termination.  To the extent that any payments on the Obligations or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the other Secured Parties' Liens, security interests, rights, powers and remedies under this Agreement and each other Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and the Grantor shall take such action as may be reasonably requested by the Administrative Agent to effect such reinstatement and Security Termination shall not be deemed to have occurred.

Section 8.09    Captions.   Captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

Section 8.10    No Oral Agreements.   **THIS AGREEMENT, THE CREDIT AGREEMENT, THE OTHER LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE PARTIES AND SUPERSEDE ALL OTHER AGREEMENTS AND UNDERSTANDINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES**.

Section 8.11    Governing Law; Submission to Jurisdiction.

(a)    **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

(b)    **ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY HERETO ARISING OUT OF OR RELATING HERETO OR ANY OTHER LOAN DOCUMENT,**

**OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY HERETO, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (iii) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE GRANTOR AT ITS ADDRESS PROVIDED ON THE SCHEDULES HERETO IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE GRANTOR IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (iv) AGREES THAT THE ADMINISTRATIVE AGENT AND THE SECURED PARTIES RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST THE GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION.**

**(c)     EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER HEREOF.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 8.11</u> AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HEREOF OR HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

Section 8.12     <u>Acknowledgments</u>.  The Grantor hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement;

(b)     neither the Administrative Agent nor any other Secured Party has any fiduciary relationship with or duty to the Grantor arising out of or in connection with this Agreement, the Credit Agreement or any of the other Loan Documents, and the relationship between the Grantor, on the one hand, and the Administrative Agent and the other Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor;

(c)     no Joint Venture is created hereby, by the Credit Agreement or any other Loan Document or by or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Grantor and the Lenders;

(d)     **EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER COLLATERAL DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS"**; and

(e)     The Grantor warrants and agrees that each of the waivers and consents set forth in this Agreement are made voluntarily and unconditionally after consultation with outside legal counsel and with full knowledge of their significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which the Grantor otherwise may have against the Grantor, the Administrative Agent or the other Secured Parties or any other Person or against any Collateral.  If, notwithstanding the intent of the parties that the terms of this Agreement shall control in any and all circumstances, any such waivers or consents are determined to be unenforceable under applicable law, such waivers and consents shall be effective to the maximum extent permitted by law.

Section 8.13    <u>Set-Off</u>.  The Grantor agrees that, in addition to (and without limitation of) any right of set-off, bankers' lien or counterclaim a Secured Party may otherwise have pursuant to Section 10.4 of the Credit Agreement, each Secured Party shall have the right and be entitled (after consultation with the Administrative Agent), at its option, to offset, to the extent provided in Section 10.4 of the Credit Agreement, balances held by it or by any of its Affiliates for account of the Grantor at any of its offices, in Dollars or in any other currency, against any principal of or interest on any of such Secured Party's Loans, or any other amount due and payable to such Secured Party hereunder, which is not paid when due (regardless of whether such balances are then due to such Person), in which case it shall promptly notify the Grantor and the Administrative Agent thereof, provided that such Secured Party's failure to give such notice shall not affect the validity thereof.

Section 8.14    <u>Releases.</u>

(a)     <u>Release Upon Payment in Full</u>.  The grant of a security interest hereunder and all of the rights, powers and remedies in connection herewith shall, to the extent permitted by law, remain in full force and effect until Security Termination or in connection with a transaction described in clause (b) below.  Upon the occurrence of Security Termination or a transaction described in clause (b) below, this Agreement and the Lien created hereby shall terminate; and in connection with any such release or termination, the Administrative Agent, at the request and expense of the applicable Grantor, will execute and deliver to the Grantor such documents and instruments (in form and substance satisfactory to the party executing the same) evidencing such release or termination as the Grantor may reasonably request and will assign, transfer and deliver to the Grantor, without recourse and without representation or warranty, such of the Collateral as may then be in the possession of Administrative Agent (or, in the case of any partial release of Collateral, such of the Collateral so being released as may be in its possession).

(b)     <u>Further Assurances</u>.  If any of the Collateral shall be sold, transferred or otherwise disposed of by the Grantor in a transaction permitted by the Credit Agreement, then the Administrative Agent, at the request and sole expense of the Grantor, shall promptly execute and deliver to the Grantor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Collateral.  At the request and sole expense of the Grantor, the Grantor shall be released from its obligations hereunder in the event that all the Capital Stock of the Grantor shall be sold, transferred or

otherwise disposed of in a transaction permitted by the Credit Agreement; provided that the Grantor shall have delivered to the Administrative Agent, at least ten (10) Business Days prior to the date of the proposed release, a written request for release identifying the relevant Grantor and the terms of the sale or other disposition in reasonable detail, including the price thereof and any expenses in connection therewith, together with a certification by the Grantor stating that such transaction is in compliance with the Credit Agreement and the other Loan Documents.

(c)    Retention in Satisfaction.  Except as may be expressly applicable pursuant to Section 9-620 of the UCC, no action taken or omission to act by the Administrative Agent or the other Secured Parties hereunder, including, without limitation, any exercise of voting or consent rights or any other action taken or inaction, shall be deemed to constitute a retention of the Collateral in satisfaction of the Obligations or otherwise to be in satisfaction of the Obligations, and the Obligations shall remain in full force and effect, until the Administrative Agent and the other Secured Parties shall have applied payments (including, without limitation, collections from Collateral) towards the Obligations in the full amount then outstanding or until such subsequent time as is provided in Section 8.14(a).

Section 8.15    Reinstatement.  The obligations of the Grantor under this Agreement (including, without limitation, the provision of collateral herein) shall continue to be effective, or be reinstated, as the case may be, and Security Termination shall not be deemed to have occurred, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Grantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Grantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

Section 8.16    Acceptance.  The Grantor hereby expressly waives notice of acceptance of this Agreement, acceptance on the part of the Administrative Agent and the other Secured Parties being conclusively presumed by their request for this Agreement and delivery of the same to the Administrative Agent.

Section 8.17    Administrative Agent.  The parties hereto agree that the Administrative Agent shall be afforded all of the rights, protections, indemnities, immunities and privileges afforded to the Administrative Agent under the Credit Agreement in connection with the execution of this Agreement and performance of its obligations hereunder.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

IN WITNESS WHEREOF, each of the undersigned has caused this Collateral Agreement to be duly executed and delivered as of the date first above written.

**GRANTOR:**                                    **MTE HOLDINGS LLC**


By: _____
Name: Mark A. Siffin
Title: Authorized Signatory

Acknowledged and Agreed to as of the date hereof by:

**ADMINISTRATIVE AGENT:**        **RIVERSTONE CREDIT MANAGEMENT, LLC**


By:_____
Name:
Title:

## GRANTOR DISCLOSURE SCHEDULES

These Grantor Disclosure Schedules are delivered by MTE Holdings LLC, a Delaware limited liability company (the "**Grantor**"), in connection with that certain Collateral Agreement (the "**Agreement**") dated as of September 17, 2018, by and among the Grantor in favor of Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders.

Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to such terms in the Agreement and all references to Schedules of the Grantor Disclosure Schedules are references to the Schedules herein.

## Schedule 1

**NOTICE ADDRESSES OF GRANTOR**

For the Grantor:

c/o Maefield Development Corporation
280 East 96th Street, Suite 210
Indianapolis, Indiana 46240
Attention: Bob Quinn
Fax: (317) 805-0777
Email: bquinn@maefield.com

**Schedule 2**

**DESCRIPTION OF PLEDGED SECURITIES**

| Owner | Loan Party | Percentage Owned | Form of Entity | Class of Capital Stock | No. of Capital Stock | Certificated or Uncertificated | Certificate No. |
|---|---|---|---|---|---|---|---|
| MTE Holdings LLC | MDC Energy LLC | 100% | Limited liability company | Limited liability company membership interest | N/A | Certificated | 1 |

**Schedule 3**

**FILINGS AND OTHER ACTIONS
REQUIRED TO PERFECT SECURITY INTERESTS**

1.      Filing of UCC-1 Financing Statements with respect to the Collateral with the Secretary of State of the state set forth below opposite the Grantor's name:

| Owner/Grantor | State(s) |
|---|---|
| MTE Holdings LLC | Delaware |

2.      Delivery to the Administrative Agent of all Pledged Securities consisting of certificated securities, if any, in each case properly endorsed for transfer in blank.

**Schedule 4**

**CORRECT LEGAL NAME, LOCATION OF JURISDICTION OF ORGANIZATION, ORGANIZATIONAL IDENTIFICATION NUMBER, TAXPAYER IDENTIFICATION NUMBER AND CHIEF EXECUTIVE OFFICE**

Loan Party: MTE Holdings LLC
Current Jurisdiction of Organization: Delaware
Organizational Number: 5544287
Tax ID Number: 47-1017894
Locations of Chief Executive Office over the last Five Years: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240
Current Location of Chief Executive Office: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

**<u>Schedule 5</u>**

**PRIOR NAMES AND PRIOR CHIEF EXECUTIVE OFFICE**

1.      MTE Holdings LLC

      a.   Prior Names:    None.

      b.   Prior Chief Executive Offices:   None.

**<u>Schedule 6</u>**

**COMMERCIAL TORT CLAIMS**

None.

