**<u>EXHIBIT B</u>**

**EXECUTION VERSION**

**CREDIT AGREEMENT**

**DATED AS OF SEPTEMBER 17, 2018**

**AMONG**

**MDC ENERGY LLC,**
**AS BORROWER,**

**NATIXIS, NEW YORK BRANCH,**
**AS ADMINISTRATIVE AGENT AND AS ISSUING BANK,**

**AND**

**THE LENDERS PARTY HERETO**

**NATIXIS, NEW YORK BRANCH**
**AS JOINT LEAD ARRANGER AND JOINT BOOKRUNNER**

**BMO CAPITAL MARKETS CORP.**
**AS JOINT LEAD ARRANGER AND JOINT BOOKRUNNER**

**BMO HARRIS BANK N.A.**
**AS SYNDICATION AGENT**

#5729656

# TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS AND ACCOUNTING MATTERS .........................................1

Section 1.01    Terms Defined Above....................................................................1
Section 1.02    Certain Defined Terms..................................................................1
Section 1.03    Types of Loans and Borrowings ...................................................36
Section 1.04    Terms Generally; Rules of Construction .....................................37
Section 1.05    Accounting Terms and Determinations; GAAP ..........................37

ARTICLE II       THE CREDITS ................................................................................38

Section 2.01    Commitments................................................................................38
Section 2.02    Loans and Borrowings .................................................................38
Section 2.03    Requests for Borrowings..............................................................39
Section 2.04    Interest Elections..........................................................................40
Section 2.05    Funding of Borrowings ................................................................41
Section 2.06    Termination and Reduction of Aggregate Maximum Credit
                Amounts........................................................................................42
Section 2.07    Borrowing Base ............................................................................42
Section 2.08    Letters of Credit ...........................................................................45
Section 2.09    Defaulting Lenders.......................................................................52

ARTICLE III      PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES 54

Section 3.01    Repayment of Loans .....................................................................54
Section 3.02    Interest..........................................................................................54
Section 3.03    Alternate Rate of Interest .............................................................55
Section 3.04    Prepayments .................................................................................56
Section 3.05    Fees ..............................................................................................58

ARTICLE IV      PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS........59

Section 4.01    Payments Generally; Pro Rata Treatment; Sharing of Set-offs .................59
Section 4.02    Presumption of Payment by the Borrower................................................60
Section 4.03    Deductions by the Administrative Agent...................................................60
Section 4.04    Collection of Proceeds of Production .......................................................61

ARTICLE V        INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES;
                 ILLEGALITY ...................................................................................61

Section 5.01    Increased Costs .............................................................................61
Section 5.02    Break Funding Payments ..............................................................62
Section 5.03    Taxes .............................................................................................63
Section 5.04    Mitigation Obligations; Designation of Different Lending Office ...........67
Section 5.05    Replacement of Lenders ...............................................................67
Section 5.06    Illegality .......................................................................................68

ARTICLE VI        CONDITIONS PRECEDENT .........................................................68

    Section 6.01    Effective Date .........................................................................68
    Section 6.02    Each Credit Event ...................................................................71

ARTICLE VII       REPRESENTATIONS AND WARRANTIES...............................72

    Section 7.01    Organization; Powers...............................................................72
    Section 7.02    Authority; Enforceability..........................................................73
    Section 7.03    Approvals; No Conflicts ...........................................................73
    Section 7.04    Financial Condition; No Material Adverse Change....................73
    Section 7.05    Litigation.................................................................................74
    Section 7.06    Environmental Matters.............................................................74
    Section 7.07    Compliance with the Laws and Agreements; No Defaults...........75
    Section 7.08    Investment Company Act .........................................................76
    Section 7.09    Taxes.......................................................................................76
    Section 7.10    ERISA......................................................................................76
    Section 7.11    Disclosure; No Material Misstatements; Beneficial Ownership...............77
    Section 7.12    Insurance .................................................................................77
    Section 7.13    Restriction on Liens .................................................................78
    Section 7.14    Subsidiaries .............................................................................78
    Section 7.15    Location of Business and Offices ..............................................78
    Section 7.16    Properties; Titles, Etc...............................................................78
    Section 7.17    Maintenance of Properties .......................................................79
    Section 7.18    Gas Imbalances, Prepayments .................................................80
    Section 7.19    Marketing of Production ..........................................................80
    Section 7.20    Swap Agreements and Qualified ECP Counterparty .................80
    Section 7.21    Use of Loans and Letters of Credit...........................................80
    Section 7.22    Solvency..................................................................................81
    Section 7.23    Anti-Corruption Laws, Anti-Money Laundering Laws, and
                    Sanctions.................................................................................81
    Section 7.24    EEA Financial Institutions .......................................................81

ARTICLE VIII      AFFIRMATIVE COVENANTS ....................................................81

    Section 8.01    Financial Statements; Ratings Change; Other Information .......81
    Section 8.02    Notices of Material Events........................................................85
    Section 8.03    Existence; Conduct of Business.................................................86
    Section 8.04    Payment of Obligations............................................................86
    Section 8.05    Performance of Obligations under Loan Documents..................86
    Section 8.06    Operation and Maintenance of Properties..................................86
    Section 8.07    Insurance .................................................................................87
    Section 8.08    Books and Records; Inspection Rights ......................................87
    Section 8.09    Compliance with Laws .............................................................89
    Section 8.10    Environmental Matters..............................................................89
    Section 8.11    Further Assurances...................................................................91
    Section 8.12    Reserve Reports .......................................................................91

Section 8.13    Title Information.................................................................92
Section 8.14    Additional Collateral; Additional Guarantors........................93
Section 8.15    ERISA Compliance.............................................................94
Section 8.16    Commodity Exchange Act Keepwell Provisions.....................95
Section 8.17    Required Swap Agreements.................................................95
Section 8.18    Deposit Accounts; Commodities Accounts and Securities Accounts........95
Section 8.19    Operators' Subordination Agreement....................................95
Section 8.20    Post-Closing Obligations ....................................................95

ARTICLE IX        NEGATIVE COVENANTS ....................................................96

Section 9.01    Financial Covenants...........................................................96
Section 9.02    Debt..................................................................................96
Section 9.03    Liens.................................................................................97
Section 9.04    Restricted Payments...........................................................97
Section 9.05    Investments, Loans and Advances........................................98
Section 9.06    Nature of Business; No International Operations ...................99
Section 9.07    Proceeds of Loans..............................................................99
Section 9.08    ERISA Compliance.............................................................99
Section 9.09    Sale of Notes or Receivables .............................................100
Section 9.10    Mergers, Etc.....................................................................100
Section 9.11    Sale of Properties and Liquidation of Swap Agreements ......101
Section 9.12    Transactions with Affiliates...............................................102
Section 9.13    Subsidiaries......................................................................103
Section 9.14    Negative Pledge Agreements; Subsidiary Dividend Restrictions...........103
Section 9.15    Take-or-Pay or Other Prepayments ....................................103
Section 9.16    Swap Agreements..............................................................103
Section 9.17    Amendments to Organizational Documents ..........................105
Section 9.18    Reserved...........................................................................105
Section 9.19    Non-Qualified ECP Counterparties .....................................105
Section 9.20    Sale-and-Leaseback...........................................................106
Section 9.21    Limitation on Accounting Changes or Changes in Fiscal Periods ..........106
Section 9.22    Marketing Activities .........................................................106

ARTICLE X        EVENTS OF DEFAULT; REMEDIES.....................................106

Section 10.01  Events of Default ..............................................................106
Section 10.02  Remedies..........................................................................109
Section 10.03  Right to Cure Financial Covenant Non-Compliance ..............110

ARTICLE XI        THE AGENTS ...................................................................112

Section 11.01  Appointment; Powers.........................................................112
Section 11.02  Duties and Obligations of Administrative Agent....................112
Section 11.03  Action by Administrative Agent...........................................113
Section 11.04  Reliance by Administrative Agent........................................114
Section 11.05  Subagents .........................................................................114

Section 11.06  Resignation or Removal of Administrative Agent...................................114
Section 11.07  Agents as Lenders................................................................................115
Section 11.08  No Reliance.........................................................................................115
Section 11.09  Administrative Agent May File Proofs of Claim....................................115
Section 11.10  Authority of Administrative Agent to Release Collateral, Liens and Guarantors; Other Collateral Matters.....................................................116
Section 11.11  The Arrangers and Agents ...................................................................117

ARTICLE XII      MISCELLANEOUS ..................................................................117

Section 12.01  Notices ...............................................................................................117
Section 12.02  Waivers; Amendments.........................................................................118
Section 12.03  Expenses, Indemnity; Damage Waiver.................................................120
Section 12.04  Successors and Assigns.......................................................................123
Section 12.05  Survival; Revival; Reinstatement ........................................................127
Section 12.06  Counterparts; Integration; Effectiveness..............................................127
Section 12.07  Severability ........................................................................................128
Section 12.08  Right of Setoff.....................................................................................128
Section 12.09  Governing Law; Jurisdiction; Consent to Service of Process.................128
Section 12.10  Headings ............................................................................................130
Section 12.11  Confidentiality ....................................................................................130
Section 12.12  Interest Rate Limitation .......................................................................131
Section 12.13  Exculpation Provisions ........................................................................132
Section 12.14  Collateral Matters; Swap Agreements; and Bank Products....................132
Section 12.15  No Third Party Beneficiaries ................................................................132
Section 12.16  USA Patriot Act Notice .......................................................................133
Section 12.17  No Advisory or Fiduciary Responsibility ..............................................133
Section 12.18  Acknowledgement and Consent to Bail-In of EEA Financial Institutions..............................................................................................133

## ANNEX, EXHIBITS AND SCHEDULES

Annex I                List of Maximum Credit Amounts


Exhibit A              Form of Note
Exhibit B              Form of Borrowing Request
Exhibit C              Form of Interest Election Request
Exhibit D              Form of Compliance Certificate
Exhibit E              Security Instruments as of the Effective Date
Exhibit F              Form of Guaranty Agreement
Exhibit G              Form of Security Agreement
Exhibit H              Reserved
Exhibit I              Form of Assignment and Assumption
Exhibit J-1            Form of U.S. Tax Compliance Certificate (Foreign Lenders; not
                       partnerships)
Exhibit J-2            Form of U.S. Tax Compliance Certificate (Foreign Participants; not
                       partnerships)
Exhibit J-3            Form of U.S. Tax Compliance Certificate (Foreign Participants;
                       partnerships)
Exhibit J-4            Form of U.S. Tax Compliance Certificate (Foreign Lenders; partnerships)

Schedule 1.1(a)        Material Contracts
Schedule 1.1(b)        Related Agreements
Schedule 7.05          Litigation
Schedule 7.06          Environmental Matters
Schedule 7.07          Defaults Under Material Contracts
Schedule 7.14          Subsidiaries
Schedule 7.15          Location of Businesses and Offices
Schedule 7.18          Gas Imbalances
Schedule 7.19          Marketing Agreements
Schedule 7.20          Swap Agreements
Schedule 9.05          Investments

## CREDIT AGREEMENT

**THIS CREDIT AGREEMENT** dated as of September 17, 2018, is among MDC ENERGY LLC, a Delaware limited liability company (the "Borrower"); each of the Lenders from time to time party hereto; and NATIXIS, NEW YORK BRANCH, as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent") and as Issuing Bank (as defined below).

## RECITALS

A.    The Borrower has requested that the Lenders provide certain loans to and extensions of credit on behalf of the Borrower.

B.    The Lenders have agreed to make such loans and extensions of credit subject to the terms and conditions of this Agreement.

C.    In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    **Terms Defined Above**.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02    **Certain Defined Terms**.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Account Control Agreement" means a control agreement, in form and substance reasonably satisfactory to the Administrative Agent, which grants the Administrative Agent "control" as defined in the Uniform Commercial Code in effect in the applicable jurisdiction over any Deposit Account, Securities Account or Commodities Account maintained by any Credit Party, in each case, among the Administrative Agent, the applicable Credit Party and the applicable financial institution at which such Deposit Account, Securities Account or Commodities Account is maintained.

"Accounting Changes" means, with respect to any Person, changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion of the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successor thereto or any agency with similar functions).

"Acquisition" means the purchase by any Credit Party of any Oil and Gas Properties or other Properties, business, division or enterprise, including the purchase of

associated assets or operations or any Equity Interests of a Person; provided that, a merger or consolidation solely among Credit Parties shall not constitute an Acquisition.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the LIBO Rate for such Interest Period multiplied by the Statutory Reserve Rate.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Loans" has the meaning assigned to such term in Section 5.06.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agents" means, collectively, the Administrative Agent and any syndication agent or any documentation agent appointed hereunder from time to time; and "Agent" means any of them individually, as the context requires.

"Aggregate Maximum Credit Amounts" at any time shall equal the sum of the Maximum Credit Amounts, as the same may be reduced or terminated pursuant to Section 2.06. The initial Aggregate Maximum Credit Amounts of the Lenders on the Effective Date is $300,000,000.

"Agreement" means this Credit Agreement, as the same may from time to time be amended, modified, supplemented or restated.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, provided that, for the purpose of this definition, the Adjusted LIBO Rate for any day shall be based on the LIBO Screen Rate (or if the LIBO Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate, respectively.  If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 3.03 hereof, then the Alternate Base Rate shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above.

"Annualized Consolidated EBITDAX" means, for the purposes of calculating the financial ratios set forth in Section 9.01(a) and Section 9.01(c) for each Fiscal Quarter ending on or prior to June 30, 2019, the sum of (a) (i) Consolidated EBITDAX for such Fiscal Quarter (without giving effect to the amount of any Specified EBITDAX Equity Contribution that is deemed to be Consolidated EBITDAX for any fiscal quarter included in such Fiscal Quarter pursuant to Section 10.03) multiplied by (ii) four, plus (b) the amount of any Specified

2

EBITDAX Equity Contribution that is deemed to be Consolidated EBITDAX for such Fiscal Quarter pursuant to <u>Section 10.03</u>.

"<u>Anti-Corruption Laws</u>" means all state or federal laws, rules, and regulations applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption, including, without limitation, the FCPA.

"<u>Anti-Money Laundering Laws</u>" shall mean the applicable financial recordkeeping and reporting requirements, including the money laundering statutes of any jurisdiction applicable to the Borrower or its Subsidiaries, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency from time to time (including, without limitation, all applicable laws, rules, and regulations relating to terrorist financing or money laundering, including the U.S. Money Laundering Control Act of 1986 (<u>i.e.</u>, 18 U.S.C. 1956-67), and the U.S. Bank Secrecy Act, as amended by the USA PATRIOT Act).

"<u>Applicable Margin</u>" means, for any day, with respect to any ABR Loan or Eurodollar Loan, or with respect to the Commitment Fee Rate, as the case may be, the rate per annum set forth in the Borrowing Base Utilization Grid below based upon the Borrowing Base Utilization Percentage then in effect:

| Borrowing Base Utilization Grid | | | | | |
|---|---|---|---|---|---|
| Borrowing Base Utilization Percentage | <25% | ≥25% but <50% | ≥50% but <75% | ≥75% but <90% | ≥90% |
| Eurodollar Loans | 2.50% | 2.75% | 3.00% | 3.25% | 3.50% |
| ABR Loans | 1.50% | 1.75% | 2.00% | 2.25% | 2.50% |
| Commitment Fee Rate | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% |

The Applicable Margin shall change on any Business Day on which the Borrowing Base Utilization Percentage changes and, as a result of such change, the Applicable Margin would be determined by reference to a different column in the table above.  Each change in the Applicable Margin shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change, *provided*, however, that if at any time the Borrower fails to deliver a Reserve Report pursuant to <u>Section 8.12(a)</u>, then the "<u>Applicable Margin</u>" means the rate per annum set forth on the grid when the Borrowing Base Utilization Percentage is at its highest level until such Reserve Report is delivered.

"<u>Applicable Percentage</u>" means, with respect to any Lender, the percentage of the Aggregate Maximum Credit Amounts represented by such Lender's Maximum Credit Amount as such percentage is set forth on <u>Annex I</u> or, if such Lender has entered into any Assignment and Assumption, the percentage of the Aggregate Maximum Credit Amount represented by such Lender's Maximum Credit Amount as set forth in the Assignment and Assumption; *provided* that if the Commitments have terminated or expired, each Lender's Applicable Percentage shall be determined based upon the Commitments most recently in effect.

3

"Approved Counterparty" means any Lender or any Affiliate of a Lender.

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" means (i) Netherland, Sewell & Associates, Inc., (ii) Cawley, Gillespie & Associates, Inc., and (iii) any other independent petroleum engineers reasonably acceptable to the Administrative Agent.

"Arrangers" means Natixis, New York Branch and BMO Capital Markets Corp. in their capacity together as joint lead arrangers hereunder.

"ASC" means the Financial Accounting Standards Board Accounting Standards Codification, as in effect from time to time.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, substantially in the form of Exhibit I or any other form approved by the Administrative Agent.

"Auditors" means Weaver LLP or such other independent certified public accountants of recognized national standing selected by the Borrower and reasonably satisfactory to the Administrative Agent.

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, chief operating officer, president, chief financial officer, executive vice president or treasurer, or otherwise designated as an authorized person, in each case, whose signatures and incumbency have been certified in a certificate delivered to Administrative Agent.

"Auto-Renewal Letter of Credit" has the meaning assigned to such term in Section 2.08(c)(ii).

"Availability Period" means the period from and including the Effective Date to but excluding the Termination Date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Products" means any of the following bank services: (a) commercial credit cards, (b) stored value cards, and (c) treasury management services (including controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Bank Products Provider" means any Lender or Affiliate of a Lender that provides Bank Products to the Borrower or any other Credit Party.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Base" means at any time an amount equal to the amount determined in accordance with Section 2.07, as the same may be adjusted from time to time pursuant to Section 2.07(e) or Section 8.13(c).

"Borrowing Base Deficiency" means, at the time in question, the amount (if any) by which the total Revolving Credit Exposures exceed the Borrowing Base then in effect.

"Borrowing Base Properties" means the Proved Oil and Gas Properties of the Borrower and its and the other Credit Parties included in the most recently delivered Reserve Report.

"Borrowing Base Property Disposition" means (a) the sale, assignment, farm-out, conveyance, transfer or other disposition (including pursuant to a Casualty Event or like-kind exchange) of any Borrowing Base Properties and (b) the sale, assignment, or other transfer of Equity Interests in any Subsidiary that owns any such Borrowing Base Property or any interest in Hydrocarbons produced or to be produced therefrom, provided that no such sale, assignment, farm-out, conveyance or other transfer from the Borrower or any other Credit Party to the Borrower or any other Credit Party, and no grant of a Lien to any Person, shall constitute a Borrowing Base Property Disposition.

"Borrowing Base Property Value" means the portion of the total Borrowing Base that the Administrative Agent allocates to all Borrowing Base Properties disposed of pursuant to

any Borrowing Base Property Disposition (which amount shall be approved by the Required Lenders).

"Borrowing Base Utilization Percentage" means, as of any day, the fraction expressed as a percentage, the numerator of which is the sum of the Revolving Credit Exposures of the Lenders on such day, and the denominator of which is the Borrowing Base in effect on such day.

"Borrowing Request" means a written request by the Borrower for a Borrowing in accordance with Section 2.03(a).

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or the State of Texas are authorized or required by law to remain closed; and if such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, or the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment, prepayment, conversion or Interest Period, any day which is also a day on which banks are open for dealings in Dollar deposits in the London interbank market.

"Buyout Letter" means the RBL Buyout Rights Letter Agreement dated on or about the Effective Date between Riverstone Credit Management and the Administrative Agent, as in effect on the Effective Date.

"Capital Lease" means, as applied to any Person, any lease of (or other arrangement conveying the right to use) any property (whether real, personal or mixed) by that Person as lessee (or the equivalent) that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"Cash" means money, currency or a credit balance in any demand or deposit account.

"Cash Equivalents" means, as at any date of determination:

(a)     marketable securities (1) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government, or (2) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date;

(b)     marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's;

(c)     commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's;

(d)    certificates of deposit, bank deposit products or bankers' acceptances maturing within one year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (1) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator), and (2) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and

(e)    shares of any money market mutual fund that (1) has at least ninety five percent (95%) of its assets invested continuously in the types of investments referred to in clauses (a) and (b) above, (2) has net assets of not less than $500,000,000, and (3) has the highest rating obtainable from either S&P or Moody's.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or any of its Subsidiaries.

"Change in Control" means any of the following:

(a) the termination of employment, death, incapacitation or substantial removal of the Key Individual from the daily operations of the Borrower and such Key Individual is not replaced with an individual reasonably acceptable to the Administrative Agent (acting on the instructions of the Majority Lenders) who has comparable qualifications within ninety (90) days after such termination of employment, death, incapacitation or substantial removal,

(b) Mark Siffin ceases to own, directly or indirectly, more than 50% of the voting securities (including, without limitation, the Equity Interests) of the Borrower and Control the Borrower,

(c) the Borrower ceases to directly or indirectly own 100% of the Equity Interests in any Subsidiary other than as a result of a transaction permitted by this Agreement, or

(d) the occupation at any time of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were not (i) nominated or appointed by the board of directors of the Borrower or (ii) appointed by directors so nominated.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation, implementation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 5.01(b), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; *provided,* however, for the purposes of this Agreement, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, guidelines or directives in connection therewith or promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or the United States or foreign regulatory authorities, in each case, pursuant to Basel III, are deemed to have gone into effect and to have been adopted after the date of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute, and the regulations promulgated thereunder.

"Collateral" means all Property which is subject to a Lien under one or more Security Instruments.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans and to acquire participations in Letters of Credit hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be (a) modified from time to time pursuant to Section 2.06 and (b) modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04(b). The amount representing each Lender's Commitment shall at any time be the lesser of (i) such Lender's Maximum Credit Amount and (ii) such Lender's Applicable Percentage of the then effective Borrowing Base.

"Commitment Fee Rate" has the meaning set forth in the definition of "Applicable Margin".

"Commodities Account" shall have the meaning set forth in Article 9 of the UCC.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute, and any regulations promulgated thereunder.

"Compliance Certificate" means a certificate of a Financial Officer in substantially the form of Exhibit D hereto (a) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (b) setting forth reasonably detailed calculations demonstrating compliance with Section 9.01 and (c) stating whether any change in the application of GAAP to the Borrower's financial statements has occurred since the date of the most recent financial statements previously delivered in connection with this Agreement, and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

"Consolidated EBITDAX" means with respect to the Borrower and its Consolidated Subsidiaries, for any period, (a) the sum of Consolidated Net Income for such period plus the following expenses or charges to the extent deducted in calculating such Consolidated Net Income in such period: (i) interest expense, (ii) income taxes, (iii) depreciation, (iv) depletion, (v) amortization, (vi) exploration expenses, including plugging and abandonment expenses, (vii) the actual transaction costs, expenses, fees and charges incurred with respect to any Material Acquisition (including legal fees, title and environmental due diligence costs, transition overhead, pre-close overhead paid to the seller as a purchase price adjustment, and new software implementation costs) in an aggregate amount not to exceed $5,000,000 for any Rolling Period (or in the case of a Fiscal Quarter for purposes of calculating Annualized Consolidated EBITDAX, $1,250,000), (viii) losses from dispositions of Properties (other than Hydrocarbons produced in the ordinary course of business), and (ix) all other noncash charges, minus (b) all gains from dispositions of Properties (other than Hydrocarbons produced in the ordinary course

of business) and all noncash income added to Consolidated Net Income in such period. For the purposes of calculating Consolidated EBITDAX for any Rolling Period (or, with respect to any Fiscal Quarter for purposes of calculating Annualized Consolidated EBITDAX) for any determination of the financial ratios contained in Section 9.01(a) or Section 9.01(c), if at any time during such period the Borrower or any Consolidated Subsidiary shall have made (1) any permitted Material Disposition, Consolidated Net Income and Consolidated EBITDAX for such period shall be calculated after giving pro forma effect thereto as if such Material Disposition had occurred on the first day of such period or (2) any permitted Material Acquisition, Consolidated Net Income and Consolidated EBITDAX for such period may, at the Borrower's discretion, be calculated after giving pro forma effect thereto as if such Material Acquisition had occurred on the first day of such period; *provided* that if such Material Acquisition would have a negative impact on the calculation of Consolidated Net Income or Consolidated EBITDAX hereunder, then Consolidated Net Income and Consolidated EBITDAX for such period shall be calculated after giving pro forma effect thereto as if such Material Acquisition had occurred on the first day of such period; *provided further* that the calculations of such pro forma adjustments are acceptable to the Administrative Agent in its reasonable discretion.

"Consolidated Interest Charges" means, with respect to the Borrower and its Consolidated Subsidiaries, for any period, total interest expense of the Borrower and its Consolidated Subsidiaries and without duplication, accrued in that period as shown in the profit and loss statement for that period, determined in accordance with GAAP, including fees payable pursuant to Section 3.05, other fees under the Loan Documents, charges in respect of Letters of Credit and the portion of any obligations under any Capital Lease allocable to interest expense, but excluding (i) amortization, expensing or write-off of financing costs or debt discount or expense, (ii) amortization, expensing or write-off of capitalized transaction costs, to the extent such costs are treated as interest under GAAP, and (iii) the portion of the upfront costs and expenses for Swap Agreements (to the extent included in interest expense) fairly allocated to such Swap Agreements as expenses for such period, less interest income on Swap Agreements for that period and Swap Agreements payments received.

"Consolidated Interest Coverage Ratio" means, as of the last day of any Fiscal Quarter, the ratio of (i) Consolidated EBITDAX for the Rolling Period ending on such date (or, in the case of any Fiscal Quarter ending on or before June 30, 2019, Annualized Consolidated EBITDAX) to (ii) Consolidated Interest Charges for such Rolling Period.

"Consolidated Net Income" means with respect to the Borrower and its Consolidated Subsidiaries, for any period, the net income (or loss) of the Borrower and its Consolidated Subsidiaries after allowances for taxes for such period determined on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded from such net income (to the extent otherwise included therein) the following: (a) the net income of any Person in which the Borrower or any Consolidated Subsidiary has an interest (which interest does not cause the net income of such other Person to be consolidated with the net income of the Borrower and the Consolidated Subsidiaries in accordance with GAAP), except to the extent of the amount of dividends or distributions actually paid in Cash during such period by such other Person to the Borrower or to a Consolidated Subsidiary, as the case may be; (b) the net income (but not loss) during such period of any Consolidated Subsidiary to the extent that the declaration or payment of dividends or similar distributions or transfers or loans by that Consolidated

Subsidiary is not at the time permitted by operation of the terms of its charter or any agreement, instrument or Governmental Requirement applicable to such Consolidated Subsidiary or is otherwise restricted or prohibited, in each case determined in accordance with GAAP; (c) the net income (or loss) of any Person acquired in a pooling-of-interests transaction for any period prior to the date of such transaction; (d) any extraordinary gains or losses during such period; and (e) any gains or losses attributable to writeups or writedowns of assets, including ceiling test and other impairment writedowns.

"Consolidated Subsidiaries" means each Subsidiary of the Borrower (whether now existing or hereafter created or acquired) the financial statements of which shall be (or should have been) consolidated with the financial statements of the Borrower in accordance with GAAP.

"Consolidated Total Debt" means, at any date of determination, all Debt of the Borrower and the Consolidated Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"Consolidated Total Leverage Ratio" means, (a) with respect to Section 9.01(a), as of the last day of any Fiscal Quarter, the ratio of (i) Consolidated Total Debt as of such date to (ii) Consolidated EBITDAX for the Rolling Period ending on such date (or, in the case of any Fiscal Quarter ending on or before June 30, 2019, Annualized Consolidated EBITDAX), and (b) with respect to any calculation thereof for other purposes hereunder, the ratio of (i) Consolidated Total Debt as of such date to (ii) Consolidated EBITDAX for the most recently ended Rolling Period for which financial statements are available (or Annualized Consolidated EBITDAX if the most recent Fiscal Quarter for which financial statements are available is a Fiscal Quarter ending on or before June 30, 2019).

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.    "Controlling" and "Controlled" have correlative meanings thereto.

"Credit Parties" means, collectively, the Borrower and each Guarantor, and "Credit Party" means any one of the foregoing.

"Cure Period" has the meaning assigned to such term in Section 10.03.

"Debt" means, for any Person, the sum of the following (without duplication):

(a)    all obligations of such Person for borrowed money or evidenced by bankers' acceptances, debentures, notes, bonds or other similar instruments;

(b)    all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments;

(c)    obligations of such Person with respect to Disqualified Capital Stock;

(d)    obligations of such Person under Capital Leases or Synthetic Leases;

(e)       all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services;

(f)       Debt (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Debt is assumed by such Person;

(g)       the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment;

(h)       Debt (as defined in the other clauses of this definition) of others guaranteed by such Person or in respect of which such Person otherwise assures a creditor against loss of the Debt (howsoever such assurance shall be made (including by means of obligations to pay for goods or services even if such goods or services are not actually taken, received or utilized by such Person)) to the extent of the lesser of the amount of such Debt and the maximum stated amount of such guarantee or assurance against loss; and

(i)       Debt (as defined in the other clauses of this definition) of a partnership or any other entity for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement, but only to the extent of such liability;

*provided*, *however*, that "Debt" does not include (i) obligations with respect to surety or performance bonds and similar instruments entered into in the ordinary course of business in connection with the operation of Oil and Gas Properties or with respect to appeal bonds, (ii) accounts payable and accrued expenses, liabilities or other obligations to pay the deferred purchase price of Property or services, from time to time incurred in the ordinary course of business which are not greater than ninety (90) days past the date of invoice or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, or (iii) endorsements of negotiable instruments for deposit or collection.  The Debt of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) fund any portion of its participations in Letters of Credit or (iii) pay over to any Credit Party any other amount required to be paid by it hereunder; (b) has notified the Borrower or any Credit Party in writing, or has made a public statement, to the effect that it does not intend or expect to

comply with any of its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit; (c) has failed, within three (3) Business Days after request by the Administrative Agent or a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations to fund prospective Loans and participations in then outstanding Letters of Credit under this Agreement; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent; or (d) has (or whose bank holding company has) been placed into receivership, conservatorship, bankruptcy or become the subject of a Bail-In Action; *provided* that a Lender shall not become a Defaulting Lender solely as a result of the acquisition or maintenance of an ownership interest in such Lender or Person controlling such Lender or the exercise of control over a Lender or Person controlling such Lender by a Governmental Authority or an instrumentality thereof (including the appointment of any administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Lender (or its bank holding company) under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation)), so long as, in any such case, such actions or facts do not result in or provide such Lender or Person controlling such Lender (including any Governmental Authority) with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Deposit Account" shall have the meaning set forth in Article 9 of the UCC.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Debt of the type described in clause (a) of the definition thereof or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part (but if in part only with respect to such amount that meets the criteria set forth in this definition), on or prior to the date that is one year after the earlier of (a) the Maturity Date and (b) the date on which there are no Loans, LC Exposure or other obligations hereunder outstanding and all of the Commitments are terminated.

"Dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 6.01 are satisfied (or waived in accordance with Section 12.02).

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates.

"Engineering Reports" has the meaning assigned to such term in Section 2.07(c)(i).

"Environmental Claim" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to health, safety the environment or the preservation or reclamation of natural resources, in effect in any and all jurisdictions in which the Borrower is conducting or at any time has conducted business, or where any Property of the Borrower is located, including without limitation, the Oil Pollution Act of 1990 ("OPA"), as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other environmental conservation or protection Governmental Requirements.    The term "oil" shall have the meaning specified in OPA, the terms "hazardous substance" and "release" (or "threatened release") shall have the meanings specified in CERCLA, the terms "solid waste" and "disposal" (or "disposed") shall have the meanings specified in RCRA and the term "oil and gas waste" shall have the meaning specified in Section 91.1011 of the Texas Natural Resources Code ("Section 91.1011"); provided, however, that (a) in the event either OPA, CERCLA, RCRA or Section 91.1011 is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment and (b) to the extent the laws of the state or other jurisdiction in which any Property of any Credit Party is located establish a meaning for "oil," "hazardous substance," "release," "solid waste," "disposal"

13

or "oil and gas waste" which is broader than that specified in either OPA, CERCLA, RCRA or Section 91.1011, such broader meaning shall apply.

"Environmental Permit" means any permit, registration, license, approval, consent, exemption, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto, in each case together with the regulations thereunder.

"ERISA Affiliate" means, as applied to any Person each trade or business (whether or not incorporated) that together with such Person would be treated as a single employer under Section 4001(b)(1) of ERISA or Section 414 of the Code.  Any former ERISA Affiliate of the Borrower or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of the Borrower or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Borrower or such Subsidiary and with respect to liabilities arising after such period for which the Borrower or such Subsidiary could be liable under the Code or ERISA.

"ERISA Event" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Code or Section 302 of ERISA with respect to any Pension Plan (determined without regard to any waiver of the funding provisions therein or in Section 303 of ERISA or Section 430 of the Code) or the failure to make by its due date a required installment under Section 430 of the Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the filing of a notice of intent to terminate a Pension Plan, the treatment of an amendment to a Pension Plan as a termination under Section 4041 of ERISA, or the incurrence by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan; (d) the withdrawal by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more non-related contributing sponsors or the termination of any such Pension Plan resulting in liability to the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (e) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might reasonably constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (f) the imposition of liability on the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal of the Borrower, any of its Subsidiaries or any of their respective ERISA

14

Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any liability or potential liability therefor, or the receipt by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in insolvency pursuant to Section 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (h) the occurrence of an act or omission which could reasonably be expected to give rise to the imposition on the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, Taxes or related charges under Chapter 43 of the Code or under Section 409, Section 502(c), (l) or (m), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (i) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan or the assets thereof, or against the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (j) receipt from the IRS of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; or (k) the imposition of a Lien pursuant to Section 430(k) or 436(f) of the Code or pursuant to ERISA with respect to any Pension Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to the fact that such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate (other than an ABR Loan or ABR Borrowing bearing interest by reference to the Adjusted LIBO Rate by virtue of clause (c) of the definition of Alternate Base Rate).

"Event of Default" has the meaning assigned to such term in Section 10.01.

"Excepted Liens" means:

(a)    Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(b)    Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(c)    subject to Section 8.19, landlords', operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens, in each case, arising in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties, each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with

GAAP; *provided* that any such Lien referred to in this clause (c) that is not a statutory Lien arising by operation of law does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Subsidiary or materially impair the value of the Property subject thereto;

(d)    Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; *provided* that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by such Credit Party or materially impair the value of the Property subject thereto;

(e)    Liens arising solely by virtue of any statutory or common law provision related to banker's liens, rights of set-off or similar rights and remedies arising in the ordinary course of business and burdening only deposit accounts or other funds maintained with a creditor depository institution; *provided* that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by the Borrower or any of its Subsidiaries to provide collateral to the depository institution;

(f)    (i) easements, restrictions, servitudes, permits, conditions, covenants, exceptions, reservations, zoning and land use requirements or restrictions in any Property of the Borrower or any Subsidiary for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure any Debt and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by any Credit Party or materially impair the value of such Property subject thereto, and (ii) Immaterial Title Deficiencies;

(g)    Liens on Cash or securities pledged to secure (either directly or indirectly by securing letters of credit that in turn secure) performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations, obligations in respect of workers' compensation, unemployment insurance or other forms of governmental benefits or insurance and other obligations of a like nature incurred in the ordinary course of business;

(h)    judgment and attachment Liens not giving rise to an Event of Default under Section 10.01(k);

(i)    Liens in favor of depository banks arising under documentation governing deposit accounts which Liens secure the payment of returned items, settlement item amounts, customary bank fees for maintaining deposit accounts and other related services, and similar items and fees;

(j)    zoning or other restrictions that do not secure any Debt and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or any Subsidiary or materially impair the value of such Property subject thereto;

(k)    title and ownership interests of lessors (including sub-lessors, but excluding any lessors under Capital Leases) of Property leased by such lessors to the Borrower or to any Subsidiary, Liens and encumbrances encumbering such lessors' titles and interests in such property and to which Borrower's or such Subsidiary's leasehold interests may be subject or subordinate, in each case whether or not evidenced by Uniform Commercial Code financing statement filings or other documents of record, provided that such Liens do not secure Debt of the Borrower or of any Subsidiary and do not encumber Property of any Borrower or any Subsidiary other than the Property that is the subject of such leases and items located thereon; *provided*, *further*, that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes of which such Property is held by the Borrower or any Subsidiary or materially impair the value of such Property subject thereto;

(l)    Liens of licensors of software and other intangible Property licensed by such licensors to the Borrower and/or to any Subsidiary, including restrictions and prohibitions on encumbrances and transferability with respect to such Property and the Borrower's and/or such Subsidiary's interests therein imposed by such licenses, and Liens encumbering such licensors' titles and interests in such Property and to which the Borrower's or such Subsidiary's license interests may be subject or subordinate, in each case, whether or not evidenced by Uniform Commercial Code financing statement filings or other documents of record, provided that such Liens do not encumber Property of the Borrower or of any Subsidiary other than the software and other intangible Property that is the subject of such licenses; and

(m)    Liens pursuant to merger agreements, stock purchase agreements, asset sale agreements and similar agreements (1) limiting the transfer of the subject properties and assets (and solely such subject properties and assets) pending consummation of the subject transaction and that are discharged following the consummation of such subject transaction or the termination thereof, or (2) solely in respect of Cash earnest money deposits, good faith Cash deposits, purchase price adjustment Cash escrows and similar Cash deposits and Cash escrow arrangements made or established thereunder and that are discharged following the termination thereof;

*provided*, that (i) no intention to subordinate the first priority Lien granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of such Excepted Liens and (ii) the term "Excepted Liens" shall not include any Lien securing Debt for borrowed money other than the Indebtedness.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Accounts" has the meaning assigned to such term in the Security Agreement.

"Excluded Swap Obligations" means, with respect to any Credit Party individually determined on a Credit Party by Credit Party basis, any Indebtedness in respect of any Swap Agreement or any other "swap", as defined in section 1(a)(47) of the Commodity Exchange Act if, and solely to the extent that, all or a portion of the guarantee by such Credit Party of, or the grant by such Credit Party of a security interest to secure, such Indebtedness (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Credit Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guarantee or grant of a security interest becomes effective with respect to such Indebtedness. If any Indebtedness in respect of any Swap Agreement arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Indebtedness in respect of any Swap Agreement that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or the Issuing Bank, (a) Taxes imposed on (or measured by) by net income (however denominated), franchise Taxes or branch profits Taxes, in each case, (i) imposed as a result of such recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 5.05), any withholding Tax that is imposed on amounts payable to such Foreign Lender pursuant to a law in effect at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure or inability to comply with Section 5.03(f), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax pursuant to Section 5.03(a) or Section 5.03(c), (c) any U.S. Federal withholding Taxes imposed by FATCA and (d) Taxes attributable to such recipient's failure to comply with Section 5.03(g).

"Existing NPA" means the Note Purchase Agreement dated as of June 26, 2017 among the Borrower, the "Holders" party thereto from time to time, and The Bank of New York Mellon, as administrative agent, as amended, restated, supplemented or otherwise modified and in effect immediately before the Effective Date.

"Facility" means any real property (including all buildings, fixtures or other improvements located thereon but excluding the Oil and Gas Properties) now, hereafter or heretofore owned, leased, operated or used by the Borrower or any of its Subsidiaries.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the

Code, any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code and any fiscal or regulatory legislation, rules or official administrative practices adopted pursuant to such intergovernmental agreement.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letters" means those certain letter agreements entered into from time to time between the Borrower, the Administrative Agent or any Arranger.

"Financial Officer" means, for any Person, the chief financial officer, principal accounting officer, treasurer, or controller of such Person.  Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"Financial Officer Certification" means, with respect to the Financial Statements for which such certification is required, the certification of a Financial Officer of the Borrower that such Financial Statements fairly present, in all material respects, the financial condition of the Borrower and its Consolidated Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, in each case in conformity with GAAP applied on a consistent basis, subject, in the case of interim financial statements, to changes resulting from normal audit and year-end adjustments.

"Financial Statements" means, for any Person, a balance sheet and statements of operations, members' equity and cash flows (with all consolidated Financial Statements prepared in accordance with GAAP, subject, where appropriate, to normal year-end adjustments and the absence of footnotes).

"Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

"Fiscal Year" means the fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"Flood Insurance Regulations" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC § 4001, et seq.), as the same may be amended or recodified from time to time, (d) the Flood Insurance Reform Act of 2004 and (e) any regulations promulgated under any of the foregoing.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located.  For purposes of this definition, the

United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to the Issuing Bank, such Defaulting Lender's LC Exposure other than LC Exposure as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or cash collateralized in accordance with the terms hereof.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time, subject to the terms and conditions set forth in Section 1.05.

"Governmental Authority" means the government of the United States of America, any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof, central bank, or any entity or officer exercising executive, legislative, judicial, regulatory, taxing, or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government

"Governmental Requirement" means, at any time, any law, treaty, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement (whether or not having the force of law), whether now or hereafter in effect, including, without limitation, Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"Guarantors" means each Subsidiary and other Person that guarantees the Indebtedness pursuant to Section 8.14(b) or otherwise.

"Guaranty Agreement" means an agreement executed by the Guarantors in substantially the form of Exhibit F (or otherwise in form and substance satisfactory to the Administrative Agent) unconditionally guarantying on a joint and several basis, payment of the Indebtedness, as the same may be amended, modified, supplemented or restated from time to time.

"Hazardous Material" means any substance regulated by or as to which liability might arise under any applicable Environmental Law and including, without limitation: (a) any chemical, compound, material, product, byproduct, effluent, emission, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; (b) petroleum hydrocarbons, petroleum products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any components, fractions, or derivatives thereof; (c) explosives, radioactive materials, asbestos containing materials, polychlorinated biphenyls, radon, mold, silica or any silicates and (d) any material which shall be

removed from any Property pursuant to any Environmental Law or Environmental Permit or in order to place any Property in a condition that is suitable for ordinary use.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Hydrocarbon Interests" means all rights, options, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.  Unless otherwise expressly provided herein, all references in this Agreement to "Hydrocarbon Interests" refer to Hydrocarbon Interests owned at the time in question by the Borrower and its Subsidiaries.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Immaterial Title Deficiencies" means minor defects or deficiencies in title which do not diminish by more than 2% the total value of the Proved Oil and Gas Properties evaluated in the Reserve Report used in the most recent determination of the Borrowing Base.

"Indebtedness" means any and all amounts owing or to be owing (including fees, reimbursements, indemnifications and other amounts) by the Borrower or any Subsidiary (whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising):  (a) to any Agent, the Issuing Bank or any Lender under any Loan Document, including LC Exposure and all principal and interest on any of the Loans (including any interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of any Credit Party (or could accrue but for the operation of applicable Debtor Relief Laws), whether or not such interest is allowed or allowable as a claim in any such case, proceeding or other action); (b) to any Secured Swap Provider under any Swap Agreement including any Swap Agreement in existence prior to the date hereof, but excluding any additional transactions or confirmations entered into (A) after such Secured Swap Provider ceases to be a Lender or an Affiliate of a Lender or (B) after assignment of such transactions or confirmations by a Secured Swap Provider to another Person that is not a Lender or an Affiliate of a Lender; (c) to any Bank Products Provider in respect of Bank Products; and (d) all renewals, increases, extensions and/or rearrangements of any of the above; *provided* that solely with respect to any Credit Party that is not an "eligible contract participant" under the Commodity Exchange Act, Excluded Swap Obligations of such Credit Party shall in any event be excluded from "Indebtedness" owing by such Credit Party.

"Indemnified Taxes" means (a) Taxes imposed on or with respect to any payment made by or on account of any obligation of the Borrower or any Guarantor under any Loan

Document other than Excluded Taxes and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 12.03(b).

"Information" shall have the meaning assigned to such term in Section 12.11.

"Initial Financial Statements" means (i) the unaudited Financial Statements of the Borrower and its Consolidated Subsidiaries as of December 31, 2017, (ii) the unaudited Financial Statements of the Borrower and its Consolidated Subsidiaries as of March 31, 2018, and (iii) the unaudited *pro forma* balance sheet of the Borrower and its Consolidated Subsidiaries as of the Effective Date (giving effect to the Transactions).

"Initial Reserve Report" means, collectively, the reserve reports and other reserve engineering information provided by the Borrower to the Administrative Agent and the Lenders prior to the Effective Date and utilized by the Administrative Agent and the Lenders in determining the initial Borrowing Base hereunder.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last Business Day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender, twelve months) thereafter, as the Borrower may elect; *provided*, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Redetermination" has the meaning assigned such term in Section 2.07(b).

"Interim Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to an Interim Redetermination becomes effective as provided in Section 2.07(d).

"Interpolated Rate" means, at any time, for any Interest Period, the rate *per annum* (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate (for the longest period for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period; and (b) the LIBO Screen Rate (for the shortest period for which that LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"Investment" means, for any Person:  (a) the acquisition (whether for Cash, Property, services or securities or otherwise) of Equity Interests of any other Person or any agreement to make any such acquisition (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale) or any contribution of capital to such Person; (b) the making of any deposit with, or advance or loan to, assumption of Debt of, purchase or other acquisition of any other Debt of, or other extension of credit to, any other Person (including any such transaction in the form of the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person); (c) the purchase or acquisition (in one or a series of transactions) of Property (other than Equity Interests) of another Person that constitutes a business unit; or (d) the entering into of any guarantee of, or other surety obligation with respect to, any Debt of any other Person; *provided*, in each case that accounts receivable and extensions of credit (including extensions of credit to joint working interest owners) arising in the ordinary course of business do not constitute Investments.

"IRS" means the United States Internal Revenue Service.

"Issuing Bank" means Natixis, New York Branch, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.08(i). The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"Key Individual" means Mark Siffin, and any individual acceptable to the Administrative Agent and the Majority Lenders that has replaced the foregoing Person (or such replacement Key Individual) in a comparable executive or officer position.

"LC Commitment" means $10,000,000.

"LC Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lenders" means the Persons listed on Annex I and any Person that shall have become a party hereto pursuant to an Assignment and Assumption, in each case, unless and until any such Person ceases to be a party hereto pursuant to an Assignment and Assumption.

"Letter of Credit" means any letter of credit issued pursuant to this Agreement.

"Letter of Credit Agreements" means all letter of credit applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower, or entered into by the Borrower, with the Issuing Bank relating to any Letter of Credit.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the LIBO Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that if the LIBO Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") then the LIBO Rate shall be the Interpolated Rate; provided, further, that if neither of the foregoing rates is available, the LIBO Rate shall be the average of the rates offered by major banks in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"LIBO Screen Rate" means, for any day and time, with respect to any Eurodollar Borrowing for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for U.S. Dollars for a period equal in length to such Interest Period as displayed on such day and time on the applicable Bloomberg screen or page that displays such rate (or, in the event such rate does not appear on a Bloomberg page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion), provided that if the LIBO Screen Rate shall be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to (a) the lien or security interest arising from a deed of trust, mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes, (b) production payments and the like payable out of Oil and Gas Properties, and (c) to the extent securing such an obligation or claim, any interest in Property in the form of an easement, restriction, servitude, permit, condition, covenant, exception or reservation. For the purposes of this Agreement, the Borrower and its Subsidiaries shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Liquidate" means, with respect to any Swap Agreement in respect of commodities, the sale, assignment, novation, unwind, monetization or early termination of all or any part of such Swap Agreement or the creation of an offsetting position against all or any part

of such Swap Agreement, or the amendment of any such Swap Agreement, including any sale, assignment, or other transfer of Equity Interests in any Subsidiary that is a party to any Swap Agreement to a party that is not the Borrower or a Subsidiary; provided that none of the following shall constitute a Liquidation: (a) any transfer (by novation or otherwise) of a Swap Agreement from the Borrower or any Subsidiary to the Borrower or any Subsidiary, (b) any assignment or novation of a Swap Agreement from the existing counterparty to an Approved Counterparty, with the Borrower or any Subsidiary being the "remaining party" for purposes of such assignment or novation, (c) the termination of a Swap Agreement at the end of its stated term, and (d) any replacement approved by the Administrative Agent, in a substantially contemporaneous transaction, of one or more Swap Agreements of the Borrower or any Subsidiary with one or more Swap Agreements with the Borrower or any Subsidiary covering Hydrocarbons of the type that were hedged pursuant to such replaced Swap Agreement(s) and with notional volumes, prices and tenors not less favorable to the Borrower or the applicable Subsidiary during the period commencing on the first Redetermination Date after the Effective Date and ending on the Maturity Date as those set forth in such replaced Swap Agreement(s) and without Cash payments (other than transaction expenses) to the Borrower or any Subsidiary in connection therewith.   The terms "Liquidating", "Liquidated" and "Liquidation" have a correlative meaning thereto.

"Liquidation Value" means any reduction in the value of the Borrowing Base attributed to any Liquidation of any Swap Agreement, as determined by the Administrative Agent and approved by the Required Lenders.

"Loan Documents" means this Agreement, the Notes, the Letter of Credit Agreements, the Letters of Credit, the Security Instruments, and each Fee Letter, in each case, as the same may be amended, modified, supplemented or restated from time to time.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Majority Lenders" means (a) if there are one or two Lenders at such time, all Lenders, and (b) if there are three or more Lenders at such time, (i) at any time while no Loans or LC Exposure is outstanding, Non-Defaulting Lenders having at least a majority (greater than 50.0%) of the Aggregate Maximum Credit Amounts of all Non-Defaulting Lenders; and (ii) at any time while any Loans or LC Exposure is outstanding, Non-Defaulting Lenders holding at least a majority (greater than 50.0%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit of all Non-Defaulting Lenders (without regard to any sale by a Non-Defaulting Lender of a participation in any Loan under Section 12.04(c)).

"Material Acquisition" means any Acquisition of Property or series of related Acquisitions of Property (including by way of merger or consolidation) that involves the payment of consideration by any Credit Party in excess of $5,000,000.

"Material Adverse Effect" means a material adverse change in, or material adverse effect on (a) the business, operations, Property or condition (financial or otherwise) of the Borrower and its Subsidiaries  taken as a whole, (b) the ability of the Credit Parties to perform their obligations, taken as a whole, under the Loan Documents, (c) the validity or

25

enforceability of any Loan Document or (d) the rights and remedies of, or benefits available to, taken as a whole, the Administrative Agent, any other Agent, the Issuing Bank or any Lender under any Loan Document.

"Material Contract" means, collectively, (a) any contract or agreement listed in Schedule 1.1(a), (b) any contract or agreement requiring payments to be made or providing for payments to be received, in each case in excess of $200,000 individually or, if involving a series of related contracts or agreements, in the aggregate, (c) any other contract or other arrangement to which any Credit Party is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect, (d) the Related Agreements, and (e) any agreement or instrument evidencing or governing Debt, if the sum of the aggregate principal amount outstanding under any such agreement or instrument plus any amounts available to be drawn thereunder exceeds $200,000 (including, for the avoidance of doubt, any Swap Agreement).

"Material Debt" means any Debt of any one or more of the Borrower and its Subsidiaries (other than the Loans and reimbursement obligations in respect of Letters of Credit), or obligations in respect of one or more Swap Agreements of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding the Threshold Amount.  For purposes of determining Material Debt, the "principal amount" of the obligations of the Borrower and any Subsidiary in respect of any Swap Agreement at any time shall be the Swap Termination Value of such Swap Agreement.

"Material Disposition" means any disposition of Property or series of related dispositions of Properties that yields gross proceeds to the Credit Parties in excess of $5,000,000 for any single transaction or series of related transactions, or $10,000,000 in the aggregate in any Fiscal Year.

"Maturity Date" means March 17, 2022.

"Maximum Credit Amount" means, as to each Lender, the amount set forth opposite such Lender's name on Annex I under the caption "Maximum Credit Amounts", as the same may be (a) reduced or terminated from time to time in connection with a reduction or termination of the Aggregate Maximum Credit Amounts pursuant to Section 2.06(b) or (b) modified from time to time pursuant to any assignment permitted by Section 12.04(b).

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgaged Property" means any Property owned by the Borrower or any Guarantor that is subject to the Liens existing and to exist under the terms of any Mortgage.

"Mortgages" means the mortgages and deeds of trust described or referred to in Exhibit E, and any other mortgages or deeds of trust burdening real or immovable property that are now or hereafter executed and delivered by the Borrower or any Subsidiary as security for the payment or performance of the Indebtedness, as such mortgages or deeds of trust may be amended, modified, supplemented or restated from time to time.

"MTE Holdings LLC Agreement" means the Third Amended and Restated Limited Liability Company Agreement of MTE Holdings LLC, dated on or about the Effective Date, by and among Olam Energy Resources I LLC and MTE Partners LLC.

"Multiemployer Plan" means a multiemployer plan as defined in section 3(37) or section 4001(a)(3) of ERISA.

"New Borrowing Base Notice" has the meaning assigned to such term in Section 2.07(d).

"Non-Consenting Lender" means any Lender that does not approve (a) any amendment, waiver or consent of or under any Loan Document that requires the approval of all Lenders or all affected Lenders in accordance with Section 12.02 (other than any Proposed Borrowing Base that would increase the then-current Borrowing Base) and has been approved by the Majority Lenders or (b) any Proposed Borrowing Base that would increase the then-current Borrowing Base that has been approved by (i) if there are one or two Lenders at such time, all Non-Defaulting Lenders, and (ii) if there are three or more Lenders at such time (A) at any time while no Loans or LC Exposure is outstanding, Non-Defaulting Lenders having at least eighty percent (80%) of the Aggregate Maximum Credit Amounts and (B) at any time while any Loans or LC Exposure is outstanding, Non-Defaulting Lenders holding at eighty percent (80%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)).

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Renewal Notice Date" has the meaning assigned to such term in Section 2.08(c)(ii).

"Notes" means the promissory notes of the Borrower described in Section 2.02(d) and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"NYFRB" means the New York Federal Reserve Bank.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for a day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"OFAC" means the Office of Foreign Asset Control of the Department of the Treasury of the United States of America.

27

"Oil and Gas Properties" means: (a) Hydrocarbon Interests; (b) any Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production farmout agreements, farm-in agreements, area of mutual interest agreements, equipment leases and other sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or contracts, the production, sale, purchase, exchange or processing, handling, storage, transporting or marketing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; and (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests, and (g) all Properties, rights, titles, interests and estates described or referred to above, including any all Property, real or personal, now owned or hereinafter acquired, that is affixed to, situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Properties (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.  Unless the context otherwise requires, the term Oil and Gas Properties refers to Oil and Gas Properties of the Credit Parties.

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation, amalgamation, formation or organization, as amended, and its bylaws, as amended, (b) with respect to any limited partnership, its certificate of limited partnership or certificate of formation, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its articles of organization or certificate of formation, as amended, and its operating agreement, as amended.  In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes" means, with respect to any recipient, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

28

"<u>Other Taxes</u>" means any and all present or future stamp, court or documentary, intangible, recording, filing, excise, property or other similar Taxes, charges or levies arising from any payment made hereunder or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and any other Loan Document.

"<u>Overnight Bank Funding Rate</u>" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar Borrowings by U.S.-managed banking offices of depositary institutions (as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time) and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"<u>Parent</u>" means MTE Holdings LLC, a Delaware limited liability company.

"<u>Parent Credit Agreement</u>" means the Term Loan Credit Agreement dated on or about the Effective Date, among the Parent, Riverstone Credit Management, LLC, as administrative agent, and the lenders party thereto from time to time, as in effect on the Effective Date, together with such amendments, restatements, supplements and modifications thereto (or refinancings thereof) that would not cause an Event of Default under <u>Section 10.01(o)</u> or otherwise hereunder.

"<u>Participant</u>" has the meaning set forth in <u>Section 12.04(c)(i)</u>.

"<u>Participant Register</u>" has the meaning set forth in <u>Section 12.04(c)(i)</u>.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"<u>Pension Plan</u>" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA.

"<u>Permitted Lien</u>" means Excepted Liens and any other Liens permitted under <u>Section 9.03</u>.

"<u>Permitted Tax Distributions</u>" means, for any taxable period or portion thereof during which the Borrower is a pass-through entity (including a disregarded entity or partnership) for United States federal income tax purposes, the payment of amounts distributable pursuant to Section 5.4 of the MTE Holdings LLC Agreement as such section is in effect on the Effective Date.

"<u>Person</u>" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"Plan" means any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code and that (a) is currently or hereafter sponsored, maintained or contributed to by the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower or a Subsidiary or an ERISA Affiliate.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by the Wall Street Journal as the U.S. prime rate in effect on such day; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including Cash, securities, accounts and contract rights.

"Proposed Borrowing Base" has the meaning assigned to such term in Section 2.07(c)(i).

"Proposed Borrowing Base Notice" has the meaning assigned to such term in Section 2.07(c)(ii).

"Proved Developed Producing Reserves" or "PDP Reserves" means "proved developed producing oil and gas reserves" as such term is defined by the SPE in its standards and guidelines.

"Proved Oil and Gas Properties" means Oil and Gas Properties to which Proved Reserves are attributed.  References herein to the "total value" of any Proved Oil and Gas Property refer to the present value of the Proved Reserves that are attributed to such Oil and Gas Property in the then most recent Reserve Report.

"Proved Reserves" or "Proved" means collectively, "proved oil and gas reserves," "proved developed producing oil and gas reserves," "proved developed non-producing oil and gas reserves" (consisting of proved developed shut-in oil and gas reserves and proved developed behind pipe oil and gas reserves), and "proved undeveloped oil and gas reserves," as such terms are defined by the SPE in its standards and guidelines.

"Purchase Money Debt" means Debt, the proceeds of which are used to finance the acquisition, construction, or improvement of inventory, equipment or other Property in the ordinary course of business; provided, however, that such Debt is incurred no later than 120 days after such acquisition or the completion of such construction or improvement.

"Qualified ECP Counterparty" means, in respect of any Swap Agreement, each Credit Party that (a) has total assets exceeding $10,000,000 at the time any guarantee of obligations under such Swap Agreement or grant of the relevant security interest to secure such Swap Agreement becomes effective or (b) otherwise constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible

contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Quarterly Redetermination Period" means the period commencing November 1, 2018 and ending May 1, 2019.

"Redemption" means with respect to any Debt, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Debt.  "Redeem" has the correlative meaning thereto.

"Redetermination Date" means, with respect to any Scheduled Redetermination or any Interim Redetermination, the date that the redetermined Borrowing Base related thereto becomes effective pursuant to Section 2.07(d).

"Register" has the meaning assigned to such term in Section 12.04(b)(iv).

"Regulation D" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

"Related Agreements" means collectively, the agreements set forth in Schedule 1.1(b) hereto and each agreement, exhibit, schedule, certificate or document related to the foregoing.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Release" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing.

"Remedial Work" has the meaning assigned to such term in Section 8.10(c).

"Required Lenders" means (a) if there are one or two Lenders at such time, all Lenders, and (b) if there are three or more Lenders at such time, (i) at any time while no Loans or LC Exposure is outstanding, Non-Defaulting Lenders having at least sixty-six and two-thirds percent (66-2/3%) of the Aggregate Maximum Credit Amounts of all Non-Defaulting Lenders; and (ii) at any time while any Loans or LC Exposure is outstanding, Non-Defaulting Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit of all Non-Defaulting Lenders (without regard to any sale by a Non-Defaulting Lender of a participation in any Loan under Section 12.04(c)).

"Reserve Report" means a report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of each December 31st or June 30th (or dated effective as of such later date as agreed by the Administrative Agent pursuant to Section 8.12) (or such other date in the event of an Interim Redetermination), the Proved Reserves attributable to the

Oil and Gas Properties of the Borrower and its Subsidiaries, together with a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date, based upon the pricing assumptions consistent with the Administrative Agent's lending requirements at the time.

"Restricted Payment" means (i) any dividend or other distribution (whether in Cash, securities or other Property) with respect to any Equity Interest in the Borrower or any of its Subsidiaries, or any payment (whether in Cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interest in the Borrower or any of its Subsidiaries, or (ii) any payment of management fees, advisory fees or similar fees by the Borrower or any Subsidiary to any holders of their Equity Interests or any Affiliates thereof.

"Revolving Credit Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans and its LC Exposure at such time.

"Rolling Period" means the period of four (4) consecutive Fiscal Quarters ending on the last day of such applicable Fiscal Quarter.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (as of the Effective Date, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, or by the United Nations Security Council, the European Union or any European Union member state or Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Scheduled Redetermination" has the meaning assigned to such term in Section 2.07(b).

"Scheduled Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to a Scheduled Redetermination becomes effective as provided in Section 2.07(d).

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Secured Parties" means, collectively, the Administrative Agent, the Lenders, the Issuing Bank, the Bank Products Providers and Secured Swap Providers, and "Secured Party" means any of them individually.

"Secured Swap Provider" means any (a) Person that is a party to a Swap Agreement with the Borrower or any of its Subsidiaries that entered into such Swap Agreement (including any Swap Agreement assigned or transferred to such Person (by novation or otherwise)) before or while such Person was a Lender or an Affiliate of a Lender, whether or not such Person at any time ceases to be a Lender or an Affiliate of a Lender, as the case may be, or (b) assignee of any Person described in clause (a) above so long as such assignee is a Lender or an Affiliate of a Lender' provided, that (x) any such Person that ceases to be a Lender or an Affiliate of a Lender shall not be a Secured Swap Provider with respect to any Swap Agreement that it thereafter enters into (or that is assigned or transferred to it) while it is not a Lender or an Affiliate of a Lender, and (y) any Person that assigns a Swap Agreement as contemplated in clause (b) of this definition shall cease to be a Secured Swap Provider with respect to such Swap Agreement to the extent of such assignment.

"Securities Account" shall have the meaning set forth in Article 8 of the UCC.

"Security Agreement" means a Pledge and Security Agreement among the Borrower, the other Credit Parties from time to time party thereto and the Administrative Agent in substantially the form of Exhibit G (or otherwise in form and substance satisfactory to the Administrative Agent) granting Liens and a security interest on the Credit Parties' personal property constituting Collateral (as defined therein) in favor of the Administrative Agent for the benefit of the Secured Parties to secure the Indebtedness, as the same may be amended, modified, supplemented or restated from time to time.

"Security Instruments" means the Mortgages, the Guaranty Agreement, the Security Agreement, Account Control Agreements, UCC financing statements and other agreements, instruments or certificates described or referred to in Exhibit E, and any and all other Mortgages, UCC financing statements, agreements or instruments, now or hereafter executed and delivered by, the Borrower, any Guarantor, or any other Person (other than Swap Agreements or participation or similar agreements between any Lender and any other lender or creditor with respect to any Indebtedness pursuant to this Agreement) to guarantee or provide security for the payment or performance of the Indebtedness, the Notes, this Agreement, or reimbursement obligations under the Letters of Credit, in each case, as such agreements or instruments may be amended, modified, supplemented or restated from time to time.

"Solvent" means, with respect to any Person, that as of the date of determination, both (a) (i) the sum of such Person's and its consolidated Subsidiaries' debt and liabilities (including contingent liabilities), on a consolidated basis, does not exceed the fair saleable value of such Person's and its consolidated Subsidiaries' assets, on a consolidated basis; (ii) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at

maturity or otherwise); (b) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances, and (c) such Person does not have (and does not have reason to believe such Person will have at any time) unreasonably small capital for the conduct of its business.  For purposes of this definition, (A) the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that could reasonably be expected to become an actual or matured liability and (B) the amount of any assets at any time shall be computed as the amount that gives effect to amounts that, in light of all of the facts and circumstances existing at such time, represents the amount that could reasonably be expected to become an asset by reason of indemnity, offset, insurance or any similar arrangement.

"SPE" means the Society of Petroleum Engineers.

"Specified Current Asset Equity Contribution" means any direct or indirect Investment in the Borrower to cure a breach of Section 9.01(b) pursuant to Section 10.03 (and designated in writing at or about the time made as being a Specified Current Asset Equity Contribution) in Cash, which may be in the form of a capital contribution to the Borrower or the purchase of common Equity Interests issued by the Borrower (or other Equity Interests issued by the Borrower and reasonably acceptable to the Administrative Agent, but not Disqualified Capital Stock).

"Specified EBITDAX Equity Contribution" means any direct or indirect Investment in the Borrower to cure a breach of Section 9.01(a) and/or Section 9.01(c) pursuant to Section 10.03 (and designated in writing at or about the time made as being a Specified EBITDAX Equity Contribution) in Cash, which may be in the form of a capital contribution to the Borrower or the purchase of common Equity Interests issued by the Borrower (or other Equity Interests issued by the Borrower and reasonably acceptable to the Administrative Agent, but not Disqualified Capital Stock).

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"subsidiary" means, with respect to any Person (the "parent") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other Person (a) of which Equity Interests representing

34

more than 50% of the equity or more than 50% of the ordinary voting power (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) or, in the case of a partnership, any general partnership interests are, as of such date, owned, controlled or held, or (b) the management decisions of which, as of such date, are otherwise controlled, in each case, directly, indirectly through one or more intermediaries, or both, by the parent.

"Subsidiary" means any subsidiary of the Borrower.

"Swap Agreement" means any transaction (including an agreement with respect thereto) now existing or hereafter entered by any Person which is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or other financial measures and whether exchange traded, "over-the-counter" or otherwise; provided that (a) no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or its Subsidiaries shall be a Swap Agreement, and (b) no transaction or agreement that is intended to be a physical sale or to be physically settled shall be a Swap Agreement. If multiple transactions are entered into under a master agreement, each such transaction that constitutes a Swap Agreement shall be a separate Swap Agreement for the purposes of this Agreement. Notwithstanding the foregoing, solely for purposes of Section 9.16, the term "Swap Agreement" shall be deemed to exclude any purchased put options or floors for Hydrocarbons that are not related to corresponding calls, collars or swaps and with respect to which neither the Borrower nor any Subsidiary has any payment obligation other than premiums and charges the total amount of which are fixed and known at the time such transaction is entered into.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"Synthetic Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Taxes" means any present or future tax, levy, impost, duty, assessment, charge, deduction, withholding or similar charges in the nature of a tax, imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, penalties or additional amounts thereon.

"Termination Date" means the earlier of the Maturity Date and the date of termination in full of the Commitments.

"Threshold Amount" means $5,000,000.

"Transactions" means, with respect to (a) the Borrower, the execution, delivery and performance by the Borrower of this Agreement, each other Loan Document to which it is a party (and the transactions contemplated hereby and thereby), the borrowing of Loans and the issuance of Letters of Credit hereunder on the Effective Date and thereafter from time to time, and the grant of Liens by the Borrower on the Collateral pursuant to the Security Instruments, and (b) each Guarantor, the execution, delivery and performance by such Guarantor of each Loan Document to which it is a party, the guaranteeing of the Indebtedness under the Guaranty Agreement by such Guarantor and the grant by such Guarantor of Liens on the Collateral pursuant to the Security Instruments.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Adjusted LIBO Rate.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, Administrative Agent's or any Secured Party's Lien on any Collateral.

"USA Patriot Act" means the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"U.S. Person" shall mean any person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 5.03(f).

"Withholding Agent" means the Borrower, any Guarantor or the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.03    **Types of Loans and Borrowings**. For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (e.g., a "Eurodollar Loan" or a "Eurodollar Borrowing").

36

Section 1.04  **Terms Generally; Rules of Construction**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" as used in this Agreement shall be deemed to be followed by the phrase "without limitation".  The word "or" is not exclusive.  The word "shall" shall be construed to have the same meaning and effect as the word "will".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or modifications set forth in the Loan Documents), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.05  **Accounting Terms and Determinations; GAAP**.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP, applied on a consistent basis except for changes in which the Borrower's independent certified public accountants concur and which are disclosed to the Administrative Agent as part of, or along with, the audited annual financial statements delivered to the Lenders pursuant to Section 8.01(a); *provided* that, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants set forth in Section 9.01 is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods.  In the event that any Accounting Changes shall occur and such change results in a change in the method of calculation of covenants, standards or terms in this Agreement, then at the Borrower's or Administrative Agent's request, the Administrative Agent, the Lenders and the Borrower shall enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the application of this Agreement to the Credit Parties shall be the same after such Accounting Changes as if such Accounting Changes had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Majority Lenders, all covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred.

## ARTICLE II
## THE CREDITS

Section 2.01    **Commitments**.  Subject to the terms and conditions set forth herein, each Lender agrees to make Loans to the Borrower during the Availability Period in an aggregate principal amount that will not result in such Lender's Revolving Credit Exposure exceeding such Lender's Commitment or the total Revolving Credit Exposures exceeding the total Commitments.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Loans.

Section 2.02    **Loans and Borrowings**.

(a)    Borrowings; Several Obligations.    Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)    Types of Loans.    Subject to Section 3.03, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.  Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)    Minimum Amounts; Limitation on Number of Borrowings.    At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $500,000.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $500,000; *provided* that, notwithstanding the foregoing, an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.08(e).  Borrowings of more than one Type may be outstanding at the same time, *provided* that there shall not at any time be more than a total of six (6) Eurodollar Borrowings outstanding.  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(d)    Notes.    Upon request of such Lender, the Loans made by such Lender shall be evidenced by a Note, and, (i) in the case of any Lender party hereto as of the date of this Agreement, such Note shall be dated as of the date of this Agreement, or (ii) in the case of any Lender that becomes a party hereto pursuant to an Assignment and Assumption, such Note shall be dated as of the effective date of the Assignment and Assumption, in each case, payable to such Lender in a principal amount equal to its Maximum Credit Amount as in effect on such date, and otherwise duly completed.  In the event that any Lender's Maximum Credit Amount increases or decreases for any reason (whether pursuant to Section 2.06, Section 12.04(b) or

otherwise), the Borrower shall, upon request of such Lender, deliver or cause to be delivered on the effective date of such increase or decrease, a new Note payable to such Lender in a principal amount equal to its Maximum Credit Amount after giving effect to such increase or decrease, and otherwise duly completed, against the return to the Borrower of the Note so replaced.  The date, amount, Type, interest rate and, if applicable, Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be endorsed by such Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by such Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.03  **Requests for Borrowings**.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing in substantially the form of Exhibit B and signed by the Borrower (a) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., New York, New York time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 9:00 a.m., New York, New York time, one Business Day prior to the date of the proposed Borrowing; *provided* that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e).  Each such Borrowing Request shall be irrevocable and shall be by hand delivery, email, or fax to the Administrative Agent.  Each such written Borrowing Request shall specify the following information in compliance with Section 2.02:

(a)    the aggregate amount of the requested Borrowing;

(b)    the date of such Borrowing, which shall be a Business Day;

(c)    whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(d)    in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(e)    the amount of the then effective Borrowing Base, the current total Revolving Credit Exposures (without regard to the requested Borrowing) and the *pro forma* total Revolving Credit Exposures (giving effect to the requested Borrowing); and

(f)    the location and number of the account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Each Borrowing Request shall constitute a representation by the Borrower that the amount of the requested Borrowing shall not cause the total Revolving Credit Exposures to exceed the total Commitments (i.e., the lesser of the Aggregate Maximum Credit Amounts and the then effective Borrowing Base).

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04    **Interest Elections**.

(a)    Conversion and Continuance.  Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.04.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    Interest Election Requests.  To make an election pursuant to this Section 2.04, the Borrower shall notify the Administrative Agent of such election in writing in substantially the form of Exhibit C (or such other form as may be agreed to by the Administrative Agent and the Borrower) and signed by the Borrower by the time that a Borrowing Request would be required under Section 2.03(a) if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable and shall be by hand delivery, email or fax to the Administrative Agent.

(c)    Information in Interest Election Requests.  Each Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to Section 2.04(c)(iii) and (iv) shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)     Notice to Lenders by the Administrative Agent.  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     Effect of Failure to Deliver Timely Interest Election Request and Events of Default on Interest Election.  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing: (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05   **Funding of Borrowings**.

(a)     Funding by Lenders.  Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 11:00 a.m., New York, New York time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. Upon receipt of all requested funds, the Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to one or more accounts designated by the Borrower in the applicable Borrowing Request; *provided* that (i) ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e) shall be remitted by the Administrative Agent to the Issuing Bank and (ii) with respect to any such accounts designated by the Borrower that are not owned by a Credit Party, such designation shall in all respects be subject to any know-your-customer requirements applicable to the Administrative Agent. Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

(b)     Presumption of Funding by the Lenders.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.05(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to ABR Loans.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower

shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.06    **Termination and Reduction of Aggregate Maximum Credit Amounts**.

(a)    Scheduled Termination of Commitments.    Unless previously terminated, the Commitments shall terminate on the Maturity Date.  If at any time the Aggregate Maximum Credit Amounts are terminated or reduced to zero, then the Commitments shall terminate on the effective date of such termination or reduction.

(b)    Optional Termination and Reduction of Aggregate Maximum Credit Amounts.

(i)    The Borrower may at any time terminate, or from time to time reduce, the Aggregate Maximum Credit Amounts; *provided* that (A) each reduction of the Aggregate Maximum Credit Amounts shall be in an amount that is an integral multiple of $1,000,000 and not less than $2,000,000, and (B) the Borrower shall not terminate or reduce the Aggregate Maximum Credit Amounts if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c), the total Revolving Credit Exposures would exceed the total Commitments.

(ii)    The Borrower shall notify the Administrative Agent in writing (which may be by email) of any election to terminate or reduce the Aggregate Maximum Credit Amounts under Section 2.06(b)(i) at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section 2.06(b)(ii) shall be irrevocable; *provided* that a notice of termination of the Aggregate Maximum Credit Amounts delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by timely notice to the Administrative Agent) if such condition is not satisfied.  Any termination or reduction of the Aggregate Maximum Credit Amounts shall be permanent and may not be reinstated.  Each reduction of the Aggregate Maximum Credit Amounts shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

Section 2.07    **Borrowing Base**.

(a)    Initial Borrowing Base.  For the period from and including the Effective Date to but excluding the first Redetermination Date, the amount of the Borrowing Base shall be $75,000,000.  Notwithstanding the foregoing, the Borrowing Base may be subject to further adjustments in between Scheduled Redeterminations from time to time pursuant to Section 2.07(e) or Section 8.13(c).

(b)    Scheduled and Interim Redeterminations.  The Borrowing Base shall be redetermined semi-annually (or, during the Quarterly Redetermination Period, quarterly) in accordance with this Section 2.07 (each such scheduled redetermination, a "Scheduled Redetermination"), and, subject to Section 2.07(d), such redetermined Borrowing Base shall become effective and applicable to the Borrower, the Administrative Agent, the Issuing Bank and the Lenders as and when provided by Section 2.07(d).  In addition, (i) the Borrower may, by

notifying the Administrative Agent thereof, and the Administrative Agent may, at the direction of the Required Lenders, by notifying the Borrower thereof, each elect to cause the Borrowing Base to be redetermined one time between any two successive Scheduled Redeterminations in accordance with this Section 2.07, and (ii) the Borrower may elect, in addition to any such elections permitted to be made by it pursuant to the foregoing clause (i), by notifying the Administrative Agent of any Acquisition of Proved Oil and Gas Properties by the Borrower or any Subsidiary with a purchase price in the aggregate of at least twenty percent (20%) of the then effective Borrowing Base, to cause the Borrowing Base to be redetermined between Scheduled Redeterminations (each such redetermination described in clauses (i) and (ii) being an "Interim Redetermination") in accordance with this Section 2.07.  For purposes of this Agreement, the determination of the Borrowing Base on the Effective Date provided for herein shall be deemed and considered to be a Scheduled Redetermination.

       (c)      Scheduled and Interim Redetermination Procedure.

       (i)      Each Scheduled Redetermination and each Interim Redetermination shall be effectuated as follows:  Upon receipt by the Administrative Agent of (A) the Reserve Report and the certificate required to be delivered by the Borrower to the Administrative Agent, in the case of a Scheduled Redetermination, pursuant to Section 8.12(a) and (c), and, in the case of an Interim Redetermination, pursuant to Section 8.12(b) and (c), and (B) such other reports, data and supplemental information, including the information provided pursuant to Section 8.12(c), as may, from time to time, be reasonably requested by the Required Lenders (the Reserve Report, such certificate and such other reports, data and supplemental information being the "Engineering Reports"), the Administrative Agent shall evaluate the information contained in the Engineering Reports and shall, in good faith, propose a new Borrowing Base (the "Proposed Borrowing Base") based upon such information and such other information (including the status of title information with respect to the Proved Oil and Gas Properties as described in the Engineering Reports, the existence of any other Debt, the Credit Parties' other assets, liabilities, fixed charges, cash flow, business and financial condition, properties, Liens, prospects, management and ownership, hedged and unhedged exposure of the Credit Parties to price, price and production scenarios, interest rate, operating cost changes, general and administrative expenses, Restricted Payments, title matters, and environmental and legal costs) as the Administrative Agent in good faith deems appropriate and consistent with its normal oil and gas lending criteria as it exists at the particular time.  In no event shall the Proposed Borrowing Base exceed the Aggregate Maximum Credit Amounts.  For the avoidance of doubt, in the case of an Interim Redetermination, the Administrative Agent may utilize the Engineering Reports delivered in connection with the last Scheduled Redetermination, provided, however, the Administrative Agent may in its sole discretion request Borrower generated supplemental Engineering Reports in connection with such Interim Redetermination.

       (ii)      The Administrative Agent shall notify the Borrower and the Lenders of the Proposed Borrowing Base (the "Proposed Borrowing Base Notice") after the Administrative Agent has received complete Engineering Reports from the Borrower and has had a reasonable opportunity to determine the Proposed Borrowing Base in accordance with Section 2.07(c)(i).

       (iii)      Any Proposed Borrowing Base that would increase the Borrowing Base then in effect must be approved by all of the Lenders (other than any Defaulting Lenders) as

provided in this Section 2.07(c)(iii); and any Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect must be approved by the Required Lenders as provided in this Section 2.07(c)(iii).  Upon receipt of the Proposed Borrowing Base Notice, each Lender shall have fifteen (15) days to agree with the Proposed Borrowing Base or disagree with the Proposed Borrowing Base by proposing an alternate Borrowing Base.  If, in the case of any Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, at the end of such fifteen (15) days, any Lender has not communicated its approval or disapproval in writing to the Administrative Agent, such silence shall be deemed to be an approval of the Proposed Borrowing Base.  If, in the case of any Proposed Borrowing Base that would increase the Borrowing Base then in effect, at the end of such fifteen (15) days, any Lender has not communicated its approval or disapproval in writing to the Administrative Agent, such silence shall be deemed to be a disapproval of the Proposed Borrowing Base.  If, at the end of such 15-day period, all of the Lenders (other than any Defaulting Lenders), in the case of a Proposed Borrowing Base that would increase the Borrowing Base then in effect, or the Required Lenders, in the case of a Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, have approved the Proposed Borrowing Base (or deemed to have approved, as applicable, in the case of a Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect), then the Proposed Borrowing Base shall, subject to the restrictions in Section 12.02(b) on increasing any Lender's Commitment, become the new Borrowing Base, effective on the date specified in Section 2.07(d).  If, however, at the end of such 15-day period, all of the Lenders (other than any Defaulting Lenders) or the Required Lenders, as applicable, have not approved the Proposed Borrowing Base, then the Administrative Agent shall poll the Lenders to ascertain the highest Borrowing Base then acceptable to (x) in the case of a decrease or reaffirmation, a number of Lenders sufficient to constitute the Required Lenders and (y) in the case of an increase, all of the Lenders (other than any Defaulting Lenders), as applicable, and, subject to the restrictions in Section 12.02(b) on increasing any Lender's Commitment, such amount shall become the new Borrowing Base, effective on the date specified in Section 2.07(d).

(d)    Effectiveness of a Redetermined Borrowing Base.    After a redetermined Borrowing Base has been approved by all of the Lenders or the Required Lenders, as applicable, pursuant to Section 2.07(c)(iii), the Administrative Agent shall notify the Borrower and the Lenders of the amount of the redetermined Borrowing Base (the "New Borrowing Base Notice"), and such amount shall become the new Borrowing Base, effective and applicable to the Borrower, the Administrative Agent, the Issuing Bank and the Lenders:

(i)    in the case of a Scheduled Redetermination, (A) if the Administrative Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and (c) in a timely and complete manner, then (x) on April 30th and October 1st of such year, and (y) during the Quarterly Redetermination Period, also February 1, 2019 (or, in each case of the foregoing clauses (x) and (y), such date promptly thereafter as reasonably practicable), commencing November 1, 2018, as applicable, following such notice, or (B) if the Administrative Agent shall not have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and (c) in a timely and complete manner, then on the Business Day next succeeding delivery of such notice; and

44

(ii)    in the case of an Interim Redetermination, on the Business Day next succeeding delivery of such notice.

Such amount shall then become the Borrowing Base until the next Scheduled Redetermination Date, the next Interim Redetermination Date, or the next adjustment to the Borrowing Base under <u>Section 2.07(e)</u> or <u>Section 8.13(c)</u>, whichever occurs first. Notwithstanding the foregoing, no Scheduled Redetermination, Interim Redetermination or adjusted Borrowing Base shall become effective until the New Borrowing Base Notice related thereto is received by the Borrower.

(e)    <u>Reduction of Borrowing Base Upon Borrowing Base Property Dispositions and Liquidations</u>.  To the extent that, during any period following the most recent Redetermination Date, the combination of all Borrowing Base Property Dispositions and/or Liquidations occurring since the most recent Redetermination Date (including, for the avoidance of doubt, any Liquidation required by <u>Section 9.16(b)</u>) with an aggregate Borrowing Base Property Value and/or Liquidation Value is in excess of five percent (5%) of the Borrowing Base, as established on the most recent Redetermination Date, the Borrowing Base shall be immediately reduced by the aggregate Borrowing Base Property Value of the Proved Oil and Gas Properties subject to all such Borrowing Base Property Dispositions and/or the Liquidation Value of the Swap Agreements subject to all such Liquidations, and the Borrower shall make any mandatory prepayments required under <u>Section 3.04(c)(iii)</u> as a result of such reduction. Upon any such reduction in the Borrowing Base in connection with the foregoing, the Administrative Agent shall promptly deliver notice thereof to the Borrower and the Lenders.

Section 2.08    **Letters of Credit**.

(a)    <u>General</u>.  Subject to the terms and conditions set forth herein, the Borrower may request the issuance of Dollar denominated Letters of Credit for its own account or for the account of any of its Subsidiaries , in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the Availability Period in an aggregate amount not to exceed the LC Commitment; *provided* that the Borrower may not request the issuance of Letters of Credit hereunder if a Borrowing Base Deficiency exists at such time or would exist as a result thereof.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.  For all purposes of this Agreement, the amount of a Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the stated amount thereof shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at the time of determination.

(b)    <u>Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions</u>.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or fax (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the

Issuing Bank and the Administrative Agent (not less than five (5) Business Days in advance of the requested date of issuance, amendment, renewal or extension) a notice:

(i)      requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)     specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)    specifying the date on which such Letter of Credit is to expire (which shall comply with Section 2.08(c));

(iv)     specifying the amount of such Letter of Credit;

(v)      specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit; and

(vi)     specifying the amount of the then effective Borrowing Base and whether a Borrowing Base Deficiency exists at such time, the current total Revolving Credit Exposures (without regard to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit) and the *pro forma* total Revolving Credit Exposures (giving effect to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit).

Each notice shall constitute a representation by the Borrower that after giving effect to the requested issuance, amendment, renewal or extension, as applicable, (x) the LC Exposure shall not exceed the LC Commitment and (y) the total Revolving Credit Exposures shall not exceed the total Commitments (i.e., the lesser of (A) the Aggregate Maximum Credit Amounts and (B) the then effective Borrowing Base).  No letter of credit issued by the Issuing Bank (if the Issuing Bank is not the Administrative Agent) shall be deemed to be a "Letter of Credit" issued under this Agreement unless the Issuing Bank has requested and received written confirmation from the Administrative Agent that the representations by the Borrower contained in the foregoing clauses (x) and (y) are true and correct.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit; *provided* that, in the event of any conflict between such application or any Letter of Credit Agreement and the terms of this Agreement, the terms of this Agreement shall control. Upon issuance of a Letter of Credit, the Issuing Bank shall provide a copy to the Administrative Agent.

(c)      Expiration Date.

(i)      Each Letter of Credit shall expire at or prior to the close of business on the earlier of (A) the date that is one year (or, in the case of a Letter of Credit issued in favor of the Texas Railroad Commission, eighteen months) after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year (or eighteen months, if applicable) after such renewal or extension), and (B) the date that is five Business Days prior to the Maturity Date.

(ii)    If the Borrower so requests in any request for a Letter of Credit, the Issuing Bank may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic renewal provisions (each, an "Auto-Renewal Letter of Credit"); provided that any such Auto-Renewal Letter of Credit must permit the Issuing Bank to prevent any such renewal at least once in each twelve-month (or eighteen-month, as applicable) period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Renewal Notice Date") in each such twelve-month (or eighteen-month, as applicable) period to be agreed upon at the time such Letter of Credit is issued.  Unless otherwise directed by the Issuing Bank, the Borrower shall not be required to make a specific request to the Issuing Bank for any such renewal.  Once an Auto-Renewal Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the Issuing Bank to permit the renewal of such Letter of Credit at any time to an expiry date not later than the earlier of (A) one year (or eighteen months, if applicable) from the date of such renewal and (B) the date that is five Business Days prior to the Maturity Date; provided that the Issuing Bank shall not permit any such renewal if (1) the Issuing Bank has determined that it would have no obligation at such time to issue such Letter of Credit in its renewed form under the terms hereof (by reason of the provisions of Section 2.08(f) or otherwise), or (2) it has received notice on or before the day that is two Business Days before the Non-Renewal Notice Date, from the Administrative Agent, any Lender or the Borrower that one or more of the applicable conditions specified in Section 6.02 are not then satisfied.

(d)    Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.08(e), or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.08(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, the existence of a Borrowing Base Deficiency or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    Reimbursement.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 11:00 a.m., New York, New York time, on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 9:00 a.m., New York, New York time, on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 11:00 a.m., New York, New York time, on (i) the Business Day that the Borrower receives such notice, if such notice is received prior to 9:00 a.m., New York, New York time, on the day of receipt, or (ii) the Business Day immediately following the day that the

47

Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; *provided* that, unless the Borrower has notified the Administrative Agent that it intends to reimburse all or part of such LC Disbursement without using Loan proceeds or has submitted a Borrowing Request with respect thereto, the Borrower shall, subject to the conditions to Borrowing set forth herein, be deemed to have requested, and the Borrower does hereby request under such circumstances, that such payment be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing. If the Borrower fails to make any payment in respect of any LC Disbursement when due, the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof. Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.05 with respect to Loans made by such Lender (and Section 2.05 shall apply, *mutatis mutandis*, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders. Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.08(e), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Lenders have made payments pursuant to this Section 2.08(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear. Any payment made by a Lender pursuant to this Section 2.08(e) to reimburse the Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)    Obligations Absolute. The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.08(e) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.08(f), constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder. Neither the Administrative Agent, the Lenders nor the Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; *provided* that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by

the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise due care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised all requisite care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)    _Disbursement Procedures_.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by fax) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; _provided_ that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the Lenders with respect to any such LC Disbursement.

(h)    _Interim Interest_.  If the Issuing Bank shall make any LC Disbursement, then, until the Borrower shall have reimbursed the Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under Section 2.08(e)), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Loans. Interest accrued pursuant to this Section 2.08(h) shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to Section 2.08(e) to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i)    _Replacement of the Issuing Bank_.  The Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank. The Administrative Agent shall notify the Lenders of any such replacement of the Issuing Bank. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 3.05(b). From and after the effective date of any such replacement, the successor Issuing Bank shall have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. After the replacement of the Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(j)     Cash Collateralization.  If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent or the Majority Lenders demanding the deposit of cash collateral pursuant to this Section 2.08(j), (ii) the LC Exposure exceeds the LC Commitment at any time as a result of a reduction in the Borrowing Base or (iii) the Borrower is required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then the Borrower shall deposit, in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in Cash or Cash Equivalents equal to 104% of, (A) in the case of an Event of Default, the LC Exposure, (B) in the case of the LC Exposure exceeding the LC Commitment, the amount of such excess, and (C) in the case of a payment required by Section 3.04(c), the amount of such excess as provided in Section 3.04(c), as of such date plus any accrued and unpaid interest thereon; *provided* that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower or any Subsidiary described in Section 10.01(h) or Section 10.01(i).  The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Bank and the Lenders, an exclusive first priority and continuing perfected security interest in and Lien on such account and all Cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in such account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, Cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor.  The Borrower's obligation to deposit amounts pursuant to this Section 2.08(j) shall be absolute and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a Letter of Credit, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which the Borrower or any of its Subsidiaries may now or hereafter have against any such beneficiary, the Issuing Bank, the Administrative Agent, the Lenders or any other Person for any reason whatsoever.  Such deposit shall be held as collateral securing the payment and performance of the Borrower's and the Guarantors' obligations under this Agreement and the other Loan Documents.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such collateral account.  Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in such collateral account.  Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors under this Agreement or the other Loan Documents.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then such amount (to

the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

(k)    Defaulting Lenders.  If, at any time, a Defaulting Lender exists hereunder, then, within one (1) Business Day following the written request of the Issuing Bank, the Borrower shall cash collateralize the Fronting Exposure of the Issuing Bank with respect to such Defaulting Lender (determined after giving effect to Section 2.09(a)(iv) and any cash collateral provided by such Defaulting Lender) in an amount equal to the lesser of (x) the amount of such Fronting Exposure and (y) an amount otherwise agreeable to the Issuing Bank and the Administrative Agent in their sole discretion.

(i)    Grant of Security Interest.  The Borrower and, to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to the Administrative Agent, for the benefit of the Issuing Bank, and agrees to maintain, a first priority security interest in all such cash collateral as security for (A) in the case of the Defaulting Lender, the Defaulting Lender's obligation to fund participations in respect of LC Exposure, to be applied pursuant to clause (ii) below and (B) in the case of the Borrower, its obligations hereunder to reimburse the LC Exposure for which such Defaulting Lender is obligated as a participant.  Borrower or such Defaulting Lender, as applicable, shall execute any documents and agreements, including the Administrative Agent's standard form assignment of deposit accounts, that the Administrative Agent reasonably requests in connection therewith to establish such cash collateral account and to grant the Administrative Agent, for the benefit of the Issuing Bank, a first priority security interest in such account and the funds therein.  If at any time the Administrative Agent determines that cash collateral is subject to any right or claim of any Person other than the Administrative Agent and the Issuing Bank as herein provided, or that the total amount of such cash collateral is less than the amount required above, the Borrower will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional cash collateral in an amount sufficient to eliminate such deficiency (after giving effect to any cash collateral provided by the Defaulting Lender).

(ii)    Application.  Notwithstanding anything to the contrary contained in this Agreement, cash collateral provided by a Defaulting Lender under this Section 2.08(k) or Section 2.09 in respect of Letters of Credit shall be applied to the satisfaction of the Defaulting Lender's obligation to fund participations in respect of LC Exposure (including, as to cash collateral provided by a Defaulting Lender, any interest accrued on such obligation) for which the cash collateral was so provided, prior to any other application of such property as may otherwise be provided for herein.

(iii)    Termination of Requirement.  Cash collateral (or the appropriate portion thereof) provided to reduce the Issuing Bank's Fronting Exposure shall no longer be required to be held as cash collateral pursuant to this Section 2.08(k) following (A) the elimination of the applicable Fronting Exposure (including by the termination of Defaulting Lender status of the applicable Lender), or (B) the determination by the Administrative Agent and the Issuing Bank that there exists excess cash collateral; *provided that*, subject to Section 2.09, (x) the Issuing Bank may determine in its sole discretion that cash collateral provided by a Defaulting Lender shall be held to support future anticipated Fronting Exposure or other obligations of such Defaulting Lender and (y) the Borrower and the Issuing Bank may agree that cash collateral

provided by the Borrower shall be held to support future anticipated Fronting Exposure or other obligations; and *provided further* that to the extent that such cash collateral was provided by the Borrower, such cash collateral shall remain subject to any other security interest granted pursuant to the Loan Documents.

Section 2.09   **Defaulting Lenders**.

(a)   Defaulting Lender Adjustments.   Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)   Waivers and Amendments.   Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Majority Lenders" and "Required Lenders".

(ii)   Defaulting Lender Waterfall.   Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article X or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 12.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Issuing Bank hereunder; *third*, to cash collateralize the Issuing Bank's Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.08(k); *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) cash collateralize the Issuing Bank's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with Section 2.08(k); *sixth*, to the payment of any amounts owing to the Lenders or the Issuing Bank as a result of any judgment of a court of competent jurisdiction obtained by any Lender or the Issuing Bank against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or LC Exposure in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 6.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and LC Exposure owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or LC Exposure owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in LC Exposure are held by the Lenders pro rata in accordance with the

Commitments without giving effect to Section 2.09(a)(iv).  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 2.09(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

   (iii) Certain Fees.

    (A) No Defaulting Lender shall be entitled to receive any commitment fee pursuant to Section 3.05(a) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

    (B) Each Defaulting Lender shall be entitled to receive fees pursuant to Section 3.05(b) for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Percentage of the stated amount of Letters of Credit for which it has provided cash collateral pursuant to Section 2.08(k).

    (C) With respect to any fee pursuant to Section 3.05(b) not required to be paid to any Defaulting Lender pursuant to sub-clause (B) above, the Borrower shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in Letter of Credit obligations that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to the Issuing Bank the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to the Issuing Bank's Fronting Exposure to such Defaulting Lender and (z) not be required to pay the remaining amount of any such fee.

   (iv) Reallocation of Participations to Reduce Fronting Exposure.  All or any part of such Defaulting Lender's participation in LC Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Maximum Credit Amount) but only to the extent that (x) the conditions set forth in Section 6.02 are satisfied at the time of such reallocation (and, unless the Borrower shall have otherwise notified the Administrative Agent at such time, the Borrower shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause the Revolving Credit Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Commitment then in effect.  Subject to Section 12.18, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

   (v) Cash Collateral.  If the reallocation described in clause (iv) above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under law, cash collateralize the Issuing Bank's Fronting Exposure in accordance with the procedures set forth in Section 2.08(k).

(b)    <u>Defaulting Lender Cure</u>.  If the Borrower, the Administrative Agent and the Issuing Bank agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held pro rata by the Lenders in accordance with the Commitments (without giving effect to <u>Section 2.09(a)(iv)</u>), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender

(c)    <u>New Letters of Credit</u>.  So long as any Lender is a Defaulting Lender, the Issuing Bank shall not be required to issue, extend, renew or increase any Letter of Credit unless it is satisfied that it will have no Fronting Exposure after giving effect thereto.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01    **Repayment of Loans**.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Maturity Date.

Section 3.02    **Interest**.

(a)    <u>ABR Loans</u>.  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b)    <u>Eurodollar Loans</u>.  The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)    <u>Post-Default Rate</u>.  Notwithstanding the foregoing, (i) if any Event of Default of the type described in <u>Section 10.01(a)</u>, <u>Section 10.01(b)</u>, <u>Section 10.01(h)</u>, <u>Section 10.01(i)</u> or <u>Section 10.01(j)</u> has occurred and is continuing, then all outstanding principal, fees and other obligations under any Loan Document shall automatically bear interest at a rate per annum of two percent (2%) plus the rate applicable to (A) in the case of principal, such Loans as provided in <u>Section 3.02(a)</u> or <u>Section 3.02(b)</u>, as applicable or (B) in the case of fees and other obligations, ABR Loans as provided in <u>Section 3.02(a)</u> (including, in each case, the Applicable Margin), but in no event to exceed the Highest Lawful Rate, and shall be payable on demand by the Administrative Agent and (ii) if any Event of Default occurs (other than an Event of Default described in   <u>Section 10.01(a)</u>,    <u>Section 10.01(b)</u>,    <u>Section 10.01(h)</u>,    <u>Section 10.01(i)</u>   or

Section 10.01(j)), then at the election of the Majority Lenders (or the Administrative Agent at the direction of Majority Lenders), all outstanding principal, fees and other obligations under any Loan Document shall bear interest at a rate per annum of two percent (2%) plus the rate applicable to (A) in the case of principal, such Loans as provided in Section 3.02(a) or Section 3.02(b), as applicable or (B) in the case of fees and other obligations, ABR Loans as provided in Section 3.02(a) (including, in each case, the Applicable Margin), but in no event to exceed the Highest Lawful Rate, and shall be payable on demand by the Administrative Agent.

(d)    Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; *provided* that (i) interest accrued pursuant to Section 3.02(c) shall be payable on demand, or if no demand has been made, on each Interest Payment Date, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)    Interest Rate Computations.  All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).   The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

Section 3.03   **Alternate Rate of Interest**.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable (including, without limitation, because the LIBO Screen Rate is not available or published on a current basis) for such Interest Period; or

(b)    the Administrative Agent is advised by the Majority Lenders that the Adjusted LIBO Rate or LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone, email, or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, (ii) if any

Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth above have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth above have not arisen but the supervisor for the administrator of the LIBO Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBO Screen Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. Notwithstanding anything to the contrary in Section 12.02, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Majority Lenders stating that such Majority Lenders object to such amendment. Until an alternate rate of interest shall be determined in accordance with this section (but, in the case of the circumstances described in clause (ii) of the first sentence of this paragraph, only to the extent the LIBO Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, and (y) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing; provided that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

Section 3.04    **Prepayments**.

(a)    Optional Prepayments. The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with Section 3.04(b).

(b)    Notice and Terms of Optional Prepayment. The Borrower shall notify the Administrative Agent in writing of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., New York, New York time, three Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York, New York time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitments as contemplated by Section 2.06(b), then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.06(b). Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in

Section 2.02.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02.

(c)    Mandatory Prepayments.

(i)    If, after giving effect to any termination or reduction of the Aggregate Maximum Credit Amounts pursuant to Section 2.06(b), the total Revolving Credit Exposures exceed the total Commitments, then the Borrower shall (A) prepay the Borrowings on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (B) if any excess remains after prepaying all of the Borrowings as a result of an LC Exposure, deposit with the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.08(j).

(ii)    Upon any redetermination of or adjustment to the amount of the Borrowing Base in accordance with Section 2.07 (other than Section 2.07(e)) or Section 8.13(c), if a Borrowing Base Deficiency shall result therefrom, then the Borrower shall eliminate such Borrowing Base Deficiency by electing to (w) prepay the Borrowings and/or deposit of cash collateral in an aggregate principal amount equal to such Borrowing Base Deficiency within thirty (30) days after the Borrower's receipt of notice of the redetermined or adjusted Borrowing Base, (x) repay such Borrowing Base Deficiency in six (6) equal and consecutive monthly installments (or, during the Quarterly Redetermination Period, in three (3) equal and consecutive monthly installments), the first installment being due and payable thirty (30) days after the Borrower's receipt of notice of the redetermined or adjusted Borrowing Base, and each subsequent installment being due and payable on the same day in each of the five (5) subsequent calendar months (or, during the Quarterly Redetermination Period, in each of the two (2) subsequent calendar months), (y) provide additional Oil and Gas Properties or other collateral acceptable to the Required Lenders in their sole discretion (together with title information with respect thereto acceptable to the Administrative Agent) sufficient to increase the Borrowing Base by an amount at least equal to such Borrowing Base Deficiency within thirty (30) days after the Borrower's receipt of notice of the redetermined or adjusted Borrowing Base or (z) effect any combination of the foregoing clauses (w), (x) and (y) in amounts necessary to eliminate such Borrowing Base Deficiency; provided that all payments required to be made pursuant to this Section 3.04(c)(ii) must be made on or prior to the Termination Date.  The Borrower shall make such election in writing to the Administrative Agent within ten (10) days after the Borrower's receipt of notice of the redetermined or adjusted Borrowing Base.  If a Borrowing Base Deficiency remains after prepaying all of the Borrowings as a result of an LC Exposure, the Borrower shall deposit with the Administrative Agent on behalf of the Lenders an amount equal to such Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.08(j).

(iii)    Upon any adjustment to the Borrowing Base pursuant to Section 2.07(e), if a Borrowing Base Deficiency shall result therefrom, then the Borrower shall (A) prepay the Borrowings in an aggregate principal amount equal to such Borrowing Base Deficiency, and (B) if a Borrowing Base Deficiency remains after prepaying all of the Borrowings as a result of LC Exposure, deposit with the Administrative Agent on behalf of the Lenders an amount equal to such Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.08(j).  The Borrower shall be obligated to make such prepayment and/or deposit of cash collateral on the

date of the applicable Borrowing Base Property Disposition or Liquidation; *provided* that in all cases, the Borrowing Base Deficiency must be eliminated on or prior to the Termination Date.

(iv)     Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied, first, ratably to any ABR Borrowings then outstanding, and, second, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto.

(v)     Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied ratably to the Loans included in the prepaid Borrowings.  Prepayments pursuant to this Section 3.04(c) shall be accompanied by accrued interest to the extent required by Section 3.02.

(d)     No Premium or Penalty.     Prepayments permitted or required under this Section 3.04 shall be without premium or penalty, except as required under Section 5.02.

Section 3.05     **Fees**.

(a)     Commitment Fees.     Except as otherwise provided in Section 2.09(a)(iii), the Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the applicable Commitment Fee Rate on the average daily amount of the unused amount of the Commitment of such Lender during the period from and including the date of this Agreement to but excluding the Termination Date (it being understood that LC Exposure shall constitute usage of the Commitments for purposes of this Section 3.05(a)).  Accrued commitment fees shall be payable in arrears on the last Business Day of March, June, September and December of each year and on the Termination Date, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case commitment fees shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)     Letter of Credit Fees.     The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Eurodollar Loans on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, (ii) to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.125% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, *provided* that in no event shall such fee be less than $500 during any quarter, and (iii) to the Issuing Bank, for its own account, its standard

fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder. Participation fees and fronting fees accrued through and including the last Business Day of March, June, September and December of each year shall be payable on the such last Business Day, commencing on the first such date to occur after the date of this Agreement; *provided* that all such fees shall be payable on the Termination Date and any such fees accruing after the Termination Date shall be payable on demand. Any other fees payable to the Issuing Bank pursuant to this <u>Section 3.05(b)</u> shall be payable within 10 days after demand. All participation fees and fronting fees shall be computed on the basis of a year of 360 days, unless such computation would exceed any applicable Highest Lawful Rate, in which case participation and fronting fees shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)    <u>Administrative Agent Fees</u>.  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times set forth in the Fee Letters.

# ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01    **Payments Generally; Pro Rata Treatment; Sharing of Set-offs**.

(a)    <u>Payments by the Borrower</u>.  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under <u>Section 5.01</u>, <u>Section 5.02(a)</u>, <u>Section 5.03</u> or otherwise) prior to 11:00 a.m., New York, New York time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim. Fees, once paid, shall be fully earned and shall not be refundable under any circumstances, absent manifest error. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices specified in <u>Section 12.01</u>, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to <u>Section 5.01</u>, <u>Section 5.02(a)</u>, <u>Section 5.03</u> and <u>Section 12.03</u> shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b)    <u>Application of Insufficient Payments</u>.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, then, subject to <u>Section 10.02(c)</u>, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and

unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)    <u>Sharing of Payments by Lenders</u>.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this <u>Section 4.01(c)</u> shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this <u>Section 4.01(c)</u> shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participations as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 4.02    **Presumption of Payment by the Borrower**.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03    **Deductions by the Administrative Agent**.  If any Lender shall fail to make any payment required to be made by it pursuant to <u>Section 2.05(a)</u>, <u>Section 2.08(d)</u>, <u>Section 2.08(e)</u>, <u>Section 4.02</u> or otherwise hereunder, then the Administrative Agent may, in its sole discretion (notwithstanding any contrary provision hereof), (a) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid or (b) hold

any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender hereunder, in the case of each of clauses (a) and (b) above, in any order as determined by the Administrative Agent in its discretion.  After acceleration or maturity of the Loans, all principal will be paid ratably as provided in <u>Section 10.02(c)</u>.

Section 4.04  **Collection of Proceeds of Production**.    The Security Instruments comprised of deeds of trust and mortgages contain an assignment by the Borrower and/or the Guarantors to and in favor of the Administrative Agent for the benefit of the Secured Parties of all of the Borrower's or each Guarantor's interest in and to production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property.  The Security Instruments further provide in general for the application of such proceeds to the satisfaction of the Indebtedness and other obligations described therein and secured thereby. Notwithstanding the terms of any such assignment contained in such Security Instruments, unless an Event of Default has occurred and is continuing, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Administrative Agent and the Lenders will instead permit such proceeds to be paid to and retained by the Borrower and the Guarantors and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary or advisable to cause such proceeds to be paid to the Borrower and such Guarantors.

## ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES; ILLEGALITY

Section 5.01  **Increased Costs**.

(a)    <u>Eurodollar Changes in Law</u>.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or the Issuing Bank;

(ii)    subject any Lender or the Issuing Bank to any Taxes (other than (A) Indemnified Taxes and (B) Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the Issuing Bank or the London interbank market any other condition (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or

61

the Issuing Bank such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b)      Capital Requirements.  If any Lender or the Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy or liquidity), then from time to time, upon receipt of a certificate described in the following subsection (c), the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)      Certificates.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in Section 5.01(a) or (b) shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

(d)      Effect of Failure or Delay in Requesting Compensation.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 5.01 for any increased costs or reductions incurred more than nine months prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; *provided*, *further* that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine month period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.02  **Break Funding Payments**.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan into an ABR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert or continue any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 5.05, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (x) the amount of interest which would have accrued on the principal

amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (y) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for Dollar deposits of a comparable amount and period from other banks in the Eurodollar market.

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

Section 5.03    **Taxes**.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower or any Guarantor under any Loan Document shall be made without deduction or withholding for any Indemnified Taxes; provided that if the applicable Withholding Agent shall be required by applicable law to deduct or withhold any Indemnified Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 5.03(a)), the applicable Administrative Agent, Lender or Issuing Bank, as the case may be, receives an amount equal to the sum it would have received had no such deduction or withholding been made, (ii) the Withholding Agent shall make such deductions or withholding and (iii) the applicable Withholding Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b)    Payment of Other Taxes by the Borrower.  Without limiting the provisions of Section 5.03(a), the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Indemnification by the Borrower.    The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes payable or paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.03) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability under this Section 5.03 delivered to the Borrower by a Lender or the Issuing Bank (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or the Issuing Bank, shall be conclusive absent manifest error.

(d)      Indemnification by the Lenders.   Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.   Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)      Evidence of Payments.   As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower or a Guarantor to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)      Status of Lenders.   (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.   In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Withholding Agent as will enable the Withholding Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.   Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.03(f)(ii)(A), Section 5.03(f)(ii)(B) and Section 5.03(h) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or

the Administrative Agent), executed originals of IRS Form W-9 (or any successor form) certifying that such Lender is exempt from United States federal backup withholding Tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or, in each case, any successor form) establishing an exemption from, or reduction of, United States federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or, in each case, any successor form) establishing an exemption from, or reduction of, United States federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI (or any successor form);

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit J-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable); or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY (or, in each case, any successor form), accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or, in each case, any successor form), a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-2 or Exhibit J-3, IRS Form W-9 (or any successor form), and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-4 on behalf of each such direct and indirect partner; and

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by

applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

Each Lender agrees that if any form or certification it previously delivered under this Section 5.03(f) or Section 5.03(g), expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Withholding Agent in writing of its legal inability to do so.

(g)     Status of Administrative Agent. On or before the date on which Natixis, New York Branch (and any successor or replacement Administrative Agent) becomes the Administrative Agent hereunder, it shall deliver to the Borrower two duly executed originals of either (i) IRS Form W-9 (or any successor form), or (ii) IRS Form W-8ECI (or any successor form) with respect to any payments to be received on its own behalf and IRS Form W-8IMY (or any successor form) (certifying that it is either a "qualified intermediary" within the meaning of Treasury Regulation Section 1.1441-1(e)(5) that has assumed primary withholding obligations under the Code, including Chapters 3 and 4 of the Code, or a "U.S. branch" within the meaning of Treasury Regulation Section 1.1441-1(b)(2)(iv) that is treated as a U.S. person for purposes of withholding obligations under the Code) for the amounts the Administrative Agent receives for the account of others.   The Administrative Agent (or, upon assignment or replacement, any assignee or successor) agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any material respect, it shall update such form or certification or promptly notify the Borrower in writing of its inability to do so.

(h)     FATCA.  If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 5.03(h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(i)     Treatment of Certain Refunds.  If the Administrative Agent, a Lender or the Issuing Bank determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 5.03, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 5.03 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent, such Lender or the Issuing Bank, as the

case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). The Borrower, upon the request of the Administrative Agent, a Lender, or the Issuing Bank, shall repay the amount paid over pursuant to this <u>Section 5.03(i)</u> (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Administrative Agent, Lender or Issuing Bank is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this <u>Section 5.03(i)</u>, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this <u>Section 5.03(i)</u> to the extent such payment would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the indemnification payments or additional amounts with respect to such refund had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(j)     <u>Applicable Law</u>.  For purposes of this <u>Section 5.03</u>, the term "applicable law" includes FATCA.

(k)     <u>Survival</u>.  Each party's obligations under this <u>Section 5.03</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 5.04    **Mitigation Obligations; Designation of Different Lending Office**.  If any Lender requests compensation under <u>Section 5.01</u>, or if the Borrower is required to pay any Indemnified Taxes or additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 5.03</u>, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 5.01</u> or <u>Section 5.03</u>, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 5.05    **Replacement of Lenders**.  If any Lender requests compensation under <u>Section 5.01</u>, or if the Borrower is required to pay any Indemnified Taxes or additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 5.03</u>, and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with <u>Section 5.04</u>, or if any Lender becomes a Defaulting Lender or a Non-Consenting Lender hereunder, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in <u>Section 12.04(b)</u>) all its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to

the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (iii) in the case of any such assignment resulting from a claim for compensation under <u>Section 5.01</u> or payments required to be made pursuant to <u>Section 5.03</u>, such assignment will result in a reduction in such compensation or payments and (iv) in the case of any assignment from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver, consent or Proposed Borrowing Base. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 5.06   **Illegality**.   Notwithstanding any other provision of this Agreement, in the event that it becomes unlawful for any Lender or its applicable lending office to honor its obligation to make or maintain Eurodollar Loans either generally or having a particular Interest Period hereunder, then (a) such Lender shall promptly notify the Borrower and the Administrative Agent thereof and such Lender's obligation to make such Eurodollar Loans shall be suspended (the "<u>Affected Loans</u>") until such time as such Lender may again make and maintain such Eurodollar Loans and (b) all Affected Loans which would otherwise be made by such Lender shall be made instead as ABR Loans (and, if such Lender so requests by notice to the Borrower and the Administrative Agent, all Affected Loans of such Lender then outstanding shall be automatically converted into ABR Loans on the date specified by such Lender in such notice) and, to the extent that Affected Loans are so made as (or converted into) ABR Loans, all payments of principal which would otherwise be applied to such Lender's Affected Loans shall be applied instead to its ABR Loans; *provided* that such ABR Loans shall not bear interest by reference to the Adjusted LIBO Rate pursuant to clause (c) of the definition of Alternate Base Rate).

## ARTICLE VI
## CONDITIONS PRECEDENT

Section 6.01   **Effective Date**.   The obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 12.02</u>):

(a)     The Administrative Agent, the Arrangers and the Lenders shall have received all commitment, facility and agency fees pursuant to the Fee Letters (which Fee Letters shall have been duly executed and delivered by the parties thereto) and all other fees and amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder (including, to the extent invoiced on or prior to the Effective Date, the fees and expenses of Bracewell LLP, counsel to the Administrative Agent).

(b)     The Administrative Agent shall have received a certificate of the Secretary, Assistant Secretary or an Authorized Officer of each of the Credit Parties setting forth (i) resolutions of the members, board of directors or other appropriate governing body with respect to the authorization of such Credit Party to execute and deliver the Loan Documents to which it

is a party and to enter into the transactions contemplated in those documents, (ii) the officers of each such Credit Party who are authorized to sign the Loan Documents to which such Credit Party is a party and who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers, and (iv) the limited liability company agreements and certificates of formation of each such Credit Party, certified as being true and complete.  The Administrative Agent and the Lenders may conclusively rely on such certificates until the Administrative Agent receives notice in writing from the Borrower to the contrary.

(c)     The Administrative Agent shall have received certificates of the appropriate State agencies with respect to the existence, qualification and good standing of each of the Credit Parties.

(d)     The Administrative Agent shall have received a closing certificate of an Authorized Officer of the Borrower, dated as of the Effective Date, certifying that (i) the representations and warranties of the Borrower in this Agreement and the other Loan Documents are true and correct, (ii) no Default or Event of Default then exists both before and after giving effect to the Transactions, (iii) each of the Borrower and its Subsidiaries has received all consents and approvals required by Section 7.03 in connection with the Transactions (and such consents and approvals are in full force and effect), (iv) attached to such certificate is a true, accurate and complete copy of the Parent Credit Agreement and all related "Loan Documents" (as defined therein) and all other material agreements and instruments delivered in connection therewith, and (v) the Parent Credit Agreement is (or will be substantially contemporaneously with the effectiveness of this Agreement) in full force and effect.

(e)     The Administrative Agent shall have received from each party hereto, counterparts (in such number as may be requested by the Administrative Agent) of this Agreement signed on behalf of such party.

(f)     The Administrative Agent shall have received duly executed Notes payable to each Lender requesting a Note in a principal amount equal to its Maximum Credit Amount dated as of the date hereof.

(g)     The Administrative Agent shall have received from each party thereto duly executed counterparts (in such number as may be requested by the Administrative Agent) of the Security Instruments (including, without limitation, any Account Control Agreements required by the Security Agreement) described on Exhibit E.  In connection with the execution and delivery of the Security Instruments, the Administrative Agent shall (i) be reasonably satisfied that the Security Instruments create (or will upon recording create) first priority, perfected Liens (subject only to Permitted Liens) on at least 85% of the total value of the Proved Oil and Gas Properties and 85% of the present value of PDP Reserves, in each case, evaluated in the Initial Reserve Report and on all other Property purported to be pledged as collateral pursuant to the Security Instruments and (ii) have received certificates, together with undated, blank stock powers for each such certificate, representing all of the issued and outstanding Equity Interests of each Subsidiary, to the extent such Equity Interests are certificated.

(h)    The Administrative Agent shall have received an opinion of Baker Botts LLP, special counsel to the Credit Parties, in form and substance reasonably satisfactory to the Administrative Agent.

(i)    The Administrative Agent shall have received certificates of insurance coverage of the Borrower and the other Credit Parties evidencing that the Borrower and the other Credit Parties are carrying insurance in accordance with Section 7.12.

(j)    The Administrative Agent shall have received title information satisfactory to it as the Administrative Agent may reasonably require with respect to the status of title to at least 85% (or such other amount as agreed by the Administrative Agent in its sole discretion) of the total value of the Proved Oil and Gas Properties and 85% of the present value of PDP Reserves, in each case, evaluated in the Initial Reserve Report.

(k)    The Administrative Agent shall be reasonably satisfied with the environmental condition of the Oil and Gas Properties of the Borrower and the Subsidiaries.

(l)    The Administrative Agent shall have received the Initial Financial Statements and the Initial Reserve Report accompanied by a certificate covering the matters described in Section 8.12(c).

(m)    The Administrative Agent shall have received appropriate UCC search certificates and county-level real property record search results reflecting no prior Liens encumbering the Properties of the Borrower and its Subsidiaries for the State of Delaware and any other jurisdiction requested by the Administrative Agent, other than those being assigned or released on or prior to the Effective Date or Permitted Liens.

(n)    The Administrative Agent and the Lenders (i) shall have received, and satisfactorily completed its review of, all due diligence information regarding the Credit Parties as it shall have requested including to the extent requested information regarding litigation, tax matters, accounting matters, insurance matters, labor matters, pension liabilities (actual or contingent), real estate leases, material contracts (including Swap Agreements, gathering, processing and transportation contracts, management contracts, oil and gas sale agreements, and transportation agreements), debt agreements, property ownership, contingent liabilities and other legal matters of the Borrower and its Subsidiaries, and (ii) shall be satisfied in their sole and absolute discretion with the terms and conditions of the Parent Credit Agreement and all "Loan Documents" (as defined therein) and other material agreements and instruments delivered in connection therewith.

(o)    (i) The Borrower shall have received a Cash equity contribution from the Parent in an amount of at least $170,000,000, and (ii) the capitalization structure and equity ownership of each Credit Party after giving effect to the Transactions shall be satisfactory to the Administrative Agent in all respects.

(p)    The Administrative Agent shall have received an executed copy of the payoff letter in respect of the Existing NPA and other evidence satisfactory to it (including mortgage releases and UCC-3 financing statement terminations) that all Debt (other than Debt permitted by Section 9.02 (other than Section 9.02(e))) and Liens (other than Permitted Liens) associated

with any credit facilities and funded debt of the Credit Parties or otherwise encumbering the Credit Parties' Properties have been released or terminated, subject only to the funding of the initial Loans hereunder and the filing of applicable terminations and releases.

(q)    To the extent requested by the Lenders or the Administrative Agent at least 10 days prior to the Effective Date, the Administrative Agent shall have received from the Credit Parties, all documentation and other information required by regulatory authorities under applicable "know your customer" and Anti-Money Laundering Laws (including, without limitation, a duly executed IRS Form W-9 or other applicable tax form).

(r)    The Administrative Agent and each Lender shall have received at least five days prior to the Effective Date a Beneficial Ownership Certification  in relation to the Borrower to the extent that (i) the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, and (ii) any Lender that has so requested in a written notice to the Borrower at least five days prior to the Effective Date such Beneficial Ownership Certification (*provided* that, upon the execution and delivery by such Lender of its signature page to this Agreement, the condition set forth in this clause (r) shall be deemed to be satisfied).

(s)    The Credit Parties shall have entered into Swap Agreements with Approved Counterparties on terms and prices that are mutually agreeable to the Credit Parties and the Administrative Agent.

(t)    The Administrative Agent shall have received such other certificates, documents, agreements or instruments as the Administrative Agent or any Lender may reasonably request.

Without limiting the generality of the provisions of Section 11.04, for purposes of determining compliance with the conditions specified in this Section 6.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required under this Section 6.01 to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Effective Date specifying its objection thereto.   All documents executed or submitted pursuant to this Section 6.01 by and on behalf of the Borrower or any of its Subsidiaries shall be in form and substance satisfactory to the Administrative Agent and its counsel.   The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding.   Notwithstanding the foregoing, the obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 12.02) at or prior to 1:00 p.m., New York, New York time, on September 17, 2018 (and, in the event such conditions are not so satisfied or waived, the Commitments shall terminate at such time).

Section 6.02   **Each Credit Event**.  The obligation of each Lender to make a Loan on the occasion of any Borrowing (including the initial funding), and of the Issuing Bank to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)     At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default or Borrowing Base Deficiency shall have occurred and be continuing.

(b)     The representations and warranties of the Borrower and the Guarantors set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, except to the extent that (i) any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, such representations and warranties shall continue to be true and correct in all material respects as of such specified earlier date and (ii) any such representation and warranty is expressly qualified by materiality or by reference to Material Adverse Effect, in which case such representation and warranty (to the extent so qualified) shall continue to be true and correct in all respects.

(c)     The making of such Loan or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, would not conflict with, or cause any Lender or the Issuing Bank to violate or exceed, any applicable Governmental Requirement and no litigation shall be pending or threatened in writing, which does or, with respect to any such threatened litigation, seeks to, enjoin, prohibit or restrain, the making or repayment of any Loan, the issuance, amendment, renewal, extension or repayment of any Letter of Credit or any participations therein or the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(d)     The receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03(a) or a request for a Letter of Credit (or an amendment, extension or renewal of a Letter of Credit) in accordance with Section 2.08(b), as applicable.

Each request for a Borrowing and each request for the issuance, amendment, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in Section 6.02(a) through (c).

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders that:

Section 7.01    **Organization; Powers**.  Each Credit Party (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and (ii) has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except in the case of this clause (ii) where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications would not reasonably be expected to have a Material Adverse Effect.

Section 7.02  **Authority; Enforceability**.  The Transactions are within the Borrower's, and each Guarantor's corporate, limited liability company, or partnership powers and have been duly authorized by all necessary corporate, limited liability company or partnership action and, if required, action by any holders of its Equity Interests (including any action required to be taken by any class of directors, managers or supervisors, whether interested or disinterested, as applicable, of the Borrower or any other Person, in order to ensure the due authorization of the Transactions).  Each Loan Document to which the Borrower and each Guarantor is a party has been duly executed and delivered by the Borrower and such Guarantor and constitutes a legal, valid and binding obligation of the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to applicable Debtor Relief Laws and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03  **Approvals; No Conflicts**.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person (including holders of its Equity Interests or any class of directors, managers or supervisors, as applicable, whether interested or disinterested, of the Borrower or any other Person), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the Transactions, except such as have been obtained or made and are in full force and effect, other than (i) the recording and filing of the Security Instruments as required by this Agreement, and (ii) those third party approvals or consents which, if not made or obtained, could not reasonably be expected to have a Material Adverse Effect, (b) will not violate any applicable law or regulation or the limited liability company agreements, charter, bylaws or other Organizational Documents of the Borrower or any Subsidiary or any order of any Governmental Authority, (c) will not violate or result in a default under any Material Contract, indenture or other agreement regarding Debt or Swap Agreements, in each case, binding upon the Borrower or any Subsidiary or its Properties, or give rise to a right thereunder to require any payment to be made by the Borrower or such Subsidiary, and (d) will not result in the creation or imposition of any Lien on any Property of the Borrower or any Subsidiary (other than the Liens created by the Loan Documents).

Section 7.04  **Financial Condition; No Material Adverse Change**.

(a)     The Borrower has heretofore furnished to the Lenders the Initial Financial Statements.  Such financial statements present fairly in all material respects the financial condition of the Borrower and its Consolidated Subsidiaries  as of the Effective Date in accordance with GAAP, and do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements contained therein not misleading at such time.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its Consolidated Subsidiaries  as of such dates and for such periods in accordance with GAAP.

(b)     Since December 31, 2017, there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

(c)     Neither the Borrower nor any Subsidiary has on the date hereof, after giving effect to the Transactions, any material Debt (including Disqualified Capital Stock) or any

contingent liabilities, material off-balance sheet liabilities or partnerships, material liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that, in each case, would be required by GAAP to be reflected in audited financial statements, except as referred to or reflected or provided for in written information provided by Borrower to Administrative Agent and the Lenders prior to the date hereof.

Section 7.05    **Litigation**.

(a)    Except as set forth on Schedule 7.05, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against the Borrower or any Subsidiary (i) not fully covered by insurance (except for normal deductibles) as to which there is a reasonable possibility of an adverse determination that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (ii) that involve the validity or enforceability of any Loan Document or the Transactions (including any provision relating to the Credit Parties' obligations to repay the Indebtedness or any provision relating to the validity or perfection of any Lien created by any Loan Document).

(b)    Since the Effective Date, there has been no change in the status of the matters disclosed in Schedule 7.05 that, individually or in the aggregate, has resulted in a Material Adverse Effect.

Section 7.06    **Environmental Matters**.    Except for matters set forth on Schedule 7.06 or that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    each Credit Party, each Credit Party's Oil and Gas Properties, and the Credit Parties' operations their respective Oil and Gas Properties are, and within all applicable statute of limitation periods have been, in compliance with all applicable Environmental Laws;

(b)    the Borrower and the Subsidiaries have obtained all Environmental Permits required for their respective operations and each of their Oil and Gas Properties, with all such Environmental Permits being currently in full force and effect, and none of the Borrower or the Subsidiaries has received any written notice or otherwise has knowledge that any such existing Environmental Permit will be revoked or that any application for any new Environmental Permit or renewal of any existing Environmental Permit will be denied;

(c)    there are no claims, demands, suits, orders, inquiries, or proceedings concerning any violation of, or any liability (including as a potentially responsible party) under, any applicable Environmental Laws that is pending or, to the Borrower's knowledge, threatened against the Borrower or any Subsidiary or any of their respective Oil and Gas Properties or as a result of any operations at such Oil and Gas Properties;

(d)    to the knowledge of the Credit Parties, none of the Oil and Gas Properties of the Borrower or any Subsidiary contain or have contained any:  underground storage tanks; asbestos-containing materials; landfills or dumps; hazardous waste management units as defined pursuant to RCRA or any comparable state law; or sites on or nominated for the National Priority List

74

promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law;

(e)     there has been no Release of Hazardous Materials at, on, under or from the Borrower's or any Subsidiary's Oil and Gas Properties that is required by law to be reported to any Governmental Authority or that would materially adversely affect the Oil and Gas Properties (individually or cumulatively with any other Release). There are no investigations, remediations, abatements, removals, or monitorings of Hazardous Materials required under applicable Environmental Laws at such Oil and Gas Properties the failure of which to perform would materially adversely affect the Oil and Gas Properties and, to the knowledge of the Borrower, none of such Properties are adversely affected by any Release or threatened Release of a Hazardous Material originating or emanating from any other real property;

(f)     none of the Borrower or any Subsidiary has received any written notice asserting an alleged liability or obligation under any applicable Environmental Laws with respect to the investigation, remediation, abatement, removal, or monitoring of any Hazardous Materials at, under, or Released or threatened to be Released from any real properties offsite the Borrower's or any Subsidiary's Properties and, to the Borrower's knowledge, there are no conditions or circumstances that could reasonably be expected to result in the receipt of such written notice;

(g)     to the knowledge of the Credit Parties, there has been no exposure of any Person or Property to any Hazardous Materials as a result of or in connection with the operations and businesses of any of the Borrower's or any Subsidiary's Oil and Gas Properties that could reasonably be expected to form the basis for a claim for damages or compensation;

(h)     the Borrower and its Subsidiaries have made available to the Administrative Agent complete and correct copies of all environmental site assessment reports, and studies on environmental matters (including matters relating to any alleged non-compliance with or liability under Environmental Laws) requested by the Administrative Agent that are in the Borrower's or any Subsidiary's possession or control and relating to the Borrower's or any Subsidiary's Oil and Gas Properties or operations thereon; and

(i)     there are no conditions or circumstances associated with any of the Borrower's, nor any Subsidiary's currently or, to the Borrower's knowledge, previously owned or leased real properties that could reasonably be expected to give rise to the imposition of any material liabilities under any Environmental Laws against any Credit Party as a result of any of their operations at such properties.

Section 7.07   **Compliance with the Laws and Agreements; No Defaults**.

(a)     Each of the Borrower and each Subsidiary is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     Neither the Borrower nor any Subsidiary is in default nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default or would require the Borrower or such Subsidiary to Redeem or make any offer to Redeem under any indenture, note, credit agreement or similar instrument pursuant to which any Material Debt is outstanding or by which the Borrower or any Subsidiary or any of their Properties is bound.

(c)     No Default has occurred and is continuing.

(d)     Except as reflected on Schedule 7.07, no Credit Party is in default in the performance, observance or fulfillment of the obligations, covenants or conditions contained in its Material Contracts.

Section 7.08    **Investment Company Act**.  Neither the Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09    **Taxes**.  Each of the Borrower and its Subsidiaries has timely filed or caused to be filed (taking into account any extensions obtained in the ordinary course) all federal income Tax returns and reports, and all other material Tax returns and reports, required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP.  The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of Taxes and other governmental charges are, in the reasonable opinion of the Borrower, adequate.  No Tax Lien has been filed and, to the knowledge of the Borrower, no material claim is being asserted with respect to any such Tax or other such governmental charge.

Section 7.10    **ERISA**.  The Borrower, its Subsidiaries and each of their respective ERISA Affiliates are in compliance in all material respects with all applicable provisions and requirements of ERISA and the Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan in all material respects.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status.  No liability to the PBGC (other than required premium payments) or the IRS has been or is expected to be incurred by any Credit Party or any of their ERISA Affiliates with respect to any Employee Benefit Plan.  No ERISA Event has occurred or is reasonably expected to occur.  Except to the extent required under Section 4980B of the Code or similar state laws, or otherwise funded entirely by the participants thereof, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of the Credit Parties or any of their respective ERISA Affiliates.  The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by the Credit Parties or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did

not exceed the aggregate current value of the assets of such Pension Plan.  As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of the Credit Parties and their respective ERISA Affiliates for a complete or partial withdrawal from such Multiemployer Plan, when aggregated with such potential liability for a complete or partial withdrawal from all Multiemployer Plans, is zero.  The Credit Parties and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

Section 7.11  **Disclosure; No Material Misstatements; Beneficial Ownership**.  Taken as a whole, the reports, Initial Financial Statements, Financial Statements, certificates or other information furnished by or on behalf of the Borrower or any Subsidiary to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) do not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading as of the date such information is dated or certified; provided that (a), with respect to projected or forecasted financial information, financial estimates, pro forma financial information, prospect information, geological and geophysical data, Reserve Reports and engineering projections and other forward-looking information the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being recognized by the Lenders, however, that projections or forecasts as to future events are not to be viewed as facts and that results during the period(s) covered by such projections or forecasts may differ from the projected or forecasted results and that such differences may be material and that the Borrower makes no representation that such projections or forecasts will be realized), (b) no representation is made with respect to information of a general economic or general industry nature, and (c) as to statements, information and reports supplied by third parties, the Borrower represents only that it is not aware of any material misstatement or omission therein.  There are no statements or conclusions in any Reserve Report which are based upon or include materially misleading information or fail to take into account material information known to the Borrower regarding the material matters reported therein, provided that (i) with respect to any Reserve Report prepared by one or more Approved Petroleum Engineers, the Borrower represents only that there are no statements or conclusions in any Reserve Report or in any information delivered in connection therewith which are based upon or include materially misleading information of a material fact or which fail to take into account material information known to the Borrower regarding the matters reported therein, and (ii) it is understood that projections concerning volumes attributable to the Oil and Gas Properties of the Borrower and its Subsidiaries  and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Borrower and its Subsidiaries  do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate. As of the Effective Date, the information included in the Beneficial Ownership Certification provided on or prior to the Effective Date to any Lender in connection with this Agreement is true and correct in all material respects.

Section 7.12  **Insurance**.  The Borrower has, and has caused all of its Subsidiaries to have, (a) all insurance policies sufficient for the compliance by each of them with all material

Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower and its Subsidiaries.  The Administrative Agent has been named as additional insured in respect of such liability insurance policies and the Administrative Agent has been named as lender loss payee with respect to Property loss insurance covering the Collateral pursuant to the Security Instruments.

Section 7.13    **Restriction on Liens**.  Neither the Borrower nor any Subsidiary is a party to any material agreement or arrangement, or subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Administrative Agent for the benefit of the Secured Parties on or in respect of their Properties to secure the Indebtedness and the Loan Documents, or restricts any Subsidiary from paying dividends or making any other distributions in respect of its Equity Interests to the Borrower or any Subsidiary, or restricts any Subsidiary from making loans or advances to the Borrower or any Subsidiary, or which requires the consent of other Persons in connection therewith, except, in each case, for such encumbrances or restrictions permitted under Section 9.14.

Section 7.14    **Subsidiaries**.  Except as set forth on Schedule 7.14 or as disclosed in writing to the Administrative Agent (which shall promptly furnish a copy to the Lenders), which shall upon disclosure be deemed a supplement to Schedule 7.14, the Borrower has no Subsidiaries.  The Borrower has no Foreign Subsidiaries.

Section 7.15    **Location of Business and Offices**.  No Credit Party has, during the preceding five years, been known by, or used any other trade or fictitious name.  The chief executive office and principal place of business of each Credit Party is located at the address of such Person set out in Schedule 7.15  Except as indicated in Schedule 7.15, no Credit Party has had any other office or place of business within the past 5 years.  Each such Person's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and Federal Taxpayer Identification Number is stated on Schedule 7.15 (or as set forth in a notice delivered pursuant to Section 8.01(j) in accordance with Section 12.01).

Section 7.16    **Properties; Titles, Etc**.

(a)    Except for Immaterial Title Deficiencies, each of the Borrower and its Subsidiaries  has good and defensible title to its respective Proved Oil and Gas Properties evaluated in the most recently delivered Reserve Report and good title to all its material personal Properties, in each case, free and clear of all Liens except Permitted Liens.  After giving full effect to the Excepted Liens and any Immaterial Title Deficiencies, the Borrower or its Subsidiaries  specified as the owners owns at least the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate the Borrower or its Subsidiaries  to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding

proportionate increase in the Borrower's or such Subsidiaries ' net revenue interest in such Property or the revenues therefrom.

(b)     All material leases and agreements necessary for the conduct of the business of the Borrower and its Subsidiaries  are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, which could reasonably be expected to have a Material Adverse Effect.

(c)     The rights and Properties presently owned, leased or licensed by the Borrower and its Subsidiaries  including, all easements and rights of way, include all rights and Properties necessary to permit the Borrower and its Subsidiaries  to conduct their business in all material respects in the same manner as their business has been conducted prior to the date hereof.

(d)     All of the Properties of the Borrower and its Subsidiaries  which are necessary for the operation of their businesses are maintained in accordance with prudent business standards.

(e)     The Borrower and each Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the Borrower and such Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrower and its Subsidiaries either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

Section 7.17  **Maintenance of Properties**.  Except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Proved Oil and Gas Properties (and Properties unitized therewith) of the Borrower and its Subsidiaries  have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases, or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of such Oil and Gas Properties of the Borrower and its Subsidiaries. Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (i) no Proved Oil and Gas Property of the Borrower or any Subsidiary is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of the Proved Oil and Gas Properties (or Properties unitized therewith) of the Borrower and each of its Subsidiaries is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, such Proved Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) in which the Borrower or such Subsidiary owns an interest.  All pipelines, wells, gas processing plants, platforms and

other material improvements, fixtures and equipment owned in whole or in part by the Borrower or any of its Subsidiaries  that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations (other than those the failure of which to maintain in accordance with this <u>Section 7.17</u> could not reasonably be expected to have a Material Adverse Effect).

Section 7.18   **Gas Imbalances, Prepayments**.  Except as set forth on <u>Schedule 7.18</u> or on the most recent certificate delivered pursuant to <u>Section 8.12(c)</u>, on a net aggregate basis there are no gas imbalances, take or pay or other prepayments which would require the Borrower or any of its Subsidiaries to deliver Hydrocarbons produced from their Proved Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding 2.0% of the aggregate annual production of gas from the Oil and Gas Properties of the Borrower and its Subsidiaries during the most recent calendar year (on an mcf equivalent basis).

Section 7.19   **Marketing of Production**.  Except for contracts listed and in effect on the date hereof on <u>Schedule 7.19</u>, or hereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Borrower represents that it or its Subsidiaries  are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract), no material agreements exist which are not cancelable on 60 days' notice or less without penalty or detriment, for the sale of production from the Borrower's and its Subsidiaries' Hydrocarbons (including, calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (i) pertain to the sale of production at a fixed price, (ii) represent in respect of all such agreements 2.0% or more (in the aggregate) of the Credit Parties' average monthly production of Hydrocarbon volumes, and (iii) have a maturity or expiry date of longer than six (6) months from the effective date of such agreement.

Section 7.20   **Swap Agreements and Qualified ECP Counterparty**.  <u>Schedule 7.20</u>, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to <u>Section 8.01(f)</u>, as of the date of (or as of the date(s) otherwise set forth in) such report, sets forth, a true and complete list of all Swap Agreements of the Borrower and each Subsidiary, the material terms thereof (including the type, effective date, term or termination date and notional amounts or volumes), the net mark to market value thereof, all credit support agreements relating thereto other than Loan Documents (including any margin required or supplied) and the counterparty to each such agreement.  The Borrower is a Qualified ECP Counterparty.

Section 7.21   **Use of Loans and Letters of Credit**.  The proceeds of the Loans and the Letters of Credit shall be used solely to provide working capital for exploration and production operations, to fund capital expenditures related to the Borrower's drilling program, for acquisitions of Oil and Gas Properties, for general company purposes and to pay related fees and expenses.  The Borrower and its Subsidiaries  are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, Regulation U or Regulation X of the Board).  No part of the proceeds of any Loan or Letter of Credit will be used by any Credit Party for any purpose which violates the provisions of Regulations T, Regulation U or Regulation X of the Board.

Section 7.22  **Solvency**.  After giving effect to the Transactions and each Borrowing made and each issuance, increase or extension of each Letter of Credit hereunder, (a) the Borrower is Solvent and (ii) the Borrower and its Subsidiaries taken as a whole, are Solvent.

Section 7.23  **Anti-Corruption Laws, Anti-Money Laundering Laws, and Sanctions**. The Borrower has implemented and maintains in effect policies and procedures to ensure compliance by the Borrower and its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, Anti-Money Laundering Laws, and applicable Sanctions, and the Borrower and its Subsidiaries and their respective officers and employees and, to the knowledge of the Borrower, their respective directors and agents, are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, and applicable Sanctions.  None of (a) the Borrower and its Subsidiaries or, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law, Anti-Money Laundering Laws, or applicable Sanctions.

Section 7.24  **EEA Financial Institutions**.  Neither the Borrower nor any other Credit Party is an EEA Financial Institution.

## ARTICLE VIII
## AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents shall have been paid in full and all Letters of Credit shall have expired or terminated and all LC Disbursements shall have been reimbursed, the Borrower covenants and agrees with the Lenders that:

Section 8.01  **Financial Statements; Ratings Change; Other Information**.  The Borrower will furnish to the Administrative Agent and each Lender:

(a)    Annual Financial Statements.  As soon as available, and in any event with respect to each Fiscal Year end, within one hundred twenty (120) days after the end of such Fiscal Year, (A) the consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its consolidated Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year, in reasonable detail, together with a Financial Officer Certification with respect thereto; and (B) with respect to such financial statements for any Fiscal Year ended December 31, 2017 and thereafter, a report thereon by the Borrower's Auditors, which shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Borrower and its Subsidiaries as at the dates indicated and that the results of their operations and their cash flows for the periods indicated are in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in

accordance with generally accepted auditing standards, and, in any case, without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit other than a "going concern" or other qualification that results solely from the Maturity Date being scheduled to occur within one year from the time such opinion is delivered.

(b)    Quarterly Financial Statements.  As soon as available, and in any event within forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year, the consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then-current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a Financial Officer Certification with respect thereto.

(c)    Certificate of Financial Officer – Compliance.  Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a duly executed and completed Compliance Certificate.

(d)    Financial Plan and Forecasts.  As soon as practicable and in any event no later than each November 1st, a consolidated plan and financial forecast for following Fiscal Year and each Fiscal Year (or portion thereof) through the final maturity date of the Loans (a "Financial Plan"), including (i) a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of the Borrower and its consolidated Subsidiaries for each such Fiscal Year, together with an explanation of the assumptions on which such forecasts are based, (ii) forecasted consolidated statements of income and cash flows of the Borrower and its consolidated Subsidiaries for each month of each such Fiscal Year, (iii) forecasts demonstrating projected compliance with the requirements of Section 9.01 through the final maturity date of the Loans, (iv) forecasts demonstrating adequate liquidity through the final maturity date of the Loans, and (v) a twelve (12) month forecast showing the projected monthly production of Hydrocarbons by the Borrower and its Subsidiaries and the projected capital expenditures to be incurred by the Borrower and its Subsidiaries, together, in each case, with an explanation of the assumptions on which such forecasts are based all in form and substance satisfactory to the Administrative Agent and accompanied by a Financial Officer Certification certifying that the projections contained therein are based upon good faith estimates and assumptions believed to be reasonable at the time made and at the time of delivery thereof (it being understood that projections concerning volumes attributable to the Oil and Gas Properties of the Borrower and its Subsidiaries  and production and cost estimates contained in such budgets and projections are necessarily based upon professional opinions, estimates and projections and that the Borrower and its Subsidiaries  do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate).

(e)    Reserved.

(f)    Certificate of Financial Officer – Swap Agreements.  Concurrently with any delivery of financial statements under Section 8.01(a) and Section 8.01(b), a certificate of a Financial Officer, in form and substance satisfactory to the Administrative Agent, setting forth as

of the end of such fiscal quarter or fiscal year, as applicable (or as of a more recent date), a true and complete list of all Swap Agreements of the Borrower and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the estimated mark to market value thereof, any new credit support agreements relating thereto (other than the Loan Documents) not listed on <u>Schedule 7.20</u>, any margin required or supplied under any credit support document, and the counterparty to each such agreement.

(g)    <u>Certificate of Insurer – Insurance Coverage</u>.  Concurrently with any delivery of financial statements under <u>Section 8.01(a)</u>, one or more certificates of insurance coverage from the Borrower's insurance broker or insurers with respect to the insurance required by <u>Section 8.07</u>, in form reasonably satisfactory to the Administrative Agent, and, if requested by the Administrative Agent, all copies of the applicable policies.

(h)    <u>SEC and Other Filings; Reports to Shareholders</u>.  If the Borrower or any of its Subsidiaries  becomes subject to SEC requirements for public reporting, then promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary with the SEC, or with any national securities exchange, or distributed by the Borrower to its shareholders generally, as the case may be.

(i)    <u>Notices Under Material Instruments</u>.  Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any Person pursuant to the terms of the Parent Credit Agreement (including, without limitation, the financial statements of the Parent delivered thereunder, together with such auditors' reports and letters as the same may be delivered with such financial statements of the Parent), any preferred stock designation, indenture, loan or credit or other similar agreement with respect to Material Debt (other than this Agreement) and not otherwise required to be furnished to the Lenders pursuant to any other provision of this <u>Section 8.01</u>.

(j)    <u>Information Regarding Collateral</u>.  The Borrower will furnish to Administrative Agent written notice at least thirty (30) days prior to the occurrence of any change in an Credit Party's (i) organizational name, (ii) identity or organizational structure or (iii) Federal Taxpayer Identification Number.  The  Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or other applicable law or otherwise that are required in order for Administrative Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral and for the Collateral at all times following such change to have a valid, legal and perfected security interest as contemplated in the Security Instruments.  The Borrower will furnish to Administrative Agent prompt written notice of the any Credit Party's knowledge of any Lien or claims made or asserted against any Collateral or interest therein.  The Borrower also agrees promptly to notify Administrative Agent in writing if any material Collateral is lost, damaged or destroyed.

(k)    <u>Notice of Borrowing Base Property Dispositions and Liquidations</u>.  In the event the Borrower or any Subsidiary (i) intends to consummate any Borrowing Base Property Disposition involving Proved Oil and Gas Properties with a fair market value in excess of

$1,000,000 in accordance with Section 9.11, reasonable prior written notice (and in any event not less than five Business Days' prior notice) of such disposition, the price thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent or (ii) receives any notice of early termination of any Swap Agreement to which the Borrower or any Subsidiary is a party from any of its counterparties, or any Swap Agreement to which the Borrower or any Subsidiary is a party is Liquidated and results in Cash payments to the Borrower or any Subsidiary in excess of $1,000,000 written notice, promptly thereafter (and in any event, not more than three (3) Business Days thereafter), of such early termination notice or such Liquidation.

(l)    Production Report and Lease Operating Statements.    Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a summary report setting forth, for each calendar month during the then current fiscal year to the end of such fiscal quarter, the volume of production and sales attributable to production (and the average prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month.

(m)    Notices of Certain Changes.    Promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the certificate of formation, limited liability company agreement, articles of incorporation, by-laws, any preferred stock designation or any other organic document of the Borrower or any Subsidiary, if such amendment, modification or supplement could reasonably be expected to be material to the Lenders or would have a direct impact on provisions set forth in the Loan Documents.

(n)    List of Purchasers.    Promptly following any request therefor, a list of all Persons purchasing Hydrocarbons from the Borrower or any other Credit Party.

(o)    Notice of Casualty Events.    Prompt written notice of the occurrence of any Casualty Event with respect to Property having a fair market value in excess of the Threshold Amount or the commencement of any condemnation proceeding that could reasonably be expected to result in a Casualty Event with respect to Property having a fair market value in excess of the Threshold Amount.

(p)    Opening of Accounts.    Prompt written notice (such notice to include reasonably detailed information regarding the account number, purpose and applicable bank or other institution in respect of such Deposit Account, Commodities Account or Securities Account) to the Administrative Agent of any Deposit Account, Commodities Account or Securities Account (other than an Excluded Account) intended to be opened by the Borrower or any Guarantor.

(q)    Patriot Act and Beneficial Ownership Information.    Promptly upon request, (i) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act, and (ii) information and documentation reasonably requested by the Administrative Agent or any

Lender for purposes of compliance with applicable anti-money laundering rules and regulations, including the USA Patriot Act and the Beneficial Ownership Regulation.

(r)    <u>Other Requested Information</u>.    Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary (including any Plan and any reports or other information required to be filed with respect thereto under the Code or under ERISA (but with respect to a Multiemployer Plan, only such information as is reasonably available to the Borrower)), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender may reasonably request.

Section 8.02  **Notices of Material Events**.    The Borrower will furnish to the Administrative Agent prompt (and in any event within three Business Days after any Authorized Officer of the Borrower obtains knowledge thereof) written notice of the following:

(a)    the occurrence of any Default or Event of Default, or any "Default" or "Event of Default" under the Parent Credit Agreement;

(b)    the filing or commencement of, or the receipt of a threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against any Credit Party not previously disclosed in writing (including in the Schedules hereto) to Administrative Agent that has caused or could reasonably be expected to result in, liability in excess of $200,000 or any material adverse development in any action, suit, proceeding, investigation or arbitration previously disclosed to Administrative Agent;

(c)    the filing or commencement of any action, suit, proceeding, or arbitration by or on behalf of any Credit Party claiming or asserting (i) injunctive relief, or (ii) damages, penalties other claims in favor of such Credit Party valued in excess of $200,000;

(d)    the occurrence of any ERISA Event that, individually, could reasonably be expected to result in liability for any Credit Party or its ERISA Affiliates in an aggregate amount exceeding $200,000;

(e)    the occurrence of a default under any Material Contract;

(f)    any change in the information provided in the Beneficial Ownership Certification delivered to such Lender that would result in a change to the list of beneficial owners identified in such certification;

(g)    receipt of any incident of noncompliance or similar notice from a Governmental Authority which would cost $200,000 or more to remediate (including, without limitation, any action, investigation or inquiry by any Governmental Authority threatened in writing or any demand or lawsuit threatened in writing by any Person against the Borrower or its Subsidiaries or their Properties, in each case, in connection with any Environmental Laws); and

(h)    any other development that results in, or could result in, either individually or in the aggregate, a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of an Authorized Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 8.03    **Existence; Conduct of Business**.  The Borrower will, and will cause each Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect (a) its legal existence and (b) the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Oil and Gas Properties are located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; *provided* that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.10.

Section 8.04    **Payment of Obligations**.   The Borrower will, and will cause each Subsidiary to, pay its obligations, including Tax liabilities of the Borrower and all of its Subsidiaries, before the same shall become delinquent or in default following expiry of any applicable grace period for payment, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

Section 8.05    **Performance of Obligations under Loan Documents**.   The Borrower will pay the Loans in accordance with the terms hereof, and the Borrower will, and will cause each Subsidiary to, perform every act and discharge all of the obligations to be performed and discharged by them under the Loan Documents.

Section 8.06    **Operation and Maintenance of Properties**.   The Borrower, at its own expense, will, and will cause each Subsidiary to:

(a)      operate its Proved Oil and Gas Properties and other material Properties or cause such Proved Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, in each case, in all material respects, including applicable proration requirements and Environmental Laws, and all applicable material laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Proved Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom;

(b)      maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its Proved Oil and Gas Properties and other Properties material to the conduct of its business, including all equipment, machinery and facilities, unless the Borrower determines in good faith that the continued maintenance of such Oil and Gas Properties and other Properties is no longer economically desirable, necessary or useful to the business of the Credit

Parties or such Oil and Gas Properties or other Properties are sold, assigned or transferred in a disposition permitted by Section 9.11;

(c)     promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Proved Oil and Gas Properties and do all other things necessary to keep unimpaired its rights with respect thereto and prevent any forfeiture thereof or default thereunder, except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect; and

(d)     promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with customary industry standards, the obligations required by the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Proved Oil and Gas Properties and other material Properties, except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

To the extent the Borrower and its Subsidiaries are not the operator of any Property, the Borrower shall use commercially reasonable efforts to cause the operator to comply with this Section 8.06, but failure of the operator so to comply will not constitute a Default or Event of Default.

Section 8.07    **Insurance**.  The Borrower will, and will cause each other Credit Party to, maintain or cause to be maintained, with financially sound and reputable insurers, casualty insurance, such public liability insurance, and third party property all risk damage insurance, in each case, with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Credit Parties as are customarily carried or maintained under similar circumstances by Persons of established reputation of similar size and engaged in similar businesses, in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Each such policy of insurance shall (a) contain loss payable clauses or provisions in each such insurance policy or policies that are equivalent endorsements in favor of and made payable to Administrative Agent as its interests may appear and (b) name Administrative Agent and the Lenders as "additional insureds" and provide that the insurer will endeavor to give no less than 30 days prior written notice of any cancellation to Administrative Agent (10 days for non-payment).  Such endorsement shall be further endorsed to show that each Credit Party waives the right and the Borrower shall use reasonable efforts to cause and will cause other Credit Parties to use reasonable efforts to cause its insurers to waive the right, to subrogate against the Secured Parties.  Each such policy shall be primary and not excess to or contributing with any insurance or self-insurance maintained by any Secured Party.

Section 8.08    **Books and Records; Inspection Rights**.

(a)     The Borrower will, and will cause each other Credit Party to, (i) keep adequate books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (ii) permit any representatives

designated by Administrative Agent on behalf of all Lenders (including employees of Administrative Agent or any consultants, accountants, lawyers and appraisers retained by Administrative Agent) to visit and inspect any of the properties of any Credit Party, to inspect, copy and take extracts from its financial and accounting records, and to discuss its affairs, finances and accounts with its officers and independent accountants, all upon reasonable notice and at such reasonable times during normal business hours (so long as no Default or Event of Default has occurred and is continuing) and as often as may reasonably be requested, and by this provision the Credit Parties authorize such accountants to discuss with Administrative Agent and such representatives the affairs, finances and accounts of each Credit Party.  The Borrower acknowledges that Administrative Agent, after exercising its rights of inspection, may prepare and distribute to the Lenders certain reports pertaining to the Credit Parties' assets for internal use by Administrative Agent and the Lenders.

(b)     With respect to any event described in Section 8.10 or if an Event of Default has occurred and is continuing:

(i)     Administrative Agent and its representatives (shall have the right, but not the obligation or duty, upon reasonable notice to enter the applicable Oil and Gas Properties at reasonable times for the purposes of observing the applicable Oil and Gas Properties.  Such access shall include, at the reasonable request of Administrative Agent, access to relevant documents and employees of each Credit Party and to their outside representatives, to the extent necessary to obtain necessary information related to the event at issue.  If an Event of Default has occurred and is continuing, the Credit Party shall conduct such tests and investigations on the Oil and Gas Properties of the affected Credit Party or relevant portion thereof, as reasonably requested by Administrative Agent, including the preparation of a report or such other sampling or analysis as determined to be necessary under the circumstances by a qualified environmental engineer or consultant.  If an Event of Default has occurred and is continuing, and if a Credit Party does not undertake such tests and investigations in a reasonably timely manner following the request of the Administrative Agent, Administrative Agent may hire an independent engineer, at the Credit Party's expense, to conduct such tests and investigations.  Administrative Agent will make all reasonable efforts to conduct any such tests and investigations so as to avoid interfering with the operation of the Oil and Gas Properties.

(ii)     Any observations, tests or investigations of the Oil and Gas Properties by or on behalf of Administrative Agent shall be solely for the purpose of protecting the Lenders' interests and rights under the Loan Documents.  The exercise or non-exercise of Administrative Agent's rights under this subsection (ii) shall not constitute a waiver of any Default or Event of Default of any Credit Party or impose any liability on Administrative Agent or any of the Lenders.  In no event will any observation, test or investigation by or on behalf of Administrative Agent be a representation that Hazardous Materials are or are not present in, on or under any of the Oil and Gas Properties, or that there has been or will be compliance with any Environmental Law, and the Administrative Agent shall not be deemed to have made any representation or warranty to any party regarding the truth, accuracy or completeness of any report or findings with regard thereto.  Neither any Credit Party nor any other Person is entitled to rely on any observation, test or investigation by or on behalf of Administrative Agent.  Administrative Agent and the Lenders owe no duty of care to protect any Credit Party or any other Person against, or to inform any Credit Party or any other Person of, any Hazardous Materials or any other adverse

condition affecting any of the Facilities or any other Oil and Gas Properties. The Administrative Agent may, in its sole discretion, disclose to the applicable Credit Party, or to any other Person if so required by law, any report or findings made as a result of, or in connection with, its observations, tests or investigations. The Borrower acknowledges that it may be obligated to notify relevant Governmental Authorities regarding the results of any observation, test or investigation disclosed to such Credit Party, and that such reporting requirements are site and fact-specific and are to be evaluated by such Credit Party without advice or assistance from Administrative Agent.

Section 8.09   **Compliance with Laws**.

(a)    The Borrower will, and will cause each Subsidiary to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    The Borrower will, and will cause each Subsidiary to, comply with Anti-Corruption Laws, Anti-Money Laundering Laws, and applicable Sanctions.

(c)    The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, Anti-Money Laundering Laws, and applicable Sanctions.

Section 8.10   **Environmental Matters**.

(a)    Environmental Disclosure. The Borrower will deliver to Administrative Agent and Lenders:

(i)    as soon as practicable but no later than three Business Days following receipt thereof by any Credit Party, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of any Credit Party or by independent consultants, Governmental Authorities or any other Persons, with respect to significant environmental matters at any Facility or any Oil and Gas Properties of any Credit Party or with respect to any material Environmental Claims;

(ii)    promptly but no later than three Business Days from the occurrence thereof, written notice describing in reasonable detail (A) any Release required to be reported to any federal, state or local Governmental Authority under any applicable Environmental Laws, (B) any remedial action taken by any Credit Party or any other Person in response to (x) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims, or (y) any Environmental Claims and (C) any Credit Party's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility or any Oil and Gas Property that could reasonably be expected to cause such Facility or such Oil and Gas Property or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii)     as soon as practicable but no later than three Business Days following the sending or receipt thereof by any Credit Party or any operator, a copy of any and all written communications with respect to (A) any Environmental Claims, (B) any Release required to be reported to any federal, state or local Governmental Authority, and (C) any request for information from any Governmental Authority that suggests such agency is investigating whether any Credit Party may be potentially responsible for any Hazardous Materials Activity; and

(iv)     promptly but no later than three Business Days from discovery, written notice describing in reasonable detail (A) any proposed acquisition of stock, assets, or property by any Credit Party that could reasonably be expected to (x) expose any Credit Party to, or result in, Environmental Claims or (y) affect the ability of any Credit Party to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (B) any proposed action to be taken by any Credit Party to modify current operations in a manner that could reasonably be expected to subject any Credit Party to any additional material obligations or requirements under any Environmental Laws.

(b)     <u>Hazardous Materials Activities, Etc</u>.  The Borrower shall, and shall cause each Credit Party to, promptly take, and shall, and shall cause each Credit Party to, use commercially reasonable efforts to cause each operator promptly to take, any and all actions reasonably necessary to (i) cure any violation of applicable Environmental Laws by such Person, and (ii) make an appropriate response to any Environmental Claim against such Person and discharge any obligations it may have to any Person thereunder.

(c)     <u>Other</u>.  Without duplication of the obligations in clause (b) above, the Borrower will at its sole expense: (i) comply, and cause its Properties and operations and each Subsidiary and each Subsidiary's Properties and operations to comply, with all applicable Environmental Laws, to the extent the breach thereof could be reasonably expected to have a Material Adverse Effect; (ii) not Release or threaten to Release, and cause each Subsidiary not to Release or threaten to Release, any Hazardous Material on, under, about or from any of the Borrower's or its Subsidiaries' Properties or any other property offsite the Property to the extent caused by the Borrower's or its Subsidiaries' operations except in compliance with applicable Environmental Laws, to the extent such Release or threatened Release could reasonably be expected to have a Material Adverse Effect; (iii) timely obtain or file, and cause each Subsidiary to timely obtain or file, all Environmental Permits, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of the Borrower's or its Subsidiaries' Properties, to the extent such failure to obtain or file could reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion, and cause each Subsidiary to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "<u>Remedial Work</u>") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future Release or threatened Release of any Hazardous Material on, under, about or from any of the Borrower's or its Subsidiaries' Properties, to the extent failure to do so could reasonably be expected to have a Material Adverse Effect; (v) conduct, and cause its Subsidiaries to conduct, their respective operations and businesses in a manner that will not expose any Property or Person to Hazardous

Materials that could reasonably be expected to cause the Borrower or its Subsidiaries to owe damages or compensation that could reasonably be expected to cause a Material Adverse Effect; and (vi) establish and implement, and shall cause each Subsidiary to establish and implement, such procedures as may be necessary to continuously determine and assure that the Borrower's and its Subsidiaries' obligations under this <u>Section 8.10(c)</u> are timely and fully satisfied, to the extent failure to do so could reasonably be expected to have a Material Adverse Effect.

Section 8.11   **Further Assurances**.

(a)    The Borrower at its sole expense will, and will cause each Subsidiary to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrower or any Subsidiary, as the case may be, in the Loan Documents, including the Notes, or to further evidence and more fully describe the collateral intended as security for the Indebtedness, or to correct any omissions in this Agreement or the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Administrative Agent, in connection therewith.

(b)    The Borrower hereby authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, describing all or any part of the Collateral without the signature of the Borrower or any other Credit Party where permitted by law.  A carbon, photographic or other reproduction of the Security Instruments or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.  The Borrower acknowledges and agrees that any such financing statement may describe the collateral as "all assets" of the applicable Credit Party or words of similar effect as may be required by the Administrative Agent.

Section 8.12   **Reserve Reports**.

(a)    On or before March 31st or September 1st of each year, commencing March 31, 2019 (and, during the Quarterly Redetermination Period, January 1, 2019), the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Proved Oil and Gas Properties of the Borrower and its Subsidiaries as of the immediately preceding December 31st (or dated effective as of such later date (but in any event, no later than March 31st) reasonably acceptable to the Administrative Agent) or June 30th (or dated effective as of such later date (but in any event, no later than September 1st) reasonably acceptable to the Administrative Agent), respectively (and during the Quarterly Redetermination Period, a Reserve Report evaluating the Proved Oil and Gas Properties of the Borrower and its Subsidiaries as of October 31, 2018).  Each Reserve Report shall be prepared by one or more Approved Petroleum Engineers.

(b)    In the event of an Interim Redetermination, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report prepared by Approved Petroleum Engineers, in each case in accordance with the procedures used in the immediately preceding

December 31 (or such later date as reasonably acceptable to the Administrative Agent as described above) Reserve Report. For any Interim Redetermination requested by the Administrative Agent or the Borrower pursuant to Section 2.07(b), the Borrower shall provide such Reserve Report with an "as of" date as required by the Administrative Agent as soon as possible, but in any event no later than 30 days following the receipt of such request.

(c)    With the delivery of each Reserve Report, the Borrower shall provide to Administrative Agent and the Lenders a certificate from an Authorized Officer certifying that: (1) the factual information provided to the Approved Petroleum Engineers for purposes of the Reserve Report and any other factual information provided to the Approved Petroleum Engineers in connection therewith is true and correct in all material respects (or in the case of any internally generated engineering data prepared by the Borrower, the information contained in such data and any other information delivered in connection therewith is true and correct in all material respects), (2) each Credit Party owns good and defensible title to its Oil and Gas Properties evaluated in such Reserve Report (or such internally generated engineering data), and such Properties are free of all Liens except for Permitted Liens, (3) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments with respect to the Oil and Gas Properties evaluated in such Reserve Report (or such internally generated engineering data) which would require any Credit Party to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (4) none of any Credit Party's Oil and Gas Properties have been sold since the date of the last Reserve Report (or the most recently delivered internally generated engineering data), except as set forth on an exhibit to the certificate, which certificate shall list all of such Oil and Gas Properties sold and in such detail as required by the Majority Lenders, (5) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report (or most recently delivered internally generated engineering data) which the Borrower could reasonably be expected to have been obligated to list on Schedule 1.1(a) had such agreement been in effect on the Effective Date, (6) attached thereto is a list of all persons purchasing Hydrocarbons from any Credit Party as of the date of the Reserve Report (or internally generated engineering data), and (7) attached thereto is a schedule of the Proved Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties.

Section 8.13    **Title Information**.

(a)    On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 8.12(a), the Borrower will deliver title information in form and substance acceptable to the Administrative Agent covering enough of the Proved Oil and Gas Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, satisfactory title information (as appropriate for the various categories of Proved Reserves) on at least eighty-five percent (85%) of the total value of the Proved Oil and Gas Properties and at least eight-five percent (85%) of the present value of PDP Reserves, in each case, evaluated by such Reserve Report.

(b)    If the Borrower has provided title information for additional Proved Oil and Gas Properties under Section 8.13(a) the Borrower shall, within sixty (60) days after notice from the

Administrative Agent that title defects (excluding Permitted Liens and Immaterial Title Deficiencies) exist with respect to such additional Proved Oil and Gas Properties, either (i) cure any such title defects which are not permitted by Section 9.03 raised by such information, (ii) substitute acceptable Mortgaged Properties with satisfactory title information having an equivalent value, or (iii) deliver title information in form and substance acceptable to the Administrative Agent so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, satisfactory title information on at least eighty-five percent (85%) of the total value of the Proved Oil and Gas Properties and at least eight-five percent (85%) of the present value of PDP Reserves, in each case, evaluated by such Reserve Report.

(c)     If the Borrower fails to cure any title defect (excluding Permitted Liens and Immaterial Title Deficiencies) requested by the Administrative Agent to be cured within the 60-day period or the Borrower fails to comply with the requirements to provide acceptable title information covering at least eighty-five percent (85%) of the total value of the Proved Oil and Gas Properties and at least eight-five percent (85%) of the present value of PDP Reserves, in each case, evaluated in the most recent Reserve Report, such failure shall not be a Default or an Event of Default, but instead the Administrative Agent and/or the Required Lenders shall have the right to exercise the following remedy in their sole discretion from time to time, and any failure to so exercise this remedy at any time shall not be a waiver as to future exercise of the remedy by the Administrative Agent or the Lenders.  Such remedy is to have the Administrative Agent declare that such unacceptable Mortgaged Property shall not count towards the 85% requirements described above, and the Administrative Agent may send a notice to the Borrower and the Lenders that the then outstanding Borrowing Base shall be reduced by an amount as determined by the Required Lenders to cause the Borrower to be in compliance with the requirement to provide acceptable title information as provided in Section 8.13(a).  This new Borrowing Base shall become effective immediately after the Borrower's receipt of such notice.

Section 8.14    **Additional Collateral; Additional Guarantors**.

(a)     In connection with each redetermination of the Borrowing Base, the Borrower shall review the Reserve Report and the list of current Mortgaged Properties (as described in Section 8.12(c)(vi)) to ascertain whether the Mortgaged Properties represent at least eighty-five percent (85%) of the total value of the Proved Oil and Gas Properties and at least eight-five percent (85%) of the present value of PDP Reserves, in each case, evaluated in the most recently completed Reserve Report after giving effect to exploration and production activities, acquisitions, dispositions and production.  In the event that the Mortgaged Properties do not represent at least eighty-five percent (85%) of such total value and 85% of such present value of PDP Reserves, then the Borrower shall, and shall cause its Subsidiaries to, grant, within 30 days (or such longer period of time as may be acceptable to the Administrative Agent) after delivery of the certificate required under Section 8.12(c), to the Administrative Agent, as security for the Indebtedness, a first priority Lien interest (subject only to Permitted Liens) on additional Proved Oil and Gas Properties of the Credit Parties that are not already subject to a Lien of the Security Instruments such that after giving effect thereto, the Mortgaged Properties will represent at least eighty-five percent (85%) of such total value and 85% of such present value of PDP Reserves. All such Liens will be created and perfected by and in accordance with the provisions of Mortgages or other Security Instruments, all in form and substance reasonably satisfactory to the

Administrative Agent and in sufficient executed (and acknowledged where necessary or appropriate) counterparts for recording purposes.

(b)     In the event that the Borrower forms or acquires any Subsidiary, the Borrower shall promptly cause such Subsidiary to guarantee the Indebtedness pursuant to the Guaranty Agreement and to grant a lien and security interest in all of its Collateral (as defined in the Security Agreement) pursuant to the Security Agreement.  In connection therewith, the Borrower shall, or shall cause the applicable Subsidiary and, in the case of clause (ii) below, cause any Credit Party that owns any Equity Interests of the new Subsidiary, to, (i) execute and deliver a Guaranty Agreement (or a supplement or joinder thereto, as applicable) and a supplement or joinder to the Security Agreement executed by such Subsidiary, (ii) pledge all of the Equity Interests of such new Subsidiary that are owned by any Credit Party (including delivery of original stock certificates evidencing the Equity Interests of such Subsidiary, together with an appropriate undated stock power for each certificate duly executed in blank by the registered owner thereof), and (iii) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

(c)     The Borrower will at all times cause the other material tangible and intangible assets of the Borrower and each Subsidiary (including all Swap Agreements) to be subject to a Lien of the Security Instruments, excluding the assets excluded from the Collateral under the Security Instruments.

(d)     Notwithstanding any provision in any of the Loan Documents to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulations) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulations) owned by any Credit Party included in the Mortgaged Property and no Building or Manufactured (Mobile) Home shall be encumbered by any Security Instrument; provided, that (A) the applicable Credit Party's interests in all lands and Hydrocarbons situated under any such Building or Manufactured (Mobile) Home shall be included in the Mortgaged Property and shall be encumbered by all applicable Security Instruments and (B) the Borrower shall not, and shall not permit any of its Subsidiaries  to, permit to exist any Lien on any Building or Manufactured (Mobile) Home except Excepted Liens.

Section 8.15  **ERISA Compliance**.  The Borrower will promptly furnish and will cause the Subsidiaries and any ERISA Affiliate to promptly furnish to the Administrative Agent (a) promptly upon the request of the Administrative Agent after the filing thereof with the United States Secretary of Labor or the IRS, copies of each annual and other report with respect to each Plan (other than a Multiemployer Plan) or any trust created thereunder, and (b) immediately upon becoming aware of the occurrence of any "prohibited transaction," as described in section 406 of ERISA or in section 4975 of the Code, in connection with any Plan (other than a Multiemployer Plan) or any trust created thereunder, a written notice signed by the President or the principal Financial Officer of the Borrower, the Subsidiary or the ERISA Affiliate, as the case may be, specifying the nature thereof, what action the Borrower, the Subsidiary or the ERISA Affiliate is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the IRS or the Department of Labor with respect thereto.

Section 8.16   **Commodity Exchange Act Keepwell Provisions**.  The Borrower hereby absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each Credit Party (other than the Borrower) that is not otherwise an "eligible contract participant" as defined in the Commodity Exchange Act in order for such Credit Party to honor its obligations under the Guaranty Agreement including obligations with respect to Swap Agreements (provided, however, that the Borrower shall only be liable under this Section 8.16 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 8.16, or otherwise under this Agreement or any Loan Document, as it relates to such other Credit Parties, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of the Borrower under this Section 8.16 shall remain in full force and effect until all Indebtedness is paid in full to the Lenders, the Administrative Agent and all other Secured Parties, and all of the Lenders' Commitments are terminated.  The Borrower intends that this Section 8.16 constitute, and this Section 8.16 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 8.17   **Required Swap Agreements**.  Commencing with the date that is 30 days after the Effective Date, and subject to Section 9.16, the Credit Parties shall maintain in effect at all times on a continuous basis, and updated quarterly as of the end of each calendar quarter end, one or more Swap Agreements reasonably satisfactory to Administrative Agent with respect to their oil production with an Approved Counterparty, which Swap Agreements, when taken together, shall at all times cover not less than 50% of the reasonably anticipated monthly projected production from PDP Reserves for the twenty-four months following such calendar quarter end.

Section 8.18   **Deposit Accounts; Commodities Accounts and Securities Accounts**.  The Borrower and each Guarantor will cause each of their respective Deposit Accounts, Commodities Accounts or Securities Accounts (in each case, other than Excluded Accounts) to at all times be subject to an Account Control Agreement in accordance with and to the extent required by the Security Agreement.

Section 8.19   **Operators' Subordination Agreement**.  The Borrower will, and will cause each Affiliate of the Borrower to, (a) subordinate their operator Liens, if any, on any Mortgaged Property to the Administrative Agent's security interest in the Mortgaged Property, and (b) within thirty days following the Administrative Agent's reasonable request therefor (or such longer time as the Administrative Agent shall agree in its sole discretion), deliver a lien subordination agreement in form and substance reasonably satisfactory to the Administrative Agent.

Section 8.20   **Post-Closing Obligations**.  The Borrower shall, within ten (10) days following the Effective Date (or such longer time as the Administrative Agent may agree in its sole discretion), deliver to the Administrative Agent (i) the consolidated balance sheets of the Borrower and its Subsidiaries as at the end of the Fiscal Year ending December 31, 2017 and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its consolidated Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year, in reasonable detail, together with a

Financial Officer Certification with respect thereto; and (ii) with respect to such financial statements, a report thereon by the Borrower's Auditors, which shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Borrower and its Subsidiaries as at the dates indicated and that the results of their operations and their cash flows for the periods indicated are in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards in the United States of America, and, in any case, without any qualification as to the Borrower's ability to continue as a "going concern".

## ARTICLE IX
## NEGATIVE COVENANTS

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents have been paid in full and all Letters of Credit have expired or terminated and all LC Disbursements shall have been reimbursed, the Borrower covenants and agrees with the Lenders that:

Section 9.01    **Financial Covenants**.

(a)     Consolidated Total Leverage Ratio.  The Borrower will not permit, as of the last day of any Fiscal Quarter commencing with the first full Fiscal Quarter ending after the Effective Date, the Consolidated Total Leverage Ratio to exceed 4.00 to 1.00.

(b)     Current Ratio.  The Borrower will not permit, as of the last day of any Fiscal Quarter, commencing with the first full fiscal quarter ending after the Effective Date, the ratio of (i) consolidated current assets of the Borrower and its Consolidated Subsidiaries  (including the unused amount of the Commitments to the extent that the Borrower is permitted to borrow such amount under the terms of this Agreement, including Section 6.02 hereof (except as a result of non-compliance with this Section 9.01(b) before giving pro forma credit to such unused amounts of the Commitments in the calculation of consolidated current assets to the extent the Borrower would otherwise be permitted to borrow such amount hereunder), but excluding non-Cash assets under the equivalent of ASC 410 and ASC 815 under GAAP and non-Cash assets in respect of gas imbalances under GAAP) as of such date to (ii) consolidated current liabilities of the Borrower and its Consolidated Subsidiaries  (excluding non-Cash obligations under the equivalent of ASC 410 and ASC 815 under GAAP, non-Cash obligations in respect of gas imbalances under GAAP, and current maturities under this Agreement) as of such date to be less than 1.00 to 1.00.

(c)     Interest Coverage Ratio.  The Borrower will not permit, as of the last day of any Fiscal Quarter commencing with the first full Fiscal Quarter ending after the Effective Date, the Consolidated Interest Coverage Ratio to be less than 2.00 to 1.00.

Section 9.02    **Debt**.  The Borrower will not, and will not permit any Subsidiary to, incur, create, assume or suffer to exist any Debt, except:

(a)     the Loans and other Indebtedness arising under the Loan Documents, or any guaranty of or suretyship arrangement for the Loans and or other Indebtedness arising under the Loan Documents;

(b)     Debt under Capital Leases or that constitutes Purchase Money Debt; *provided* that the aggregate principal amount of all Debt described in this Section 9.02(b) at any one time outstanding shall not exceed $2,500,000 in the aggregate;

(c)     intercompany Debt between the Borrower and its Subsidiaries; *provided* that such Debt is subordinated to the Indebtedness as and to the extent set forth in the Guaranty Agreement;

(d)     Debt consisting of obligations to pay insurance premiums arising in the ordinary course of business; and

(e)     other Debt not to exceed $5,000,000 in the aggregate principal amount outstanding at any time.

Section 9.03   **Liens**.  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)     Liens securing the payment of any Indebtedness;

(b)     Excepted Liens; and

(c)     Liens securing Capital Leases and Purchase Money Debt permitted by Section 9.02(b) but only on the Property under lease or the Property purchased, constructed or improved with such Purchase Money Debt, together with any improvements, fixtures or accessions to such Property and the proceeds of such Property, improvements, fixtures or accessions.

This Section 9.03 shall be construed to allow the above Liens to cover and encumber all improvements, fixtures and/or accessions to the Property which are permitted to be subject to such Liens and all proceeds of such Property (including any insurance for such property) as determined in accordance with the Uniform Commercial Code.

Section 9.04   **Restricted Payments**.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make any distribution of its Property to its Equity Interest holders, except:

(a)     the Borrower may declare and pay distributions and dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Capital Stock);

(b)     Subsidiaries  may declare and pay distributions and dividends ratably with respect to their Equity Interests;

97

(c)    the Borrower may make Restricted Payments to the Parent on a quarterly basis to provide the Parent with the cash needed to pay the cash interest then due and payable under the Parent Credit Agreement for such quarter or to make a payment required by the terms of the Parent Credit Agreement; *provided* that, (i) (A) with respect to the payment of cash interest then due and payable under the Parent Credit Agreement, the amount of any such quarterly Restricted Payment may not exceed the amount of Cash interest due and payable under the Parent Credit Facility within ten (10) Business Days following the date of such Restricted Payment, and (B) with respect to any other payment required to be made under the Parent Credit Agreement, the amount of such Restricted Payment may not exceed the amount actually due and payable, (ii) in each case, no Borrowing Base Deficiency, Default or Event of Default exists or would result from the making of such Restricted Payment, (iii) after giving effect to such Restricted Payment (and any Borrowings incurred in connection therewith), the Consolidated Total Leverage Ratio on a pro forma basis (with Debt determined on the date of such Restricted Payment and Consolidated EBITDAX determined as of the most recently delivered compliance certificate specified in Section 8.01(c)) is less than or equal to 3.00 to 1.00, (iv) after giving effect to such Restricted Payment (and any Borrowings incurred in connection therewith), unused Commitments are greater than or equal to 20% of the Borrowing Base in effect at such time, and (v) the Borrower shall have delivered a certificate in form and substance satisfactory (and in reasonable detail) to the Administrative Agent (x) certifying each of the foregoing clauses (i), (ii), (iii), and (iv), and (y) demonstrating the calculations specified in the foregoing clauses (iii) and (iv).

(d)    the Borrower may make Restricted Payments in an amount equal to required Permitted Tax Distributions to the Parent quarterly, based on the Borrower's estimated taxable income for each applicable quarterly period, and annually, based on the Borrower's annual taxable income included in the Parent's federal income tax filing; *provided* that if the aggregate quarterly estimates for any tax year exceed the actual annual amount for such tax year, such excess shall be deducted from the next quarterly or annual distribution(s) to occur after such annual federal income tax filing.

Section 9.05  **Investments, Loans and Advances**.  The Borrower will not, and will not permit any Subsidiary to, make or permit to exist, any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)    Investments as of the Effective Date that are disclosed in Schedule 9.05;

(b)    Investment in Cash and Cash Equivalents;

(c)    Investments made by the Borrower in or to any Guarantor (including any newly formed Subsidiary that becomes a Guarantor in accordance with this Agreement) or made by any Subsidiary in or to the Borrower or any Guarantor (including any newly formed Subsidiary that becomes a Guarantor in accordance with this Agreement);

(d)    subject to the limits in Section 9.06, to the extent, if any, constituting Investments, Acquisitions or Investments of the type described in clause (c) of the definition thereof resulting in direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint venture or area of mutual

interest agreements, gathering systems, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America;

(e)     Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 9.05 or from accounts receivable arising in the ordinary course of business, which Investments are obtained by the Borrower or any other Subsidiary as a result of a bankruptcy or other insolvency proceeding of, or difficulties in collecting from, the obligor in respect of such obligations, *provided* that the Borrower shall give the Administrative Agent prompt written notice in the event that the aggregate amount of all Investments held at any one time under this Section 9.05(e) exceeds $500,000; and

(f)     Investments constituting Debt permitted under Section 9.02(c).

Section 9.06    **Nature of Business; No International Operations**.  The Borrower will not, and will not permit any Subsidiary to, allow any material change to be made in the character of its business as an independent oil and gas exploration and production company.  From and after the date hereof, the Borrower and its Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States.  The Borrower shall at all times remain organized under the laws of the United States of America or any State thereof or the District of Columbia.

Section 9.07    **Proceeds of Loans**.  The Borrower will not permit the proceeds of the Loans to be used for any purpose other than those permitted by Section 7.21.  Neither the Borrower nor any Person acting on behalf of the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations T, Regulation U or Regulation X or any other regulation of the Board or to violate Section 7 of the Exchange Act or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  If requested by the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.  The Borrower will not request any Borrowing or Letter of Credit, and the Borrower shall not use, and shall procure that the Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or Anti-Money Laundering Laws in any material respect, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 9.08    **ERISA Compliance**.  Except for actions that would not reasonably be expected to result in a Material Adverse Effect, the Borrower will not, and will not permit any Subsidiary to, at any time:

(a)     engage in, or permit any ERISA Affiliate to engage in, any transaction in connection with which the Borrower, a Subsidiary or any ERISA Affiliate could be subjected to either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code;

(b)     fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, the Borrower, a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto; or

(c)     contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to (i) any employee welfare benefit plan, as defined in section 3(1) of ERISA, including any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any material liability, or (ii) any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 9.09   **Sale of Notes or Receivables**.  Except for the sale of defaulted notes or accounts receivable in connection with the compromise or collection thereof and not in connection with any financing transaction, the Borrower will not, and will not permit any Subsidiary to, sell (with or without recourse) any of its notes receivable or accounts receivable to any Person other than the Borrower or any Guarantor.

Section 9.10   **Mergers, Etc**.  The Borrower will not, and will not permit any Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve, except that:

(a)     any Subsidiary may participate in a consolidation with the Borrower (*provided* that the Borrower shall be the continuing and surviving entity);

(b)     any Subsidiary may participate in a consolidation with another Subsidiary (provided that if a Credit Party is involved in such consolidation, such Credit Party shall be the continuing or surviving entity);

(c)     if the Acquisition of any Person would be permitted by the terms of this Agreement, the Borrower or any Subsidiary may merge into or with or consolidate with such Person (*provided* that the Borrower or such Subsidiary shall be the continuing or surviving entity);

(d)     if the disposition of the Equity Interests in any Subsidiary would be permitted by Sections 9.11(d), (f), or (g), as applicable, such Subsidiary may merge into or with or consolidate with any other Person so long as the conditions and restrictions for such disposition under Section 9.11(d), Section 9.11(f), or Section 9.11(g), as applicable, are otherwise satisfied; and

(e)     any Subsidiary may wind-up if the Borrower determines in good faith that such wind-up is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; *provided* that such Subsidiary (x) provides written notice to the Administrative Agent not less than ten (10) days prior to such wind-up, (y) distributes all Property of such Subsidiary subject of the wind-up to the Borrower or another Credit Party, and (z) complies in all respects with all covenants and agreements in the Loan Documents to provide the Administrative Agent with perfected first priority liens on all Property so distributed.

Section 9.11    **Sale of Properties and Liquidation of Swap Agreements**.    The Borrower will not, and will not permit any Subsidiary to, sell, assign, farm-out, convey, dispose of, or otherwise transfer any Property, or to Liquidate any Swap Agreement in respect of commodities, except for:

(a)     the sale of Hydrocarbons in the ordinary course of business;

(b)     farmouts of undeveloped acreage and/or depths and assignments in connection with such farmouts;

(c)     the sale or transfer of equipment and other personal property that is obsolete, worn out, depleted, uneconomic, or no longer necessary for the business of the Borrower or such Subsidiary, or is replaced by equipment or personal property of at least comparable value and use;

(d)     any Borrowing Base Property Disposition and any Liquidation, provided that:

(i)     except with respect to Casualty Events, no Event of Default shall exist or result from such Borrowing Base Property Disposition or Liquidation;

(ii)     substantially all of the consideration received in respect of such Borrowing Base Property Disposition or Liquidation shall be Cash or Cash Equivalents and the release or assumption of environmental or other liabilities related to any Oil and Gas Properties disposed of in connection therewith; provided that in the case of a like-kind exchange that constitutes a Borrowing Base Property Disposition, (A) such consideration received in respect of such Borrowing Base Property Disposition shall be Oil and Gas Properties which qualify for non-recognition of gain or loss under the provisions of Section 1031 of the Code, and (B) after giving effect to such transaction and any required reduction in the Borrowing Base pursuant to Section 2.07(e)(ii), no Borrowing Base Deficiency exists;

(iii)     the consideration received in respect of such Borrowing Base Property Disposition or Liquidation shall be equal to or greater than the fair market value of the (A) Oil and Gas Property and any interest therein, (B) Subsidiary subject of such Borrowing Base Property Disposition, or (C) Swap Agreement subject of such Liquidation (as reasonably determined by the board of managers, board of directors, or other comparable governing body of the Borrower), and, in each case, if requested by the Administrative Agent, the Borrower shall deliver a certificate of an Authorized Officer of the Borrower certifying to that effect;

(iv)     (A) if the aggregate Borrowing Base Property Value of all Borrowing Base Property Dispositions and Liquidation Value of all Swap Agreements that have been

Liquidated since the immediately preceding Scheduled Redetermination of the Borrowing Base exceeds three percent (3%) of the Borrowing Base then in effect, the Borrower shall deliver to the Administrative Agent ten (10) Business Days' prior written notice (or such shorter time as the Administrative Agent may agree to in its sole discretion) of such Borrowing Base Property Disposition or Liquidation and shall provide the Administrative Agent with such information in connection therewith as the Administrative Agent may reasonably request; and (B) if the aggregate Borrowing Base Property Value of all Borrowing Base Property Dispositions and Liquidation Value of all Swap Agreements that have been Liquidated since the immediately preceding Scheduled Redetermination of the Borrowing Base exceeds five percent (5%) of the Borrowing Base then in effect, the Borrowing Base shall be subject to reduction in accordance with Section 2.07(e);

(v)    if a Borrowing Base Deficiency exists after any resulting reduction in the Borrowing Base pursuant to Section 2.07(e), the Borrower shall prepay Borrowings in accordance with Section 3.04(c)(iii); and

(vi)    if any such Borrowing Base Property Disposition is of Equity Interests in a Subsidiary owning Oil and Gas Properties, such sale or other disposition shall include all the Equity Interests of such Subsidiary;

(e)    transfers of Properties among the Credit Parties; *provided* that (i) with respect to any transfers of Equity Interests in any Subsidiaries of the Borrower, the requirements of Section 8.14(b) are satisfied and (ii) with respect to any transfers of Proved Oil and Gas Properties, the transferee promptly delivers mortgages or other Security Instruments in favor of the Administrative Agent to the extent necessary to satisfy the requirements of Section 8.14;

(f)    so long as no Borrowing Base Deficiency and no Event of Default exists or would result therefrom, dispositions of Oil and Gas Properties (for fair market value) to which no Proved Reserves are attributable or that are otherwise not Borrowing Base Properties;

(g)    so long as no Borrowing Base Deficiency and no Event of Default exists or would result therefrom, dispositions (for fair market value) of other Property (that would otherwise not constitute a Borrowing Base Property Disposition or Liquidation) in an amount not to exceed $500,000 during this Agreement;

(h)    Restricted Payments and the making of any Investments, in each case, that are permitted under this Agreement;

(i)    losses, casualty or other damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or any Subsidiary.

Section 9.12    **Transactions with Affiliates**.  The Borrower will not, and will not permit any Subsidiary to, enter into any transaction, including any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than the Borrower and any Subsidiary) unless such transaction is upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate.  The restrictions set forth in this Section 9.12 shall not apply to (a) the execution and delivery of any

Loan Document, (b) compensation to, and the terms of any employment contracts with, individuals who are officers, managers or directors of the Borrower and its Subsidiaries , *provided* such compensation is approved by the Borrower's board of managers or provided for in the limited liability company agreement, articles or certificate of incorporation, bylaws or other applicable Organizational Documents of the Borrower or such Subsidiary, (c) payments made pursuant to Section 9.04 or otherwise expressly permitted under this Agreement, and (d) the issuance and sale of Equity Interests in the Borrower (other than Disqualified Capital Stock) or the amendment of the terms of any Equity Interests issued by the Borrower (other than Disqualified Capital Stock).

Section 9.13    **Subsidiaries**.  The Borrower will not, and will not permit any Subsidiary to create or acquire any additional Subsidiary unless the Borrower gives written notice to the Administrative Agent of such creation or acquisition and complies with Section 8.14(b).  The Borrower will not, and will not permit any Subsidiary to, sell, assign or otherwise dispose of any Equity Interests in any Subsidiary except (a) to the Borrower or any Credit Party (with each such Subsidiary being required to be or become a Guarantor as provided in this Agreement) or (b) in compliance with Section 9.11.  Neither the Borrower nor any Subsidiary will have any Foreign Subsidiaries.  The Borrower will not, and will not permit any Person other than the Borrower or another Credit Party, to own any Equity Interests in any Guarantor.

Section 9.14    **Negative Pledge Agreements; Subsidiary Dividend Restrictions**.  The Borrower will not, and will not permit any Guarantor to, create, incur, assume or suffer to exist any contract, agreement or understanding (other than (a) this Agreement, (b) the Security Instruments, (c) agreements with respect to Purchase Money Debt or Capital Leases secured by Liens permitted by Section 9.03(c), and (d) documents creating Liens which are described in clause (d), (f), (k) or (l) of the definition of "Excepted Liens", but then only with respect to the Property that is the subject of the applicable lease, document or license described in such clause (d), (f), (k) or (l)) which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property in favor of the Administrative Agent and the Secured Parties to secure the Indebtedness or restricts any Subsidiary from paying dividends or making distributions to the Borrower or any Guarantor, or which requires the consent of or notice to other Persons in connection therewith.

Section 9.15    **Take-or-Pay or Other Prepayments**.  The Borrower will not, and will not permit any Subsidiary to, allow take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Subsidiary that would require the Borrower or such Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed 2.0% of the aggregate annual production of gas from the Oil and Gas Properties of the Borrower and its Subsidiaries  during the most recent calendar year (on an mcf equivalent basis).

Section 9.16    **Swap Agreements**.

(a)    The Borrower will not, and will not permit any other Subsidiary to, enter into (or be a party to) any Swap Agreements for speculative purposes.  The Borrower will not, and will not permit any Subsidiary to, enter into (or be a party to) any Swap Agreements with any Person other than:

(i)     Swap Agreements in respect of commodities with a Person that is an Approved Counterparty as of the date such Swap Agreement is entered into with notional volumes (when netted and aggregated with other commodity Swap Agreements then in effect) that do not cause the net aggregate notional volumes of all Swap Agreements then in effect to exceed, as of the date such Swap Agreement is entered into, for the forty-eight (48) month period (and for each full calendar month during such period) from the date such Swap Agreement is entered into, seventy-five (75%) of the reasonably anticipated production of crude oil, natural gas and natural gas liquids, calculated separately, as such production is projected from the most recently delivered Reserve Report from the Credit Parties' PDP Reserves; *provided*, however, that such Swap Agreements shall not, in any case, have a tenor longer than 48 consecutive calendar months, beginning with the first full calendar month following the date in question.

(ii)     Swap Agreements in respect of interest rates with a Person that is an Approved Counterparty as of the date such Swap Agreement is entered into, as follows:

(A)     Swap Agreements effectively converting interest rates from fixed to floating, the notional amounts of which (when aggregated with all other Swap Agreements of the Borrower and its Subsidiaries  then in effect effectively converting interest rates from fixed to floating and netted against all other Swap Agreements of the Borrower and its Subsidiaries then in effect effectively converting interest rates from floating to fixed) do not exceed seventy-five percent (75%) of the then outstanding principal amount of the Credit Parties' Debt for borrowed money which bears interest at a fixed rate, and which Swap Agreements shall not, in any case, have a tenor beyond the maturity date of such Debt; and

(B)     Swap Agreements effectively converting interest rates from floating to fixed, the notional amounts of which (when aggregated with all other Swap Agreements of the Borrower and its Subsidiaries  then in effect effectively converting interest rates from floating to fixed and netted against all other Swap Agreements of the Borrower and its Subsidiaries  then in effect effectively converting interest rates from fixed to floating) do not exceed 75% of the then outstanding principal amount of the Credit Parties' Debt for borrowed money which bears interest at a floating rate, and which Swap Agreements shall not, in any case, have a tenor beyond the maturity date of such Debt.

(b)     If, due to changes in the Credit Parties' reasonably anticipated production of Hydrocarbons (whether due to revised estimates of production, sales of Proved Oil and Gas Properties, or otherwise), the Swap Agreements of the Credit Parties from time to time in effect in respect of commodities have net aggregate notional volumes that exceed, as of the end of any calendar month, 100% of the reasonably anticipated production of crude oil, natural gas or natural gas liquids, calculated separately, for such month, as such production is projected from the Credit Parties' PDP Reserves as set forth in the most recent Reserve Report delivered pursuant to the terms of this Agreement, then the Credit Parties shall (i) notify the Administrative Agent of such excess in writing within five Business Days of such month's end, and (ii) promptly, but only to the extent permitted under Section 9.11, unwind, terminate or transfer Swap Agreements to the extent required to reduce the net aggregate notional volumes in respect of crude oil, natural gas and natural gas liquids to be in compliance with Section 9.16(a)(i).

(c)    In no event shall any Swap Agreement contain any requirement, agreement or covenant for the Borrower or any Subsidiary to post collateral, credit support (including in the form of letters of credit) or margin (other than, in each case, pursuant to the Security Instruments) to secure their obligations under such Swap Agreement or to cover market exposures.

(d)    For purposes of entering into Swap Agreements under Section 9.16(a)(i) or determining required unwinds, terminations and transfers of Swap Agreements under Section 9.16(b), projections of reasonably anticipated production from the Credit Parties' PDP Reserves as set forth on the most recent Reserve Report delivered pursuant to the terms of this Agreement shall be deemed to be updated to account for any increase or decrease in production anticipated because of information obtained by the Credit Parties and delivered to the Administrative Agent subsequent to the publication of such Reserve Report including (i) the Borrower's or any of the Credit Parties' internal forecasts of production decline rates for existing wells, (ii) additions to or deletions from anticipated future production from new wells, (iii) completed dispositions, (iv) completed acquisitions, and (v) other production coming on stream or failing to come on stream; *provided* that (A) any such supplemental information shall be presented in the form of a summary of engineering cash flows prepared by or under the supervision of the chief engineer of the Borrower, which summary shall be (1) a "roll forward" of the most recently delivered Reserve Report presented on a comparison basis and (2) substantially in the form of the summary of engineering cash flows delivered to the Administrative Agent prior to the Effective Date (or such other form that is acceptable to the Administrative Agent), (B) if any such supplemental information is delivered, such information shall be presented on a net basis (i.e. it shall take into account both increases and decreases in anticipated production subsequent to publication of the most recent Reserve Report) and (C) any such supplemental information shall be accompanied by a certificate of an Authorized Officer of the Borrower certifying as to the content thereof (which certificate shall be in form and substance reasonably acceptable to the Administrative Agent).

(e)    It is understood that Swap Agreements in respect of commodities permitted under Section 9.16(a)(i) and Section 9.16(b) which may, from time to time, "hedge" the same volumes, but different elements of commodity risk thereof (such as, for example, basis risk and price risk), shall not be aggregated together when calculating the limitations on notional volumes contained in Section 9.16(a)(i) and Section 9.16(b).

Section 9.17    **Amendments to Organizational Documents**.  Without the prior written consent of the Administrative Agent, the Borrower will not, and will not permit any of the other Credit Parties to, alter, amend or modify in any manner materially adverse to the Lenders, its certificate of formation, limited liability company agreement, articles of incorporation, by-laws, or any other similar Organizational Document.

Section 9.18    **Reserved**.

Section 9.19    **Non-Qualified ECP Counterparties**.  The Borrower shall not permit any Credit Party that is not a Qualified ECP Counterparty to own, at any time, any Proved Oil and Gas Properties or any Equity Interests in any Subsidiaries that own Proved Oil and Gas Properties.

Section 9.20 **Sale-and-Leaseback**. The Borrower shall not, and shall not permit any Subsidiary to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Subsidiary (a) has sold or transferred or is to sell or to transfer to any other Person (other than the Borrower or any of its Subsidiaries) or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Subsidiary to any Person (other than the Borrower or any of its Subsidiaries) in connection with such lease.

Section 9.21 **Limitation on Accounting Changes or Changes in Fiscal Periods**. The Borrower shall not make (a) any change in any of its accounting policies affecting the presentation of financial statements or reporting practices, except as required or permitted by GAAP, or (b) any change to the end of its fiscal year to end on a day other than December 31 or change any method of determining fiscal quarters.

Section 9.22 **Marketing Activities**. The Borrower will not, and will not permit any of its Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (a) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their Oil and Gas Properties constituting Proved Reserves during the period of such contract, (b) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from Oil and Gas Properties constituting Proved Reserves of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower and its Subsidiaries that the Borrower or one of its Subsidiaries has the right or obligation to market pursuant to joint operating agreements, unitization agreements or other similar contracts (or contracts executed in connection therewith) that are usual and customary in the oil and gas business, and (c) other contracts for the purchase and/or sale of Hydrocarbons of third parties (i) which have generally offsetting provisions (*i.e.*, corresponding pricing mechanics, delivery dates and points and volumes) such that no "position" is taken and (ii) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto.

## ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01 **Events of Default**. One or more of the following events shall constitute an "Event of Default":

(a)    the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)(i)) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c)     any representation or warranty made or deemed made by or on behalf of the Borrower or any Subsidiary in any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any certificate furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect (without duplication of any materiality qualifier contained therein) when made or deemed made;

(d)     the Borrower shall fail to give notice of any Default as required under Section 8.02(a), or the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 8.01(j), Section 8.02, Section 8.03(a), Section 8.20, or Article IX;

(e)     the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b) or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after the earlier to occur of (i) an Authorized Officer of the Borrower or any Credit Party having knowledge of such failure, or (ii) receipt of notice thereof by the Borrower from the Administrative Agent;

(f)     the Borrower or any Subsidiary shall fail to make any payment of principal or interest on any Material Debt, when and as the same shall become due and payable, and such failure to pay shall extend beyond any applicable period of grace;

(g)     any event or condition (including, without limitation, a termination event under a Swap Agreement) occurs that results in any Material Debt or Debt of the Parent under the Parent Credit Agreement becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of such Material Debt or the holders of, or lenders under, the Parent Credit Agreement or any trustee or agent on its or their behalf to cause such Material Debt or the Debt of the Parent under the Parent Credit Agreement to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the Borrower or any Subsidiary (or, the Parent in the case of the Parent Credit Agreement) to make an offer in respect thereof;

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Parent, the Borrower or any Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Parent, the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)     the Parent, the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign Debtor Relief Law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 10.01(h), (iii) apply for or consent to the appointment of a receiver, trustee,

custodian, sequestrator, conservator or similar official for the Parent, the Borrower or any Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, or (vi) take any action for the purpose of effecting any of the foregoing;

(j)      the Parent, the Borrower or any Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k)      one or more judgments for the payment of money in an aggregate amount in excess of the Threshold Amount (to the extent not covered by independent third party insurance as to which the insurer does not dispute coverage) shall be rendered against the Borrower, any Subsidiary or any combination thereof and the same shall not be discharged, vacated or stayed within thirty days after becoming a final judgment;

(l)      the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor party thereto or shall be repudiated by any of them, or cease to create valid and perfected Liens of the priority required thereby on any portion of the Collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement or the Security Instruments, or the Borrower or any other Credit Party or any of their Affiliates shall so state in writing;

(m)      a Change in Control shall occur;

(n)      (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or could reasonably be expected to result in liability of the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of the Threshold Amount; or (A) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest on any Collateral under Section 430(k) or 436(f) of the Code or under ERISA; and

(o)      the Parent shall:

(i)      own any Oil and Gas Properties;

(ii)      create or acquire any Subsidiary or make or own any Investment, directly or indirectly, in any Person other than the Borrower and the Borrower's Subsidiaries;

(iii)      fail to hold itself out to the public as a legal entity separate and distinct from all other Persons;

(iv)      fail to hold directly 100% of the Equity Interests of the Borrower; or

(v)      amend, restate, supplement, modify or refinance the Parent Credit Agreement after the Effective Date if the result of such amendment, restatement, supplement, modification or refinancing would (A) prohibit the repayment or prepayment of any Indebtedness, (B) prohibit the creation or perfection of any Liens in favor of the Administrative

Agent (or such other Agent as applicable) pursuant to, or other such transactions and obligations contemplated by, the Security Instruments, (C) cause the Parent Credit Agreement to have a maturity date that is on or earlier than the date six months after the Maturity Date, or (D) cause the Parent Credit Agreement have any sinking fund payments, scheduled principal payments, or mandatory redemption obligations (other than customary mandatory redemption provisions of the type set forth in the Parent Credit Agreement as of the Effective Date) that are due on or prior to the date six months after the Maturity Date.

Section 10.02  **Remedies**.

(a)    In the case of an Event of Default other than one described in <u>Section 10.01(h)</u> or <u>Section 10.01(i)</u>, at any time thereafter during the continuance of such Event of Default, the Administrative Agent may, and at the request of the Majority Lenders, shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Notes and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents (including the payment of cash collateral to secure the LC Exposure as provided in <u>Section 2.08(j)</u>), shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor; and in case of an Event of Default described in <u>Section 10.01(h)</u> or <u>Section 10.01(i)</u>, the Commitments shall automatically terminate and the Notes and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and the other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents (including the payment of cash collateral to secure the LC Exposure as provided in <u>Section 2.08(j)</u>), shall automatically become due and payable, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor.

(b)    In the case of the occurrence of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

(c)    All proceeds realized from the liquidation or other disposition of Collateral or otherwise received after maturity of the Loans, whether by acceleration or otherwise, shall be applied:

(i)    *first*, to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Administrative Agent in its capacity as such;

(ii)    *second*, pro rata to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Lenders;

(iii)     *third*, pro rata to payment of accrued interest on the Loans;

(iv)     *fourth*, pro rata to payment of principal outstanding on the Loans, LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time, Indebtedness referred to in clause (b) of the definition of Indebtedness owing to Secured Swap Providers and Indebtedness referred to in clause (c) of the definition of Indebtedness owing to Bank Products Providers in respect of Bank Products;

(v)     *fifth*, to serve as cash collateral to be held by the Administrative Agent to secure the remaining LC Exposure;

(vi)     *sixth*, pro rata to any other Indebtedness; and

(vii)     *seventh*, any excess, after all of the Indebtedness shall have been indefeasibly paid in full in Cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

Notwithstanding the foregoing, amounts received from the Borrower or any Guarantor that is not an "eligible contract participant" under the Commodity Exchange Act shall not be applied to any Excluded Swap Obligations (it being understood, that in the event that any amount is applied to Indebtedness other than Excluded Swap Obligations as a result of this clause, the Administrative Agent shall make such adjustments as it determines are appropriate to distributions pursuant to clause fourth above from amounts received from "eligible contract participants" under the Commodity Exchange Act to ensure, as nearly as possible, that the proportional aggregate recoveries with respect to Indebtedness described in clause fourth above by the holders of any Excluded Swap Obligations are the same as the proportional aggregate recoveries with respect to other Indebtedness pursuant to clause fourth above).

Section 10.03  **Right to Cure Financial Covenant Non-Compliance**.  Notwithstanding anything to the contrary contained in Section 10.01 or Section 10.02, if:

(a)     the Borrower fails to comply with the requirements of Section 9.01(a), Section 9.01(b) and/or Section 9.01(c) as of the last day of any Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019); and

(b)     during the period (the "Cure Period") beginning ten (10) Business Days prior to the date on which financial statements as of the last day of, or covering any period ending on the last day of, such Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019) are required to be delivered pursuant to Section 8.01 and ending ten (10) Business Days after the date on which financial statements as of the last day of, or covering any period ending on the last day of, such Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019) are required to be delivered pursuant to Section 8.01, the Borrower receives a Specified EBITDAX Equity Contribution and/or a Specified Current Asset Equity Contribution;

then Consolidated EBITDAX for the last fiscal quarter of such Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019) shall, for purposes of Section 9.01(a) and/or Section 9.01(c), be deemed increased by the amount of the net Cash proceeds

from such Specified EBITDAX Equity Contribution and current assets as of the last day of such Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019) shall, for purposes of Section 9.01(b), be deemed increased by the amount of the net Cash proceeds from such Specified Current Asset Equity Contribution.  The parties hereby acknowledge and agree that (i) this Section 10.03 may not be relied on or used for purposes of determining permitted amounts with respect to any covenants in this Agreement other than Section 9.01, (ii) any such deemed increase to Consolidated EBITDAX in any Fiscal Quarter shall be applied solely for the purpose of determining the existence of a Default or Event of Default under Section 9.01(a) and/or Section 9.01(c) with respect to any Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019) that includes such Fiscal Quarter and not for any other purpose under any Loan Document, and (iii) any such deemed increase to current assets shall be applied solely for the purpose of determining the existence of a Default or Event of Default under Section 9.01(b) as of the last day of such Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019) and not for any other purpose under any Loan Document.

If, after receipt of any Specified EBITDAX Equity Contribution and/or any Specified Current Asset Equity Contribution and the recalculations pursuant to this Section 10.03, the Borrower shall then be in compliance with the requirements of Section 9.01(a), Section 9.01(b) and/or Section 9.01(c), as applicable, the Borrower shall be deemed to have satisfied the requirements of Section 9.01(a), Section 9.01(b) and/or Section 9.01(c), as applicable, as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable Default and Event of Default under Section 10.01 that had occurred shall be deemed cured; *provided* that (i) the equity cure provisions in this Section 10.03 may not be used more than once in any four consecutive Fiscal Quarter period (it being understood that if, with respect to any Fiscal Quarter (or last day thereof, as applicable), the Borrower receives both a Specified EBITDAX Equity Contribution and a Specified Current Asset Equity Contribution for the benefit of the same Fiscal Quarter (or last day thereof, as applicable), such occurrence will only count as one financial covenant test date for purposes of this clause (i)), (ii) with respect to each four consecutive Fiscal Quarter period, there shall be at least three Fiscal Quarters in respect of which neither a Specified EBITDAX Equity Contribution nor a Specified Current Asset Equity Contribution is made, (iii) the amount of any Specified EBITDAX Equity Contribution shall be no greater than the amount required to cause the Borrower to be in compliance with Section 9.01(a) and/or Section 9.01(c) for any applicable period, (iv) the amount of any Specified Current Asset Equity Contribution shall be no greater than the amount required to cause the Borrower to be in compliance with Section 9.01(b) for any applicable period, (v) solely with respect to the Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019) for which a Specified EBITDAX Equity Contribution is received in order to cure, (A) there shall be no pro forma or actual reduction in Debt with the proceeds of any Specified EBITDAX Equity Contribution for determining compliance with Section 9.01(a) (even if the proceeds of any Specified EBITDAX Equity Contribution are actually used to repay Debt, regardless of whether the proceeds of the Specified EBITDAX Equity Contribution are received before or after the last day of such Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019)), (B) the amount of such Specified EBITDAX Equity Contribution shall not be included in the calculation of current assets as of the last day of such Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019) for determining compliance with Section 9.01(b), regardless of whether

the proceeds of the Specified EBITDAX Equity Contribution are received before or after the last day of such Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019), and (C) there shall be no pro forma or actual reduction in current liabilities with the proceeds of any Specified EBITDAX Equity Contribution for determining compliance with Section 9.01(b) (even if the proceeds of any Specified EBITDAX Equity Contribution are actually used to pay current liabilities, regardless of whether the proceeds of the Specified EBITDAX Equity Contribution are received before or after the last day of such Rolling Period (or Fiscal Quarter for Fiscal Quarters ending on or before June 30, 2019)), and (vi) in no event shall there be any increase or deemed increase in Consolidated EBITDAX with the amount of any Specified Current Asset Equity Contribution.

## ARTICLE XI
## THE AGENTS

Section 11.01 **Appointment; Powers**.  Each of the Lenders and the Issuing Bank hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the Lenders and the Issuing Bank hereby direct (i) the Administrative Agent to enter into the Buyout Letter and any amendment, restatement, modification or supplement thereto acceptable to the Administrative Agent, (ii) any successor Administrative Agent appointed pursuant to Section 11.06 below to enter into a joinder to the Buyout Letter in accordance with the terms thereof.

Section 11.02 **Duties and Obligations of Administrative Agent**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing: (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; rather, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties), (b) the Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except as provided in Section 11.03(a), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any the Borrower and any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into: (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability,

effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of the Borrower and its Subsidiaries or any other obligor or guarantor, or (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein. For purposes of determining compliance with the conditions specified in Article VI, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed closing date specifying its objection thereto.

Section 11.03  **Action by Administrative Agent**.  The Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 12.02</u>) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lenders or the Lenders, as applicable (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 12.02</u>), specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action. The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders. If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this <u>Section 11.03</u>, *provided* that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Lenders. In no event, however, shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, the Loan Documents or applicable law. If a Default has occurred and is continuing, no Agent shall have any obligation to perform any act in respect thereof. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 12.02</u>), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct.

Section 11.04 **Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Administrative Agent may deem and treat the payee of any Note as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.

Section 11.05 **Subagents**.  The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding Sections of this Article XI shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 11.06 **Resignation or Removal of Administrative Agent**.  Subject to the appointment and acceptance of a successor Administrative Agent as provided in this Section 11.06, (a) the Administrative Agent may resign at any time by notifying the Lenders, the Issuing Bank and the Borrower and (b) if the Person serving as Administrative Agent is a Defaulting Lender in such Person's capacity as a Lender pursuant to clause (d) of the definition thereof, the Majority Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person, remove such Person as Administrative Agent.  Upon any such resignation or removal, the Majority Lenders shall have the right, in consultation with the Borrower, to appoint a successor.  In the case of a resignation by the Administrative Agent pursuant to clause (a) of this Section 11.06 if no successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  In the case of a removal of the Administrative Agent pursuant to clause (b) of this Section 11.06 no removal shall be effective until the Majority Lenders shall have appointed a successor Administrative Agent and such successor shall have accepted such appointment.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Administrative Agent's resignation hereunder, the provisions of this Article XI and Section 12.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties

in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.  Each successor Administrative Agent shall enter into a joinder to the Buyout Letter in accordance with the terms thereof.

Section 11.07  **Agents as Lenders**.  Each bank serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Section 11.08  **No Reliance**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.  The Agents shall not be required to keep themselves informed as to the performance or observance by the Borrower or any of its Subsidiaries of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of the Borrower or its Subsidiaries. Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Agent or Arranger shall have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of such Agent or any of its Affiliates.  In this regard, each Lender acknowledges that Bracewell LLP is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document.  Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 11.09  **Administrative Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or other judicial proceeding relative to the Borrower or any of its Subsidiaries, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 12.03) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 12.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 11.10 **Authority of Administrative Agent to Release Collateral, Liens and Guarantors; Other Collateral Matters**.

(a)      Each Lender and the Issuing Bank, and each of the other Secured Parties that has accepted the benefit of the Liens granted pursuant to the Security Instruments, hereby authorizes the Administrative Agent (i) to release any Collateral that is permitted to be sold or released pursuant to the terms of the Loan Documents, (ii) to release any Guarantor if 100% of the Equity Interests in such Guarantor are sold in a transaction permitted under the Loan Documents, (iii) to subordinate (or release) any Lien on any Property granted to or held by the Administrative Agent under any Loan Document to any Lien on such Property that is permitted by Section 9.03(c), and (iv) release all Collateral and Guarantors upon termination of this Agreement, termination of all Swap Agreements secured by the Security Instruments (other than such Swap Agreements as to which arrangements satisfactory to the applicable counterparty in its sole discretion have been made), termination of all Letters of Credit (other than Letters of Credit as to which arrangements satisfactory to the applicable Issuing Bank in its sole discretion have been made), and the payment in full in Cash of all outstanding Loans, LC Disbursements, all other Indebtedness, and all other  obligations payable under this Agreement and under any other Loan Document.  Each Lender and the Issuing Bank, and each of the other Secured Parties that has accepted the benefit of the Liens granted pursuant to the Security Instruments, hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense (and the Administrative Agent hereby agrees to take such actions at the request of the Borrower), any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any sale or other disposition of Property to the extent such sale or other disposition is permitted by the terms of Section 9.11 or is otherwise authorized by the terms of the Loan Documents.

(b)      The Administrative Agent is authorized on behalf of the Secured Parties, without the necessity of any notice to or further consent from such Secured Parties, from time to time, to take any actions with respect to any Collateral or Security Instruments which may be necessary to perfect and maintain the Liens upon the Collateral granted pursuant to the Security Instruments.  The Administrative Agent is further authorized (but not obligated) on behalf of the

Secured Parties, without the necessity of any notice to or further consent from the Secured Parties, from time to time, to take any action in exigent circumstances as may be reasonably necessary to preserve any rights or privileges of the Secured Parties under the Loan Documents or applicable legal requirements.  Each of the Secured Parties, by accepting the benefit of the Liens granted pursuant to the Security Instruments, hereby agrees to the terms of this Section 11.10(b).

(c)      By accepting the benefits of the Collateral, each Secured Swap Provider agrees that, notwithstanding anything to the contrary in any of its Swap Agreements with the Borrower or any other Credit Party, the Borrower and the other Credit Parties may grant Liens under the Loan Documents that burden and attach to such Swap Agreements and the rights of the Borrower and the other Credit Parties thereunder.

Section 11.11  **The Arrangers and Agents**.   Neither the Arrangers, nor any of the Agents other than the Administrative Agent shall have any duties, responsibilities or liabilities under this Agreement and the other Loan Documents other than their duties, responsibilities and liabilities in their capacity as Lenders hereunder.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01  **Notices**.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(i)      if to the Borrower, to it at:

280 E. 96th Street, Suite 210
Indianapolis, IN 46240
Attn:  Bob Quinn
Email: bquinn@maefield.com
Telephone: (317) 805-0777

(ii)      if to the Administrative Agent, to it at:

Natixis, New York Branch
1251 Avenue of the Americas, 5th Floor
New York, NY 10020
Attention: Urs Fischer
Email: urs.fischer@natixis.com and AdminAgency@natixis.com
Telephone: (212) 891-1954

with a copy to:

117

Natixis, New York Branch
1251 Avenue of the Americas, 5th Floor
New York, NY 10020
Attention: Hana Beckles
Email: Hana.Beckles@natixis.com
Telephone: (212) 583-4913

(iii)    if to the Issuing Bank, to it at:

Natixis
Attention: Wilbert Velazquez
Vice President – Letter of Credit Manager
Global Finance Operations
1251 Avenue of the Americas
New York, NY 10020
Email: Wilbert.Velazquez@natixis.com
With a copy to LETTER_OF_CREDIT@natixis.com
Telephone: (212) 872-5051
Fax: (201) 761-6936

(iv)    if to any other Lender, to it at its address (or fax number) set forth in its Administrative Questionnaire.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article II, Article III, Article IV or Article V unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto.   All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 12.02  **Waivers; Amendments**.

(a)    No failure on the part of the Administrative Agent, any other Agents, the Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent, any other Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative

and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any other Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

(b)      Neither this Agreement nor any provision hereof (other than Section 3.03 as expressly set forth therein) nor any Security Instrument nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; *provided* that no such agreement (including, for the avoidance of doubt, any New Borrowing Base Notice) shall (i) increase the Commitment or the Maximum Credit Amount of any Lender without the written consent of such Lender, (ii) increase the Borrowing Base without the written consent of each Lender (other than any Defaulting Lender), (iii) decrease (other than pursuant to Section 2.07(e) and Section 8.13(c)) or maintain the Borrowing Base without the consent of the Required Lenders, (iv) modify Section 2.07 in any manner that results in an increase in the Borrowing Base without the consent of each Lender (other than any Defaulting Lender), (v) reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Indebtedness hereunder or under any other Loan Document, without the written consent of each Lender affected thereby, (vi) postpone the scheduled date of payment or prepayment of the principal amount of any Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or any other Indebtedness hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone or extend the Termination Date without the written consent of each Lender affected thereby, (vii) change Section 4.01(b) or Section 4.01(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (viii) waive or amend Section 3.04(c) (other than clause (iv) thereof), Section 6.01, Section 10.02(c) or Section 12.14, without the written consent of each Lender, (ix) release any Guarantor (except as set forth in the Guaranty Agreement or in this Agreement), amend Section 8.14 to change the requirements of which Persons are required to become Guarantors, release or subordinate the Administrative Agent's Liens on all or substantially all of the Collateral (other than as provided in Section 11.10), amend or reduce the percentages set forth in Section 8.14(a) to less than 85% without the written consent of each Lender (other than any Defaulting Lender), or (x) change any of the provisions of this Section 12.02(b) or the definition of "Majority Lenders" or "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or to make any determination or grant any consent hereunder or any other Loan Documents, without the written consent of each Lender (other than any Defaulting Lender); *provided*, *further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, any other Agent, or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, such other Agent or the Issuing Bank, as the case may be.  Notwithstanding the foregoing, (x) any supplement to Schedule 7.14 shall be effective simply by delivering to the Administrative Agent a supplemental schedule

clearly marked as such and, upon receipt, the Administrative Agent will promptly deliver a copy thereof to the Lenders, (y) the Borrower and the Administrative Agent may amend this Agreement or any other Loan Document without the consent of the Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document or to add any Subsidiary as a party thereto, and (z) the Administrative Agent and the Borrower (or other applicable Credit Party) may enter into any amendment, modification or waiver of this Agreement or any other Loan Document or enter into any agreement or instrument to effect the granting, perfection, protection, expansion or enhancement of any Lien in any Collateral or Property to become Collateral to secure the Indebtedness for the benefit of the Lenders or as required by any Governmental Requirement to give effect to, protect or otherwise enhance the rights or benefits of any Lender under the Loan Documents without the consent of any Lender.

Section 12.03  **Expenses, Indemnity; Damage Waiver**.

(a)      The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable and documented fees, charges and disbursements of counsel and other outside consultants for the Administrative Agent, the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, and the cost of environmental assessments and audits and surveys and appraisals) in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent as to the rights and duties of the Administrative Agent and the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, Taxes, assessments and other charges incurred by the Administrative Agent in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to therein, (iii) all reasonable and documented out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, and (iv) all out-of-pocket expenses incurred by any Agent or the Issuing Bank or by any Lender (including the fees, charges and disbursements of any and all counsels for any Agent, the Issuing Bank or any Lender during the existence of any Event of Default) in connection with the enforcement or protection of its rights under this Agreement or any other Loan Document, including its rights under this Section 12.03, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)      **THE BORROWER SHALL INDEMNIFY EACH AGENT, THE ARRANGERS, THE ISSUING BANK AND EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND DEFEND AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY AND ALL**

**COUNSELS FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (i) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY (OTHER THAN EXPENSES IN CONNECTION WITH THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS DATED OF EVEN DATE HEREWITH, WHICH EXPENSES SHALL ONLY BE PAID BY THE BORROWER TO THE EXTENT PROVIDED IN <u>SECTION 12.03(a)</u>), (ii) THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER LOAN DOCUMENT, (iii) THE FAILURE OF THE BORROWER OR ANY SUBSIDIARY TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (iv) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER OR ANY GUARANTOR SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (v) ANY LOAN OR LETTER OF CREDIT OR THE USE OF THE PROCEEDS THEREFROM, INCLUDING (A) ANY REFUSAL BY THE ISSUING BANK TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT, OR (B) THE PAYMENT OF A DRAWING UNDER ANY LETTER OF CREDIT NOTWITHSTANDING THE NON-COMPLIANCE, NON-DELIVERY OR OTHER IMPROPER PRESENTATION OF THE DOCUMENTS PRESENTED IN CONNECTION THEREWITH, (vi) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, (vii) THE OPERATIONS OF THE BUSINESS OF THE BORROWER AND THE SUBSIDIARIES BY THE BORROWER AND THE SUBSIDIARIES, (viii) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS, (ix) ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY OR ANY OF THEIR PROPERTIES OR OPERATIONS, INCLUDING, THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF HAZARDOUS MATERIALS ON OR AT ANY OF THEIR PROPERTIES, (x) THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY SUBSIDIARY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY, (xi) THE PAST OWNERSHIP BY THE BORROWER OR ANY SUBSIDIARY OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (xii) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF HAZARDOUS MATERIALS ON OR AT ANY OF THE**

**PROPERTIES OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OF ITS SUBSIDIARIES, (xiii) ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY OF ITS SUBSIDIARIES, OR ANY OTHER ENVIRONMENTAL, PUBLIC HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS, OR (xiv) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; *PROVIDED* THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM (A) THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, (B) SUCH INDEMNITEE'S BREACH IN BAD FAITH OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS OR (C) A DISPUTE SOLELY BETWEEN OR AMONG INDEMNITEES OTHER THAN ANY CLAIMS AGAINST THE ADMINISTRATIVE AGENT OR THE ARRANGERS IN THEIR RESPECTIVE CAPACITIES OR IN FULFILLING THEIR RESPECTIVE ROLES AS THE ADMINISTRATIVE AGENT OR AN ARRANGER OR ANY SIMILAR ROLE HEREUNDER, AND OTHER THAN ANY CLAIMS ARISING OUT OF ANY ACT OR OMISSION ON THE PART OF ANY CREDIT PARTY OR ANY AFFILIATE THEREOF.  WITH RESPECT TO THE OBLIGATION TO REIMBURSE AN INDEMNITEE FOR FEES, CHARGES AND DISBURSEMENTS OF COUNSEL, EACH INDEMNITEE AGREES THAT ALL INDEMNITEES WILL AS A GROUP UTILIZE ONE PRIMARY COUNSEL (PLUS NO MORE THAN ONE ADDITIONAL LOCAL COUNSEL IN EACH APPROPRIATE JURISDICTION) UNLESS, IN EACH CASE, (1) THERE IS AN ACTUAL OR PERCEIVED CONFLICT OF INTEREST AMONG INDEMNITEES, (2) DEFENSES OR CLAIMS EXIST WITH RESPECT TO ONE OR MORE INDEMNITEES THAT ARE NOT AVAILABLE TO ONE OR MORE OTHER INDEMNITEES OR (3) SPECIAL COUNSEL IS REQUIRED TO BE RETAINED.**

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to any Agent, any Arranger or the Issuing Bank under <u>Section 12.03(a)</u> or (<u>b</u>), each Lender severally agrees to pay to such Agent, such Arranger or the Issuing Bank, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was

incurred by or asserted against such Agent, such Arranger or the Issuing Bank in its capacity as such.

(d)     All amounts due under this <u>Section 12.03</u> shall be payable promptly after written demand therefor.

Section 12.04  **Successors and Assigns**.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this <u>Section 12.04</u> (and any other attempted assignment or transfer by any party shall be null and void).   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in <u>Section 12.04(c)</u>), to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Bank and the Lenders, and to the extent expressly contemplated hereby, the Secured Swap Providers and the Bank Products Providers) any legal or equitable right, remedy or claim under or by reason of this Agreement, and except for the foregoing Persons there are no third party beneficiaries to this Agreement.

(b)

(i)     Subject to the conditions set forth in <u>Section 12.04(b)(ii)</u>, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)     the Borrower; *provided* that no consent of the Borrower shall be required if such assignment is to a Lender, an Affiliate of a Lender, an Approved Fund or if an Event of Default has occurred and is continuing;

(B)     the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender, an Affiliate of a Lender or an Approved Fund immediately prior to giving effect to such assignment; and

(C)     the Issuing Bank; *provided* that no consent of the Issuing Bank shall be required for an assignment to an assignee that is a Lender, an Affiliate of a Lender or an Approved Fund immediately prior to giving effect to such assignment.

(ii)     Assignments shall be subject to the following additional conditions:

123

(A)    except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower and the Administrative Agent otherwise consent; *provided* that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all documentation and other information required by Governmental Authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA PATRIOT Act; and

(E)    in no event may any Lender assign all or a portion of its rights and obligations under this Agreement to the Borrower, any Affiliate of the Borrower, or any natural person.

(iii)    Subject to Section 12.04(b)(iv) and the acceptance and recording thereof by the Administrative Agent, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 5.01, Section 5.02(a), Section 5.03 and Section 12.03); *provided*, that except to the extent expressly agreed by the affected parties, no such assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lender having been a Defaulting Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.04(c).

(iv)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Maximum Credit Amount of, and principal amount (and stated interest) of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive (absent manifest error),

and the Borrower, the Administrative Agent, the Issuing Bank and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, the Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on Annex I and forward a copy of such revised Annex I to the Borrower, the Issuing Bank and each Lender.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and know-your-customer documentation (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this Section 12.04(b) and any written consent to such assignment required by this Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 12.04(b).

(vi)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent) to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the Issuing Bank and each other Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)    (i) Any Lender may, without the consent of the Borrower, the Administrative Agent or the Issuing Bank, sell participations to one or more banks or other Persons (other than the Borrower, any Affiliate of the Borrower, or any natural person) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (C) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to

approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso to Section 12.02 that affects such Participant.  In addition such agreement must provide that the Participant be bound by the provisions of Section 12.03.  Subject to the following subsection (ii), each Participant shall be entitled to the benefits of Section 5.01, Section 5.02(a) and Section 5.03 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.04(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, *provided* such Participant agrees to be subject to Section 4.01(c) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     Each Participant agrees (A) to be subject to the provisions of Section 5.03 (subject to the requirements and limitations therein, including the requirements under Section 5.03(f) (it being understood that the documentation required under Section 5.03(f) shall be delivered to the participating Lender)) as if it were an assignee under paragraph (b) of this Section; and (B) that it shall not be entitled to receive any greater payment under Section 5.01 or Section 5.03, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section 12.04 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Notwithstanding any other provisions of this Section 12.04, no transfer or assignment of the interests or obligations of any Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require any Credit Party to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any state.

(f)     Notwithstanding any other provisions of this <u>Section 12.04</u>, all assignments and participations hereunder are subject to the terms and conditions of the Buyout Letter, and the Administrative Agent is hereby directed by the Lenders and the Borrower to make assignments and participations hereunder in accordance with the terms and conditions of the Buyout Letter. Each Lender agrees to use commercially reasonable efforts to cooperate with the Administrative Agent in performing its obligations under the Buyout Letter in the event of a "Purchase Event" (as defined therein).  Each Lender represents to the Administrative Agent that it has received a copy of the Buyout Letter.

Section 12.05  **Survival; Revival; Reinstatement**.

(a)     All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any other Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated. The provisions of <u>Section 5.01</u>, <u>Section 5.02(a)</u>, <u>Section 5.03</u> and <u>Section 12.03</u> and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)     To the extent that any payments on the Indebtedness or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any Debtor Relief Law, common law or equitable cause, then to such extent, the Indebtedness so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the Lenders' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and the Borrower shall take such action as may be reasonably requested by the Administrative Agent and the Lenders to effect such reinstatement.

Section 12.06  **Counterparts; Integration; Effectiveness**.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)     This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the

127

parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof. **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(c)    Except as provided in <u>Section 6.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by fax, as an attachment to an email or other similar electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.07 **Severability**.  Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.08 **Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including obligations under Swap Agreements) at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower or any Subsidiary against any of and all the obligations of the Borrower or any Subsidiary owed to such Lender now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured. Each Lender or its Affiliate agrees to promptly notify the Borrower and the Administrative Agent after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights of each Lender under this <u>Section 12.08</u> are in addition to other rights and remedies (including other rights of setoff) which such Lender or its Affiliates may have.

Section 12.09 <u>**GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS.**</u>

(a)    **THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT UNITED STATES FEDERAL LAW PERMITS ANY LENDER TO CONTRACT FOR, CHARGE, RECEIVE, RESERVE OR**

**TAKE INTEREST AT THE RATE ALLOWED BY THE LAWS OF THE STATE WHERE SUCH LENDER IS LOCATED.**

(b)    **ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EITHER CASE LOCATED IN NEW YORK COUNTY, NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.  THIS SUBMISSION TO JURISDICTION IS NON-EXCLUSIVE AND DOES NOT PRECLUDE A PARTY FROM BRINGING SUIT AGAINST ANOTHER PARTY IN ANY COURT OTHERWISE HAVING JURISDICTION.**

(c)    **EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN SECTION 12.01 OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO SECTION 12.01 (OR ITS ASSIGNMENT AND ASSUMPTION), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING (OR AS SOON THEREAFTER AS IS PROVIDED BY APPLICABLE LAW).  NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF A NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.**

(d)    EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; PROVIDED THAT NOTHING CONTAINED IN THIS SECTION 12.09(d)(ii) SHALL LIMIT THE BORROWER'S INDEMNIFICATION OBLIGATIONS TO THE EXTENT SET FORTH IN SECTION 12.03 TO THE EXTENT SUCH SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARE INCLUDED IN ANY THIRD PARTY CLAIM IN CONNECTION WITH WHICH SUCH INDEMNITEE IS OTHERWISE ENTITLED TO INDEMNIFICATION HEREUNDER;    (iii) CERTIFIES    THAT    NO    PARTY    HERETO    NOR    ANY

REPRESENTATIVE OR AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iv) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS <u>SECTION 12.09</u>.

Section 12.10 **<u>Headings</u>**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11 **<u>Confidentiality</u>**.  Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially similar to those of this <u>Section 12.11</u>, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement and to any actual or prospective counterparty (or its advisors) to any Swap Agreement other agreement relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information becomes publicly available other than as a result of a breach of this <u>Section 12.11</u> or becomes available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower. For the purposes of this <u>Section 12.11</u>, "<u>Information</u>" means all information received from the Borrower or any Subsidiary relating to the Borrower or any Subsidiary and their businesses, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary; *provided* that, in the case of information received from the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this <u>Section 12.11</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.  Notwithstanding anything herein to the contrary, "Information" shall not include, and the Borrower, the Borrower's Subsidiaries, the Administrative Agent, each Lender and the respective Affiliates of each of the foregoing (and the respective partners, directors, officers, employees, agents, advisors and other representatives of the aforementioned Persons), and any other party, may disclose to any and all Persons, without limitation of any kind (a) any information with respect to the United States federal and state income tax treatment of the transactions contemplated hereby and any facts that may be relevant to understanding the United States federal or state income tax treatment of such transactions

("tax structure"), which facts shall not include for this purpose the names of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, or any pricing terms or other nonpublic business or financial information that is unrelated to such tax treatment or tax structure, and (b) all materials of any kind (including opinions or other tax analyses) that are provided to the Borrower, the Administrative Agent or such Lender relating to such tax treatment or tax structure.

Section 12.12  **Interest Rate Limitation**.  It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America or any state or other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Loans, it is agreed as follows: (a) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Loans shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (b) in the event that the maturity of the Loans is accelerated by reason of an election of any Lender resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12 and in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12.  To the extent that Chapter 303 of the Texas Finance Code is relevant for the purpose of determining the Highest Lawful Rate applicable to a Lender, such Lender elects to determine the applicable rate ceiling under such

131

Chapter by the weekly ceiling from time to time in effect. Chapter 346 of the Texas Finance Code does not apply to the Borrower's obligations hereunder.

Section 12.13 **EXCULPATION PROVISIONS**. EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY. EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 12.14 **Collateral Matters; Swap Agreements; and Bank Products**. The benefit of the Security Instruments and of the provisions of this Agreement relating to any collateral securing the Indebtedness shall also extend to and be available to the Secured Swap Providers with respect to any Swap Agreement including any Swap Agreement in existence prior to the date hereof, but excluding any additional transactions or confirmations entered into (a) after such Secured Swap Provider ceases to be a Lender or an Affiliate of a Lender or (b) after assignment of such transactions or confirmations by a Secured Swap Provider to another Person that is not a Lender or an Affiliate of a Lender. The benefit of the Security Instruments and of the provisions of this Agreement relating to any collateral securing the Indebtedness shall further extend to and be available to each Bank Products Provider with respect to Bank Products, but only for so long as such Bank Products Provider is a Lender or an Affiliate of a Lender. No Lender or any Affiliate of a Lender shall have any voting or consent rights under any Loan Document as a result of the existence of obligations owed to it under any such Swap Agreements or Bank Products.

Section 12.15 **No Third Party Beneficiaries**. This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans and the Issuing Bank to issue, amend, renew or extend Letters of Credit hereunder are solely for the benefit of the Borrower, and no other Person (including any Subsidiary of the Borrower, any obligor, contractor, subcontractor, supplier or materialsman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Administrative Agent, any other Agent, the Issuing Bank or any Lender for any reason whatsoever. There are no third party

beneficiaries other than as expressly provided herein with respect to Secured Swap Providers, Indemnitees (as provided in <u>Section 12.03</u>) and Participants (as provided in <u>Section 12.04</u>).

Section 12.16 **USA Patriot Act Notice**.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA Patriot Act.

Section 12.17 **No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that: (a) (i) no fiduciary, advisory or agency relationship between the Borrower and its Subsidiaries and the Administrative Agent or any Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether the Administrative Agent or any Lender has advised or is advising the Borrower or any Subsidiary on other matters; (ii) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrower and its Subsidiaries, on the one hand, and the Administrative Agent and the Lenders, on the other hand; (iii) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent that it has deemed appropriate; and (iv) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; and (b) (i) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Subsidiaries, or any other Person; (ii) neither the Administrative Agent nor any of the Lenders has any obligation to the Borrower or any of its Subsidiaries with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Borrower and its Subsidiaries, and neither the Administrative Agent nor the Lenders has any obligation to disclose any of such interests to the Borrower or its Subsidiaries.  To the fullest extent permitted by Law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 12.18 **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[SIGNATURES BEGIN NEXT PAGE]

134

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**BORROWER:**          **MDC ENERGY LLC,**
a Delaware limited liability company


By: _____
Name:  Mark A. Siffin
Title:    Authorized Person

**ADMINISTRATIVE AGENT:**

**NATIXIS, NEW YORK BRANCH,**
as Administrative Agent

By: _____
Name:  Urs Fischer
Title:    Executive Director


By: _____
Name:  Frederic Bouley
Title:    Vice President

**ISSUING BANK AND LENDER:**

**NATIXIS, NEW YORK BRANCH,**
as Lender and Issuing Bank

By: _____
Name:  Tim Polvado
Title:   Managing Director

By: _____
Name:  Carlos Quinteros
Title:   Managing Director

**LENDER:**

**BMO HARRIS BANK N.A.**, as a Lender

By: _____
Name:   Gumaro Tijerina
Title:   Managing Director

**ANNEX I**
**LIST OF MAXIMUM CREDIT AMOUNTS**

| Name of Lender | Applicable Percentage | Maximum Credit Amount |
|---|---|---|
| Natixis, New York Branch | 53.333333333% | $160,000,000.00 |
| BMO Harris Bank N.A. | 46.666666667% | $140,000,000.00 |
| **TOTAL** | **100.00%** | **$300,000,000.00** |

**EXHIBIT A**
**FORM OF NOTE**

$[      ]                                                                [      ], 20[      ]

      FOR VALUE RECEIVED, MDC Energy LLC, a Delaware limited liability company (the "Borrower") hereby promises to pay to [      ] (the "Lender"), at the office of Natixis, New York Branch (together with its successors or assigns, the "Administrative Agent"), located at [      ], the principal sum of [      ] Dollars ($[      ]) (or such lesser amount as shall equal the aggregate unpaid principal amount of the Loans made by the Lender to the Borrower under the Credit Agreement, as hereinafter defined), in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the Credit Agreement, and to pay interest on the unpaid principal amount of each such Loan, at such office, in like money and funds, for the period commencing on the date of such Loan until such Loan shall be paid in full, at the rates per annum and on the dates provided in the Credit Agreement.

      The date, amount, Type, interest rate, Interest Period and maturity of each Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, may be endorsed by the Lender on the schedules attached hereto or any continuation thereof or on any separate record maintained by the Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of this Note.

      This Note is one of the Notes referred to in the Credit Agreement dated as of September 17, 2018 among the Borrower, the Administrative Agent, the Issuing Bank, and the other agents and lenders from time to time party thereto (including the Lender), and evidences Loans made by the Lender thereunder (such Credit Agreement as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Credit Agreement").  Capitalized terms used in this Note have the respective meanings assigned to them in the Credit Agreement.

      This Note is issued pursuant to, and is subject to the terms and conditions set forth in, the Credit Agreement and is entitled to the benefits provided for in the Credit Agreement and the other Loan Documents.  The Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events, for prepayments of Loans upon the terms and conditions specified therein and other provisions relevant to this Note.

      THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

MDC ENERGY LLC


By:  _____
Name: _____
Title:  _____

A-1

**EXHIBIT B**
**FORM OF BORROWING REQUEST**

[                    ], 20[    ]

MDC Energy LLC, a Delaware limited liability company (the "<u>Borrower</u>"), pursuant to Section 2.03 of the Credit Agreement dated as of September 17, 2018 (together with all amendments, restatements, supplements or other modifications thereto, the "<u>Credit Agreement</u>") among the Borrower, Natixis, New York Branch, as Administrative Agent and Issuing Bank, and the other agents and lenders (the "<u>Lenders</u>") which are or become parties thereto (unless otherwise defined herein, each capitalized term used herein is defined in the Credit Agreement), hereby requests a Borrowing as follows:

(i)      Aggregate amount of the requested Borrowing is $[                ];

(ii)     Date of such Borrowing is [                ], 20[    ] (the "<u>Borrowing Date</u>")[1];

(iii)    Requested Borrowing is to be [an ABR Borrowing] [a Eurodollar Borrowing];

(iv)     [In the case of a Eurodollar Borrowing, the initial Interest Period applicable thereto is [                ][2];]

(v)      Amount of Borrowing Base in effect on the date hereof is $[                ];

(vi)     Total Revolving Credit Exposures on the date hereof (i.e., the sum of the outstanding principal amount of Loans and total LC Exposure without regard to the requested Borrowing) is $[                ];

(vii)    *Pro forma* total Revolving Credit Exposures (i.e., the sum of the outstanding principal amount of Loans and total LC Exposure after giving effect to the requested Borrowing) is $[                ]; and

(viii)   Location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05 of the Credit Agreement, is as follows:

[_____]
[_____]
[_____]
[_____]
[_____]

---

[1] Such date shall be a Business Day.
[2] Which shall be a period contemplated by the definition of the term "Interest Period" in the Credit Agreement.

The undersigned certifies that he/she is the [          ] of the Borrower, and that as such he/she is authorized to execute this certificate on behalf of the Borrower.

MDC ENERGY LLC

By: _____
Name: _____
Title: _____

**EXHIBIT C**
**FORM OF INTEREST ELECTION REQUEST**

[          ], 20[   ]

MDC Energy LLC, a Delaware limited liability company (the "<u>Borrower</u>"), pursuant to Section 2.04 of the Credit Agreement dated as of September 17, 2018 (together with all amendments, restatements, supplements or other modifications thereto, the "<u>Credit Agreement</u>") among the Borrower, Natixis, New York Branch, as Administrative Agent and Issuing Bank, and the other agents and lenders (the "<u>Lenders</u>") which are or become parties thereto (unless otherwise defined herein, each capitalized term used herein is defined in the Credit Agreement), hereby makes an Interest Election Request as follows:

(i)      The Borrowing to which this Interest Election Request applies, and if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information specified pursuant to (iii) and (iv) below shall be specified for each resulting Borrowing) is [          ];

(ii)      The effective date of the election made pursuant to this Interest Election Request is [          ], 20[   ]$^3$;[and]

(iii)      The resulting Borrowing is to be [an ABR Borrowing] [a Eurodollar Borrowing][; and]

(iv)      [If the resulting Borrowing is a Eurodollar Borrowing, add the following:] [The Interest Period applicable to the resulting Borrowing after giving effect to such election is [          ]$^4$].

The undersigned certifies, represents and warrants on behalf of the Borrower (and not individually) that (a) he/she is the [          ] of the Borrower, and that as such he/she is authorized to execute this certificate on behalf of the Borrower and (b) that the Borrower is entitled to receive the requested continuation or conversion under the terms and conditions of the Credit Agreement.

MDC ENERGY LLC

By: _____
Name: _____
Title: _____

---

[3] Such date shall be a Business Day.
[4] Which shall be a period contemplated by the definition of the term "Interest Period" in the Credit Agreement.

## EXHIBIT D
## FORM OF COMPLIANCE CERTIFICATE

The undersigned hereby certifies that he/she is the [          ] of MDC Energy LLC, a Delaware limited liability company (the "Borrower"), and that as such he/she is authorized to execute this certificate on behalf of the Borrower.  With reference to the Credit Agreement dated as of September 17, 2018 (together with all amendments, restatements, supplements or other modifications thereto being the "Credit Agreement") among the Borrower, Natixis, New York Branch, as Administrative Agent and Issuing Bank, and the other agents and lenders (the "Lenders") which are or become a party thereto, the undersigned certifies on behalf of the Borrower (and not individually) as follows (each capitalized term used herein having the same meaning given to it in the Credit Agreement unless otherwise specified):

1.    The financial statements for the [fiscal year/fiscal quarter] ending [_____, 20__] delivered with this Compliance Certificate in accordance with Section [8.01(a)/8.01(b)] of the Credit Agreement fairly present in all material respects the financial condition and results of operations and cash flows of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied.

2.    There exists no Default [or specify Default and describe any action taken or proposed to be taken with respect thereto].

3.    Except as set forth herein, the Borrower is in compliance, as of the end of the [fiscal quarter][fiscal year] ending [          ], with all financial covenants set forth in Section 9.01 of the Credit Agreement, as demonstrated by the detailed computations of such covenants attached hereto as Exhibit A.

4.    No change in the application of GAAP to the Borrower's financial statements has occurred since the most recent financial statements previously provided in connection with the Credit Agreement [except          ][5].

EXECUTED AND DELIVERED this [        ] day of [        ].

MDC ENERGY LLC

By:    _____
Name:    _____
Title:    _____

---

[5] Specify the effect of such change on the financial statements accompanying this certificate.

**EXHIBIT A**
**TO FORM OF COMPLIANCE CERTIFICATE**

(*See Attached*)

**EXHIBIT E**
**SECURITY INSTRUMENTS AS OF THE EFFECTIVE DATE**

1.       Pledge and Security Agreement dated as of September 17, 2018 among the Credit Parties and the Administrative Agent.

2.       Deed of Trust, Assignment, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production, dated as of September 17, 2018, from MDC Energy LLC d/b/a MDC Texas Energy LLC to Carlos Quinteros, as Trustee for the benefit of Natixis, New York Branch, as Administrative Agent, for itself and for the ratable benefit of the other Secured Parties, to be recorded in various counties in Texas.

3.       Deed of Trust, Assignment, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production, dated as of September 17, 2018, from MDC Reeves Energy LLC to Carlos Quinteros, as Trustee for the benefit of Natixis, New York Branch, as Administrative Agent, for itself and for the ratable benefit of the other Secured Parties, to be recorded in various counties in Texas.

4.       UCC-1 Financing Statements in respect of items 1, 2 and 3.

5.       Blocked Account Control Agreement dated as of September 17, 2018 by and among the Borrower, Prosperity Bank, a Texas banking association, as the depository bank, and the Administrative Agent.

6.       Collateral Account Control Agreement dated as of September 17, 2018 among the Borrower, The Bank of New York Mellon, as the depository bank, and the Administrative Agent.

**EXHIBIT F**
**FORM OF GUARANTY**

[Attached.]

## EXHIBIT F
## FORM OF GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (as it may be amended, restated, supplemented or modified from time to time, this "Guaranty") is dated as of the [__] day of [____], 20[__], by each of the undersigned identified on the signature pages hereto as guarantors (together with any other entity that may become a party hereto as provided herein, each a "Guarantor", and collectively, the "Guarantors"), in favor of NATIXIS, NEW YORK BRANCH ("Administrative Agent"), each of the other Secured Parties (as defined in the Credit Agreement described below) and each of their successors and assigns as permitted pursuant to the Credit Agreement (as defined below) (Administrative Agent, the other Secured Parties, and their respective successors and assigns, collectively, the "Beneficiaries").

## RECITALS

A.    MDC Energy LLC, a Delaware limited liability company ("Borrower"), entered into that certain Credit Agreement dated as of September 17, 2018, with Administrative Agent, the Issuing Bank and the financial institutions party thereto as "Lenders" (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Credit Agreement"), pursuant to which the Lenders agreed to make loans and other extensions of credit to Borrower for the purposes set forth therein (unless otherwise defined herein, all terms used herein with their initial letter capitalized shall have the meaning given such terms in the Credit Agreement).

B.    Pursuant to the terms of the Credit Agreement, and as a condition precedent to the extension of credit thereunder, the Lenders have required that each Guarantor execute and deliver this Guaranty to guarantee the payment and performance of the Indebtedness.

C.    Each Guarantor has determined that valuable benefits will be derived by it as a result of the Credit Agreement and the extension of credit made (and to be made) by the Lenders thereunder.

Accordingly, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, each Guarantor hereby covenants and agrees in favor of Administrative Agent for the benefit of the Beneficiaries as follows:

1.    Each Guarantor hereby absolutely and unconditionally guarantees the prompt, complete and full payment when due, no matter how such shall become due, of the Indebtedness, and further guarantees that Borrower will properly and timely perform the Indebtedness and other obligations and liabilities of the Credit Parties under the Credit Agreement, Notes and other Loan Documents. Notwithstanding any contrary provision in this Guaranty or any other Loan Document, however, each Guarantor's maximum liability under this Guaranty is limited, to the extent, if any, required so that its liability is not subject to avoidance under applicable Debtor Relief Laws or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

2.    If any Guarantor is or becomes liable for any indebtedness owing by any Credit Party to any Beneficiary by endorsement or otherwise other than under this Guaranty, such

liability shall not be in any manner impaired or affected hereby, and the rights of Beneficiaries hereunder shall be cumulative of any and all other rights that Beneficiaries may ever have against any Guarantor.  The exercise by any Beneficiary of any right or remedy hereunder or under any other instrument, at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

3.    All obligations of each Guarantor hereunder, shall be absolute and unconditional irrespective of:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any of the Indebtedness, by operation of law or otherwise, or any obligation of any other guarantor of any of the Indebtedness, or any default, failure or delay, willful or otherwise, in the payment or performance of the Indebtedness;

(b)    any lack of validity or enforceability relating to or against Borrower, any other Credit Party or any other guarantor of any of the Indebtedness, for any reason related to the Credit Agreement, any other Loan Document or any other agreement or instrument governing or evidencing any Indebtedness, or any Governmental Requirements purporting to prohibit the payment by Borrower, any other Credit Party or any other guarantor of the Indebtedness of the principal of or interest on the Indebtedness;

(c)    any modification or amendment of or supplement to the Credit Agreement or any other Loan Document;

(d)    any change in the time, manner or place of payment of, or in any other term of, all or any part of the Indebtedness, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument governing or evidencing any Indebtedness, including any increase or decrease in the rate of interest thereon;

(e)    any release, nonperfection or invalidity of any direct or indirect security for any obligation of any Credit Party under the Credit Agreement or any other Loan Document or any obligations of any other guarantor of any of the Indebtedness, any amendment or waiver of, or consent to departure from, any other guaranty or support document, any exchange, release or non-perfection of any Mortgaged Property or other Collateral pursuant to the Security Instruments, for all or any of the Loan Documents or Indebtedness, or any action or failure to act by Administrative Agent, any Lender or any Affiliate of any Lender with respect to any Mortgaged Property or other Collateral securing all or any part of the Indebtedness;

(f)    any change in the existence, structure or ownership of Borrower, any other Credit Party or any other guarantor of any of the Indebtedness, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Borrower, any other Credit Party or any other guarantor of the Indebtedness, or any of their assets or any resulting release or discharge of any obligation of Borrower, any other Credit Party or any other guarantor of any of the Indebtedness;

(g)    any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Loan Document or the Indebtedness;

(h)    any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Credit Agreement, any other Loan Document, any other agreement or instrument or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, Borrower or any Guarantor, other than payment or performance of the Indebtedness; or

(i)    any other act or omission to act or delay of any kind by Borrower, any other Credit Party, any other guarantor of the Indebtedness, Administrative Agent, any Lender or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of any Guarantor's obligations hereunder, other than payment or performance of the Indebtedness;

except in each case to the extent that any written amendment, settlement, compromise, waiver or release expressly modifies or terminates the obligations of such Guarantor.

4.    In the event of default by Borrower or any other Credit Party in payment of the Indebtedness, or any part thereof, when such Indebtedness becomes due, either by its terms or as the result of the exercise of any power to accelerate, each Guarantor shall, on demand, and without further notice of dishonor and without any notice having been given to such Guarantor previous to such demand of the acceptance by the Beneficiaries of this Guaranty, and without any notice having been given to such Guarantor previous to such demand of the creating or incurring of such Indebtedness, pay the amount due thereon to Beneficiaries at Administrative Agent's office as set forth in the Credit Agreement, and it shall not be necessary for any Beneficiary, in order to enforce such payment by any Guarantor, first, to institute suit or exhaust its remedies against Borrower, any other Guarantor or others liable on such Indebtedness, to have Borrower joined with any Guarantor in any suit brought under this Guaranty or to enforce its rights against any security which shall ever have been given to secure such Indebtedness; provided, however, that in the event any Beneficiary elects to enforce and/or exercise any remedies it may possess with respect to any security for the Indebtedness prior to demanding payment from any Guarantor, such Guarantor shall nevertheless be obligated hereunder for any and all sums still owing to Beneficiaries on the Indebtedness and not repaid or recovered incident to the exercise of such remedies.

5.    Notice to any Guarantor of the acceptance of this Guaranty and of the making, renewing or assignment of the Indebtedness and each item thereof, are hereby expressly waived by each Guarantor to the extent permitted by law.

6.    Each payment on the Indebtedness shall be deemed to have been made by Borrower unless express written notice is given to Administrative Agent at the time of such payment that such payment is made by any Guarantor as specified in such notice.

7.    If all or any part of the Indebtedness at any time is secured, each Guarantor agrees that Administrative Agent and/or the Secured Parties may at any time and from time to time, at

3

their discretion and with or without valuable consideration, allow substitution or withdrawal of collateral or other security and release collateral or other security or compromise or settle any amount due or owing under the Credit Agreement or amend or modify in whole or in part the Credit Agreement or any Loan Document executed in connection with same without impairing or diminishing the obligations of each Guarantor hereunder.  Each Guarantor further agrees that if any Credit Party executes in favor of any Beneficiary any collateral agreement, mortgage or other security instrument, the exercise by any Beneficiary of any right or remedy thereby conferred on such Beneficiary shall be wholly discretionary with such Beneficiary, and that the exercise or failure to exercise any such right or remedy shall in no way impair or diminish the obligation of each Guarantor hereunder.  Each Guarantor further agrees that Beneficiaries and Administrative Agent shall not be liable for their failure to use diligence in the collection of the Indebtedness or in preserving the liability of any person liable for the Indebtedness, and each Guarantor hereby waives, to the extent permitted by law, presentment for payment, notice of nonpayment, protest and notice thereof (including, notice of acceleration), and diligence in bringing suits against any Person liable on the Indebtedness, or any part thereof.

8.    Each Guarantor agrees that Beneficiaries, in their discretion, may (a) acting through Administrative Agent, bring suit against all guarantors (including, without limitation, each Guarantor hereunder) of the Indebtedness jointly and severally or against any one or more of them, (b) compound or settle with any one or more of such guarantors for such consideration as Beneficiaries may deem proper, and (c) release one or more of such guarantors from liability hereunder, and that no such action shall impair the rights of Beneficiaries to collect the Indebtedness (or the unpaid balance thereof) from other such guarantors of the Indebtedness, or any of them, not so sued, settled with or released.  Each Guarantor agrees, however, that nothing contained in this paragraph, and no action by Beneficiaries permitted under this paragraph, shall in any way affect or impair the rights or Indebtedness of such guarantors among themselves.

9.    Each Guarantor represents and warrants to each Beneficiary that (a) such Guarantor is a corporation, limited liability company, partnership or limited partnership duly organized and validly existing under the laws of the jurisdiction of its incorporation or formation; (b) such Guarantor possesses all requisite authority and power to authorize, execute, deliver and comply with the terms of this Guaranty, except in the case of this clause (b) where failure to have such authority and power would not reasonably be expected to have a Material Adverse Effect; (c) this Guaranty has been duly authorized and approved by all necessary action on the part of such Guarantor and constitutes a legal, valid and binding obligation of such Guarantor enforceable in accordance with its terms, except as the enforcement thereof may be limited by applicable Debtor Relief Laws, and equitable principles of general applicability; (d) the execution, delivery and compliance with this Guaranty do not violate any agreement, instrument or Governmental Requirement applicable to such Guarantor; (e) no approval or consent of any person or entity, including but not limited to any court or governmental authority, or any filing or registration of any kind is required for the authorization, execution, delivery or compliance with this Guaranty which has not been obtained, except in the case of this clause (e) where failure to have such approvals or consent would not reasonably be expected to have a Material Adverse Effect; and (f) in executing and delivering this Guaranty, each Guarantor has (i) without reliance on Administrative Agent or any information received from Administrative Agent and based upon such documents and information it deems appropriate, made an independent investigation of the transactions contemplated hereby and Borrower, Borrower's business, assets, operations,

4

prospects and condition, financial or otherwise, and any circumstances which may bear upon such transactions, Borrower or the obligations and risks undertaken herein with respect to the Indebtedness; (ii) adequate means to obtain from Borrower on a continuing basis information concerning Borrower; (iii) full and complete access to the Loan Documents and any other documents executed in connection with the Loan Documents; and (iv) not relied and will not rely upon any representations or warranties of Administrative Agent not embodied herein or any acts heretofore or hereafter taken by Administrative Agent (including but not limited to any review by Administrative Agent of the affairs of Borrower).

10.    Each Guarantor covenants and agrees that until the Indebtedness is paid and performed in full, except as otherwise provided in the Credit Agreement or unless Lenders give their prior written consent to any deviation therefrom, it will duly and punctually observe and perform all covenants applicable to such Guarantor under the Credit Agreement and the other Loan Documents.

11.    This Guaranty is for the benefit of the Administrative Agent, the Lenders, the Issuing Bank, and each of their respective successors and permitted assigns, and for the benefit of the Secured Swap Providers and Bank Products Providers, and each of their respective successors and assigns but only to the extent such successor and assign also then qualifies as a Secured Swap Provider or Bank Products Provider, as applicable, and in the event of an assignment by any Secured Party (or its successors or permitted assigns) of the Indebtedness, or any part thereof, the rights and benefits hereunder, to the extent applicable to the Indebtedness so assigned, may be transferred with such Indebtedness.  This Guaranty is binding upon each Guarantor and its successors and assigns.

12.    No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any Guarantor therefrom, shall be effective unless the same shall be in writing and signed by Administrative Agent (with requisite Lender approval as required under the Credit Agreement) and the Guarantors, and then shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case shall, of itself, entitle such Guarantor to any other or further notice or demand in similar or other circumstances.  No delay or omission by the Beneficiaries in exercising any power or right hereunder shall impair any such right or power or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder.  All rights and remedies of the Beneficiaries hereunder are cumulative of each other and of every other right or remedy which the Beneficiaries may otherwise have at law or in equity or under any other contract or document, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

13.    No provision herein or in any promissory note, instrument or any other Loan Document executed by Borrower or any Guarantor evidencing the Indebtedness shall require the payment or permit the collection of interest in excess of the Highest Lawful Rate.  If any excess of interest in such respect is provided for herein or in any such promissory note, instrument, or any other Loan Document, the provisions of this paragraph shall govern, and neither Borrower nor any Guarantor shall be obligated to pay the amount of such interest to the extent that it is in excess of the amount permitted by law.  The intention of the parties being to conform strictly to

any applicable federal or state usury laws now in force, all promissory notes, instruments and other Loan Documents executed by Borrower or any Guarantor evidencing the Indebtedness shall be held subject to reduction to the amount allowed under said usury laws as now or hereafter construed by the courts having jurisdiction.

14.    If any Guarantor should breach or fail to perform any provision of this Guaranty, each Guarantor agrees to pay Beneficiaries all costs and expenses (including court costs and reasonable attorneys' fees) incurred by Beneficiaries in the enforcement hereof.

15.    (a)    The liability of each Guarantor under this Guaranty shall in no manner be impaired, affected or released by the insolvency, bankruptcy, making of an assignment for the benefit of creditors, arrangement, compensation, composition or readjustment of any Credit Party, or any proceedings affecting the status, existence or assets of any Credit Party or other similar proceedings instituted by or against any Credit Party and affecting the assets of any Credit Party.

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Indebtedness which accrues after the commencement of any proceeding referred to in clause (a) above (or, if interest on any portion of the Indebtedness ceases to accrue by operation of law by reason of the commencement of said proceeding, such interest as would have accrued on such portion of the Indebtedness if said proceedings had not been commenced) shall be included in the Indebtedness because it is the intention of each Guarantor and the Beneficiaries that the Indebtedness which is guaranteed by each Guarantor pursuant to this Guaranty should be determined without regard to any rule of law or order which may relieve any Credit Party of any portion of such Indebtedness.  Each Guarantor will, to the extent not prohibited by law from doing so, permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Beneficiaries or Administrative Agent, or allow the claim of Beneficiaries or Administrative Agent in respect of, any such interest accruing after the date on which such proceeding is commenced.

(c)    In the event that all or any portion of the Indebtedness is paid by any Credit Party, the obligations of each Guarantor hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from Administrative Agent or any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Indebtedness for all purposes under this Guaranty.

16.    Each Guarantor understands and agrees that any amounts of any Guarantor on account with any Lender may, if an Event of Default shall have occurred and be continuing, be offset to satisfy the obligations of such Guarantor hereunder.

17.    (a) Each Guarantor hereby subordinates and makes inferior any and all indebtedness now or at any time hereafter owed by any Credit Party to such Guarantor to the Indebtedness evidenced by the Credit Agreement and agrees if an Event of Default shall have occurred and be continuing, not to permit any Credit Party to repay, or to accept payment from any Credit Party of, such indebtedness or any part thereof without the prior written consent of Administrative Agent.  Each Guarantor further agrees that if Administrative Agent so requests

6

while an Event of Default is continuing, such indebtedness of such Credit Party to such Guarantor shall be collected, enforced and received by such Guarantor as trustee for Administrative Agent (for the benefit of itself and the other Beneficiaries) and shall be paid over to Administrative Agent (for the benefit of itself and the other Beneficiaries) on account of the Indebtedness but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty, except to the extent of such payment.

(b)     To the extent any Guarantor from time to time has any Liens on any Collateral owned by another Credit Party securing any obligation of such Credit Party to such Guarantor (including, by way of example, any operators' liens), each Guarantor hereby agrees that any and all of its present or future Liens on any Collateral, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, are and shall be subordinate, junior and inferior to the Administrative Agent's security interests and Liens in the Collateral, notwithstanding (i) anything to the contrary contained in any agreement or filing to which any Guarantor may now or hereafter be a party to, and regardless of the time, order or method of grant, attachment, recording or perfection of any financing statements or other security interests, assignments, pledges, deeds, mortgages and other liens, charges or encumbrances or any defect or deficiency or alleged defect or deficiency in any of the foregoing, and (ii) any provision of the UCC or any applicable law, Loan Document or other agreement to which any Guarantor may now or hereafter be a party to or any other circumstance whatsoever. Each Guarantor further agrees that the Administrative Agent's security interest in the Collateral shall remain unconditionally first, prior and superior to any of the Guarantor's Liens on the Collateral at any time.

18.     Each Guarantor hereby agrees that to the extent that any Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Paragraph 19. The provisions of this Paragraph 18 shall in no respect limit the obligations and liabilities of any Guarantor to the Secured Parties, and each Guarantor shall remain liable to the Secured Parties for the full amount guaranteed by such Guarantor hereunder.

19.     Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by any Beneficiary, no Guarantor shall be entitled to be subrogated to any of the rights of any Beneficiary against Borrower or any Guarantor or any collateral security or guaranty or right of offset held by any Beneficiary for the payment of the Indebtedness, nor shall any Guarantor seek or be entitled to seek any indemnity, exoneration, participation, contribution or reimbursement from Borrower or any Guarantor in respect of payments made by such Guarantor hereunder, until all amounts owing to the Beneficiaries by the Credit Parties on account of the Indebtedness are paid in full and the Commitments are terminated. If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Indebtedness shall not have been paid in full, such amount shall be held by such Guarantor in trust for Administrative Agent (for the benefit of itself and the other Beneficiaries), segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to Administrative Agent (for the benefit of itself and the other Beneficiaries) in the exact form received by such Guarantor (duly endorsed by such Guarantor to

Administrative Agent, if required), to be applied against the Indebtedness whether matured or unmatured.

20.    After giving effect to the Transactions and each Borrowing made and each issuance, increase or extension of each Letter of Credit, the Guarantors, collectively with the Borrower and taken as a whole, are Solvent.

21.    If any provision of this Guaranty is held to be illegal, invalid, or unenforceable, such provision shall be fully severable, this Guaranty shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid, or unenforceable provision there shall be added automatically as a part of this Guaranty a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

22.    (a)    EXCEPT TO THE EXTENT REQUIRED FOR THE EXERCISE OF THE REMEDIES PROVIDED IN THE OTHER SECURITY INSTRUMENTS, EACH GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR NEW YORK STATE COURT, IN EITHER CASE, LOCATED IN NEW YORK COUNTY, NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT AND EACH GUARANTOR HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF THE BENEFICIARIES OR GUARANTOR TO BRING PROCEEDINGS IN THE COURTS OF ANY OTHER JURISDICTION.

(b)    To the extent effective under applicable law, each Guarantor hereby irrevocably consents to the service of process out of any of the aforementioned courts in any such Litigation by the delivery of copies thereof by Federal Express or other nationally recognized overnight delivery service, to each Guarantor's office, 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240, Attention: Bob Quinn, telephone: (317) 805-0777, electronic mail: bquinn@maefield.com. Nothing herein shall affect the right of the Beneficiaries or any Guarantor to serve process in any manner permitted by applicable law. As used herein, the term "Litigation" means any proceeding, claim, lawsuit or investigation (i) conducted or threatened by or before any court or governmental department, commission, board, bureau, agency or instrumentality of the United States or of any state, commonwealth, nation, territory, possession, county, parish, or municipality, whether now or hereafter constituted or existing, or (ii) pending before any public or private arbitration board or panel.

(c)    To the extent that any Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise)

with respect to itself or its property, such Guarantor hereby irrevocably waives, to the extent permitted by law, such immunity in respect of its obligations under this Guaranty and the other Loan Documents.

23.    THIS GUARANTY AND THE OTHER LOAN DOCUMENTS COLLECTIVELY REPRESENT THE FINAL AGREEMENT BY AND AMONG ADMINISTRATIVE AGENT, THE OTHER SECURED PARTIES AND EACH GUARANTOR AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE SECURED PARTIES, ADMINISTRATIVE AGENT AND EACH GUARANTOR. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE SECURED PARTIES, ADMINISTRATIVE AGENT AND EACH GUARANTOR.

24.    EACH GUARANTOR, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ITS RIGHT TO A JURY TRIAL, IN ANY LITIGATION ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS.

25.    THIS GUARANTY AND THE OTHER LOAN DOCUMENTS SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

26.    Each Guarantor agrees to cause each of its Domestic Subsidiaries that is required to become a party to this Guaranty pursuant to Section 8.14(b) of the Credit Agreement to become a Guarantor for all purposes of this Guaranty by causing such Domestic Subsidiary to execute and deliver an Assumption Agreement in substantially the form of Annex 1 attached to the Security Agreement.

27.    This Guaranty may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Guaranty by facsimile or other electronic transmission (e.g. .pdf) shall be effective as delivery of a manually executed counterpart of this Guaranty.

28.    Each Guarantor that is a Qualified ECP Counterparty hereby absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each Credit Party (other than itself) in order for such Credit Party to honor its obligations with respect to Swap Agreements (provided, however, that each such Guarantor shall only be liable under this Paragraph 28 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Paragraph 28, or otherwise under this Guaranty or any Loan Document, as it relates to such other Credit Parties, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each such Guarantor under this Paragraph 28 shall remain in full force and effect until all Indebtedness is paid in full to the Lenders and Administrative Agent, and all of the Lender's Commitments are terminated.  Each Guarantor intends that this Paragraph 28 constitute, and this Paragraph 28 shall be deemed to constitute, a

"keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

[Remainder of Page Intentionally Left Blank]

EXECUTED and effective as of the date first above written.

**GUARANTORS:**

**MDC ENERGY LLC**,
a Delaware limited liability company

By: _____
Name:
Title:

**MDC REEVES ENERGY LLC**,
a Delaware limited liability company

By: _____
Name:
Title:

**WARD I, LLC**,
a Delaware limited liability company

By: _____
Name:
Title:

**EXHIBIT G**
**FORM OF SECURITY AGREEMENT**

[Attached.]

*Execution Version*

# PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT (as it may be amended, restated, supplemented or modified from time to time, this "Security Agreement") is entered into as of September 17, 2018, by and among each of the undersigned identified on the signature pages hereto as Grantors (together with any other entity that may become a party hereto as provided herein, each a "Grantor, and collectively, the "Grantors"), and Natixis, New York Branch, in its capacity as administrative agent (the "Administrative Agent") for the Lenders and the other Secured Parties.

## PRELIMINARY STATEMENTS

A.    On even date herewith, MDC Energy LLC, a Delaware limited liability company (the "Borrower"), entered into that certain Credit Agreement with the Administrative Agent and the financial institutions party thereto as "Lenders" (the "Lenders") (as amended, restated, replaced, modified or supplemented from time to time, the "Credit Agreement") pursuant to which the Lenders have agreed to make loans and other extensions of credit to the Borrower for the purposes set forth therein.

B.    The Borrower and/or certain of its Subsidiaries and certain Secured Swap Providers have or may enter into certain Swap Agreements (the "Secured Swap Agreements").

C.    The Borrower and/or certain of its Subsidiaries and certain Bank Products Providers have or may enter into certain agreements regarding Bank Products (collectively, the "Secured Bank Products Agreements").

D.    The Grantors (other than the Borrower) have executed or may from time to time execute the Guaranty Agreement, whether by means of a joinder or assumption agreement related thereto or otherwise (such Guaranty Agreement and such joinders and assumption agreements, as they may from time to time be amended, restated, replaced, modified or supplemented, are collectively the "Guaranty") pursuant to which, upon the terms and conditions stated therein, the Grantors party thereto agree to guarantee the obligations of the Borrower and the other Credit Parties under the Credit Agreement, the other Loan Documents, the Secured Swap Agreements and the Secured Bank Products Agreements.  The Credit Agreement, the Guaranty, the other Loan Documents, the Secured Swap Agreements and the Secured Bank Products Agreements are collectively referred to herein as the "Secured Transaction Documents".

E.    The Administrative Agent and the other Secured Parties have conditioned their obligations under the Secured Transaction Documents upon the execution and delivery by the Grantors of this Security Agreement, and the Grantors have agreed to enter into this Security Agreement to secure all obligations owing to the Administrative Agent and the other Secured Parties under the Secured Transaction Documents.

F.    Each Grantor has determined that valuable benefits will be derived by it as a result of the Credit Agreement and the extension of credit made (and to be made) by the Lenders thereunder.

ACCORDINGLY, the Grantors and the Administrative Agent, on behalf of the Secured Parties, hereby act and agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    <u>Terms Defined in Credit Agreement</u>.  All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

1.2.    <u>Terms Defined in UCC</u>.  Terms defined in the UCC which are not otherwise defined in this Security Agreement or the Credit Agreement are used herein as defined in the UCC.

1.3.    <u>Definitions of Certain Terms Used Herein</u>.  As used in this Security Agreement, in addition to the terms defined in the introductory paragraph hereto and in the Preliminary Statements, the following terms shall have the following meanings:

"<u>Account Debtor</u>" means a Person who is obligated on an Account.

"<u>Account</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Amendment</u>" shall have the meaning set forth in <u>Section 4.4</u> hereof.

"<u>Article</u>" means a numbered article of this Security Agreement, unless another document is specifically referenced.

"<u>As-extracted Collateral</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Assigned Contracts</u>" means, collectively, all of the Grantors' rights and remedies under, and all moneys and claims for money due or to become due to any Grantor under all written contracts, and any and all amendments, supplements, extensions, and renewals thereof including all rights and claims of the Grantors now or hereafter existing: (a) under any insurance, indemnities, warranties, and guarantees provided for or arising out of or in connection with any of the foregoing contracts; (b) for any damages arising out of or for breach or default under or in connection with any of the foregoing contracts; (c) to all other amounts from time to time paid or payable under or in connection with any of the foregoing contracts; or (d) to exercise or enforce any and all covenants, remedies, powers and privileges thereunder.

"<u>Assumption Agreement</u>" means an Assumption Agreement substantially in the form of <u>Annex 1</u> hereto.

"<u>Chattel Paper</u>" and "<u>Electronic Chattel Paper</u>" shall have the meanings set forth in Article 9 of the UCC.

"<u>Collateral</u>" shall have the meaning set forth in <u>Article II</u>.

"Collateral Account" means any Deposit Account under the sole dominion and control of the Administrative Agent established by the Administrative Agent as provided in Section 7.1.

"Commercial Tort Claim" means a commercial tort claim (as that term is defined in Article 9 of the UCC).

"Commodity Account" shall have the meaning set forth in Article 9 of the UCC.

"Commodity Account Control Agreement" means an agreement, in form and substance reasonably satisfactory to the Administrative Agent, among any Credit Party, a commodity intermediary holding such Credit Party's assets, including funds and commodity contracts, and the Administrative Agent with respect to collection and control of all deposits, commodity contracts and other balances held in a Commodity Account maintained by any Credit Party with such commodity intermediary.

"Control" shall have the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"Control Agreement" means a Deposit Account Control Agreement, a Securities Account Control Agreement or a Commodity Account Control Agreement, as context may require.

"Copyrights" means, with respect to any Person, all of such Person's right, title, and interest in and to the following:  (a) all copyrights, rights and interests in copyrights, works protectable by copyright, copyright registrations, and copyright applications; (b) all renewals of any of the foregoing; and (c) all rights corresponding to any of the foregoing.

 "Deposit Account" shall have the meaning set forth in Article 9 of the UCC.

"Deposit Account Control Agreement" means an agreement, in form and substance satisfactory to the Administrative Agent, among any Credit Party, a banking institution holding such Credit Party's funds, and the Administrative Agent with respect to collection and control of all deposits and balances held in a Deposit Account maintained by any Credit Party with such banking institution.

"Document" shall have the meaning set forth in Article 9 of the UCC.

"Effective Date" means (a) with respect to the Borrower and each other Grantor party hereto on the date hereof, the "Effective Date" as defined in the Credit Agreement, and (b) with respect to each other Grantor, the "Effective Date" as defined in the Assumption Agreement by means of which such Grantor becomes a party hereto.

"Equipment" shall have the meaning set forth in Article 9 of the UCC.

"Excluded Accounts" means (a) any Deposit Account, Commodity Account or Securities Account so long as the balance in each such account, individually, does not exceed $250,000 at any time and the aggregate balance of all such Deposit Accounts, Commodity Accounts and Securities Accounts does not at any time exceed $500,000, (b) any Deposit Account that is a zero

balance account or a Deposit Account for which the balance of such Deposit Account is transferred at the end of each date to a Deposit Account that is not an Excluded Account, (c) any other Deposit Accounts exclusively used for trust, payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any employees of the Grantors or any of their subsidiaries and (d) any other Deposit Account, Commodity Account or Securities Account that is pledged to a third party to the extent such Lien is permitted by the Loan Documents.

"Excluded Assets" means:

(a)     any motor vehicle, aircraft, rolling stock or other asset in which a lien can only be perfected by action with respect to a certificate of title;

(b)     Letter-of-Credit Rights, except to the extent a lien on such Letter-of-Credit Rights can be perfected by filing a UCC financing statement;

(c)     commercial tort claims not to exceed $250,000 individually or $500,000 in the aggregate;

(d)     Excluded Contracts; *provided* that (i) any Excluded Contract shall automatically cease to be excluded from this definition (and shall automatically be subject to the lien and security interest granted herein, to the extent that (A) either of the prohibitions discussed in clause (a) and (b) of the definition of Excluded Contracts below is ineffective or subsequently rendered ineffective under Sections 9-406, 9-407, 9-408 or 9-409 of the UCC or under any other legal requirement or is otherwise no longer in effect, or (B) the applicable Credit Party has obtained the consent of the other parties to such Excluded Contract to the creation of a lien and security interest in, such Excluded Contract (which consent, upon the reasonable request of the Administrative Agent, such Credit Party will use its commercial reasonable efforts to obtain)), and (ii) any Proceeds received by any Credit Party from the sale, transfer or other disposition of Excluded Contracts shall constitute Collateral unless any assets or property constituting such Proceeds are themselves Excluded Assets;

(e)     Margin Stock;

(f)     Equity Interests in any Person other than Subsidiaries, but only to the extent prohibited by the terms of any applicable organizational documents, joint venture agreement, shareholders' agreement or similar agreement of such Person;

(g)     any Trademark application filed in the United States Patent and Trademark Office on the basis of any Grantor's intent-to-use such trademark prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, to the extent, and only for so long as, the granting by any Grantor of a security interest therein would result in the loss by such Grantor of any material rights therein, or impair the validity or enforceability of any registration that issues therefrom under applicable federal law; and

(h)     any asset as to which the Administrative Agent and the Borrower reasonably determine that the cost of obtaining such security interest or perfection thereof are excessive in relation to the benefit to the Lenders of the security to be afforded thereby;

provided, however, that "Excluded Assets" shall (1) not include any right to receive Proceeds from the sale or other disposition of Excluded Assets or any Proceeds, substitutions or replacements of Excluded Assets (unless such Proceeds, substitutions or replacements would constitute Excluded Assets) and (2) with respect to Excluded Contracts, not be construed to limit, impair or otherwise affect the Administrative Agent's continuing security interests in the Borrower's or any Grantor's rights to or interests of the Borrower or any Grantor in (x) monies due or to become due under any such general intangibles, contract, license, agreement, instrument, contract document or other document (to the extent not prohibited by such contract, license, agreement, instrument or other document and applicable law), or (y) any Proceeds from the sale, license, lease or other disposition of any such general intangibles, contract, license, agreement, instrument, contract document or other document.

"Excluded Contracts" means any general intangibles, contract, contract document or other document (and any contract rights arising thereunder) to which any of the Credit Parties is a party to the extent (but only to the extent) that a Credit Party is prohibited from granting a security interest in, pledge of, or charge, mortgage or lien upon any such property by reason of (a) an enforceable negative pledge or anti-assignment provision that is in effect on the Effective Date or otherwise in effect when the general intangible, contract, contract document or other document is acquired or (b) applicable law or regulation to which such Credit Party is subject.

"Excluded Payments" shall have the meaning set forth in Section 4.6(b)(iii) hereof.

"Exhibit" refers to a specific exhibit to this Security Agreement (unless another document is specifically referenced) as from time to time supplemented by any Assumption Agreements.

"Fixtures" shall have the meaning set forth in Article 9 of the UCC.

"General Intangible" shall have the meaning set forth in Article 9 of the UCC.

"Goods" shall have the meaning set forth in Article 9 of the UCC.

"Instrument" shall have the meaning set forth in Article 9 of the UCC.

"Inventory" shall have the meaning set forth in Article 9 of the UCC.

"Investment Property" shall have the meaning set forth in Article 9 of the UCC.

"Issuer" shall have the meaning set forth in Section 11.1 hereof.

"Letter-of-Credit Rights" shall have the meaning set forth in Article 9 of the UCC.

"Licenses" means, with respect to any Person, all of such Person's right, title, and interest as a licensor in and to any and all licensing agreements or similar arrangements in and to its Patents, Copyrights, or Trademarks.

"<u>Margin Stock</u>" means "margin stock" within the meaning of Regulations T, U and X of the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"<u>Patents</u>" means, with respect to any Person, all of such Person's right, title, and interest (other than as a licensee) in and to: (a) any and all patents and patent applications; (b) all inventions and improvements described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions, and continuations-in-part thereof; and (d) all rights corresponding to any of the foregoing.

"<u>Permitted Liens</u>" means all Liens permitted by Section 9.03 of the Credit Agreement.

"<u>Pledged Equity</u>" means all Equity Interests owned by any of the Grantors, whether or not evidenced by certificates physically delivered to the Administrative Agent pursuant to this Security Agreement.

"<u>Proceeds</u>" shall have the meaning set forth in Article 9 of the UCC and, in any event shall include, without limitation, all dividends or other income from the Pledged Equity or other Collateral, collections thereon or distributions or payments with respect thereto.

"<u>Receivables</u>" means the Accounts, Chattel Paper, Documents, Investment Property, Instruments and any other rights or claims to receive money which are General Intangibles or which are otherwise included as Collateral.

"<u>Section</u>" means a numbered section of this Security Agreement, unless another document is specifically referenced.

"<u>Securities Account Control Agreement</u>" means an agreement, in form and substance reasonably satisfactory to the Administrative Agent, among any Credit Party, a securities intermediary holding such Credit Party's assets, including funds and securities, or an issuer of Securities, and the Administrative Agent with respect to collection and control of all deposits, securities and other balances held in a Securities Account maintained by any Credit Party with such securities intermediary.

"<u>Securities Account</u>" shall have the meaning set forth in Article 8 of the UCC.

"<u>Security</u>" has the meaning set forth in Article 8 of the UCC.

"<u>Stock Rights</u>" means all dividends, Instruments or other distributions and any other right or property which the Grantors shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Equity Interest constituting Collateral, any right to receive an Equity Interest and any right to receive earnings, in which the Grantors now have or hereafter acquire any right, issued by an issuer of such Equity Interest.

"<u>Supporting Obligation</u>" shall have the meaning set forth in Article 9 of the UCC.

"Trademarks" means, with respect to any Person, all of such Person's right, title, and interest (other than as a licensee) in and to the following:  (a) all trademarks (including service marks), trade names, trade dress, and trade styles and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all licenses of the foregoing; (c) all renewals of the foregoing; and (d) all rights corresponding to any of the foregoing.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, Administrative Agent's or any Secured Party's Lien on any Collateral.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

## ARTICLE II
## GRANT OF SECURITY INTEREST

Each Grantor hereby pledges, assigns and grants to the Administrative Agent, on behalf of and for the ratable benefit of the Secured Parties, a security interest in all of its right, title and interest in, to and under all of the following items, categories and types of personal property, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Grantor (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, such Grantor, and regardless of where located (all of which will be collectively referred to as the "Collateral"), including:

(i)    all Accounts;

(ii)    all Chattel Paper;

(iii)    all Documents;

(iv)    all Equipment;

(v)    all General Intangibles;

(vi)    all Goods (other than consumer goods);

(vii)    all Instruments;

(viii)    all Inventory;

(ix)    all Investment Property;

(x)    all Copyrights, Patents and Trademarks;

(xi)    all cash and Cash Equivalents;

(xii)    all letters of credit, Letter-of-Credit Rights and Supporting Obligations;

(xiii)    all Deposit Accounts;

(xiv)    all Commercial Tort Claims listed on <u>Exhibit G</u> hereto;

(xv)    all Securities Accounts;

(xvi)    all Commodity Accounts;

(xvii)    all Pledged Equity

(xviii)    all Assigned Contracts and all Swap Agreements; and

(xix)    all accessions to, substitutions for and replacements, Proceeds (including Stock Rights), insurance Proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing;

to secure the prompt and complete payment and performance of the Indebtedness; provided, however, that "Collateral" shall not include any Excluded Assets; and provided further, that if and when any such item, category or type of property shall cease to be an Excluded Asset, such property shall be deemed at all times from and after such date to constitute Collateral.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each Grantor represents and warrants to the Administrative Agent and the Secured Parties that:

3.1.    <u>Title, Perfection and Priority</u>.  The representations and warranties of the Borrower in the Credit Agreement concerning each Grantor, this Security Agreement, and the Collateral are true and correct in all material respects (without duplication of any materiality qualifier contained therein), except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, such representations and warranties are true and correct in all material respects as of such specified earlier date. When financing statements have been filed in the appropriate offices against each Grantor in the locations listed on <u>Exhibit E</u>, the Administrative Agent will have a validly perfected first priority security interest in that Collateral of the Grantor in which a security interest may be perfected by the filing of financing statements, subject only to Permitted Liens.

3.2.    <u>Type and Jurisdiction of Organization, Organizational and Identification Numbers</u>.  The type of entity of such Grantor, its state of organization, the organizational number issued to it by its state of organization and its federal employer identification number are set forth on <u>Exhibit A</u>.

3.3.    <u>Principal Location</u>.  Such Grantor's mailing address and the location of its place of business (if it has only one) or its chief executive office (if it has more than one place of business), are disclosed in <u>Exhibit A</u>.

3.4.    <u>Deposit Accounts, Commodity Accounts and Securities Accounts</u>.  All of such Grantor's Deposit Accounts, Commodity Accounts and Securities Accounts as of the Effective Date are listed on <u>Exhibit B</u> and any Excluded Accounts as of the Effective Date are identified as such on <u>Exhibit B</u>.

3.5.    <u>Exact Names</u>.  Such Grantor's name in which it has executed this Security Agreement is the exact name as it appears in such Grantor's organizational documents, as amended, as filed with such Grantor's jurisdiction of organization as of the Effective Date. Except as may be described in <u>Exhibit A</u> or in an applicable Assumption Agreement, such Grantor has not, during the past five years prior to its becoming a party hereto, had any other name or been a party to any merger or consolidation.

3.6.    <u>Letter-of-Credit Rights and Chattel Paper on Effective Date</u>.  <u>Exhibit C</u> lists all Letter-of-Credit Rights and Chattel Paper owned by such Grantor as of the Effective Date, if any, with a value in excess of $250,000.

3.7.    <u>No Financing Statements, Security Agreements</u>.  No financing statement describing all or any portion of the Collateral which has not lapsed or been terminated naming such Grantor as debtor has been filed or is of record in any jurisdiction except (a) for financing statements naming the Administrative Agent as the secured party, (b) financing statements with respect to Liens permitted by <u>Section 4.1(e)</u>, (c) financing statements being terminated concurrently with the execution hereof, and (d) financing statements filed as a precaution to describe personal property leased to a Grantor.

3.8.    <u>Pledged Equity</u>.

(a)    <u>Exhibit D</u> sets forth a complete and accurate list of all Pledged Equity owned by such Grantor as of the Effective Date.  Such Grantor is the direct, sole beneficial owner and sole holder of record of the Pledged Equity listed on <u>Exhibit D</u> as being owned by it, free and clear of any Liens except for Permitted Liens.  Such Grantor further represents and warrants that (i) all Pledged Equity owned by it constituting an Equity Interest has been (to the extent such concepts are relevant with respect to such Pledged Collateral) duly authorized and validly issued and, if such Pledged Equity is stock in a corporation, is fully paid and non-assessable, (ii) with respect to any certificates delivered to the Administrative Agent representing Pledged Equity, either such certificates are Securities as defined in Article 8 of the UCC as a result of actions by the issuer or otherwise, or, if such certificates are not Securities, such Grantor has so informed the Administrative Agent so that the Administrative Agent may take steps to perfect its security interest therein as a General Intangible, and (iii) all such Pledged Equity held by a securities intermediary is covered by a Securities Account Control Agreement.

(b)    In addition, except for any that have been obtained, as of the Effective Date, no consent, approval, authorization, or other action by, and no giving of notice, filing with, any Governmental Authority or any other Person is required for the pledge by such Grantor of such Pledged Equity pursuant to this Security Agreement or for the execution, delivery and performance of this Security Agreement by such Grantor.

(c)     Except as set forth in <u>Exhibit D</u>, as of the Effective Date such Grantor owns 100% of the issued and outstanding Equity Interests in each issuer that has issued Pledged Equity to such Grantor.

3.9     <u>Instruments, Securities and Documents</u>.  <u>Exhibit D</u> lists all (a) Instruments with an aggregate value exceeding $250,000, (b) Securities (other than Equity Interests) with an aggregate value exceeding $250,000 and (c) Documents with an aggregate value exceeding $250,000, in each case, to the extent constituting or evidencing Collateral owned by such Grantor as of the Effective Date, if any.

3.10     <u>Intellectual Property</u>.  As of the Effective Date, such Grantor does not have any interest in, or title to, or pending application for, any Patent, Trademark or Copyright except as set forth in <u>Exhibit H</u>.  This Security Agreement is effective to create a valid and continuing first priority security interest in such Grantor's interest in, or title to, or pending application for, Patents, Trademarks (other than any Trademark application that constitutes Excluded Assets) and Copyrights (subject only to Liens permitted by Section 9.03 of the Credit Agreement).

## ARTICLE IV
## COVENANTS

From the date of this Security Agreement, and thereafter until this Security Agreement is terminated, each Grantor agrees that:

4.1.     <u>General</u>.

(a)     <u>Access to Records</u>.  Such Grantor will comply with the Borrower's covenants contained in Section 8.08 of the Credit Agreement concerning maintenance of books and records and provision of access to such records and the Collateral to the Administrative Agent (and its designated representatives).

(b)     <u>Authorization to File Financing Statements; Ratification</u>.  Such Grantor hereby authorizes the Administrative Agent to file financing statements and other documents describing the Collateral in order to perfect the security interests created hereby.  Each Grantor hereby agrees to deliver or file such financing statements, and to take such other actions, as may from time to time be reasonably requested by the Administrative Agent in order to maintain the perfection and priority described in <u>Section 3.1</u> and, if applicable and subject to the limitations herein, Control of, the Collateral owned by such Grantor (other than Excluded Assets).  Any financing statement filed by the Administrative Agent may be filed in any filing office in any UCC jurisdiction and may (i) describe such Grantor's Collateral (1) as all assets of the Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, or (2) by any other description which reasonably approximates the description contained in this Security Agreement, and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office's acceptance of any financing statement or amendment, including whether such Grantor is an organization, the type of organization and any organization identification number

issued to such Grantor.  Such Grantor also agrees to furnish any such information to the Administrative Agent promptly upon reasonable request.

(c) <u>Further Assurances</u>.  Such Grantor will, if so reasonably requested by the Administrative Agent, furnish to the Administrative Agent, as often as the Administrative Agent reasonably requests, statements and schedules further identifying and describing the Collateral owned by it and such other reports and information in connection with its Collateral as the Administrative Agent may reasonably request, all in such detail as the Administrative Agent may reasonably specify.  Such Grantor also agrees to take any and all actions necessary to defend title to the Collateral against all persons and to defend the security interest of the Administrative Agent in its Collateral and the priority thereof against any Lien not expressly permitted hereunder.

(d) <u>Disposition of Collateral</u>.  Such Grantor will not sell, lease or otherwise dispose of the Collateral owned by it in violation of Section 9.11 of the Credit Agreement.

(e) <u>Liens</u>.  Such Grantor will not create, incur, or suffer to exist any Lien on the Collateral owned by it except (i) the security interest created by this Security Agreement, and (ii) other Permitted Liens.

(f) <u>Other Financing Statements</u>.  Such Grantor will not authorize the filing of any financing statement naming it as debtor covering all or any portion of the Collateral owned by it, except for (i) financing statements naming the Administrative Agent as the secured party, (ii) financing statements with respect to Liens permitted by <u>Section 4.1(e)</u>, and (iii) financing statements filed as a precaution to specifically describe personal property leased to a Grantor and permitted under the Credit Agreement.  Such Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement naming the Administrative Agent as secured party without the prior written consent of the Administrative Agent, subject to such Grantor's rights under Section 9.509(d)(2) of the UCC.

4.2.  <u>Electronic Chattel Paper</u>.  Upon request by the Administrative Agent at any time that an Event of Default has occurred and is continuing, such Grantor shall take all steps necessary to grant the Administrative Agent Control of such Grantor's electronic chattel paper in accordance with the UCC and all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

4.3.  <u>Inventory and Equipment</u>.  Each Grantor will perform its obligations with respect to Inventory and Equipment under Section 8.06 of the Credit Agreement.

4.4.  <u>Delivery of Instruments, Certificated Securities, Chattel Paper and Documents</u>.  Such Grantor will (a) deliver to the Administrative Agent, (i) immediately upon the Effective Date, the originals of all certificated Securities constituting Collateral owned by it on the Effective Date (if any then exist), and (ii) thereafter, deliver to the Administrative Agent any Chattel Paper and Instruments constituting Collateral promptly after the acquisition thereof,

(b) deliver to the Administrative Agent any Document evidencing or constituting Collateral promptly upon request by the Administrative Agent, (c) following the Effective Date, upon receipt thereof, deliver to the Administrative Agent any certificated Securities constituting Collateral and (d) upon the Administrative Agent's request, deliver to the Administrative Agent a duly executed amendment to this Security Agreement (an "Amendment"), substantially in the form of Exhibit F hereto, pursuant to which such Grantor will identify and ratify the pledge of such additional Collateral.  Such Grantor hereby authorizes the Administrative Agent to attach each Amendment to this Security Agreement and agrees that all additional Collateral owned by it set forth in such Amendments shall be considered to be part of the Collateral.

4.5.    Uncertificated Pledged Equity.  Such Grantor will permit the Administrative Agent from time to time to cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated Securities or other types of Pledged Equity not represented by certificates owned by it with a value of $100,000 or more to mark their books and records with respect thereto to reflect the Lien of the Administrative Agent granted pursuant to this Security Agreement.  With respect to any Pledged Equity owned by it, such Grantor will, upon request by the Administrative Agent, cause (a) the issuers of uncertificated Securities which are Pledged Equity and (b) any securities intermediary which is the holder of any such Pledged Equity, to cause the Administrative Agent to have and retain Control over such Pledged Equity.  Without limiting the foregoing, such Grantor will, with respect to any such Pledged Equity held with a securities intermediary, cause such securities intermediary to enter into a Securities Account Control Agreement unless such Pledged Equity is held in an Excluded Account.

4.6.    Pledged Equity.

(a)    Registration of Pledged Equity.  After an Event of Default has occurred and is continuing, such Grantor will permit any registerable Pledged Equity owned by it to be registered in the name of the Administrative Agent or its nominee at any time at the option of the Required Lenders.

(b)    Exercise of Rights in Pledged Equity.

(i)    Subject to clause (ii) below, such Grantor shall have the right to exercise all voting rights or other rights relating to the Pledged Equity owned by it for all purposes not inconsistent with this Security Agreement, the Credit Agreement or any other Loan Document; *provided however*, *that* no vote or other right shall be exercised or action taken which would have the effect of impairing the rights of the Administrative Agent in respect of such Pledged Equity.

(ii)    Such Grantor will permit the Administrative Agent or its nominee at any time during the continuance of an Event of Default to exercise all voting rights or other rights relating to the Pledged Equity owned by it, including, without limitation, exchange, subscription or any other rights, privileges, or options pertaining to any Equity Interest or Investment Property constituting such Pledged Equity as if it were the absolute owner thereof.

12

(iii)    Such Grantor shall be entitled to collect and receive for its own use all cash dividends and interest paid in respect of the Pledged Equity owned by it to the extent not in violation of the Credit Agreement; provided that, to the extent, if any, that any Pledged Equity is issued by a Person other than a Credit Party, the following distributions and payments (collectively referred to as the "Excluded Payments") shall be delivered to the Administrative Agent as and to the extent required in the following subsection (iv): (A) dividends and interest paid or payable other than in cash in respect of such Pledged Equity, and Instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any such Pledged Equity; (B) dividends and other distributions paid or payable in cash in respect of such Pledged Equity in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in capital of an issuer; and (C) cash paid, payable or otherwise distributed, in respect of principal of, or in redemption of, or in exchange for, such Pledged Equity; *provided however, that* until actually paid, all rights to such distributions shall remain subject to the Lien created by this Security Agreement; and

(iv)    All Excluded Payments, whenever paid or made, shall be delivered to the Administrative Agent to hold as Pledged Equity and shall, if received by such Grantor, be received in trust for the benefit of the Administrative Agent, be segregated from the other property or funds of such Grantor, and be forthwith delivered to the Administrative Agent as Pledged Equity in the same form as so received (with any necessary endorsement).

(c)    Securities.  No Grantor shall permit any Equity Interest which is included within the Collateral at any time to constitute a Security or permit the issuer of any such Equity Interest to take any action to have such interests treated as a Security unless (i) all certificates or other documents constituting such Security have been delivered to the Administrative Agent and such Security is properly defined as such under Article 8 of the UCC of the applicable jurisdiction, whether as a result of actions by the issuer thereof or otherwise, or (ii) the Administrative Agent has entered into a Securities Account Control Agreement with the issuer of such Security or with a securities intermediary relating to such Security.

4.7    Commercial Tort Claims.  Such Grantor shall promptly notify the Administrative Agent of any commercial tort claim (as defined in the UCC) acquired by it that is the subject of pending litigation and that could reasonably be expected to result in a judgment or settlement in such Grantor's favor in excess of $250,000 and, upon request by the Administrative Agent, such Grantor shall enter into an Amendment substantially in the form of Exhibit F hereto, granting to Administrative Agent a first priority security interest in such Commercial Tort Claim.

4.8.    Letter-of-Credit Rights.  If such Grantor is or becomes the beneficiary of a letter of credit with a face amount in excess of $250,000, it shall promptly notify the Administrative Agent thereof and, if requested to do so by the Administrative Agent at any time that an Event of Default has occurred and is continuing, make commercially reasonable efforts to cause the issuer and/or confirmation bank to (a) consent to the assignment of the related Letter-of-Credit Rights

to the Administrative Agent and (b) agree to direct all payments thereunder to a Deposit Account subject to a Deposit Account Control Agreement, all in form and substance reasonably satisfactory to the Administrative Agent.

4.9.   Control Agreements.  Subject to Section 8.18 of the Credit Agreement, for each Deposit Account, Securities Account and Commodity Account constituting Collateral that such Grantor at any time maintains, such Grantor will, promptly and in any event within ten (10) days of the opening of such Deposit Account, Securities Account or Commodity Account (or in the case of any Deposit Account, Securities Account or Commodity Account acquired pursuant to an acquisition permitted under Section 9.05 of the Credit Agreement (and which was not formed in contemplation of such acquisition), within thirty (30) days of such acquisition), provide a Control Agreement to the Administrative Agent in form and substance satisfactory to the Administrative Agent, pursuant to which such Control Agreement shall cause the depository bank that maintains such Deposit Account, securities intermediary that maintains such Securities Account, or commodities intermediary that maintains such Commodity Account, as applicable, to agree to comply at any time with instructions from the Administrative Agent to such depository bank, securities intermediary or commodities intermediary directing the disposition of funds from time to time credited to such Deposit Account, Securities Account or Commodity Account, without further consent of such Grantor, or take such other action as the Administrative Agent may approve in order to perfect the Administrative Agent's security interest in such Deposit Account, Securities Account or Commodity Account; provided that, funds may not be deposited into any Deposit Account, Securities Account or Commodity Account constituting Collateral until the applicable Grantor has provided a Control Agreement to the Administrative Agent for such Deposit Account, Securities Account or Commodity Account.

4.10.   Change of Name or Location; etc.  Such Grantor shall insure that Borrower gives the notices required in Section 8.01(j) of the Credit Agreement with respect to any change in Grantor's name, jurisdiction of organization, or the other matters addressed in such section of the Credit Agreement.

4.11.   Additional Grantors.  Each Grantor agrees to cause each of its Subsidiaries that is required to become a party to this Security Agreement pursuant to Section 8.14(b) of the Credit Agreement to become a Grantor for all purposes of this Security Agreement by executing and delivering an Assumption Agreement substantially in the form of Annex 1 hereto.

4.12   Intellectual Property.

(a)   At any time that an Event of Default has occurred and is continuing, the Administrative Agent or its designee may file this Security Agreement (or, if applicable, such short form intellectual property security agreements as the parties may agree upon with respect to the Grantors' Patents, Trademarks and Copyrights) with the United States Copyright Office and the United States Patent and Trademark Office.

(b)   Upon the request of the Administrative Agent at any time that an Event of Default has occurred and is continuing, such Grantor will use its best efforts to secure all consents and approvals necessary or appropriate for the assignment to or benefit of the

Administrative Agent of any material License of such Grantor and to enforce the security interests granted hereunder.

## ARTICLE V
## EVENTS OF DEFAULT AND REMEDIES

5.1    <u>Remedies</u>.  During the continuation of an Event of Default:

(a)    the Administrative Agent may, or at the direction of the Required Lenders, shall, exercise any or all of the following rights and remedies to the fullest extent permitted under applicable law:

(i)    those rights and remedies provided in this Security Agreement, the Credit Agreement, or any other Loan Document; *provided that,* this <u>Section 5.1(a)</u> shall not be understood to limit any rights or remedies available to the Administrative Agent and the Secured Parties prior to an Event of Default;

(ii)    those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' lien) when a debtor is in default under a security agreement;

(iii)    the right to give notice of sole control or any other instruction under any Control Agreement and take any action therein with respect to such Collateral;

(iv)    without notice, demand or advertisement of any kind to any Grantor or any other Person (except as specifically provided in <u>Section 8.1</u> or elsewhere herein or in the UCC), the right to enter the premises of any Grantor where any Collateral is located (through self-help and without judicial process), the right to collect, receive, assemble, process, appropriate, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the Collateral or any part thereof in one or more parcels at public or private sale or sales (which sales may be adjourned or continued from time to time with or without notice and may take place at any Grantor's premises or elsewhere), for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as are commercially reasonable;

(v)    concurrently with written notice to the applicable Grantor, the right to transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Equity, to exchange certificates or Instruments representing or evidencing Pledged Equity for certificates or Instruments of smaller or larger denominations, to exercise the voting and all other rights as a holder with respect thereto, to collect and receive all cash dividends and other distributions made thereon and to otherwise act with respect to the Pledged Equity as though the Administrative Agent was the outright owner thereof; and

(vi)     the right to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such Liens as are specifically permitted hereunder).

(b)     The Administrative Agent, on behalf of the Secured Parties, may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(c)     Upon any such public sale or sales or any such private sale or sales, the Administrative Agent shall have the right, to the extent permitted by law, to purchase for the benefit of the Administrative Agent and the Secured Parties, the whole or any part of the Collateral so sold, free of any right or equity of redemption, which rights and equities of redemption the Grantor hereby expressly releases.

(d)     Until the Administrative Agent is able to effect a sale, lease, or other disposition of Collateral, the Administrative Agent shall have the right, as provided under applicable law, to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving or protecting the Collateral or its value, enforcing this Security Agreement or perfecting and maintaining the perfection and priority of the Administrative Agent's security interest in the Collateral.  The Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Administrative Agent and Secured Parties), with respect to such appointment.

(e)     Notwithstanding the foregoing, neither the Administrative Agent nor any Secured Party shall be required to (i) make any demand upon, or pursue or exhaust any of their rights or remedies against, any Grantor, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Indebtedness or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Collateral or any guarantee of the Indebtedness or to resort to the Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Collateral.

(f)     Each Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Equity and may be compelled to resort to one or more private sales thereof in accordance with clause (a) above.  Each Grantor also acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.  The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Equity for the period of time necessary to permit any Grantor or the issuer of the Pledged Equity to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if the applicable Grantor and the issuer would agree to do so.

5.2.   Grantor's Obligations Upon Default.   Upon the request of the Administrative Agent during the continuation of an Event of Default, each Grantor will:

(a)     assemble and make available to the Administrative Agent the Collateral and all books and records relating thereto at any place or places reasonably specified by the Administrative Agent, whether at a Grantor's premises or elsewhere; and

(b)     permit the Administrative Agent, by the Administrative Agent's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay the Grantor for such use and occupancy.

5.3.    Grant of Intellectual Property License.    For the purpose of enabling the Administrative Agent to exercise the rights and remedies under this Article V at such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Administrative Agent, for the benefit of the Administrative Agent and the Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to any Grantor) to use, license or sublicense, during the continuance of an Event of Default, any intellectual property rights now owned or hereafter acquired by such Grantor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

## ARTICLE VI
## ACCOUNT VERIFICATION; ATTORNEY IN FACT; PROXY

6.1.    Account Verification and Collection.    During the continuation of an Event of Default, the Administrative Agent shall have the right at any time at the Grantors' expense to (a) verify the validity, amount or any other material information relating to any Accounts, including verification with the relevant Account Debtors, and (b) enforce collection of any such Accounts and to adjust, settle or compromise the amount of payment thereof, in each case to the full extent permitted by applicable law.

6.2.    Authorization for Secured Party to Take Certain Action.

(a)     Each Grantor irrevocably authorizes the Administrative Agent at any time and from time to time and appoints the Administrative Agent as its attorney in fact to do all acts and things necessary or desirable in the Administrative Agent's sole discretion to preserve and protect the Collateral and perfect and maintain the perfection and priority of the Administrative Agent's security interest in the Collateral including, without limitation, to endorse and collect any cash Proceeds of the Collateral, and to contact and enter into one or more agreements with the issuers of uncertificated securities which are Pledged Equity or with securities intermediaries holding Pledged Equity as may be necessary or advisable to give the Administrative Agent Control over such Pledged Equity; *provided that*, this authorization shall not relieve such Grantor of any of its obligations under this Security Agreement, the Credit Agreement or under any other Loan Document.

(b)     All acts of said attorney or designee are hereby ratified and approved. The powers conferred on the Administrative Agent, for the benefit of the Administrative Agent and Secured Parties, under this <u>Section 6.2</u> are solely to protect the Administrative Agent's interests in the Collateral and shall not impose any duty upon the Administrative Agent or any Secured Party to exercise any such powers.  The Administrative Agent agrees that it shall not exercise any power or authority granted to it under this <u>Section 6.2</u> unless an Event of Default has occurred and is continuing.

6.3.    <u>Proxy</u>. EACH GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS THE ADMINISTRATIVE AGENT AS ITS PROXY AND ATTORNEY-IN-FACT TO TAKE THOSE ACTIONS WITH RESPECT TO ITS PLEDGED EQUITY THAT ARE DESCRIBED IN <u>SECTION 4.6(b)(ii)</u>, INCLUDING THE RIGHT TO VOTE SUCH PLEDGED EQUITY, WITH FULL POWER OF SUBSTITUTION TO DO SO. IN ADDITION TO THE RIGHT TO VOTE ANY SUCH PLEDGED EQUITY, THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF SUCH PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS). SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY SUCH PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF SUCH PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF). NOTWITHSTANDING THE FOREGOING, THE ADMINISTRATIVE AGENT MAY EXERCISE THE RIGHTS AND POWERS PROVIDED IN THIS <u>SECTION 6.3</u> ONLY DURING THE CONTINUANCE OF AN EVENT OF DEFAULT.

6.4.    <u>Nature of Appointment; Limitation of Duty</u>.  THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS <u>ARTICLE VI</u> IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS SECURITY AGREEMENT IS TERMINATED IN ACCORDANCE WITH <u>SECTION 8.13</u>. NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER THE ADMINISTRATIVE AGENT, NOR ANY SECURED PARTY, NOR ANY OF THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT  IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION; PROVIDED THAT, IN NO EVENT SHALL THEY BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

# ARTICLE VII
## COLLECTION AND APPLICATION OF RECEIVABLES AND OTHER COLLATERAL PROCEEDS

7.1.    <u>Collection and Application of Receivables and Other Collateral Proceeds</u>.   The Administrative Agent hereby authorizes each Grantor to collect such Grantor's Receivables, and the Administrative Agent may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default (but not at any other time).  If required by the Administrative Agent at any time after the occurrence and during the continuance of an Event of Default, any Proceeds constituting collections of such Receivables, when collected by such Grantor, (a) shall be forthwith (and, in any event, within two Business Days) be deposited by such Grantor in the exact form received, duly endorsed by such Grantor to the Administrative Agent if required, in a Collateral Account maintained under the sole dominion and control of the Administrative Agent, subject to withdrawal by the Administrative Agent for the account of the Secured Parties only as provided below in this Section, and (b) until so turned over, shall be held by such Grantor in trust for the Secured Parties, segregated from other funds of such Grantor. Each such deposit of Proceeds of Receivables shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.  All Proceeds constituting collections of Receivables while held by the Collateral Account bank (or by any Grantor in trust for the benefit of the Secured Parties) shall continue to be collateral security for the Indebtedness of the applicable Grantor and shall not constitute payment thereof until applied as hereinafter provided.  At any time when an Event of Default has occurred and is continuing, at the Administrative Agent's election, the Administrative Agent may apply all or any part of the funds on deposit in the Collateral Account established by the relevant Grantor to the payment of the Indebtedness of such Grantor then due and owing, such application to be made as set forth below in this Section.  In addition to the rights of the Secured Parties specified above with respect to payments of Receivables, if an Event of Default shall occur and be continuing, all Proceeds of Collateral received by any Grantor consisting of cash, checks and other near cash items shall be held by such Grantor in trust for the Secured Parties segregated from other funds of such Grantor, and shall, at the request of the Administrative Agent, forthwith upon receipt by such Grantor, be turned over to the Administrative Agent in the exact form received by such Grantor (duly endorsed by such Grantor to the Administrative Agent, if required). All Proceeds received by the Administrative Agent hereunder shall be held by the Administrative Agent in a Collateral Account maintained under its sole dominion and control.  All Proceeds while held by the Administrative Agent in a Collateral Account (or by such Grantor in trust for the Secured Parties) shall continue to be held as collateral security for all the Indebtedness and shall not constitute payment thereof until applied as provided below in this Section.  At any time after the occurrence and during the continuance of an Event of Default, at the Administrative Agent's election, the Administrative Agent may apply all or any part of Proceeds of any Grantor held in any Collateral Account in payment of the Indebtedness of such Grantor in such order as the Administrative Agent may elect in compliance with the Credit Agreement, and any part of such funds which the Administrative Agent elects not so to apply and deems not required as collateral security for such Indebtedness shall be paid over from time to time by the Administrative Agent to the Borrower or to whomsoever may be lawfully entitled to receive the same.  Any balance of such Proceeds remaining after the Indebtedness shall have been paid in full shall be paid over to the Borrower or to whomsoever may be lawfully entitled to receive the same.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1.    <u>Waivers</u>.  As provided in Section 9.612 of the UCC, any notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made shall be deemed sent within a reasonable time if sent to the Grantors, addressed as set forth in <u>Article IX</u>, after the occurrence of an Event of Default and at least ten days prior to (a) the date of any such public sale or (b) the time after which any such private sale or other disposition may be made. To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any Secured Party, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or under the power of sale conferred by this Security Agreement, or applicable law.  Except as otherwise specifically provided herein, each Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Security Agreement or any Collateral.

8.2.    <u>Limitation on Administrative Agent's and any Secured Party's Duty with Respect to the Collateral</u>.  The Administrative Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale. The Administrative Agent and each Secured Party shall use reasonable care with respect to the Collateral in its possession or under its control.  Neither the Administrative Agent nor any Secured Party shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Administrative Agent or such Secured Party, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

8.3.    <u>Compromises and Collection of Collateral</u>.  The Grantors and the Administrative Agent recognize that setoffs, counterclaims, defenses and other claims may be asserted by obligors with respect to certain of the Receivables, that certain of the Receivables may be or become uncollectible in whole or in part and that the expense and probability of success in litigating a disputed Receivable may exceed the amount that reasonably may be expected to be recovered with respect to a Receivable.  In view of the foregoing, each Grantor agrees that the Administrative Agent may at any time and from time to time, if an Event of Default has occurred and is continuing, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as the Administrative Agent in its sole discretion shall determine or abandon any Receivable, and any such action by the Administrative Agent shall be commercially reasonable so long as the Administrative Agent acts in good faith based on information known to it at the time it takes any such action.

8.4.    <u>Secured Party Performance of Debtor Obligations</u>.  Without having any obligation to do so, the Administrative Agent may during the continuance of an Event of Default perform or pay any obligation which any Grantor has agreed to perform or pay in this Security Agreement and the Grantors shall reimburse the Administrative Agent for any amounts paid by the

Administrative Agent pursuant to this <u>Section 8.4</u>.  The Grantors' obligation to reimburse the Administrative Agent pursuant to the preceding sentence shall be included in the Indebtedness and payable on demand.

8.5.    <u>Specific Performance of Certain Covenants</u>.  Each Grantor acknowledges and agrees that a breach of any of the covenants contained herein will cause irreparable injury to the Administrative Agent and the Secured Parties, that the Administrative Agent and Secured Parties have no adequate remedy at law in respect of such breaches and therefore agrees that the covenants of the Grantors contained herein shall be specifically enforceable against the Grantors.

8.6.    <u>No Waiver; Amendments; Cumulative Remedies</u>.  No delay or omission of the Administrative Agent or any Lender to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Default or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever (other than any Amendment or Assumption Agreement) shall be valid unless in writing signed by the Administrative Agent with the concurrence or at the direction of the Lenders to the extent required under Section 12.02(b) of the Credit Agreement and then only to the extent in such writing specifically set forth.  All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to the Administrative Agent and the Secured Parties until the Indebtedness has been paid in full.

8.7.    <u>Limitation by Law; Severability of Provisions</u>.  All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Security Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Security Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part.  Any provision in this Security Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of this Security Agreement are declared to be severable.

8.8.    <u>Reinstatement</u>.  This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Indebtedness, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Indebtedness, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Indebtedness shall

be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

8.9.    <u>Benefit of Agreement</u>.  The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of the Grantors, the Administrative Agent and the Secured Parties and their respective successors and assigns (including all persons who become bound as a debtor to this Security Agreement), except that no Grantor shall have the right to assign its rights or delegate its obligations under this Security Agreement or any interest herein, without the prior written consent of the Administrative Agent.  No sales of participations, assignments, transfers, or other dispositions of any agreement governing the Indebtedness or any portion thereof or interest therein shall in any manner impair the Lien granted to the Administrative Agent, for the benefit of the Administrative Agent and the Secured Parties, hereunder.

8.10.    <u>Survival of Representations</u>.  All representations and warranties of the Grantors contained in this Security Agreement shall survive the execution and delivery of this Security Agreement.

8.11.    <u>Taxes and Expenses</u>.  Any taxes (other than Excluded Taxes) payable or ruled payable by Federal or State authority in respect of this Security Agreement shall be paid by the Grantors, together with interest and penalties, if any, upon and pursuant to the terms set forth in Section 5.03 of the Credit Agreement.  The Grantors shall reimburse the Administrative Agent for any and all out-of-pocket expenses (including reasonable attorneys', auditors' and accountants' fees) paid or incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, collection and enforcement of this Security Agreement, in each case upon and pursuant to the terms set forth in Section 12.03 of the Credit Agreement.  Any and all costs and expenses incurred by the Grantors in the performance of actions required pursuant to the terms hereof shall be borne solely by the Grantors.

8.12.    <u>Headings</u>.  The title of and section headings in this Security Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Security Agreement.

8.13.    <u>Termination</u>.  This Security Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Indebtedness outstanding) until the termination hereof as provided in the Credit Agreement.

8.14.    <u>Entire Agreement</u>.  This Security Agreement, the Credit Agreement, and the other Loan Documents embody the entire agreement and understanding between the Grantors and the Administrative Agent relating to the Collateral and supersede all prior agreements and understandings between the Grantors and the Administrative Agent relating to the Collateral.

8.15.    **<u>CHOICE OF LAW</u>.    THIS SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

8.16.  **CONSENT TO JURISDICTION.  EACH GRANTOR HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR NEW YORK STATE COURT, IN EITHER CASE, LOCATED IN NEW YORK COUNTY, NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT AND EACH GRANTOR HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM.  NOTHING HEREIN SHALL LIMIT THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY SECURED PARTY OR GRANTOR TO BRING PROCEEDINGS IN THE COURTS OF ANY OTHER JURISDICTION.**

8.17.  **WAIVER OF JURY TRIAL. EACH GRANTOR, THE ADMINISTRATIVE AGENT AND EACH SECURED PARTY HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.**

8.18.  <u>Indemnity</u>.  Section 12.03(b) and Section 12.03(d) of the Credit Agreement are hereby incorporated by reference *mutatis mutandis*, as if stated verbatim herein as agreements and obligations of each Grantor.

8.19.  <u>Counterparts</u>.  This Security Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Security Agreement by signing any such counterpart.  Delivery of an executed counterpart of this Security Agreement by facsimile or other electronic transmission (e.g. .pdf) shall be effective as delivery of a manually executed counterpart of this Security Agreement.

8.20.  <u>Lien Absolute</u>.  No Grantor that is a Guarantor shall be released from its obligations hereunder by reason of:

(a)  any extension, renewal, settlement, compromise, waiver or release in respect of any of the Indebtedness, by operation of law or otherwise, or any obligation of any other guarantor of any of the Indebtedness, or any default, failure or delay, willful or otherwise, in the payment or performance of the Indebtedness;

(b)  any lack of validity or enforceability relating to or against the Borrower, any other Credit Party or any other guarantor of any of the Indebtedness, for any reason related to the Credit Agreement, any other Loan Document or any other agreement or instrument governing or evidencing any Indebtedness, or any Laws purporting to prohibit the payment by

the Borrower, any other Credit Party or any other guarantor of the Indebtedness of the principal of or interest on the Indebtedness;

(c)    any modification or amendment of or supplement to the Credit Agreement or any other Loan Document;

(d)    any change in the time, manner or place of payment of, or in any other term of, all or any part of the Indebtedness, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument governing or evidencing any Indebtedness, including any increase or decrease in the rate of interest thereon;

(e)    any change in the corporate existence, structure or ownership of the Borrower, any other Credit Party or any other guarantor of any of the Indebtedness, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower, any other Credit Party or any other guarantor of the Indebtedness, or any of their assets or any resulting release or discharge of any obligation of the Borrower, any other Credit Party or any other guarantor or any of the Indebtedness;

(f)    any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Loan Document or Indebtedness;

(g)    any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Credit Agreement, any other Loan Document, any other agreement or instrument or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of any Guarantor; or

(h)    any other act or omission to act or delay of any kind by the Borrower, any other Credit Party, any other guarantor of the Indebtedness, the Administrative Agent, any Lender or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of any Guarantor's obligations hereunder;

except in each case to the extent that any written amendment, settlement, compromise, waiver or release expressly modifies or terminates the obligations of such Grantor.

8.21.   <u>Release</u>.   Each Grantor that is a Guarantor consents and agrees that the Administrative Agent may at any time, or from time to time, in compliance with the Credit Agreement and otherwise in its discretion:

(a)    renew, extend or change the time of payment, and/or the manner, place or terms of payment of all or any part of the Indebtedness; and

(b)    exchange, release and/or surrender all or any of the Collateral (including the Pledged Equity), or any part thereof, by whomsoever deposited, which is now or may hereafter be held by the Administrative Agent in connection with all or any of the Indebtedness; all in such manner and upon such terms as the Administrative Agent may deem proper, and

without notice to or further assent from any Grantor that is a Guarantor, it being hereby agreed that each such Guarantor shall be and remain bound upon this Security Agreement, irrespective of the value or condition of any of the Collateral, and notwithstanding any such change, exchange, settlement, compromise, surrender, release, renewal or extension, and notwithstanding also that the Indebtedness may, at any time, exceed the aggregate principal amount thereof set forth in the Credit Agreement, or any other agreement governing any Indebtedness.

## ARTICLE IX
## NOTICES

9.1.    <u>Sending Notices</u>.  Any notice required or permitted to be given under this Security Agreement shall be given in accordance with Section 12.01 of the Credit Agreement, with each notice to each Grantor other than the Borrower being given in the same manner as notice to the Borrower under the Credit Agreement, provided that such notice shall in each case be addressed to such Grantor at its notice address set forth on <u>Exhibit A</u>.

9.2.    <u>Change in Address for Notices</u>.  Each of the Grantors, the Administrative Agent and the Lenders may change the address for service of notice upon it by a notice in writing to the other parties.

## ARTICLE X
## THE ADMINISTRATIVE AGENT

Natixis, New York Branch has been appointed Administrative Agent for the Secured Parties hereunder pursuant to Article XI of the Credit Agreement.  It is expressly understood and agreed by the parties to this Security Agreement that any authority conferred upon the Administrative Agent hereunder is subject to the terms of the delegation of authority made by the Secured Parties to the Administrative Agent pursuant to the Credit Agreement, and that the Administrative Agent has agreed to act (and any successor Administrative Agent shall act) as such hereunder only on the express conditions contained in such Article XI.  Any successor Administrative Agent appointed pursuant to Article XI of the Credit Agreement shall be entitled to all the rights, interests and benefits of the Administrative Agent hereunder.

## ARTICLE XI
## CONSENT TO PLEDGED EQUITY

11.1    Each Grantor, in its respective capacity as an issuer of Pledged Equity (in such capacity, an "<u>Issuer</u>"), hereby (a) consents to the grant by each other Grantor to the Administrative Agent, for the benefit of the Secured Parties, of a security interest in and lien on all of the Pledged Equity, (b) represents to the Administrative Agent that it has no rights of setoff or other claims against any of the Pledged Equity, (c) acknowledges and agrees that it shall, upon demand by the Administrative Agent during the continuation of an Event of Default, pay to the Administrative Agent, for the benefit of the Secured Parties, any dividends and distributions due to any Grantor in accordance with the terms hereof, and (d) consents to the transfer of such Pledged Equity to the Administrative Agent or its nominee during the continuation of an Event of Default and to the substitution of the Administrative Agent or its nominee as a partner in any

partnership or as a member in any limited liability company with all the rights and powers related thereto.

11.2    Each Grantor hereby authorizes and instructs each Issuer to comply with any instruction received by it from the Administrative Agent in writing that (a) states that an Event of Default has occurred and is continuing and (b) is otherwise in accordance with the terms of this Security Agreement, without any other or further instructions from such Grantor.

[Signature Pages Follow]

IN WITNESS WHEREOF, the Grantors and the Administrative Agent have executed this Security Agreement as of the date first above written.

**GRANTORS:**

**MDC ENERGY LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**MDC REEVES ENERGY LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**WARD I, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**ADMINISTRATIVE AGENT:**

**NATIXIS BANK, NEW YORK BRANCH**,
as Administrative Agent

By: _____
Name:
Title:

**EXHIBIT A**
(See Sections 3.2, 3.3, 3.5 and 9.1 of Security Agreement)

NOTICE ADDRESS FOR ALL GRANTORS:

280 E. 96th Street, Suite 210
Indianapolis, IN 46240
Attn: Bob Quinn
Telephone: (317) 805-0777
Electronic mail: bquinn@maefield.com

ENTITY INFORMATION

I.      **Name of Grantor**:  MDC Energy LLC

II.     **State of Incorporation or Organization**:  Delaware

III.    **Type of Entity**:  Limited liability company

IV.     **Organizational Number assigned by State of Incorporation or Organization**:  5554941

V.      **Federal Identification Number**: 46-3569140

VI.     **Principal Place of Business and Mailing Address**: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

VII.    **Prior Name of Grantor**:  MDC Texas Energy LLC (June 2014 – present)


I.      **Name of Grantor**:  MDC Reeves Energy LLC

II.     **State of Incorporation or Organization**:  Delaware

III.    **Type of Entity**:  Limited liability company

IV.     **Organizational Number assigned by State of Incorporation or Organization**:  5758023

V.      **Federal Identification Number**: 47-3814809

VI.     **Principal Place of Business and Mailing Address**: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

VII.    **Prior Name of Grantor**:  None


I.      **Name of Grantor**:  Ward I, LLC

II.     **State of Incorporation or Organization**:  Delaware

III.    **Type of Entity**:  Limited liability company

IV.     **Organizational Number assigned by State of Incorporation or Organization**:  5758005

V.      **Federal Identification Number**: 47-4856817

VI.     **Principal Place of Business and Mailing Address**: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

VII.    **Prior Name of Grantor**:  None

**EXHIBIT B**
(See Section 3.4 of Security Agreement)

DEPOSIT ACCOUNTS

| Name of Grantor | Name of Institution | Account Numbers | Description of Account | Excluded Account as of the Effective Date (Yes/No) |
|---|---|---|---|---|
| MDC Energy LLC | Prosperity Bank | 8963221 and 9066891 | Operating Account | No |
| MDC Energy LLC | The Bank of New York Mellon | 4088118400 | Operating Account | No |

COMMODITY ACCOUNTS

| Name of Grantor | Name of Institution | Account Number | Description of Account | Excluded Account as of the Effective Date (Yes/No) |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

SECURITIES ACCOUNTS

| Name of Grantor | Name of Institution | Account Number | Description of Account | Excluded Account as of the Effective Date (Yes/No) |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

**EXHIBIT C**
(See Section 3.6 of Security Agreement)


LETTER OF CREDIT RIGHTS

None.


CHATTEL PAPER

None.

Exhibit C-1

**EXHIBIT D**

(See Section 3.8 and Section 3.9 of Security Agreement and Definition of "Pledged Equity")

**LIST OF PLEDGED EQUITY, SECURITIES AND OTHER INVESTMENT PROPERTY**

PLEDGED EQUITY

| Owner | Issuer | Percentage Owned | Form of Entity | Type of Equity Interest | Number of Shares | Percentage of Outstanding Equity Interests Owned by Grantor | Certificate Number(s) |
|---|---|---|---|---|---|---|---|
| MDC Energy LLC | MDC Reeves Energy LLC | 100% | Limited liability company | Limited liability company membership interest | N/A | 100% | 1 |
| MDC Energy LLC | Ward I, LLC | 100% | Limited liability company | Limited liability company membership interest | N/A | 100% | N/A |

OTHER INSTRUMENTS, SECURITIES AND DOCUMENTS

| Name of Grantor | Issuer | Number | Face Amount | Coupon Rate | Maturity |
|---|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A | N/A |

**EXHIBIT E**
(See Section 3.1 of Security Agreement)

FILING OFFICES

| **Name of Grantor** | **Filing Office** |
|---|---|
| MDC Energy LLC | Delaware |
| MDC Reeves Energy LLC | Delaware |
| Ward I, LLC | Delaware |

**EXHIBIT F**

(See Section 4.4 and Section 4.7 of Security Agreement)

AMENDMENT

Reference is made to that certain Pledge and Security Agreement, dated September 17, 2018, by and among the undersigned, the other Grantors from time to time party thereto, and Natixis, New York Branch, as the Administrative Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement").

This Amendment, dated _____, ___ (the "Effective Date") is delivered pursuant to Section [4.4][4.7] of the Security Agreement.  All defined terms herein shall have the meanings ascribed thereto or incorporated by reference in the Security Agreement.

The undersigned hereby agrees that this Amendment may be attached to the Security Agreement and that the Collateral listed on Schedule I to this Amendment shall be and become a part of the Collateral referred to in the Security Agreement and shall secure all Indebtedness referred to in the Security Agreement.

_____

By:    _____
Name:  _____
Title: _____

**SCHEDULE I TO AMENDMENT**

PLEDGED EQUITY

| Name of Grantor | Issuer | Certificate Number(s) | Number of Shares | Type of Equity Interest | Percentage of Outstanding Equity Interests Owned by Grantor |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

OTHER INSTRUMENTS, SECURITIES AND DOCUMENTS

| Name of Grantor | Issuer | Number | Face Amount | Coupon Rate | Maturity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

COMMERCIAL TORT CLAIMS

| Name of Grantor | Description of Claim | Parties | Case Number; Name of Court where Case was Filed |
|---|---|---|---|
| | | | |
| | | | |

**EXHIBIT G**

COMMERCIAL TORT CLAIMS AS OF THE EFFECTIVE DATE

| Name of Grantor | Description of Claim | Parties | Case Number; Name of Court where Case was Filed |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

**EXHIBIT H**

(See Section 3.10 of Security Agreement)

**INTELLECTUAL PROPERTY RIGHTS**

PATENTS

| **Name of Grantor** | **Patent Description** | **Patent Number** | **Issue Date** |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

PATENT APPLICATIONS

| **Name of Grantor** | **Patent Application** | **Application Filing Date** | **Application Serial Number** |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

TRADEMARKS

| **Name of Grantor** | **Trademark** | **Registration Date** | **Registration Number** |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

TRADEMARK APPLICATIONS

| **Name of Grantor** | **Trademark Application** | **Application Filing Date** | **Application Serial Number** |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

COPYRIGHTS

| **Name of Grantor** | **Copyright** | **Registration Date** | **Registration Number** |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

COPYRIGHT APPLICATIONS

| **Name of Grantor** | **Copyright Application** | **Application Filing Date** | **Application Serial Number** |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

INTELLECTUAL PROPERTY LICENSES

| **Name of Grantor** | **Name of Agreement** | **Date of Agreement** | **Parties to Agreement** |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

ASSUMPTION AGREEMENT (this "<u>Assumption Agreement</u>"), dated as of _____, 20___, by _____, a _____ (the "<u>Additional Grantor</u>"), in favor of NATIXIS, NEW YORK BRANCH, as Administrative Agent (in such capacity, the "<u>Administrative Agent</u>") for the Secured Parties.  All capitalized terms not defined herein shall have the meaning ascribed to them in the Credit Agreement referred to below.

## <u>PRELIMINARY STATEMENTS</u>

A.    MDC ENERGY LLC, a Delaware limited liability company (the "<u>Borrower</u>"), the Lenders and the Administrative Agent have entered into a Credit Agreement, dated as of September 17, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>").

B.    In connection with the Credit Agreement, the Borrower and/or certain other Credit Parties are party to [(i)] that certain Pledge and Security Agreement, dated as of September 17, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Security Agreement</u>") [and (ii) the Guaranty Agreement, dated as of  September 17, 2018 (as amended, restated or otherwise modified from time to time, the "<u>Guaranty</u>"), in favor of the Administrative Agent for the benefit of the Secured Parties].

C.    The Credit Agreement requires the Additional Grantor to become a party to the Security Agreement [and the Guaranty].

D.    The Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Security Agreement [and the Guaranty].

ACCORDINGLY, IT IS AGREED:

1.    <u>Security Agreement</u>.  By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 4.11 of the Security Agreement, hereby becomes a party to the Security Agreement as a "Grantor" thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Grantor thereunder and grants a security interest to the Administrative Agent, as provided therein, in all of its right, title and interest in and to the Collateral (as defined in the Security Agreement) to secure the prompt and complete payment and performance of the Indebtedness.  The information set forth in <u>Annex 1-A</u> hereto is hereby added to the information set forth in the appropriate Exhibits to the Security Agreement.  The Additional Grantor hereby represents and warrants that each of the representations and warranties contained in Article III of the Security Agreement is, as to itself and its Collateral, true and correct on and as the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.

2.    [<u>Guaranty</u>.  By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Paragraph 27 of the Guaranty, hereby becomes a party to the Guaranty as a "Guarantor" thereunder with the same force and effect as if originally named therein as a Guarantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Guarantor thereunder.  The Additional Grantor hereby represents and warrants that each of the

representations and warranties contained in Paragraph 10 of the Guaranty is, as to itself, true and correct on and as the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.]

   3. <u>GOVERNING LAW</u>.  THIS ASSUMPTION AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS ASSUMPTION AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

   IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GRANTOR]

_____,
a _____

By:_____
Name:_____
Title:_____

**EXHIBIT H**
**RESERVED**

**EXHIBIT I**
**FORM OF ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (this "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "<u>Assignor</u>") and [*Insert name of Assignee*] (the "<u>Assignee</u>").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in <u>Annex 1</u> attached hereto (the "<u>Standard Terms and Conditions</u>") are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the Credit Agreement (including any Letters of Credit and guarantees included in the Credit Agreement) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "<u>Assigned Interest</u>").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.    Assignor:            _____

2.    Assignee:            _____
                          [and is an Affiliate/Approved Fund of [*identify Lender*][6]]

3.    Borrower:            MDC Energy LLC, a Delaware
                          limited liability company

4.    Administrative Agent: Natixis, New York Branch as the administrative agent
                          under the Credit Agreement

---

[6] Select as applicable.

5.      Credit Agreement:      Credit Agreement dated as of September 17, 2018, among MDC Energy LLC, the Lenders from time to time party thereto, and Natixis, New York Branch, as Administrative Agent and Issuing Bank

6.      Assigned Interest:

| Commitment Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[7] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By:_____
   Title:

ASSIGNEE

[NAME OF ASSIGNEE][8]

By:_____
   Title:

---

[7] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.
[8] Please note that all assignees are subject to the terms and conditions of that certain RBL Buyout Rights Letter Agreement dated as of September 17, 2018 among the Borrower, the Administrative Agent and Riverstone Credit Management, LLC.

[Consented to and][9] Accepted:

NATIXIS, NEW YORK BRANCH, as
Administrative Agent [and Issuing Bank]


By_____
  Title:


[Consented to:][10]

[NAME OF RELEVANT PARTY]


By_____
  Title:

---

[9] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

[10] To be added only if the consent of the Borrower and/or other parties (e.g. Issuing Bank) is required by the terms of the Credit Agreement.

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.      <u>Representations and Warranties</u>.

1.1     <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, and (iv) it is [not] a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of the Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of the Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2     <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 8.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      General Provisions.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and the other parties to the Credit Agreement and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by fax or other electronic transmission (e.g., ".pdf") shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the laws of the State of New York.

**EXHIBIT J-1**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE (FOREIGN LENDERS; NOT PARTNERSHIPS)**

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of September 17, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among MDC Energy LLC, a Delaware limited liability company, as Borrower, Natixis, New York Branch, as Administrative Agent and Issuing Bank, the financial institutions from time to time party thereto as Lenders, and the other Agents party thereto.  Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 5.03 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable (or, in each case, any successor form).  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]
By:
Name:
Title:
Date: _____ __, 20[  ]

**EXHIBIT J-2**
**FORM OF U.S. TAX COMPLIANCE CERTIFICATE (FOREIGN PARTICIPANTS; NOT PARTNERSHIPS)**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of September 17, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among MDC Energy LLC, a Delaware limited liability company, as Borrower, Natixis, New York Branch, as Administrative Agent and Issuing Bank, the financial institutions from time to time party thereto as Lenders, and the other Agents party thereto.  Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 5.03 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable (or, in each case, any successor form).  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]
By:
Name:
Title:
Date: _____ __, 20[  ]

**EXHIBIT J-3**
**FORM OF U.S. TAX COMPLIANCE CERTIFICATE (FOREIGN PARTICIPANTS; PARTNERSHIPS)**

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of September 17, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among MDC Energy LLC, a Delaware limited liability company, as Borrower, Natixis, New York Branch, as Administrative Agent and Issuing Bank, the financial institutions from time to time party thereto as Lenders, and the other Agents party thereto.  Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 5.03 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY (or any successor form) accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable (or, in each case, any successor form), or (ii) an IRS Form W-8IMY (or any successor form) accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable (or, in each case, any successor form), from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]
By:
Name:
Title:
Date: _____ __, 20[  ]

## EXHIBIT J-4
## FORM OF U.S. TAX COMPLIANCE CERTIFICATE (FOREIGN LENDERS; PARTNERSHIPS)

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of September 17, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among MDC Energy LLC, a Delaware limited liability company, as Borrower, Natixis, New York Branch, as Administrative Agent and Issuing Bank, the financial institutions from time to time party thereto as Lenders, and the other Agents party thereto. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 5.03 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY (or any successor form) accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable (or, in each case, any successor form), or (ii) an IRS Form W-8IMY (or any successor form) accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable (or, in each case, any successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]
By:
Name:
Title:
Date: _____ __, 20[  ]

**Schedule 1.1(a)**
**Material Contracts**

<u>JOINT OPERATING AGREEMENTS, EASEMENTS AND RELATED CONTRACTS</u>

*1) Copperhead 23 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

    c) H&D Empire LLC Pipeline Easement Agreement (Gas Pipeline)

    d) Forrister Generation Skipping Trusts Pipeline Easement Agreement (Gas Pipeline)

    e) Forrister Generation Skipping Trusts Fresh Water Storage Pit & Easement Agreement

    f) Wagner & Brown Ltd et al Easement & ROW Agreement (Gas Pipeline)

*2) Yucca #5H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

*3) Yucca #1*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

*4) Yucca #2 SWD*

    a) A.A.P.L. Forfm 610-1989 Model Form Operating Agreement (Yucca Block JOA)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

    c) Salt Water Disposal Agreement

*5) Yucca #3*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

*6) Yucca #4*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

*7) Diamond Back 17 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of

Yucca block)

    c) Isabel Cole Brooks et al Pipeline Easement (Dated 2-14-17)

    d) Isabel Cole Brooks et al Pipeline Easement (Dated 3-18-17)

    e) Isabel Cole Brooks et al Pipeline Easement (Dated 2-20-17)

    f) TX Road & Bridge Permit Approval for CR413 (6" steel Gas Pipeline)

    g) TX Road & Bridge Permit Approval for CR420 (6" steel Gas Pipeline)

8) *Diamond Back #1*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

    c) Isabel Cole Brooks et al Pipeline Easement (Dated 1-31-17)

    d) TX Road & Bridge Permit Approval for CR413 (6" steel Gas Pipeline)

    e) TX Road & Bridge Permit Approval for CR420 (6" steel Gas Pipeline)

9) *Mesquite 10 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

    c) Toyah Farms Pipeline Easement

    d) Freda Blahosky Pipeline Easement

10) *Affirmed 6 #2H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

11) *Citation 14 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

12) *Omaha 11 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

13) *Assault 6 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

14) *War Admiral 24 #1H*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

15) *Count Fleet #2H*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

16) *Secretariat 10 #1HR*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

17) *Big Brown 15 #1H*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

18) *Smarty Jones 26 #1H*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

19) *Pickpocket 21 #1H*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

20) *Delightful Dasher 11 #1H*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

21) *Eastex 6 #1H*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

22) *Imperial Eagle 24 #1H*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

23) *California Chrome 27 #1H*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

24) *Gallant Fox 9 #1H*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

25) *Block C-18, Sections: 2, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 17, 20*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

26) *Block C-9, Sections 10, 11, 13, 23, 24, 26*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

27) *Block DW Washburn, Section 13*

a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

28) *Block C-9, Sections 15, 16, 17, 18*

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

    b) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

29) ***Block C-8, Section 27***

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

30) ***Block C-9, Sections 10, 11, 13, 23, 24, 26 and Block C-8 Section 27***

    a) Water Management Services Agreement

31) ***Northern San Saba Gas Pipeline***

    a) Toyah Farms Pipeline Easement

    b) Isabel Cole Brooks et al Pipeline Easement (Dated 1/17/14)

    c) Keith Kraakevik et al Pipeline Easement Agreement

    d) Dorris Morrison Letter Agreement for Pipeline Easement Agreement (Gas Pipeline)

    e) Keith Kraakevik et al Pipeline Easement Agreement (A)

    f) Keith Kraakevik et al Pipeline Easement Agreement (B)

    g) Keith Kraakevik et al Pipeline Easement Agreement (C)

    h) Tom Kraakevik Letter Agreement for Pipeline Easement Agreement

    i) Isabel Cole Brooks et al Pipeline Easement (Dated 2-14-14)

    j) Isabel Cole Brooks et al Pipeline Easement (Dated 3-18-14)

    k) Isabel Cole Brooks et al Pipeline Easement (Dated 2-20-14)

    l) Mason David Hounshell Pipeline Easement

    m) Aurora Cisneros Garcia et al Pipeline Easement

    n) Freda Blahosky Pipeline Easement

    o) Blake O&G Pipeline Easement

    p) Fred Corwin Sr & Irene Agnes Klein Liv Trust Pipeline Easement

    q) Carol T Crouch et al Pipeline Easement  (A)

    r) Carol T Crouch et al Pipeline Easement (B)

    s) Carolyn Hawkins Byrd Pipeline Easement

    t) Mary Lynlee Sayles Darby et al Pipeline Easement

    u) Michael Edward Thomas Pipeline Easement

    v) Perry Sayles Pipeline Easement

    w) Robert Kinney III Pipeline Easement

    x) Mary Wyley Williamson Pipeline Easement

32) ***David Trimble 13 SWD***

    a) A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

    b)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

    c)  Salt Water Disposal Agreement

*33) Three Sisters Lease - Wells 1, 3, 4, and 5*

    a)  Salt Water Disposal Agreement

*34) Cotter 6 Lease - Wells 1 and 2*

    a)  Salt Water Disposal Agreement

*35) G Hillger 8 Lease - Wells 1 and 2*

    a)  Salt Water Disposal Agreement

*36) McCauley 6 Lease - Wells 2, 3, and 4*

    a)  Salt Water Disposal Agreement

*37) Laredo 17-1*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations on the N/2 Section 17, Block 34, T3S)

    b)  Term Assignment of N/2 Section 17, Block 34, T3S from Laredo Petroleum to MDC - 25% WI retained by Laredo APO

    c)  Salt Water Disposal Agreement

*38) Hannathon East #1H*

    a)  A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations on the N/2 Section 17, Block 34, T3S)

    b)  Term Assignment of N/2 Section 17, Block 34, T3S from Laredo Petroleum to MDC - 25% WI retained by Laredo APO

    c)  Salt Water Disposal Agreement

39) Contract Operating Agreement, dated as of August 27, 2014, by and between MDC Texas Operator LLC, a Delaware limited liability company, and MDC Energy LLC, a Delaware limited liability company doing business in Texas as MDC Texas Energy LLC

<u>SOFTWARE CONTRACTS</u>

1)  Advanced Reservoir Characterization and Well Spacing Project, dated May 11, 2018 by and among Schlumberger Technology Corporation and MDC Texas Energy LLC

<u>MARKETING CONTRACTS</u>

1)  Gas Purchase Agreement, dated June 30, 2012, by and among ETC Field Services LLC (successor in interest to Regency Energy Partners) and MDC Reeves Energy LLC

2)  Gas Purchase Agreement, dated January 13, 2016, by and among EagleClaw Midstream Ventures, LLC and MDC Reeves Energy LLC

3)  Gas Purchase Agreement, dated August 1, 2012, by and among DCP Midstream, LP and MDC Texas Energy LLC

4)  Gas Purchase Agreement, dated April 1, 2002, by and among DCP Midstream, LP and MDC Texas Energy LLC

5) Crude Oil Purchase Agreement, dated September 1, 2013, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Reeves Energy LLC

6) Crude Oil Purchase Agreement, dated November 1, 2008, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Texas Energy LLC

7) Crude Oil Purchase Agreement, dated April 1, 2014, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Texas Energy LLC

8) BML Service Agreement, dated May 14, 2018, but effective as of June 1, 2018, by and among BML Crude Oil Marketing Inc. and MDC Texas Energy LLC

9) BML Service Agreement, dated August 1, 2016 but effective as of September 1, 2016, by and among BML Crude Oil Marketing Inc. and MDC Texas Energy LLC

**Schedule 1.1(b)**
**Related Agreements**

1. A.A.P.L. Form 610-1989 Model Form Operating Agreement (Yucca Block JOA)

2. A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

3. A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations outside of Yucca block)

4. A.A.P.L. Form 610-1989 Model Form Operating Agreement (Exhibit to San Saba PSA Agreement)

5. A.A.P.L. Form 610-1989 Model Form Operating Agreement (JOA for operations on the N/2 Section 17, Block 34, T3S)

6. Term Assignment of N/2 Section 17, Block 34, T3S from Laredo Petroleum to MDC - 25% WI retained by Laredo APO

7. Contract Operating Agreement, dated as of August 27, 2014, by and between MDC Texas Operator LLC, a Delaware limited liability company, and MDC Energy LLC, a Delaware limited liability company doing business in Texas as MDC Texas Energy LLC

**Schedule 7.05**
**Litigation**

None.

**Schedule 7.06**
**Environmental Matters**

None.

**Schedule 7.07**
**No Defaults**

None.

**Schedule 7.14**
**Subsidiaries**

1) MDC Reeves Energy LLC

2) Ward I, LLC

**Schedule 7.15**
**Location of Business and Offices**

Group Member: MDC Energy LLC

Other Names and Trade Names Used in the Last Five Years: MDC Texas Energy LLC

Current Jurisdiction of Organization: Delaware

Organizational Number: 5554941

Tax ID Number: 46-3569140

Locations of Chief Executive Office over the last Five Years: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

Current Location of Chief Executive Office: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240


Group Member: MDC Reeves Energy LLC

Other Names and Trade Names Used in the Last Five Years: None

Current Jurisdiction of Organization: Delaware

Organizational Number: 5758023

Tax ID Number: 47-3814809

Locations of Chief Executive Office over the last Five Years: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

Current Location of Chief Executive Office: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240


Group Member: Ward I, LLC

Other Names and Trade Names Used in the Last Five Years: None

Current Jurisdiction of Organization: Delaware

Organizational Number: 5758005

Tax ID Number: 47-4856817

Locations of Chief Executive Office over the last Five Years: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

Current Location of Chief Executive Office: 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240

**Schedule 7.18**
**Gas Imbalances**

None.

**Schedule 7.19**
**Marketing Contracts**

1) Gas Purchase Agreement, dated June 30, 2012, by and among ETC Field Services LLC (successor in interest to Regency Energy Partners) and MDC Reeves Energy LLC

2) Gas Purchase Agreement, dated January 13, 2016, by and among EagleClaw Midstream Ventures, LLC and MDC Reeves Energy LLC

3) Gas Purchase Agreement, dated August 1, 2012, by and among DCP Midstream, LP and MDC Texas Energy LLC

4) Gas Purchase Agreement, dated April 1, 2002, by and among DCP Midstream, LP and MDC Texas Energy LLC

5) Crude Oil Purchase Agreement, dated September 1, 2013, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Reeves Energy LLC

6) Crude Oil Purchase Agreement, dated November 1, 2008, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Texas Energy LLC

7) Crude Oil Purchase Agreement, dated April 1, 2014, by and among Sunoco Partners Marketing & Terminal L.P. and MDC Texas Energy LLC

8) BML Service Agreement, dated May 14, 2018, but effective as of June 1, 2018, by and among BML Crude Oil Marketing Inc. and MDC Texas Energy LLC

9) BML Service Agreement, dated August 1, 2016 but effective as of September 1, 2016, by and among BML Crude Oil Marketing Inc. and MDC Texas Energy LLC

**Schedule 7.20**
**Swap Agreements**

| Swap Agreement (incl. counterparty) | Type | Term | Effective Date | Termination Date | Notional Amount | Net Mark-to-Market Value[1] |
|---|---|---|---|---|---|---|
| 2002 ISDA Master Agreement, dated as of July 26, 2017, between Bank of Montreal (as successor in interest to NextEra Energy Marketing, LLC), and MDC Energy LLC, a Delaware limited liability company, as modified by the Schedule to the 2002 ISDA Master Agreement attached thereto | Costless Collar Option | 24 Months | September 20, 2017 | August 31, 2019 | 93,335 barrels | $587,634.18 |
| 2002 ISDA Master Agreement, dated as of July 26, 2017, between Bank of Montreal (as successor in interest to NextEra Energy Marketing, LLC), and MDC Energy LLC, a Delaware limited liability company, as modified by the Schedule to the 2002 ISDA Master Agreement attached thereto | Costless Collar Option | 24 Months | January 16, 2018 | December 31, 2019 | 141,644 barrels | $345,402.59 |
| 2002 ISDA Master Agreement, dated as of July 26, 2017, between Bank of Montreal (as successor in interest to NextEra Energy Marketing, LLC), and MDC Energy LLC, a Delaware limited liability company, as modified by the Schedule to the 2002 ISDA Master Agreement attached thereto | Costless Collar Option | 24 Months | March 15, 2018 | February 29, 2020 | 225,349 barrels | $907,965.84 |

---

[1] Figures current as of September 10, 2018

**Schedule 9.05**
**Investments**

None.