# **EXHIBIT EE**

**Riverstone Credit Management LLC**
**712 Fifth Avenue, 36th Floor**
**New York, NY  10015**

October 21, 2019

**VIA EMAIL AND OVERNIGHT COURIER**
MTE Holdings LLC
Attention:  Mark Siffin
               Bob Quinn
280 E. 96th Street, Suite 210
Indianapolis, IN  46240
Emails:    siffin@maefield.com
               bquinn@maefield.com

Re:    Notice of Exercise of Voting Rights of Pledged Securities

Ladies and Gentlemen:

Reference is made to the Term Loan Credit Agreement dated September 17, 2018 (as amended by that certain Limited Waiver and First Amendment dated as of February 22, 2019 and as further amended or otherwise modified prior to the date hereof, the "Credit Agreement"), among MTE Holdings LLC, a Delaware liability company (the "Company"), the lenders party thereto as lenders (the "Lenders"), and Riverstone Credit Management, LLC, as administrative agent for the Lenders (in such capacity, the "Administrative Agent").  Capitalized terms used herein, but not defined herein, shall have the meaning ascribed to such terms in the Credit Agreement.

Reference is also made to (i) that certain letter dated September 13, 2019 delivered by the Administrative Agent to the Company (the "September 13 Reservation of Rights Letter"), (ii) that certain Limited Forbearance Agreement, a draft of which was delivered by the Administrative Agent to the Company on September 20, 2019 (the "Sept. 20 Draft Limited Forbearance Agreement"), (iii) that certain Limited Forbearance Agreement, a draft of which was delivered by the Administrative Agent to the Company on September 28, 2019 (the "Sept. 28 Draft Limited Forbearance Agreement", and (iv) that certain letter dated October 7, 2019 delivered by the Administrative Agent to the Company (the "October 7 Notice of Default and Reservation of Rights Letter"), together with the September 13 Reservation of Rights Letter, the Sept. 20 Draft Limited Forbearance Agreement and the Sept. 28 Draft Limited Forbearance Agreement, the "Prior Default Notices"), whereby the Administrative Agent notified the Company that significant and material Events of Default exist under the Credit Agreement.  As initially described in the Prior Default Notices, certain Events of Default under the Loan Documents have occurred and are continuing, each as more specifically described in Exhibit A attached hereto (collectively, the "Specified Events of Default").

MTE Holdings LLC
October 21, 2019
Page 2

Pursuant to Section 6.01 and Section 7.01 of the Collateral Agreement dated September 17, 2018 (as amended or otherwise modified prior to the date hereof, the "Collateral Agreement") among the Company, as Grantor, and the Administrative Agent, the Administrative Agent hereby notifies you that (i) the rights of the Company to exercise all voting and membership rights with respect to the equity interests of MDC Energy LLC ("Opco") are no longer effective and have become vested in the Administrative Agent, which has the sole right to exercise such voting and membership rights, (ii) the Pledged Securities (as defined in the Collateral Agreement) are hereby deemed registered in the name of the Administrative Agent, and (iii) the Administrative Agent, at the direction of the Requisite Lenders, has exercised its rights under Section 6.01(b) of the Collateral Agreement to exercise all voting, membership and other rights pertaining to such Pledged Securities (the Administrative Agent, acting in such capacity, the "Voting Party").

In connection with the exercise by the Administrative Agent (at the direction of the Requisite Lenders) of the voting, membership and other rights described above, the Administrative Agent, as the Voting Party, has executed (i) the written consent attached hereto as Exhibit B (the "Written Consent") and (ii) the Amendment No. 1 to the Third Amended and Restated Limited Liability Company Agreement of MDC Energy LLC attached hereto as Exhibit C (the "Amendment"). The Written Consent and Amendment provide for, among other things, the appointment of a board of managers at Opco (the "Board"), including independent members of such board (and compensation and indemnification arrangements for the benefit of such persons), and the appointment of a Chief Restructuring Officer. Please note that, per the terms of the Amendment, the approval of the Board, including the independent members, is necessary to undertake certain actions, and the scope of the Chief Restructuring Officer's authority is set forth in the Written Consent and engagement letter attached thereto.

Notwithstanding the foregoing or anything to the contrary contained herein, this letter does not constitute (a) a waiver of the Specified Events of Default or any other Default or Event of Default, whether or not identified herein or (b) an agreement to forbear from exercising any rights and remedies available to the Administrative Agent and the Lenders pursuant to the terms of the Loan Documents or otherwise by law.

The Administrative Agent and Lenders hereby reserve each and every right and remedy available to them under the Credit Agreement, the other Loan Documents and applicable law resulting from or arising out of the Specified Events of Default and any other Default or Event of Default. You are hereby again notified that effective as of earliest date of occurrence of any other Specified Event of Default, and continuing thereafter for so long as any Event of Default exists, the Obligations shall accrue interest at the rate set forth in Section 2.6(c) of the Credit Agreement.

You are further notified that no failure or delay on the part of the Administrative Agent or any Lender to exercise any additional right or remedy under the Credit Agreement, any other Loan Document or applicable law shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of any right or remedy, all of which are cumulative and may be exercised without notice except to the extent notice is expressly required (and has not been waived) under the Credit Agreement, the other Loan Documents and applicable law. Unless and until otherwise agreed in a writing signed by the Administrative Agent and the Requisite Lenders, in no event and under no circumstance shall any

MTE Holdings LLC
October 21, 2019
Page 3

past, present or future negotiations, discussions or written communications with the Administrative Agent or any Lender or the Administrative Agent's or any Lender's delay in or forbearance from exercising any of its rights, powers, privileges or remedies under the Loan Documents or applicable law or any other indulgence granted by the Administrative Agent or any Lender: (i) cause an amendment, waiver or modification of the Loan Documents; (ii) establish a custom or course of dealing under the Loan Documents; (iii) operate as a waiver of any existing or future default under the Loan Documents (including, without limitation, the Specified Events of Default and the Other Defaults); (iv) entitle any Group Member to any other or further notice or demand; (v) modify, change, impair, affect, diminish or release any of the Company's or any other Group Member's obligations or liabilities under the Loan Documents; (vi) impair any other notice of default the Administrative Agent or any Lender has delivered (or will deliver), (vii) constitute an agreement of the Administrative Agent or any Lender to agree to any amendment or modification of the Loan Documents, or (viii) waive, limit, suspend or condition the Administrative Agent's or any Lender's rights, powers, privileges and remedies under the Loan Documents and applicable law, all of which rights, powers, privileges and remedies are expressly reserved.

Any future negotiations or discussions with any agent or representative of the Administrative Agent or any Lender regarding the Loan Documents shall not be binding upon the Administrative Agent and the Lenders unless and until any terms resulting from such negotiations or discussions are reduced to written agreement signed by the Administrative Agent and the Requisite Lenders. Any and all rights and remedies available to the Administrative Agent and the Lenders shall be cumulative and may be exercised separately, successively or concurrently at the sole discretion of the Administrative Agent and the Lenders. Nothing contained in this letter shall waive, modify, or limit any and all rights and remedies of the Administrative Agent under its contracts and documents, at law, in equity, or otherwise, all of which are expressly reserved.

Please contact the Administrative Agent with any questions you may have regarding the foregoing.

[Signature Page Follows]

Sincerely,

**RIVERSTONE    CREDIT    MANAGEMENT,
LLC,**
as Administrative Agent

By: _____

Name: Christopher Abbate

Title: Managing Director

# EXHIBIT A
# SPECIFIED EVENTS OF DEFAULT

Each of the existing and prospective breaches of the Loan Documents set forth below are Specified Events of Default:

1.     The Event of Default under Section 8.1(c) of the Credit Agreement as a result of the failure to deliver audited financial statements with respect to the Fiscal Year 2018 without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit as required by Section 5.1(c) of the Credit Agreement.

2.     The Event of Default under Section 8.1(b) of the Credit Agreement based on the Company's default under Section 9.01(b) of the RBL Facility Credit Agreement for the Fiscal Quarter ending December 31, 2018.

3.     The Event of Default under Section 8.1(c) of the Credit Agreement as a result of the incurrence of additional Indebtedness in the form of accounts payable that is or at one time was overdue for a period in excess of 90 days in violation of Section 6.1 of the Credit Agreement.

4.     The Event of Default under Section 8.1(c) of the Credit Agreement as a result of the creation of, and associated filings related to, mechanics liens with respect to certain accounts payable, which mechanics liens were not created in the ordinary course of business and, with respect to a portion of such mechanics liens, are related to accounts payable that are or at one time were overdue for a period in excess of 90 days, which, in each case, is a violation of Section 6.2 of the Credit Agreement.

5.     The separate Events of Default under Section 8.1(d) of the Credit Agreement as a result of the execution and delivery of (i) the First Amendment, (ii) the Borrowing Notice dated as of February 22, 2019, (iii) the Borrowing Notice dated as of March 18, 2019 and (iv) the Borrowing Notice dated as of April 1, 2019, in each case while the mechanics liens referenced in clause (3) above were outstanding.

6.     The separate Events of Default under Section 8.1(c) of the Credit Agreement as a result of the failure to deliver (i) quarterly financial statements along with Financial Officer Certifications and an executed and completed Compliance Certificate for the Fiscal Quarter ending December 31, 2018, (ii) quarterly financial statements along with Financial Officer Certifications and an executed and completed Compliance Certificate for the Fiscal Quarter ending March 31, 2019 and (iii) quarterly financial statements along with Financial Officer Certifications and an executed and completed Compliance Certificate for the Fiscal Quarter ending June 30, 2019, in each case as required by Section 5.1(b) and Section 5.1(e) of the Credit Agreement.

7.     The separate Events of Default under Section 8.1(c) of the Credit Agreement as a result of the failure to deliver (i) monthly financial statements along with Financial Officer Certifications within thirty days after the end of calendar month ending January 31, 2019, (ii) monthly financial statements along with Financial Officer Certifications within thirty days after the end of calendar month ending February 28, 2019, (iii) monthly financial statements along with Financial Officer Certifications within thirty days after the end of calendar month ending March 31, 2019, (iv) monthly financial statements along with Financial Officer Certifications

MTE Holdings LLC
October 21, 2019
Page 6

within thirty days after the end of calendar month ending April 30, 2019, (v) monthly financial statements along with Financial Officer Certifications within thirty days after the end of calendar month ending May 31, 2019, (vi) monthly financial statements along with Financial Officer Certifications within thirty days after the end of calendar month ending June 30, 2019, (vii) monthly financial statements along with Financial Officer Certifications within thirty days after the end of calendar month ending July 31, 2019, and (viii) monthly financial statements along with Financial Officer Certifications within thirty days after the end of calendar month ending August 31, 2019, in each case as required by Section 5.1(a) of the Credit Agreement.

8.      The Event of Default under Section 8.1(b) of the Credit Agreement based on the Company's default under Section 9.01(b) of the RBL Facility Credit Agreement for the Fiscal Quarter ending March 31, 2019.

9.      The Event of Default under Section 8.1(c) of the Credit Agreement as a result of the failure to deliver a Reserve Report concerning the Company's Oil and Gas Properties as of December 31, 2018, by March 31, 2019, with an officer certification as required by Section 5.1(q) of the Credit Agreement and title information covering all of the Oil and Gas Properties of the Company as required under Section 5.1(r) of the Credit Agreement.

10.     The Event of Default under Section 8.1(c) of the Credit Agreement as a result of the failure to deliver, concurrently with the annual audited financial statements for the Fiscal Year 2018 pursuant to Section 5.1(c) of the Credit Agreement, a certificate of insurance coverage from each insurer or its authorized agent or broker as required by Section 5.1(i) of the Credit Agreement.

11.     The Event of Default under Section 8.1(c) of the Credit Agreement as a result of the failure to comply with the Total Asset Coverage Ratio for the Fiscal Quarter ending June 30, 2019 as required by Section 6.7(c) of the Credit Agreement.

12.     The Event of Default under Section 8.1(b) of the Credit Agreement based on the Company's default under Section 9.01(b) of the RBL Facility Credit Agreement for the Fiscal Quarter ending June 30, 2019.

13.     The Event of Default under Section 8.1(e) of the Credit Agreement as a result of the failure to submit a new APOD for approval by the Super-Majority Requisite Lender as required by Section 5.13 of the Credit Agreement upon the lapse of effectiveness of the most recent APOD approved pursuant to the First Amendment.

14.     The Event of Default under Section 8.1(c) of the Credit Agreement as a result of making Consolidated Capital Expenditures in a manner not provided for in the APOD or an Approval Letter as required by Section 6.20 of the Credit Agreement.

15.     The Event of Default under Section 8.1(a) of the Credit Agreement as a result of the failure to pay the Administrative Agent fee of $150,000 on the anniversary of the Closing Date in accordance with Section 2.6(d) of the Credit Agreement.

MTE Holdings LLC
October 21, 2019
Page 7

16.      The Event of Default under Section 8.1(c) of the Credit Agreement as a result of the failure to deliver a Reserve Report concerning the Company's Oil and Gas Properties as of June 30, 2019, by September 30, 2019, with an officer certification as required by Section 5.1(q) of the Credit Agreement along with title information covering all of the Oil and Gas Properties of the Company as required under Section 5.1(r) of the Credit Agreement.

17.      The Events of Default under Section 8.1(c) of the Credit Agreement as a result of the failure to deliver notices of Defaults and Events of Default as required by Section 5.2(a) of the Credit Agreement.

18.      The Events of Default under Section 8.1(c) of the Credit Agreement as a result of the failure to deliver notices of defaults and events of default under the RBL Facility Loan Documents as required by Section 5.1(o) of the Credit Agreement.

19.      The Event of Default under Section 8.1(b) of the Credit Agreement as a result of the occurrence of certain "Events of Default" under the RBL Facility in connection with the events described in the foregoing clauses (1) through (18) above.

## EXHIBIT B
## ACTION BY WRITTEN CONSENT OF THE ADMINISTRATIVE AGENT PURSUANT TO SECTION 6.01(b) OF THE COLLATERAL AGREEMENT (ON BEHALF OF THE MEMBER OF MDC ENERGY LLC)

(See attached.)

**ACTION BY WRITTEN CONSENT OF**

**THE ADMINISTRATIVE AGENT PURSUANT TO**

**SECTION 6.01(b) AND SECTION 7.01 OF THE COLLATERAL AGREEMENT**

**(ON BEHALF OF THE MEMBER OF MDC ENERGY LLC)**

**Effective as of October 21, 2019**

The undersigned, in its capacity as the Administrative Agent (as defined below) pursuant to the Collateral Agreement between MTE Holdings LLC (the "*Member*") and Riverstone Credit Management, LLC (the "*Administrative Agent*"), dated as of September 17, 2018 (the "*Collateral Agreement*") and acting pursuant to the terms of the Collateral Agreement, hereby confirms, consents to, adopts and ratifies the following resolutions.

**WHEREAS**, the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders (as such terms are defined in the Term Loan Credit Agreement dated September 17, 2018 among the Member, the Lenders party thereto and the Administrative Agent (as such agreement may be amended or otherwise modified pursuant to the terms thereof, the "*Credit Agreement*")) has exercised its rights under Section 6.01(b) and Section 7.01 of the Collateral Agreement between the Member and the Administrative Agent, dated as of September 17, 2018 (the "*Collateral Agreement*")), pursuant to which, if an Event of Default (as defined in the Collateral Agreement) has occurred and is continuing, the Administrative Agent may exercise all voting, corporate, membership, partnership and other rights pertaining to the Member's membership interests in MDC Energy LLC (the "*Company*");

**WHEREAS**, Events of Default (as defined in the Collateral Agreement) have occurred and are continuing as of the date of this written consent, and the Administrative Agent has provided notice of such Events of Default to the Member; and

**Opportune Engagement Letter**

**WHEREAS**, the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement, desires to cause the Company to enter into an engagement letter with Opportune LLP in the form attached hereto as <u>Annex A</u> (the "*Opportune Engagement Letter*").

