## **EXHIBIT GG**

*V&E Draft 9/20/19*

### LIMITED FORBEARANCE AGREEMENT

This LIMITED FORBEARANCE AGREEMENT (this "Agreement"), dated as of September [__], 2019 (the "Effective Date"), is by and among MTE Holdings LLC, a Delaware limited liability company (the "Borrower"); MTE Partners LLC, a Delaware limited liability company ("MTE Partners"); and Olam Energy Resources I LLC, a Delaware limited liability company, ("Olam", together with MTE Partners, the "Parent Companies"; together with the Borrower, the "Obligors"); each of the Lenders (as defined below) party hereto; and Riverstone Credit Management, LLC, as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent").

### RECITALS:

A.    The Loan Documents.  The Obligors are indebted to the Lenders and have granted collateral security as evidenced by certain instruments, agreements and documents, including, without limitation, that certain Term Loan Credit Agreement, dated as of September 17, 2018, by and among the Borrower, the Administrative Agent, and the financial institutions party thereto from time to time, as lenders ("Lenders"), as amended by that certain Limited Waiver and First Amendment to Term Loan Credit Agreement, dated as of February 20, 2019 (collectively, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "Credit Agreement"), and the other Loan Documents (as defined in the Credit Agreement); such indebtedness being secured by perfected, first priority security interests in and liens on (i) substantially all property of the Borrower (the "Collateral") as provided in the Security Instruments (as defined in the Credit Agreement) and (ii) the "Collateral" as defined in that certain Pledge Agreement, dated as of September 17, 2018, made by the Parent Companies in favor of the Administrative Agent.

B.    Existing Defaults.  The Obligors acknowledge that certain Events of Default under the Loan Documents have occurred and are continuing, each as more specifically described in Exhibit A attached hereto (collectively, the "Specified Defaults").

C.    Forbearance Request by the Borrower and the Parent Companies.  The Obligors have requested that the Administrative Agent and Lenders forbear until October 31, 2019, from exercising their rights and remedies arising as a result of the occurrence of the Specified Defaults in order to allow the Obligors sufficient time to consider certain restructuring and financing transactions to be agreed (collectively, with such other restructuring, financing and other related transactions, the "Restructuring").  The Administrative Agent and the Lenders party hereto are willing to grant such forbearance subject to (i) the Borrower engaging a chief transition officer (the "CTO") acceptable to the Administrative Agent in its sole discretion as further described in Section 5(g) hereof and (ii) the other terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants, representations, warranties and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**AGREEMENTS**:

1.    <u>Defined Terms</u>.  Capitalized terms used and not otherwise defined herein shall have the same meanings as set forth in the Credit Agreement or the other Loan Documents, as applicable.  In addition, the following terms, for the purposes of this Agreement, shall have the following meanings:

(a)    "<u>Forbearance Period</u>" means the period commencing on the Effective Date and continuing through and including the Termination Date, unless earlier terminated pursuant to the terms and provisions of this Agreement.

(b)    "<u>Termination Date</u>" means 5:00 p.m. (New York, New York Time) on October 31, 2019.

(c)    "<u>Termination Event</u>" means the occurrence of any of the following: (i) any representation or warranty made or deemed made by any Obligor in this Agreement shall be false, misleading or erroneous in any material respect when made or deemed to have been made; (ii) any Obligor's failure to satisfy any Milestone in strict compliance with this Agreement; (iii) any Obligor shall fail to perform, observe or comply timely with any other covenant, agreement or term contained in this Agreement; (iv) any Default or Event of Default, other than the Specified Defaults, shall occur or shall have occurred under this Agreement or any of the Loan Documents; (v) any Obligor or Group Member shall commence a voluntary proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official of it or any part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any action to authorize any of the foregoing; (vi) an involuntary proceeding shall be commenced against any Obligor or Group Member seeking liquidation, reorganization, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or any part of its property, in each case that remains undismissed or unstayed for five (5) consecutive calendar days; (vii) any event or condition shall occur after the Effective Date which shall have a Material Adverse Effect, as determined by Administrative Agent in its sole discretion; (viii) the exercise by the RBL Facility Administrative Agent or any RBL Facility Lender of any other obligations on account of the RBL Facility Credit Agreement of any right or remedy available to them in connection with any default under the documents governing the RBL Facility Credit Agreement, including, but not limited to acceleration of the loans under the RBL Facility Credit Agreement, any foreclosure or enforcement action against any collateral or Oil and Gas Properties of the Group Members; (ix) any additional "Event of Default" under the RBL Facility Credit Agreement not subject to the forbearance referenced in Section 5(i) below, (x) the exercise by any swap counterparty of any right or remedy available to them in connection with any default, event of default, "early termination event,

"additional termination event", the swap counterparty declaring any obligations under any Swap Agreement due and owing, or any similar event under any Swap Agreement, including, but not limited to any foreclosure or enforcement action against any collateral or Oil and Gas Properties of the Group Members; (xi) the exercise by any creditor or holder of any other any agreement or instrument evidencing or governing Indebtedness, if the sum of the aggregate principal amount outstanding under any such agreement or instrument plus any amounts available to be drawn thereunder exceeds $200,000 (such Indebtedness, "Material Indebtedness") of any Obligor or Group Member of any right or remedy available to them in connection with any default under the documents governing such Material Indebtedness, including, but not limited to acceleration of such Material Indebtedness, any foreclosure or enforcement action against any Collateral, (xii) the CTO shall notify the Administrative Agent or the Lenders (A) that the Borrower is failing to provide open and unfettered access to all information of the Group Members, (B) that the CTO is not getting access to the Borrower's managers, employees, accountants, counsel and other representative as needed to perform the scope of its engagements or (C) that the CTO is unable to perform its duties as contemplated in the Engagement Letter attached hereto as Exhibit B due to interference from management, (xiii) the Independent Director (as defined below) resigns without a replacement acceptable to the Administrative Agent in its sole discretion being appointed concurrently, (xiv) the aggregate amount of Indebtedness in the form of accounts payable described in Item 2 of Exhibit A attached hereto exceeds the cap amount listed on Exhibit A and (xv) the filing of any mechanics lien after the Effective Date.

