**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 11 |
| MTE HOLDINGS LLC, *et al.*,[1] | Case No. 19-12269 (KBO) |
|  | (Joint Administration Requested) |
| Debtors. | **Hearing Date: TBD** |
|  | **Objection Due: TBD** |

**MOTION OF NATIXIS, NEW YORK BRANCH FOR AN ORDER (I) APPOINTING A
TRUSTEE PURSUANT TO SECTION 1104(A) OF THE BANKRUPTCY CODE, OR (II)
IN THE ALTERNATIVE, APPOINTING AN EXAMINER PURSUANT TO
SECTION 1104(C) OF THE BANKRUPTCY CODE**

Natixis, New York Branch ("Natixis"), in its capacity as the administrative agent on behalf

of lenders to a $60 million credit facility (the "Agent"), by and through its undersigned counsel,

hereby moves (the "Motion") this Court for an order, substantially in the form attached hereto as

Exhibit A, (i) appointing a chapter 11 trustee for Debtor MDC Energy LLC ("MDC")  for itself

and on behalf of wholly owned MDC subsidiaries Debtors Ward I, LLC ("Ward") and MDC

Reeves Energy LLC ("Reeves"),[2] pursuant to § 1104(a) of the Bankruptcy Code, or (ii) in the

alternative, appointing an examiner for MDC, Ward, and Reeves pursuant to § 1104(c) of the

Bankruptcy Code.  In support of its Motion, the Agent respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, are: MTE Holdings LLC (7894); MTE Partners LLC (1158); Olam Energy
Resources I LLC (0770); MDC Energy LLC (9140); MDC Texas Operator LLC (1087); Ward I, LLC
(6817); and MDC Reeves Energy LLC (3644). The Debtors' address is 280 East 96th Street, Suite 210,
Indianapolis, Indiana 46240.

[2] The Agent would support expansion of the chapter 11 trustee's scope of services to the rest of the Debtors
in these chapter 11 cases that are not party to the MDC Credit Facility (as defined below), to the extent a
CRO (as defined below) that is acceptable to the Lenders (as defined below) is not put in place for these
other Debtors.

## PRELIMINARY STATEMENT

The immediate appointment of a chapter 11 trustee is critical to preserve the value of MDC by stopping the ongoing mismanagement, stabilizing the insecurity of MDC's trade creditors, and putting MDC's financial affairs in order so that these bankruptcy proceedings can proceed efficiently and the creditors can avoid the acrimonious disputes that are certain to worsen without confidence in the accuracy of the financial and operational data essential to charting a path forward.

Although MDC proclaims that it "adopts a culture of complete and total transparency with its credit partners, giving them unique access to its people and operations at all times,"[3] the Agent's experience with MDC has been plagued by a near complete lack of transparency and MDC's obstinate refusal to meet its contractual obligations.

Almost immediately after MDC executed the credit agreement, MDC violated its contractual obligations to provide the Agent even the most basic financial reporting requirements. Over time, those violations became the rule, not the exception; MDC acted with impunity by steadfastly refusing to deliver monthly, quarterly, and annual audited and unaudited financial statements; financial forecasts; operational reports regarding MDC's production capacity and expectations; reports detailing the value of MDC's oil and gas reserves; and certifications that it remained in compliance with the financial covenants meant to protect the Agent against unauthorized debt increases and impairment of the extensive collateral package securing the $60 million underlying loan.

What little information the Agent has managed to decipher from stale bank statements, which it obtained only by exercising its rights directly with those banks pursuant to account control

---

[3] *Investors*, MDCTEXASENERGY.NET,  https://www.mdctexasenergy.net /investors (last visited Nov. 11, 2019).

agreements, and its own diligence illustrates a pattern and practice of gross mismanagement. MDC's finances reveal inter-company transfers in violation of multiple provisions of the applicable credit agreement, including improper distributions to MDC's parent company, inexplicable transfers to non-Debtor affiliates, and large monthly payments to two non-Debtor affiliates for purported management services that seem illusory, considering MDC is incapable of providing any of the required financial or operational reporting.

MDC's gross mismanagement is also evident from the meteoric rise in MDC's aging accounts payable and trade creditor liens – some 85 trade creditors, who provide services without which MDC is incapable of operating, have filed over 615 liens totaling in excess of $110 million, nearly all of which has been amassed in the past six months.

In addition, conflicts of interest pervade the Debtors' and its web of non-Debtor affiliates' management.  MDC CEO Mark Siffin controls every Debtor, the two companies allegedly providing MDC with management services, and a host of other companies, at least some of which are receiving transfers for unknown reasons.

Moreover, a pre-petition corporate governance dispute between Debtor and MDC parent MTE Holdings LLC and Riverstone Credit Management LLC, the administrative agent for a group of lenders who loaned $410 million, over the lawful control of MDC means that any post-petition action taken by existing management is in doubt.  Given the gross mismanagement to date, the existence of this dispute raises serious questions about existing management's ability and willingness to preserve the value of MDC for the benefit of its creditors.

These facts provide clear and convincing cause for the appointment of a trustee under 11 U.S.C. § 1104(a)(1), as well as under the more lenient "best interests" standard set by 11 U.S.C. §

1104(a)(2).  In the alternative, the facts support the appointment of an examiner to investigate, uncover, and preserve value for the creditors.

