## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FOREVER 21, INC., *et al.*,[1] | ) Case No. 19-12122 (KG) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION SEEKING ENTRY OF AN
## ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO
## THE CONSULTING AGREEMENT, (II) APPROVING PROCEDURES
## FOR STORE CLOSING SALES, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"): (a) authorizing the Debtors to enter into that certain consulting agreement

dated as of September 30, 2019 (the "Consulting Agreement") by and between Forever 21, Inc.

and the contractual joint venture comprised of Gordon Brothers Retail Partners, LLC and Hilco

Merchant Resources, LLC (the "Consultant"), a copy of which is attached as Annex 1 to

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Forever 21, Inc. (4795); Alameda Holdings, LLC (2379); Forever 21 International Holdings, Inc. (4904); Forever 21 Logistics, LLC (1956); Forever 21 Real Estate Holdings, LLC (4224); Forever 21 Retail, Inc. (7150); Innovative Brand Partners, LLC (7248); and Riley Rose, LLC (6928).  The location of the Debtors' service address is: 3880 N. Mission Road, Los Angeles, California 90031.

[2]    A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Jonathan Goulding, Chief Restructuring Officer of Forever 21, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on September 29, 2019 (the "Petition Date"). Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

**Exhibit A**; (b) authorizing, but not directing, the Debtors to close the stores listed on <u>Annex 2</u> to

**Exhibit A** (collectively, the "<u>Designated Closing Stores</u>"), in accordance with the terms of the

store closing procedures attached as <u>Annex 3</u> to **Exhibit A** (the "<u>Store Closing Procedures</u>"), and

any sales provided for therein to be free and clear of all liens, claims, and encumbrances

(the "<u>Sales</u>"); (c) authorizing the Debtors to close additional stores at a later date or dates

(collectively, the "<u>Supplemental Closing Stores</u>," if any, and, together with the Designated Closing

Stores, the "<u>Closing Stores</u>"), in accordance with the terms of the Store Closing Procedures; and

(d) granting related relief. *As of the Petition Date, the Debtors do not anticipate closing all of*

*the Designated Closing Stores or any Supplemental Closing Stores.* To the extent the Debtors

determine in their business judgment that it is in the best interests of their estates to close stores in

addition to the Closing Stores, they shall close such stores in accordance with the terms of the

Order and the Store Closing Procedures. In addition, the Debtors request that the Court schedule

a hearing within approximately 30 days after the commencement of these chapter 11 cases to

consider entry of the Order.

<u>**Jurisdiction and Venue**</u>

2. The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

*Order of Reference* from the United States District Court for the District of Delaware, dated

February 29, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules

of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and rule 9013-1(f) of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "<u>Local Rules</u>"), to the entry of an order by the Court in connection with this Motion

to the extent that it is later determined that the Court, absent consent of the parties, cannot enter

orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.       The statutory bases for the relief requested herein are sections 105, 363, 365, and 554 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, and 6004, and Local Rule 9013-1(m).

**<u>Background</u>**

5.       The Debtors are a specialty fashion retailer of women's and men's apparel and accessories.  As of the Petition Date, the Debtors operate 549 stores across the United States, and 251 stores are operated internationally by non-Debtor affiliates.  Of the 251 international stores, 181 are owned and operated exclusively by the non-Debtor affiliates, 54 are franchises, and 16 are operated as joint ventures.  The Debtors also maintain a substantial online presence, with their e-commerce platform accounting for approximately 16 percent of all sales.  In addition to the 534 stores operated under the Forever 21 brand, the Debtors formed a beauty and wellness brand, Riley Rose, in 2017, which operates 15 stores in the United States.

6.       On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### The Store Closings

7.     As of the Petition Date, the Debtors operate 549 retail stores in 45 states, Guam, and Puerto Rico.  Like many retailers, the Debtors have struggled to support their outsized store footprint as consumers increasingly purchase clothing and other goods online.  However, in contrast to other retailers who sought chapter 11 relief to facilitate nationwide store closures to the detriment of their landlords, the Debtors expect to be able to solicit the postpetition support of their landlords in order to craft a consensual solution to an industrywide problem.  The Store Closing Procedures are a necessary tool for the Debtors to reinvigorate their strong underlying business and allow for a reorganized business unburdened by under-performing operations.

8.     In deciding which stores to shed, the Debtors' management team and advisors conducted an extensive store-by-store performance analysis of all existing stores to evaluate, among other factors, historical and recent store profitability, historical and recent sales trends, occupancy costs, the geographic market in which each store is located, the mall in which each store is located, the potential to negotiate rent reductions with the applicable landlords, and specific operational circumstances related to each store's performance (the "Performance Evaluation").

9.     After conducting the Performance Evaluation, the Debtors' management team and advisors determined it may be appropriate to close and wind down or conduct other similarly themed sales ("Store Closings") for up to 178 underperforming brick-and-mortar store locations. Pursuant to the Order, the Debtors seek to commence the Sales for the Designated Closing Stores no later than October 31, 2019 and expect such Sales and Store Closings to be completed and the properties vacated by December 31, 2019.  To the extent the Debtors determine to close any Supplemental Closing Stores, such related Sales may continue into 2020.  While the expected total proceeds from the Sales will depend on the number of Designated Closing Stores that are

ultimately closed, Debtors estimate that the total inventory cost in these store locations is approximately $80 million as of the Petition Date.

