**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| MTE HOLDINGS LLC, *et al.* | ) | Case No. 19-12269 (CSS) |
| Debtors.[1] | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | Ref. Docket No. 71 |

**MOTION OF RIVERSTONE CREDIT MANAGEMENT, LLC AND JOINDER TO MOTION FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE**

Riverstone Credit Management, LLC ("***Riverstone***" or the "***Agent***"), as Administrative and Collateral Agent for the lenders (the "***Lenders***")[2] under that certain Term Loan Credit Agreement dated September 17, 2018 (the "***Credit Agreement***"), by and through its undersigned counsel, respectfully submits this motion (the "***Motion***") for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Proposed Order***"), appointing a single chapter 11 trustee at the Debtors MTE and MDC under the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and this Joinder to the *Motion of Natixis, New York Branch[3] for an Order (I) Appointing a Trustee Pursuant to Section 1104(a) of the Bankruptcy Code, Or (II) in the Alternative,*

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: MTE Holdings LLC ("***MTE***") (7894); MTE Partners LLC ("***MTE Partners***") (1158); Olam Energy Resources I LLC "***Olam***") (0770); MDC Energy LLC ("***MDC***") (9140); MDC Texas Operator LLC (1087); Ward I, LLC (6817); and MDC Reeves Energy LLC (3644) (collectively, the "***Debtors***"). The Debtors' address is 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240.

[2] The Lenders are: CPPIB Credit Investments III Inc.; Centaurus Capital LP; New Jutland Partners, LP; Fenwood Road Capital Partners, LP; AG Energy Funding, LLC; Riverstone Credit Partners – Direct, L.P.; Riverstone Credit Partners II – Direct, L.P.; Riverstone Strategic Credit Partners A-1 AIV, L.P.; Melody Business Finance, LLC; The Värde Fund XII (Master), L.P.; Värde Investment Partners (Offshore) Master, L.P.; Värde Investment Partners, L.P.; The Värde Fund VI-A, L.P.; The Värde Skyway Master Fund, L.P.; and The Värde Private Debt Opportunities Fund (Onshore), L.P.

[3] Natixis, New York Branch ("***Natixis***") is the administrative agent on behalf of the lenders, Natixis and BMO Harris Bank N.A., in connection with a $60 million credit agreement with MDC dated September 17, 2018 (the "***MDC Credit Facility***").

1

*Appointing an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code* [Docket No. 71][4] (the "***Natixis Trustee Motion***," and this joinder thereto, the "***Joinder***"). In support of this Motion and Joinder, Riverstone incorporates by reference the Agent's *Complaint for Declaratory Relief by Riverstone Credit Management, LLC against MDC Energy LLC* [Adv. Docket No. 1] (the "***Declaratory Judgment Complaint***," initiating the "***Declaratory Judgment Action***") and respectfully submits the following:

## PRELIMINARY STATEMENT

1.  For the reasons set forth below, as well as in the Declaratory Judgment Complaint and the Natixis Trustee Motion, MTE is incapable and unfit to manage MDC, and its continued status as manager is detrimental to the Debtors' estates and all stakeholders. At the helm of MTE is Mark Siffin, who controls and manages each of the Debtors, and who the Agent is concerned may have inappropriately diverted money belonging to the Debtors' estates to himself through an affiliate for the purpose of hiding such payments. Under Mr. Siffin's mismanagement, both MTE and MDC have demonstrated a consistent pattern of disregard for their contractual obligations, obfuscation and deceit toward their creditors, and, upon filing these Chapter 11 cases, a disregard for the Chapter 11 process and the orders of this Court.

2.  Riverstone also joins the Natixis Trustee Motion, the allegations of which are incorporated herein by reference. Because Mr. Siffin's mismanagement and conflicts of interest will harm creditors of both MTE and MDC, the appointment of a single trustee for both entities is necessary to protect the interests of all stakeholders.

