# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MTE Holdings LLC, *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 19-12269 (CTG)<br><br>Jointly Administered<br><br>**Related Docket No. 2334** |

## <u>MEMORANDUM OPINION</u>[1]

    The debtors are parties to various mineral rights leases that authorize them to drill for oil and gas in exchange for the payment of royalties on the oil and gas they extract from the land.  Certain of the lessors, known as "interest holders," filed proofs of claim, alleging that they were owed amounts for royalties that were due and owing as of the petition date.  The debtors generally do not dispute that they owe money to the interest holders for unpaid royalties, though the precise amounts of those claims have not yet been fully liquidated.  The question the parties have put before the Court, however, is whether those claims are secured, and if so, whether the interest holders' liens come ahead of or behind the liens held by the debtors' reserve-based lenders.  The interest owners' argument for secured and priority status rests on Texas Business and Commerce Code § 9.343, a non-uniform provision of the Uniform Commercial Code enacted by the Texas legislature to protect the rights of interest owners.  The Court concludes that the interest holders' claims are unsecured because

---

[1] This Memorandum Opinion sets out the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable to this contested matter under Fed. R. Bankr. P. 9014(c).

the language of section 9.343 does not create a security interest that covers the claims that the interest holders actually hold.  While the parties also present other disputes, such as the relative priority of any lien created under section 9.343 and the liens of the RBL lenders in light of the reasoning of *In re Semcrude*,[2] the effect of the cash collateral order on any liens held by the interest holders and the application of the lowest-intermediate balance test to the proceeds of the oil and gas at issue, the Court does not believe, in light of the conclusions reached on the statutory issue, that the outcome of those disputes would affect the conclusion that the interest holders have unsecured claims.  The Court accordingly does not reach those issues.

## Factual and Procedural Background

The debtors, which are in the oil and gas exploration, drilling and development business, filed for bankruptcy protection in October 2019.[3]  In the ordinary course, the debtors have entered into numerous mineral leases with various interest holders under which they are obligated to pay interest holders royalties for extracted hydrocarbons.  These leases authorize owners of mineral interests to sell or otherwise convey the exclusive right to extract minerals to third parties in exchange for a share of the proceeds from the sale of oil and gas production.  The debtors are party to approximately 800 oil and gas leases in Texas.[4]  A number of interest holders have

---

[2] 407 B.R. 112 (Bankr. D. Del. 2009).

[3] The lead debtor in these cases, MTE Holdings, LLC, filed its petition on October 22, 2019. MDC Energy LLC and MDC Texas Operator, LLC, each a subsidiary of MTE Holdings, LLC, filed their petitions on November 8, 2019.

[4] *Declaration of Scott J. Davido in Support of Debtors' Tenth Omnibus (Substantive) Objection to Claims* [D.I. 2335] ¶ 7.

filed proofs of claim for unpaid royalties. In the debtors' tenth omnibus proof of claim objection, D.I. 2334, (the "Objection"), the debtors objected to 42 proofs of claim. In the Objection, the debtors seek to reclassify the claims that were filed as secured claims as unsecured claims. In some cases, the debtors also seek to reduce the amount of the asserted claims.

Six royalty claimants filed responses to the debtors' Objection, which cover 19 of the proofs of claim at issue in the debtors' Objection.[5] The Court held an evidentiary hearing with respect to these claims allowance disputes on August 11, 2021.[6] The parties agreed that the question of the amount of unpaid royalties with respect to the 19 proofs of claim was not yet ripe for decision – the parties intended