## ACKNOWLEDGMENT AND CONSENT

The undersigned hereby acknowledges receipt of a copy of the Collateral Agreement dated as of September 17, 2018 (the "**Agreement**"), made by the Grantor parties thereto for the benefit of Riverstone Credit Management, LLC, as Administrative Agent.  The undersigned agrees for the benefit of the Administrative Agent and the other Secured Parties (as defined in the Agreement) as follows:

1.    The undersigned will be bound by the terms of the Agreement and will comply with such terms insofar as such terms are applicable to the undersigned.

2.    The terms of Sections 5.02(c) and 5.03 of the Agreement shall apply to it, *mutatis mutandis*, with respect to all actions that may be required of it pursuant to Sections 5.02(c) or 5.03 of the Agreement.

*[NAME OF PLEDGED ENTITY]*

By:    _____
Title:    _____

Address for Notices:
_____
_____
_____
Fax:    _____

---

**\*This consent is necessary only with respect to any Pledged Entity which is not also a Grantor.  This acknowledgement and consent is not required to be delivered by any Pledged Entity that is not controlled by a Grantor.**

**EXHIBIT H**

**FORM OF PARENT PLEDGE AGREEMENT**

(See Attached)

**Execution Version**

**PLEDGE AGREEMENT**

**DATED AS OF SEPTEMBER 17, 2018**

**MADE BY**

**OLAM ENERGY RESOURCES I LLC, AND**

**MTE PARTNERS LLC**

**IN FAVOR OF**

**RIVERSTONE CREDIT MANAGEMENT, LLC,**
*AS ADMINISTRATIVE AGENT*

# TABLE OF CONTENTS

**Page**

**ARTICLE I Definitions** ........................................................................................................ 1

    Section 1.01    Definitions ........................................................................................... 1
    Section 1.02    Other Definitional Provisions ............................................................. 2
    Section 1.03    Rules of Interpretation ........................................................................ 2

**ARTICLE II Grant of Security Interest** ............................................................................... 2

    Section 2.01    Grant of Security Interest ................................................................... 2
    Section 2.02    Authorization to File Financing Statements ....................................... 3
    Section 2.03    Transfer of Pledged Securities ........................................................... 3

**ARTICLE III Representations and Warranties** .................................................................... 3

    Section 3.01    No Conflict .......................................................................................... 3
    Section 3.02    Governmental Consents ...................................................................... 4
    Section 3.03    Title; No Other Liens .......................................................................... 4
    Section 3.04    Perfected First Priority Liens ............................................................. 4
    Section 3.05    Pledgor Information ............................................................................ 4
    Section 3.06    Pledged Securities .............................................................................. 4
    Section 3.07    Instruments ......................................................................................... 5

**ARTICLE IV Covenants** ........................................................................................................ 5

    Section 4.01    Maintenance of Perfected Security Interest; Further Documentation ... 5
    Section 4.02    Changes in Locations, Name, Etc ....................................................... 5
    Section 4.03    Pledged Securities .............................................................................. 5
    Section 4.04    Instruments ......................................................................................... 6

**ARTICLE V Remedial Provisions** ......................................................................................... 7

    Section 5.01    Code and Other Remedies .................................................................. 7
    Section 5.02    Pledged Securities .............................................................................. 7
    Section 5.03    Private Sales of Pledged Securities ..................................................... 9
    Section 5.04    Non-Judicial Enforcement .................................................................. 9
    Section 5.05    No Subrogation ................................................................................... 9
    Section 5.06    Amendments, Etc. with respect to the Obligations ............................ 9
    Section 5.07    Waivers ............................................................................................... 10
    Section 5.08    Pledge Absolute and Unconditional .................................................. 10

**ARTICLE VI The Administrative Agent** .............................................................................. 11

    Section 6.01    Administrative Agent's Appointment as Attorney-in-Fact, Etc ......... 11
    Section 6.02    Duty of Administrative Agent ........................................................... 13
    Section 6.03    Financing Statements ......................................................................... 13
    Section 6.04    Securities Laws .................................................................................. 13

**ARTICLE VII Subordination of Indebtedness** ................................................................... 13

    Section 7.01    Subordination of All Pledgor Claims ................................................ 13
    Section 7.02    Claims in Bankruptcy ........................................................................ 14
    Section 7.03    Payments Held in Trust ...................................................................... 14

Section 7.04 Liens Subordinate ................................................................................................... 14
Section 7.05 Notation of Records ................................................................................................ 14

**ARTICLE VIII Miscellaneous** ................................................................................................ **15**

Section 8.01 Waiver ..................................................................................................................... 15
Section 8.02 Notices ..................................................................................................................... 15
Section 8.03 Payment of Expenses, Indemnities, Etc .................................................................. 15
Section 8.04 Amendments in Writing .......................................................................................... 15
Section 8.05 Successors and Assigns ........................................................................................... 15
Section 8.06 Survival; Revival; Reinstatement ........................................................................... 16
Section 8.07 Counterparts; Integration; Effectiveness ................................................................ 16
Section 8.08 Severability ............................................................................................................. 16
Section 8.09 **GOVERNING LAW; SUBMISSION TO JURISDICTION** ........................ 17
Section 8.10 Headings .................................................................................................................. 17
Section 8.11 Acknowledgments ................................................................................................... 18
Section 8.12 Additional Pledgors and Additional Pledged Securities ....................................... 18
Section 8.13 Releases ................................................................................................................... 18
Section 8.14 Acceptance .............................................................................................................. 19
Section 8.15 Administrative Agent .............................................................................................. 19

SCHEDULES:

1    Notice Address of Pledgors
2    Description of Pledged Securities
3    Filings and Other Actions Required to Perfect Security Interests
4    Principal Residence

ANNEXES:

I    Form of Assumption Agreement
II   Form of Supplement

ii

This **PLEDGE AGREEMENT**, dated as of September 17, 2018, is made by Olam Energy Resources I LLC, a Delaware limited liability company ("**Olam**") and MTE Partners LLC, a Delaware limited liability company ("**Partners**", collectively with Olam, the "**Pledgors**"), in favor of Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (as defined below) from time to time parties to the Credit Agreement (as defined below) (together with its successors in such capacity, the "**Administrative Agent**").

## R E C I T A L S:

A.     MTE Holdings LLC, a Delaware limited liability company (the "**Borrower**") is party to that certain Term Loan Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), dated as of even date herewith, among the Borrower, the lenders from time to time party thereto (the "**Lenders**") and the Administrative Agent.

B.     It is a condition precedent to the obligation of the Lenders to make the Loans (as defined in the Credit Agreement) that each Pledgor shall have executed and delivered this Agreement to the Administrative Agent for the ratable benefit of the Lenders.

C.     Now, therefore, in consideration of the premises herein and to induce the Administrative Agent and the Lenders to enter into the Credit Agreement and to induce the Lenders to make the Loans thereunder, each Pledgor hereby agrees with the Administrative Agent, for the ratable benefit of the Lenders, as follows:

## ARTICLE I
## Definitions

Section 1.01     Definitions.

(a)     Unless otherwise defined herein, capitalized terms used herein shall have the meanings given to them in the Credit Agreement, and all uncapitalized terms which are defined in the UCC on the date hereof are used herein as so defined.

(b)     The following terms have the following meanings:

"**Agreement**" means this Pledge Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Assumption Agreement**" means an Assumption Agreement substantially in the form attached hereto as Annex I.

"**Collateral**" has the meaning assigned such term in Section 2.01.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute, and any regulations promulgated thereunder.

"**Discharge of Loan Obligations**" means the payment in full in cash of all Obligations (other than indemnities and other contingent obligations not then due and payable and for which no claim has been made as of the time of determination).

"**Pledged Entity**" means the Borrower.

"**Pledged Securities**" means: (a) the Capital Stock described or referred to in Schedule 2 (as the same may be supplemented from time to time pursuant to a Supplement); and (b) (i) the certificates or instruments, if any, representing such Capital Stock, (ii) all dividends (cash, Capital Stock or otherwise), cash, instruments, rights to subscribe, purchase or sell and all other rights and Property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such securities, (iii) all replacements, additions to and substitutions for any of the Property referred to in this definition, including, without limitation, claims against third parties, (iv) all other Collateral constituting securities, (v) the proceeds, interest, profits and other income of or on any of the Property referred to in this definition, (vi) all security entitlements in respect of any of the foregoing, if any, and (vii) all books and records reflecting ownership of the foregoing.

"**Pledgor**" has the meaning assigned to such term in the preamble hereto.

"**Pledgor Claims**" has the meaning assigned to such term in Section 7.01.

"**Proceeds**" means all "proceeds" as such term is defined in the UCC on the date hereof and, in any event, shall include, without limitation, all dividends or other income from the Pledged Securities, collections thereon or distributions or payments with respect thereto.

"**Secured Documents**" means the collective reference to the Credit Agreement and the other Loan Documents.

"**Security Termination**" means such time as when each of the following shall have occurred: (i) the Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted at such time) and (ii) the Loans and all commitments under the Credit Agreement have been terminated.  For purposes of clarification, "Security Termination" shall have occurred for purposes of this Agreement if the two events provided in clauses (i)-(ii) above have occurred.

"**Supplement**" means a Supplement substantially in the form attached hereto as Annex II.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

Section 1.02    Other Definitional Provisions.  Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Pledgor, refer to such Pledgor's Collateral or the relevant part thereof.