**NOW THEREFORE BE IT RESOLVED**, that the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement, hereby (i) approves the form, terms and provisions of the Opportune Engagement Letter and (ii) authorizes, empowers and directs the Company to enter into the Opportune Engagement Letter.

**Amendment**

**WHEREAS**, the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement, desires

to amend the Third Amended and Restated limited Liability Company Agreement of the Company pursuant to an amendment in the form attached hereto as <u>Annex B</u> (the "***Amendment***").

**NOW THEREFORE BE IT RESOLVED**, that the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement, hereby approves the form, terms and provisions of the Amendment.

## Independent Directors

**WHEREAS**, pursuant to the Amendment, each of Dan Gillett and Steve Pully (each, an "***Independent Director***") shall be designated as "Independent Directors" (as defined in the Amendment); and

**WHEREAS**, the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement, desires (i) to approve certain compensation arrangements for each Independent Director in connection with such Person's appointment and service as an Independent Director (as defined in the Amendment); and (ii) to cause the Company to enter into an indemnification agreement with each Independent Director in the form attached hereto as <u>Annex C</u> (the "***Indemnification Agreement***").

**NOW THEREFORE BE IT RESOLVED**, that the Company shall pay each Independent Director as compensation for such Person's service as an Independent Director (as defined in the Amendment), for so long as such Person serves in such capacity, an amount equal to $10,000 per calendar month, payable in advance and to be prorated for any partial calendar month of service based on the number of days during which such Independent Director provided services during such calendar month; *provided*, *however*, that unless such Independent Director (a) resigns or is otherwise unable to serve as an Independent Director or (b) is removed by the Member (subject, however, to the consent of the Administrative Agent for so long as an Event of Default has occurred and is continuing) for Cause (as defined in the Amendment) pursuant to the Amendment, the Company shall engage each Independent Director for a minimum term of nine (9) months; and

**FURTHER**, **RESOLVED**, that the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement, hereby approves the form, terms and provisions of the Indemnification Agreement and authorizes the execution thereof by the Company in favor of each Independent Director.

## Officers

**WHEREAS**, the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement, desires to appoint John Echols as an Officer of the Company with the title "Chief Restructuring Officer".

**NOW THEREFORE BE IT RESOLVED**, that John Echols is hereby appointed an Officer of the Company with the title "Chief Restructuring Officer" until the earlier of his resignation or removal, with such duties consistent with those set forth in the Opportune Engagement Letter.

**Insurance Policy**

 **WHEREAS**, the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement, desires to cause the Company to obtain director's and officer's insurance for the Directors (as defined in the Amendment) of the Company appointed pursuant to the Amendment (the "***Insurance Policy***").

 **NOW THEREFORE BE IT RESOLVED**, that the Company is hereby authorized to enter into and bind the Insurance Policy; and

 **FURTHER**, **RESOLVED**, that John Echols, in his capacity as Chief Restructuring Officer, is hereby authorized and empowered to execute, bind and deliver, for and on behalf of the Company and its subsidiaries, the Insurance Policy on standard commercial terms (such determination to be conclusively evidenced by the execution and binding of such Insurance Policy).

**Evercore Engagement Negotiations**

 **WHEREAS**, the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement, desires to cause the Company to enter into negotiations with Evercore Group L.L.C. ("***Evercore***") to provide financial advisory services in connection with (i) a potential corporate merger involving the Company, or a possible partial or full divestiture, directly or indirectly, of all or a portion of the Company's oil and gas reserves, acreage, water assets/dedications, and/or its midstream infrastructure assets in the Permian Basin, regardless of the form or structure thereof and (ii) its efforts to raise capital, from one or a limited number of investors or other financing sources, through the issuance by the Company or one of its affiliates, in a private placement, of equity (including equity-linked) and/or debt or debt-like securities, or through one or more loans or other financing arrangements, in each case in one or a series of transactions, regardless of the form or structure thereof (the foregoing, collectively "***Advisory Services***").

 **NOW THEREFORE BE IT RESOLVED**, that the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement, hereby authorizes, empowers and directs the Company to enter into negotiations with Evercore regarding the provision of Advisory Services; and

 **FURTHER, RESOLVED**, that John Echols, in his capacity as Chief Restructuring Officer, is hereby authorized and empowered to execute and deliver, any agreements that he reasonably deems necessary to engage Evercore to provide Advisory Services, but to the extent, and only to the extent, that the Board grants Board Approval (as defined in the Amendment) of the terms and conditions, including any consideration paid to Evercore, of such engagement.

**Credit Documents**

 **WHEREAS**, the Administrative Agent, in its capacity as Administrative Agent on behalf of the Lenders pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement desires to cause the Company to enter into negotiations regarding amendments, waivers and/or forbearance

agreements regarding the Credit Agreement dated as of September 17, 2018 (such agreement as modified from time to time, the "***Natixis Credit Agreement***") by and among the Company by a syndicate of lenders, with Natixis, New York Branch, a branch of Natixis S.A., a société anonyme à conseil d'administration, organized and existing under the laws of France acting as administrative agent.

**NOW THEREFORE BE IT RESOLVED**, that the Company is hereby authorized to enter into the foregoing negotiations; and

**FURTHER**, **RESOLVED**, that John Echols, in his capacity as Chief Restructuring Officer, is hereby authorized and empowered to execute and deliver, any agreements that he reasonably deems necessary to facilitate the foregoing negotiations, provided that the terms of any amendment, waiver, forbearance or other modification of the Natixis Credit Agreement or the Loan Documents (as defined in the Natixis Credit Agreement) shall require Board Approval;

**Authorized Signatories**

**FURTHER**, **RESOLVED**, that (i) John Echols, in his capacity as Chief Restructuring Officer, is hereby authorized and empowered to do and perform such acts and things for and on behalf of the Company and its subsidiaries, and execute and deliver, for and on behalf of the Company and its subsidiaries, any agreements binding on the Company or any of its subsidiaries, in each case, to the extent authorized herein or with Board Approval, and (ii) no other Officer shall be permitted to bind the Company or any of its subsidiaries or execute any agreement on behalf of the Company or any of its subsidiaries, in each case, without prior Board Approval; and

**Miscellaneous**

**FURTHER**, **RESOLVED**, that this consent by be executed in multiple counterparts (including via facsimile or portable document format (pdf) attachment to electronic mail), each of which is taken together shall constitute one and the same consent.

*     *     *     *     *     *

**IN WITNESS WHEREOF,** the undersigned has caused this consent to be duly executed as of the date first written above.

> **RIVERSTONE CREDIT MANAGEMENT, LLC,** a Delaware limited liability company
>
> (in its capacity as Administrative Agent pursuant to Section 6.01(b) and Section 7.01 of the Collateral Agreement)
>
> By: _____
> Name: _Christopher Abbate_
> Title: _Managing Director_

Signature Page to the Written Consent of the
Administrative Agent Pursuant to
Section 6.01(b) and Section 7.01 of the Collateral Agreement
(on behalf of the Member of MDC Energy LLC)

## **Annex A**

Opportune Engagement Letter

[Attached]

October 21, 2019

MDC Energy LLC
280 E. 96th Street, Suite 210
Indianapolis, Indiana 46240

Dear Mr. Siffin,

This engagement letter (the "Engagement Letter"), together with the attached Appendix A: Terms and Conditions, sets forth our entire understanding regarding the engagement (the "Engagement") between Opportune LLP ("Opportune") and MDC Energy LLC and its affiliated entities (collectively the "Company"), for the purpose of Opportune providing services to the Company, including the scope of the services to be performed and the basis of compensation for those services.   Upon execution of this Engagement Letter by each of the parties below and receipt of the retainer described below, this Engagement Letter will constitute an agreement between the Company and Opportune (the "Agreement").

1. **Scope of Services.**

   Opportune will perform the following Services:

   a. <u>Officers</u>. In connection with this engagement, Opportune shall make available to the Company:

      i. John Echols to serve in the role of Chief Restructuring Officer (the "CRO") for the Company. The CRO shall devote such time to the performance of his services hereunder, including onsite involvement at the Company's offices, as he determines appropriate in his sole discretion. To the extent the Company does not obtain an insurance policy acceptable to the CRO, Opportune may serve as third-party financial advisor (the "Financial Advisor"), but Opportune will not provide a named officer of the Company, nor will any of its partners, employees, affiliates, or other relations be liable under any legal theory for any causes of action brought against the Company, its directors, or its officers, as further described below.

   b. <u>Duties</u>. Subject to his business judgment and fiduciary responsibilities and with the assistance of the Chief Executive Officer (the "CEO") and other executive officers, the CRO:

      i. Will assume a lead management position in guiding the Company through its reorganization efforts and the evaluation, development, negotiation, and implementation of such restructuring efforts (the "Reorganization Efforts");

    ii. Will engage and assist a strategic advisor to conduct a review of all strategic alternatives for the Company, which may include a monetization of some or all of the Company's assets;

    iii. Will be granted authority to evaluate, implement, and manage cost reduction measures and operational improvement measures necessary to preserve and maximize the value and efficiency of the Company;

    iv. Will be granted sole authority, in consultation with the Company's executive officers, regarding cash management and disbursements;

    v. Will be granted sole authority, in consultation with the Company's executive officers, to enter into contracts on behalf of the Company; and

    vi. Will be granted sole authority, in consultation with the Company's executive officers, to communicate and share information with the Company's lenders, provided, however, that the CRO shall have sole authority, without the need to consult with the Company's executive officers, to communicate to such lenders if any executive officers, owners, or directors of the Company interfere with the CRO's mandate as set forth in this Engagement Letter.

The CRO will report directly to the board of directors of the Company.

  c. <u>Responsibilities</u>. Subject to applicable bylaws and corporate governance processes, the CRO will have primary responsibility for the following Reorganization Efforts (to include but not be limited to):

    i. Make restructuring process decisions;

    ii. Formulate a comprehensive 13-week cash flow and providing weekly updates to the board and the lenders;

    iii. Engage with and support the strategic advisor in a review of strategic alternatives for the Company, including a potential monetization of some or all of the Company's assets;

    iv. Review and develop any material drafted for consumption outside the Company;

    v. Assist in developing and evaluating the Company's business plan, and the preparation of a revised operating plan and cash flow forecasts;

    vi. Approve any expenditures or cash payments;

    vii. Manage vendor payables, including developing any plan needed to manage vendor relationships;

    viii. Manage the financial and operational reporting processes to all constituents;

    ix. Make business and financial decisions with respect to any financing sought or put in place;

    x. Make decisions with respect to the Company's operations and its personnel, including sole authority to determine whether to incur any capital expenditures and to commence or continue any drilling operations;

    xi. Engage in day-to-day normal business operations;

      xii.   Make decisions with respect to all professionals engaged by, strategies developed, and activities taken by the Company related to the Reorganization Efforts; and

      xiii.   Perform other services and activities as mutually agreed by the Company's board and the CRO.

d.   <u>Access to Information</u>. In connection with this Engagement, Opportune shall have open and unfettered access to all Company information that the CRO has reasonably deemed appropriate.   Additionally, the Company will provide reasonable access to the Company's managers, employees, accountants, counsel and other representatives (collectively the "Representatives") necessary to perform the services as outlined in this Engagement Letter.   It is understood that Opportune is relying solely upon the information supplied by the Company and its Representatives without assuming any responsibility for independent investigation or verification thereof.   All confidential information concerning the Company that is given to Opportune will be used solely in the course of performance of the Services outlined in this Engagement Letter.   Except as required by law, such confidential information will not be disclosed to a third party without the Company's consent.

e.   <u>Projections; Reliance; Limitation of Duties</u>. The Company understands that the services to be rendered by the CRO may include the preparation of projections and other forward-looking statements, and that numerous factors can affect the actual results of the Company's operations, which may materially and adversely differ from those projections and other forward-looking statements.   In addition, the CRO will be relying on information provided by other members of the Company's management in the preparation of those projections and other forward-looking statements. Neither the CRO nor Opportune make any representation or guarantee that an appropriate restructuring proposal or strategic alternative can be formulated for the Company, that any restructuring proposal or strategic alternative presented to the board will be more successful than all other possible restructuring proposals or strategic alternatives, that restructuring is the best course of action for the Company or, if formulated, that any proposed restructuring plan or strategic alternative will be accepted by any of the Company's creditors, shareholders and other constituents.   Further, neither the CRO nor Opportune assume responsibility for the selection of any restructuring proposal or strategic alternative that any such officer assists in formulating and presenting to the board, and the CRO shall be responsible for implementation only of the proposal or alternative approved by the board and only to the extent and in the manner authorized and directed by the board.

## 2.  <u>Compensation</u>

a.   Opportune will be paid by the Company for the services of the CRO. The hourly billing rate for the CRO is $965.

To the extent the CRO requires additional Opportune personnel to assist in the performance of the duties set forth in this Engagement Letter the current hourly billing rates for additional personnel, based on the position held by such Opportune personnel, are:

|      |                          |          |
|------|--------------------------|----------|
| i.   | Partner                  | $965/hr  |
| ii.  | Managing Directors       | $835/hr  |
| iii. | Directors                | $740/hr  |
| iv.  | Managers                 | $660/hr  |
| v.   | Senior Consultants       | $425/hr  |
| vi.  | Consultants              | $430/hr  |
| vii. | Administration Personnel | $275/hr  |

b. In addition to our fees, reasonable and documented out-of-pocket expenses (e.g., parking, travel, courier, overtime meals, copying, and postage) incurred directly in connection with the Services will be included on each invoice.

c. The Company shall promptly remit to Opportune a retainer in the amount of $200,000 (the "Retainer"). This amount shall be carried by Opportune (but not in a separate bank account) and credited against any amounts due at the termination of this Engagement, and any remaining amounts returned upon the satisfaction of all obligations hereunder.

d. Opportune shall bill for its services on weekly basis, or as necessary to maintain the retainer. The Company will pay such billings when received.

3. <u>Indemnification</u>

The Company shall indemnify CRO, Opportune, and their (as applicable) partners, employees, managers, principals, agents, affiliates, independent contracts, insurers (collectively, the "Indemnified Persons") from and against any and all pending or threatened claims, demands, suits, investigations, proceedings, judgments, awards, liabilities, losses, damages, fees and expenses paid or incurred by any Indemnified Person in connection with, arising out of or related to (whether from direct claims or third party claims) the Engagement or this Agreement (including but not limited to any Indemnified Person's reasonable counsel fees and expenses). In addition to the foregoing indemnification, any Opportune personnel who may serve as board-approved officers of the Company including but not limited to John Echols, as CRO, shall be individually indemnified to the same extent as the most favorable indemnification it extends to its officers or directors, whether under the Company's bylaws, its certificate of incorporation, by contract or otherwise. The CRO shall report to the board and shall be covered as an officer under the Company's existing director and officer liability insurance policy as an "additional named insured" and as a "certificate holder" under each liability insurance policy of the Company. As a condition of Opportune accepting this engagement, a

MDC Energy LLC
October 21, 2019
Page **5** of **10**

Certificate of Insurance evidencing such coverage shall be furnished to Opportune prior to the effective date of this Agreement.   The Company shall instruct all applicable carriers to give Opportune and the CRO thirty (30) days prior written notice of cancellation, non-renewal, or material change in coverage, scope, or amount of such director and officer liability policy.   The provisions of this section are in the nature of contractual obligations and no change in applicable law or the Company's charter, bylaws or other organizational documents or policies shall affect the CRO's rights hereunder.   The foregoing indemnification obligations shall not apply in the event that a court of competent jurisdiction finally determines that such claims resulted directly from the gross negligence, willful misconduct or fraudulent acts of CRO or Opportune.