2.    Forbearance.

(a)    Forbearance.  Subject to the terms of this Agreement, and only so long as no Termination Event shall have occurred, the Administrative Agent and the Lenders hereby agree to forbear until the Termination Date from exercising their rights and remedies under the Loan Documents arising from Specified Defaults.  Notwithstanding the foregoing, the forbearance granted by the Administrative Agent and the Lenders pursuant hereto shall not (x) constitute and shall not be deemed to constitute a waiver of any of the Specified Defaults or of any other Default or Event of Default under the Loan Documents and (y) prohibit the application of the post-default interest rate provided for in Section 2.6(c) of the Credit Agreement from and after the occurrence of any Event of Default (regardless of whether such Event of Default is a Specified Default).  On and after the Termination Date, or such earlier date on which a Termination Event occurs, Administrative Agent's and Lenders' agreement hereunder to forbear shall terminate automatically without further act or action by the Administrative Agent or the Lenders, and the Administrative Agent and the Lenders shall be entitled to exercise any and all rights and remedies available to it or them under the Loan Documents and this Agreement, at law, in equity, or otherwise.

(b)    Interest Payments and Other Payments.  Borrower shall pay to the Administrative Agent on demand, for the benefit of the Lenders on a pro rata basis, the default interest, which interest shall, on and after the earliest date of occurrence of any Specified Event of Default, accrue at the post-default rate provided for in Section 2.6(c) of the Credit Agreement.  Borrower also agrees to reimburse the Administrative Agent

and the Lenders upon demand for all out-of-pocket expenses (including attorneys' fees and fees of any other advisors) incurred in connection with the negotiation of this Agreement, other restructuring and refinancing transactions, whether or not consummated, of any Secured Obligations, and any enforcement of any Secured Obligations. Borrower acknowledges and agrees that all such expenses are being incurred in connection with a workout, restructuring, or negotiation in respect of the Loans as such terms are used in Section 10.2 of the Credit Agreement.

3.      <u>Representations and Warranties</u>.  To induce the Administrative Agent and the Lenders to enter into this Agreement, the Obligors hereby jointly and severally represent and warrant to the Administrative Agent and the Lenders as follows:

(a)      <u>Organization; Existence</u>.  Each Obligor and each Group Member (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.1 of the Credit Agreement, (b) has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own and operate its Properties, to carry on its business as now conducted and as proposed to be conducted, to enter into this Agreement to the extent it is a party and to carry out the transactions contemplated herein, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations as now conducted, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect

(b)      <u>Due Authorization</u>.  The execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate, limited liability company or partnership (as applicable) action and, if required, shareholder, member and/or partner action, on the part of each Obligor and each Group Member.

(c)      <u>No Conflict</u>.  The execution, delivery and performance by each of the Obligors and each Group Member of this Agreement do not and will not (i) violate in any material respect any provision of any Governmental Requirement applicable to, or any of the Organizational Documents of, any Obligor or any Group Member; (ii) conflict with, result in a material breach of or constitute (with due notice or lapse of time or both) a material default under any RBL Facility Loan Document or any Material Contract of any Obligor or any Group Member; (iii) result in or require the creation or imposition of any Lien upon any of the Properties or assets of any Obligor or any Group Member (other than any Liens created under any of the Loan Documents in favor of Administrative Agent, on behalf of the Lenders and other Permitted Liens); (iv) result in any material default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to any Obligor's or any Group Member's operations or any of its Properties or (v) require any approval of stockholders, members or partners or any approval or consent of any Person under any RBL Facility Loan Document or any Material Contract of any Obligor or any Group Member, except for such approvals or consents which will be obtained on or before the Effective Date and disclosed in writing to Administrative Agent and the Lenders.

(d)      No Defenses.  As of the Effective Date, the outstanding principal balance of the Loans is $[_____], and the outstanding amount of interest (excluding any default interest) on account of the Loans is $[_____].  None of Obligors has any defenses to payment, counterclaims, or rights of setoff with respect to the Loans or any other Secured Obligations existing as of the Effective Date.

(e)      No Other Defaults.  Except for the Specified Defaults, (i) no Default or Event of Default under the Loan Documents has occurred and is continuing, (ii) no default, event of default, or similar event has occurred and is continuing under the RBL Facility Credit Agreement, and (iii) no default, event of default, "early termination event", "additional termination event", or similar event has occurred and is continuing under any Swap Agreement to which any of the Obligors or any of the Group Members is a party.

(f)      Loan Document Representations and Warranties.  Other than as they relate to the Specified Defaults, the representations and warranties set forth in Section 4 of the Credit Agreement and the representations and warranties set forth in the other Loan Documents are true and correct on and as of the Effective Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties were true and correct as of such earlier date).

(g)      Taxes.  All payments due to all taxing authorities with respect to the Collateral are current as of the Effective Date.

(h)      Governmental Consents.  The execution, delivery and performance by each of the Obligor and each of the Group Members of this Agreement do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority to be made, taken or obtained by an Obligor or a Group Member.