Absent the requested relief, existing MDC management will continue to mismanage the business, which threatens the viability of the company's real enterprise value – its oil and gas reserves.  A chapter 11 trustee is necessary to provide creditor confidence and to stabilize the situation in the field so that these oil and gas reserves are not damaged or rendered inaccessible through critical work stoppages.  As explained below, the risk of loss is not just monetary, but also includes serious safety, environmental, and health risks that cannot be ignored.

## JURISDICTION

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The legal predicates for the relief requested herein are 11 U.S.C. §§ 1104(a) and 1104(c).

## BACKGROUND

### A.    The MDC Loan Documents and Collateral

2.    Natixis and BMO Harris Bank N.A. are Lenders to MDC under the terms of a Credit Agreement, dated as of September 17, 2018 (as amended, the "MDC Credit Facility").  *See* Siffin Decl. ¶ 13; Fay Ex. 1.[4]

3.    The purpose of the loan was to fund MDC's oil and gas exploration and production operations in the Permian Basin of Texas.  *See* Siffin Decl. ¶ 6.  The agreement reflects an industry-

---

[4] "Siffin Decl." refers to the Declaration of Mark Siffin, Chief Executive Officer Of MDC Energy LLC In Support Of Chapter 11 Petitions And First Day Motions [D.I. 50].  "Fay Ex." refers to the exhibits attached to the Declaration of Erin R. Fay filed herewith.  Capitalized terms used but not defined herein shall have the meanings set forth in the MDC Credit Facility.

standard reserve-based lending ("RBL") arrangement in which the Lenders loaned MDC funds against MDC's estimated oil and gas reserves, otherwise known as the "Borrowing Base." *See id.* ¶ 13. MDC has drawn down the maximum amount allowed – $60 million (exclusive of required interest, other mandated fees and costs and applicable setoffs). *See id.* Although the agreement allows for potential loan increases in the event that the Borrowing Base is recalculated, *see id.*, MDC's self-inflicted continuing Events of Default prevented MDC from seeking such increases.

4.      The parties also executed a number of other agreements and documents in connection with the MDC Credit Facility, which are referred to (collectively with the MDC Credit Facility) as "Loan Documents." Among the Loan Documents are various guaranty, security, and other agreements intended to secure the broad base of collateral securing the MDC Credit Facility. *See id.* ¶ 14. These include:

- A Guaranty Agreement, dated as of September 17, 2018 (the "Guaranty Agreement"), pursuant to which wholly owned MDC subsidiaries Ward and Reeves are jointly and severally liable Guarantors of the MDC Credit Facility and required to repay all amounts due and owing in a continuing Event of Default under the MDC Credit Facility upon demand by the Administrative Agent. *See* Fay Ex. 2.

- A Pledge and Security Agreement, dated September 17, 2018 (the "Security Agreement"), pursuant to which MDC (as well as Ward and Reeves) pledged, assigned, and granted the Administrative Agent, on behalf of the Lenders, a first priority security interest in substantially all of MDC's, Ward's, and Reeves's assets. *See* Fay Ex. 3.

- Two Account Control Agreements, each dated September 17, 2018 (together, the "Control Agreements"), which provide the Administrative Agent certain rights with respect MDC's bank accounts at Prosperity Bank and The Bank of New York Mellon. *See* Fay Exs. 4 & 5.

- Two separate documents, each titled a "Deed of Trust, Assignment, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production" and each dated September 17, 2018 (together, the "Deeds of Trust"), transferring and assigning into a trust as collateral MDC's mineral and other property interests in Glasscock County, Texas and Reeves County, Texas. *See* Fay Exs. 6 & 7.

5.      Pursuant to these and other Loan Documents, the Lenders maintain first-priority liens on substantially all of MDC's assets, including, but not limited to, MDC's oil and gas reserves, its equipment, its cash, its bank accounts, its personal and intellectual property, and 100% of the equity in Ward and Reeves.

**B.      The MTE Credit Facility**

6.      MDC's parent company and co-Debtor MTE Holdings LLC ("MTE") separately borrowed $410 million under a separate Term Loan Credit Agreement between MTE and a group of lenders for which Riverstone Credit Management LLC ("Riverstone") acts as the administrative agent (the "MTE Credit Facility").  *See* Siffin Decl. ¶ 15.  The MTE Credit Facility is secured by, among other things, a pledge of MTE's equity interest in MDC.  *See id.* ¶ 16.

7.      Certain defaults by MTE under the MTE Credit Facility triggered Events of Default by MDC under the MDC Credit Facility.

**C.      Events Of Default Caused By MDC's Mismanagement**

***Financial Reporting and Related Defaults***

8.      Since not long after the MDC Credit Facility was executed, MDC violated its contractual obligation to provide the Lenders with various financial information, reserve reports, production reports, forecasts, certifications of compliance, and other essential information.

9.      On May 14, 2019, and July 18, 2019, the Agent provided MDC with formal notice of numerous Events of Default.  This included, among other Events of Default, MDC's failure to provide the Lenders with MDC's audited financial statements for 2018, unaudited financials for the first quarter of 2019, a Financial Plan for 2019, monthly production reports, reserve reports, and insurance certificates.  *See* Fay Exs. 8 & 9.