10.    For the avoidance of doubt, the Debtors do not anticipate closing all 178 store locations listed on Annex 2.  As the Debtors negotiate rent concessions and other operational improvements with the applicable landlords, the Debtors expect that it will be in the Debtors' best interest not to conduct Store Closings at certain locations.  If the Debtors determine to keep such store locations open, the Debtors will remove these store locations from Annex 2 and file an amended Annex 2 prior to the Court's hearing on this Motion.

11.    Concurrently, the Debtors, with the assistance of RCS Real Estate Advisors and Alvarez & Marsal North America, LLC, the Debtors' restructuring advisor, began lease modification negotiations with the Debtors' landlords for certain rent concessions and cure cost reductions with respect to certain leases associated with the Designated Closing Stores (the "Lease Negotiations"), with the goal of improving the financial performance of the Debtors' remaining store base.  These Lease Negotiations are ongoing, and the Debtors' ability to negotiate more favorable lease terms and rent reductions will drive the determination of whether or not to close additional stores.  Where the Debtors are unable to obtain sufficient relief in the Lease Negotiations concerning stores that are on the cusp of failing to meet certain performance standards, such stores will close as part of the Store Closings (which may begin simultaneously or on a rolling basis, depending on the relative timing the various Lease Negotiations conclude).

12.    The Debtors selected and engaged the Consultant to (a) assist the Debtors in their preparation for and management of the myriad steps required to effectuate the Store Closings in an orderly and efficient manner; (b) advise and assist the Debtors in their sale of their store inventory, together with certain inventory located in the Debtors' distribution centers that the

Debtors will transfer to the Closing Stores (collectively, the "Merchandise"), certain furniture, fixtures, and equipment located at the Closing Stores (the "FF&E"), and, subject to the Debtors' consent, the "Additional Consultant Goods" (together with the FF&E and the Merchandise, the "Store Closure Assets"); and (c) advise and assist the Debtors in their preparation of the stores for turnover to the applicable landlords on the terms set forth in the Consulting Agreement. Based on the Consultant's excellent reputation and experience in conducting store closings on an expedited timeline, the Debtors' management, in consultation with the Debtors' advisors, determined that retaining the Consultant to assist with the Store Closings and Sales provided the best and most effective path forward.

13.     The Store Closings are a critical component of the Debtors' go-forward business plan, and entry into the Consulting Agreement will allow the Debtors to conduct the Sales and Store Closings in an efficient, controlled manner that is integral to maximizing value for the Debtors' estates. The relief requested in this Motion will permit the Debtors to commence the Sales and Store Closings in a timely manner and will establish fair and uniform store closing procedures to assist the Debtors and their creditors through the Debtors' transition to a smaller, more profitable enterprise.

**I.     The Consulting Agreement.**

14.     Pursuant to the Consulting Agreement and subject to the Court's approval, the Consultant will serve as the exclusive consultant to the Debtors in connection with the Sales. Entering into the Consulting Agreement will allow the Debtors to utilize the logistical capabilities, experience, and resources of the Consultant in performing large-scale liquidations in a format that

allows the Debtors to retain control over the sale process.  A summary of the salient terms of the

Consulting Agreement is set forth below.[3]

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Services Provided by Consultant** | <u>Pre-Sale Services</u> In order to assist the Debtors in preparing the Stores for the Sale, and allocating inventory from its distribution centers to the Closing Locations, during the period between the date of execution of the Consulting Agreement and the Sale Commencement Date, the Consultant shall consult with the Debtors with respect to the merchandising of the Closing Locations and other matters in preparation for the Sale (the "Pre-Sale Services"), including providing merchandising to maximize gross margin and minimize sales deterioration. *Consulting Agreement, Section 2.2(xii).*<br><br><u>Consulting Services During the Sale Term.</u>  During the Sale Term, the Consultant shall provide the following services to the Debtors:  to the conduct of the Sale: (i) provide qualified Supervisors to supervise and assist the Debtors in the conduct of the Sale.  To the extent that the Debtors exercise the Removed Store Election and/or the Additional Closing Location Election, the number of Supervisors provided by the Consultant shall adjust upwards or downwards, as the case may be, as mutually agreed by the Debtors and the Consultant; (ii) provide the Debtors with such oversight, supervision and guidance with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and FF&E from the Closing Locations as may be required to maximize Gross Sales; (iv) recommend and implement appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term, consistent with the theme of the Sale and the Sale Guidelines, it being understood that the Sale will be advertised as a "Total Inventory Blowout", "Store Closing", "Everything Must Go," "Everything on Sale" or similar handles throughout the term of the Sale; (v) advise the Debtors as to discounting of Merchandise, appropriate staffing levels for the Closing Locations, and appropriate deferred compensation and incentive programs for Store Employees;  (vi) oversee the display of Merchandise in the Closing Locations; (vii) assist the Debtors in the formulation and implementation of a loss prevention security program designed to protect the Merchandise from theft or other shortages; (viii) assist the Debtors with accounting functions for the Closing Locations, including evaluation of sales of Merchandise by category, sales reporting and monitoring of expenses, in each case using the Debtors' infrastructure; (ix) recommend and implement the transfer and balancing of Merchandise between and among the Closing Locations to maximize results during the Sale; (x) participate in weekly calls with representatives of the Debtors and Lender Agent; and (xi) provide such other related services deemed necessary or prudent by the Debtors (in consultation with Lender Agent) and as mutually agreed by the Consultant under the circumstances giving rise to the Sale.  *Consulting Agreement, Sections 2.2(i) through Section 2.2(xi).* |
| **Term of Sale** | The Sale shall commence at the Closing Locations on or about the first business day after entry of the Order, but in no event later than October 31, 2019 (the "<u>Sale Commencement Date</u>"), other than with respect to Additional Designated Closing Locations, in which case as to each such location, the Sale Commencement shall be the date set forth in the Additional Sale Supplement for such location.  The Sale at the Closing Location shall conclude not later than December 31, 2019 (the "<u>Sale Termination Date</u>"), except with |