3.  The Agent understands the magnitude of the relief being sought at this juncture in these Chapter 11 cases; however, rarely are there circumstances so clearly warranting a creditor's

---

[4] References to "Docket No." shall relate to the Debtors' main case, Case No. 19-12269 (KBO). Any references to "Adv. Docket No." shall relate to this Declaratory Judgment Action.

deep mistrust of a debtor's current management and the need for the immediate replacement of such management by an independent and competent estate fiduciary. Riverstone is not alone in its views, as evidenced by the Natixis Trustee Motion and as Riverstone believes will be further evidenced by certain of the Debtors' other stakeholders. As the Court likely has noticed, there is nothing typical about these Chapter 11 cases, and it is under these atypical circumstances that the Agent is forced to seek the relief set forth herein.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). This Court has the ability to grant the relief sought under 11 U.S.C. § 1104(a). Riverstone confirms its consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## RELIEF REQUESTED

5.      By this Motion, the Agent seeks entry of an order appointing a single chapter 11 trustee at the Debtors under 11 U.S.C. § 1104(a).

**BASIS FOR RELIEF**

**THE COURT SHOULD APPOINT A SINGLE CHAPTER 11 TRUSTEE AT THE DEBTORS**

6. Courts will leave in place a debtor in possession only when current management "can be depended upon to carry out the fiduciary responsibilities of a trustee." *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). Where management is incapable of performing these duties, or where the confidence of creditors evaporates, a chapter 11 trustee must be appointed. *See In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 473 (3d Cir. 1998). The creditors of MTE and MDC cannot trust the Debtors' management due to a consistent pattern of deceit and obfuscation.

7. The Court should appoint a single chapter 11 trustee at the Debtors MTE and MDC for cause, because the Debtors' management has exhibited fraud, dishonesty, and incompetence both pre-and post-petition. In addition, appointment of a Trustee would be in the interests of the Debtors' creditors and all other stakeholders because the Debtors' current management cannot be relied upon to make decisions that are consistent with management's fiduciary duties to all stakeholders. It is precisely under these circumstances that courts appoint a chapter 11 trustee.

8. Section 1104(a) of the Bankruptcy Code authorizes the appointment of a trustee in a chapter 11 case in two circumstances:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, *either before or after the commencement of the case*, or similar cause []; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate[].

11 U.S.C. § 1104(a) (emphasis added).

9. "The party moving for appointment of a trustee . . . must prove the need for a trustee under either subsection by clear and convincing evidence." *Marvel*, 140 F.3d at 471; *see also In re*

*Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989); *In re G-I Holdings, Inc.*, 385 F.3d 313, 317-18 (3rd Cir. 2004). "If a court finds that the moving party has discharged this burden, it 'shall' appoint a trustee, 11 U.S.C. § 1104(a), but determining whether the moving party has satisfied its burden under either subsection is committed to the court's discretion." *G-I Holdings*, 385 F.3d at 318 (citing *Marvel*, 140 F.3d at 471); *see Sharon Steel*, 871 F.2d at 1225-26; *In re W.R. Grace & Co.*, 285 B.R. 148, 157-58 (Bankr. D. Del. 2002).

10. The categories enumerated in Section 1104(a)(1) "cover a wide range of conduct" and are best described as illustrative, rather than exclusive. *See Marvel*, 140 F.3d at 472 (internal citations and quotations omitted). Significantly, prepetition conduct that raises serious questions regarding management's ability to run the company without bias toward a particular stakeholder, like the conduct here, is sufficient alone to warrant the appointment of a chapter 11 trustee. *See* 11 U.S.C. § 1104(a)(1); *see also Sharon Steel*, 871 F.2d at 1225-29 (cause existed to appoint chapter 11 trustee based in part on prepetition actions); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("[The debtor's] pre-petition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee.").

**A.    Cause Exists to Appoint A Chapter 11 Trustee**

11. This Court should find that cause exists to appoint a chapter 11 trustee under 11 U.S.C. § 1104(a)(1) because of the fraud and dishonesty of MTE and MDC management, as well as their incompetence and gross mismanagement both before and after the commencement of these cases.

*Fraud and Dishonesty*

12. Since MTE and MDC's respective bankruptcy filings (both of which were commenced without any notice to the Agent, the Lenders, or Natixis), the Debtors' management has demonstrated a pattern of attempting to evade and deceive their creditors. Despite the clear

5

grant of reporting and information rights to the Agent and Natixis in the *Interim Cash Collateral Order* [Docket No. 12], MTE and MDC have refused to provide required information. For instance, MTE and MDC have failed to provide the finalized pre-petition accounts payable monthly balances since August 2019, monthly financial statements since July 2019, and a detailed schedule of cash flows from October 1, 2018 through to the petition date.