---

[5] *Response of Dr. Austin I. King and Austin King Oil & Gas, LLC in Opposition to Debtors' Tenth Omnibus (Substantive) Objection to Claims* (the "King Response") [D.I. 2383]; *Response of Susan Finley, Sherrie Finley, Rene Daugherty Gill, Patricia Lynn Dixon, Odie Finley, John Finley and Edwin Finley Holdings, LLC to Debtors' Tenth Omnibus (Substantive) Objection to Claims – (I) Reclassify Royalty Claims, and (II) Reduce and Reclassify Royalty Claims* (the "Finley Response") [D.I. 2387]; *Response of Wagner & Brown LTD to Debtors' Tenth Omnibus (Substantive) Objection to Claims - (I) Reclassify Royalty Claims and (II) Reduce and Reclassify Royalty Claims* (the "Wagner Response") [D.I. 2391]; *Response of the Chester J. Kesey and Patsy P. Kesey Revocable Trust to Debtors' Tenth Omnibus (Substantive) Objection to Claims – (I) Reclassify Royalty Claims and (II) Reduce and Reclassify Royalty Claims* (the "Kesey Response") [D.I. 2392]; *Response of Claimant s James M. Wilson, Bar H Oil & Gas, LLC, Thomas L. Free Family Trust, Ann Hudson Starnes, William T. Hudson, and Kathryn Hudson Andrews in Opposition to Debtors' Tenth Omnibus (Substantive) Objection to Claims* (the "Wilson Response") [D.I. 2394]; and *Response of Aurora Cisneros Garcia and Leandro Benjamin Cisneros to Debtors' Tenth Omnibus (Substantive) Objection to Claims – (I) Reclassify Royalty Claims and (II) Reduce and Reclassify Royalty Claims* (the "Cisneros Response") [D.I. 2395].

[6] A confirmation hearing on the debtors' plan of reorganization is scheduled for August 25, 2021. Because the resolution of these matters may bear on the issues presented at the confirmation hearing, the Court noted at the conclusion of the August 11 hearing that it intended to issue a bench ruling on the objections at some point this week. Aug. 11, 2021 Hearing Tr. at 125. In the course of preparing the bench ruling, the Court concluded that it would likely be easier and more efficient to set out its findings and conclusions in this Memorandum Opinion. For that reason, however, this Memorandum Opinion may lack the polish that one might otherwise expect of a judicial opinion.

to continue discussions in order to see if those amounts might be reconciled on a consensual basis, with any disputes presented to the Court if those efforts proved unsuccessful.  Accordingly, the question now before the Court is not whether any of the 19 claims should be allowed or disallowed, or in what amount.  The rights of all parties in that regard are expressly preserved.  Rather, the question presented to the Court is only whether those claims should be classified as secured claims.  *See* Aug. 11, 2021 Hearing Tr. 125-126.

Based on the evidentiary record established at the August 11, 2021 hearing, the asserted royalty amounts, and key mineral lease terms are set out below:

1. The King Response and associated proof of claim assert a royalty in the amount of $40,590.23.  The governing lease terms, dated April 3, 2014, call for a one-fourth royalty of production.  A division order annexed to the mineral lease, with an effective date of January 1, 2019, provides for payments to be made by check to the royalty interest owner.[7]

2. The Finley Response and associated proofs of claim assert a royalty in the amount of $449,949.77.[8]

3. The Wagner Response and associated proofs of claim assert a royalty in the amount of $376,219.39, along with a claim for surface damages in the amount of $66,511.00 that the claimant concedes is a general unsecured claim.  The governing lease terms, dated March 13, 2014, call for as royalty *either* one-fourth of production, *or* one-fourth of the gross proceeds for the sale of hydrocarbons severed from the land.  Various division orders annexed to the mineral lease, with effective dates stemming from June 2015, provide for payments to be made by check to the royalty interest owner.  An example of such a check, in the

---

[7] *See* D.I. 2383; POC No. 340.

[8] *See* D.I. 2387; POC Nos. 410, 418, 421-425.

amount of $11,600.20, is provided as Exhibit C to the Wagner Response.[9]

4. The Kesey Response and associated proof of claim assert a royalty in the amount of $88,341.63. The governing lease terms, dated September 30, 2010, call for a one-fourth royalty of the net proceeds of production.[10]

5. The Wilson Response and associated proofs of claim assert royalties in the aggregate amount of $71,016.69. The governing lease terms, dated from April 4, 2014, call for a one-fourth royalty of the net proceeds of production.[11]

6. The Cisneros Response and associated proofs of claim assert a royalty in the amount of $219,128.88. The governing lease terms, dated from September 2, 2015, call for a one-fourth royalty of the gross proceeds of production.[12]

## Jurisdiction

This Court has subject-matter jurisdiction over the motion under 28 U.S.C. § 1334(b). This is a core matter under 28 U.S.C. § 157(b).