Section 1.03    Rules of Interpretation.  Section 1.3 and Section 1.4 of the Credit Agreement are hereby incorporated herein by reference and shall apply to this Agreement, *mutatis mutandis*.

## ARTICLE II
## Grant of Security Interest

Section 2.01    Grant of Security Interest.  Each Pledgor hereby pledges, assigns and transfers to the Administrative Agent, and grants to the Administrative Agent, for the ratable benefit of the Secured Parties, a security interest in all of the following property now owned or at any time hereafter acquired by such Pledgor or in which such Pledgor now has or at any time in the future may acquire any right, title or interest and whether now existing or hereafter coming into existence (collectively, the "**Collateral**"), as

collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations:

      (a)     all Pledged Securities;

      (b)     all books and records pertaining to the Collateral; and

      (c)     to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all collateral security and other Supporting Obligations (as defined in the UCC on the date hereof) given with respect to any of the foregoing.

Section 2.02   <u>Authorization to File Financing Statements</u>.  Each Pledgor hereby irrevocably authorizes the Administrative Agent at any time and from time to time to file, without obligation and in the instance such Pledgor has not filed a financing statement or amendment as required, in any filing office in any relevant jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as described in Section 2.01, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail; and (b) provide any other information required by part 5 of Article 9 of the UCC, or such other jurisdiction, for the sufficiency or filing office acceptance of any financing statement or amendment, including whether such Pledgor is an organization, the type of organization and any organizational identification number issued to such Pledgor.  Each Pledgor agrees to furnish any information required for the sufficiency or filing office acceptance of any such financing statement to the Administrative Agent promptly upon the Administrative Agent's reasonable request.

Section 2.03   <u>Transfer of Pledged Securities</u>.  All certificates or instruments representing or evidencing the Pledged Securities, if any, shall be delivered to and held pursuant hereto by the Administrative Agent or a Person designated by the Administrative Agent and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed, binding and enforceable instruments of transfer or assignment in blank, and accompanied by any required transfer tax stamps, if any, to effect the pledge of the Pledged Securities to the Administrative Agent.  Notwithstanding the preceding sentence, at the Administrative Agent's discretion, all Pledged Securities must be delivered or transferred in such manner as to permit the Administrative Agent to be a "protected purchaser" to the extent of its security interest as provided in Section 8-303 of the UCC (if the Administrative Agent otherwise qualifies as a protected purchaser).  During the continuance of an Event of Default, the Administrative Agent shall have the right, at any time in its discretion and without notice, to transfer to or to register in the name of the Administrative Agent or any of its nominees any or all of the Pledged Securities, subject only to the revocable rights of the relevant Pledgor specified in Section 5.02.  In addition, during the continuance of an Event of Default, the Administrative Agent shall have the right at any time to exchange certificates or instruments representing or evidencing Pledged Securities for certificates or instruments of smaller or larger denominations.

## ARTICLE III
## Representations and Warranties

To induce the Lenders to enter into the Credit Agreement and to make their respective Loans, each Pledgor hereby represents and warrants to the Administrative Agent and each Secured Party that:

Section 3.01   <u>No Conflict</u>.  The execution, delivery and performance by each Pledgor of the Agreement and the consummation of the transactions contemplated hereby do not and will not (a) violate in any material respect any provision of any Governmental Requirement applicable to, or any of the Organizational Documents of such Pledgor; (b) conflict with, result in a material breach of or constitute

(with due notice or lapse of time or both) a material default under any Material Contract of such Pledgor, other than with respect to agreements evidencing Indebtedness that is being repaid in full on the Closing Date; or (c) require any approval of stockholders, members or partners or any approval or consent of any Person under any Material Contract of such Pledgor, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to the Administrative Agent.

Section 3.02    Governmental Consents.    The execution, delivery and performance by each Pledgor of this Agreement and the consummation of the transactions contemplated hereby do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for (a) filings and recordings with respect to the Collateral to be made, or otherwise delivered to the Administrative Agent for filing and/or recordation, as of the Closing Date, (b) filings necessary to maintain perfection of the Collateral, (c) routine filings related to Pledgor and the operating of its business and (d) such filings as may be necessary in connection with the Administrative Agent's or any other Secured Party's exercise of remedies hereunder.

Section 3.03    Title; No Other Liens.    Except for the security interests granted to the Administrative Agent for the ratable benefit of the Secured Parties pursuant to this Agreement, each Pledgor is the record and beneficial owner of its respective Collateral free and clear of any and all Liens (other than Permitted Liens) and has the power to transfer each item of the Collateral in which a Lien is granted by it hereunder, free and clear of any Lien.  No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, pursuant to this Agreement or the Collateral Documents.

Section 3.04    Perfected First Priority Liens.    The security interests granted pursuant to this Agreement upon the completion of the filings and the other actions specified on Schedule 3 constitute valid perfected First Priority security interests (other than Permitted Liens) in all of the Collateral which may be perfected by filing a financing statement in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, as collateral security for the Obligations, enforceable in accordance with the terms hereof against all creditors of any Pledgor and any Persons purporting to purchase any Collateral from any Pledgor.

Section 3.05    Pledgor Information.    On the date hereof, the correct legal name of each Pledgor, each Pledgor's jurisdiction of organization, organizational number, taxpayer identification number and the location of each Pledgor's chief executive office or sole place of business are specified in Schedule 4.

Section 3.06    Pledged Securities.    The Pledged Securities required to be pledged hereunder are listed in Schedule 2.  The shares (or such other interests) of Pledged Securities pledged by each Pledgor hereunder constitute, as of the date hereof, all the issued and outstanding shares (or such other interests) of all classes of the Capital Stock of the Pledged Entity owned by such Pledgor.  As of the date hereof, all the shares (or such other interests) of the Pledged Securities have been duly and validly issued and are fully paid and nonassessable; and such Pledgor is the record and beneficial owner of, and has good title to, the Pledged Securities pledged by it hereunder, free of any and all Liens or options in favor of, or claims of,

any other Person, except the security interest created by this Agreement and Liens permitted by Section 6.2 of the Credit Agreement.

Section 3.07    Instruments.  No Collateral constitutes instruments (except in the case of any such instrument delivered to the Administrative Agent and constituting Collateral under Section 4.04).

## ARTICLE IV
## Covenants

Each Pledgor covenants and agrees with the Secured Parties that, from and after the date of this Agreement until Security Termination:

Section 4.01    Maintenance of Perfected Security Interest; Further Documentation.

(a)    Each Pledgor shall maintain the security interest created by this Agreement as a perfected First Priority Lien (subject only to Permitted Encumbrances) and shall defend such Lien against the claims and demands of all Persons whomsoever.

(b)    Each Pledgor will furnish to the Administrative Agent and the other Secured Parties from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Administrative Agent may reasonably request, all in reasonable detail.

(c)    At any time and from time to time, upon the written request of the Administrative Agent, and at the sole expense of each Pledgor, such Pledgor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Administrative Agent may reasonably deem necessary for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, the delivery of certificated securities and the filing of any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the Liens created hereby.

Section 4.02    Changes in Locations, Name, Etc.  Each Pledgor recognizes that financing statements pertaining to the Collateral have been or may be filed where such Pledgor maintains any Collateral or is organized.  Without limitation of any provision of the Credit Agreement or any other covenant herein, no Pledgor will cause or permit (i) any change to be made in its name, identity or corporate structure or (ii) any change to such Pledgor's jurisdiction of organization, unless such Pledgor shall have first (1) notified the Administrative Agent and the other Secured Parties of such change at least thirty (30) days prior to the effective date of such change, and (2) taken all action reasonably requested by the Administrative Agent for the purpose of maintaining the perfection and priority of the Administrative Agent's security interests under this Agreement.  In any notice furnished pursuant to this Section 4.02, any Pledgor will expressly state in a conspicuous manner that the notice is required by this Agreement and contains facts that may require additional filings of financing statements or other notices for the purposes of continuing perfection of the Administrative Agent's security interest in the Collateral.

Section 4.03    Pledged Securities.  Each Pledgor agrees that:

(a)    if it shall become entitled to receive or shall receive any stock or equity certificate (including, without limitation, any certificate representing a stock or equity dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the Capital Stock of the Pledged Entity, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of the Pledged Securities,

or otherwise in respect thereof, each Pledgor shall accept the same as the agent of the Administrative Agent and the other Secured Parties, hold the same in trust for the Administrative Agent and the other Secured Parties, segregated from other Property of such Pledgor, and deliver the same forthwith to the Administrative Agent in the exact form received, duly indorsed by such Pledgor to the Administrative Agent, if required, together with an undated stock power or other equivalent power covering such certificate duly executed in blank by such Pledgor and with, if the Administrative Agent so requests, signature guaranteed, to be held by the Administrative Agent, subject to the terms hereof, as additional collateral security for the Obligations.  Any sums paid upon or in respect of any Pledged Securities upon the liquidation or dissolution of the Pledged Entity, any distribution of capital made on or in respect of any Pledged Securities or any property distributed upon or with respect to any Pledged Securities pursuant to the recapitalization or reclassification of the capital of the Pledged Entity or pursuant to the reorganization thereof shall, unless otherwise subject to a perfected security interest in favor of the Administrative Agent, be delivered to the Administrative Agent to be held by it hereunder as additional collateral security for the Obligations.  If any sum of money or property so paid or distributed in respect of any Pledged Securities shall be received by any Pledgor, such Pledgor shall, until such money or property is paid or delivered to the Administrative Agent, hold such money or property in trust for the Administrative Agent, segregated from other funds of such Pledgor, as additional security for the Obligations.