4. <u>Confirmed Agreement</u>

We are ready to begin our work immediately upon our receipt of the signed Engagement Letter.   Please confirm the agreement to the Engagement Letter by signing below and returning to our office at your earliest convenience.   Again, we look forward to working with you.

Very truly yours,

John Echols
Partner

MDC Energy LLC
October 21, 2019
Page **6** of **10**

**Accepted by: MDC Energy LLC**

By:    MTE Holdings LLC, its sole member

By:    RIVERSTONE CREDIT MANAGEMENT,
       LLC, a Delaware limited liability company,
       as Administrative Agent

       (as attorney-in-fact pursuant to the
       Collateral Agreement)

By:    _____
Name:  _____
Title: _____

MDC Energy LLC
October 21, 2019
Page **7** of **10**

**Appendix A:   Terms and Conditions**

**Terms and Conditions**

The following are the terms and conditions (the "Terms and Conditions") on which Opportune will provide the services (the "Services") set forth in the attached engagement letter (the "Engagement Letter").   Together, the Terms and Conditions and the Engagement Letter are referred to as the "Contract," which forms the entire agreement between Opportune and the Company.   Opportune and the Company may be collectively referred to herein as "Parties" and individually as "Party".

**Fees**

1.  Opportune's invoices are payable upon receipt.   If payment of any invoice is not received within 30 days of the invoice date, Opportune shall be entitled, without prejudice to any other rights that it may have, to suspend provision of the Services until all sums due are paid in full.

2.  Opportune has no responsibility to update any report, analysis or any other document relating to this Engagement for any events or circumstances occurring subsequent to the date of such report, analysis or other document.   Any such subsequent consultations or work shall be subject to arrangements at our then standard fees plus expenses.

3.  In the event additional services are requested, the Parties shall work together to memorialize any such agreement, including payment of reasonable additional fees and a reasonable additional period to provide any additional services.   Any variation to this Contract, including any variation to fees, services, or time for performance of the Services, shall be set forth in a separate engagement letter executed by the Parties which shall form part of this Contract.

4.  Opportune's performance of the Services is dependent upon Company providing accurate and timely information and assistance as may be reasonably required from time to time. Company shall use reasonable skill, care and attention to ensure that all required information is provided on a timely basis and is accurate and complete.   Company shall notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.   *The inability to supply us with the agreed upon information in a useable form within the amount of time reasonably required by us may increase fees and delay completion.   Additionally, in the event unforeseen complications are encountered which would significantly increase fees; we would discuss these with you and await your approval before proceeding.*

MDC Energy LLC
October 21, 2019
Page **8** of **10**

## Termination

5. Any Party may terminate this Contract in the event that the other Party has breached any material provision of this Contract and such breach has not been cured within ten (10) days after receipt of written notice from the then non-breaching Party.

6. Upon termination of this Contract, each Party shall, upon written request from the other, return to the other all property and documentation of the other that is in its possession, except that we shall be entitled to retain one copy of such documents in order to maintain a professional record of our involvement in the Engagement, subject to our continuing confidentiality obligations hereunder.

7. The provisions included within "Fees", "Preservation of Confidential Information" and "Other Terms and Provisions" shall survive the termination or expiration of this Contract.

## Work Products and Report

8. During the Engagement, Opportune may prepare certain reports, and any analysis will be based upon the information provided by and on behalf of the Company. Opportune assumes no responsibility and makes no representations with respect to the accuracy or completeness of any information provided by and on behalf of the Company. There will usually be differences between estimated and actual results because events and circumstances frequently do not occur as expected, and those differences may be material. The Company acknowledges that no reliance shall be placed on draft reports, conclusions or advice, whether oral or written, issued by Opportune since the same may be subject to further work, revision and other factors which may mean that such drafts are substantially different from any final report or advice issued.

9. Opportune is not a CPA firm, and any report or any results of our Services shall not constitute an Audit, Attestation, Valuation, Solvency Opinion or a Fairness Opinion or otherwise and may not be relied upon by Company or any other party as such. Any advice given or report issued by Opportune is provided solely for Company's use and benefit and only in connection with the Services that are provided. Furthermore, any analyses Opportune performs should not be taken to supplant any procedures that Company should undertake in consideration of the matter contemplated in connection with this Engagement or any other past, present, or future transaction.

10. The Company expressly acknowledges that Opportune does not guarantee, warrant or otherwise provide assurance regarding the results of the Services.

## Preservation of Confidential Information

MDC Energy LLC
October 21, 2019
Page **9** of **10**

11. No Party will disclose to any third party without the prior written consent of the other Party any confidential information which is received from the other Party for the purposes of providing or receiving the Services which if disclosed in tangible form is marked confidential or if disclosed otherwise is confirmed in writing as being confidential or, if disclosed in tangible form or otherwise, is manifestly confidential.  The Parties agree that any confidential information received from the other Party shall only be used for the purposes of providing or receiving the Services under this or any other contract between us.

12. These restrictions will not apply to any information which: (a) is or becomes generally available to the public other than as a result of a breach of an obligation by the receiving party; (b) is acquired from a third party who owes no obligation of confidence with respect to the information; or (c) is or has been independently developed by the recipient.

13. Notwithstanding the foregoing, any Party will be entitled to disclose confidential information of the other (i) to our respective insurers or legal advisors, or (ii) to a third party to the extent that this is required, by any court of competent jurisdiction, or by a governmental or regulatory authority or where there is a legal right, duty or requirement to disclose, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than two (2) business days' notice in writing is first given to the other Party.

**Other Terms and Provisions**

14. Except in the event of our willful misconduct or fraud, in no event shall we be liable to Company (or any person claiming through either) under this Contract, under any legal theory, for any amount in excess of the total professional fees paid to Opportune under this Contract or any addendum thereto.  In no event shall Opportune be liable to Company under this Contract under any legal theory for any consequential, indirect, lost profit or similar damages relating to or arising from our Services provided under this Contract.

15. The Parties accept and acknowledge that any legal proceedings arising from or in connection with this Contract (or any variation or addition thereto) must be commenced within one (1) year from the conclusion of the Services.  Company agrees that no action or claims will be brought against CRO or any Opportune employees personally.

16. Company agrees to indemnify and hold harmless CRO and Opportune, its affiliates and their respective employees from and against any and all claims, liabilities, losses, costs, demands and reasonable expenses, including but not limited to reasonable legal fees and expenses, internal management time and administrative costs, relating to Services we render under this Contract or otherwise arising under this Contract.  The foregoing indemnification obligations shall not apply in the event that a court of competent jurisdiction finally determines that such claims resulted directly from the gross negligence, willful misconduct or fraudulent acts of CRO or Opportune.

MDC Energy LLC
October 21, 2019
Page **10** of **10**

17. Company accepts and acknowledges that CRO and Opportune have not made any warranties or guarantees, whether express or implied, with respect to the Services or the results that you may obtain as a result of the provision of the Services.

18. Except for your payment obligations, neither of us will be liable to the other for any delay or failure to fulfill obligations caused by circumstances outside our reasonable control.

19. This Contract constitutes the entire agreement between the Parties hereto regarding the subject matter hereof and supersedes any prior agreements (whether written or oral) between the parties regarding the subject matter hereof.   This Contract may be executed in any number of counterparts each of which shall be an original, but all of which together shall constitute one and the same instrument.

20. This Contract shall be governed by and interpreted in accordance with the internal laws of the State of Texas and the courts of the State of Texas shall have exclusive jurisdiction in relation to any claim arising out of this Contract.

## **Annex B**

Amendment

[Attached]

# AMENDMENT NO. 1 TO THE
# THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
# OF
# MDC ENERGY LLC

This Amendment No. 1 (this "**Amendment**"), dated and effective as of October 21, 2019, to the Third Amended and Restated Limited Liability Company Agreement (as amended, the "**Agreement**"), dated as of June 26, 2017, of MDC Energy LLC, a Delaware limited liability company, is made and entered into in accordance with Section 31 of the Agreement.  Capitalized terms used but not defined herein have the meanings set forth in the Agreement.

**WHEREAS**, pursuant to Section 31, the Agreement may not be amended unless pursuant to a written agreement executed and delivered by the Member; and

**WHEREAS**, Riverstone Credit Management, LLC (the "**Administrative Agent**"), in its capacity as Administrative Agent on behalf of the Lenders (as such terms are defined in the Term Loan Credit Agreement dated September 17, 2018 among the Member, the Lenders party thereto and the Administrative Agent (as such agreement may be amended or otherwise modified pursuant to the terms thereof, the "**Credit Agreement**")) has exercised its rights under Section 6.01(b) of the Collateral Agreement between the Member and the Administrative Agent, dated as of September 17, 2018 (the "**Collateral Agreement**")), pursuant to which, if an Event of Default (as defined in the Collateral Agreement) has occurred and is continuing, the Administrative Agent may exercise all voting, corporate, membership, partnership and other rights pertaining to MTE Holdings LLC's membership interests in MDC Energy LLC;

**WHEREAS**, Events of Default (as defined in the Collateral Agreement) have occurred and are continuing as of the date of this Amendment, and the Administrative Agent has provided notice of such Events of Default to the Member; and

**WHEREAS**, the Administrative Agent (in its capacity as administrative agent and collateral agent for the Lenders) desires to amend certain provisions of the Agreement.

**NOW**, **THEREFORE**, for good and valuable consideration, the Administrative Agent (in its capacity as administrative agent and collateral agent for the Lenders (as defined in the Collateral Agreement)) and pursuant to the authority delegated to the Administrative Agent in the Collateral Agreement, agrees as follows:

1.  <u>Amendment to Section 9</u>.  Section 9 of the Agreement is hereby amended and restated in its entirety as follows:

"<u>Management</u>.

(a)     The business and affairs of the Company (including all rights of the Member set forth in <u>Sections 8</u>,  <u>11</u>, <u>16</u>, <u>17</u> and <u>24</u>) shall be managed by or under the direction of a board of directors (the "<u>Board</u>"), to whom, subject to the limitations set forth in this Agreement and as otherwise required by the Act, the Member hereby delegates, and in which is vested, the full, exclusive and complete power, authority

and discretion to manage and control the administration, affairs and operations of the Company.  Each member of the Board (a "Director") shall be a "manager" of the Company as defined in Section 18-101(10) of the Act.  All actions, determinations, elections, judgments, approvals, considerations, amendments, calls or designations taken or omitted to be taken by the Board pursuant to this Agreement (whether to the Board's satisfaction, sole discretion or otherwise) shall be taken or omitted to be taken only with Board Approval.

(b)     Unless explicitly provided otherwise in this Agreement, the Board shall have the power, right and authority on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts which the Board, in its sole discretion, may deem necessary or desirable.

(c)     The Board shall consist of five (5) Directors.  The Directors as of October 21, 2019 are Dan Gillett, Steve Pully (together, the "Independent Directors" and each, an "Independent Director"), Mark Siffin, Etienne Locoh and, for so long as he is the chief restructuring officer of the Company, John Echols.  The Member (subject, however, to the consent of the Administrative Agent for so long as an Event of Default has occurred and is continuing) shall have the right to remove any Director at any time for Cause.  In the event that a vacancy is created on the Board by the death, disability, retirement, resignation or removal of any Director in accordance with this Agreement, such vacancy shall be filled only by consent of the Member (and so long as an Event of Default has occurred and is continuing, with the consent of the Administrative Agent); *provided*, *however*, that in the event that (i) John Echols ceases to be the chief restructuring officer of the Company, the then-current chief restructuring officer of the Company shall automatically replace John Echols (or, if applicable, his replacement pursuant to this Section 9(c)) or (ii) an Independent Director ceases to be a Director for any reason, any replacement of such Independent Director must be an Independent Person.

(d)     Each Director shall have one (1) vote.  Unless otherwise required by this Agreement, Directors having at least three (3) votes, including each Independent Director, either present (in person or by teleconference) or represented by proxy, shall constitute a quorum for the transaction of business at a meeting of the Board.  Unless provided otherwise in this Agreement, any action (including the giving of consent, waivers or approvals) by the Board shall require Board Approval.

(e)     The Board may hold its meetings in such place or places, within or without the State of Delaware, as the Board may from time to time determine by resolution.  At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by resolution of the Board.

(f)     Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action so taken shall be signed by Directors representing the requisite number of votes that would be required to take the applicable action at a meeting of the Board and, when so signed, such written consent shall constitute Board Approval of such action, and

2

notice of any such action taken shall be provided to those Directors who have not consented in writing promptly following the taking of such action.

(g)    Subject to the requirement for notice of meetings, members of the Board may participate in a meeting by means of a telephone conference or similar communications equipment by means of which all individuals participating in the meeting can hear each other, and participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(h)    Each Director shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or reports made to the Company by any of its Officers or by an independent certified public accountant or by an appraiser selected with reasonable care by the Board, or in relying in good faith upon other records of the Company.  Furthermore, each Director (in such Person's capacity as a Director) may rely, and shall incur no liability in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing reasonably believed by it to be genuine, and may rely on a certificate signed by an officer, agent or representative of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, in each case unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such reliance, action or inaction, such Director engaged in bad faith, fraud or willful or intentional misconduct or criminal wrongdoing."

2.    <u>Amendment to Section 20(a)</u>:  Section 20(a) of the Agreement is hereby amended to include "the Administrative Agent (current or former)", "Directors" and "Lenders" in the definition of "Covered Persons."

3.    <u>Amendment to Section 20</u>:  A new Section 20(g) is hereby added as follows:

"(g)    Each Officer (in such Person's capacity as an Officer) shall have such fiduciary duties that an officer of the Company would have if the Company were a corporation organized under the laws of the State of Delaware. To the maximum extent permitted by applicable law, no Officer (in such Person's capacity as such) shall be liable to the Company or to the Member for losses sustained or liabilities incurred as a result of any act or omission (in relation to the Company, any transaction, any investment or any business decision or action, including for breach of duties including fiduciary duties) taken or omitted by such Officer (in such Person's capacity as such), unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such act or omission, and taking into account the acknowledgments and agreements set forth in this Agreement, such Officer (in such Person's capacity as such) would have had such liability for such act or omission that an officer of the

Company would have if the Company were a corporation organized under the laws of the State of Delaware."

4.   Amendment to Section 26:  Section 26 is hereby amended by adding the following after the second sentence:

"Notwithstanding anything to the contrary herein, the Administrative Agent (in its capacity as Administrative Agent for the Lenders) is an intended third-party beneficiary of Sections 9, 20, and 31 and the definition of "Board Approval" and may enforce the provisions thereof as if it were a party hereto."

5.   Amendment to Schedule A:  Schedule A of the Agreement is hereby amended by adding the below definitions in the appropriate alphanumeric order:

""Administrative Agent" means Riverstone Credit Management, LLC, in its capacity as administrative agent and collateral agent for the Lenders, pursuant to each of the Credit Agreement and the Collateral Agreement, and any successor thereto."

""Board" has the meaning set forth in Section 9(a)."

""Board Approval" means the affirmative vote of, or written consent signed by, the Directors holding a majority of the number of votes of the Directors, including each Independent Director."

""Cause" means, as to a Director (a) any material breach of an agreement between the Company or one of its subsidiaries and such Director, (b) such Director's gross negligence, willful misconduct or breach of fiduciary duty, (c) commission of an act of fraud, theft or embezzlement on the part of such Director, (d) conviction or indictment of such Director, or plea of *nolo contendere* by such Director, to any felony (or state law equivalent) or any crime involving moral turpitude, or (e) such Director's willful failure or refusal to perform such Director's obligations pursuant to this Agreement."