(i)      Adverse Proceedings, etc.  There are no Adverse Proceedings, individually or in the aggregate, which could reasonably result in a Material Adverse Effect.  No Obligor or Group Member (i) is in violation of any Governmental Requirement of any Governmental Authority (including, to the knowledge of the Obligors or Group Members, Environmental Laws) that, individually or in the aggregate, could result in a Material Adverse Effect, or (ii) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any Governmental Authority, domestic or foreign, that relate to this Agreement, any other Loan Document, any Related Agreement or any of the Transactions.

4.      Covenants.  Notwithstanding any provisions to the contrary contained in the Loan Documents, Obligors hereby covenant and agree that, during the Forbearance Period, each of them will, and will cause each Group Member to, perform, observe and comply with each of the following covenants:

(a)      Compliance with Related Documents, this Agreement, and Law.  Each Obligor and each Group Member will timely perform, observe and comply with each

covenant, agreement and term contained in this Agreement and each of the Loan Documents, including, without limitation, the fees and payments required thereunder. Each Obligor will, and will cause each Group Member to, comply, and will use commercially reasonable efforts to cause all other Persons (including any operator), if any, on or occupying any Facilities or any Oil and Gas Properties to comply, with the requirements of all applicable Governmental Requirements of any Governmental Authority (including all Environmental Laws) in all material respects.

(b)      <u>Restructuring Milestones</u>.  The Obligors shall pursue and consummate the Restructuring on the following timeline (such deadlines, the "<u>Milestones</u>"):

(i)      On or before September 24, 2019, the Borrower shall have engaged an investment banking financial advisor of national standing acceptable to the Administrative Agent in its sole discretion (the "<u>Strategic Advisor</u>"), which investment banking financial advisor shall (x) conduct a strategic review process in contemplation of one or more strategic transactions, including, but not limited to, an asset sale, merger or an additional capital raise, in an effort to improve the Borrower's leverage and liquidity profile and (y) whose scope of engagement is acceptable to the Administrative Agent in its sole discretion.

(ii)      On or before September 24, 2019, the Administrative Agent shall have received from the Borrower a formal written proposal satisfactory to the Administrative Agent in its sole discretion that (x) sets forth the underlying details of all outstanding Defaults and Events of Default under the Credit Agreement and the other Loan Documents and any action taken or proposed to be taken with respect thereto and (y) provides for a detailed operational and work plan for the Borrower, including a proposed budget, forecast, and any other information requested by the Administrative Agent in its sole discretion.

(iii)      On or before September 25, 2019, (x) the Parent Companies and the Borrower shall have duly executed definitive documents with respect to an amendment of the organizational documents of the Borrower to form of a new board of directors of the Borrower, which board shall be structured in form and substance satisfactory to the Administrative Agent in its sole discretion and shall include at least one (1) independent director and (y) the Borrower shall have appointed an independent director (the "<u>Independent Director</u>") acceptable to the Administrative Agent in its sole discretion.

(iv)      On or before September 27, 2019, the Administrative Agent shall have received duly executed definitive documentation with respect to the amendment to the RBL Facility Credit Agreement to allow for funding a new second-out tranche of debt in the RBL Facility and on terms and conditions and in form and substance satisfactory to the Administrative Agent in its sole discretion (it being understood that no Lender hereunder shall have any obligation to participate in any such second-out tranche).

(v)      On or before October 23, 2019, the Borrower shall have received  net cash proceeds in an amount no less than $150,000,000 from a capital infusion, which may take the form of an equity issuance by the Borrower or an asset sale of non-core assets and which shall be in form and substance and on terms and conditions satisfactory to the Administrative Agent in its sole discretion.

(c)     Financial Statements.  The Borrower shall deliver to the Administrative Agent and the Lenders, no later than twenty (20) days after the end of each calendar month, a copy of the unaudited consolidated balance sheet for the Borrower and its consolidated Subsidiaries, and such break-outs, consolidating spreadsheets and eliminating entries for the Borrower and its consolidated Subsidiaries, and related statements of operations, stockholders' equity, as applicable, and cash flows as of the end of and for such calendar month and the then elapsed portion of the fiscal year.  Such financial statements shall be delivered together with a Financial Officer Certification with respect thereto and any operating reports prepared by management for such period.

(d)     Cash Flow Forecasts.  The Borrower shall deliver to the Administrative Agent, in each case subject to the review, confirmation, and approval of the CTO, (i) by no later than noon (12:00 P.M.) Central Time on Thursday of each week beginning on the first Thursday after the Effective Date and by no later than noon (12:00 P.M.) Central Time on each Thursday thereafter, an updated weekly 13-week cash flow forecast, in form and substance acceptable to the Administrative Agent, setting forth all sources and uses of cash, and beginning and ending cash balances (the "Budget"), and (ii) by no later than noon (12:00 P.M.) Central Time of each week, a variance report, reconciling the prior week's cash flow forecast to the actual sources and uses of cash for the prior week, along with a line-by-line reconciliation and explanation of material variances.  The Obligors and the Group Members shall also provide the Administrative Agent access to the Obligors' and the Group Members' management to discuss any variances.  The Obligors shall not, and shall not permit any Group Members to, permit (i) more than a ten percent (10%) variance per week on a line item basis above the projected uses set forth in the Budget, (ii) more than a ten percent (10%) variance per week on a line item basis below projected sources set forth in the Budget, (iii) the net cash flow from aggregate sources and uses to have more than a five percent (5%) variance per week below the net cash flow from aggregate sources and uses set forth in the Budget and (iv) any capital expenditures not in compliance with Section 4(p) below.