10.     These are not mere technical violations.  Rather, the Lenders required MDC to provide this information on a timely and regular basis because it is the only means by which the Lenders can assess MDC's current financial condition, oil and gas reserves, production capacity, and operational status.  It is also the only way that the Lenders can ensure that MDC remains compliant with financial covenants, which are intended to restrict MDC's ability to incur unsafe levels of debt, right to draw on the MDC Credit Facility, and distribute funds to third parties, including to MTE.

11.     Indeed, when coupled with MDC's repeated failures to certify that it is in compliance with applicable financial covenants and negative covenants, it becomes impossible to rely on any information from MDC.  Thus, while MDC has on occasion dribbled out late and incomplete financial information that still fails to comply with the information and disclosure obligations under the MDC Credit Facility, the information is already so stale on arrival that it offers no insight into MDC's actual financial condition.

12.     Prior to the July letter, MDC asked the Agent to voluntarily waive the Events of Default or forbear from enforcing rights and remedies.  In response, the Agent demanded insight into MDC's finances and operational capabilities, but, consistent with MDC's pattern and practice, the requested information never materialized and MDC did not otherwise meaningfully respond.

### Mounting Lien Defaults and Litigation

13.     Starting in May 2019, the Agent learned that MDC was in arrears on payments to its vendors.  MDC itself has no employees, *see* Siffin Decl. ¶ 10, and instead depends upon third party vendors and service providers to supply nearly all the materials, equipment, and labor necessary to MDC's operations.  As a result, failure to timely pay these trade creditors raised

concerns, particularly given the near-complete lack of insight into MDC's financial and operational condition.

14.     When the Agent first began its vendor inquiry in May 2019, it learned that a number of trade creditors had filed liens totaling millions of dollars.  That amount steadily continued to rise, eclipsing $55 million in or around September 6, 2019, and subsequently ballooning to over $110 million at the end of October 2019 in liens and aged accounts payable attributable to some 615 trade creditors.  In addition, the Agent discovered that vendors have filed at least 40 lawsuits against MDC seeking over $40 million.

15.     MDC never informed the Agent about any of these liens or lawsuits, despite its obligation under the MDC Credit Facility to do so promptly.  Moreover, the liens violated negative covenants under the MDC Credit Facility and presented a substantial threat to the value of the Lenders' secured collateral.

### Improper Distributions to MTE and Affiliates

16.     On or about June 30, 2019, MDC paid roughly $13 million to MTE's lenders to satisfy MTE's interest payment due under the MTE Credit Facility.  That distribution violated the MDC Credit Facility, which prohibits MDC from making such distributions while there are ongoing Events of Default.

17.     In breach of the MDC Credit Facility, MDC also has transferred funds to at least one non-Debtor affiliate, MDC Acquisition LLC ("MDC Acquisition"), which is not subject to a Control Agreement and therefore outside of the Agent's immediate control.

### Bankruptcy Event of Default

18.     MTE's bankruptcy petition constituted an automatic and incurable Event of Default under the MDC Credit Facility (the "Bankruptcy EOD"), which accelerated and required

immediate repayment of the entire principal amount of $60 million (plus accrued interest, fees, and other costs along with any applicable set offs) by MDC, Ward, and Reeves.

### MDC's Additional Improper Acts

19.     The Riverstone filings before this Court make clear that MDC has further breached the MDC and MTE Credit Facilities and threatened the ability of MDC to operate as a going concern through this bankruptcy process.  *See* [D.I. 6, 6-4, & 43].

20.     Before MTE filed its chapter 11 bankruptcy petition, and as a result of numerous alleged defaults by MTE under the MTE Credit Facility, Riverstone claimed MTE's equity interest in MDC and voted to, among other things, install a chief restructuring officer ("CRO") and a new five-member Board of Directors at MDC, as well as require MDC to use a financial advisor.  MTE then filed for bankruptcy and MDC refused to acknowledge Riverstone's rights, claiming them "void *ab initio*."  *See* [D.I. 6, ¶ 23].

21.     MDC's obstructionist behavior is not limited to its interactions with Riverstone. Over the course of the past month, despite entering into a Pre-Workout Agreement with the Agent intended to allow for the free flow of information and evaluate potential out-of-court restructuring options, no reliable or verifiable information was disclosed.[5]  Neither MDC nor its recently retained financial advisor have meaningfully engaged with the Agent or its financial advisor, RPA Advisors.

---

[5] As a result of that agreement, the Agent may not introduce as evidence any of the parties' discussions retroactive to May 13, 2019, except for May 14 and July 18, 2019 letters and the agreement itself.