---

[3]   The following summary chart is for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects.

| TERM | CONSULTING AGREEMENT |
|---|---|
| | respect to the Additional Designated Closing Locations, in which as the Sale shall terminate no later than the last date in the calendar month in which the sixtieth (60th) day following the applicable Sale Commencement date for such Additional Designated Closing Location; *provided*, that the Debtors and the Consultant can mutually agree on an earlier Sale Termination Date. *Consulting Agreement, Section 1, Definitions.* |
| **Closing Locations** | Annexed to the Consulting Agreement as Exhibit A is a list of 178 Stores that the Debtors' have earmarked for Closure; *provided however*, the Debtors reserved the right (i) to designate, prior to October 25, 2019 (or such other date as the Debtors and the Consultant mutually agree) of the 178 Stores to be excluded from the Sale; and (ii) at any time during the Sale Term, designated additional stores for closure upon filing and service of one or more Additional Store Supplements; *provided however*, the aggregate number of Closing Locations, including any Additional Designated Closing Locations, shall not exceed 276 unless the Consultant consents. *Consulting Agreement, Sections 6.1 and 6.2.* |
| **Merchandise Included in the Sale** | All Merchandise located in the Closing Stores (including any inventory located in any Supplemental Closing Stores once identified), together with  any additional clearance or other Debtor owned inventory that the Debtors, following consultation with the Consultant in connection with the Pre-Sale Services being provided by Consultant, elect to transfer to the Closing Stores and include in the Sale. |
| **Compensation for Consultant and Special Purpose Payment** | <u>Pre-Sale Services Fee.</u>  The Debtors shall pay Consultant a fee equal to $20,000 per week ("Pre-Sale Fee") from execution of the Consulting Agreement through the Sale Commencement Date, which fee shall be due and payable on Wednesday for the week prior.  In addition to the Pre-Sale Fee, the Debtors shall reimburse Consultant for any expenses to be incurred in connection with the Pre-Sale Services in accordance with the budget attached to the Consulting Agreement as <u>Exhibit C</u> (the "Pre-Sale Budget") up to the aggregate amount set forth therein, which expenses shall be reimbursed to Consultant in addition to any Consultant Incurred Expenses and the Budget.  Prompty following the execution of the Agreement, the Company shall obtain Bankruptcy Court approval to fund, and shall thereafter promptly fund, to Consultant $75,000 (the "Special Purpose Payment") which shall be held by Consultant until the Final Settlement (defined below). The Debtors shall not be entitled to apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under the Consulting Agreement prior to the Final Settlement.  Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by the Debtors to Consultant under the Consulting Agreement.  Any portion of the Special Purpose Payment not used to pay amounts contemplated by the Consulting Agreement shall be returned to the Debtors within three days following the Final Settlement.  *Consulting Agreement, Section 3.2(c).* <br><br> <u>Base Consulting Fee.</u>  In consideration of Consultant's provision of the Services provided for under the Consulting Agreement, the Debtors shall pay to Consultant, from Gross Sales, a consulting fee in an amount equal to one and one-half percent (1.50%) of the Gross Sales at all of the Closing Locations (including any Additional Designated Closing Location(s) following exercise of the Additional Store Election (each as defined below)) (the "Base Consulting Fee"). *Consulting Agreement, Section 3.2(a).* <br><br> <u>Discretionary Fee Enhancement.</u>  In consideration of Consultant achieving results that are satisfactory to the Debtors, Consultant may, at its option, request that the Debtors approve an enhancement of the Base Consulting Fee in an amount up to one-half percent (0.50%) of the Gross Sales at all of the Closing Locations based on overall performance and |