13. The information that has been provided by the Debtors post-petition has demonstrated why the Debtors are so reluctant to share certain critical required information with key stakeholders. Soon after the Debtors' bankruptcy filing, the Debtors disclosed that approximately $23.5 million had been transferred from the MDC Energy bank account to MDC Acquisitions ("***MDCA***"), an entity affiliated with Mr. Siffin, between January and November of 2019. At the Debtors' Section 341 meeting, the Agent learned for the first time that MDCA used certain of these funds to pay bills on behalf of the Debtors, including funding retainers for the Debtors' professionals (a fact that is notably absent from the Debtors' professionals' retention applications), and that approximately $8.5 million of these funds had been used to pay Mr. Siffin—their own CEO—"consulting fees" in connection with the Debtors' saltwater disposal business. In the week following the Section 341 meeting, the Agent and other creditors asked additional questions about these consulting fees and learned that: (i) that there was no underlying consulting or other agreement between the Debtors and Mr. Siffin; (ii) the payment of these fees was hidden through the diverting of money out of the Debtor through Siffin affiliate MDCA; (iii) the invoices for these fees were first sent by email to the Chief Operating Officer ("***COO***") of MDC, Mr. Paul Cyphers, on November 8, 2019, the day MDC filed for chapter 11; (iv) this was the first time the COO became aware that such fees were charged; and (v) the fees were not just related to the saltwater disposal business, but also for "services related to vendor and loan management."

14. The payment of "consulting fees" to Mr. Siffin, which went undisclosed to the Lenders prepetition, also constitute events of default under the Credit Agreement as clear violations of both the representation regarding transactions with affiliates in the Credit Agreement and the covenant restricting transactions with affiliates in the Credit Agreement. The Debtors have not explained why Mr. Siffin should be paid millions of dollars in "consulting fees" for managing the businesses for which he served as CEO, or why the payments were obscured from both the COO of MDC and the Lenders by being diverted through an affiliate not under the observation or control of the COO. These circumstances not only evidence mismanagement, but also emphasize the immediate and dire need for independent oversight at the Debtors, and further demonstrate that it is imperative that the Agent move forward with discovery on an expedited basis to determine the extent and magnitude of the mismanagement and interested transactions by the Debtors' management.

15. This post-petition deceit and obfuscation on the part of the Debtors' management is, unfortunately, something the Agent has experienced throughout its relationship with the Debtors. Prepetition, MTE concealed numerous ongoing defaults from the Agent and Lenders under both the Credit Agreement and MDC Credit Facility, and falsely certified on numerous occasions that MTE was in compliance with the Credit Agreement. *See* Adv. Docket No. 1, ¶¶ 34-42, 44-45, 47-48, 50, 53, 55; *see also* Docket No. 71, ¶¶ 9, 22.

16. In February 2019, the Agent waived several specified then-existing events of default through the First Amendment to the Credit Agreement. *See* Adv. Docket No. 1, ¶ 29. Following the First Amendment, MTE made several draw requests in quick succession totaling $120 million. *See* Adv. Docket No. 1, ¶¶ 41-49. For each of the First Amendment and three successive borrowing requests, the Debtors (through either Mr. Siffin or COO Paul Cyphers)

certified compliance with the Credit Agreement, and the Agent relied on these certificates. *See* Adv. Docket No. 1, ¶¶ 42-44, 46-49. The Agent would learn months later that these compliance certificates were false, and that MTE was not in compliance with the Credit Agreement. *See* Adv. Docket No. 1, ¶¶ 42, 45, and 48.

17. The events of default concealed from the lenders included, among other things, millions of dollars in mechanics liens, accounts payable representing debt materially past due, unauthorized capital expenditures that occurred without an approved plan of development in place, transactions with affiliates, and violations of the financial covenants under the Credit Agreement and the MDC Credit Facility. *See* Adv. Docket No. 1, ¶¶ 42, 45, 48, and 54.