## Analysis

Under Bankruptcy Code § 502(a), a proof of claim is deemed allowed unless objected to. 11 U.S.C. § 502(a). If a proof of claim follows certain requirements under Federal Rule of Bankruptcy Procedure 3001, then it is *prima facie* evidence of the claim's validity.[13] As the Third Circuit explained in *Allegheny*, however, the filing of an objection under Rule 9014 operates to defeat that *prima facie* case so long as the

---

[9] *See* D.I. 2391; POC Nos. 515, 741.

[10] *See* D.I. 2392; POC No. 684.

[11] *See* D.I. 2394; POC Nos. 141-142, 678, 734-736.

[12] *See* D.I. 2422; POC Nos. 726-727.

[13] 4 *Collier on Bankruptcy* ¶ 502.02 n.2 (citing *In re Sears*, 863 F.3d 973, 977 (8th Cir. 2017)); *see also* Fed. R. Bankr. P. 3001.

objection "produces sufficient evidence to negate one or more of the sworn facts in the proof of claim."[14]   In that event, the burden is then shifted back to the claimant to demonstrate the validity of the claim.[15]   For purposes of the present dispute, the debtors' Objection and supporting declarations, D.I. 2334, 2335, 2411, provided sufficient evidence challenging the secured status of the claims to shift the burden, under *Allegheny*, to the claimants to demonstrate that their claims are secured.

### Section 9.343 creates a senior statutory lien only to secure an obligation to pay the purchase price of produced oil and gas.

The initial question presented to the Court is whether the claims are secured by virtue of the statutory lien created under Texas law by section 9.343.   In determining whether a claim asserted by a creditor is secured, bankruptcy courts look to the applicable state law, as "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."[16]   Here, no one disputes that Texas law is applicable.   None of the parties, however, has pointed to any decision of the Texas courts, let alone of the Texas Supreme Court, addressing the issue now before this Court.   Accordingly, the role of this Court is to predict how this question of would be resolved by the Texas courts, and particularly by its Supreme Court.[17]

---

[14] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-174 (3d Cir. 1992).

[15] *Id.* at 174.

[16] *Butner v. United States*, 440 U.S. 48, 54 (1979).

[17] *See In re Semcrude*, 407 B.R. at 125 (citing authority).

For the reasons set forth below, the Court finds that, as a matter of ordinary English, the statutory lien created by section 9.343(a) secures only an obligation to pay the purchase of *produced* oil and gas, as opposed to hydrocarbons in their unproduced (raw material) state. The interest owners here, however, never owned produced oil and gas. That construction (which the Court believes is required by the statutory language) gives rise to a fair question: why would the Texas legislature enact a statute designed to protect interest owners (who typically do not themselves produce oil and gas) that does not cover the amounts typically due to interest owners? A partial response to that question, suggested by a law review article cited by the debtors, is that where the operator is obligated to pay the royalty in kind, meaning in produced oil or gas, rather than cash, the interest owner would become a seller of that produced oil or gas.[18] In that event, the statute would serve its intended purpose of creating a lien to secure the obligation to make the royalty payment. But here, the only record evidence bearing directly on that question is the debtor's testimony that none of the claimants in fact were paid in kind. And while some of the claimants presented evidence suggesting that they had the right, under their contracts, to be paid in kind, none met its burden of presenting evidence indicating that this option was exercised for the amounts at issue here.

Finally, that construction of the statute is confirmed by a subsequent change in the Texas statute, one that does not become effective until September 1, 2021 and

---

[18] *See* Rhett Campbell, *A Survey of Oil and Gas Bankruptcy Issues,* 5 Tex. J. Oil & Gas Energy L. 265 (2010).

does not have retroactive application, that does not limit its application to *produced* oil and gas, but creates a royalty interest that applies to an obligation to pay a royalty for the sale of the hydrocarbons before they are extracted from the land. The principle that a change in statutory language should typically bring with it a change in the meaning of the law counsels in favor of the debtor's proposed construction of the version of the statute applicable here.

### A. The plain language of section 9.343 limits a security interest to securing a debt to pay the purchase price of *produced* oil and gas.