(b)      without the prior written consent of the Administrative Agent and unless otherwise expressly permitted hereby or under the Credit Agreement or any other Loan Documents, it will not (i) vote to enable, or take any other action to permit, the Pledged Entity to issue any Capital Stock of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any Capital Stock of any nature of the Pledged Entity unless such action would not result in a Change of Control; (ii) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Pledged Securities or Proceeds thereof unless such action would not result in a Change of Control; (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of, any Person with respect to, any of the Pledged Securities or Proceeds thereof, or any interest therein, except for the Lien created by this Agreement or Permitted Liens; or (iv) enter into any agreement or undertaking restricting the right or ability of any Pledgor or the Administrative Agent to sell, assign or transfer any of the Pledged Securities or Proceeds thereof.

(c)      when and as often as may be reasonably requested by the Administrative Agent, it shall furnish to the Administrative Agent such stock or equity powers and other instruments, in each case executed in blank, as may be required by the Administrative Agent to assure the transferability of the Pledged Securities.

(d)      the Pledged Securities will at all times constitute not less than 100% of the Capital Stock of the Pledged Entity owned by any Pledgor. Each Pledgor shall promptly execute and deliver a Supplement or any other documentation reasonably required by the Administrative Agent in order to comply with this Section 4.03(d).

Section 4.04    <u>Instruments</u>.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any instrument in the outstanding or stated amount of greater than $25,000, such instrument shall be promptly, but in any event within 3 Business Days, delivered to the Administrative Agent, duly endorsed in a manner satisfactory to the Administrative Agent, to be held as Collateral pursuant to this Agreement (and the grant of security contained in Section 2.01 shall be deemed amended to include such instrument as "Collateral").

## ARTICLE V
## Remedial Provisions

Section 5.01    Code and Other Remedies.

(a)    Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, on behalf of the Secured Parties, may exercise, in addition to all other rights and remedies granted to them in this Agreement, the other Loan Documents and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a secured party under the UCC or any other applicable law or otherwise available at law or equity.  Without limiting the generality of the foregoing, the Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Pledgor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof. Any Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Pledgor, which right or equity is hereby waived and released.  Upon any such sale or transfer, the Administrative Agent shall have the right to deliver, assign and transfer to the purchaser or transferee thereof the Collateral so sold or transferred.  The Administrative Agent shall apply the net proceeds of any action taken by it pursuant to this Section 5.01, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Administrative Agent and the other Secured Parties hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in accordance with Section 2.10 of the Credit Agreement, and only after such application and after the payment by the Administrative Agent of any other amount required by any provision of law, including, without limitation, Section 9-615 of the UCC, if the Administrative Agent must account for the surplus, if any, to any Pledgor.  To the extent permitted by applicable law, each Pledgor waives all claims, damages and demands it may acquire against the Administrative Agent or any other Secured Party arising out of the exercise by them of any rights hereunder except to the extent caused by the gross negligence or willful misconduct of the Administrative Agent or such Secured Parties or their respective agents.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(b)    In the event that the Administrative Agent elects not to sell the Collateral in connection with the exercise of remedies provided pursuant to this Section 5.01, the Administrative Agent retains its rights to dispose of or utilize the Collateral or any part or parts thereof in any manner authorized or permitted by law or in equity, and to apply the proceeds of the same towards payment of the Obligations. Each and every method of disposition of the Collateral described in this Agreement shall constitute disposition in a commercially reasonable manner.

(c)    The Administrative Agent may appoint any Person as agent to perform any act or acts necessary or incident to any sale or transfer of the Collateral.

Section 5.02    Pledged Securities.

(a)    Unless an Event of Default shall have occurred and be continuing and the Administrative Agent shall have given written notice to each Pledgor of the Administrative Agent's intent to exercise its corresponding rights pursuant to Section 5.02(b), the Pledgors shall be permitted to receive

all dividends paid in respect of the Pledged Securities in the normal course of business of the Pledged Entity (other than liquidating dividends), to the extent permitted in the Credit Agreement, and to exercise all voting and partnership, corporate or limited liability company rights with respect to the Pledged Securities; *provided*, *however*, that no vote shall be cast, consent given or right exercised or other action taken by any Pledgor that would impair the Collateral, be inconsistent with or result in any violation of any provision of the Credit Agreement, this Agreement or any other Loan Document.

(b)     If an Event of Default shall occur and be continuing and the Administrative Agent shall give notice of its intent to exercise such rights to each Pledgor, (i) the Administrative Agent shall have the right to receive any and all cash dividends, interest, principal or other payments, Property or other Proceeds paid in respect of the Pledged Securities and make application thereof to the Obligations in accordance with Section 2.10 of the Credit Agreement, and (ii) the Administrative Agent shall have the right to have any or all of the Pledged Securities registered in the name of the Administrative Agent or its nominee, and (iii) the Administrative Agent or its nominee may exercise (A) all voting, consent, corporate, partnership or limited liability company and other rights pertaining to such Pledged Securities at any meeting of members, shareholders or partners (or other equivalent body), as the case may be, of the Pledged Entity or otherwise and (B) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Pledged Securities as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Pledged Securities upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the organizational structure of the Pledged Entity, or upon the exercise by any Pledgor or the Administrative Agent of any right, privilege or option pertaining to such Pledged Securities, and in connection therewith, the right to deposit and deliver any and all of the Pledged Securities with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Administrative Agent may determine), all without liability except to account for Property actually received by it, but the Administrative Agent shall have no duty to any Pledgor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(c)     Upon the occurrence and during the continuance of an Event of Default, in order to permit the Administrative Agent to exercise the voting and other consensual rights that it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions that it may be entitled to receive hereunder, (i) each Pledgor shall promptly execute and deliver (or cause to be executed and delivered) to the Administrative Agent all such proxies, dividend payment orders and other instruments as the Administrative Agent may from time to time reasonably request and (ii) without limiting the effect of clause (i) above, such Pledgor hereby grants to the Administrative Agent an irrevocable proxy to vote all or any part of the Pledged Securities and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Securities would be entitled (including giving or withholding written consents of members, shareholders or partners, as the case may be, calling special meetings of members, shareholders or partners, as the case may be, and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Securities on the record books of the Pledged Entity) by any other Person (including the Pledged Entity of such Pledged Securities or any officer or agent thereof) and which proxy shall only terminate upon Security Termination (or upon cessation of the Event of Default).

(d)     Each Pledgor hereby authorizes and instructs the Pledged Entity of any Pledged Securities pledged by such Pledgor hereunder to (i) comply with any instruction received by it from the Administrative Agent in writing that (A) states that an Event of Default has occurred and is continuing and (B) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Pledgor, and such Pledgor agrees that the Pledged Entity shall be fully protected in so complying, (ii) unless otherwise expressly permitted hereby, during the continuance of an Event of Default, pay any dividends or other payments with respect to the Pledged Securities directly to the Administrative Agent and

(iii)  not transfer any Pledged Securities on the books and records of the Pledged Entity without the prior written consent of the Administrative Agent.

Section 5.03    <u>Private Sales of Pledged Securities</u>.

(a)    Each Pledgor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Securities, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, or may determine that a public sale is impracticable or not commercially reasonable and, accordingly, may resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  Each Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner.  The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Securities for the period of time necessary to permit the Pledged Entity thereof to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Pledged Entity would agree to do so.

(b)    Each Pledgor agrees to use its best efforts to do or cause to be done all such other acts as may reasonably be necessary to make such sale or sales of all or any portion of the Pledged Securities pursuant to this Section 5.03 valid and binding and in compliance with any and all other applicable Governmental Requirements.  Each Pledgor further agrees that a breach of any of the covenants contained in this Section 5.03 will cause irreparable injury to the Secured Parties, that the Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 5.03 shall be specifically enforceable against such Pledgor, and such Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Credit Agreement.

Section 5.04    <u>Non-Judicial Enforcement</u>.  The Administrative Agent may enforce its rights hereunder without prior judicial process or judicial hearing, and to the extent permitted by law, each Pledgor expressly waives any and all legal rights which might otherwise require the Administrative Agent to enforce its rights by judicial process.

Section 5.05    <u>No Subrogation</u>.  Notwithstanding any payment made by any Pledgor hereunder or any set-off or application of funds of such Pledgor by any Secured Party, such Pledgor shall not be entitled to be subrogated to any of the rights of any Secured Party against the Borrower or any collateral security or right of offset held by any Secured Party for the payment of the Obligations, and no Pledgor shall seek nor be entitled to seek any indemnity, exoneration, participation, contribution or reimbursement from the Borrower in respect of payments made by such Pledgor hereunder until Security Termination.  If any amount shall be paid to any Pledgor on account of such subrogation rights at any time, such amount shall be held by such Pledgor in trust for the Secured Parties, and shall, forthwith upon receipt by such Pledgor, be turned over to the Administrative Agent in the exact form received by such Pledgor (duly indorsed by such Pledgor to the Administrative Agent, if required), to be applied against the Obligations, whether matured or unmatured, in accordance with Section 2.10 of the Credit Agreement.