""Collateral Agreement" means the Collateral Agreement dated as of September 17, 2018 among the Member and the Administrative Agent (as such agreement may be amended or otherwise modified pursuant to the terms thereof)."

""Credit Agreement" means the Term Loan Credit Agreement dated September 17, 2018 among the Member, the Lenders party thereto and the Administrative Agent (as such agreement may be amended or otherwise modified pursuant to the terms thereof)."

""Director" has the meaning set forth in Section 9(a)."

""Event of Default" has the meaning set forth in the Credit Agreement."

""Independent Director" has the meaning set forth in Section 9(c)."

4

""Independent Person" means a natural person with at least ten (10) years of oil and gas industry experience and who is not, as of the time of initial appointment as a Director or at any time while serving as a Director, and has not been during the five (5) years preceding such initial appointment as a Director: (a) a direct or indirect owner of any equity interest in the Company, the Member, the Administrative Agent, any of the Lenders or any of their respective Affiliates, (b) an officer, employee, partner or director of the Company, the Member, the Administrative Agent, any of the Lenders or any of their respective Affiliates, or (c) a creditor, customer or supplier of the Company or any of its Affiliates."

""Lenders" has the meaning set forth in the Credit Agreement."

6.   Amendment to Schedule A:  Schedule A of the Agreement is hereby amended by amending and restating the below definition in its entirety:

""Act" means the Delaware Limited Liability Act."

7.   Miscellaneous.  Except as expressly amended hereby, the Agreement shall remain unchanged, and the Agreement, as so amended, shall continue in full force and effect in accordance with its terms.  For the avoidance of doubt, the provisions of Sections 21, 26 and 30 of the Agreement shall apply to this Amendment *mutatis mutandis*.  This Amendment may be executed in one or more counterparts and transmitted via electronic means.

*     *     *     *     *

5

IN WITNESS WHEREOF, the undersigned has executed this Amendment as of the date first above written.

**RIVERSTONE CREDIT MANAGEMENT, LLC**, a Delaware limited liability company

(as attorney-in-fact pursuant to the Collateral Agreement)

By: _____

Name:_____

Title:_____

Signature Page to Amendment No. 1 to The
Third Amended and Restated Limited Liability Company Agreement of
MDC Energy LLC

**<u>Annex C</u>**

Indemnification Agreement

[Attached]

# INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("Agreement") is made and entered into as of this 21st day of October, 2019, by and between MDC Energy LLC, a Delaware limited liability company (the "Indemnitor") and Dan Gillett (the "Indemnitee").

WHEREAS, in light of the litigation costs and risks to directors, officers and/or members of boards of managers resulting from their service to companies, it is reasonable, prudent and necessary for the Indemnitor to indemnify and advance expenses on behalf of its and their directors, officers and members of such boards of managers so that they will serve or continue to serve one or more of the Indemnitor Entities free from undue concern regarding such risks;

WHEREAS, the Indemnitor has requested that the Indemnitee serve or continue to serve as a director, officer or member of the board of managers of one or more of the Indemnitor Entities and may have requested or may in the future request that the Indemnitee serve as a director, officer or member of the board of managers of another entity or in another capacity; and

WHEREAS, the Indemnitee is willing to serve as a director, officer or member of the board of managers of one or more of the Indemnitor Entities on the condition that the Indemnitee be indemnified by the Indemnitor as provided for herein.

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the Indemnitor and the Indemnitee do hereby covenant and agree as follows:

1.  <u>Services by the Indemnitee</u>.  The Indemnitee agrees to serve as a member, director, officer or member of the board of managers of the Indemnitor.  The Indemnitee may at any time and for any reason resign from such position (subject to any contractual obligation under any other agreement or any obligation imposed by operation of law).

2.  <u>Indemnification - General</u>.  On the terms and subject to the conditions of this Agreement, the Indemnitor shall indemnify the Indemnitee with respect to, and hold the Indemnitee harmless from and against, all losses, liabilities, judgments, fines, penalties, costs, Expenses (as hereinafter defined) and other amounts that the Indemnitee reasonably incurs and that result from, arise in connection with or are by reason of the Indemnitee's Management Status (as hereinafter defined) and shall advance Expenses to the Indemnitee, as provided herein.  The obligation of the Indemnitor under this Agreement shall, subject to the other terms and conditions of this Agreement, (a) continue after such time as Indemnitee ceases to serve as a director, officer or member of the board of managers of any of the Indemnitor Entities or in any other Management Status; and (b) include, without limitation, claims for monetary damages against the Indemnitee in respect of any actual or alleged liability or other loss of the Indemnitee.

3.  <u>Proceedings Other Than Proceedings by or in the Right of the Company</u>.  If in connection with or by reason of the Indemnitee's Management Status the Indemnitee was, is, or is threatened to be made, a party to or a participant in any Proceeding (as hereinafter defined) other than a Proceeding by or in the right of any Indemnitor Entity to procure a judgment in its favor, the Indemnitor shall indemnify the Indemnitee with respect to, and

US 6664011

hold the Indemnitee harmless from and against, all Expenses, liabilities, judgments, penalties, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such liabilities, judgments, penalties, fines and amounts paid in settlement) reasonably incurred by the Indemnitee or on behalf of the Indemnitee in connection with such Proceeding or any claim, issue or matter therein, if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Indemnitor Entity/ies at which the Indemnitee served in a Management Status and, with respect to any criminal Proceeding, had no reasonable cause to believe the Indemnitee's conduct was unlawful.

4.    <u>Proceedings by or in the Right of the Indemnitor</u>.   If by reason of the Indemnitee's Management Status the Indemnitee was, is, or is threatened to be made, a party to or a participant in any Proceeding by or in the right of any Indemnitor Entity to procure a judgment in its favor, the Indemnitor shall indemnify the Indemnitee with respect to, and hold the Indemnitee harmless from and against, all Expenses reasonably incurred by the Indemnitee or on behalf of the Indemnitee in connection with such Proceeding if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Indemnitor Entity/ies at which the Indemnitee served in a Management Status; <u>provided</u>, <u>however</u>, that indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which the Indemnitee shall have been adjudged by a court of competent jurisdiction to be liable to the Indemnitor only if (and only to the extent that) the Court of Chancery of the State of Delaware or other court in which such Proceeding shall have been brought or is pending (the "<u>Trial Court</u>") shall determine that despite such adjudication of liability and in light of all circumstances such indemnification may be made.

5.    <u>Mandatory Indemnification in Case of Successful Defense</u>.   Notwithstanding any other provision of this Agreement, to the extent that the Indemnitee is, by reason of the Indemnitee's Management Status, a party to (or a participant in) and is successful, on the merits or otherwise, in defense of any Proceeding (including, without limitation, any Proceeding brought by or in the right of any Indemnitor Entity), the Indemnitor shall indemnify the Indemnitee with respect to, and hold the Indemnitee harmless from and against, all Expenses reasonably incurred by the Indemnitee or on behalf of the Indemnitee in connection therewith.   If the  Indemnitee is not wholly successful in defense of such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Indemnitor shall indemnify the Indemnitee against all Expenses reasonably incurred by the Indemnitee or on behalf of the Indemnitee in connection with each successfully resolved claim, issue or matter.   For purposes of this <u>Section 5</u> and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, on substantive or procedural grounds, shall be deemed to be a successful result as to such claim, issue or matter.

6.    <u>Partial Indemnification</u>.   If   the Indemnitee is entitled under any provision of this Agreement or otherwise to indemnification by the Indemnitor for some or a portion of the

Expenses, liabilities, judgments, penalties, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such liabilities, judgments, penalties, fines and amounts paid in settlement) incurred by the Indemnitee or on behalf of the Indemnitee in connection with a Proceeding or any claim, issue or matter therein, in whole or in part, the Indemnitor shall indemnify the Indemnitee subject to the other terms and conditions of this Agreement.

7.    <u>Indemnification for Additional Expenses Incurred to Secure Recovery or as Witness</u>.

(a)    The Indemnitor shall indemnify the Indemnitee with respect to, and hold the Indemnitee harmless from and against, any and all Expenses and, if requested by the Indemnitee, shall advance on an as-incurred basis (as provided in <u>Section 8</u> of this Agreement) such Expenses to the Indemnitee, which are reasonably incurred by the Indemnitee in connection with any action or proceeding or part thereof brought by the Indemnitee for (i) indemnification or advance payment of Expenses by the Indemnitor under this Agreement, any operating agreement, limited liability company agreement, certificate of incorporation, articles of association or bylaws of any of the Indemnitor Entities or any other agreement or organizational document of any of the Indemnitor Entities as now or hereafter in effect; or (ii) recovery under any director and officer liability, or any other management or professional liability insurance policies maintained by any of the Indemnitor Entities.

(b)    To the extent that the Indemnitee is, by reason of the Indemnitee's Management Status, a witness (or is forced or asked to respond to discovery requests) in any Proceeding to which the Indemnitee is not a party, the Indemnitor shall indemnify the Indemnitee with respect to, and hold the Indemnitee harmless from and against, and the Indemnitor shall advance on an as-incurred basis (as provided in <u>Section 8</u> of this Agreement), all Expenses reasonably incurred by the Indemnitee or on behalf of the Indemnitee in connection therewith.

8.    <u>Advancement of Expenses</u>.  The Indemnitor shall, to the fullest extent permitted by law, advance on a current and as-incurred basis all Expenses incurred by the Indemnitee in connection with any Proceeding in any way connected with, resulting from or relating to the Indemnitee's Management Status.  Such Expenses shall be paid in advance of the final disposition of such Proceeding, without regard to whether the Indemnitee will ultimately be entitled to be indemnified for such Expenses and without regard to whether an Adverse Determination has been or may be made, except as contemplated by the last sentence of <u>Section 9(f)</u> of this Agreement.  Upon submission of a request for advancement of Expenses pursuant to <u>Section 9(c)</u> of this Agreement, the Indemnitee shall be entitled to advancement of Expenses as provided in this <u>Section 8</u>, and such advancement of Expenses shall continue until such time (if any) as there is a final non-appealable judicial determination that the Indemnitee is not entitled to indemnification. The Indemnitee shall repay such amounts advanced if and to the extent that it shall ultimately be determined in a decision by a court of competent jurisdiction from which no appeal can be taken that the Indemnitee is not entitled to be indemnified by the

Indemnitor for such Expenses.  Such repayment obligation shall be unsecured and shall not bear interest.  The Indemnitor shall not impose on the Indemnitee additional conditions to advancement or require from the Indemnitee additional undertakings regarding repayment.

9.    <u>Indemnification Procedures</u>.

    (a)    <u>Notice of Proceeding</u>.  The Indemnitee agrees to notify the Indemnitor promptly upon being served with any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification or advancement of Expenses hereunder.  Any failure by the Indemnitee to notify the Indemnitor will relieve the Indemnitor of its advancement or indemnification obligations under this Agreement only to the extent the Indemnitor can establish that such omission to notify resulted in actual prejudice to it, and the omission to notify the Indemnitor will, in any event, not relieve the Indemnitor from any liability which it may have to indemnify the Indemnitee otherwise than under this Agreement.  If, at the time of receipt of any such notice, the Indemnitor has director and officer liability insurance, or other management or professional liability insurance, policies in effect, the Indemnitor shall promptly notify the relevant insurers in accordance with the procedures and requirements of such policies.  The Indemnitor shall thereafter keep such director and officer, or other management or professional liability, insurers informed of the status of the Proceeding or other claim, as appropriate to secure coverage of the Indemnitee for such claim.

    (b)    <u>Defense; Settlement</u>.  The Indemnitee shall have the sole right and obligation to control the defense or conduct of any claim or Proceeding with respect to the Indemnitee.  The Indemnitor shall not, without the prior written consent of the Indemnitee, which may be provided or withheld in the Indemnitee's sole discretion, effect any settlement of any Proceeding against the Indemnitee or which could have been brought against the Indemnitee or which potentially or actually imposes any cost, liability, exposure or burden on the Indemnitee unless such settlement solely involves the payment of money or performance of any obligation by persons other than the Indemnitee and includes an unconditional release of the Indemnitee from all liability on any matters that are the subject of such Proceeding and an acknowledgment that the Indemnitee denies all wrongdoing in connection with such matters.  The Indemnitor shall not be obligated to indemnify the Indemnitee against amounts paid in settlement of a Proceeding against the Indemnitee if such settlement is effected by the Indemnitee without the Indemnitor's prior written consent, which consent shall not be unreasonably withheld.

    (c)    <u>Request for Advancement; Request for Indemnification</u>.

        (i)    To obtain advancement of Expenses under this Agreement, the Indemnitee shall submit to the Indemnitor a written request therefor, together with such invoices or other supporting information as may be reasonably

requested by the Indemnitor and reasonably available to the Indemnitee, and, only to the extent required by applicable law which cannot be waived, an unsecured written undertaking to repay amounts advanced. The Indemnitor shall make advance payment of Expenses to the Indemnitee no later than twenty (20) days after receipt of the written request for advancement (and each subsequent request for advancement) by the Indemnitee.

(ii)    To obtain indemnification under this Agreement, at any time after submission of a request for advancement pursuant to Section 9(c)(i) of this Agreement, the Indemnitee may submit a written request for indemnification hereunder. The time at which the Indemnitee submits a written request for indemnification shall be determined by the Indemnitee in the Indemnitee's sole discretion. Once the Indemnitee submits such a written request for indemnification (and only at such time that the Indemnitee submits such a written request for indemnification), a Determination shall thereafter be made, as provided in and only to the extent required by Section 9(d) of this Agreement. In no event shall a Determination be made, or required to be made, as a condition to or otherwise in connection with any advancement of Expenses pursuant to Section 8 and Section 9(c)(i) of this Agreement.

(d)    Determination. The Indemnitor agrees that the Indemnitee shall be indemnified under this Agreement and that no Determination shall be required in connection with such indemnification unless specifically required by applicable law which cannot be waived. In no event shall a Determination be required in connection with indemnification for Expenses incurred as a witness pursuant to Section 7 of this Agreement or incurred in connection with any Proceeding or portion thereof with respect to which the Indemnitee has been successful on the merits or otherwise. Any decision that a Determination is required by law in connection with any other indemnification of the Indemnitee, and any such Determination, shall be made within thirty (30) days after receipt of the Indemnitee's written request for indemnification pursuant to Section 9(d)(ii) and such Determination shall be made either (i) by the Disinterested Directors, even though less than a quorum, so long as the Indemnitee does not request that such Determination be made by Independent Counsel, or (ii) if so requested by the Indemnitee, in the Indemnitee's sole discretion, by Independent Counsel in a written opinion to the Indemnitor and the Indemnitee. If a Determination is made that the Indemnitee is entitled to indemnification, payment to the Indemnitee shall be made within twenty (20) days after such Determination. The Indemnitee shall reasonably cooperate with the person, persons or entity making such determination with respect to the Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to the Indemnitee and reasonably necessary to such Determination. Any Expenses incurred by the Indemnitee in so cooperating with the Disinterested Directors or Independent Counsel, as the case

may be, making such determination shall be advanced and indemnified by the Indemnitor (irrespective of the Determination as to the Indemnitee's entitlement to indemnification) and the Indemnitor is liable to indemnify and hold the Indemnitee harmless therefrom.