(e)     Reconciliation Reports.   The Borrower shall deliver to the Administrative Agent and the Lenders concurrently with each Budget (i) a variance report reconciling the prior week's cash flow forecast to the actual sources and uses of cash for the prior week, along with a line-by-line reconciliation and explanation of material variances, and (ii) a listing of each Obligor's and each Group Member's accounts receivable, including invoices aged by invoice date and due date (with an explanation of the terms offered), together with a summary specifying the name, address, and balance due for each account debtor, and a schedule and aging of each Obligor's and each Group Member's accounts payable.

(f)     Notices.  Borrower shall give the Administrative Agent prompt written notice of the following:

(i)     Any notice of a default or required redemption relating to any Material Indebtedness of any Obligor (including, without limitation, with respect to the RBL Facility Credit Agreement and any Swap Agreement);

(ii)     Any actual or threatened suspension of services by the providers of Borrower's midstream and gathering services or any other adverse development in Borrower's relationship with such providers;

(iii)    The filing or commencement of, or the threat in writing of, any action, suit (whether in state or federal court), proceeding, receivership, involuntary petition in bankruptcy, investigation or arbitration by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting any of the Obligors or Group Members not previously disclosed in writing to the Administrative Agent and the Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Administrative Agent and the Lenders); and

(iv)    Any notice of the filing or recordation of a mechanic's, materialmen's or other like Lien received by any of the Obligors or Group Members with respect to any of their Oil and Gas Properties.

(g)     <u>Information</u>.    The Obligors shall cooperate with any financial, regulatory, or legal advisors in performing their work as financial, regulatory, or legal advisor to the Administrative Agent.  In addition to any notices required to be given under the Loan Documents, the Obligors, the Group Members and their Advisors will provide the Administrative Agent and the Lenders with such other information as may be requested by the Administrative Agent from time to time, within five (5) Business Days of such request, including, without limitation, copies of any bank or other financial institution statements; financial statements; accounts receivable and accounts payable agings; transactional documentation; litigation pleadings, depositions, related documents and transcripts; letters of intent or offers to purchase, lease or license any portion, all or substantially all of the assets or ownership interests of any of the Obligors or Group Members; and letters of intent or commitments for any capital investment, loan or other financing in or to any of the Obligors or Group Members, except, in each case, to the extent expressly designated as confidential and not to be disclosed to the Obligors' or Group Members' secured lenders.    The Borrower hereby acknowledges the Administrative Agent's right under the Credit Agreement to engage any financial, regulatory, or legal advisor in its sole discretion under these circumstances and agrees to reimburse Administrative Agent for the fees and expenses of such professionals as provided in Section 2(b).

(h)     <u>Access</u>.    The Administrative Agent, the Lenders, and their agents and advisors shall have access during normal business hours to the Obligors' and the other or Group Members' business premises and to the Collateral and the Oil and Gas Properties to review, appraise and evaluate the physical condition of the Collateral and the Oil and Gas Properties and to inspect the books, records and reports of Obligors and the Group Members concerning the operation of the Obligors' and the Group Members' businesses, financial condition, the transfers and expenditures of funds generated therefrom, the accrual of expenses relating thereto, and any and all other records relating to the operations of the Obligors and the Group Members.    The Obligors and the Group Members and their Advisors will fully cooperate with the Administrative Agent, the

Lenders and their agents and advisors regarding such reviews, evaluations, and inspections, and the Obligors and the Group Members shall make their employees, consultants and professionals reasonably available to the Administrative Agent, the Lenders, and the Administrative Agent's other professionals and consultants in conducting such reviews, evaluations, and inspections.

(i)     Status Updates.  During the Forbearance Period, the Borrower will provide to the Administrative Agent and the Lenders, via scheduled weekly conference calls, status updates with respect to the material operations of the Obligors and the Group Members and the implementation and activities of the CTO and the Strategic Advisor, including, without limitation, any updates with respect to any sale, transfer, or disposition of any real property by the Obligors or the Group Members and commitments to provide capital for the Obligors or the Group Members.

(j)     Obligors' Advisors.  The Obligors shall maintain their engagement of each of (i) Opportune LLP, as the CTO engaged pursuant to Section 5(g), (ii) the Strategic Advisor engaged pursuant to Section 4(b)(i) and (iii) the Independent Director engaged pursuant to Section 4(b)(iii), or in the event either one or more of such engagements shall terminate, such replacement advisors or officers of comparable standing and reputation to which the Administrative Agent may consent in writing in its sole discretion (collectively, the "Advisors") at all times during the Forbearance Period. The Obligors authorize the Administrative Agent and its agents, advisors, and professionals to communicate with the Obligors' and Group Members' Advisors without notice to, or the presence of, the Obligors or the Group Members.

(k)     Chief Transition Officer.  The Borrower agrees, and agrees to cause the CTO to:

(i)     conduct a conference call no less frequently than once a week with the Administrative Agent and its agents and advisors, for the purpose of informing the Administrative Agent of the status of his or her restructuring efforts and other status updates; and

(ii)     provide such other information, reports, and strategy options as the Administrative Agent may request from time to time.

(l)     Strategic Advisor.  The Borrower agrees, and agrees to cause the Strategic Advisor to:

(i)     conduct a conference call no less frequently than once a week with the Administrative Agent and its agents and advisors, for the purpose of informing the Administrative Agent of the status of his or her strategic review process and other status updates; and

(ii)     provide such other information, reports, and strategy options as the Administrative Agent may request from time to time.