*List of Events of Default and Attempted Enforcement*

22.     There are numerous uncured and incurable Events of Default outstanding, none of which the Lenders have waived or agreed to forbear from enforcing.  These Events of Default include, but are not limited to, the following violations of the MDC Credit Facility:

- Breach of §§ 10.01(i) and 10.02(a) for failure to repay the accelerated loan following MTE's bankruptcy filing;

- Failure to deliver (i) audited financial statements for the Fiscal Year ending December 31, 2018 within 120 days after the end of such Fiscal Year as required by § 8.01(a), and (ii) the related Compliance Certificate as required by § 8.01(c);

- Failure to deliver (i) financial statements for the Fiscal Quarters ending September 30, 2018, and December 31, 2018, within 45 days after the end of such Fiscal Quarter as required by § 8.01(b), and (ii) the related Compliance Certificate as required by § 8.01(c);

- Failure to deliver a Financial Plan for the 2019 Fiscal Year as required by § 8.01(d);

- Failure to deliver summary reports indicating the volume of production and sales for each calendar month during the Fiscal Year ending December 31, 2018, and for each month during the Fiscal Quarters ending March 3 and June 30, 2019, as required by § 8.01(l);

- Failure to deliver notices of any Default or Event of Default as required by § 8.02(a);

- Failure to promptly notify the Lenders or Agent of the existence of any action, suit, proceeding, investigation, or arbitration in excess of $200,000, such as vendor liens and lawsuits, as required by § 8.02(b);

- Failure to pay its obligations before they become delinquent or in default as required by § 8.04;

- Failure to deliver (i) updated Reserve Reports evaluating the Proved Oil and Gas Properties on or before March 31 or September 1, 2019, as required by § 8.12(a), and (ii) the related Authorized Officer certificate required by § 8.12(c);

- Failure to maintain the required Swap Agreements as of March 31, 2019, covering not less than 50% of reasonably anticipated monthly projected production from PDP Reserves for the future 24-month period following such date as required by § 8.17;

- Failure to observe the financial covenants required by § 9.01, including violations as of the last day of the fiscal quarters ending December 31, 2018, March 31, 2019 and June 30, 2019;

- Failure to prevent the existence of any Lien on any Properties as required by § 9.03;

- Failure to observe the financial covenants regarding Restricted Payments as required by § 9.04, including the prohibition against making a Restricted Payment during a Default or Event of Default; and

- Failure to remedy any breach of any covenant, condition, or agreement within designated time period as required by § 10.01(e).

23.    Following 13-plus months of fruitless efforts to obtain contractually required documents and information critical to assessing MDC's current financial position and restructuring discussions that amounted to little more than a delay tactic, the Agent had little choice but to enforce its rights and remedies.  Accordingly, on the morning of November 8, 2019, the Agent posted notices of foreclosure on, among other assets, MDC's oil and gas properties in Reeves/Glasscock Counties.

24.    MDC, Ward, and Reeves filed for chapter 11 bankruptcy protection later that day.

### **ARGUMENT**

25.    By this Motion, the Agent seeks entry of an order directing the appointment of a chapter 11 trustee in these chapter 11 cases to manage the business and affairs of MDC and its wholly owned subsidiaries – Ward and Reeves – pursuant to § 1104(a) of the Bankruptcy Code or, in the alternative, for appointment of an examiner under § 1104(c).

26.    MDC has demonstrated a pattern and practice of flouting its obligations under various credit agreements and an apparent unwillingness and inability to provide even the most basic financial information on a timely basis.  MDC wants to continue the trend in bankruptcy.  Indeed, as part of its first-day relief, MDC and the other Debtors have requested a nearly two-month extension to file its schedules of assets and liabilities and Statements of

Financial Affairs – that is an unacceptably long extension given that preparation of those documents already should be well underway and is not a difficult undertaking for a case of this size, not to mention it only prolongs the total lack of transparency into MDC's and the other Debtors' finances.  Moreover, the incontrovertible evidence shows chronic mismanagement and conflicts of interest between and among the web of MDC and MTE affiliates.

27.     Critically, the very existence of the pre-petition dispute between MTE and Riverstone over the right to manage MDC warrants the appointment of a trustee under either § 1104(a)(1) or § 1104(a)(2).  Alternatively, at least the appointment of an examiner under § 1104(c) is necessary to protect the Agent and the other creditors.

## I.     Cause Exists for the Appointment of a Chapter 11 Trustee Under § 1104(a)(1)

28.     The MDC Credit Facility was entered into less than two years ago.  Yet, in that short time, MDC's incompetence and mismanagement – in addition to its poor decision-making and otherwise obfuscating, distrustful, and improper behavior – have been demonstrated time and time again, necessitating the appointment of a trustee for cause.

### A.     The Applicable Standard

29.     Section 1104(a) provides, in pertinent part, as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest . . ., and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management . . ., or similar cause . . . or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . .

11 U.S.C. § 1104(a).  Where a court finds either that cause exists or that appointment is in the interest of the parties, an order for the appointment of a trustee is mandatory.  *In re W.R. Grace & Co.*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

30.    The categories enumerated in 11 U.S.C. § 1104(a)(1) "cover a wide range of conduct" and, thus, are best described as illustrative, rather than exclusive.  *In re Marvel Entm't. Corp.*, 140 F.3d 463, 472 (3d Cir. 1998) (internal quotations omitted).  Fraud, dishonesty, incompetence, and gross mismanagement of a debtor's business affairs are all grounds for appointment of a chapter 11 trustee under § 1104(a)(1).  *See, e.g.*, *In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989); *In re Colby Constr. Corp.*, 51 B.R. 113, 116-18 (Bankr. S.D.N.Y. 1985). The determination of whether cause exists is discretionary; it must be taken on a case-by-case basis, taking into account all relevant factors and the totality of the circumstances.  *See Sharon Steel*, 871 F.2d at 1225, 1228.