| TERM | CONSULTING AGREEMENT |
|---|---|
| | performance in transitioning customers to the Debtors' ongoing stores and on-line platform, which enhancement shall be subject to the exclusive discretion of the Debtors, following consultation with the Lender Agent. *Consulting Agreement, Section 3.2(a).* <br><br> FF&E Disposition Fee.  In addition to the consulting Services provided for herein with respect to the sale of Merchandise, with respect to furniture, fixtures and equipment owned by the Debtors and located at the Closing Locations (collectively, the "FF&E"), Consultant shall sell the FF&E in the Closing Locations for the Debtors' benefit. Consultant shall advertise in the context of advertising for the Sale that items of FF&E at Closing Locations are available for sale, and shall contact and solicit known purchasers and dealers of furniture and trade fixtures.  In consideration of providing such services, Consultant shall retain 15.0% of the gross receipts (net only of applicable sales taxes) from all sales or other dispositions of FF&E (the "FF&E Fee").   In addition, the Debtors shall reimburse Consultant for Consultant's reasonable and documented out–of-pocket expenses incurred in connection with the sale or other disposition of the FF&E pursuant to a budget established by mutual agreement of the Debtors, the Consultant and the Lender Agent (the "FF&E Budget").  *Consulting Agreement, Section 3.3(a).* |
| **Payment of Consultant's Fees** | With regard to the payment of all fees and expense reimbursements due to the Consultant (collectively, the "Consultant's Fees and Expenses"), the Consulting Agreement requires that the Order, shall provide that, among other things, (A) the payment of all Consultant Fees and Expenses: (i) is approved without further order of the Court; (ii) shall be free and clear of all liens, claims and encumbrances, (iii)  shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with the Consulting Agreement; and (B) the Consultant's Fees and Expenses will be protected on terms and conditions reasonably acceptable to each of the Consultant, the agent under the Debtors' proposed debtor in possession ABL financing facility, and the agent under the Debtors' proposed debtor in possession term loan facility. *Consulting Agreement, Section 10.8.* |
| **Consultant's Insurance Obligations** | The Debtors shall maintain throughout the Sale Term, (i) insurance with respect to the Merchandise at the Closing Locations and any storage facility in amounts and on such terms and conditions as are consistent with the Debtors' ordinary course operations and (ii) casualty and liability insurance policies (including, but not limited to, product liability, comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the operation of the Closing Locations, and shall cause Consultant to be listed as an additional insured with respect to all such policies, and as loss payee for the property insurance.  The Debtors shall be responsible for the payment of all deductibles, self-insurance and other amounts payable in connection with any claim asserted under such policies, except for any claims arising directly from the negligence or willful misconduct of Consultant, or its employees, representatives, agents or Supervisors. *Consulting Agreement, Section 10.1.* |
| **Agent's Insurance Obligations** | Consultant shall maintain, throughout the Sale Term, liability insurance policies (including, but not limited to, comprehensive general liability and auto liability insurance) covering injuries to persons and property in or in connection with Consultant's provision of Services at the Closing Locations, and shall cause the Debtors to be named an additional insured with respect to such policies. *Consulting Agreement, Section 10.2.* <br><br> Notwithstanding any other provision of the Consulting Agreement, the Debtors and the Consultant agree that the Debtors shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Closing Locations before, during and after the Sale Term, except to the extent any such claim arises from the negligence, willful misconduct, or unlawful acts of |

| Term | Consulting Agreement |
|---|---|
| | the Consultant or any Supervisor engaged by Consultant under the terms of the Consulting Agreement. *Consulting Agreement, Section 10.2.* |
| **Indemnification by Agent** | The Consultant shall indemnify and hold the Debtors and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, the "Debtors Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; (ii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of the Debtors (including, without limitation, any Store Employees) by Consultant or any of Consultant's representatives (including, without limitation, any Supervisor); (iii) any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of the Debtors or the Debtors Indemnified Parties or from a breach of the terms hereof by the Debtors; and (iv) the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor. *Consulting Agreement, Section 8.2.* |
| **Indemnification by Merchant** | The Debtors shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) the Debtors' material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; (ii) any failure of the Debtors to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iii) any consumer warranty or products liability claims relating to any Merchandise; (iv) any liability or other claims asserted by customers, any of the Debtors' employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant; (v) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by the Debtors or any of the Debtors' employees, agents, or representatives (including, without limitation, any the Debtors employees); and (vi) the negligence or willful misconduct of the Debtors or any of its officers, directors, employees, agents or representatives. *Consulting Agreement, Section 10.7.* |
| **Miscellaneous** | Subject to prior consent of the Debtors', Consultant shall have the right to syndicate and partner with additional entities to serve as "Consultant" under the Consulting Agreement and as to any similar agreements, including with respect to Company's Canadian affiliate. *Consulting Agreement, Section 10.8.* |

II.     **The Store Closing Procedures.**

15.     The Debtors seek approval of streamlined procedures (*i.e.*, the Store Closing Procedures) to sell the Store Closure Assets, in each case free and clear of liens, claims, and encumbrances.   The Debtors also seek approval of the Store Closing Procedures to provide newspapers and other advertising media in which the Sales may be advertised with comfort that the Debtors are conducting the Sales in compliance with applicable law and with the Court's approval.   The Debtors seek approval of the Store Closing Procedures in light of the need to commence the Sales and Store Closures associated with the Designated Closing Stores during the approaching traditionally high-volume season.

16.     The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Store Closure Assets to maximize their value to the estates.   The Debtors estimate that the Designated Closing Stores will take until approximately December 31, 2019, and, depending on the number of Supplemental Closing Stores (if any), the Store Closings may continue into 2020.

III.    **Liquidation Sale Laws and Dispute Resolution Procedures.**

17.     Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws").   Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closings.   Such requirements likely would hamper the Debtors' ability to maximize value in selling their inventory.   Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Store Closing

Procedures and, to the extent such procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures shall control.