18. In one particularly egregious example, MTE's February 22, 2019 compliance certificate, issued in connection with the First Amendment, included either falsified or materially inaccurate 2018 year-end financial information. *See* Adv. Docket No. 1, ¶ 37. The balance sheet delivered in connection with the February 22, 2019 compliance certificate showed current liabilities of $69.781 million, which kept MTE in compliance with the financial covenants of the Credit Agreement and the MDC Credit Facility. But when Mr. Siffin delivered an updated balance sheet in July (in connection with the required audit of the Company for the year ended December 31, 2018), this new balance sheet revealed $114.243 million in new "Accrued Liabilities", indicating that throughout 2019, including during each of the draws totaling $120 million, MTE was in breach of the Credit Agreement. These new "accrued liabilities" appeared nowhere on the balance sheet relied upon by the Agent in waiving specified defaults in February and funding $120 million between February and April. *See* Adv. Docket No. 1, ¶ 37.

19. MTE also failed repeatedly to provide complete, accurate, and current financial information to the Lenders, despite contractual requirements to provide such information and the

Agent's exercise of contractual inspection rights. *See* Adv. Docket No. 1, ¶¶ 37, 55-62, 66, 78, 96; *see also* Docket No. 71, ¶ 22.

20. This blatant disregard for contractual obligations by the Debtors' management was felt acutely by the Agent and Lenders. As lenders to the holding company MTE, unauthorized debt or capital expenditures at MDC or defaults under the MDC Credit Facility can prevent the Lenders from receiving cash interest payments. Moreover, unlike secured operating company creditors, the Lenders cannot look directly to operating company assets as security if MTE defaults on its obligations under the Credit Agreement or the MDC Credit Facility. An independent trustee is necessary to ensure competent management of MDC and to protect the Lenders from Mr. Siffin's complete disregard for their interests.

*Incompetence and Gross Mismanagement*

21. The incompetence and gross mismanagement on the part of the Debtors' management has been evident throughout the short duration of these chapter 11 proceedings. Paragraphs 12-20, *supra*, describe just some of MTE and MDC's delay, deceit, and obfuscation tactics.

22. On November 27, 2019, on the eve of the Thanksgiving holiday, the Debtors—without providing any advance notice to the Agent or Natixis—filed an emergency motion to authorize payment of a deposit to Great American Capital Partners ("**GACP**") for GACP's expenses in negotiating a DIP financing facility on an exclusive basis, along with a motion for shortened notice. *See* Docket Nos. 142 and 143. The Debtors' attempt to rush into DIP financing negotiations without consulting its existing lenders is additional evidence of their mismanagement and lack of transparency to their creditors.

23. On December 4, 2019, the Agent learned that the Debtors' financial advisor, Conway MacKenzie, had abruptly resigned or been terminated, leaving creditors of MTE and MDC without a financial professional to facilitate the flow of information and concerned as to what may have prompted Conway's departure. *See* Docket No. 251.

24. As of today, the latest monthly financial statements delivered to the Agent are for the month ended July 31, 2019 and the latest accounts payable listing provided to the Agent is as of the month ended August 31, 2019. Even more concerning, the Debtors have represented that they do not ***have*** more recent monthly financial statements or an accounts payable listing. That the Debtors' stakeholders—and apparently the Debtors themselves—have no insight into the financial performance of MDC for over four months underscores the gross mismanagement of this enterprise and the need for a trustee that will protect the creditors' interests.

25. In sum, the Debtors' management has engaged in tactics to obfuscate the current financial situation at MTE and MDC, and have demonstrated that management itself may not understand the current financial situation of the Debtors. This leaves both the Court and creditors in the dark as to how the current management is running the companies. One of the most fundamental duties of a chapter 11 debtor, the violation of which alone warrants appoint of a trustee, "is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization." *V. Savino Oil & Heating Co., Inc.*, 99 B.R. at 526 (describing "[o]ne of the most fundamental and crucial duties of a debtor-in-possession upon the filing of a Chapter 11 petition"). In this respect, the Debtors have and continued to fail both the Court and their creditors.

26. All the while, value is deteriorating at the Debtors to the detriment of all stakeholders. As a striking example, the Debtors did not pay royalties on their oil and gas leases

for the months of September 2019 and October 2019, and did not make a motion to pay such royalties until December 6, 2019.  *See* Docket No. 231.  Because Texas oil and gas leases, which are not subject to Section 365 of the Bankruptcy Code, *see Matter of Topco, Inc.*, 894 F.2d 727, 739 n.17 (5th Cir. 1990), can be terminated upon a single missed payment, the disregard of these payments puts the Debtors' most valuable assets in serious jeopardy.