Section 9.343 is a non-uniform provision of the Texas Uniform Commercial Code. The statute provides, in relevant part, for "a security interests in favor of interest owners, as secured parties, to secure the obligations of the first purchaser of oil and gas production, as debtor, to pay the purchase price." Section 9.343(a). "Oil and gas production," in turn, is expressly defined to mean "any oil, natural gas, condensate of either, natural gas liquids, other gaseous, liquid, or dissolved hydrocarbon … *which is severed, extracted, or produced from the ground* … within the jurisdiction of this state." *Id.* § 9.343(r)(1) (emphasis added). An "interest owner" is a "person owning an entire or fractional interest of any kind or nature in oil or gas production at the time of severance." *Id.* § 9.343(r)(2). A "first purchaser" is "the first person that purchases oil or gas production from an operator or interest owner *after the production is severed*, or an operator that receives production proceeds from a third-party purchaser who acts in good faith under a division order or other agreement[.]" *Id.* § 9.343(r)(3). Finally, an "operator" is a "person engaged in the

8

business of severing oil or gas production from the ground, whether for the person alone, only for other persons, or for the person and others." *Id.* § 9.343(r)(4).

The Texas Supreme Court has made clear that courts should give effect to the plain and unambiguous text of a statute.[19]  That principle of statutory construction is of course a familiar one in the bankruptcy context, as the Supreme Court has repeatedly explained, in bankruptcy cases, that "Congress says in a statute what it means and means in a statute what it says there.  When a statute's language is plain, the sole function of the courts, at least where the disposition required by the text is not absurd, is to enforce it according to its terms."[20]

Applying this principle, the Court believes the language of section 9.343(a) to be plain and unambiguous.  It creates a security interest "in favor of interest owners, as secured parties, to secure the obligations of the first purchaser of oil and gas production, as debtor, to pay the purchase price."  The context of that sentence makes clear that the "purchase price" obligation that the statutory lien secures is the obligation to pay for the purchase of *oil and gas production*.  And "oil and gas production" must be "severed, extracted, or produced from the ground." *Id.* § 9.343(r)(1).  In the absence of evidence that the unpaid royalties at issue are debts that are for the purchase of produced oil and gas, and as explained below, the record

---

[19] *Abutahoun v. Dow Chemical Co.*, 463 S.W.3d 42, 47 (Tex. 2015) ("We read [the applicable statute] to be unambiguous, and therefore we apply its plain meaning as the statute is written.")

[20] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000).  *See also*, *e.g.*, *United States v. Ron Pair Enterprises, Inc.,* 489 U. S. 235, 241 (1989); *Lamie v. United States Trustee*, 540 U.S. 526 (2004).

contains no such evidence, the conclusion seems inescapable that the interest owners do not hold a statutory lien.

The interest owners' principal response to that argument is to point to the definition of "first purchaser" in section 9.343(r)(3).  The second sentence of that definition states that to "the extent the operator receives proceeds attributable to the interest of other interest owners from a third-party purchaser who acts in good faith under a division order or other agreement authenticated by such operator, the operator is considered to be the first purchaser of the production for all purposes under this section, notwithstanding the characterization of other persons as first purchasers under other laws or regulations."  *Id.*  The interest holders argue that this sentence means that "to the extent the operator receives proceeds attributable to our interest, it's considered to be the first purchaser of the production."  Aug. 11, 2021 Hearing Tr. at 47.  The Court respectfully disagrees with that analysis.  In the Court's view, the work done by the second sentence of section 9.343(r)(3) is to ensure that, when an operator sells the produced oil to a third-party buyer, the interest owner remains the "first purchaser" for the purposes of the first sentence of section 9.343(a).  But the sentence does not appear to do anything to solve the problem that the interest owners do not have a lien unless they are themselves the sellers of produced oil to begin with.

### B.    The statute accordingly protects interest owners only to the extent those parties elected to be paid *in kind*.

This construction of the statute, while seemingly the most natural (or perhaps even the only plausible) reading of the words of the statute, does give rise to a

question.  The obvious purpose of section 9.343 is to create a lien in favor of interest owners to secure the obligation of the operator to pay royalties.  The analysis of the language set forth above, however, means that the statute does no such thing.  And while this would not authorize a court to read a statute to mean something different from what its words say, a court should certainly pause before construing a statute in a way that would defeat the manifest legislative purpose.