Section 5.06    <u>Amendments, Etc. with respect to the Obligations</u>.  Each Pledgor shall remain obligated hereunder, and such Pledgor's obligations hereunder shall not be released, discharged or otherwise affected, notwithstanding that, without any reservation of rights against such Pledgor and without notice to, demand upon or further assent by such Pledgor (which notice, demand and assent requirements are hereby expressly waived by such Pledgor), (a) any demand for payment of any of the Obligations made by any Secured Party may be rescinded by such Secured Party or otherwise and any of the Obligations

continued; (b) the Obligations, the liability of any other Person upon or for any part thereof or any collateral security or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by, or any indulgence or forbearance in respect thereof granted by, any Secured Party; (c) the Credit Agreement and the other Loan Documents may be amended, modified, supplemented or terminated, in whole or in part, as the Secured Parties may deem advisable from time to time; (d) any collateral security or right of offset at any time held by any Secured Party for the payment of the Obligations may be sold, exchanged, waived, surrendered or released; (e) any guarantors, makers or endorsers of the Obligations may from time to time be obligated on the Obligations or any additional security or collateral for the payment and performance of the Obligations may from time to time secure the Obligations; or (f) any other event shall occur which constitutes a defense or release of sureties generally.  No Secured Parties shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or any Property subject thereto.

Section 5.07    Waivers.  Each Pledgor hereby waives, to the extent permitted by law, any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by any Secured Party upon the provision of collateral contained in this Agreement or acceptance of the provision of collateral contained in this Agreement; the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the provision of collateral contained in this Agreement and no notice of creation of the Obligations or any extension of credit already or hereafter contracted by or extended to the Borrower need be given to any Pledgor; and all dealings between the Borrower and any other Pledgor, on the one hand, and the Secured Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the provision of collateral contained in this Agreement.  Each Pledgor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower or any other Pledgor with respect to the Obligations.

Section 5.08    Pledge Absolute and Unconditional.

(a)    Each Pledgor hereby waives any defense of a surety or guarantor or any other obligor on any obligations arising in connection with or in respect of any of the following and hereby agrees that its obligations hereunder shall not be discharged or otherwise affected as a result of any of the following:

(i)    the invalidity or unenforceability of any Secured Document, any of the Obligations or any other collateral security therefor or right of offset with respect thereto at any time or from time to time held by any Secured Party;

(ii)    any defense, set-off or counterclaim which may at any time be available to or be asserted by the Borrower or any other Person against any Secured Party;

(iii)    the insolvency, bankruptcy arrangement, reorganization, adjustment, composition, liquidation, disability, dissolution or lack of power of the Borrower or any other Pledgor or any other Person at any time liable for the payment of all or part of the Obligations, including any discharge of, or bar or stay against collecting, any Obligation (or any part of them or interest therein) in or as a result of such proceeding;

(iv)    any sale, lease or transfer of any or all of the assets of the Borrower or any other Pledgor, or any changes in the shareholders of the Borrower or any other Pledgor;

(v)     any change in the relationship between the Borrower and any other Pledgor;

(vi)     the fact that any Collateral or Lien contemplated or intended to be given, created or granted as security for the repayment of the Obligations shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other Lien, it being recognized and agreed by each Pledgor that it is not entering into this Agreement in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the Collateral for the Obligations;

(vii)     the absence of any attempt to collect the Obligations or any part of them from any obligor;

(viii)     (A) any Secured Party's election, in any proceeding instituted under chapter 11 of the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code; (B) any borrowing or grant of a Lien by the Borrower, as debtor-in-possession, or extension of credit, under Section 364 of the Bankruptcy Code; (C) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of any Secured Party's claim (or claims) for repayment of the Obligations; (D) any use of cash collateral under Section 363 of the Bankruptcy Code; (E) any agreement or stipulation as to the provision of adequate protection in any bankruptcy proceeding; (F) the avoidance of any Lien in favor of the Secured Parties or any of them for any reason; or (G) failure by any Secured Party to file or enforce a claim against the Borrower or its estate in any bankruptcy or insolvency case or proceeding; or

(ix)     any other circumstance or act whatsoever, including any action or omission of the type described in Section 5.06 (with or without notice to or knowledge of the Borrower or any other Pledgor), which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower for the Obligations, or of any other Pledgor under the provision of collateral contained in this Agreement, in bankruptcy or in any other instance.

(b)     When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Pledgor, any Secured Party may, but shall be under no obligation to, join or make a similar demand on or otherwise pursue or exhaust such rights and remedies as it may have against the Borrower or any other Person or against any collateral security or any right of offset with respect thereto, and any failure by any Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower or any other Person or to realize upon any such collateral security or to exercise any such right of offset, or any release of the Borrower or any other Person or any such collateral security or right of offset, shall not relieve any Pledgor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of any Secured Party against any Pledgor.  For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

**ARTICLE VI**
**The Administrative Agent**

Section 6.01     <u>Administrative Agent's Appointment as Attorney-in-Fact, Etc.</u>

(a)     Each Pledgor hereby irrevocably constitutes and appoints the Administrative Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Pledgor and in the name of such Pledgor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all reasonably appropriate action and to execute any and all documents and instruments which may be reasonably necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the

generality of the foregoing, such Pledgor hereby gives the Administrative Agent the power and right, on behalf of such Pledgor, without notice to or assent by such Pledgor, to do any or all of the following:

(i)    in the name of such Pledgor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to any Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Administrative Agent for the purpose of collecting any such moneys due with respect to any other Collateral whenever payable;

(ii)    pay or discharge Taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement or any other Loan Document and pay all or any part of the premiums therefor and the costs thereof;

(iii)    execute, in connection with any sale provided for in Section 5.01 or Section 5.03, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(iv)    (A) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Administrative Agent or as the Administrative Agent shall direct; (B) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (C) sign and indorse any drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (D) in the name of such Pledgor, or in its own name, or otherwise, commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (E) defend any suit, action or proceeding brought against such Pledgor with respect to any Collateral; (F) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Administrative Agent may deem appropriate; and (G) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Administrative Agent were the absolute owner thereof for all purposes, and do, at the Administrative Agent's option and such Pledgor's expense, at any time, or from time to time, all acts and things which the Administrative Agent deems necessary to protect, preserve or realize upon the Collateral and the Administrative Agent's and the Secured Parties' security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Pledgor might do.

Anything in this Section 6.01(a) to the contrary notwithstanding, the Administrative Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 6.01(a) unless an Event of Default shall have occurred and be continuing.

(b)    If any Pledgor fails to perform or comply with any of its agreements contained herein within the applicable grace periods, the Administrative Agent, at its option, but without any obligation to do so, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(c)    The reasonable expenses of the Administrative Agent incurred in connection with actions undertaken as provided in this Section 6.01, together with interest thereon at the Default Rate, but in no event to exceed the Highest Lawful Rate, from the date of payment by the Administrative Agent to the date reimbursed by such Pledgors, shall be payable by the Pledgors to the Administrative Agent on demand.

(d)      Each Pledgor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue and in compliance hereof.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

Section 6.02      Duty of Administrative Agent.  The Administrative Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Administrative Agent deals with similar Property for its own account and the Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which comparable secured parties accord comparable collateral.  Neither the Administrative Agent, any other Secured Party nor any of their Affiliates shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Pledgor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the Administrative Agent and the other Secured Parties hereunder are solely to protect the Administrative Agent's and the Secured Parties' interests in the Collateral and shall not impose any duty upon the Administrative Agent or any other Secured Party to exercise any such powers.  The Administrative Agent and the other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their Affiliates shall be responsible to any Pledgor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.  To the fullest extent permitted by applicable law, the Administrative Agent shall be under no duty whatsoever to make or give any presentment, notice of dishonor, protest, demand for performance, notice of non-performance, notice of intent to accelerate, notice of acceleration, or other notice or demand in connection with any Collateral or the Obligations, or to take any steps necessary to preserve any rights against any Pledgor or other Person or ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not it has or is deemed to have knowledge of such matters.  Each Pledgor, to the extent permitted by applicable law, waives any right of marshaling in respect of any and all Collateral, and waives any right to require the Administrative Agent or any other Secured Party to proceed against such Pledgor or other Person, exhaust any Collateral or enforce any other remedy which the Administrative Agent or any other Secured Party now has or may hereafter have against such Pledgor or other Person.

Section 6.03      Financing Statements.  Pursuant to the UCC and any other applicable law, each Pledgor authorizes the Administrative Agent, without obligation and in the instance such Pledgor has not filed a financing statement or amendment as required, to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signature of such Pledgor in such form and in such offices as the Administrative Agent reasonably determines necessary or appropriate to perfect the security interests of the Secured Parties under this Agreement.  A photographic or other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction.

Section 6.04      Securities Laws.  The Administrative Agent hereby represents and warrants that it is an accredited investor as defined in Section 501 of Regulation D promulgated under the Securities Act.

**ARTICLE VII**
**Subordination of Indebtedness**

Section 7.01      Subordination of All Pledgor Claims.  As used herein, the term "**Pledgor Claims**" shall mean all debts and obligations of any Loan Party to any Pledgor, whether such debts and obligations now exist or are hereafter incurred or arise, or whether the obligation of the debtor thereon be direct,

13

contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or obligations be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or obligations may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired.  After and during the continuation of an Event of Default, no Pledgor shall receive or collect, directly or indirectly, from any Loan Party in respect thereof any amount upon the Pledgor Claims.