(e)     Independent Counsel.  In the event the Indemnitee requests that the Determination be made by Independent Counsel pursuant to Section 9(d) of this Agreement, Independent Counsel shall be selected as provided in this Section 9(e). Independent Counsel shall be selected by the Indemnitee (unless the Indemnitee shall request that such selection be made by the Board of Directors, in which event the Board of Directors shall make such selection on behalf of the Indemnitor, subject to the remaining provisions of this Section 9(e)), and the Indemnitee or the Indemnitor, as the case may be, shall give written notice to the other, advising the Indemnitor or the Indemnitee of the identity of Independent Counsel so selected.  The Indemnitor or the Indemnitee, as the case may be, may, within ten (10) days after such written notice of selection shall have been received, deliver to the Indemnitee or the Indemnitor, as the case may be, a written objection to such selection; provided, however, that such objection may be asserted only on the ground that Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 14 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion.  Absent a proper and timely objection, the person so selected shall act as Independent Counsel.  If a written objection is so made and substantiated, Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court of competent jurisdiction has determined that such objection is without merit.  If, within twenty (20) days after submission by the Indemnitee of a written request for indemnification pursuant to Section 9(c)(ii) of this Agreement, no Independent Counsel shall have been selected and not objected to, either the Indemnitor or the Indemnitee may petition a court of competent jurisdiction for resolution of any objection which shall have been made by the Indemnitor or the Indemnitee to the other's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 9(d) of this Agreement.  Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 9(f) of this Agreement, Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).  Any expenses incurred by Independent Counsel shall be borne by the Indemnitor (irrespective of the Determination of the Indemnitee's entitlement to indemnification) and not by the Indemnitee.

(f)     Consequences of Determination; Remedies of the Indemnitee.  The Indemnitor shall be bound by and shall have no right to challenge a Favorable Determination. If an Adverse Determination is made, or if for any other reason the Indemnitor does not make timely indemnification payments or advances of Expenses, the

Indemnitee shall have the right to commence a Proceeding before a court of competent jurisdiction to challenge such Adverse Determination and/or to require the Indemnitor to make such payments or advances (and the Indemnitor shall have the right to defend its position in such Proceeding and to appeal any adverse judgment in such Proceeding). The Indemnitee shall be entitled to be indemnified for all Expenses incurred in connection with such a Proceeding and to have such Expenses advanced by the Indemnitor in accordance with Section 8 of this Agreement. If the Indemnitee fails to challenge an Adverse Determination, or if the Indemnitee challenges an Adverse Determination and such Adverse Determination has been upheld by a final judgment of a court of competent jurisdiction from which no appeal can be taken, then, to the extent and only to the extent required by such Adverse Determination or final judgment, the Indemnitor shall not be obligated to indemnify or advance Expenses to the Indemnitee under this Agreement.

(g)     Presumptions; Burden and Standard of Proof. The parties intend and agree that in connection with any Determination with respect to the Indemnitee's entitlement to indemnification hereunder by any person, including a court:

    (i)     It will be presumed that the Indemnitee is entitled to indemnification under this Agreement, and the Indemnitor, or any other person or entity challenging such right, will have the burden of proof to overcome that presumption in connection with the making by any person, persons or entity of any determination contrary to that presumption;

    (ii)     The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Indemnitee did not act in good faith and in a manner which the Indemnitee reasonably believed to be in or not opposed to the best interests of the Indemnitor Entities, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the Indemnitee's conduct was unlawful;

    (iii)     The Indemnitee will be deemed to have acted in good faith if the Indemnitee's action is based on the records or books of account of the Indemnitor Entities, including financial statements, or on information supplied to the Indemnitee by the Board of Directors, or any committee of the Board of Directors or any officers or employees of the Indemnitor Entities, or on the advice of legal counsel for the Indemnitor Entities or on information or records given in reports made to the Indemnitor Entities by an independent certified public accountant or by an appraiser or other expert or advisor selected by the Indemnitor Entities; and

    (iv)     The knowledge and/or actions, or failure to act, of any director, officer, manager, member of the board of managers, agent or employee of any of the Indemnitor Entities will not be imputed to the Indemnitee in a manner

that limits or otherwise adversely affects the Indemnitee's rights hereunder.

The provisions of this <u>Section 9(g)</u> shall not be deemed to be exclusive or to limit in any way the other circumstances in which the Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement.

10.    <u>Insurance; Subrogation; Other Rights of Recovery, etc.</u>

(a)    The Indemnitor shall use its reasonable best efforts to purchase and maintain a policy or policies of insurance with reputable insurance companies with A.M. Best ratings of "A" or better, providing the Indemnitee with coverage for any liability asserted against, and incurred by, the Indemnitee or on the Indemnitee's behalf by reason of the Indemnitee's Management Status, or arising out of the Indemnitee's status as such, whether or not the Indemnitor would have the power to indemnify the Indemnitee against such liability.  Such insurance policies shall have coverage terms and policy limits at least as favorable to the Indemnitee as the insurance coverage provided to any other director, officer, manager or member of the board of managers of the Indemnitor.  The Indemnitor shall continue to provide such insurance coverage to the Indemnitee for a period of at least six (6) years after the Indemnitee ceases to serve as a director, officer or member of the board of managers of any of the Indemnitor Entities.

(b)    In the event of any payment by the Indemnitor under this Agreement, the Indemnitor shall be subrogated to the extent of such payment to all of the rights of recovery of the Indemnitee against any other party, and the Indemnitee hereby agrees, as a condition to obtaining any advancement or indemnification from the Indemnitor, to assign to the Indemnitor all of the Indemnitee's rights to obtain from such other party such amounts to the extent that they have been paid by the Indemnitor to or for the benefit of the Indemnitee as advancement or indemnification under this Agreement and are adequate to indemnify the Indemnitee with respect to the costs, Expenses or other items to the full extent that the Indemnitee is entitled to indemnification or other payment hereunder; and the Indemnitee will (upon request by the Indemnitor) execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Indemnitor to bring suit or enforce such rights.

(c)    The Indemnitor shall not be liable to pay or advance to the Indemnitee any amounts otherwise indemnifiable under this Agreement or under any other indemnification agreement if and to the extent that the Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise; <u>provided</u>, <u>however</u>, that the Indemnitor hereby agrees that it is the indemnitor of first resort under this Agreement and under any other indemnification agreement or undertaking (i.e., its obligation to the Indemnitee under this Agreement or any other agreement or undertaking to provide advancement and/or indemnification to the Indemnitee) are primary, and any

obligation of any insurer providing insurance coverage under any personal umbrella liability insurance policy (or other applicable insurance policy, other than insurance policies maintained by the Indemnitor), to provide advancement, indemnification, or insurance coverage for the same Expenses, liabilities, judgments, penalties, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, liabilities, judgments, penalties, fines and amounts paid in settlement) incurred by the Indemnitee are secondary.

(d)     Except for the rights set forth in <u>Section 10(c)</u> of this Agreement, the rights to indemnification and advancement of Expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which the Indemnitee may at any time, whenever conferred or arising, be entitled under applicable law, under the operating agreement or limited liability company agreement, bylaws or under any other organizational document, agreement, vote of members or resolution of directors or board of managers of any Indemnitor Entity, or otherwise.  The Indemnitee's rights under this Agreement are present contractual rights that fully vest upon the Indemnitee's first service as a director, officer or member of the board of managers of any of the Indemnitor Entities.  The Parties hereby agree that <u>Section 10(c)</u> of this Agreement shall be deemed exclusive and shall be deemed to modify, amend and clarify any other inconsistent right to indemnification or advancement provided to the Indemnitee under any other contract, agreement or other document with any Indemnitor Entity.

(e)     No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of the Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in the Indemnitee's Management Status prior to such amendment, alteration or repeal.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

11.     <u>Employment Rights; Successors; Third Party Beneficiaries.</u>

(a)     This Agreement shall not be deemed an employment contract between any Indemnitor Entity and the Indemnitee.  This Agreement shall continue in force as provided above after the Indemnitee has ceased to serve as a director, officer or member of the board of managers of any of the Indemnitor Entities or in any other Management Status.

(b)     This Agreement shall be binding upon the Indemnitor and its successors and assigns and shall inure to the benefit of the Indemnitee and the Indemnitee's heirs, executors and administrators.

12.     <u>Severability</u>.  If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever:  (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any Section of this Agreement containing any such provision

held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; (b) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

13.    <u>Exception to Right of Indemnification or Advancement of Expenses</u>.  Notwithstanding any other provision of this Agreement and except as provided in <u>Section 7(a)</u> of this Agreement or as may otherwise be agreed by the Indemnitor, the Indemnitee shall not be entitled to indemnification or advancement of Expenses under this Agreement with respect to any Proceeding brought by the Indemnitee (other than a Proceeding by the Indemnitee (i) by way of defense or counterclaim, (ii) to enforce the Indemnitee's rights under this Agreement or (iii) to enforce any other rights of the Indemnitee to indemnification, advancement or contribution from the Indemnitor Entities under any other contract, operating agreement, limited liability company agreement, articles of association, bylaws or under statute or other law, including any rights under the Delaware General Corporation Law) unless the bringing of such Proceeding or making of such claim shall have been approved by the Board of Directors.

14.    <u>Definitions</u>.  For purposes of this Agreement:

(a)    "<u>Board of Directors</u>" means the board of directors or board of managers of the applicable Indemnitor Entity.

(b)    "<u>Determination</u>" means a determination that either (x) there is a reasonable basis for the conclusion that indemnification of the  Indemnitee is proper in the circumstances because the Indemnitee met a particular standard of conduct (a "<u>Favorable Determination</u>") or (y) there is no reasonable basis for the conclusion that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee met a particular standard of conduct (an "<u>Adverse Determination</u>"). An Adverse Determination shall include the decision that a Determination was required in connection with indemnification and the decision as to the applicable standard of conduct.

(c)    "<u>Disinterested Director</u>" means any director or member of the board of managers (or equivalent position) of the applicable Indemnitor Entity who is not and was not a party to the Proceeding in respect of which indemnification is sought by the Indemnitee.

(d)    "<u>Expenses</u>" shall mean all reasonable direct and indirect costs, fees and expenses of any type or nature whatsoever and shall specifically include, without limitation, all reasonable attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other

disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness, in, or otherwise participating in, a Proceeding, including, but not limited to, the premium for appeal bonds, attachment bonds or similar bonds and all interest, assessments and other charges paid or payable in connection with or in respect of any such Expenses, and shall also specifically include, without limitation, all reasonable attorneys' fees and all other expenses incurred by or on behalf of Indemnitee in connection with preparing and submitting any requests or statements for indemnification, advancement, contribution or any other right provided by this Agreement.  Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amounts of judgments or fines against Indemnitee.

(e)    "Independent Counsel" means, at any time, any law firm, or a member of a law firm, that (a) is experienced in matters of corporation and alternative entity law and (b) is not, at such time, or has not been in the five years prior to such time, retained to represent: (i) any Indemnitor Entity or the Indemnitee in any matter material to either such party (other than with respect to matters concerning the Indemnitee under this Agreement, or of other indemnities under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder.  Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Indemnitor or the Indemnitee in an action to determine the Indemnitee's rights under this Agreement.  The Indemnitor agrees to pay the reasonable fees and expenses of Independent Counsel referred to above and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto and to be liable therefor.

(f)    "Indemnitor Entities" means the Indemnitor and its past, present and future direct or indirect subsidiaries and controlled affiliates.

(g)    "Management Status" means the status of a person by reason of such person's past, present or future service as a director, officer or member of the board of managers of any Indemnitor Entity (including, without limitation, one who serves at the specific request of any of the Indemnitor Entities as a director, officer or member of the board of managers, employee, fiduciary or agent of another entity).

(h)    "Proceeding" means any actual, threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened, pending or completed proceeding, whether brought by or in the right of any Indemnitor Entity or otherwise and whether civil, criminal, administrative or investigative in nature, in which the Indemnitee was, is, may be or will be involved as a party, witness or otherwise, by reason of the Indemnitee's Management Status or by reason of any action taken by the Indemnitee or of any inaction on the Indemnitee's part while

acting as director, officer, manager or member of the board of managers of any Indemnitor Entity (in each case whether or not he is acting or serving in any such capacity or has such status at the time any liability or expense is incurred for which indemnification or advancement of Expenses can be provided under this Agreement).

15.     Construction.  Whenever required by the context, as used in this Agreement the singular number shall include the plural, the plural shall include the singular, and all words herein in any gender shall be deemed to include (as appropriate) the masculine, feminine and neuter genders.

16.     Reliance; Integration.  The Indemnitor expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce the Indemnitee to serve as a director, officer or member of the board of managers of any of the Indemnitor Entities, and the Indemnitor acknowledges that the Indemnitee is relying upon this Agreement in serving as a director, officer or member of the board of managers of any of the Indemnitor Entities.

17.     Modification and Waiver.   No supplement, modification or amendment of this Agreement shall be binding unless executed in a writing identified as such by both of the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

18.     Notice Mechanics.  All notices, requests, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if (i) delivered by hand and receipted for by the party to whom said notice or other communication shall have been direct, or (ii) mailed by certified or registered mail with postage prepaid, on the third business day after the date on which it is so mailed:

(a)    If to Indemnitee, to:

>   Dan Gillett
>   1312 Brians Meadow Cove
>   Austin, Texas 78747

>   with a copy to:
>   N/A

(b)    If to the Indemnitor, to:

>   MDC Energy LLC
>   280 E. 96th Street, Suite 210
>   Indianapolis, Indiana 46240
>   Attention: John Echols

>   with a copy to (which shall not constitute notice):

>   Vinson & Elkins L.L.P.
>   666 5th Avenue, 25th Floor
>   New York, New York
>   Attention: David Meyer

or to such other address as may have been furnished (in the manner prescribed above) as follows:  (a) in the case of a change in address for notices to the Indemnitee, furnished by the Indemnitee to the Indemnitor and (b) in the case of a change in address for notices to the Indemnitor, furnished by the Indemnitor to the Indemnitee.

19.    <u>Contribution</u>.  If the indemnification provided for in this Agreement is unavailable to the Indemnitee for any reason whatsoever, the Indemnitor, in lieu of indemnifying the Indemnitee, shall contribute to the amount incurred by the Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for reasonably incurred Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Indemnitor and the Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding; and/or (ii) the relative fault of the Indemnitor (and its other directors, officers, employees and agents) and the Indemnitee in connection with such event(s) and/or transaction(s).

20.    <u>Governing Law; Submission to Jurisdiction; Appointment of Agent for Service of Process</u>.  This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules.  The Indemnitor and the Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Trial Court, and not in any other state or federal court in the United States of America or any court in any other

country, (ii) consent to submit to the exclusive jurisdiction of the Trial Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in the Trial Court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Trial Court has been brought in an improper or otherwise inconvenient forum.

21.    <u>Headings</u>.    The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

22.    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement.

23.    <u>Confidentiality</u>.    Indemnitee acknowledges that, in the course of Indemnitee's service as a director, officer or member of the Board of Directors of one or more of the Indemnitor Entities, Indemnitee will be provided with, and will have access to, Confidential Information (as defined below) of the Indemnitor Entities and of third parties who have supplied such information to the Indemnitor Entities, as applicable.    In consideration of Indemnitee's receipt and access to such Confidential Information and in exchange for other valuable consideration provided hereunder, Indemnitee shall comply with this <u>Section 23</u>.

    (a)    Both while Indemnitee serves as a director, officer or member of the Board of Directors of any of the Indemnitor Entities and thereafter, except as expressly permitted by this Agreement or by directive of the Board of Directors, Indemnitee shall not disclose any Confidential Information to any person or entity and shall not use any Confidential Information except for the benefit of the Indemnitor Entities.    Indemnitee shall follow all policies and protocols of the Indemnitor Entities regarding the physical security of all documents and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored).    The covenants of Indemnitee in this <u>Section 23(a)</u> shall apply to all Confidential Information, whether now known or later to become known to Indemnitee while serving as a director, officer or member of the Board of Directors of any of the Indemnitor Entities.