(m)    <u>No Control</u>.  No act committed or action taken by the Administrative Agent or any Lender under this Agreement or the Loan Documents will be used, construed, or deemed to hold the Administrative Agent or any Lender to be in control of any Obligor or any Group Member, or the governance, management or operations of any Obligor or any Group Member for any purpose, without limitation, or to be participating in the management of any Obligor or any Group Member or acting as a "responsible person" or "owner or operator" or a person in "control" with respect to the governance, management or operation of any Obligor or any Group Member or their respective businesses (as such terms, or any similar terms, are used in the U.S. Bankruptcy Code, the Code, or CERCLA, each as may be amended from time to time, or any other federal or state statute, at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon the Administrative Agent or any Lender under this Agreement or the Loan Documents.

(n)    <u>Preservation of Collateral</u>.  Each Obligor shall maintain the liens and security interests created by the Security Instruments as first priority, perfected liens and security interests and shall defend such security interest against the claims and demands of all Persons whomsoever except for Liens permitted under the Credit Agreement.  At any time and from time to time, upon the request of the Administrative Agent, and at the sole expense of the Obligors, the Obligors will promptly and duly give, execute, deliver, indorse, file or record any and all amendments, notices (including, without limitation, notifications to financial institutions and any other Person), contracts, agreements, assignments, certificates, stock powers or other instruments, obtain any and all governmental approvals and consents and take or cause to be taken any and all steps or acts that may be necessary or advisable or as the Administrative Agent may reasonably request to create, perfect, establish the priority of, or to preserve the validity, perfection or priority of, the Liens granted by the Security Instruments or to enable the Administrative Agent to enforce its rights, remedies, powers and privileges under the Security Instruments with respect to such Liens or to otherwise obtain or preserve the full benefits of the Security Instruments and the rights, powers and privileges therein granted.

(o)    <u>Asset Sales</u>.  Notwithstanding anything to the contrary in any Loan Document or herein, no Obligor or Group Member shall sell, convey, or otherwise transfer any of its assets without the written consent of the Administrative Agent.

(p)    <u>Capital Expenditures</u>.  Notwithstanding anything to the contrary in any Loan Document or herein, the Borrower shall not, and shall not permit any Group Member to, make Consolidated Capital Expenditures in any manner unless approved by the CTO and the Requisite Lenders.

The failure of any Obligor or Group Member to timely comply with the terms of this Section 4 shall constitute (i) a Default and an Event of Default under and for all purposes of the Credit Agreement and the other Loan Documents, and (ii) a Termination Event hereunder.

5.    <u>Conditions Precedent</u>.  As a condition to the commencement of the Forbearance Period on the Effective Date, each of the following conditions shall have been fulfilled by the Obligors:

(a)    This Agreement.  The Administrative Agent shall have received duly executed counterparts of this Agreement from each of the Obligors, the Administrative Agent, and the Lenders.

(b)    Payments.  The Borrower shall have paid in cash all invoiced and unpaid fees and expenses reasonably incurred by and owing to Administrative Agent's counsel, Vinson & Elkins L.L.P.

(c)    Budget.  The Borrower shall have delivered an updated budget, together with an aging of each Obligor's and each Group Member's receivables and payables in accordance with Section 4(d) of this Agreement.

(d)    Evidence of Authority.  The Obligors and the Group Members shall have delivered to Administrative Agent certificates of duly authorized officers of the Obligors and the Group Members, and such other documents, instruments and agreements as Administrative Agent shall require, to evidence the due authorization, execution and delivery of this Agreement, each of which shall be in form and substance satisfactory to Administrative Agent.

(e)    Due Diligence.  The Administrative Agent shall have completed its business, legal, tax, structuring, and other due diligence review.

(f)    Material Contracts.  Each of the Obligors' and the Group Members' material contracts (including, without limitation, all material leases) shall be in full force and effect and shall not be impaired or terminated as a result of the Obligors' or the Group Members' entry into this Agreement or the transactions contemplated herein, and the counterparties to such contracts shall not have the ability to terminate or modify such agreement as a result of the transactions contemplated by the Restructuring.

(g)    CTO.  Borrower shall have engaged a CTO acceptable to the Administrative Agent in its sole discretion and pursuant to the terms and conditions reflected in the Engagement Letter with Opportune LLP, attached hereto as Exhibit B;

(h)    RBL Forbearance. The RBL Facility Administrative Agent shall have agreed to forbear from exercising certain rights and remedies as a result of the defaults and events of default under the RBL Facility Credit Agreement that correspond to the Specified Defaults, which forbearance agreement shall be on terms and conditions satisfactory to the Administrative Agent in its sole discretion.

6.    Ratification of Related Documents and Collateral.  Each Obligor hereby acknowledges that it has received from the Administrative Agent proper notice of Default with respect to the Specified Defaults.  Each of the Obligors hereby waives (a) any further notice of Default, notice of intent to accelerate, or demand for payment and (b) any further opportunity to cure any of the Specified Defaults.  Except as modified by this Agreement, each Obligor hereby acknowledges, ratifies, reaffirms, and agrees that each of the Loan Documents, and the first priority, perfected liens and security interests created thereby in favor of the Administrative Agent in the Collateral, are and will remain in full force and effect and binding on Obligors, and are enforceable in accordance with their respective terms and applicable law.  Each Obligor