31.    While gross mismanagement and incompetence are the most common reasons supporting appointment of a trustee, *see In re Sharon Steel Corp.*, 86 B.R. 455, 458 (Bankr. W.D. Pa. 1988) *aff'd*, 871 F.2d 1217 (3d Cir. 1989), other factors, although not explicitly enumerated, are also considered:

> In determining the existence of cause, courts should consider enumerated and similar grounds in the context of the totality of the circumstances, including such things as management's competence and the quality of its business decisions, strategies and tactics; the debtor's policies, procedures and accounting practices; any financial improprieties; failure to maintain adequate records or to provide timely reports; the debtor's business with related parties; conflicts of interest; the actual or perceived dishonesty of debtor's management; and acrimony or loss of trust and confidence between the debtor and its creditors or employees or other parties with whom the debtor does business.  No single circumstance is necessarily determinative, and the importance ascribed to any particular circumstance must be considered in light of the whole.

*In re Railyard Co., LLC*, No. 15-12386-J11, 2016 WL 1254998, at *11 (Bankr. D.N.M. Mar. 30, 2016).

32.     A debtor-in-possession owes fiduciary duties to its creditors and the bankruptcy estate.  *In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 303 (Bankr. M.D. Pa. 2016) (citing *In re Marvel Entm't. Corp.*, 140 F.3d 463, 471 (3d Cir. 1998)); *see also Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 175 (2d Cir. 2005). These obligations "include a duty of care to protect the assets, a duty of loyalty and a duty of impartiality." *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010).  The rights of a debtor-in-possession, however, are not absolute and must be forfeited if these fiduciary duties are neglected.  *See id.* (collecting cases).

**B.      A Chapter 11 Trustee Is Necessary To Stop MDC's Incompetence And Gross Mismanagement**

33.     MDC management has demonstrated its inability to operate MDC and its wholly owned subsidiaries – Ward and Reeves – and its unwillingness to preserve the value of the company for its creditors.  Although the Debtors' filings to date blame its bankruptcy on the unexpected reduction in the price of oil and Riverstone's refusal to disburse further funds under the MTE Credit Facility, it is in fact due to MDC's incompetence and gross mismanagement. MDC's inability to provide even the most basic of financial reporting under the MDC Credit Facility, and failure to prepare and deliver financial and production forecasts and plans, does not stem from an unwillingness to turn it over; MDC would have otherwise done so long ago to stave off what MDC dismisses as "technical" failures under its credit agreements.  It is the result of a complete failure to act in a transparent and business-like manner, which is more than sufficient for the mandatory appointment of a trustee for cause under § 1104(a)(1).

34.     Failure to maintain adequate records or to provide timely reports is a key consideration in determining whether cause exists.  *See In re Railyard Co., LLC*, 2016 WL 1254998, at *11; *see also In re Oklahoma Ref. Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("It is also established that failure to keep adequate records and make prompt and complete reports justifies the appointment of a trustee.").

35.     Since almost immediately after execution of the MDC Credit Facility, MDC breached, and has continued to be in breach of, nearly every disclosure and reporting provision in the MDC Credit Facility.  This includes not just missing delivery of unaudited, consolidated financial statements for each quarter in 2019, but also a demonstrated inability to deliver audited financial statements for 2018.  While MDC's legal counsel forwarded along what appear to be 2018 financial statements, they are marked "draft," are not on any auditor letterhead, and show no indication that they are complete or accurate.  To date, no auditor has certified these financial statements, and it is unclear any auditor would be willing to do so.

36.     Moreover, at no point has MDC provided the mandated certificates attesting to the accuracy of what little, stale financial information MDC has dribbled out, nor has it certified compliance with the financial covenants required under the MDC Credit Facility.  As a result, MDC management has shown it is unwilling to attest to the accuracy of its own information.  That fact alone negates any ability to rely upon or trust any MDC information.

37.     MDC's refusal to engage with the Agent's financial advisor, and refusal to allow Riverstone's financial advisor access to its books and records, further indicates that MDC simply does not keep proper books and records.

38.     Further evidence of MDC's financial mismanagement is apparent from the dramatic rise in MDC's aging accounts payable and trade creditor liens, not to mention MDC's

indefensible failure to provide notice to the Agent of these debts and liens as required under the MDC Credit Facility.  The fact that MDC has incurred over $110 million in liens and aged accounts payable since May 2019 alone is an unfortunately remarkable feat that can only be attributed to gross financial and operations mismanagement.

39.     Operating oil and gas wells is extremely capital intensive, requiring proper exercise of cash management that is fundamentally lacking at MDC.  MDC's failure to pay its vendors and service providers while operating under a business model that is entirely reliant on their materials and labor destroys the creditors' trust and confidence in MDC.  *See In re Railyard Co., LLC*, 2016 WL 1254998, at *11; *Sharon Steel*, 86 B.R. at 466.

40.     It also creates a real and imminent risk of lost revenue and, more importantly, damage to the real value of MDC as a going concern – its wells and reserves.  MDC has no employees, *see* Siffin Decl. ¶ 10, and therefore cannot operate its business – extracting oil and gas from multiple locations in the Permian Basin – without its vendors and service providers.  Without the ability to operate, there will be no revenue.