18.     To facilitate the orderly resolution of any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), on a final basis:

a.      Provided that the Sales are conducted in accordance with the terms of the Order and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors and the Consultant will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of the Order and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

b.      Within five (5) business days after entry of the Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Order, the Consulting Agreement, and the Store Closing Procedures on the following: (i) the landlords for the Closing Stores; (ii) the Attorney General's office for each state in which the Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Sales are being held; and (iv) the division of consumer protection for each state in which the Sales are being held (collectively, the "Dispute Notice Parties").

c.      With respect to any Supplemental Closing Stores, within five (5) business days after filing any list of Supplemental Closing Stores (each, a "Supplemental Closing Store List") with the Court, the Debtors will serve by email, facsimile, or first-class mail, copies of the Order, the Consulting Agreement, the Store Closing Procedures, and the Supplemental Closing Store List on the Dispute Notice Parties.

d.      To the extent that there is a dispute arising from or relating to the Sales, the Order, the Consulting Agreement, or the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Order or service of any Supplemental Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to:  (i) the Debtors, 3880 N.

Mission Road, Los Angeles, California 90031, Attn: Scott Hampton (scott.hampton@Forever21.com); (ii) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (jsussberg@kirkland.com) and Aparna Yenamandra (aparna.yenamandra@kirkland.com) and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Anup Sathy, P.C. (asathy@kirkland.com); (iii) proposed co-counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Attn: Laura Davis Jones (ljones@pszjlaw.com), James E. O'Neill (jo'neill@pszjlaw.com), and Timothy P. Cairns (tcairns@pszjlaw.com); (iv) proposed special counsel to the Debtors, Montgomery McCracken Walker & Rhoads, 437 Madison Avenue, New York, NY 10022, Attn: Maura I. Russell; (v) co-counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox (sfox@riemerlaw.com); (vi) co-counsel to the Consultant, Pepper Hamilton, LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, Delaware 19899-1709, Attn: Douglas Herrmann (herrmand@pepperlaw.com); (vii) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Juliet M. Sarkessian (juliet.m.sarkessian@usdoj.gov); (viii) counsel to any statutory committee appointed in these chapter 11 cases; (iv) counsel to the administrative agent under the Debtors' prepetition revolving credit facility and the Debtors' proposed debtor in possession ABL financing facility, Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Julia Frost-Davies (julia.frost-davies@morganlewis.com) and Christopher L. Carter (christopher.carter@morganlewis.com) and Richards, Layton & Finger, PA, One Rodney Square, 920 North King St., Wilmington, Delaware 19801, Attn: Mark D. Collins (collins@rlf.com); and (x) counsel to the administrative agent under the Debtors' proposed debtor in possession term loan facility, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Adam C. Harris (adam.harris@srz.com), Frederic L. Ragucci (frederic.ragucci@srz.com), and Marc B. Friess (marc.friess@srz.com).  If the Debtors, the Consultant, and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

e.      In the event that a Dispute Resolution Motion is filed, nothing in the Order shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Order nor the conduct of the Debtors pursuant to the Order violates such Liquidation Sale Laws.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Order or to limit or interfere with the

Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to the Order, absent further order of the Court. Upon the entry of the Order, the Court grants authority for the Debtors and the Consultant to conduct the Sales pursuant to the terms of the Order, the Consulting Agreement, and/or the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

f.   If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (d) and (e) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

## IV.    Fast Pay Laws.

19.    Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws" and, together with the Liquidation Sale Laws, the "Applicable State Laws"). These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

20.    The nature of the Store Closings contemplated by this Motion will result in a substantial number of employees being terminated at or near the end of the Store Closings. To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible, under normal payment procedures, and pursuant to applicable Court order.[4]   However, the Debtors'

---

[4]   The Debtors are seeking such relief pursuant to the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief,* filed contemporaneously herewith.

payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws.  Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by state law.  This process requires the Debtors' payroll department to calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check, and then prepare each such check for mailing.  Given the number of employees who will likely be terminated in connection with the Store Closings, this process easily could take several days, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible.

**V.      Lease Restrictions.**

21.      The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings and Sales.  In certain cases, the contemplated Store Closings and Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including, without limitation, reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions.  Such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory.

22.      The Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the Store Closings, the Sales, or institute any action against the Debtors in any court (other than this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise

impedes the conduct of the Store Closings, the Sales, or the advertising and promotion (including through the posting of signs) of the Sales.

**Basis for Relief**

I.      **The Court Should Authorize the Debtors' Entry into the Consulting Agreement.**

23.     The Debtors seek to enter into the Consulting Agreements pursuant to section 363(b)(1) of the Bankruptcy Code, which provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C.§ 363(b). Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have required that such use, sale, or lease be based upon the sound business judgment of the debtor. *See, e.g.*, *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.*, and requiring good faith); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Del. & Hudson Ry., Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision).