27.    Again, the Debtors' disregard of their obligations to creditors and refusal to provide any transparency has been consistent even before the filing of these chapter 11 proceedings.  Since September 2018 when MTE entered into the Credit Agreement and the MDC Credit Facility, MTE committed more than thirty events of default.  *See* Docket No. 71, ¶ 7.  In addition to the false certifications discussed above, on which the Lenders relied to advance $120 million to MTE, MTE's refusal to provide required financial information, and the payment of the "consulting fees" in clear violation of the Credit Agreement, these defaults included drilling without an approved plan of development in place and breaching required financial covenants under both the Credit Agreement and MDC Credit Facility.  MTE and MDC's numerous defaults demonstrate management's complete inability to manage their business affairs as well as a total disregard for their obligations to creditors.  MTE and MDC's disregard of contractual obligations is not limited to the Lenders and Natixis.  At the time of MDC's bankruptcy filing it had more than $250 million in aging accounts payable and reported over $135 million in mechanics liens.

28.    Further, as described in detail in paragraph 18, *supra*, the liabilities on the Debtors' balance sheet sheared more than $114 million to the downside when the Debtors' internal financial statements were subject to audit.  That change was more than 25% of the balance sheet asset value of MTE and indicated that MTE could not pay its debts as they came due as early as December 31, 2018.  Discovery will help the Agent understand if the omission of this $114 million from the

December 31 2018 balance sheet, which facilitated $120 million in draws on the Credit Agreement, was either fraudulent or grossly incompetent.

29.    Moreover, MTE and MDC have misled and failed to negotiate in good faith with creditors to resolve their violations of their obligations, refusing to respond meaningfully to the Agent's forbearance proposals, and filing these bankruptcy proceedings in an effort to avoid the Agent exercising remedies under the Credit Agreement.

**Conflicts of Interest**

30.    Besides the unwillingness or inability of MTE and MDC management to fulfill their obligations to creditors, there also exist material conflicts of interest that prevent management from discharging its duties to creditors, and an independent trustee should be appointed.  *Marvel*, 140 F.3d at 473.  Courts have appointed chapter 11 trustees where the officers and principals of the debtor were the same as those of the parent corporation.  *See, e.g.*, *In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174, 177 (Bankr. E.D. Pa. 1984) (noting that "an obvious conflict of interest exists in the management of the two . . . corporations because the officers and principals of the parent corporation are the same individuals as the officers and principals of the debtor").

31.    A chapter 11 trustee, however, is a disinterested party who can "monitor the relationship between the debtor and its parent corporation, establish controls over the transfer of cash assets, and insure that the assets of the estate are not being depleted." *Id.; see also In re Patman Drilling Int'l, Inc.*, No. 07-34622-SGJ, 2008 WL 724086, at *6 (N.D. Tex. Mar. 14, 2008) (holding that trustee appointment was appropriate due to management's conflicts of interest and creditors' lack of confidence); *In re McCorhill Publ'g Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (noting that where there are questionable intercompany financial transfers and the principals of the debtor occupy conflicting positions in the various transferee companies, cause exists to

appoint a trustee); *cf. In re China Fishery Grp. Ltd. (Cayman)*, No. 16-11895, 2016 WL 6875903, at *20 (Bankr. S.D.N.Y. Oct. 28, 2016) (holding that appointment of independent party to review intercompany balances "without the conflicts of interest that plague[d] current management" was warranted).

32. An irreconcilable conflict exists as Mark Siffin serves as the CEO of MDC, MTE, and the other Debtors, and received $8.5 million in undisclosed and essentially undocumented payments for "consulting services" shortly before the Debtors' chapter 11 filings. *See Declaration of Mark Siffin, Chief Executive Officer Of MDC Energy LLC In Support Of Chapter 11 Petitions And First Day Motions* [Docket No. 50] ("**Siffin Declaration**"), ¶ 1. Siffin is also the Chairman and CEO of non-Debtor Maefield, to which MDC has been paying approximately $305,000 each month for management services. *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Continue Using Existing Centralized Cash Management System, (b) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (c) Maintain Exiting Bank Accounts and Check Stock and (II) Granting Related Relief* [Docket No. 47] ("**Cash Management Motion**"), at ¶ 16. Notably, neither the Debtors' Cash Management Motion nor the Siffin Declaration discloses the movement of cash outside of the Debtors' cash management system to MDCA. These undisclosed payments also constitute events of default under the Credit Agreement and further demonstrate the need for the appointment of a trustee. *See In re Citizens Corp.*, No. 311-11792, 2012 WL 649853, at *7 (Bankr. M.D. Tenn. Feb. 27, 2012) (owner of holding company used operating company as income source rather than in the best interest of the debtor, justifying appointment of a trustee).