An answer to this question, albeit only a partial one, is provided in one of the law review articles cited in the debtor's brief. [21]  The author of that article suggests that insofar as the royalty provided for an operator to pay the interest owner its royalty "in kind," meaning, in oil and gas directly rather than the cash proceeds thereof, then the interest owner would in fact own produced oil and gas.  To the extent the operator then sold that oil and gas on the interest owner's behalf, the interest owner would be owed a debt for the purchase price of produced oil.  And in that case, the obligation to pay that purchase price would be secured by the statutory lien created by section 9.343(a).

The consequence of this reading is that it would mean that section 9.343 at least *could* operate to protect the interest owner.  And a reading of a statute in which it *sometimes* achieves the legislative purpose is certainly better than one in which it *never* does so.[22]  Under the construction of section 9.343 adopted herein, that is what the statute does.

---

[21] Campbell, *supra*.

[22] *Cf. Mission Product Holdings v. Tempnology*, 139 S. Ct. 1652, 1665 (2019) (rejecting a reading of the Bankruptcy Code that allegedly would better accomplish the objective of

1.    **A plain reading of section 9.343 demonstrates a statutory lien only for those royalty owners maintaining an interest in produced oil and gas.**

As the author of the law review article explained, in "the ordinary case, a prepetition royalty is an unsecured claim."[23]  The author acknowledges, however, that section 9.343 was intended, at least some of the time, to provide greater protection to interest owners.  But it only does so, under his analysis, where the royalty owner "has a right to a percentage of the oil produced," as (the author asserts) is typical in oil leases.[24]  On this view, "[a] royalty owner with a properly worded division order is a seller of the production," and therefore would have a lien under section 9.343.[25]  On the other hand, a royalty for gas is "almost always invariable payable only in cash and not in kind."[26]  In that case, all of the gas production belongs to the operator and the royalty interest owner is thus not a seller of produced oil that receives the benefit of section 9.343.[27]

On this reading, it becomes the creditor's burden, under the Third Circuit's reasoning of *Allegheny*,[28] to demonstrate that its claim is secured by collateral.  To meet that burden, the creditor would need to show that the debt that the creditor is

---

facilitating reorganization on the ground that, while the "Code of course aims to make reorganizations possible," it "does not permit anything and everything that might advance that goal.")

[23] Campbell, *supra* at 294.

[24] *Id.* at 297.

[25] *Id.*

[26] *Id.* at 298 (citing Ernest E. Smith & Jacqueline Lang Weaver, TEXAS LAW OF OIL AND GAS (2d ed.) 4-59).

[27] *Id.*

[28] 954 F.2d at 173-174.

owed is for the sale of produced oil and gas, which would require it demonstrate that it in fact was owed an in-kind royalty rather than cash proceeds. As described below, none of the creditors here has met that burden.

### 2. No claimant met its burden of showing that it was paid on its royalty in kind.

During the August 11 hearing, no royalty claimant demonstrated an election to be paid in kind despite the relevant contracts providing for such an opportunity.[29] A review of the mineral leases further drives home the point that each of the six royalty claimants who filed a response *could have* elected to receive royalty payments in kind. The parties testified to the same.[30] But no party offered any evidence that this option was ever exercised. Indeed, the only testimony speaking directly to this question was that of Scott J. Davido, the debtors' Chief Restructuring Officer, who was asked during the hearing whether he was "aware of any situation in which any lessor sought to take their royalties in kind, that is, by taking barrels of oil as opposed to being paid in cash." Aug. 11, 2021 Hearing Tr. at 123. He responded that he "personally [was] not aware of, certainly during the time I've been with the company, of any lessor seeking to take payment in kind." *Id.*

None of the creditors offered any contrary testimony. The Court accordingly finds that the creditors have not met their burden, in light of the construction of the statute adopted herein, of demonstrating that their claims are secured by a statutory lien created under section 9.343.

---

[29] *See generally* Aug. 11, 2021 Hearing Tr.

[30] *Id.*

### C.   The Court's reading of section 9.343 is confirmed by subsequent amendments to the Texas Statute.

The Court's construction of section 9.343 is reinforced by the subsequent act of the Texas legislature to replace the current version of section 9.343 with a new statute that, when it becomes effective on September 1, 2021, operates to protect interest owner in a way that the existing statute does not.[31]   The new legislation repeals section 9.343 in its entirety and moves the law regarding Texas statutory liens pertaining to oil and gas to the Texas property code.  The revised language, in relevant part, provides for the following:

(a) To secure the obligations of a first purchaser to pay the sales price, each interest owner has an oil and gas lien to the extent of the interest owners interest in oil and gas rights.  The oil and gas lien exists as part of and incident to the ownership of oil and gas rights.