Section 7.02    Claims in Bankruptcy.  In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving any Loan Party, (a) the Administrative Agent on behalf of the Administrative Agent and the other Secured Parties shall have the right to prove their claim in any proceeding, so as to establish their rights hereunder and receive directly from the receiver, trustee or other court custodian, dividends and payments which would otherwise be payable upon the Pledgor Claims and (b) each Pledgor hereby assigns such dividends and payments to the Administrative Agent for the benefit of the Administrative Agent and the other Secured Parties for application against the Obligations as provided in Section 2.10 of the Credit Agreement.  Should any Secured Party receive, for application upon the Obligations, any such dividend or payment which is otherwise payable to any Pledgor, and which, as between such Pledgor and any Loan Party, shall constitute a credit upon the Pledgor Claims, then upon Security Termination, the intended recipient shall become subrogated to the rights of the Administrative Agent and the other Secured Parties to the extent that such payments to the Administrative Agent and the other Secured Parties on the Pledgor Claims have contributed toward the liquidation of the Obligations, and such subrogation shall be with respect to that proportion of the Obligations which would have been unpaid if the Administrative Agent and the other Secured Parties had not received dividends or payments upon the Pledgor Claims.

Section 7.03    Payments Held in Trust.  In the event that, notwithstanding Section 7.01 and Section 7.02, any Pledgor should receive any funds, payments, claims or distributions which is prohibited by such Sections, then it agrees: (a) to hold in trust for the Administrative Agent and the other Secured Parties an amount equal to the amount of all funds, payments, claims or distributions so received, and (b) that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions except to pay them promptly to the Administrative Agent, for the benefit of the Secured Parties; and each Pledgor covenants promptly to pay the same to the Administrative Agent.

Section 7.04    Liens Subordinate.  Each Pledgor agrees that, until Security Termination, any Liens securing payment of such Pledgor Claims shall be and remain inferior and subordinate to any Liens securing payment of the Obligations, regardless of whether such encumbrances in favor of any Pledgor, the Administrative Agent or any other Secured Party presently exist or are hereafter created or attach.  Without the prior written consent of the Administrative Agent, no Pledgor, during the period prior to Security Termination, shall (a) exercise or enforce any creditor's right it may have against any debtor in respect of such Pledgor Claims, or (b) foreclose, repossess, sequester or otherwise take steps or institute any action or proceeding (judicial or otherwise, including without limitation the commencement of or joinder in any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any Lien held by it.

Section 7.05    Notation of Records.  Upon the reasonable request of the Administrative Agent, all promissory notes and all accounts receivable ledgers and all other evidence of such Pledgor Claims accepted by or held by any Pledgor shall contain a specific written notice thereon that the indebtedness evidenced thereby is subordinated under the terms of this Agreement.

## ARTICLE VIII
### Miscellaneous

Section 8.01    Waiver.  No failure on the part of the Administrative Agent or any other Secured Party to exercise and no delay in exercising, and no course of dealing with respect to, any right, power, privilege or remedy or any abandonment or discontinuance of steps to enforce such right, power, privilege or remedy under this Agreement or any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, privilege or remedy under this Agreement or any other Loan Document preclude or be construed as a waiver of any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; provided, that only the Administrative Agent, in its capacity as such, shall be entitled to take action in accordance with the terms of the Loan Documents on behalf of the Secured Parties.  The remedies provided herein are cumulative and not exclusive of any remedies provided by law or equity.

Section 8.02    Notices.  All notices and other communications provided for herein shall be given in the manner and subject to the terms of Section 10.1 of the Credit Agreement; provided that any such notice, request or demand to or upon any Pledgor shall be addressed to such Pledgor at its notice address set forth on Schedule 1 (or such other notice address as to which such Pledgor may notify the Administrative Agent in writing from time to time).

Section 8.03    Payment of Expenses, Indemnities, Etc.

(a)    Each Pledgor agrees to pay or reimburse each Secured Party and the Administrative Agent for all reasonable out-of-pocket expenses incurred by such Person, including the fees, charges and disbursements of any outside counsel for the Administrative Agent or any other Secured Party, in connection with the enforcement or protection of its rights in connection with this Agreement, including, without limitation, all costs and expenses incurred in collecting against any Pledgor by enforcing or preserving any rights under this Agreement.

(b)    Each Pledgor agrees to pay, and to save the Administrative Agent and the other Secured Parties harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all Other Taxes which may be payable or determined to be payable with respect to any of the Collateral of that particular Pledgor or in connection with any of the transactions contemplated by this Agreement.

(c)    Each Pledgor agrees to pay, and to save the Administrative Agent and the other Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, and costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement against that particular Pledgor himself (but not for actions against any other Pledgor) to the extent the Borrower would be required to do so pursuant to Sections 10.2 and 10.3 of the Credit Agreement.

Section 8.04    Amendments in Writing.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with the terms of Section 10.6 of the Credit Agreement.

Section 8.05    Successors and Assigns.  The provisions of this Agreement shall be binding upon each Pledgor and its successors and assigns and shall inure to the benefit of the Administrative Agent and the other Secured Parties and their respective successors and assigns; provided that no Pledgor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent

of the Administrative Agent, and any such purported assignment, transfer or delegation shall be null and void.

Section 8.06    Survival; Revival; Reinstatement.

(a)    All covenants, agreements, and the representations and warranties made by any Pledgor herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Administrative Agent and the other Secured Parties and shall survive the execution and delivery of this Agreement, notwithstanding that the Administrative Agent or any other Secured Party may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and all such covenants, agreements and representations and warranties shall continue in full force and effect until Security Termination.  The provisions of Section 8.03 shall survive and remain in full force and effect regardless of the occurrence of Security Termination.

(b)    To the extent that any payments on the Obligations or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the other Secured Parties' Liens, rights, powers and remedies under this Agreement and each other Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and each Pledgor shall take such action as may be reasonably requested by the Administrative Agent to effect such reinstatement and Security Termination shall not be deemed to have occurred.

Section 8.07    Counterparts; Integration; Effectiveness.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)    **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES**.

(c)    This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto, the Secured Parties and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 8.08    Severability.  Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 8.09    **GOVERNING LAW; SUBMISSION TO JURISDICTION.**

(a)    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY HERETO ARISING OUT OF OR RELATING HERETO OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PLEDGOR, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (iii) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO SUCH PLEDGOR AT ITS ADDRESS PROVIDED ON THE SCHEDULES HERETO IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER SUCH PLEDGOR IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (iv) AGREES THAT THE ADMINISTRATIVE AGENT AND THE OTHER SECURED PARTIES RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST SUCH PLEDGOR IN THE COURTS OF ANY OTHER JURISDICTION.

(c)    EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER HEREOF.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.09 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HEREOF OR HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 8.10    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 8.11    Acknowledgments.

(a)    Each Pledgor hereby acknowledges that:

(i)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement;

(ii)    neither the Administrative Agent nor any other Secured Party has any fiduciary relationship with or duty to any Pledgor arising out of or in connection with this Agreement, the Credit Agreement or any of the other Loan Documents, and the relationship between any Pledgor, on the one hand, and the Administrative Agent and Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(iii)    no joint venture is created hereby or by any other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among any Pledgor and the Secured Parties.

(b)    **EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT, AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."**

Section 8.12    Additional Pledgors and Additional Pledged Securities.    Each Person that is required to become a party to this Agreement shall become a party hereto as a Pledgor for all purposes of this Agreement upon execution and delivery by such Person to the Administrative Agent of an Assumption Agreement and shall thereafter have the same rights, benefits and obligations as a Pledgor party hereto on the date hereof.  Any Pledgor that is required to pledge additional Capital Stock pursuant to this Agreement or the Credit Agreement shall promptly execute and deliver a Supplement to the Administrative Agent.

Section 8.13    Releases.

(a)    Release Upon Security Termination.  The grant of a security interest hereunder and all of the rights, powers and remedies in connection herewith shall, to the extent permitted by law, remain in full force and effect until Security Termination or in connection with a transaction described in clause (b) below.  Upon the occurrence of Security Termination, this Agreement and the Lien created hereby shall terminate; and in connection with any such release or termination, the Administrative Agent, at the written request and expense of a Pledgor, will execute and deliver to such Pledgor such documents and instruments (in form and substance satisfactory to the party executing the same) evidencing such release or termination as such Pledgor may reasonably request and will assign, transfer and deliver to such Pledgor, without recourse and without representation or warranty, such of the Collateral as may then be in the possession of Administrative Agent (or, in the case of any partial release of Collateral, such of the Collateral so being released as may be in its possession).

(b)    Partial Releases.  If any of the Collateral shall be sold, transferred or otherwise disposed of by any Pledgor in a transaction permitted by the Credit Agreement, then the Administrative Agent, at the request and sole expense of a Pledgor, shall promptly execute and deliver to such Pledgor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Collateral and the Capital Stock of the Pledged Entity thereof.