    (b)    Notwithstanding anything in <u>Section 23(a)</u> to the contrary, Indemnitee may make the following disclosures and uses of Confidential Information:

        (i)    disclosures to employees of the Indemnitor Entities or other members of the Board of Directors who have a need to know the information in connection with the business of the Indemnitor Entities;

        (ii)    disclosures to customers and suppliers when, in the reasonable and good faith belief of Indemnitee, such disclosure is in connection with

Indemnitee's service on the Board of Directors and is in the best interests of the Indemnitor Entities;

(iii)    disclosures and uses that are approved in writing by the Board of Directors;

(iv)    disclosures to a person or entity that has (x) been retained by the Indemnitor Entities to provide services to the Indemnitor Entities and (y) agreed in writing to abide by the terms of a confidentiality agreement; or

(v)    disclosures for the purpose of complying with any applicable laws or regulatory requirements or that Indemnitee is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by law; provided, however, that, prior to any such disclosure, Indemnitee shall, to the extent legally permissible and practicable: (A) provide the Board of Directors with prompt notice of such requirements so that the Board of Directors may, at its expense, seek a protective order or other appropriate remedy or waive compliance with the terms of this Section 23; (B) consult with the Board of Directors on the advisability of taking steps to resist or narrow such disclosure; and (C) cooperate with the Board of Directors (at the reasonable cost and expense of the Indemnitor Entities) in any attempt it may make to obtain a protective order or other appropriate remedy or assurance that confidential treatment will be afforded the Confidential Information; and in the event such protective order or other remedy is not obtained, Indemnitee agrees (1) to furnish only that portion of the Confidential Information that is required to be furnished, as advised by written opinion of counsel to Indemnitee, if any, and (2) to exercise (at the reasonable cost and expense of the Indemnitor Entities) all reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information.

(c)    Upon the expiration of service as a director, officer or member of the Board of Directors of one or more of the Indemnitor Entities and at any other time upon request of any of the Indemnitor Entities, Indemnitee shall promptly surrender and deliver to the Indemnitor Entities all documents (including electronically stored information) and all copies thereof and all other materials of any nature containing or pertaining to all Confidential Information in Indemnitee's possession, custody and control and shall not retain any such document or other materials.  Within 10 days of any such request, Indemnitee shall certify to the Indemnitor Entities in writing that all such documents and materials have been returned to the Indemnitor Entities.

(d)    All non-public information, designs, ideas, concepts, improvements, product developments, discoveries and inventions, whether patentable or not, that are conceived, made, developed or acquired by or disclosed to Indemnitee, individually or in conjunction with others, during the period that Indemnitee

serves as a director, officer or member of the Board of Directors of one or more of the Indemnitor Entities or is affiliated with any of the Indemnitor Entities (whether during business hours or otherwise and whether on the premises of any of the Indemnitor Entities or otherwise) that relate to any of the Indemnitor Entities' businesses or properties, products or services is defined as "Confidential Information." Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voice mail, electronic databases, maps, drawings, architectural renditions, models and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions and other similar forms of expression are and shall be the sole and exclusive property of the Indemnitor Entities and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement. Confidential Information shall not include any information that is or becomes generally available to the public other than as a result of a disclosure or wrongful act of Indemnitee or any of Indemnitee's agents.

*[Remainder of Page Intentionally Blank]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

**INDEMNITOR:**                     **MDC ENERGY LLC**

By:      MTE Holdings LLC, its sole member

By:      Riverstone Credit Management, LLC, a Delaware limited liability company, as Administrative Agent

(as attorney-in-fact pursuant to the Collateral Agreement)

By: _____
Name: _____
Title: _____

**INDEMNITEE:**                     _____

**Dan Gillett**

# INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("Agreement") is made and entered into as of this 21st day of October, 2019, by and between MDC Energy LLC, a Delaware limited liability company (the "Indemnitor") and Steve Pully (the "Indemnitee").

WHEREAS, in light of the litigation costs and risks to directors, officers and/or members of boards of managers resulting from their service to companies, it is reasonable, prudent and necessary for the Indemnitor to indemnify and advance expenses on behalf of its and their directors, officers and members of such boards of managers so that they will serve or continue to serve one or more of the Indemnitor Entities free from undue concern regarding such risks;

WHEREAS, the Indemnitor has requested that the Indemnitee serve or continue to serve as a director, officer or member of the board of managers of one or more of the Indemnitor Entities and may have requested or may in the future request that the Indemnitee serve as a director, officer or member of the board of managers of another entity or in another capacity; and

WHEREAS, the Indemnitee is willing to serve as a director, officer or member of the board of managers of one or more of the Indemnitor Entities on the condition that the Indemnitee be indemnified by the Indemnitor as provided for herein.

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the Indemnitor and the Indemnitee do hereby covenant and agree as follows:

1.  Services by the Indemnitee.  The Indemnitee agrees to serve as a member, director, officer or member of the board of managers of the Indemnitor.  The Indemnitee may at any time and for any reason resign from such position (subject to any contractual obligation under any other agreement or any obligation imposed by operation of law).

2.  Indemnification - General.  On the terms and subject to the conditions of this Agreement, the Indemnitor shall indemnify the Indemnitee with respect to, and hold the Indemnitee harmless from and against, all losses, liabilities, judgments, fines, penalties, costs, Expenses (as hereinafter defined) and other amounts that the Indemnitee reasonably incurs and that result from, arise in connection with or are by reason of the Indemnitee's Management Status (as hereinafter defined) and shall advance Expenses to the Indemnitee, as provided herein.  The obligation of the Indemnitor under this Agreement shall, subject to the other terms and conditions of this Agreement, (a) continue after such time as Indemnitee ceases to serve as a director, officer or member of the board of managers of any of the Indemnitor Entities or in any other Management Status; and (b) include, without limitation, claims for monetary damages against the Indemnitee in respect of any actual or alleged liability or other loss of the Indemnitee.

3.  Proceedings Other Than Proceedings by or in the Right of the Company.  If in connection with or by reason of the Indemnitee's Management Status the Indemnitee was, is, or is threatened to be made, a party to or a participant in any Proceeding (as hereinafter defined) other than a Proceeding by or in the right of any Indemnitor Entity to procure a judgment in its favor, the Indemnitor shall indemnify the Indemnitee with respect to, and

US 6635599

hold the Indemnitee harmless from and against, all Expenses, liabilities, judgments, penalties, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such liabilities, judgments, penalties, fines and amounts paid in settlement) reasonably incurred by the Indemnitee or on behalf of the Indemnitee in connection with such Proceeding or any claim, issue or matter therein, if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Indemnitor Entity/ies at which the Indemnitee served in a Management Status and, with respect to any criminal Proceeding, had no reasonable cause to believe the Indemnitee's conduct was unlawful.

4.    <u>Proceedings by or in the Right of the Indemnitor</u>.  If by reason of the Indemnitee's Management Status the Indemnitee was, is, or is threatened to be made, a party to or a participant in any Proceeding by or in the right of any Indemnitor Entity to procure a judgment in its favor, the Indemnitor shall indemnify the Indemnitee with respect to, and hold the Indemnitee harmless from and against, all Expenses reasonably incurred by the Indemnitee or on behalf of the Indemnitee in connection with such Proceeding if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Indemnitor Entity/ies at which the Indemnitee served in a Management Status; <u>provided</u>, <u>however</u>, that indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which the Indemnitee shall have been adjudged by a court of competent jurisdiction to be liable to the Indemnitor only if (and only to the extent that) the Court of Chancery of the State of Delaware or other court in which such Proceeding shall have been brought or is pending (the "<u>Trial Court</u>") shall determine that despite such adjudication of liability and in light of all circumstances such indemnification may be made.

5.    <u>Mandatory Indemnification in Case of Successful Defense</u>.  Notwithstanding any other provision of this Agreement, to the extent that the Indemnitee is, by reason of the Indemnitee's Management Status, a party to (or a participant in) and is successful, on the merits or otherwise, in defense of any Proceeding (including, without limitation, any Proceeding brought by or in the right of any Indemnitor Entity), the Indemnitor shall indemnify the Indemnitee with respect to, and hold the Indemnitee harmless from and against, all Expenses reasonably incurred by the Indemnitee or on behalf of the Indemnitee in connection therewith.  If the  Indemnitee is not wholly successful in defense of such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Indemnitor shall indemnify the Indemnitee against all Expenses reasonably incurred by the Indemnitee or on behalf of the Indemnitee in connection with each successfully resolved claim, issue or matter.  For purposes of this <u>Section 5</u> and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, on substantive or procedural grounds, shall be deemed to be a successful result as to such claim, issue or matter.

6.    <u>Partial Indemnification</u>.  If  the Indemnitee is entitled under any provision of this Agreement or otherwise to indemnification by the Indemnitor for some or a portion of the

Expenses, liabilities, judgments, penalties, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such liabilities, judgments, penalties, fines and amounts paid in settlement) incurred by the Indemnitee or on behalf of the Indemnitee in connection with a Proceeding or any claim, issue or matter therein, in whole or in part, the Indemnitor shall indemnify the Indemnitee subject to the other terms and conditions of this Agreement.

7.    Indemnification for Additional Expenses Incurred to Secure Recovery or as Witness.

(a)    The Indemnitor shall indemnify the Indemnitee with respect to, and hold the Indemnitee harmless from and against, any and all Expenses and, if requested by the Indemnitee, shall advance on an as-incurred basis (as provided in Section 8 of this Agreement) such Expenses to the Indemnitee, which are reasonably incurred by the Indemnitee in connection with any action or proceeding or part thereof brought by the Indemnitee for (i) indemnification or advance payment of Expenses by the Indemnitor under this Agreement, any operating agreement, limited liability company agreement, certificate of incorporation, articles of association or bylaws of any of the Indemnitor Entities or any other agreement or organizational document of any of the Indemnitor Entities as now or hereafter in effect; or (ii) recovery under any director and officer liability, or any other management or professional liability insurance policies maintained by any of the Indemnitor Entities.

(b)    To the extent that the Indemnitee is, by reason of the Indemnitee's Management Status, a witness (or is forced or asked to respond to discovery requests) in any Proceeding to which the Indemnitee is not a party, the Indemnitor shall indemnify the Indemnitee with respect to, and hold the Indemnitee harmless from and against, and the Indemnitor shall advance on an as-incurred basis (as provided in Section 8 of this Agreement), all Expenses reasonably incurred by the Indemnitee or on behalf of the Indemnitee in connection therewith.

8.    Advancement of Expenses.  The Indemnitor shall, to the fullest extent permitted by law, advance on a current and as-incurred basis all Expenses incurred by the Indemnitee in connection with any Proceeding in any way connected with, resulting from or relating to the Indemnitee's Management Status.  Such Expenses shall be paid in advance of the final disposition of such Proceeding, without regard to whether the Indemnitee will ultimately be entitled to be indemnified for such Expenses and without regard to whether an Adverse Determination has been or may be made, except as contemplated by the last sentence of Section 9(f) of this Agreement.  Upon submission of a request for advancement of Expenses pursuant to Section 9(c) of this Agreement, the Indemnitee shall be entitled to advancement of Expenses as provided in this Section 8, and such advancement of Expenses shall continue until such time (if any) as there is a final non-appealable judicial determination that the Indemnitee is not entitled to indemnification. The Indemnitee shall repay such amounts advanced if and to the extent that it shall ultimately be determined in a decision by a court of competent jurisdiction from which no appeal can be taken that the Indemnitee is not entitled to be indemnified by the

Indemnitor for such Expenses.  Such repayment obligation shall be unsecured and shall not bear interest.  The Indemnitor shall not impose on the Indemnitee additional conditions to advancement or require from the Indemnitee additional undertakings regarding repayment.

9.    Indemnification Procedures.

(a)    Notice of Proceeding.  The Indemnitee agrees to notify the Indemnitor promptly upon being served with any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification or advancement of Expenses hereunder.  Any failure by the Indemnitee to notify the Indemnitor will relieve the Indemnitor of its advancement or indemnification obligations under this Agreement only to the extent the Indemnitor can establish that such omission to notify resulted in actual prejudice to it, and the omission to notify the Indemnitor will, in any event, not relieve the Indemnitor from any liability which it may have to indemnify the Indemnitee otherwise than under this Agreement.  If, at the time of receipt of any such notice, the Indemnitor has director and officer liability insurance, or other management or professional liability insurance, policies in effect, the Indemnitor shall promptly notify the relevant insurers in accordance with the procedures and requirements of such policies.  The Indemnitor shall thereafter keep such director and officer, or other management or professional liability, insurers informed of the status of the Proceeding or other claim, as appropriate to secure coverage of the Indemnitee for such claim.

(b)    Defense; Settlement.  The Indemnitee shall have the sole right and obligation to control the defense or conduct of any claim or Proceeding with respect to the Indemnitee.  The Indemnitor shall not, without the prior written consent of the Indemnitee, which may be provided or withheld in the Indemnitee's sole discretion, effect any settlement of any Proceeding against the Indemnitee or which could have been brought against the Indemnitee or which potentially or actually imposes any cost, liability, exposure or burden on the Indemnitee unless such settlement solely involves the payment of money or performance of any obligation by persons other than the Indemnitee and includes an unconditional release of the Indemnitee from all liability on any matters that are the subject of such Proceeding and an acknowledgment that the Indemnitee denies all wrongdoing in connection with such matters.  The Indemnitor shall not be obligated to indemnify the Indemnitee against amounts paid in settlement of a Proceeding against the Indemnitee if such settlement is effected by the Indemnitee without the Indemnitor's prior written consent, which consent shall not be unreasonably withheld.

(c)    Request for Advancement; Request for Indemnification.

(i)    To obtain advancement of Expenses under this Agreement, the Indemnitee shall submit to the Indemnitor a written request therefor, together with such invoices or other supporting information as may be reasonably

- 4 -

requested by the Indemnitor and reasonably available to the Indemnitee, and, only to the extent required by applicable law which cannot be waived, an unsecured written undertaking to repay amounts advanced. The Indemnitor shall make advance payment of Expenses to the Indemnitee no later than twenty (20) days after receipt of the written request for advancement (and each subsequent request for advancement) by the Indemnitee.

(ii)    To obtain indemnification under this Agreement, at any time after submission of a request for advancement pursuant to Section 9(c)(i) of this Agreement, the Indemnitee may submit a written request for indemnification hereunder. The time at which the Indemnitee submits a written request for indemnification shall be determined by the Indemnitee in the Indemnitee's sole discretion. Once the Indemnitee submits such a written request for indemnification (and only at such time that the Indemnitee submits such a written request for indemnification), a Determination shall thereafter be made, as provided in and only to the extent required by Section 9(d) of this Agreement. In no event shall a Determination be made, or required to be made, as a condition to or otherwise in connection with any advancement of Expenses pursuant to Section 8 and Section 9(c)(i) of this Agreement.