acknowledges, ratifies, and reaffirms all of the terms and provisions of the Loan Documents, except as modified herein, which are incorporated by reference as of the Effective Date as if set forth herein including, without limitation, all promises, agreements, warranties, representations, covenants, releases, indemnifications, and waivers of jury trials contained therein. Each Obligor hereby acknowledges, ratifies, and confirms the Credit Agreement, the Notes, the Security Instruments, the other Loan Documents, and all of their respective debts and obligations to the Administrative Agent and each Lender thereunder. Each Obligor acknowledges and agrees that in the event the Administrative Agent seeks to take possession of any or all of the Collateral securing any of the Secured Obligations by court process, each Obligor irrevocably waives, to the fullest extent permitted by law, any bonds and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession. Each Obligor hereby agrees and acknowledges that the Secured Parties require and will require strict performance by each Obligor of all of its respective obligations, agreements, and covenants contained in the Credit Agreement and the other Loan Documents (including any action or circumstance that is prohibited or limited during the existence of a Default or Event of Default), and no action or inaction by any Secured Party regarding any Default or Event of Default is intended to be or shall be a waiver thereof. Each Obligor hereby also agrees and acknowledges that no course of dealing and no delay in exercising any right, power, or remedy conferred to any Secured Party in the Credit Agreement or in any other Loan Documents or now or hereafter existing at law, in equity, by statute, or otherwise shall operate as a waiver of or otherwise prejudice any such right, power, or remedy.

7.      Remedies Upon Termination Event.   Upon the occurrence of a Termination Event, (a) the Forbearance Period will terminate without further act or action by the Administrative Agent or any Lender and (b) the Administrative Agent will be entitled immediately to accelerate the Secured Obligations, institute foreclosure proceedings against the Collateral and to exercise any and all of Administrative Agent's and the Lenders' rights and remedies available to the Administrative Agent and any Lender under the Loan Documents and this Agreement, at law, in equity, or otherwise, without further opportunity to cure, demand, presentment, notice of dishonor, notice of Default, notice of intent to accelerate, notice of intent to foreclose, notice of protest or other formalities of any kind, all of which are hereby expressly waived by the Obligors.

8.      Acknowledgment of Defaults.   The Obligors specifically acknowledge the existence and continuation of the Specified Defaults.

9.      **WAIVER AND RELEASE.  EACH OF OBLIGORS (IN ITS OWN RIGHT AND ON BEHALF OF ITS RESPECTIVE PREDECESSORS, SUCCESSORS, LEGAL REPRESENTATIVES, SUBSIDIARIES AND ASSIGNS) HEREBY EXPRESSLY AND UNCONDITIONALLY ACKNOWLEDGES AND AGREES THAT IT HAS NO SETOFFS, COUNTERCLAIMS, ADJUSTMENTS, RECOUPMENTS, DEFENSES, CLAIMS, CAUSES OF ACTION, ACTIONS OR DAMAGES OF ANY CHARACTER OR NATURE, WHETHER CONTINGENT, NONCONTINGENT, LIQUIDATED, UNLIQUIDATED, FIXED, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED, KNOWN OR UNKNOWN, ACTUAL OR PUNITIVE, FORESEEN OR UNFORESEEN, DIRECT, OR INDIRECT, AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER, ANY OF THEIR**

**RESPECTIVE AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, ATTORNEYS OR REPRESENTATIVES OR ANY OF THEIR RESPECTIVE PREDECESSORS, SUCCESSORS OR ASSIGNS (COLLECTIVELY, THE "LENDER-RELATED PARTIES") OR ANY GROUNDS OR CAUSE FOR REDUCTION, MODIFICATION, SET ASIDE OR SUBORDINATION OF THE SECURED OBLIGATIONS OR ANY LIENS OR SECURITY INTERESTS OF THE SECURED PARTIES.  IN PARTIAL CONSIDERATION FOR THE AGREEMENT OF ADMINISTRATIVE AGENT AND LENDERS TO ENTER INTO THIS AGREEMENT, EACH OF OBLIGORS HEREBY KNOWINGLY AND UNCONDITIONALLY WAIVES AND FULLY AND FINALLY RELEASES AND FOREVER DISCHARGES THE LENDER-RELATED PARTIES FROM, AND COVENANTS NOT TO SUE THE LENDER-RELATED PARTIES FOR, ANY AND ALL SETOFFS, COUNTERCLAIMS, ADJUSTMENTS, RECOUPMENTS, CLAIMS, CAUSES OF ACTION, ACTIONS, GROUNDS, CAUSES, DAMAGES, COSTS AND EXPENSES OF EVERY NATURE AND CHARACTER, WHETHER CONTINGENT, NONCONTINGENT, LIQUIDATED, UNLIQUIDATED, FIXED, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED, KNOWN OR UNKNOWN, ACTUAL OR PUNITIVE, FORESEEN OR UNFORESEEN, DIRECT OR INDIRECT, ARISING OUT OF OR FROM OR RELATED TO ANY OF THE LOAN DOCUMENTS, WHICH ANY OBLIGOR NOW OWNS AND HOLDS, OR HAS AT ANY TIME HERETOFORE OWNED OR HELD, SUCH WAIVER, RELEASE AND DISCHARGE BEING MADE WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE CIRCUMSTANCES AND EFFECTS OF SUCH WAIVER, RELEASE AND DISCHARGE AND AFTER HAVING CONSULTED LEGAL COUNSEL OF ITS OWN CHOOSING WITH RESPECT THERETO.  THIS SECTION IS IN ADDITION TO ANY OTHER RELEASE OF ANY OF THE LENDER-RELATED PARTIES BY ANY OF OBLIGORS AND SHALL NOT IN ANY WAY LIMIT ANY OTHER RELEASE, COVENANT NOT TO SUE, OR WAIVER BY ANY OF OBLIGORS IN FAVOR OF ANY OF THE LENDER-RELATED PARTIES.**

10.    <u>No Obligation of the Secured Parties</u>.  Each Obligor hereby acknowledges and understands that upon the expiration or termination of the Forbearance Period, if all the Specified Defaults have not been cured or waived by written agreement in accordance with the Credit Agreement, or if there shall at such time exist a Default or Event of Default, then the Secured Parties shall have the right to proceed to exercise any or all available rights and remedies, which may include foreclosure on the Collateral and/or institution of legal proceedings.  The Secured Parties shall have no obligation whatsoever to extend the maturity of the Secured Obligations, waive any Events of Default or Defaults, defer any payments, or further forbear from exercising its rights and remedies.