41.     Worse still, if certain critical trade creditors – such as compression services, measurement services, gas lifting, sand separating, water disposal, chemical treatment, roustabout services, pumpers – cease providing services, there are imminent and serious health, safety, environmental risks.  In addition, oil wells are not something that can simply be shut off.  Ceasing operations is a complicated process that risks serious damage to the wellbore, any downhole equipment, and surface facilities, not to mention geological changes to the sub-surface reservoirs caused by pressurization changes that could alter the value of the oil and gas reserves themselves.  These risks are significantly increased here, where MDC would not face shutting in just one or two wells, but its entire field.  Additionally, even in the event of successful well shut-ins,

attempting to bring wells back online could cause damage or result in lower than previous production capability.

42.    More troubling is the fact that, in the face of exponentially increasing trade debt, MDC elected to funnel nearly $13 million to MTE's lenders to make an interest payment even though MTE was on the verge of a bankruptcy filing.  MDC also decided to continue making payments in unknown amounts to its own affiliates, including Debtor MDC Texas Operator LLC ("MDC Operator") and non-Debtor Maefield Development Corporation ("Maefield"), both of whom purport to manage MDC's business.  Moreover, MDC transferred funds to at least another of its affiliates, MDC Acquisition, rather than deploy that capital appropriately.   All of these actions were in clear breach of the MDC Credit Facility.

43.    Appointing a chapter 11 trustee is essential to stopping the ongoing mismanagement, putting MDC's financial affairs in order so that this bankruptcy proceeding  can proceed efficiently and with confidence in the accuracy of the financial and operational data, and stabilizing the insecurities of all MDC's creditors, including the trade creditors.

**C.    MDC's Web Of Conflicts Warrants The Appointment Of A Trustee To Prevent Improper Actions**

44.    Actions by debtors previously found to constitute cause under § 1104(a)(1) include material conflicts of interest that interfere with the debtor's ability to fulfill its fiduciary duties. *See, e.g.*, *In re Aardvark, Inc.*, No. 96-858, 1997 WL 129346, at *4 (D. Del. Mar. 4, 1997) (reversing bankruptcy court decision not to appoint trustee where there was "evidence of a potential conflict of interest" in addition to undisputed evidence of "inadequate recordkeeping, failure to file tax returns, and failure to make required payments"); *In re Grasso*, 490 B.R. 500, 517-18 (Bankr. E.D. Pa. 2013) (finding a conflict of interest where estate possessed potential claims against debtor's wife, and that such conflict constituted cause for appointment of trustee);

*Sharon Steel*, 86 B.R. at 465 (holding that management's conflict of interest warranted appointment of trustee).

45.     Where a debtor suffers from material conflicts of interest that prevent it from discharging its duties, an independent trustee should be appointed. *See In re Marvel Entm't*, 140 F.3d at 473.  A chapter 11 debtor-in-possession, which acts as a fiduciary of the bankrupt estate, must be an honest broker. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1986) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'") (internal quotation omitted).

46.     Courts have appointed chapter 11 trustees where, in addition to the questionable transfers of the debtor's assets as shown above, the officers and principals of the debtor were the same as those of the parent corporation. *See, e.g.*, *In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174, 177 (Bankr. E.D. Pa. 1984) (noting that "an obvious conflict of interest exists in the management of the two . . . corporations because the officers and principals of the parent corporation are the same individuals as the officers and principals of the debtor").  A chapter 11 trustee, however, is a disinterested party who can "monitor the relationship between the debtor and its parent corporation, establish controls over the transfer of cash assets, and insure that the assets of the estate are not being depleted." *Id.*; *see also In re Patman Drilling Int'l, Inc.*, No. 07-34622-SGJ, 2008 WL 724086, at *6 (N.D. Tex. Mar. 14, 2008) (holding that trustee appointment was appropriate due to management's conflicts of interest and creditors' lack of confidence); *In re McCorhill Publ'g Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (noting that where there are questionable intercompany financial transfers and the principals of the debtor occupy conflicting positions in the various transferee companies, cause exists to appoint a trustee); *cf. In re China*

*Fishery Grp. Ltd. (Cayman)*, No. 16-11895, 2016 WL 6875903, at *20 (Bankr. S.D.N.Y. Oct. 28, 2016) (holding that appointment of independent party to review intercompany balances "without the conflicts of interest that plague[d] current management" was warranted).

47.     Here, in addition to the reasons stated above, MDC management is hopelessly conflicted in carrying out its fiduciary duties for the benefit of creditors.  MDC CEO Mark Siffin is also in charge of MTE, MDC Operator, Ward, Reeves, and the other Debtors.  *See* Siffin Decl. ¶ 1. Siffin is also the Chairman and CEO of non-Debtor Maefield, which MDC has been paying approximately $305,000 each month for so-called "management services," and its affiliates.  *See* http://www.maefield.com/company/ (last visited November 11, 2019); *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Continue Using Existing Centralized Cash Management System, (b) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (c) Maintain Exiting Bank Accounts and Check Stock and (II) Granting Related Relief* ("Cash Management Motion") [D.I. 47], at ¶ 16.

48.     These inherent and otherwise unavoidable conflicts of interest indisputably prevent Siffin and MDC management generally from executing their fiduciary duties to the Debtors and their creditors.  *See In re SunCruz Casinos, LLC*, 298 B.R. 821, 832 (Bankr. S.D. Fla. 2003) (noting that where an owner wears "so many hats," it is impossible for it to carry out fiduciary duties of a debtor in possession and supplies cause to appoint a chapter 11 trustee).