24.     "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *vacated on other grounds* 607 F.3d 957 (3d Cir. 2010); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14

(Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

25.     Here, the Debtors have exercised their sound business judgment in determining to enter into the Consulting Agreement.   In consultation with its advisors, the Debtors have determined that continuing to operate the Closing Stores, without the concessions the Debtors are attempting to obtain through the Lease Negotiations, the Closing Stores are a burden to these estates, and the Store Closure Assets should be liquidated for the benefit of the Debtors' estates and their creditors.   Prior to the Petition Date, the Debtors retained the services of Montgomery McCracken Walker & Rhoads LLP ("MMW&R").   MMW&R reached out to seven (7) of the national liquidation firms, to solicit proposals from such firms to serve as a consultant to the Debtors in connection with the Debtors conduct of the Sales.   With the consent of the Debtors, certain of the liquidation firms formed contractual joint ventures, and the process culminated in the Debtors receiving three (3) proposals.  Ultimately, after reviewing the proposals and consulting with their advisors, the Debtors selected the Consultant, and the terms set forth in the Consulting Agreement as providing the best alternative for the conduct of the Store Closings and Sales.   The terms of the Consulting Agreement are the result of a reasonable due diligence and solicitation process, are the product of arm's-length bargaining, and in the Debtors' business judgment provide the Debtors with the necessary flexibility to effectuate the Store Closings and Sales, while at the same time pursue the Lease Negotiations.

26.     The Consultant has extensive expertise in conducting liquidation sales and can provide the Debtors with the requisite guidance and assistance in the implementation of the Store Closings and Sales in an efficient and cost effective manner.  While the Debtors will retain control

and all decision making authority with respect to the Closing Stores, the Sales, and the Debtors'

employees at the Closing Stores, approval of the Consulting Consulting Agreement will enable the

Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct

the Store Closing and Sales for the benefit of all stakeholders.  Given the potential number of

Closing Stores and overall impact of the Lease Negotiations on the Designated Closing Stores list,

the terms of the Consulting Agreement accommodate and satisfy the Debtors' need to be fluid and

flexible as the Lease Negotiations unfold.

## II.      The Debtors Have a Valid Business Justification for the Sales.

27.     Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a

debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may

use, sell, or lease, other than in the ordinary course of business, property of the estate."

11 U.S.C. § 363(b)(1).  When selling assets outside of the ordinary course of business, a debtor

must articulate a valid business justification to obtain court approval.  *See, e.g.*, *Myers v. Martin*

(*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788

F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel*

*Corp.*, and requiring good faith); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel*

*Corp.*), 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Del. & Hudson Ry., Co.*, 124 B.R. 169, 175–

76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test

in the *Abbotts Dairies* decision).  When a debtor demonstrates a valid business justification for a

decision, a strong presumption arises "that in making [the] business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action taken

was in the best interests of the company."  *Official Comm. of Subordinated Bondholders v.*

*Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that

the Delaware business judgment rule has "vitality by analogy" in Chapter 11, especially where the

debtor is a Delaware corporation) (quotations omitted).

28.    Store closing or liquidation sales are a routine occurrence in chapter 11 cases

involving retail debtors.    *See, e.g.*, *In re Ames Dept. Stores*, 136 B.R. 357, 359 (Bankr.

S.D.N.Y. 1992) (noting that liquidation sales are an important part of "overriding federal policy

requiring [a] Debtor to maximize estate assets").    As such, bankruptcy courts in this jurisdiction

have approved similar store closing sales.    *See, e.g.*, *In re Avenue Stores, LLC*, No. 19-11842 (LSS)

(Bankr. D. Del. Sept. 13, 2019); *In re Charming Charlie Holdings, Inc.*, No. 19-11534 (CSS)

(Bankr. D. Del. August 14, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del.

Apr. 9, 2019); *In re Heritage Home Group, LLC*, No. 18-11736 (KG) (Bankr. D. Del. Sept. 28,

2018); *In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018);

*In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014).[5]

29.    Sufficient business justification exists to approve the proposed Sales under

section 363(b)(1).    The Debtors, with the assistance of their advisors, have determined that the

Sales represent the best alternative to maximize recoveries to the Debtors' estates with respect to

the Store Closure Assets and provide the Debtors with much-needed liquidity while optimizing

their remaining fleet of Stores.    There are meaningful amounts of Merchandise, in the aggregate,

that will be monetized most efficiently and quickly through an orderly process conducted in

consultation with an experienced liquidation firm.    Further, delay in commencing the Sales would

diminish the recovery tied to monetization of the Store Closure Assets for several important

reasons.    Many of the Closing Stores fail to generate positive cash flow and therefore are a

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.
Copies of these orders are available upon request to the Debtors' proposed counsel.

significant drain on liquidity.  As such, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at the Closing Stores.  Further, uninterrupted and orderly Sales will allow the Debtors to timely reject leases associated with the Closing Stores and, therefore, avoid the accrual of unnecessary administrative expenses for rent and related costs.[6]

### III.   The Court Should Approve the Sale of the Store Closure Assets Free and Clear of all Liens, Encumbrances, and Other Interests Under Bankruptcy Code Section 363(f) of the Bankruptcy Code.