**B.    Appointing A Chapter 11 Trustee Is In The Interests of Creditors**

33. Even absent a finding of "cause," the Court has broad discretion to appoint a chapter 11 trustee when "such appointment is in the interests of creditors, any equity security holders, and

13

other interests of the estate . . . ." 11 U.S.C. § 1104(a)(2). In deciding whether to exercise its equitable power to appoint a trustee under Section 1104(a)(2), a court will "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." *In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980). "Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of fault." *In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) (appointing trustee upon finding that it was in the best interests of creditors, as well as on evidence of gross mismanagement).

34. In deciding whether a trustee should be appointed under § 1104(a)(2), courts consider: "(1) the debtor's trustworthiness; (2) past and present performance and the potential for reorganization; (3) whether creditors have confidence in present management; (4) and the benefits of appointing trustee balanced against the cost of appointment." *In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016) (citing *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010)); *see In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

35. Here, all of the factors weigh in favor of the appointment of a single trustee to administer the estates of the Debtors in the best interests of the creditors and all equity holders. As set forth above, and in the Declaratory Judgment Action and Natixis's Motion for Chapter 11 Trustee, MTE and MDC have been incompetently managed by Mr. Siffin, and all of the creditors' collateral is at risk of deterioration in the near term. *See* Adv. Docket No. 1; Docket No. 71. MTE and its Debtor affiliates have displayed a consistent disregard for their obligations (both contractual and Court-ordered), have drawn down millions of dollars under the Credit Agreement and, as demonstrated in the Natixis Trustee Motion, the MDC Credit Facility through materially false statements, have paid Mr. Siffin (either directly or through a non-Debtor affiliate) $8.5 million in

undisclosed "consulting fees" before the commencement of these cases, have refused to provide required information to their creditors both pre- and post-petition, and have repeatedly taken significant action throughout these bankruptcy proceedings without notifying or consulting its creditors. A trustee, as a neutral and professional third party, is necessary to stabilize the situation at each of the Debtors to protect the interests of creditors and all equity holders.

36. In the case of jointly administered cases, when appropriate, single election of a chapter 11 trustee is not only permitted but also preferred. *See* Bankruptcy Rule 2009; *In re PL Liquidation Corp.*, 305 B.R. 629, 633 (Bankr. D. Del. 2004).

37. As such, the Court should grant this Motion and the Natixis Trustee Motion, and appoint a single chapter 11 trustee to administer the estates of the Debtors under 11 U.S.C. § 1104(a)(2).

## **NOTICE**

38. Riverstone will provide notice of this Motion by first class mail to (i) the Debtors and (ii) the Office of the United States Trustee for the District of Delaware.

[*Remainder of Page Intentionally Left Blank*]

## **CONCLUSION**

39. The Agent respectfully requests that the Court enter the Proposed Order granting the relief requested herein and granting such other relief as the Court deems just and proper.

Dated: December 16, 2019
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Edmon L. Morton*
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Rolin P. Bissell (No. 4478)
Kenneth J. Enos (No. 4544)
James M. Yoch, Jr. (No. 5251)
Jaclyn C. Weissgerber (No. 6477)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1256

**VINSON & ELKINS LLP**
David S. Meyer (admitted pro hac vice)
Clifford Thau (admitted pro hac vice)
Marisa Antos-Fallon (admitted pro hac vice)
Jessica C. Peet (admitted pro hac vice)
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Telephone: (212) 237-0000
Facsimile: (212)237-0100

**BAILEY & GLASSER LLP**
Brian A. Glasser (admitted pro hac vice)
Kevin W. Barrett (admitted pro hac vice)
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103

*Attorneys for the Agent*