(b) An oil and gas lien:

(1) Exists in and ***attaches to all oil and gas before severance***;

(2) Continues uninterrupted and without lapse in all oil and gas on and after severance; and

(3) Continues uninterrupted and without lapse in and to all proceeds from the sale of the oil or gas.

(c) Except as provided by Subsection (d), an oil and gas lien exists until the interest owner or representative first entitled to receive the sales price has received the sales price for the oil or gas production, but the lien does not continue to attach to the production after the production is sold by the first purchaser, unless the first subsequent purchaser:

(1) Is an affiliate of the first purchaser; or

(2) Has actual knowledge, not constructive notice or inquiry notice, that the first purchaser has not paid the interest owner or representative first entitled to receive the sales price.

---

[31] *See* 2021 Tex. Sess. Law. Serv. Ch. 284 (H.B. 3794) (Vernon's).

Tx. Property § 67.002(a)-(c) (emphasis added).

In clear contrast to section 9.343, the revised statutory language makes clear that a security interest in oil and gas no longer requires severance from the land.[32] The statute would grant the royalty claimants an enduring security interest in their respective minerals and "in the proceeds paid to or otherwise due the interest owner or representative."[33]  Regardless of whether the minerals were extracted from the ground, sold to a third-party, or held in reserve, the royalty interest owners would have a valid and enforceable lien against the debtors.

With respect to section 9.343's requirement that a royalty interest owner receive payment in kind to maintain the statutory lien, the Texas Act disposes of this requirement:

> The validity of an oil and gas lien is not dependent on possession of the oil or gas by an interest owner or representative.  An oil and gas lien is not void or expired because of a change or transfer of the actual or constructive possession of or title to the oil or gas from the interest owner or representative to a first purchaser or other purchaser.

Tx. Property §67.003(a).

In the ordinary course, a change in the language of the statute should give rise to an inference that the legislature intended the new words to have a different meaning than the prior legislation.  "If the legislature amends or reenacts a provision

---

[32] Tx. Property §67.002(b)(1).

[33] *Id.* at (f).

other than by way of a consolidating statute or restyling project, a significant change in language is presumed to entail a change in meaning."[34]

In fairness, the Court's initial reaction to the amended statute was that the change of language could equally be characterized as a "clarification" of the prior statute, and thus suggested that one could not draw much of an inference one way or the other from the new statutory language.  Aug. 11, 2021 Hearing Tr. at 42-43 (suggesting that the duel between the argument that the change in language is a change in meaning and the argument that the change is a "clarification" of the original meaning "battle[s] to a draw").

On reflection, however, the Court believes that initial reaction to have been incorrect.  That reaction may be a fair one when the context of the new legislation can plausibly give rise to an inference that the new legislation is intended to clarify an ambiguity in, or correct an erroneous judicial construction of, the earlier enactment.  After all, as the Supreme Court has explained, "subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."[35]  But where a legislature intends a *clarification* rather than a *change*, one would expect the new legislation to be made expressly retroactive.  Here, the legislature did exactly the opposite, ma

---

[34] Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 256 (Thomson/West 1st ed. 2012).

[35] *Consumer Product Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 118 n.13 (1980).

king plain that the "Act takes effect September 1, 2021."[36]  That action strongly suggests that the legislature knew and understood that the new legislation changed rather than clarified existing law, and thus supports the reading of the prior section 9.343 set forth above.

## Conclusion

In view of this conclusion, the Court does not reach the other issues raised by the claimants, as the above reasoning is sufficient to resolve the current dispute.  For the reasons described above, the Court will sustain the debtors' Objection, authorizing the reclassification and/or reduction in amount of the royalty claims, as applicable.  The debtors' are directed to settle an order to the effect for entry by the Court.

Dated: August 18, 2021

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[36] 2021 Tex. Sess. Law. Serv. Ch. 284 (H.B. 3794) (Vernon's).