(c)    <u>Retention in Satisfaction</u>.  Except as may be expressly applicable pursuant to Section 9-620 of the UCC, no action taken or omission to act by the Administrative Agent or the Secured Parties hereunder, including, without limitation, any exercise of voting or consent rights or any other action taken or inaction, shall be deemed to constitute a retention of the Collateral in satisfaction of the Obligations or otherwise to be in full satisfaction of the Obligations, and the Obligations shall remain in full force and effect, until the Administrative Agent and the other Secured Parties shall have applied payments (including, without limitation, collections from Collateral) towards the Obligations in the full amount then outstanding or until such subsequent time as is provided in Section 8.13(a).

Section 8.14    <u>Acceptance</u>.  Each Pledgor hereby expressly waives notice of acceptance of this Agreement, acceptance on the part of the Administrative Agent and the other Secured Parties being conclusively presumed by their request for this Agreement and delivery of the same to the Administrative Agent.

Section 8.15    <u>Administrative Agent</u>.  The parties hereto agree that the Administrative Agent shall be afforded all of the rights, protections, indemnities, immunities and privileges afforded to the Administrative Agent under the Credit Agreement in connection with the execution of this Agreement and performance of its obligations hereunder.

[Remainder of Page Intentionally Left Blank: Signature Pages Follow]

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

PLEDGOR:

**OLAM ENERGY RESOURCES I LLC**


By:    _____
Name:
Title:


**MTE PARTNERS LLC**


By:    _____
Name:
Title:

ACKNOWLEDGED AND AGREED TO AS
OF THE DATE HEREOF BY:

ADMINISTRATIVE AGENT:

**RIVERSTONE CREDIT MANAGEMENT, LLC**


By: _____
Name:
Title:

<u>Schedule 1</u>

NOTICE ADDRESS OF PLEDGOR

For each Pledgor:

c/o Maefield Development Corporation
280 East 96th Street, Suite 210
Indianapolis, Indiana 46240
Attention: Bob Quinn
Fax: (317) 805-0777
Email: bquinn@maefield.com

<u>Schedule 2</u>

DESCRIPTION OF PLEDGED SECURITIES

| Name of Pledgor Owner | Borrower | Percentage Owned | Form of Entity | Class of Capital Stock | No. of Capital Stock | Certificated or Uncertificated | Certificate No. |
|---|---|---|---|---|---|---|---|
| Olam Energy Resources I LLC | MTE Holdings LLC | 50% | Limited liability company | Class A Units | 4,000,000 | Uncertificated | N/A |
| MTE Partners LLC | MTE Holdings LLC | 50% | Limited liability company | Class A Units | 4,000,000 | Uncertificated | N/A |

<u>Schedule 3</u>

FILINGS AND OTHER ACTIONS
REQUIRED TO PERFECT SECURITY INTERESTS

1.      Filing of UCC-1 Financing Statements with respect to the Collateral with the Secretary of State of the state set forth below opposite each Pledgor's name:

| Owner/Pledgor | State |
|---|---|
| Olam Energy Resources I LLC | Delaware |
| MTE Partners LLC | Delaware |

2.      Delivery to the Administrative Agent of all Pledged Securities consisting of certificated securities, if any, in each case properly endorsed for transfer in blank.

Schedule 4

**CORRECT LEGAL NAME, LOCATION OF JURISDICTION OF ORGANIZATION, ORGANIZATIONAL IDENTIFICATION NUMBER, TAXPAYER IDENTIFICATION NUMBER AND CHIEF EXECUTIVE OFFICE**

Legal Name: Olam Energy Resources I LLC
Current Jurisdiction of Organization: Delaware
Organizational Number: 5481481
Tax ID Number: 47-3660770
Locations of Chief Executive Office over the last Five Years: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240
Current Location of Chief Executive Office: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

Legal Name: MTE Partners LLC
Current Jurisdiction of Organization: Delaware
Organizational Number: 5544290
Tax ID Number: 47-4861158
Locations of Chief Executive Office over the last Five Years: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240
Current Location of Chief Executive Office: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

Annex I

ASSUMPTION AGREEMENT

ASSUMPTION AGREEMENT, dated as of [     ], 20[  ], made by [       ], a [        ] (the "**Additional Pledgor**"), in favor of Riverstone Credit Management, LLC, as Administrative Agent (in such capacity, the "**Administrative Agent**") for the Lenders, party to the Credit Agreement referred to below. All capitalized terms not defined herein shall have the meaning ascribed to them in the Pledge Agreement referred to below.

W I T N E S S E T H :

WHEREAS, MTE Holdings LLC, a Delaware limited liability company (the "**Borrower**"), the Administrative Agent, as administrative agent and collateral agent for the Lenders, and certain financial institutions from time to time party thereto (the "**Lenders**") have entered into that certain Term Loan Credit Agreement, dated as of September 17, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**");

WHEREAS, it is a condition precedent to the obligations of the Lenders to make the Loans under the Credit Agreement that each Pledgor shall have executed and delivered a Pledge Agreement to the Administrative Agent for the ratable benefit of the Secured Parties;

WHEREAS, in connection with the Credit Agreement, the owners of Capital Stock in the Borrower (other than the Additional Pledgor) have entered into that certain Pledge Agreement, dated as of September 17, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "**Pledge Agreement**") in favor of the Administrative Agent;

WHEREAS, the Credit Agreement requires the Additional Pledgor to become a party to the Pledge Agreement; and

WHEREAS, the Additional Pledgor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Pledge Agreement;

NOW, THEREFORE, IT IS AGREED:

1.     Pledge Agreement.   By executing and delivering this Assumption Agreement, the Additional Pledgor, as provided in Section 8.12 of the Pledge Agreement, hereby becomes a party to the Pledge Agreement as a Pledgor thereunder with the same force and effect as if originally named therein as a Pledgor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Pledgor thereunder. The information set forth in Annex 1-A hereto is hereby added to the information set forth in Schedules 1 through 4 to the Pledge Agreement. The Additional Pledgor hereby represents and warrants that each of the representations and warranties contained in Article III of the Pledge Agreement is true and correct on and as the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.

2.     Governing Law.   This Assumption Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

3.     Miscellaneous.   This Assumption Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Any provision of this Assumption Agreement held

to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

[NAME OF ADDITIONAL PLEDGOR]

By:      _____
Name:
Title:

Annex II

SUPPLEMENT

SUPPLEMENT, dated as of [    ], made by [        ], a [        ] (the "**Pledgor**"), in favor of Riverstone Credit Management, LLC, as Administrative Agent (in such capacity, the "**Administrative Agent**") for the Lenders party to the Credit Agreement referred to below.  All capitalized terms not defined herein shall have the meaning ascribed to them in the Pledge Agreement referred to below.

W I T N E S S E T H:

WHEREAS, MTE Holdings LLC, a Delaware limited liability company (the "**Borrower**"), the Administrative Agent as administrative agent and collateral agent for the Lenders, and certain Lenders from time to time party thereto have entered into that certain Term Loan Credit Agreement, dated as of September 17, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**");

WHEREAS, in connection with the Credit Agreement, the owners of Capital Stock in the Borrower (including each Pledgor) have entered into that certain Pledge Agreement, dated as of September 17, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "**Pledge Agreement**") in favor of the Administrative Agent;

WHEREAS, the Credit Agreement requires each Pledgor to pledge the Capital Stock described in Schedule 2-S hereto; and

WHEREAS, each Pledgor has agreed to execute and deliver this Supplement in order to pledge such Capital Stock;

NOW, THEREFORE, IT IS AGREED:

1.      Pledge Agreement.  By executing and delivering this Supplement, the information set forth in Schedule 2-S hereto is hereby added to the information set forth in Schedule 2 to the Pledge Agreement. Each Pledgor hereby represents and warrants that each of the representations and warranties contained in Article III of the Pledge Agreement is true and correct on and as the date hereof (after giving effect to this Supplement) as if made on and as of such date.

2.      Governing Law.  This Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

3.      Miscellaneous.  This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Any provision of this Supplement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has caused this Supplement to be duly executed and delivered as of the date first above written.

[NAME OF PLEDGOR]


By:   _____
Name:
Title:

**EXHIBIT I**

### FORM OF APOD CERTIFICATE

[        ], 201[ ]

The undersigned hereby certifies that he is the [ ] of MTE Holdings LLC, a Delaware limited liability company (the "***Company***"), and that as such is authorized to execute this certificate on behalf of the Company.  With reference to Section 5.13(b) of the Term Loan Credit Agreement dated as of September 17, 2018 (together with all amendments, restatements, supplements or other modifications thereto, the "***Credit Agreement***"), by and among the Company, the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "***Administrative Agent***"), the undersigned represents, warrants and certifies as follows in such undersigned's capacity as the [ ] of the Company and not in such undersigned's individual capacity (each capitalized term used but not otherwise defined herein shall have the meaning given to such term in the Credit Agreement):

(a)       The Company has good and defensible title to the Oil and Gas Properties listed on the APOD attached hereto, free and clear of all Liens other than Permitted Liens.

(b)       Except for Permitted Liens, the Company is not aware of any claim, demand or challenge of any other Person with respect to the ownership of, or title to, the Oil and Gas Properties listed on the APOD.

[*Signature Page Follows*]

US 5749121v.3

EXECUTED AND DELIVERED as of the date first written above.