(d)    Determination. The Indemnitor agrees that the Indemnitee shall be indemnified under this Agreement and that no Determination shall be required in connection with such indemnification unless specifically required by applicable law which cannot be waived. In no event shall a Determination be required in connection with indemnification for Expenses incurred as a witness pursuant to Section 7 of this Agreement or incurred in connection with any Proceeding or portion thereof with respect to which the Indemnitee has been successful on the merits or otherwise. Any decision that a Determination is required by law in connection with any other indemnification of the Indemnitee, and any such Determination, shall be made within thirty (30) days after receipt of the Indemnitee's written request for indemnification pursuant to Section 9(d)(ii) and such Determination shall be made either (i) by the Disinterested Directors, even though less than a quorum, so long as the Indemnitee does not request that such Determination be made by Independent Counsel, or (ii) if so requested by the Indemnitee, in the Indemnitee's sole discretion, by Independent Counsel in a written opinion to the Indemnitor and the Indemnitee. If a Determination is made that the Indemnitee is entitled to indemnification, payment to the Indemnitee shall be made within twenty (20) days after such Determination. The Indemnitee shall reasonably cooperate with the person, persons or entity making such determination with respect to the Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to the Indemnitee and reasonably necessary to such Determination. Any Expenses incurred by the Indemnitee in so cooperating with the Disinterested Directors or Independent Counsel, as the case

may be, making such determination shall be advanced and indemnified by the Indemnitor (irrespective of the Determination as to the Indemnitee's entitlement to indemnification) and the Indemnitor is liable to indemnify and hold the Indemnitee harmless therefrom.

(e)     <u>Independent Counsel</u>.  In the event the Indemnitee requests that the Determination be made by Independent Counsel pursuant to <u>Section 9(d)</u> of this Agreement, Independent Counsel shall be selected as provided in this <u>Section 9(e)</u>. Independent Counsel shall be selected by the Indemnitee (unless the Indemnitee shall request that such selection be made by the Board of Directors, in which event the Board of Directors shall make such selection on behalf of the Indemnitor, subject to the remaining provisions of this <u>Section 9(e)</u>), and the Indemnitee or the Indemnitor, as the case may be, shall give written notice to the other, advising the Indemnitor or the Indemnitee of the identity of Independent Counsel so selected.  The Indemnitor or the Indemnitee, as the case may be, may, within ten (10) days after such written notice of selection shall have been received, deliver to the Indemnitee or the Indemnitor, as the case may be, a written objection to such selection; <u>provided</u>, <u>however</u>, that such objection may be asserted only on the ground that Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in <u>Section 14</u> of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion.  Absent a proper and timely objection, the person so selected shall act as Independent Counsel.  If a written objection is so made and substantiated, Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court of competent jurisdiction has determined that such objection is without merit.  If, within twenty (20) days after submission by the Indemnitee of a written request for indemnification pursuant to <u>Section 9(c)(ii)</u> of this Agreement, no Independent Counsel shall have been selected and not objected to, either the Indemnitor or the Indemnitee may petition a court of competent jurisdiction for resolution of any objection which shall have been made by the Indemnitor or the Indemnitee to the other's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under <u>Section 9(d)</u> of this Agreement.   Upon the due commencement of any judicial proceeding or arbitration pursuant to <u>Section 9(f)</u> of this Agreement, Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).   Any expenses incurred by Independent Counsel shall be borne by the Indemnitor (irrespective of the Determination of the Indemnitee's entitlement to indemnification) and not by the Indemnitee.

(f)     <u>Consequences of Determination; Remedies of the Indemnitee</u>.  The Indemnitor shall be bound by and shall have no right to challenge a Favorable Determination. If an Adverse Determination is made, or if for any other reason the Indemnitor does not make timely indemnification payments or advances of Expenses, the

Indemnitee shall have the right to commence a Proceeding before a court of competent jurisdiction to challenge such Adverse Determination and/or to require the Indemnitor to make such payments or advances (and the Indemnitor shall have the right to defend its position in such Proceeding and to appeal any adverse judgment in such Proceeding).  The Indemnitee shall be entitled to be indemnified for all Expenses incurred in connection with such a Proceeding and to have such Expenses advanced by the Indemnitor in accordance with <u>Section 8</u> of this Agreement.  If the Indemnitee fails to challenge an Adverse Determination, or if the Indemnitee challenges an Adverse Determination and such Adverse Determination has been upheld by a final judgment of a court of competent jurisdiction from which no appeal can be taken, then, to the extent and only to the extent required by such Adverse Determination or final judgment, the Indemnitor shall not be obligated to indemnify or advance Expenses to the Indemnitee under this Agreement.

(g)    <u>Presumptions; Burden and Standard of Proof</u>.  The parties intend and agree that in connection with any Determination with respect to the Indemnitee's entitlement to indemnification hereunder by any person, including a court:

(i)    It will be presumed that the Indemnitee is entitled to indemnification under this Agreement, and the Indemnitor, or any other person or entity challenging such right, will have the burden of proof to overcome that presumption in connection with the making by any person, persons or entity of any determination contrary to that presumption;

(ii)    The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Indemnitee did not act in good faith and in a manner which the Indemnitee reasonably believed to be in or not opposed to the best interests of the Indemnitor Entities, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the Indemnitee's conduct was unlawful;

(iii)    The Indemnitee will be deemed to have acted in good faith if the Indemnitee's action is based on the records or books of account of the Indemnitor Entities, including financial statements, or on information supplied to the Indemnitee by the Board of Directors, or any committee of the Board of Directors or any officers or employees of the Indemnitor Entities, or on the advice of legal counsel for the Indemnitor Entities or on information or records given in reports made to the Indemnitor Entities by an independent certified public accountant or by an appraiser or other expert or advisor selected by the Indemnitor Entities; and

(iv)    The knowledge and/or actions, or failure to act, of any director, officer, manager, member of the board of managers, agent or employee of any of the Indemnitor Entities will not be imputed to the Indemnitee in a manner

that limits or otherwise adversely affects the Indemnitee's rights hereunder.

The provisions of this <u>Section 9(g)</u> shall not be deemed to be exclusive or to limit in any way the other circumstances in which the Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement.

10.    <u>Insurance; Subrogation; Other Rights of Recovery, etc.</u>

(a)    The Indemnitor shall use its reasonable best efforts to purchase and maintain a policy or policies of insurance with reputable insurance companies with A.M. Best ratings of "A" or better, providing the Indemnitee with coverage for any liability asserted against, and incurred by, the Indemnitee or on the Indemnitee's behalf by reason of the Indemnitee's Management Status, or arising out of the Indemnitee's status as such, whether or not the Indemnitor would have the power to indemnify the Indemnitee against such liability.  Such insurance policies shall have coverage terms and policy limits at least as favorable to the Indemnitee as the insurance coverage provided to any other director, officer, manager or member of the board of managers of the Indemnitor.  The Indemnitor shall continue to provide such insurance coverage to the Indemnitee for a period of at least six (6) years after the Indemnitee ceases to serve as a director, officer or member of the board of managers of any of the Indemnitor Entities.

(b)    In the event of any payment by the Indemnitor under this Agreement, the Indemnitor shall be subrogated to the extent of such payment to all of the rights of recovery of the Indemnitee against any other party, and the Indemnitee hereby agrees, as a condition to obtaining any advancement or indemnification from the Indemnitor, to assign to the Indemnitor all of the Indemnitee's rights to obtain from such other party such amounts to the extent that they have been paid by the Indemnitor to or for the benefit of the Indemnitee as advancement or indemnification under this Agreement and are adequate to indemnify the Indemnitee with respect to the costs, Expenses or other items to the full extent that the Indemnitee is entitled to indemnification or other payment hereunder; and the Indemnitee will (upon request by the Indemnitor) execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Indemnitor to bring suit or enforce such rights.

(c)    The Indemnitor shall not be liable to pay or advance to the Indemnitee any amounts otherwise indemnifiable under this Agreement or under any other indemnification agreement if and to the extent that the Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise; <u>provided</u>, <u>however</u>, that the Indemnitor hereby agrees that it is the indemnitor of first resort under this Agreement and under any other indemnification agreement or undertaking (i.e., its obligation to the Indemnitee under this Agreement or any other agreement or undertaking to provide advancement and/or indemnification to the Indemnitee) are primary, and any

obligation of any insurer providing insurance coverage under any personal umbrella liability insurance policy (or other applicable insurance policy, other than insurance policies maintained by the Indemnitor), to provide advancement, indemnification, or insurance coverage for the same Expenses, liabilities, judgments, penalties, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, liabilities, judgments, penalties, fines and amounts paid in settlement) incurred by the Indemnitee are secondary.

(d)     Except for the rights set forth in <u>Section 10(c)</u> of this Agreement, the rights to indemnification and advancement of Expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which the Indemnitee may at any time, whenever conferred or arising, be entitled under applicable law, under the operating agreement or limited liability company agreement, bylaws or under any other organizational document, agreement, vote of members or resolution of directors or board of managers of any Indemnitor Entity, or otherwise.  The Indemnitee's rights under this Agreement are present contractual rights that fully vest upon the Indemnitee's first service as a director, officer or member of the board of managers of any of the Indemnitor Entities.  The Parties hereby agree that <u>Section 10(c)</u> of this Agreement shall be deemed exclusive and shall be deemed to modify, amend and clarify any other inconsistent right to indemnification or advancement provided to the Indemnitee under any other contract, agreement or other document with any Indemnitor Entity.

(e)     No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of the Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in the Indemnitee's Management Status prior to such amendment, alteration or repeal.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

11.    <u>Employment Rights; Successors; Third Party Beneficiaries.</u>

(a)     This Agreement shall not be deemed an employment contract between any Indemnitor Entity and the Indemnitee.  This Agreement shall continue in force as provided above after the Indemnitee has ceased to serve as a director, officer or member of the board of managers of any of the Indemnitor Entities or in any other Management Status.

(b)     This Agreement shall be binding upon the Indemnitor and its successors and assigns and shall inure to the benefit of the Indemnitee and the Indemnitee's heirs, executors and administrators.

12.    <u>Severability</u>.  If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever:  (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any Section of this Agreement containing any such provision

held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; (b) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

13.  Exception to Right of Indemnification or Advancement of Expenses.  Notwithstanding any other provision of this Agreement and except as provided in Section 7(a) of this Agreement or as may otherwise be agreed by the Indemnitor, the Indemnitee shall not be entitled to indemnification or advancement of Expenses under this Agreement with respect to any Proceeding brought by the Indemnitee (other than a Proceeding by the Indemnitee (i) by way of defense or counterclaim, (ii) to enforce the Indemnitee's rights under this Agreement or (iii) to enforce any other rights of the Indemnitee to indemnification, advancement or contribution from the Indemnitor Entities under any other contract, operating agreement, limited liability company agreement, articles of association, bylaws or under statute or other law, including any rights under the Delaware General Corporation Law) unless the bringing of such Proceeding or making of such claim shall have been approved by the Board of Directors.

14.  Definitions.  For purposes of this Agreement:

(a)  "Board of Directors" means the board of directors or board of managers of the applicable Indemnitor Entity.

(b)  "Determination" means a determination that either (x) there is a reasonable basis for the conclusion that indemnification of the  Indemnitee is proper in the circumstances because the Indemnitee met a particular standard of conduct (a "Favorable Determination") or (y) there is no reasonable basis for the conclusion that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee met a particular standard of conduct (an "Adverse Determination"). An Adverse Determination shall include the decision that a Determination was required in connection with indemnification and the decision as to the applicable standard of conduct.

(c)  "Disinterested Director" means any director or member of the board of managers (or equivalent position) of the applicable Indemnitor Entity who is not and was not a party to the Proceeding in respect of which indemnification is sought by the Indemnitee.

(d)  "Expenses" shall mean all reasonable direct and indirect costs, fees and expenses of any type or nature whatsoever and shall specifically include, without limitation, all reasonable attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other

- 10 -

disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness, in, or otherwise participating in, a Proceeding, including, but not limited to, the premium for appeal bonds, attachment bonds or similar bonds and all interest, assessments and other charges paid or payable in connection with or in respect of any such Expenses, and shall also specifically include, without limitation, all reasonable attorneys' fees and all other expenses incurred by or on behalf of Indemnitee in connection with preparing and submitting any requests or statements for indemnification, advancement, contribution or any other right provided by this Agreement.  Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amounts of judgments or fines against Indemnitee.

(e)     "Independent Counsel" means, at any time, any law firm, or a member of a law firm, that (a) is experienced in matters of corporation and alternative entity law and (b) is not, at such time, or has not been in the five years prior to such time, retained to represent: (i) any Indemnitor Entity or the Indemnitee in any matter material to either such party (other than with respect to matters concerning the Indemnitee under this Agreement, or of other indemnities under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder.  Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Indemnitor or the Indemnitee in an action to determine the Indemnitee's rights under this Agreement.  The Indemnitor agrees to pay the reasonable fees and expenses of Independent Counsel referred to above and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto and to be liable therefor.

(f)     "Indemnitor Entities" means the Indemnitor and its past, present and future direct or indirect subsidiaries and controlled affiliates.

(g)     "Management Status" means the status of a person by reason of such person's past, present or future service as a director, officer or member of the board of managers of any Indemnitor Entity (including, without limitation, one who serves at the specific request of any of the Indemnitor Entities as a director, officer or member of the board of managers, employee, fiduciary or agent of another entity).

(h)     "Proceeding" means any actual, threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened, pending or completed proceeding, whether brought by or in the right of any Indemnitor Entity or otherwise and whether civil, criminal, administrative or investigative in nature, in which the Indemnitee was, is, may be or will be involved as a party, witness or otherwise, by reason of the Indemnitee's Management Status or by reason of any action taken by the Indemnitee or of any inaction on the Indemnitee's part while

acting as director, officer, manager or member of the board of managers of any Indemnitor Entity (in each case whether or not he is acting or serving in any such capacity or has such status at the time any liability or expense is incurred for which indemnification or advancement of Expenses can be provided under this Agreement).

15. <u>Construction</u>.  Whenever required by the context, as used in this Agreement the singular number shall include the plural, the plural shall include the singular, and all words herein in any gender shall be deemed to include (as appropriate) the masculine, feminine and neuter genders.

16. <u>Reliance; Integration</u>.  The Indemnitor expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce the Indemnitee to serve as a director, officer or member of the board of managers of any of the Indemnitor Entities, and the Indemnitor acknowledges that the Indemnitee is relying upon this Agreement in serving as a director, officer or member of the board of managers of any of the Indemnitor Entities.

17. <u>Modification and Waiver</u>.  No supplement, modification or amendment of this Agreement shall be binding unless executed in a writing identified as such by both of the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

18. <u>Notice Mechanics</u>.  All notices, requests, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if (i) delivered by hand and receipted for by the party to whom said notice or other communication shall have been direct, or (ii) mailed by certified or registered mail with postage prepaid, on the third business day after the date on which it is so mailed:

(a)    If to Indemnitee, to:

> Steven J. Pully
> 4564 Meadowood Road
> Dallas, Texas 75220

> with a copy to:
> N/A

(b)    If to the Indemnitor, to:

> MDC Energy LLC
> 280 E. 96th Street, Suite 210
> Indianapolis, Indiana 46240
> Attention: John Echols

> with a copy to (which shall not constitute notice):

> Vinson & Elkins L.L.P.
> 666 5th Avenue, 25th Floor
> New York, New York
> Attention: David Meyer

or to such other address as may have been furnished (in the manner prescribed above) as follows:  (a) in the case of a change in address for notices to the Indemnitee, furnished by the Indemnitee to the Indemnitor and (b) in the case of a change in address for notices to the Indemnitor, furnished by the Indemnitor to the Indemnitee.

19.    <u>Contribution</u>.  If the indemnification provided for in this Agreement is unavailable to the Indemnitee for any reason whatsoever, the Indemnitor, in lieu of indemnifying the Indemnitee, shall contribute to the amount incurred by the Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for reasonably incurred Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Indemnitor and the Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding; and/or (ii) the relative fault of the Indemnitor (and its other directors, officers, employees and agents) and the Indemnitee in connection with such event(s) and/or transaction(s).

20.    <u>Governing Law; Submission to Jurisdiction; Appointment of Agent for Service of Process</u>.  This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules.  The Indemnitor and the Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Trial Court, and not in any other state or federal court in the United States of America or any court in any other

country, (ii) consent to submit to the exclusive jurisdiction of the Trial Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in the Trial Court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Trial Court has been brought in an improper or otherwise inconvenient forum.