11.    <u>No Implied Waivers</u>.  No failure or delay on the part of the Administrative Agent or any Lender in exercising, and no course of dealing with respect to, any right, power or privilege under this Agreement, the Credit Agreement, the Notes, the Security Instruments, or any other Loan Document shall operate as a waiver thereof or cause a modification of the Loan Documents, entitle any Obligor to any other or further notice or demand whatsoever beyond those required by the Loan Documents, or in any way modify, change, impair, affect, diminish, or release any Obligor's obligations or liability under the Loan Documents or any other liability

any Obligor may have to any Secured Party, nor shall any single or partial exercise of any right, power or privilege under this Agreement, the Credit Agreement, the Notes, or any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

12.    **INDEMNIFICATION**.  **IN ADDITION TO, AND WITHOUT LIMITATION OF, ANY AND ALL INDEMNITIES PROVIDED IN THE LOAN DOCUMENTS, EACH OBLIGOR HEREBY, JOINTLY AND SEVERALLY, INDEMNIFY AND HOLD EACH OF THE LENDER-RELATED PARTIES HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, COSTS, AND EXPENSES, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES, ARISING OUT OF OR FROM OR RELATED TO ANY OF THE LOAN DOCUMENTS OR THIS AGREEMENT.  IF ANY ACTION, SUIT, OR PROCEEDING IS BROUGHT AGAINST ANY OF THE LENDER-RELATED PARTIES, OBLIGORS SHALL, AT SUCH LENDER-RELATED PARTIES' REQUEST, DEFEND THE SAME AT THEIR SOLE COST AND EXPENSE, SUCH COST AND EXPENSE TO BE A JOINT AND SEVERAL LIABILITY OF OBLIGORS, BY COUNSEL SELECTED BY SUCH LENDER-RELATED PARTY. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, THIS SECTION 12 SHALL REMAIN IN FULL FORCE AND EFFECT AND SHALL SURVIVE ANY DELIVERY AND PAYMENT ON THE SECURED OBLIGATIONS, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.**

13.    <u>Survival of Representations and Warranties</u>.  All representations and warranties made in this Agreement or any other Loan Document will survive the execution and delivery of this Agreement, and no investigation by the Administrative Agent or any Lender or any closing will affect the representations and warranties or the right of the Administrative Agent or any Lender to rely upon them.

14.    <u>Review and Construction of Documents</u>.    Each of the Obligors hereby acknowledges, represents, and warrants to the Administrative Agent and the Lenders that (a) the Obligors and the Group Members have had the opportunity to consult with legal counsel of their own choice and have been afforded an opportunity to review this Agreement with their legal counsel, (b) the Obligors and the Group Members have reviewed this Agreement and fully understand the effects thereof and all terms and provisions contained herein, and (c) the Obligors and the Group Members have executed this Agreement of their own free will and volition.  The recitals contained in this Agreement shall be construed to be part of the operative terms and provisions of this Agreement.

15.    <u>ENTIRE AGREEMENT; AMENDMENT</u>.  THIS AGREEMENT AND THE RELATED DOCUMENTS AS INCORPORATED HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO REGARDING ADMINISTRATIVE AGENT'S AND LENDERS' FORBEARANCE WITH RESPECT TO THEIR RIGHTS AND REMEDIES ARISING AS A RESULT OF THE SPECIFIED DEFAULTS AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT

MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO.  THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO.  The provisions of this Agreement may be amended or waived only by an instrument in writing signed by the parties hereto.  The Loan Documents, as modified by this Agreement, continue to evidence the agreement of the parties with respect to the subject matter thereof.

16.    Notices.  All notices, requests, demands and other communications under this Agreement will be given in accordance with the provisions of the Credit Agreement, except that notices to the Administrative Agent shall be given to the following:

> Riverstone Credit Management LLC
> 712 Fifth Avenue, 36th Floor
> New York, NY 10015
> Attn: Christopher Abbate, Managing Director
> Telephone: (212) 271-2942
> Electronic mail: cabbate@riverstonecredit.com
> With a copy to: riverstoneagency@cortlandglobal.com

> with a copy (which shall not constitute notice) to:

> Vinson & Elkins LLP
> 1001 Fannin, Suite 2500
> Houston, Texas 77002
> Attention:  Brian Moss
> Phone:  713-758-3370
> Fax:  713-615-5845

17.    Successors and Assigns.  This Agreement will be binding upon, and will inure to the benefit of, the parties hereto and their respective successors and assigns, provided that none of Obligors may assign any rights or obligations under this Agreement without the prior written consent of Administrative Agent.