**D.     A Chapter 11 Trustee Should Take Over At Least Pending A Decision On The Pre-Petition Dispute Over Who Lawfully Controls MDC**

49.     The dispute between MTE and MDC over Riverstone's right to take control of the MDC equity and vote to install a CRO and new board of directors further evidences MDC gross mismanagement, which has destroyed creditor trust and generated acrimonious disputes.  *See In re Railyard Co., LLC*, 2016 WL 1254998, at *11; *Sharon Steel*, 86 B.R. at 466.  The very existence

of a corporate governance dispute militates in favor of appointing a neutral third party to manage MDC until the dispute is resolved.

50. By appointing a CRO and new board for MDC, Riverstone exercised its contractual rights under the MTE Credit Facility prior to MTE's bankruptcy filing with the goal of providing independent governance and guidance for MDC from skilled energy-industry professionals to the benefit of all MTE's and MDC's creditors.  MDC's outright refusal to acknowledge Riverstone's rights increases acrimony and eradicates trust.

51. Siffin and MDC should not be allowed to remain in control of MDC post-petition in clear violation of the plain rights afforded to Riverstone to affect change in management pre-petition.  Allowing him to remain would reward his (and similar) breaches of contract to the detriment of MDC's creditors.

52. Instead, a chapter 11 trustee is required to restore creditor confidence and allow the bankruptcy proceedings to go forward without continued mismanagement and without further acrimonious disputes over even the most basic of financial and operational information.  Based on the totality of the circumstances, there is clear cause to appoint a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a)(1).

## II. Appointment Of A Chapter 11 Trustee Is In The Best Interest of Creditors Under § 1104(a)(2)

53. Alternatively, the Court should appoint a chapter 11 trustee for MDC because it "is in the interests of creditors, any equity security holders, and other interests of the estate" for largely the same reasons identified above. 11 U.S.C. § 1104(a)(2).

### A. The "Best Interests" Standard

54. Section 1104(a)(2) provides an additional basis for the appointment of a chapter 11 trustee that is less stringent and affords the Court more discretion.  *See, e.g.*, *In re Wings Digital*

*Corp.*, No. 05-12117 (ALG), 2005 WL 3789334, at *5 (Bankr. S.D.N.Y. May 16, 2005). Whether to appoint a trustee under § 1104(a)(2) is assessed according to a flexible standard that allows for the appointment of a trustee even where no cause exists under § 1104(a)(1). *See Sharon Steel*, 871 F.2d at 1226; *see also In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

55.     Simply put, § 1104(a)(2) gives the Court "discretion to appoint a trustee when doing so would serve the parties' and the estates' interests." *In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 1540941, at *11 (Bankr. S.D.N.Y. Mar. 31, 2015) (quoting *In re Marvel*, 140 F.3d at 474). This is a fact-driven analysis under the Court's broad equity powers. *See, e.g.*, *In re Soundview Elite, Ltd.*, 503 B.R. 571, 582-83 (Bankr. S.D.N.Y. 2014). When evaluating appointment of a trustee under the "best interest" prong, the Court should "eschew rigid absolutes and look to the practical realities and necessities," *In re Hotel Associates, Inc.*, 3 Bankr. 343, 345 (Bankr. E.D. Pa. 1980), by considering the following four factors:

> (a)     the trustworthiness of the debtor;
>
> (b)     the debtor in possession's past and present performance and prospects for the debtor's rehabilitation;
>
> (c)     the confidence – or lack thereof – of the business community and of creditors in present management;
>
> (d)     the benefits derived by the appointment of a trustee, balanced against the costs of appointment.

*In re Soundview Elite, Ltd.*, 503 B.R. 571, 583 (Bankr. S.D.N.Y. 2014); *In re Colorado-UTE Electric Ass'n*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990) (same).

56.     It is not necessary to find fault on the part of a debtor before appointing a chapter 11 trustee pursuant to § 1104(a)(2). *In re Eurospark*, 424 B.R. at 627 (Bankr. E.D.N.Y. 2010) (citing *Sharon Steel*, 871 F.2d at 1226); *see also Taub v. Adams*, No. 10-CV-02600(CBA), 2010 WL 8961434, at *5 (E.D.N.Y. Aug. 31, 2010) (appointing a trustee under § 1104(a)(2) "is not

punishment, nor does it imply a finding of fault"). Instead, it is a remedy afforded to the Court to ensure that the bankruptcy system functions properly and the rights of creditors are adequately balanced against the rights of the debtor.

### B. Every Single Factor Justifies Appointing A Chapter 11 Trustee

57.     Here, all of the above factors compel the appointment of a chapter 11 trustee to take control of MDC and its wholly-owned subsidiaries.

58.     As detailed above, MDC's incompetent and gross mismanagement of its financial and operational affairs, squandering of cash, and expense and debt mismanagement have caused numerous Events of Default under the MDC Credit Facility. The overwhelming majority of them are self-inflicted, caused by MDC's inability to provide the even most basic financial reporting to the Agent. The facts show a company completely disconnected from its self-described "culture of complete and total transparency with its credit partners." *See Investors*, MDCTEXASENERGY.NET, https://www.mdctexasenergy.net/investors (last visited Nov. 11, 2019).