30.   The Debtors request approval to sell the Store Closure Assets on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f) of the Bankruptcy Code "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in *bona fide* dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f); *see also Citicorp Homeowners Servs., Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met). Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens.  *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

---

[6]   Contemporaneously herewith, the Debtors filed the *Debtors' Omnibus Motion Seeking Entry of an Order (I) Authorizing (A) The Rejection of Certain Unexpired Leases and (B) the Abandonment of Certain Personal Property, Each Effective* Nunc Pro Tunc *to the Petition Date and (II) Granting Related Relief.*

31.    Although the term "any interest" is not defined in the Bankruptcy Code, the Third Circuit has noted that the trend in modern cases is toward "a broader interpretation which includes other obligations that may flow from ownership of the property." *Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258–59 (3d Cir. 2000). As the Fourth Circuit held in *In re Leckie Smokeless Coal Co.*, the scope of section 363(f) is not limited to *in rem* interests in a debtor's assets. 99 F.3d 573, 581–82 (4th Cir. 1996) (cited with approval by the Third Circuit in *Folger Adam*). Thus, a debtor can sell its assets under section 363(f) "free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

32.    With respect to any other party asserting a lien, claim, or encumbrance against the Store Closure Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f). In connection with the sale of the Store Closure Assets, the Debtors propose that any liens, claims, and encumbrances asserted against the Store Closure Assets be transferred to and attach to the amounts earned by the Debtors under the Sales with the same force, effect, and priority as such liens currently have on the Store Closure Assets.

## IV.    The Court Should Waive Compliance with Applicable State Laws and Approve the Dispute Resolution Procedures.

33.    The Debtors' ability to conduct the Sales in accordance with the Store Closing Procedures and without strict compliance with all Applicable State Laws is critical to the Sales' success. Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Sales, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales. Additionally, compliance with Fast Pay Laws would require the Debtors to pay terminated employees within a timeframe that would be detrimental to the conduct of these chapter 11 cases, if not impossible.

34.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtors propose the Store Closing Procedures as a way to streamline the administrative burdens on their estates while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings. As such, the Debtors believe the Store Closing Procedures mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings and, therefore, the requested relief is in compliance with any applicable Liquidation Sale Laws.

35.     The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws. *First*, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws. *See, e.g.*, Ark. Code Ann. § 4-74-103 (exempting from the provisions of the chapter sales pursuant to any court order); Fla. Stat. Ann. 559.25(2) (same); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); La. Rev. Stat. Ann. § 51:43(1) (same); N.Y. Gen. Bus. Law § 584(a) (same); Or. Rev. Stat. Ann. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order). *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closings to proceed notwithstanding contrary Applicable State Laws as it is essential to the continued operation of the Debtors' business. *Third*, this Court will be able to supervise the Store Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. As such, creditors and the public interest

are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of the Court.

36.    Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See Belculfine v. Aloe (In re Shenango Group. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

37.    Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety.  *See Baker & Drake. Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).  However, preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety.  *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

38.    Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors.  Accordingly, authorizing the Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time

limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate.  The Debtors do not seek a general waiver of all state and local law requirements, but only those that apply specifically to retail liquidation sales.  Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Sales.  Moreover, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising.  Finally, the Dispute Resolution Procedures provide an ordered means for resolving any disputes arising between the Debtors and/or the Consultant and any Governmental Units with respect to the applicability of any Liquidation Sale Laws and should therefore be approved.

39.    Further, this Court has recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein.  *See, e.g.*, *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bank. D. Del. Apr. 9, 2019) (ordering that "[n]either the Debtors nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including, without limitation, any Governmental Unit"); *In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018) (authorizing debtors to conduct store closing sales under the terms of the order and holding that "no further approval, license, or permit of any Governmental Unit shall be required"); *In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (stating that debtors were authorized to conduct store closing sales under the terms of the order "without the necessity of further showing compliance" with liquidation laws); *In re Boscov's*, No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Consultant (or any of the landlords of the Closing Stores) for conducting or advertising the Sales in a manner inconsistent with Liquidation

Sales Laws, provided that the Sales are conducted and advertised in compliance with this Order");

*In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering

that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store

Closing Consultant without the necessity of compliance with any federal, state or local statute or

ordinance, lease provision or licensing requirement affecting store closing, 'going out of business',

liquidation or auction sales, or affecting advertising, including signs, banners, and posting of

signage, other than Safety Laws and General Laws").

40.     Courts in this jurisdiction have also granted similar relief from Fast Pay Laws in

other bankruptcy cases under similar circumstances.  *See, e.g.*, *In re Z Gallerie, LLC*, No. 19-10488

(LSS) (Bankr. D. Del. Mar. 15, 2018) (granting relief from federal, state, or local laws including

any "fast pay laws" in connection with store closing sales); *In re Charming Charlie Holdings, Inc.*,

No. 17-12906 (CSS) (Bankr. D. Del. Dec. 13, 2017) (same); *In re Golfsmith Int'l Holdings, Inc.*,

No. 16-12033 (Bankr. D. Del. Oct. 13, 2016) (same); *In re Vestis Retail Grp, LLC*, No. 16-10971

(LSS) (Bankr. D. Del. May 16, 2016) (same); *In re Hancock Fabrics*, No. 16-10296 (BLS) (Bankr.

D. Del. Feb. 25, 2016) (same).

## V.     The Court Should Waive Compliance with any Restriction in the Leases.

41.     Certain of the Debtors' leases governing the premises of the stores subject to any

Sales may contain provisions purporting to restrict or prohibit the Debtors from conducting store

closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in

chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly

administer its reorganization case and maximize the value of its assets under section 363 of the

Bankruptcy Code.  *See Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such

lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate

assets. . . ."); *In re R. H. Macy and Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding

that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

42.     This Court has held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.  *See, e.g.*, *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Mar. 15, 2018) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 13, 2017) (same) *In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (same); *In re Boscov's*, No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (same); *In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same).