MTE HOLDINGS LLC

By: _____
Name:
Title:

**EXHIBIT J**

**FORM OF INCREMENTAL FACILITY ACTIVATION NOTICE**

Date: [_____], 20[__]
To: Riverstone Credit Management, LLC, as the Administrative Agent
From: MTE Holdings LLC, as Company and [          ], as [Lender(s)]

Ladies and Gentlemen:

Reference is made to the Term Loan Credit Agreement, dated as of September 17, 2018 (as it may be amended, restated, supplemented or otherwise modified, the "***Credit Agreement***"), by and among MTE Holdings LLC, a Delaware limited liability company (the "***Company***"), the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "***Administrative Agent***").  Terms defined in the Credit Agreement shall have the same meanings when used herein.

This notice is an Incremental Facility Activation Notice referred to in the Credit Agreement, and the Company and each of the Lenders party hereto hereby notify you that:

　　i.　Each Lender party hereto agrees to make the Incremental Facility Loans in the amount set forth opposite such Lender's name in item (v) below.

　　ii.　The amount of this Incremental Facility Total Commitment shall be $[  ].

　　iii.　The Incremental Facility Closing Date shall be [ ], 20[ ].

　　iv.　The applicable interest rate for this Incremental Facility Loan is [          ].

　　v.　The Lender(s) providing this Incremental Facility Loan is/are and its/their Incremental Facility Commitment is/are:

| Lender | Incremental Facility Commitment |
| --- | --- |
| [Lender 1] | $[ ] |
| [Lender 2] | $[ ] |

　　vi.　The maturity date for this Incremental Facility Loan shall be [ ], 20[ ].

　　vii.　The agreement of each Lender party hereto to make the Incremental Facility Loans on the Incremental Facility Closing Date is subject to (a) compliance with Section 2.17, and (b) satisfaction of the conditions precedent set forth in Section 3.2, of the Credit Agreement.

[*Signature page to follow.*]

Very truly yours,

COMPANY:

**MTE HOLDINGS LLC**


By: _____
Name:
Title:


LENDER:

**[          ],** as a Lender


By:_____
Name:
Title:



Accepted and Agreed:

**RIVERSTONE CREDIT MANAGEMENT, LLC**,
  as Administrative Agent


By:_____
Name:
Title:

**EXHIBIT K**

**FORM OF NEW LENDER SUPPLEMENT**

[_____], 201[__]

SUPPLEMENT, dated _____, 20[__] (this "Supplement"), to Term Loan Credit Agreement, dated as of September 17, 2018 (together with all amendments, restatements, supplements or other modifications thereto, the "Credit Agreement"), among MTE Holdings LLC, a Delaware limited liability company (the "Company"), Riverstone Credit Management, LLC, as administrative agent and collateral agent for the lenders (the "Administrative Agent"), and the Lenders party thereto. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

W I T N E S S E T H

WHEREAS, the Credit Agreement provides in Section 2.17(b) thereof that any bank, financial institution or other entity may become a Lender under the Credit Agreement with the consent of the Administrative Agent in connection with a transaction described in Section 2.17(a) thereof by executing and delivering to the Company and the Administrative Agent a supplement to the Credit Agreement in substantially the form of this Supplement; and

WHEREAS, the undersigned now desires to become a Lender under the Credit Agreement;

NOW, THEREFORE, the undersigned hereby agrees as follows:

1.      The undersigned agrees to be bound by the provisions of the Credit Agreement, and agrees that it shall, on the date this Supplement is accepted by the Company and the Administrative Agent (the "Effective Date"), become a Lender for all purposes of the Credit Agreement to the same extent as if originally a party thereto, with an Incremental Facility Commitment of $[_____].

2.      The undersigned (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Supplement and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Supplement on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (v) it has delivered all requested know-your-customer documentation, and a duly executed administrative questionnaire to the Administrative Agent, (vi) it has delivered such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as may be required to be deliver to Administrative Agent pursuant to Sections **Error! Reference**

**source not found.** and (vii) if it is a Non-U.S. Lender, attached to the Supplement is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the undersigned; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

The undersigned Lender's address for notices for the purposes of the Credit Agreement is as follows:

_____

_____

_____

[Signature Pages Follow]

Very truly yours,

[NAME OF LENDER]


By: _____
Name:
Title:



Accepted this ___ day of _____, 20__:



RIVERSTONE CREDIT MANAGEMENT, LLC,
as the Administrative Agent

By:_____
 Name:
 Title:

Accepted and Agreed:

RIVERSTONE CREDIT MANAGEMENT, LLC,
  as Administrative Agent


By:_____
Name:
Title:

Accepted and Agreed:

[New Lender]


By:_____
Name:
Title:

**EXHIBIT L-1**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Term Loan Credit Agreement, dated as of September 17, 2018 (as it may be amended, restated, supplemented or otherwise modified, the "***Credit Agreement***"), by and among MTE Holdings LLC, a Delaware limited liability company (the "***Company***"), the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "***Administrative Agent***").

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iii) it is not a ten-percent (10%) shareholder of the Company within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code and (iv) it is not a "controlled foreign corporation" related to the Company as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished the Administrative Agent and the Company with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or, in each case, any successor form). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Company and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Company and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]
By:
      Name:
      Title:
Date: [        ], 20[  ]

EXHIBIT L-2

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Term Loan Credit Agreement, dated as of September 17, 2018 (as it may be amended, restated, supplemented or otherwise modified, the "***Credit Agreement***"), by and among MTE Holdings LLC, a Delaware limited liability company (the "***Company***"), the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "***Administrative Agent***").

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iii) it is not a ten-percent (10%) shareholder of the Company within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code and (iv) it is not a "controlled foreign corporation" related to the Company as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished its participating Lenders with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or, in each case, any successor form).  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.


[NAME OF PARTICIPANT]
By:
          Name:
          Title:
Date: [                    ], 20[ ]

**EXHIBIT L-3**

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Term Loan Credit Agreement, dated as of September 17, 2018 (as it may be amended, restated, supplemented or otherwise modified, the "***Credit Agreement***"), by and among MTE Holdings LLC, a Delaware limited liability company (the "***Company***"), the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "***Administrative Agent***").

Pursuant to the provisions of <u>Section 2.14</u> of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iv) none of its direct or indirect partners/members is a ten-percent (10%) shareholder of the Company within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Company as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished its participating Lender with Internal Revenue Service Form W-8IMY (or any successor form) accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or, in each case, any successor form) or (ii) an IRS Form W-8IMY (or any successor form) accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or, in each case, any successor form), from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]
By:
    Name:
    Title:
Date: [                    ], 20[ ]

EXHIBIT L-4

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Term Loan Credit Agreement, dated as of September 17, 2018 (as it may be amended, restated, supplemented or otherwise modified, the "***Credit Agreement***"), by and among MTE Holdings LLC, a Delaware limited liability company (the "***Company***"), the Lenders from time to time party thereto and Riverstone Credit Management, LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "***Administrative Agent***").

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loans(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iv) none of its direct or indirect partners/members is a ten-percent (10%) shareholder of the Company within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Company as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished the Administrative Agent and the Company with IRS Form W-8IMY (or any successor form) accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or, in each case, any successor form) or (ii) an IRS Form W-8IMY (or any successor form) accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or, in each case, any successor form), from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Company and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Company and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]
By:
      Name:
      Title:

Date: [              ], 20[ ]

**EXHIBIT M**

**FORM OF ASSIGNMENT AGREEMENT**

This Assignment Agreement (the "Assignment Agreement") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented or otherwise modified, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment Agreement as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including the Option Agreement and any letters of credit and guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment Agreement, without representation or warranty by the Assignor.

1.  Assignor:                      _____

2.  Assignee:                      _____
                                   [and is an Affiliate of [identify Lender]]

3.  Company:                       MTE Holdings LLC

4.  Administrative Agent:          Riverstone Credit Management, LLC, as the administrative agent and collateral agent under the Credit Agreement

5.  Credit Agreement:              The Term Loan Credit Agreement dated as of September 17, 2018 among MTE Holdings LLC, the Lenders from time to time party thereto, and Riverstone Credit Management, LLC, as administrative agent and collateral agent

6.    Assigned Interest:

| Commitment Assigned | Loans Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Percentage Assigned of Commitment/Loans |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date:        [            ], 20[ ] [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment Agreement are hereby agreed to:

<u>ASSIGNOR</u>

[NAME OF ASSIGNOR]


By:_____
Name:
Title:


<u>ASSIGNEE</u>

[NAME OF ASSIGNEE]


By:_____
Name:
Title:

Acknowledged:

RIVERSTONE CREDIT MANAGEMENT, LLC, as Administrative Agent


By_____
Name:
Title:

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AGREEMENT

1.      Representations and Warranties.

1.1     Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Company, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender and (v) if it is a Non-U.S. Lender, attached to the Assignment Agreement is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      General Provisions.  This Assignment Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment

Agreement may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment Agreement.  This Assignment Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  **EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS ASSIGNMENT AGREEMENT OR THE ASSIGNOR/ASSIGNEE RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS ASSIGNMENT AGREEMENT, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS ASSIGNMENT AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 3</u> AND EXECUTED BY EACH OF THE PARTIES HERETO THAT IS PARTY TO SUCH JUDICIAL PROCEEDING), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.   IN THE EVENT OF LITIGATION, THIS ASSIGNMENT AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**