21.   <u>Headings</u>.   The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

22.   <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement.

23.   <u>Confidentiality</u>.   Indemnitee acknowledges that, in the course of Indemnitee's service as a director, officer or member of the Board of Directors of one or more of the Indemnitor Entities, Indemnitee will be provided with, and will have access to, Confidential Information (as defined below) of the Indemnitor Entities and of third parties who have supplied such information to the Indemnitor Entities, as applicable.   In consideration of Indemnitee's receipt and access to such Confidential Information and in exchange for other valuable consideration provided hereunder, Indemnitee shall comply with this <u>Section 23</u>.

(a)   Both while Indemnitee serves as a director, officer or member of the Board of Directors of any of the Indemnitor Entities and thereafter, except as expressly permitted by this Agreement or by directive of the Board of Directors, Indemnitee shall not disclose any Confidential Information to any person or entity and shall not use any Confidential Information except for the benefit of the Indemnitor Entities.   Indemnitee shall follow all policies and protocols of the Indemnitor Entities regarding the physical security of all documents and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored).   The covenants of Indemnitee in this <u>Section 23(a)</u> shall apply to all Confidential Information, whether now known or later to become known to Indemnitee while serving as a director, officer or member of the Board of Directors of any of the Indemnitor Entities.

(b)   Notwithstanding anything in <u>Section 23(a)</u> to the contrary, Indemnitee may make the following disclosures and uses of Confidential Information:

(i)   disclosures to employees of the Indemnitor Entities or other members of the Board of Directors who have a need to know the information in connection with the business of the Indemnitor Entities;

(ii)   disclosures to customers and suppliers when, in the reasonable and good faith belief of Indemnitee, such disclosure is in connection with

Indemnitee's service on the Board of Directors and is in the best interests of the Indemnitor Entities;

(iii)    disclosures and uses that are approved in writing by the Board of Directors;

(iv)    disclosures to a person or entity that has (x) been retained by the Indemnitor Entities to provide services to the Indemnitor Entities and (y) agreed in writing to abide by the terms of a confidentiality agreement; or

(v)    disclosures for the purpose of complying with any applicable laws or regulatory requirements or that Indemnitee is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by law; provided, however, that, prior to any such disclosure, Indemnitee shall, to the extent legally permissible and practicable: (A) provide the Board of Directors with prompt notice of such requirements so that the Board of Directors may, at its expense, seek a protective order or other appropriate remedy or waive compliance with the terms of this <u>Section 23</u>; (B) consult with the Board of Directors on the advisability of taking steps to resist or narrow such disclosure; and (C) cooperate with the Board of Directors (at the reasonable cost and expense of the Indemnitor Entities) in any attempt it may make to obtain a protective order or other appropriate remedy or assurance that confidential treatment will be afforded the Confidential Information; and in the event such protective order or other remedy is not obtained, Indemnitee agrees (1) to furnish only that portion of the Confidential Information that is required to be furnished, as advised by written opinion of counsel to Indemnitee, if any, and (2) to exercise (at the reasonable cost and expense of the Indemnitor Entities) all reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information.

(c)    Upon the expiration of service as a director, officer or member of the Board of Directors of one or more of the Indemnitor Entities and at any other time upon request of any of the Indemnitor Entities, Indemnitee shall promptly surrender and deliver to the Indemnitor Entities all documents (including electronically stored information) and all copies thereof and all other materials of any nature containing or pertaining to all Confidential Information in Indemnitee's possession, custody and control and shall not retain any such document or other materials. Within 10 days of any such request, Indemnitee shall certify to the Indemnitor Entities in writing that all such documents and materials have been returned to the Indemnitor Entities.

(d)    All non-public information, designs, ideas, concepts, improvements, product developments, discoveries and inventions, whether patentable or not, that are conceived, made, developed or acquired by or disclosed to Indemnitee, individually or in conjunction with others, during the period that Indemnitee

serves as a director, officer or member of the Board of Directors of one or more of the Indemnitor Entities or is affiliated with any of the Indemnitor Entities (whether during business hours or otherwise and whether on the premises of any of the Indemnitor Entities or otherwise) that relate to any of the Indemnitor Entities' businesses or properties, products or services is defined as "Confidential Information."    Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voice mail, electronic databases, maps, drawings, architectural renditions, models and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions and other similar forms of expression are and shall be the sole and exclusive property of the Indemnitor Entities and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement.    Confidential Information shall not include any information that is or becomes generally available to the public other than as a result of a disclosure or wrongful act of Indemnitee or any of Indemnitee's agents.

*[Remainder of Page Intentionally Blank]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

**INDEMNITOR:**                                  **MDC ENERGY LLC**

                                                 By:      MTE Holdings LLC, its sole member

                                                 By:    Riverstone Credit Management, LLC, a Delaware limited liability company, as Administrative Agent

                                                 (as attorney-in-fact pursuant to the Collateral Agreement)

                                                 By:    _____
                                                 Name:  _____
                                                 Title: _____

**INDEMNITEE:**                                  _____
                                                 **Steve Pully**

*[Signature Page to Indemnification Agreement]*

**EXHIBIT C**
**AMENDMENT NO. 1 TO THE**
**THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY**
**AGREEMENT OF MDC ENERGY LLC**

(See attached.)

# AMENDMENT NO. 1 TO THE
# THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
# OF
# MDC ENERGY LLC

This Amendment No. 1 (this "**Amendment**"), dated and effective as of October 21, 2019, to the Third Amended and Restated Limited Liability Company Agreement (as amended, the "**Agreement**"), dated as of June 26, 2017, of MDC Energy LLC, a Delaware limited liability company, is made and entered into in accordance with Section 31 of the Agreement.  Capitalized terms used but not defined herein have the meanings set forth in the Agreement.

**WHEREAS**, pursuant to Section 31, the Agreement may not be amended unless pursuant to a written agreement executed and delivered by the Member; and

**WHEREAS**, Riverstone Credit Management, LLC (the "**Administrative Agent**"), in its capacity as Administrative Agent on behalf of the Lenders (as such terms are defined in the Term Loan Credit Agreement dated September 17, 2018 among the Member, the Lenders party thereto and the Administrative Agent (as such agreement may be amended or otherwise modified pursuant to the terms thereof, the "**Credit Agreement**")) has exercised its rights under Section 6.01(b) of the Collateral Agreement between the Member and the Administrative Agent, dated as of September 17, 2018 (the "**Collateral Agreement**")), pursuant to which, if an Event of Default (as defined in the Collateral Agreement) has occurred and is continuing, the Administrative Agent may exercise all voting, corporate, membership, partnership and other rights pertaining to MTE Holdings LLC's membership interests in MDC Energy LLC;

**WHEREAS**, Events of Default (as defined in the Collateral Agreement) have occurred and are continuing as of the date of this Amendment, and the Administrative Agent has provided notice of such Events of Default to the Member; and

**WHEREAS**, the Administrative Agent (in its capacity as administrative agent and collateral agent for the Lenders) desires to amend certain provisions of the Agreement.

**NOW**, **THEREFORE**, for good and valuable consideration, the Administrative Agent (in its capacity as administrative agent and collateral agent for the Lenders (as defined in the Collateral Agreement)) and pursuant to the authority delegated to the Administrative Agent in the Collateral Agreement, agrees as follows:

1.    Amendment to Section 9.  Section 9 of the Agreement is hereby amended and restated in its entirety as follows:

"Management.

(a)    The business and affairs of the Company (including all rights of the Member set forth in Sections 8,  11, 16, 17 and 24) shall be managed by or under the direction of a board of directors (the "Board"), to whom, subject to the limitations set forth in this Agreement and as otherwise required by the Act, the Member hereby delegates, and in which is vested, the full, exclusive and complete power, authority

and discretion to manage and control the administration, affairs and operations of the Company.  Each member of the Board (a "Director") shall be a "manager" of the Company as defined in Section 18-101(10) of the Act.  All actions, determinations, elections, judgments, approvals, considerations, amendments, calls or designations taken or omitted to be taken by the Board pursuant to this Agreement (whether to the Board's satisfaction, sole discretion or otherwise) shall be taken or omitted to be taken only with Board Approval.

(b)    Unless explicitly provided otherwise in this Agreement, the Board shall have the power, right and authority on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts which the Board, in its sole discretion, may deem necessary or desirable.

(c)    The Board shall consist of five (5) Directors.  The Directors as of October 21, 2019 are Dan Gillett, Steve Pully (together, the "Independent Directors" and each, an "Independent Director"), Mark Siffin, Etienne Locoh and, for so long as he is the chief restructuring officer of the Company, John Echols.  The Member (subject, however, to the consent of the Administrative Agent for so long as an Event of Default has occurred and is continuing) shall have the right to remove any Director at any time for Cause.  In the event that a vacancy is created on the Board by the death, disability, retirement, resignation or removal of any Director in accordance with this Agreement, such vacancy shall be filled only by consent of the Member (and so long as an Event of Default has occurred and is continuing, with the consent of the Administrative Agent); *provided*, *however*, that in the event that (i) John Echols ceases to be the chief restructuring officer of the Company, the then-current chief restructuring officer of the Company shall automatically replace John Echols (or, if applicable, his replacement pursuant to this Section 9(c)) or (ii) an Independent Director ceases to be a Director for any reason, any replacement of such Independent Director must be an Independent Person.

(d)    Each Director shall have one (1) vote.  Unless otherwise required by this Agreement, Directors having at least three (3) votes, including each Independent Director, either present (in person or by teleconference) or represented by proxy, shall constitute a quorum for the transaction of business at a meeting of the Board.  Unless provided otherwise in this Agreement, any action (including the giving of consent, waivers or approvals) by the Board shall require Board Approval.

(e)    The Board may hold its meetings in such place or places, within or without the State of Delaware, as the Board may from time to time determine by resolution.  At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by resolution of the Board.

(f)    Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action so taken shall be signed by Directors representing the requisite number of votes that would be required to take the applicable action at a meeting of the Board and, when so signed, such written consent shall constitute Board Approval of such action, and

2

notice of any such action taken shall be provided to those Directors who have not consented in writing promptly following the taking of such action.

(g)     Subject to the requirement for notice of meetings, members of the Board may participate in a meeting by means of a telephone conference or similar communications equipment by means of which all individuals participating in the meeting can hear each other, and participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(h)     Each Director shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or reports made to the Company by any of its Officers or by an independent certified public accountant or by an appraiser selected with reasonable care by the Board, or in relying in good faith upon other records of the Company.  Furthermore, each Director (in such Person's capacity as a Director) may rely, and shall incur no liability in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing reasonably believed by it to be genuine, and may rely on a certificate signed by an officer, agent or representative of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, in each case unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such reliance, action or inaction, such Director engaged in bad faith, fraud or willful or intentional misconduct or criminal wrongdoing."

2.    Amendment to Section 20(a):  Section 20(a) of the Agreement is hereby amended to include "the Administrative Agent (current or former)", "Directors" and "Lenders" in the definition of "Covered Persons."

3.    Amendment to Section 20:  A new Section 20(g) is hereby added as follows:

"(g)    Each Officer (in such Person's capacity as an Officer) shall have such fiduciary duties that an officer of the Company would have if the Company were a corporation organized under the laws of the State of Delaware. To the maximum extent permitted by applicable law, no Officer (in such Person's capacity as such) shall be liable to the Company or to the Member for losses sustained or liabilities incurred as a result of any act or omission (in relation to the Company, any transaction, any investment or any business decision or action, including for breach of duties including fiduciary duties) taken or omitted by such Officer (in such Person's capacity as such), unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such act or omission, and taking into account the acknowledgments and agreements set forth in this Agreement, such Officer (in such Person's capacity as such) would have had such liability for such act or omission that an officer of the

Company would have if the Company were a corporation organized under the laws of the State of Delaware."

4. <u>Amendment to Section 26</u>: Section 26 is hereby amended by adding the following after the second sentence:

"Notwithstanding anything to the contrary herein, the Administrative Agent (in its capacity as Administrative Agent for the Lenders) is an intended third-party beneficiary of <u>Sections 9</u>, <u>20</u>, and <u>31</u> and the definition of "Board Approval" and may enforce the provisions thereof as if it were a party hereto."

5. <u>Amendment to Schedule A</u>: Schedule A of the Agreement is hereby amended by adding the below definitions in the appropriate alphanumeric order:

""<u>Administrative Agent</u>" means Riverstone Credit Management, LLC, in its capacity as administrative agent and collateral agent for the Lenders, pursuant to each of the Credit Agreement and the Collateral Agreement, and any successor thereto."

""<u>Board</u>" has the meaning set forth in <u>Section 9(a)</u>."

""<u>Board Approval</u>" means the affirmative vote of, or written consent signed by, the Directors holding a majority of the number of votes of the Directors, including each Independent Director."

""<u>Cause</u>" means, as to a Director (a) any material breach of an agreement between the Company or one of its subsidiaries and such Director, (b) such Director's gross negligence, willful misconduct or breach of fiduciary duty, (c) commission of an act of fraud, theft or embezzlement on the part of such Director, (d) conviction or indictment of such Director, or plea of *nolo contendere* by such Director, to any felony (or state law equivalent) or any crime involving moral turpitude, or (e) such Director's willful failure or refusal to perform such Director's obligations pursuant to this Agreement."

""<u>Collateral Agreement</u>" means the Collateral Agreement dated as of September 17, 2018 among the Member and the Administrative Agent (as such agreement may be amended or otherwise modified pursuant to the terms thereof)."

""<u>Credit Agreement</u>" means the Term Loan Credit Agreement dated September 17, 2018 among the Member, the Lenders party thereto and the Administrative Agent (as such agreement may be amended or otherwise modified pursuant to the terms thereof)."

""<u>Director</u>" has the meaning set forth in <u>Section 9(a)</u>."

""<u>Event of Default</u>" has the meaning set forth in the Credit Agreement."

""<u>Independent Director</u>" has the meaning set forth in <u>Section 9(c)</u>."

4

""<u>Independent Person</u>" means a natural person with at least ten (10) years of oil and gas industry experience and who is not, as of the time of initial appointment as a Director or at any time while serving as a Director, and has not been during the five (5) years preceding such initial appointment as a Director: (a) a direct or indirect owner of any equity interest in the Company, the Member, the Administrative Agent, any of the Lenders or any of their respective Affiliates, (b) an officer, employee, partner or director of the Company, the Member, the Administrative Agent, any of the Lenders or any of their respective Affiliates, or (c) a creditor, customer or supplier of the Company or any of its Affiliates."

""<u>Lenders</u>" has the meaning set forth in the Credit Agreement."

6.    <u>Amendment to Schedule A</u>:    Schedule A of the Agreement is hereby amended by amending and restating the below definition in its entirety:

""<u>Act</u>" means the Delaware Limited Liability Act."

7.    <u>Miscellaneous</u>.    Except as expressly amended hereby, the Agreement shall remain unchanged, and the Agreement, as so amended, shall continue in full force and effect in accordance with its terms.    For the avoidance of doubt, the provisions of Sections 21, 26 and 30 of the Agreement shall apply to this Amendment *mutatis mutandis*.    This Amendment may be executed in one or more counterparts and transmitted via electronic means.

*    *    *    *    *

IN WITNESS WHEREOF, the undersigned has executed this Amendment as of the date first above written.

**RIVERSTONE CREDIT MANAGEMENT, LLC,**
a Delaware limited liability company

(as attorney-in-fact pursuant to the Collateral Agreement)

By: _____
Name: Christopher Abbate
Title: Managing Director