18.    Tolling of Statutes of Limitation.  Each of the Obligors acknowledges and agrees that the running of any statutes of limitation or doctrine of laches applicable to any claims or causes of action that the Administrative Agent or the Lenders may be entitled to take or bring in order to enforce their rights and remedies against any Obligor (or any of its respective assets) is, to the fullest extent permitted by law, tolled and suspended until the Termination Date.

19.    Arm's-Length/Good Faith.  This Agreement has been negotiated at arm's-length and in good faith by the parties hereto.

20.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York and applicable laws of the United States of America.  Sections 10.14, 10.15 and 10.16 of the Credit Agreement is hereby incorporated herein in *mutatis mutandis*.

21.    <u>Interpretation</u>.  Wherever the context hereof will so require, the singular shall include the plural, the masculine gender shall include the feminine gender and the neuter and vice versa.  The headings, captions and arrangements used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

22.    <u>Severability</u>.  In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

23.    <u>Counterparts</u>.  This Agreement may be executed and delivered in any number of counterparts, and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute one and the same instrument; provided that no party shall be bound by this Agreement until each of the parties has executed a counterpart hereof.  Execution of this Agreement via facsimile or other electronic means shall be effective, and signatures received via facsimile or other electronic means shall be binding upon the parties hereto and shall be effective as originals.

24.    <u>Further Assurances</u>.  Each Obligor hereby agrees to execute, acknowledge, deliver, file and record such further certificates, instruments and documents, and to do all other acts and things, as may be requested by the Administrative Agent as necessary or advisable to carry out the intents and purposes of this Agreement.

25.    <u>Loan Document</u>.  This Agreement is a Loan Document for all purposes of the Credit Agreement and the other Loan Documents.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**BORROWER:**    **MTE HOLDINGS LLC**


By: _____
Name:
Title:


**PARENT COMPANIES:**  **MTE PARTNERS LLC**


By: _____
Name:
Title:


**OLAM ENERGY RESOURCES I LLC**


By: _____
Name:
Title:

**ADMINISTRATIVE AGENT**:        **RIVERSTONE CREDIT MANAGEMENT, LLC**, as Administrative Agent


By: _____
Name:
Title:

**LENDERS:**                                **CPPIB CREDIT INVESTMENTS III INC.,** as Lender


By: _____
Name:
Title:

**CENTAURUS CAPITAL LP**, as Lender

By:    Centaurus Holdings, LLC, its General Partner


By:    _____
Name: John D. Arnold
Title:   Manager of Centaurus Holdings, LLC

**NEW JUTLAND PARTNERS, LP**, as Lender

By:    New Jutland Management, LLC, its General
       Partner


By:    _____
Name:  Brian Terp
Title: Manager

**FENWOOD ROAD CAPITAL PARTNERS, LP**, as Lender

By:    Fenwood Road Management, LLC, its General Partner

By:    _____
Name: Timothy J. Detmering
Title:  Manager

**AG ENERGY FUNDING, LLC**, as Lender

By:    Angelo, Gordon & Co., L.P., as its Manager

By:    _____
Name:
Title:

**RIVERSTONE CREDIT PARTNERS I DIRECT, LP**, as Lender

By: _____
Name:
Title:

**RIVERSTONE CREDIT PARTNERS II DIRECT, LP**, as Lender


By: _____
Name:
Title:

**RIVERSTONE STRATEGIC CREDIT PARTNERS A-1 AIV, L.P.**, as Lender

By: _____
Name:
Title:

**VP RATTLESNAKE LLC**, as Lender

By: _____
Name:
Title:

**MELODY BUSINESS FINANCE, LLC**, as Lender

By: _____
Name:
Title:

**EXHIBIT A**
**SPECIFIED DEFAULTS**

Each of the existing and prospective breaches of the Loan Documents set forth below are Specified Defaults:

1.      The Event of Default under Section 8.1(c) of the Credit Agreement as a result of the failure to deliver audited financial statements with respect to the Fiscal Year 2018 without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit as required by Section 5.1(c) of the Credit Agreement.

2.      The Event of Default under Section 8.1(c) of the Credit Agreement as a result of the incurrence of additional Indebtedness in the form of accounts payable that is or at one time was overdue for a period in excess of 90 days in violation of Section 6.1 of the Credit Agreement; *provided* that this incurrence of additional Indebtedness shall only constitute a Specified Default to the extent (i) such incurrence is on or prior to the date hereof and (ii) the aggregate amount of such Indebtedness does not exceed $[_____] at any time in the aggregate.

3.      The Event of Default under Section 8.1(c) of the Credit Agreement as a result of the creation of, and associated filings related to, mechanics liens with respect to certain accounts payable, which mechanics liens were not created in the ordinary course of business and, with respect to a portion of such mechanics liens, are related to accounts payable that are or at one time were overdue for a period in excess of 90 days, which, in each case, is a violation of Section 6.2 of the Credit Agreement.

4.      The Event of Default under Section 8.1(e) of the Credit Agreement as a result of the failure to submit a new APOD for approval by the Super-Majority Requisite Lender as required by Section 5.13 of the Credit Agreement upon the lapse of effectiveness of the most recent APOD approved pursuant to the First Amendment.

5.      The Event of Default under Section 8.1(c) of the Credit Agreement as a result of failure to deliver certain other reports and notices as required by Sections 5.1 and 5.2 of the Credit Agreement within the time periods provided for therein.

6.      The Event of Default under Section 8.1(b) of the Credit Agreement as a result of the occurrence of certain "Events of Default" under the RBL Facility in connection with the events described in the foregoing clauses (1) through (5) above.

**<u>EXHIBIT B</u>**
**<u>OPPORTUNE ENGAGEMENT LETTER</u>**

(See attached.)