59.     MDC is staring down over $100 million in aged accounts payable and trade creditor liens, yet funneled almost $13 million to MTE's lenders, $305,000 a month to Maefield, and unknown amounts to other affiliates, including MDC Acquisition, for no apparent purpose other than to place money out of the reach of the Agent's rights under the Control Agreements.

60.     In addition, the history of self-inflicted Events of Default, the unwillingness to proceed with out-of-court restructuring discussions, and, most recently, the corporate governance dispute with Riverstone demonstrate MDC's fundamental unwillingness to work with its creditors.

61.     Further, MDC's present performance and lack of apparent prospects is even worse than its past performance – MDC's initial bankruptcy filings show that it is almost entirely out of cash, embroiled in a corporate governance dispute, and without a path forward.

62.     Moreover, the oil and gas community in Glasscock and Reeves counties is small and interconnected.  As such, MDC's reputation as a floundering company on the brink of collapse due to gross mismanagement is well known.

63.     Finally, the health and safety risks and the likely damage to the collateral and future of MDC's business caused by improperly shut-in oil wells is a significant enough concern, without more, to establish that the best interests of MDC, Ward, Reeves, and their creditors are best served by the appointment of a chapter 11 trustee.

64.     Given the totality of the circumstances, there can be no legitimate question that the scales tip decidedly in favor of appointing a chapter 11 trustee.  A chapter 11 trustee will provide essential financial and operational controls that are lacking under MDC's management.  It also will send a strong signal to trade creditors that the mismanagement is at an end and allow for the situation in the field to stabilize.  Indeed, a neutral and professional third party is necessary to allow the distrust and animosity to dissipate and all the trustee and creditors to make rational decisions for the benefit of all creditors.

65.     As a result, the Court should appoint a chapter 11 trustee under § 1104(a)(2).

**III.**     **In the Alternative, This Court Should Direct the Appointment of an Examiner**

66.     In the event the Court finds that the facts do not warrant appointment of a trustee pursuant to either §§ 1104(a)(1) or (2) of the Bankruptcy Code, the appointment of an examiner to conduct an appropriate investigation of MDC is mandatory under § 1104(c) of the Bankruptcy Code.

67.     Section 1104(c) provides that

If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of the plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court *shall* order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor if –

(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

68.     As emphasized in the statutory language above, § 1104(c) provides that the court "shall" appoint an examiner if either of the two listed conditions are met, and the majority of courts treat the appointment of an examiner as mandatory.  *See, e.g.*, *In re Schepps Food Stores, Inc.*, 148 B.R. 27, 29-30 (S.D. Tex. 1992).

69.     Here, it should be undisputed that a plan has not yet been confirmed, that the Agent is a party in interest, and that the Agent has requested an examiner.  Moreover, it is beyond dispute that MDC's "fixed, liquidated, unsecured debts, other than debts for goods, services or taxes, or owing to an insider" exceed $5,000,000.  Consequently, appointment of an examiner is mandatory. *See In re Revco D.S., Inc.*, 898 F.2d 498, 500-01 (6th Cir. 1990) (section 1104(c)(2) mandates the appointment of an examiner if the debt threshold is met); *Walton v. Cornerstone Ministries Invs., Inc.*, 398 B.R. 77, 81-82 (Bankr. N.D. Ga. 2008) (appointment of examiner required where debt threshold is met); *In re Loral Space & Commc'ns, Ltd.*, 2004 WL 2979785, at *4 (S.D.N.Y. Dec. 23, 2004) (the majority view of Section 1104(c)(2) is that it "mandates the appointment of an examiner where a party in interest moves for an examiner and the debtor has $5,000,000 of

qualifying debt"); *In re UAL Corp.*, 307 B.R. 80, 84-86 (N.D. Ill. 2004) (concluding language of 1104(c)(2) requires appointment of an examiner).

70.     Moreover, for all the reasons above, the Agent has shown through credible evidence that the appointment of an examiner is in the best interest of creditors.

71.     Accordingly, the Agent has satisfied both prongs of § 1104(c) and, to the extent the Court is unwilling to appoint a chapter 11 trustee, in the alternative the Court therefore should appoint an examiner.

## **CONCLUSION**

Based on the foregoing, the Agent respectfully requests that the Court enter an order appointing a chapter 11 trustee or, in the alternative, appointing an examiner, and granting such other relief as the Court deems just and proper.

Dated:  November 12, 2019
       Wilmington, Delaware

**BAYARD, P.A.**

*/s/ Erin R. Fay*
Erin R. Fay (No. 5268)
Daniel N. Brogan (No. 5723)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail: efay@bayardlaw.com
       dbrogan@bayardlaw.com

- and -

**BRACEWELL LLP**

William A. (Trey) Wood III
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 221-1166
Facsimile: (713) 221-1212
Email:  trey.wood@bracewell.com

Mark E. Dendinger
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (860) 404-3970
Email: mark.dendinger@bracewell.com

**BRACEWELL LLP**
David J. Ball
David R. Kolker
Finney Abraham
1251 Avenue of the Americas, 49th Floor
New York, New York 10020
Telephone: (212) 508-6100
Facsimile: (212) 508-6101
Email: david.ball@bracewell.com
      david.kolker@bracewell.com
      finney.abraham@bracewell.com

*Counsel to the Agent*

**Exhibit A**