43.     Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors and or the Consultant to conduct the Sales and Store Closings without reference to any such restrictive provisions or interference by any landlords or other persons affected, directly or indirectly, by the Sales.

**VI.    The Court Should Approve the Abandonment of Certain Property in Connection with any Liquidation Sales.**

44.    After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

45.    The Debtors are seeking to sell all FF&E remaining in the Closing Stores. However, the Debtors may determine that the costs associated with holding or selling certain property or FF&E exceeds the proceeds that will be realized upon its sale or that such property is not sellable at all. In such event, the property would be of inconsequential value and benefit to the estates and/or may be burdensome to retain.

46.    To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining FF&E or other property located at any of the Closing Stores without incurring liability to any person or entity. The Debtors further request that the landlord of each Closing Store with any abandoned FF&E or other property be authorized to dispose of such property without liability to any third parties.

47.    Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information that, alone or in conjunction with other information, identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

27

**VII.    The Court Should Approve the Procedures Relating to the Supplemental Closing Stores.**

48.    The Debtors request that the Store Closing Procedures and the Order apply to any Supplemental Closing Stores.  To provide landlords and other parties in interest with information regarding the ultimate disposition of the Closing Stores, to the extent that the Debtors seek to conduct the Sales at any Supplemental Closing Store, the Debtors will file a Supplemental Closing Store List with the Court and serve a notice of their intent to conduct the Sales at the Supplemental Closing Stores on the applicable landlords (the "Supplemental Closing Store Landlords") and interested parties, including the (a) U.S. Trustee for the District of Delaware; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP ABL Agent and the Prepetition ABL Agent; (d) counsel to the DIP Term Loan Agent; (e) co-counsel to the Consultant; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the state attorneys general for all states in which the Debtors conduct business; (i) counsel to certain majority equity holders for Debtor Forever 21, Inc.; (j) Dispute Notice Parties; and (k) any party that requests service pursuant to Bankruptcy Rule 2002 by email (to the extent available to the Debtors) or overnight mail.  With respect to Supplemental Closing Store Landlords, the Debtors will mail such notice to the notice address set forth in the lease for such Supplemental Closing Store (or, if none, at the last known address available to the Debtors) and to their counsel, if known.

49.    The Debtors propose that the Supplemental Closing Store Landlords (each of whom will have already been served with this Motion and the Order) and any interested parties have seven days after service of the applicable Supplemental Closing Store List to object to the application of the Order to their Stores.  If no timely objections are filed with respect to the application of the Order to an Additional Closing Store, then the Debtors should be authorized,

pursuant to sections 105(a) and 363(b) and (f) of the Bankruptcy Code, to proceed with conducting the Sales at the Additional Closing Store in accordance with the Order, the Store Closing Procedures, and the Consulting Agreement.  If any objections are filed with respect to the application of the Order to an Additional Closing Store, and such objections are not resolved, the objections and the application of the Order to the Supplemental Closing Store will be considered by the Court at the next regularly scheduled omnibus hearing, subject to the rights of any party to seek relief on an emergency basis on shortened notice, to the extent necessary so that the Debtors can move promptly to maximize value and minimize expenses for the benefit of their creditors and stakeholders.  *See In re Charming Charlie Holdings, Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 13, 2017) (approving procedures on an interim basis); *In re rue21, inc.*, No. 17-22045 (Bankr. W.D. Pa. May 18, 2017) (approving similar procedures for supplemental stores on an interim basis); *In re APP Winddown, LLC (f/k/a American Apparel, LLC)*, No. 16-12551 (Bankr. D. Del. Dec. 19, 2016) (approving similar procedures for supplemental stores on a final basis); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 13, 2016) (same); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (CSS) (Bankr. D. Del. June 28, 2013) (same).

## VIII.    The Court Should Find that Any Sale of the Store Closure Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman.

50.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  The Debtors will not be selling or releasing personally identifiable information in the course of the Sales, although the Debtors request that the Consultant will be

authorized to distribute emails and promotional materials to the Debtors' customers. Therefore, appointment of a consumer privacy ombudsman is unnecessary.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

51.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P 6003. For the reasons discussed above, authorizing the Debtors to enter into the Consulting Agreement, approving store closing or similar themed sales in accordance with the Store Closing Procedures, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course, preserve the going concern value of the Debtors' operations and, maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Reservation of Rights

52.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Order is intended or shall be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to

section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party in interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties in interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's right to subsequently dispute such claim.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

53.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

54.     The Debtors will provide notice of this Motion to:  (a) the U.S. Trustee for the District of Delaware; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition revolving credit facility and the Debtors' proposed debtor in possession ABL financing facility and counsel thereto; (d) the administrative agent under the Debtors' proposed debtor in possession term loan facility and counsel thereto; (e) counsel to certain of the Debtors' landlords; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the state attorneys general for all states in which the Debtors conduct business; (i) counsel to certain majority equity holders for Debtor Forever 21, Inc.; (j) the landlords of the Closing Stores; and

(k) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### **No Prior Request**

55.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of the Order, substantially in the forms attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated: October 1, 2019
Wilmington, Delaware

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:            ljones@pszjlaw.com
                      joneill@pszjlaw.com
                      tcairns@pszjlaw.com

-and-

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Anup Sathy, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*