# **EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MTE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 19-12269 (CTG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## FOR MTE HOLDINGS LLC AND ITS AFFILIATED DEBTORS

Matthew B. Stein (admitted *pro hac vice*)
David J. Mark (admitted *pro hac vice*)
Michele L. Angell (admitted *pro hac vice*)
Andrew S. Golden (No. 6413)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone:     (212) 506-1700
Facsimile:     (212) 506-1800

Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
Daniel Butz (No. 4227)
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone:     (302) 658-9200
Facsimile:     (302) 658-3989

*Attorneys for the Debtors and Debtors in Possession*

Dated: September 3, 2021

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: MTE Holdings LLC. (7894); MTE Partners LLC. (1158); Olam Energy Resources I LLC (0770); MDC Energy LLC (9140); MDC Texas Operator LLC (1087); Ward I, LLC (6817); and MDC Reeves Energy LLC (3644).  The Debtors' address is 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
OF TIME, AND GOVERNING LAW ................................................................ 1

    A.    Defined Terms ............................................................................................ 1

    B.    Rules of Interpretation ............................................................................. 28

    C.    Computation of Time ............................................................................... 29

    D.    Governing Law ........................................................................................ 29

    E.    Reference to Monetary Figures ............................................................... 29

    F.    Controlling Document ............................................................................. 30

ARTICLE II. ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX
CLAIMS ........................................................................................................... 30

    A.    Administrative Expense Claims ............................................................... 30

    B.    Priority Tax Claims ................................................................................. 31

    C.    Professional Compensation ..................................................................... 31

        1.    Final Fee Applications and Payment of Professional Fee Claims ........... 31

        2.    Professional Fee Escrow Account .......................................................... 32

        3.    Professional Fee Reserve Amount .......................................................... 32

        4.    Post-Effective Date Fees and Expenses ................................................... 33

    D.    Statutory Fees .......................................................................................... 33

    E.    Mediator Fees ......................................................................................... 33

    F.    Substantial Contribution Claims ............................................................. 33

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS ...................................................................................................... 34

    A.    Classification of Claims and Interests ..................................................... 34

    B.    Treatment of Claims and Interests .......................................................... 35

        1.    Classes 1A-1G – Other Secured Claims ................................................. 36

        2.    Class 2A-2G – Other Priority Claims .................................................... 36

        3.    Classes 3A-3G – MTE Term Loan Claims .............................................. 36

        4.    Classes 4A-4G – Senior Secured Trade Claims ...................................... 37

        5.    Classes 5A-5G – MDC RBL Facility Claims .......................................... 38

        6.    Classes 6A-6C – MTE General Unsecured Claims ................................. 39

7.      Classes 6D-6G– MDC General Unsecured Claims and  MDC Texas Operator General Unsecured Claims ............................................... 39

8.      Classes 7A-7G – Interests ......................................................... 40

C.      Special Provision Governing Unimpaired Claims ................................................. 40

D.      Confirmation Pursuant to Section 1129(a)(10) of the Bankruptcy Code ............ 40

E.      Elimination of Vacant Classes ................................................................... 40

F.      Voting Classes; Presumed Acceptance by Non-Voting Classes .......................... 41

G.      Subordinated Claims and Interests ................................................................ 41

H.      Confirmation of MTE Debtors' Plans Not a Condition .................................... 41

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 42

A.      Settlement of Claims as Set Forth in Plan ..................................................... 42

B.      Sale Transaction ............................................................................... 42

C.      Settlement of Consolidated Adversary Proceeding ......................................... 43

D.      Luxe Settlement .................................................................................. 43

E.      Cancellation of Notes, Instruments, Certificates, and Other Documents ............ 46

F.      Exemption from Certain Taxes and Fees ...................................................... 46

G.      Establishment and Funding of Litigation Trusts ............................................ 46

H.      Effectuation of the Plan ......................................................................... 47

1.      Vesting of Assets in the Plan Administrator and Litigation Trusts .......... 47

2.      Sources of Consideration for Plan Distributions ...................................... 47

3.      Board of Directors .................................................................................. 47

4.      Management ........................................................................................... 48

5.      Corporate Action .................................................................................. 48

ARTICLE V. LITIGATION TRUSTS .............................................................................. 48

A.      Summary .............................................................................................. 48

B.      Creation and Governance of the Litigation Trusts ......................................... 49

C.      Assignment of Debtor Membership Interests to Litigation Trustees .................. 50

D.      Purpose of the Litigation Trusts ................................................................ 50

E.      The Litigation Trust Agreements ............................................................... 50

F.      Employment of Professionals ................................................................... 51

G.      Compensation and Duties of Litigation Trustees .......................................... 51

H.      Litigation Trust Assets ............................................................................ 52

I.      Prosecution and Resolution of Litigation Trust Assets that are Litigation Claims ................................................................................................. 52

J.      Preservation of Documents ................................................................... 53

K.     Preservation of Privileges and Defenses ............................................ 53

L.      Federal Income Tax Treatment of the Litigation Trusts for the Litigation Trust Assets ........................................................................................ 54

M.    Indemnification ................................................................................... 55

N.     No Bonding of Litigation Trust Claims ............................................. 55

O.     Litigation Trust Expenses ................................................................... 55

P.      Trust Distributions to Litigation Trust Beneficiaries ......................... 56

Q.     Dissolution of the Litigation Trusts ................................................... 56

R.     Inconsistencies or Conflicts Between the Litigation Trust Agreements and the Plan ..................................................................................... 56

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................................................................................. 57

A.     Assumption and Rejection of Executory Contracts and Unexpired Leases ......... 57

B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases ........... 57

C.     Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases ........................................................ 58

D.     Indemnification Obligations ............................................................... 59

E.     Director and Officer Liability Insurance ............................................ 59

F.      Modifications, Amendments, Supplements, Restatements, or Other Agreements ........................................................................................ 60

G.     Reservation of Rights ......................................................................... 60

H.     Nonoccurrence of Effective Date ....................................................... 60

I.      Contracts and Leases Entered Into After the Petition Date ................ 60

ARTICLE VII. PROVISION GOVERNING DISTRIBUTIONS ............................. 60

A.     Timing and Calculation of Amounts to Be Distributed ..................... 60

B.     Reorganized Debtors .......................................................................... 61

C.     Delivery of Distributions and Undeliverable or Unclaimed Distributions ......... 61

      1.    Record Date for Distribution ................................................... 61

      2.    Delivery of Distributions ......................................................... 61

      3.    Distribution ............................................................................. 62

      4.    Minimum Distributions ........................................................... 62

|   |   | 5. | Undeliverable Distributions and Unclaimed Property | 62 |
| D. | Manner of Payment | | | 63 |
| E. | Compliance with Tax Requirements | | | 63 |
| F. | Allocations | | | 63 |
| G. | No Postpetition Interest on Claims | | | 63 |
| H. | Setoffs and Recoupment | | | 64 |
| I. | Claims Paid or Payable by Third Parties | | | 64 |
|   |   | 1. | Claims Paid by Third Parties | 64 |
|   |   | 2. | Claims Payable by Third Parties | 64 |
|   |   | 3. | Applicability of Insurance Policies | 64 |

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS .......... 65

| A. | Allowance of Claims | 65 |
| B. | Claims Administration Responsibilities | 65 |
| C. | Estimation of Claims | 66 |
| D. | Disputed Claims | 66 |
| E. | Adjustment to Claims Without Objection | 66 |
| F. | Time to File Objections to Claims | 67 |
| G. | Disallowance of Claims | 67 |
| H. | No Distributions Pending Allowance | 67 |
| I. | Distributions After Allowance | 67 |

ARTICLE IX. RELEASE, INJUNCTION, EXCULPATION AND RELATED PROVISIONS .......... 68

| A. | Term of Injunctions or Stays | 68 |
| B. | Release of Liens | 68 |
| C. | Release by the Debtors | 68 |
| D. | Release by Holders of Claims or Interests | 70 |
| E. | Releases Under Asset Purchase Agreement | 71 |
| F. | Exculpation | 71 |
| G. | Injunction | 72 |
| H. | Allocation Disputes | 72 |
| I. | Protection Against Discriminatory Treatment | 72 |
| J. | Setoffs and Recoupment | 73 |

K.      Subordination Rights ................................................................................ 73

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION  AND
CONSUMMATION OF THE PLAN ................................................................. 73

A.      Conditions Precedent to Confirmation.................................................... 73

B.      Conditions Precedent to the Effective Date ........................................... 74

C.      Waiver of Conditions............................................................................... 75

D.      Substantial Consummation ...................................................................... 76

E.      Effect of Nonoccurrence of Conditions to the Effective Date .............. 76

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE
PLAN .................................................................................................................. 76

A.      Modification and Amendments................................................................. 76

B.      Effect of Confirmation on Modifications ............................................... 77

C.      Revocation or Withdrawal of the Plan.................................................... 77

ARTICLE XII. RETENTION OF JURISDICTION ................................................. 77

ARTICLE XIII. MISCELLANEOUS PROVISIONS ................................................ 80

A.      Immediate Binding Effect........................................................................ 80

B.      Additional Documents ............................................................................. 80

C.      Reservation of Rights............................................................................... 80

D.      Successors and Assigns............................................................................ 80

E.      Service of Documents .............................................................................. 80

F.      Entire Agreement ..................................................................................... 82

G.      Exhibits .................................................................................................... 82

H.      Nonseverability of Plan Provisions......................................................... 83

I.      Votes Solicited in Good Faith.................................................................. 83

J.      Waiver or Estoppel .................................................................................. 83

**INTRODUCTION**

Capitalized terms used in this chapter 11 Plan shall have the meanings set forth in Article I.A.  The Debtors propose this Plan for the resolution of outstanding Claims against, and Interests in, the Debtors.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, as well as a summary and description of the Plan.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan for each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

"***Administrative Expense Claim***" means a Claim (other than any adequate protection Claims) for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Debtors' Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; and (c) Allowed Substantial Contribution Claims, if any.

"***Administrative Expense Claims Bar Date***" means the deadline for Filing requests for payment of Administrative Expense Claims, except as otherwise set forth in the Plan or a Final Order, which:  (a) with respect to Administrative Expense Claims other than Professional Fee Claims, Substantial Contribution Claims, and those based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, shall be thirty (30) days after the Effective Date; (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date; (c) with respect to Substantial Contribution Claims, shall be fixed in the Disclosure Statement; and (d) with respect to Administrative Expense Claims based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, shall be sixty (60) days after the Effective Date; provided that Filing requests for payment of Administrative Expense Claims is not required, where the Plan, Bankruptcy Code or a Final Order does not require such Filing.

"***Affiliate***" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"***Allocation Disputes***" means:  (a) claims and Causes of Action brought against a Holder of Senior Secured Trade Claims by one or more other Holders of Senior Secured Trade Claims in connection with the Senior Secured Trade Claim Allocation; and (b) claims and Causes of

Action brought against a Luxe Claimant by one or more other Luxe Claimants in connection with the Luxe Allocation; *provided however* that Luxe Energy shall not be made a party to, or subjected to discovery in connection with, any Allocation Disputes.

"***Allowed***" means, with reference to any Claim or Interest:  (a) any Claim or Interest arising on or before the Effective Date, (i) as to which no objection to allowance has been interposed within the time period set forth in the Plan, or (ii) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective Holder; (b) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; (c) any Claim or Interest expressly allowed under the Plan, provided further, that notwithstanding the foregoing, the Plan Administrator or Litigation Trustees, as applicable, will retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan; (d) all scheduled Claims listed as undisputed, not contingent, and not unliquidated; or (e) any Claim or Interest affirmatively Allowed by the Debtors, or following the Effective Date, by the Plan Administrator.

"***Asset Purchase Agreement***" means that certain agreement of sale, fully executed by the Buyer and dated as of June 18, 2021, by and among the Sellers, on the one hand, and the Buyer, on the other, as may be amended, supplemented, or modified from time to time, in accordance therewith, including all exhibits and schedules attached thereto, which shall be annexed to the Disclosure Statement, pursuant to which the Buyer shall purchase substantially all assets of the Debtors other than the Excluded Assets, and which shall be in form and substance acceptable to the MDC RBL Lenders and subject to the consent rights set forth in the RSA.

"***Assets***" has the meaning set forth in Section 2.01 of the Asset Purchase Agreement.

"***Assigned Contracts***" has the meaning set forth in Section 1.01 of the Asset Purchase Agreement.

"***Assumed Buyer Priority Tax Claims***" means all Priority Tax Claims that are Assumed Obligations that have been assumed by the Buyer pursuant to the Asset Purchase Agreement.

"***Assumed Obligations***" has the meaning set forth in Section 14.01 of the Asset Purchase Agreement.

"***Avoidance Actions***" means any and all avoidance, recovery, subordination, or other claims, actions, Causes of Action, or remedies which any of the Debtors, the debtors in possession, the Estates, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

"***Bankruptcy Code***" means title 11 of the United States Code, as amended from time to time and as applicable to the Chapter 11 Cases.

2

"***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time and as applicable to the Chapter 11 Cases.

"***Bar Date***" means the dates established by the Bankruptcy Court by which Proofs of Claim must be Filed.

"***Budget***" means the Debtors' final budget as approved by the Bankruptcy Court as set forth in the Final Cash Collateral Order, which shall be acceptable to the MDC RBL Lenders, as may be amended from time to time with the agreement of the MDC RBL Lenders.

"***Business Day***" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"***Buyer***" means Maple Energy Holdings, LLC.

"***Buyer Parties***" means the Buyer and Riverstone Maple Investor, LLC, in its capacity as direct or indirect equity owner of the Buyer.

"***Cash***" means the legal tender of the United States of America or the equivalent thereof.

"***Cash Collateral***" has the meaning set forth in the Final Cash Collateral Order.

"***Cash Collateral Orders***" means the *Final Order Under Bankruptcy Code Sections 105(a), 361, 362, 363, 503, and 507, Bankruptcy Rules 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief*, entered by the Bankruptcy Court on May 15, 2020 [Docket No. 1092], as the same may be amended, modified, or supplemented from time to time (the "*Final Cash Collateral Order*"), and all other interim orders granting the Debtors' use of Cash Collateral, as entered at Docket Nos. 112, 297, 506, 554, 674 and 874 in the Chapter 11 Cases.

"***Causes of Action***" means any claims, controversies, proceedings, reimbursement claims, contribution claims, recoupment rights, interests, debts, cross-claims, third-party claims, indemnity claims, guarantees, damages, remedies, causes of action, demands, rights, Liens, actions, Avoidance Actions, suits, obligations, liabilities, debt accounts, accounts, judgments, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, in each case whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, whether asserted or not assertible directly or derivatively (including, without limitation, alter ego theories), choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or

3

pursuant to any theory of law; *provided*, that Causes of Action shall not include Receivables being used to satisfy the distributions and payments required under the Plan.  For the avoidance of doubt, Causes of Action includes, without limitation:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim that constitutes property of the Estates pursuant to section 541 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (f) any claims under any state or foreign law, including, without limitation, any breach of fiduciary duty, fraudulent transfer or similar claims; (g) the Avoidance Actions; (h) claims that are MDC Litigation Trust Assets or MTE Litigation Trust Assets; and (i) any and all claims identified in the Special Committee Report.

"***Chapter 11 Cases***" means the above-captioned chapter 11 cases of the Debtors in the Bankruptcy Court, jointly administered under Case No. 19-12269 (CTG).

"***Claim***" shall mean a "claim," as defined in section 101(5) of the Bankruptcy Code, (a) against any Debtor, or (b) against Luxe Energy in its capacity as a Non-Debtor Working Interest Owner, a party to Joint Operating Agreements or any other capacity related to the Debtors.

"***Claims Objection Deadline***" means the deadline for objecting to a Claim, which shall be forty-five (45) days after the Effective Date; provided, however, that the Debtors, Reorganized Debtors, Plan Administrator, or Litigation Trustees may seek extensions of this date from the Bankruptcy Court, with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002; and further provided that the Litigation Trustees may object to Claims otherwise entitled to distribution from their respective Litigation Trust forty-five (45) days after such funds become available for distribution.  Notwithstanding the foregoing, however, the Litigation Trustees shall not object to Senior Secured Trade Claims or Claims held by Luxe Claimants which are subject to settlements implemented pursuant to and incorporated into the Plan, after the Claims Objection Deadline.

"***Claims Register***" means the official register of Claims maintained by the Notice and Claims Agent or the Bankruptcy Court.

"***Class***" means a category of Claims or Interests as designated in this Plan.

"***Closing Date***" has the meaning set forth in Section 13.01 of the Asset Purchase Agreement, which date shall occur concurrent with the occurrence of the Effective Date.

"***Confirmation***" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan, including the conditions precedent to Confirmation as specified in Article X hereof (unless they have been waived in accordance with Article X).

"***Confirmation Date***" means the date on which Confirmation occurred.

"***Confirmation Hearing***" means a hearing held before the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

"***Confirmation Order***" means an order of the Bankruptcy Court confirming the Plan as to all or any Debtors pursuant to section 1129 of the Bankruptcy Code and authorizing the Sale Transaction pursuant to section 1123(a)(5)(B) of the Bankruptcy Code, which shall be in form and substance acceptable to the MDC RBL Lenders and subject to the consent rights set forth in the RSA.

"***Consolidated Adversary Proceeding***" means the adversary proceedings consolidated for procedural purposes only, and jointly administered by the Bankruptcy Court, under Adv. Proc. No. 20-50553 (CTG), pursuant to the Consolidation Order.

"***Consolidated Adversary Proceeding Settlement***" means the settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 whereby the Holders of Senior Secured Trade Claims agree, *inter alia*, to the Senior Secured Trade Recovery Amount, and to the MDC RBL Facility Claim Payment, as part of the final settlement and deemed dismissal with prejudice of the Consolidated Adversary Proceeding.

"***Consolidation Order***" means the *Order (I) Procedurally Consolidating Adversary Proceedings, and (II) Setting Certain Deadlines with Respect Thereto*, entered by the Bankruptcy Court on August 7, 2020 [Docket No. 1407].

"***Consummation***" means the occurrence of the Effective Date.

"***Cure/Assumption Objection Deadline***" means the date that is seven (7) days after the Filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; provided, however, that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the Filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, or an Executory Contract or Unexpired Lease proposed to be assumed by the Debtors or Reorganized Debtors is proposed to be assigned to a third party after the Filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) seven (7) days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification, and (b) the date of the scheduled Confirmation Hearing.

"***Cure Claim***" means a monetary Claim based upon a Debtor's defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

"***Cure Costs***" has the meaning set forth in Section 1.01 of the Asset Purchase Agreement.

"***Cure Notice***" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the

Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include: (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

**"D&O Liability Insurance Policies"** means all insurance policies (including any "tail policy") of any of the Debtors for defense or coverage of liability or alleged liability of any current or former directors, managers, officers, and members, and all agreements, documents or instruments relating thereto.

**"Debtors"** means, collectively, each of the following debtors and debtors in possession in the Chapter 11 Cases: (a) MTE Holdings LLC ("*MTE*"); (b) MTE Partners LLC ("*MTE Partners*"); (c) Olam Energy Resources I LLC ("*Olam Energy*"); (d) MDC Energy LLC d/b/a MDC Texas Energy LLC ("*MDC*"); (e) MDC Texas Operator LLC ("*MDC Texas Operator*"); (f) MDC Reeves Energy LLC ("*MDC Reeves*"); and (g) Ward I, LLC ("*Ward I*").

**"Disallowed"** means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated, and as to which no Proof of Claim or request for payment of an Administrative Expense Claim has been Filed or deemed Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Expense Claim has been Filed or deemed Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

"*Disclosure Statement*" means the disclosure statement for the Plan, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, which is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law, which shall be in form and substance acceptable to the MDC RBL Lenders and subject to the consent rights set forth in the RSA.

**"Disputed"** means a Claim that is not yet Allowed.

**"Disputed Claims Reserve"** means the funds to be retained by the Debtors, Reorganized Debtors, Plan Administrator, or Litigation Trustees, as applicable, for potential payment of Disputed Claims in the event such Disputed Claims, or the disputed portion thereof, are Allowed, in an amount or amounts as reasonably determined by the Debtors, Reorganized Debtors, Plan Administrator, or the Litigation Trustees, as applicable, consistent with the Proofs of Claim Filed by the applicable Holders of such Disputed Claims. For the avoidance of doubt, the Disputed Claims Reserve shall not contain any funds subject to Allocation Disputes, and any such amounts shall instead be held by the Senior Secured Trade Claim Distribution Agent or Luxe Settlement Distribution Agent, as applicable, until such Allocation Disputes are resolved.

"***Distribution Account***" means one or more accounts (which may be "book entry" accounts):  (a) into which shall be deposited all revenues and proceeds of all assets of the Debtors or the Reorganized Debtors, as applicable, including proceeds of asset sales, including of the Sale Transaction, and all Cash held by the Debtors; and (b) from which payments shall be made according to the priorities set forth in Article III hereof and the other provisions of this Plan.  Any deposits into the Distribution Account(s) shall not be commingled and shall be deposited into separate accounts for each group of beneficiaries.  The Senior Secured Trade Claim Cash Consideration shall be deposited into a Distribution Account as directed by the Senior Secured Trade Claim Distribution Agent.  The Luxe Settlement Fund shall be deposited into a Distribution Account as directed by the Luxe Settlement Distribution Agent.

"***Distribution Record Date***" means the date for determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions hereunder, which shall be (a) the date upon which the Bankruptcy Court approves the Disclosure Statement, or (b) such other date as designated in a Final Order of the Bankruptcy Court.

"***Effective Date***" means the date selected by the Debtors, Buyer Parties, Senior Secured Trade Claim Negotiating Committee, and MDC RBL Lenders, upon which all of the conditions to Consummation in Article X.B of the Plan have been satisfied in full or waived and the Plan becomes effective.

"***Entity***" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"***Estate***" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

"***Excess Claim***" means a Cause of Action against any Holder of a Senior Secured Trade Claim to the extent it is determined that such Holder filed a Proof of Claim and received a distribution under the Plan in excess of the Allowed amount of such Proof of Claim.

"***Excess MDC Distributable Cash***" means any Cash remaining after:  (a) satisfaction in full in accordance with the Plan of (i) all Administrative Expense Claims, Other Secured Claims, and Other Priority Claims, in each case to the extent Allowed, and (ii) the Senior Secured Trade Claim Cash Consideration, the MDC RBL Facility Claim Payment, and the MDC Contribution to the Luxe Settlement Fund; and (b) the funding of the Wind-Down Budget.  For the avoidance of doubt, Excess MDC Distributable Cash shall include the Unused Professional Fee Reserve and the Unused Wind-Down Amount, if any.

"***Excluded Assets***" has the meaning set forth in Section 2.02 of the Asset Purchase Agreement.

"***Excluded Liabilities***" has the meaning set forth in Section 14.01(b) of the Asset Purchase Agreement.

"***Exculpated Parties***" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Debtors' current and former officers, directors, and managers, who served in such positions at any time on or after the Petition Date; (c) the members of the Senior Secured Trade Claim Negotiating Committee in their capacity as such; (d) the members of the Luxe Claimants Negotiating Committee in their capacity as such; and (e) the Debtors' Professionals, advisors, attorneys, financial advisors, chief restructuring officers, accountants, investment bankers, and consultants, in each case solely in their capacity as such; *provided, however*, that in no event shall any Non-Released Parties besides the Debtors constitute Exculpated Parties.

"***Executory Contract***" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"***Federal Judgment Rate***" means the federal judgment rate in effect as of the Petition Date, compounded annually.

"***File***," "***Filed***," **or** "***Filing***" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

"***Final Order***" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed, and as to which:  (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"***General Unsecured Claim***" means any Claim that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court, including but not limited to MTE Term Loan Deficiency Claims, Senior Secured Trade Deficiency Claims, MDC RBL Facility Deficiency Claims, Junior Secured Trade Claims and Royalty Interest Claims.

"***Governmental Authority***" has the meaning set forth in the Asset Purchase Agreement.

"***Governmental Unit***" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

"***Holder***" means an Entity holding a Claim or Interest, as applicable.

"***Impaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"***Income Taxes***" has the meaning set forth in Section 1.01 of the Asset Purchase Agreement.

"***Indemnified Persons***" means each of the Litigation Trustees and members of the Litigation Trust Boards and their employees, officers, directors, agents, representatives and professionals.

"***Initial Cure Notice***" means the *Notice of Cure Amounts and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Sale Transaction*, Filed by the Debtors on October 9, 2020 [Docket No. 1635].

"***Interest***" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instrument, evidencing any fixed or contingent ownership interest in the Debtors, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest, that existed immediately before the Effective Date.

"***Interim Compensation Order***" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals*, entered by the Bankruptcy Court on January 13, 2020 [Docket No. 464].

"***IRS***" means the Internal Revenue Service.

"***Joint Operating Agreements***" means collectively, the MDC Joint Operating Agreements and the Non-Op Joint Operating Agreements.

"***Junior Secured Trade Claim***" means a Statutory Lien Claim of a Holder that is not a party to the Consolidated Adversary Proceeding, solely to the extent of such junior Lien, which shall be treated as a General Unsecured Claim pursuant to the Plan.

"***Lien***" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

"***Litigation Claims***" means Causes of Action belonging to the Debtors or MTE Holdings II LLC that are either property of any Debtors' Estates or such Entity, or Causes of Action that the Debtors' Estates or MTE Holdings II LLC are entitled to bring on behalf of the Estates' or such Entity's stakeholders, including without limitation any Avoidance Actions, that are:  (a) against any (i) Non-Released Parties, (ii) Holders of Senior Secured Trade Claims, or (iii) Preference Defendants that do not affirmatively vote to accept the Plan, regardless of whether their Classes vote overall to accept the Plan, (b) Non-Released Claims and Causes of Action against any Person or Entity; or (c) Excess Claims.

"***Litigation Trust Agreements***" means, collectively, the MDC Litigation Trust Agreement and the MTE Litigation Trust Agreement.

"***Litigation Trust Assets***" means, collectively, the MDC Litigation Trust Assets and the MTE Litigation Trust Assets.

"***Litigation Trust Beneficiaries***" means, collectively, the MDC Litigation Trust Beneficiaries and the MTE Litigation Trust Beneficiaries.

"***Litigation Trust Boards***" means, collectively, the MDC Litigation Trust Board and the MTE Litigation Trust Board.

"***Litigation Trust Expenses***" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by each of the Litigation Trustees, respectively, on account of administration of the respective Litigation Trusts, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.  For the avoidance of doubt, each Litigation Trust shall be solely responsible for its own Litigation Trust Expenses.

"***Litigation Trustee***" means, either the MDC Litigation Trustee or the MTE Litigation Trustee, as the particular context requires.

"***Litigation Trust Interests***" means the non-transferable interests in the respective Litigation Trusts that are issued to the Litigation Trust Beneficiaries pursuant to this Plan.

"***Litigation Trusts***" means, collectively, the MDC Litigation Trust and the MTE Litigation Trust.

"***Luxe Allocation***" means the amount of the Luxe Settlement Fund to be allocated for distribution to each Luxe Claimant, to be determined by the Luxe Claimants collectively in mediation, or by Bankruptcy Court order, pursuant to mediation procedures to be agreed upon by the Luxe Claimants and included in the Plan Supplement.

"***Luxe Claimants***" means the Holders of Statutory Lien Claims who have filed, served, recorded, or asserted, or have any right under applicable law to file, serve, record, or assert, (a) Liens against Luxe Working Interests or the interests of Other Non-Debtor Working Interest Owners, or (b) Claims against Luxe Energy or its property or Other Non-Debtor Working Interest Owners or their respective property, related to any obligation of any of the Debtors, any obligation of Luxe Energy to any of the Debtors, or any obligation of any of the Other Non-Debtor Working Interest Owners to any of the Debtors.

"***Luxe Claimants Negotiating Committee***" means the informal committee that was formed by the Mediator in the course of the Bankruptcy Court-authorized mediation in the Chapter 11 Cases to negotiate and advocate for the Luxe Claimants as a whole.  Where consent of the Luxe Claimants Negotiating Committee is required by the Plan, the Debtors shall seek such consent by email to the Mediator, for delivery to the Luxe Claimants Negotiating

Committee.  The Luxe Claimants Negotiating Committee shall then object by email signed by the Majority of the members of the Luxe Claimants Negotiating Committee, within three (3) Business Days of the Debtors' email to the Mediator.  Absent any such objection, the Luxe Claimants Negotiating Committee shall be deemed to consent.

"***Luxe Deemed Assignment Date***" has the meaning set forth in Article IV.D of the Plan.

"***Luxe Energy***" means, together and severally, Luxe Operating, Pecan Bayou Energy LLC, Luxe Energy LLC and their respective successors and assigns.

"***Luxe Lien Release***" means a writing documenting a Luxe Claimant's release of a Lien against a Luxe Working Interest.

"***Luxe Operating***" means Luxe Operating LLC.

"***Luxe Settlement***" means the settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 implemented pursuant to and incorporated into the Plan, among the Debtors, the Buyer, and Luxe Energy, whereby, *inter alia*, subject to Confirmation of this Plan as to the Sellers (including, without limitation, the releases and injunctions as set forth in Article IX of this Plan, and entry of the Confirmation Order, which shall be subject to the consent rights set forth in the RSA):

(a) Luxe Energy shall contribute the Luxe Contribution to the Luxe Settlement Fund in exchange for (i) the release from the Luxe Claimants' Claims and Liens against Luxe Energy and its property, including without limitation the Luxe Working Interests and (ii) the releases, bar and injunctions provided in Article IX of this Plan;

(b) the Buyer and the Debtors shall contribute the Buyer Contribution and the MDC Contribution, respectively, to the Luxe Settlement Fund in full satisfaction of their respective alleged obligations to Luxe Claimants with respect to the Debtors or the Joint Operating Agreements;

(c)  the Luxe Settlement Fund shall be administered by the Luxe Settlement Distribution Agent pursuant to (i) the Luxe Allocation or (ii) if the Luxe Claimants cannot agree upon the Luxe Allocation, the decision of the Bankruptcy Court in a contested matter, interpleader action, or other adversary proceeding commenced by the Luxe Settlement Distribution Agent;

(d) on the Effective Date, all Joint Operating Agreements shall be assumed by the Debtors and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code;

(e) upon the Effective Date, all accrued but unpaid claims and obligations between Luxe Energy and any Debtors (including, without limitation, (i) claims and obligations relating to joint interest billings, royalties, and revenues under the Joint Operating Agreements, and (ii) claims and obligations relating to Transferred Non-Op Working Interests) as of the Luxe Deemed Assignment Date shall be deemed "zeroed out" and mutually released,

such that no amounts accruing on or prior to the Luxe Deemed Assignment Date shall be payable to Luxe Energy by the Debtors or the Buyer, and no amounts accruing on or prior to the Luxe Deemed Assignment Date shall be payable by Luxe Energy to the Debtors or the Buyer, and all obligations accruing or arising after the Luxe Deemed Assignment Date under the Joint Operating Agreements shall be paid and performed by the Buyer or Luxe Energy, as the case may be, pursuant to the terms and conditions of the respective Joint Operating Agreements;

(f) Luxe Energy shall consent to the assumption by the Debtors and assignment to the Buyer of each of the Non-Op Joint Operating Agreements in connection with the Asset Purchase Agreement wherein no Cure Cost or other consideration shall be due on account of such assumption and assignment (besides the amounts contributed to the Luxe Settlement Fund) and therefore, the aggregate Cure Costs shall be zero ($0.00);

(g) Luxe Energy or its designee shall purchase from the Debtors on the Effective Date free and clear of all Liens, Claims, encumbrances, and other interests, forty-five (45%) percent of the Debtors' working interests in certain Luxe Energy-operated wells and leasehold interests associated therewith subject to the Non-Op Joint Operating Agreements, for a purchase price of $4,500,000.00 to be paid solely as directed by the Buyer pursuant to a separate transaction agreement, and Luxe Energy and the Buyer shall enter into certain consensual amendments to the Joint Operating Agreements, all as further described in definitive documentation to be included in the Plan Supplement, which shall be subject to the consent rights set forth in the RSA.  For the avoidance of doubt, the releases described in Article IX.D shall not release any obligations of Luxe Energy to the Buyer, or of the Buyer to Luxe Energy, arising or accruing at or after 12:01 a.m. Central Time on June 1, 2021; and

(h) the Luxe Claimants shall release their Liens and Claims against the Other Non-Debtor Working Interest Owners' working interests which are subject to the MDC Joint Operating Agreements.

Any changes or modifications to the Luxe Settlement as compared to the terms set forth herein and in the Asset Purchase Agreement that materially affect the economic value of the settlement to the Estates and/or the MDC RBL Lenders, shall be in form and substance acceptable to the MDC RBL Lenders (such consent not to be unreasonably withheld).

"*Luxe Settlement Distribution Agent*" means the Mediator, who the Luxe Claimants Negotiating Committee has selected to determine the Luxe Allocation and make distributions to the Luxe Claimants pursuant to the Luxe Allocation.

"*Luxe Settlement Fund*" means a fund to be administered by the Luxe Settlement Distribution Agent, consisting of:  (a) $4,933,334.00 in Cash to be funded by Luxe Energy on the Effective Date (the "*Luxe Contribution*"); (b) $1,033,333.00 in Cash, plus interests in the Non-Op Net Profits Interest, to be funded by the Buyer on the Effective Date (the "*Buyer Contribution*"); and (c) the MDC Contribution.

"***Luxe Settlement Supporting Claimants***" means Luxe Claimants who do not object (either directly or through Affiliates) to the Plan, the Sale Transaction or the Luxe Settlement.

"***Luxe Working Interests***" means Luxe Energy's working interests in oil and gas properties under the Joint Operating Agreements, except for working interests in leases solely operated by Luxe Energy.

"***Maefield Development***" means Maefield Development Corporation, a non-Debtor Affiliate of the Debtors.

"***Maefield Services Agreement***" means the management services agreements between MDC and MDC Texas Operator, on the one hand, and Maefield Development, on the other, pursuant to which Maefield Development provides management and related services to MDC utilizing Maefield Development's own employees.

"***Majority***" means more than fifty percent (50%).

"***MDCA***" means MDC Acquisition LLC, a non-Debtor Affiliate of the Debtors.

"***MDC Adequate Protection Claims***" means all "Administrative Adequate Protection Claims" belonging to the MDC RBL Lenders pursuant to and as defined in the Final Cash Collateral Order.

"***MDC Adequate Protection Liens***" means all "Administrative Adequate Protection Liens" belonging to the MDC RBL Lenders pursuant to and as defined in the Final Cash Collateral Order.

"***MDC Adequate Protection Payments***" means all adequate protection payments made to or for the benefit of the MDC Administrative Agent or MDC RBL Lenders under the Cash Collateral Orders, including without limitation the MDC RBL Lender Fees paid by the Debtors postpetition, and all interest, fees, costs, charges, and all other amounts paid under the Cash Collateral Orders, but excluding the MDC RBL Facility Claim Payment.

"***MDC Administrative Agent***" means Natixis, New York Branch ("*Natixis*"), as administrative agent under the MDC RBL Facility and any other applicable MDC RBL Credit Documents.

"***MDC Contribution***" means $2,033,333.00 in Cash which shall be funded or delivered by the Debtors on the Effective Date for and as part of the Luxe Settlement.

"***MDC Debtors***" means MDC, MDC Reeves and Ward I.

"***MDC General Unsecured Claim***" means a General Unsecured Claim against MDC, MDC Reeves, or Ward I, if any.

"**_MDC Joint Operating Agreements_**" means, together, the Yucca Joint Operating Agreement and the Non-Yucca Joint Operating Agreement.

"**_MDC Litigation Trust_**" means the trust established on the Effective Date in each case in accordance with the terms and conditions set forth in the MDC Litigation Trust Agreement.  As set forth in the MDC Litigation Trust Agreement, the MDC Litigation Trust shall hold the MDC Litigation Trust Assets.

"**_MDC Litigation Trust Agreement_**" means the agreement, substantially in the form included in the Plan Supplement, governing the operations of the MDC Litigation Trust, as may be amended, supplemented, or modified from time to time, and which shall be in form and substance acceptable to the MDC RBL Lenders.

"**_MDC Litigation Trust Assets_**" means:  (a) all Litigation Claims owned by and belonging to the MDC Debtors and MDC Texas Operator, if any; (b) the membership interests of each of the MDC Debtors in any of the other MDC Debtors other than MDC; (c) any rights and claims (including without limitation those rights and claims that can be made under or related to any insurance policies issued to or for the benefit of the following), (i) of, by or belonging to the MDC Debtors and MDC Texas Operator, or (ii) against (and in such capacity) any individuals constituting or acting, directly or indirectly, as officers, directors, agents, attorneys, accountants, operators, or other representatives (to the extent any individual is not expressly released herein) for or on behalf of the MDC Debtors and MDC Texas Operator, as well as all claims of the MDC Debtors against MDC Texas Operator, including any claims or rights related thereto to file or make such claims and pursue such insurance related to any such claims under this provision; (d) any and all books, records, documents, information, analyses, and privileges owned by and belonging to the MDC Debtors associated with items (a)-(c), including any analyses of the referenced Litigation Claims owned by and belonging to the MDC Debtors and MDC Texas Operator prepared by counsel for the Debtors or debtors in possession; and (e) all the MDC Texas Operator Litigation Trust Assets.  For the avoidance of doubt, neither (x) Receivables being used to satisfy the distributions and payments required under the Plan, nor (y) any obligation(s) of the Buyer pursuant to the Asset Purchase Agreement, shall be MDC Litigation Trust Assets.  In addition, the MDC RBL Lenders may transfer and assign some or all of their direct claims against any of the foregoing parties to the MDC Litigation Trust, in which event such direct claims will become MDC Litigation Trust Assets and be administered, prosecuted or settled in accordance with the MDC Litigation Trust Agreement.  For the avoidance of doubt, the Senior Secured Trade Recovery Amount and the MDC RBL Facility Claim Payment are not Litigation Trust Assets.  Notwithstanding any language in the Plan or the Confirmation Order to the contrary (including, without limitation, the assignment of membership interests of any Debtor effectuated pursuant to the Plan or the Confirmation Order), on the Effective Date the MDC Litigation Trust shall be deemed to have received from any of the Debtors the requisite assignment, standing, authority and right to pursue any claims of the MDC Debtors and MDC Texas Operator, if any, that constitute MDC Litigation Trust Assets, including as necessary to satisfy Delaware statutory requirements that may be applicable to the Debtor entities that may be necessary to accomplish the intent of this provision, which is to allow the MDC Litigation Trustee to pursue, and recover for the MDC Litigation Trust, any such claims that are MDC Litigation Trust Assets, including derivative claims on behalf of such entities whose claims are

14

assigned to the MDC Litigation Trust.  For the avoidance of doubt, the MDC RBL Facility Secured Claims (including MDC Adequate Protection Liens and MDC Adequate Protection Claims) shall remain attached to and against all MDC Litigation Trust Assets vesting in the MDC Litigation Trust in the same rank and priority as they possess immediately prior to vesting in such trust.

"*MDC Litigation Trust Beneficiaries*" means, collectively, Holders of MDC General Unsecured Claims (including Holders of Senior Secured Trade Deficiency Claims against MDC Debtors) and Holders of MDC RBL Facility Claims, and to the extent that MDC Texas Operator Litigation Trust Assets are assigned to the MDC Litigation Trust, Holders of MDC Texas Operator General Unsecured Claims, *provided* that Holders of MDC Texas Operator General Unsecured Claims shall recover solely from MDC Texas Operator Litigation Trust Assets.  For the avoidance of doubt, Holders of MTE Term Loan Deficiency Claims are not MDC Litigation Trust Beneficiaries.

"*MDC Litigation Trust Board*" means the two-member board, as described more fully in that certain MDC Litigation Trust Agreement consisting solely of two (2) representatives of the MDC RBL Lenders appointed by the MDC RBL Lenders in their sole discretion; *provided, however*, that on the date that the MDC RBL Lenders are deemed to have been paid in full, the two (2) representatives appointed by the MDC RBL Lenders shall be replaced by two (2) representatives of the Senior Secured Trade Claim Negotiating Committee appointed by a Majority of the Senior Secured Trade Claim Negotiating Committee in its sole discretion.  The MDC Litigation Trust Board shall have the authority to approve settlements of the Claims against, and assert Litigation Claims owned by, the MDC Debtors.

"*MDC Litigation Trustee*" means the Person to be retained as the trustee to manage the MDC Litigation Trust, selected by the MDC RBL Lenders with the consent of the Senior Secured Trade Claim Negotiating Committee, as of the Effective Date or as soon as reasonably practicable thereafter, or any subsequent substitute trustee named in accordance with the MDC Litigation Trust Agreement, as the fiduciary responsible for administering the MDC Litigation Trust, in accordance with Article V hereof.  For the avoidance of doubt, the MDC Litigation Trustee shall have the right to appoint a substitute MDC Litigation Trustee in the event that the MDC Litigation Trust Board fails to appoint a substitute MDC Litigation Trustee pursuant to the terms of the MDC Litigation Trust Agreement and as otherwise necessary to accomplish the purposes of the MDC Litigation Trust.

"*MDC RBL Credit Documents*" means the MDC RBL Facility and any related security, guaranty or other "Credit Documents" (as defined in the MDC RBL Facility).

"*MDC RBL Facility*" means that certain credit agreement dated as of September 17, 2018, as amended, supplemented, or otherwise modified prior to the date hereof, among MDC, as borrower, Natixis, as administrative agent, and the lenders and other parties party thereto.

"*MDC RBL Facility Claim*" means a Claim against MDC, MDC Reeves, or Ward I arising under the MDC RBL Credit Documents, including the MDC Adequate Protection Claims and MDC Adequate Protection Liens arising under the Cash Collateral Orders.

"***MDC RBL Facility Claim Payment***" means $17,500,000.00 in Cash.

"***MDC RBL Facility Deficiency Claim***" means, in accordance with section 506(a)(1) of the Bankruptcy Code, a General Unsecured Claim equal to the amount, if any, by which the total MDC RBL Facility Claim of any Holder exceeds the sum of (a) any setoff rights of the Holder against the applicable Debtor provided for by applicable law and preserved by section 553 of the Bankruptcy Code, plus (b) the portion of such MDC RBL Facility Claim that is an MDC RBL Facility Secured Claim.

"***MDC RBL Facility Secured Claim***" means a Secured Claim arising under the MDC RBL Credit Documents.

"***MDC RBL Lender Fees***" means the reasonable and documented fees and expenses incurred by counsel to the MDC Administrative Agent, Bracewell LLP and Bayard, P.A., the financial advisor to the MDC Administrative Agent, RPA Advisors, LLC, and counsel to BMO Harris Bank, N.A., Mayer Brown LLP and Archer & Greiner, P.C.

"***MDC RBL Lenders***" means, collectively, the MDC Administrative Agent, and Natixis and BMO Harris Bank, N.A. in their capacity as lenders under the MDC RBL Facility.

"***MDC RBL Remaining Collateral***" means any and all "Collateral" of the MDC RBL Lenders, as such term is defined in the Cash Collateral Orders (including Cash and Receivables), which is not (a) sold to the Buyer as part of the Sale Transaction, or (b) Transferred Non-Op Working Interests; *provided, however*, that the MDC RBL Remaining Collateral shall not include any Excluded Assets (including Cash and Receivables) which are being used to satisfy the distributions and payments required under the Plan, including but not limited to on account of (i) Allowed Administrative Expense Claims, (ii) Allowed Other Secured Claims, (iii) Allowed Other Priority Claims, (iv) the Senior Secured Trade Claim Cash Consideration, (v) the MDC RBL Facility Claim Payment, (vi) the MDC Contribution to the Luxe Settlement Fund, and (vii) the Wind-Down Expenses.

"***MDC Texas Operator General Unsecured Claim***" means a General Unsecured Claim against MDC Texas Operator, if any.

"***MDC Texas Operator Litigation Trust Assets***" means:  (a) Litigation Claims owned by and belonging to MDC Texas Operator, if any; (b) any rights and claims under or related to any insurance policies issued to or for the benefit of MDC Texas Operator or its officers, directors, agents, attorneys, accountants, or other representatives, whether acting directly or indirectly; and (c) any and all books, records, documents, information, analyses, and privileges owned by and belonging to MDC Texas Operator associated with items (a)-(b), including any analyses of the referenced Litigation Claims belonging to MDC Texas Operator prepared by counsel for the Debtors or debtors in possession.

"***Mediator***" means the Honorable Judge Steven A. Felsenthal, as mediator appointed pursuant to the *Order to Appoint Mediator in Connection with the Statutory Lien Disputes*, entered by the Bankruptcy Court on October 13, 2020 [Docket No. 1660].

"***Mineral Lease***" means a written agreement through which an owner of mineral interests sold or otherwise conveyed the exclusive right to extract minerals to the Debtors, in exchange for a share of the proceeds from the sale of the oil and gas production.

"***Mr. Siffin***" means Mark Siffin, Chief Executive Officer of MDC.

"***MTE Administrative Agent***" means Riverstone Credit Management, LLC, as administrative agent under the MTE Term Loan Facility.

"***MTE Cash Collateral***" means the approximately $2,400,000.00 remaining from the initial amount of cash collateral set aside as an interest escrow held for the benefit of the MTE Administrative Agent and MTE Term Lenders pursuant to the MTE Credit Documents.

"***MTE Credit Documents***" means the MTE Term Loan Facility; the collateral agreement, dated as of September 17, 2018, between MTE, as grantor and the MTE Administrative Agent; and the pledge agreement dated as of September 17, 2018, made by Olam Energy and MTE Partners in favor of the MTE Administrative Agent.

"***MTE Debtors***" means MTE, MTE Partners and Olam Energy.

"***MTE General Unsecured Claim***" means a General Unsecured Claim against MTE, MTE Partners, or Olam Energy, if any.

"***MTE Litigation Trust***" means the trust established on the Effective Date in each case in accordance with the terms and conditions set forth in the MTE Litigation Trust Agreement. As set forth in the MTE Litigation Trust Agreement, the MTE Litigation Trust shall hold the MTE Litigation Trust Assets.

"***MTE Litigation Trust Agreement***" means the agreement, substantially in the form included in the Plan Supplement, governing the operations of the MTE Litigation Trust, as may be amended, supplemented, or modified from time to time, and which shall be in form and substance acceptable to the MTE Term Lenders.

"***MTE Litigation Trust Assets***" means: (a) all Litigation Claims owned by and belonging to the MTE Debtors or MTE Holdings II LLC; (b) the membership interests of each of the MTE Debtors in any of the other MTE Debtors and in MDC; (c) any rights and claims (including without limitation those rights and claims that can be made under or related to any insurance policies issued to or for the benefit of the following), (i) of, by or belonging to the MTE Debtors or MTE Holdings II LLC or (ii) against (and in such capacity) any individuals constituting or acting, directly or indirectly, as officers, directors, agents, attorneys, accountants, operators, or other representatives (to the extent any individual is not expressly released herein) for or on behalf of the MTE Debtors and MTE Holdings II LLC, as well as all claims of the

17

MTE Debtors and MTE Holdings II LLC against MDC Texas Operator, including any claims or rights related thereto to file or make such claims and pursue such insurance related to any such claims under this provision; (d) any and all books, records, documents, information, analyses, and privileges owned by and belonging to the MTE Debtors or MTE Holdings II LLC associated with items (a)-(c),including any analyses of the referenced Litigation Claims owned by and belonging to the MTE Debtors or MTE Holdings II LLC prepared by counsel for the Debtors or debtors in possession.  For the avoidance of doubt, neither (x) Receivables being used to satisfy the distributions and payments required under the Plan, nor (y) any obligation(s) of the Buyer pursuant to the Asset Purchase Agreement, shall be MTE Litigation Trust Assets.  In addition, the MTE Administrative Agent and the MTE Term Lenders may transfer and assign some or all of their direct claims against any of the foregoing parties to the MTE Litigation Trust, in which event such direct claims will become MTE Litigation Trust Assets and be administered, prosecuted or settled in accordance with the MTE Litigation Trust Agreement.  For the avoidance of doubt, the Senior Secured Trade Recovery Amount and the MDC RBL Facility Claim Payment are not Litigation Trust Assets.  Notwithstanding any language in the Plan or the Confirmation Order to the contrary (including, without limitation, the assignment of membership interests of any Debtor or other entity effectuated pursuant to the Plan or the Confirmation Order), on the Effective Date the MTE Litigation Trust shall be deemed to have received from any of the Debtors or MTE Holdings II LLC the requisite assignment, standing, authority and right to pursue any claims of the MTE Debtors and MTE Holdings II LL, if any, that constitute MTE Litigation Trust Assets, including as necessary to satisfy Delaware statutory requirements that may be applicable to the Debtor entities that may be necessary to accomplish the intent of this provision, which is to allow the MTE Litigation Trustee to pursue, and recover for the MTE Litigation Trust, any such claims that are MTE Litigation Trust Assets, including derivative claims on behalf of such entities whose claims are assigned to the MTE Litigation Trust.

"***MTE Litigation Trust Beneficiaries***" means the Holders of the MTE Term Loan Claims.

"***MTE Litigation Trust Board***" means the two-member board consisting solely of two (2) representatives of the MTE Term Lenders appointed by the MTE Term Lenders in their sole discretion.  The MTE Litigation Trust Board shall have the authority to approve settlements of the Claims against, and assert Litigation Claims owned by or belonging to, the MTE Debtors.

"***MTE Litigation Trustee***" means the Person to be retained as the trustee or similar person to manage the MTE Litigation Trust, selected by the MTE Administrative Agent and MTE Term Lenders as of the Effective Date or as soon as reasonably practicable thereafter, or any subsequent substitute trustee named in accordance with the MTE Litigation Trust Agreement, as the fiduciary responsible for administering the MTE Litigation Trust, in accordance with Article V hereof.  For the avoidance of doubt, the MTE Litigation Trustee shall have the right to appoint a substitute MTE Litigation Trustee in the event that the MTE Litigation Trust Board fails to appoint a substitute MTE Litigation Trustee pursuant to the terms of the MTE Litigation Trust Agreement and as otherwise necessary to accomplish the purposes of the MTE Litigation Trust.

"***MTE Term Lenders***" means, collectively, the lenders under the MTE Term Loan Facility.

"***MTE Term Loan Claim***" means a Claim against MTE, MTE Partners or Olam Energy arising under the MTE Credit Documents.

"***MTE Term Loan Deficiency Claim***" means, in accordance with section 506(a)(1) of the Bankruptcy Code, a General Unsecured Claim equal to the amount, if any, by which the total MTE Term Loan Claim of any Holder exceeds the sum of (a) any setoff rights of the Holder against the applicable Debtor provided for by applicable law and preserved by section 553 of the Bankruptcy Code, plus (b) the portion of such MTE Term Loan Claim that is an MTE Term Loan Secured Claim.

"***MTE Term Loan Facility***" means the term loan credit agreement dated as of September 17, 2018, as amended, supplemented, or modified from time to time, among MTE, the MTE Administrative Agent and the MTE Term Lenders.

"***MTE Term Loan Secured Claim***" means a Secured Claim arising under the MTE Credit Documents.

"***Net MTE Cash***" means the Cash available for distribution on account of the MTE Term Loan Claims, after deduction of $1,000,000.00 to fund the MTE Litigation Trust and a reasonable allocation for the payment of Administrative Expense Claims against the MTE Debtors, *provided* MTE's cash payable for such allocation shall not exceed $250,000.00.  For the avoidance of doubt, Net MTE Cash shall neither enhance nor diminish the Senior Secured Trade Recovery Amount.

"***Net Profits Interest***" means the net profits interest in the Debtor-operated wells to be conveyed on the Effective Date by the Buyer to the Debtors, and by the Debtors to the Senior Secured Trade Claim Distribution Agent, which Net Profits Interest shall be distributed by the Senior Secured Trade Claim Distribution Agent as part of the Senior Secured Trade Recovery Amount in accordance with the Senior Secured Trade Claim Allocation.

"***Net Profits Interest Agreement***" means the net profits interest agreement attached as Exhibit I-1 to the Asset Purchase Agreement, which agreement shall be subject to the consent rights set forth in the RSA between the Buyer, Luxe and the Debtors and with respect (i) to the commencement date of such agreement and (ii) to any changes or modifications to such agreement as compared to such exhibit that materially affects the economic value of the interest to the Estates and/or the MDC RBL Lenders, shall be in form and substance acceptable to the Sellers and MDC RBL Lenders (such consent not to be unreasonably withheld).

"***Non-Debtor Working Interest Owner***" means, collectively, Luxe Energy and the Other Non-Debtor Working Interest Owners.

"*Non-Op Joint Operating Agreements*" mean the seven (7) joint operating agreements to which MDC Reeves and Luxe Operating are parties, in which Luxe Operating is the operator, and MDC Reeves owns working interests.

"*Non-Op Net Profits Interest*" means the net profits interest conveyed by the Buyer to the Debtors on the Effective Date, pursuant to the terms of the Non-Op Net Profits Interest Agreement, out of the Buyer's right, title and interest as non-operating working interest owner in and to the Luxe Energy-operated wells remaining after transfer to Luxe Energy or its designee of the Transferred Non-Op Working Interests and payable out of proceeds from the sale of hydrocarbons that may be produced and saved from such Luxe Energy-operated wells from and after the Effective Date in an aggregate amount of all payments made by the Buyer to the Debtors with respect to the Non-Op Net Profits Interest equal to $3,000,000.00.

"*Non-Op Net Profits Interest Agreement*" means the Non-Op Net Profits Interest agreement attached as Exhibit I-2 to the Asset Purchase Agreement.

"*Non-Released Claims and Causes of Action*" means:  (a) claims and Causes of Action against the Released Parties for fraud, gross negligence, or willful misconduct; (b) the potential Causes of Action summarized in the Special Committee Report, it being understood that no Causes of Action against Luxe Energy are summarized in the Special Committee Report; and (c) the Allocation Disputes.  For the avoidance of doubt, the Non-Released Parties shall not be released from *any* claims or Causes of Action.

"*Non-Released Parties*" means:  (a) Mr. Siffin, (b) Maefield Development, (c) MDCA, (d) MDCE Investments LLC, (e) MTE Parent LLC, (f) Third Eye Energy, (g) IUC Olam Holdings LLC, (h) MTE Olam Holdings LLC, (i) MTE Holdings II LLC, (j) MDC Water LLC, (k) the Debtors and the Reorganized Debtors, except as expressly set forth in this Plan, and (l) any Affiliates, including without limitation direct or indirect subsidiaries, of the foregoing (including entities associated with Maefield Development projects known as 20 Times Square, Olathe Point, Hazel Dell Shopping Center, Maegardner, and Olathe Commons) *except for* any employee of Maefield Development who performed services for the Debtors besides Mr. Siffin.

"*Non-Yucca Joint Operating Agreement*" means that certain joint operating agreement entered into among certain parties on June 5, 2015, with one of the Debtors serving as the operator and MDC Reeves acquiring an ownership interest, and in which Luxe Energy subsequently acquired ownership interests.

"*Notice and Claims Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto.

"*Other Non-Debtor Working Interest Owners*" means any non-Debtor Persons other than Luxe Energy who own working interests in certain oil and gas leases in Reeves County, Texas subject to the MDC Joint Operating Agreements.

"*Other Priority Claim*" means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment under section 507(a) of the Bankruptcy Code.

"***Other Secured Claim***" means any Secured Claims that are not MTE Term Loan Secured Claims, Senior Secured Trade Claims, MDC RBL Facility Claims or Junior Secured Trade Claims.

"***Person***" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"***Petition Date***" means October 22, 2019, with respect to MTE; October 23, 2019, with respect to MTE Partners and Olam Energy; and November 8, 2019, with respect to MDC, MDC Texas Operator, MDC Reeves and Ward I.

"***Plan***" means this plan, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, in form and substance acceptable to the MDC RBL Lenders and subject to the consent rights set forth in the RSA.

"***Plan Administrator***" means the Person, identified in the Plan Supplement, selected by the Debtors with the consent of the MDC RBL Lenders and the MTE Term Lenders, to act as the administrator in accordance with the Plan.

"***Plan Administration Process***" means the process for resolving and paying Claims described in Article VIII of the Plan.

"***Plan Documents***" means the Plan, the Disclosure Statement, the Plan Supplement, and the various agreements and other documents formalizing or implementing the Plan and the transactions contemplated thereunder, each of which shall be in form and substance acceptable to the MDC RBL Lenders and subject to the consent rights set forth in the RSA.

"***Plan Supplement***" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than seven (7) days before the deadline for objecting to Confirmation of the Plan, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall be in form and substance acceptable to the MDC RBL Lenders and subject to the consent rights set forth in the RSA, and shall include the following: (a) Schedule of Assumed Executory Contracts and Unexpired Leases; (b) forms of the Litigation Trust Agreements; (c) the Non-Op Net Profits Interest Agreement; (d) a form Luxe Lien Release and a form Stipulation of Dismissal, each in form and substance acceptable to Luxe Energy; and (e) any and all other documentation necessary to effectuate the Plan or that is contemplated by the Plan. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, pursuant to section 1127 of the Bankruptcy Code and the consent rights set forth in the RSA, and subject to the consent of the MDC RBL Lenders.

"***Preference Defendant***" means any Holder of a Claim that received a transfer subject to avoidance and recovery pursuant to sections 547 and 550 of the Bankruptcy Code.

"***Priority Tax Claim***" means a Claim entitled to priority, whether secured or unsecured, against a Debtor, of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"***Pro Rata***" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

"***Professional***" means an Entity retained pursuant to a Bankruptcy Court order in accordance with sections 327 or 363 of the Bankruptcy Code, including ordinary course professionals retained by the Debtors pursuant to the *Order Approving Procedures for the Retention and Compensation of Ordinary Course Professionals Nunc Pro Tunc to the Petition Date*, entered by the Bankruptcy Court on March 4, 2020 [Docket No. 699], and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

"***Professional Fee Claim***" means a Claim for the compensation of Professionals and the reimbursement of expenses incurred by Professionals through and including the Effective Date to the extent such fees and expenses have not been previously paid.

"***Professional Fee Discount***" means the amount of $775,000 consisting of an agreed reduction in the compensation of the Professionals retained by the Debtors and the Mediator to be used to increase the Senior Secured Trade Claim Cash Consideration in the event that the Holders of Senior Secured Trade Claims vote in favor of the Plan. The Professional Fee Discount will be reduced by the amount that the Senior Secured Trade Claim Cash Consideration would otherwise exceed $27,000,000.

"***Professional Fee Escrow Account***" means an account in an amount equal to the total Professional Fee Reserve Amount to be funded by the Debtors on or before the Effective Date and held by a Person or Entity to be designated by the Debtors.

"***Professional Fee Reserve Amount***" means the aggregate amount of Professional Fee Claims that the Professionals have incurred or will incur in rendering services to the Debtors, in connection with the Plan, prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.C hereof, and which amount shall be acceptable to the MDC RBL Lenders.  For the avoidance of doubt, the Professional Fee Reserve Amount (a) must be sufficient to pay (i) all Professional Fee Claims against the Sellers which are Allowed by the Bankruptcy Court and (ii) up to $250,000.00 in Professional Fee Claims against the MTE Debtors which are Allowed by the Bankruptcy Court, and (b) shall not cover or include any Substantial Contribution Claims Allowed by the Bankruptcy Court.

"***Proof of Claim***" means a proof of Claim Filed with respect to a Debtor or Debtors in the Chapter 11 Cases.

"***Receivables***" means the balance of money due to the Debtors for goods or services delivered or used but not yet paid for by the Debtors' customers.

"***Reinstated***" or "***Reinstatement***" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"***Rejection Damages Bar Date***" means, as to each Executory Contract or Unexpired Lease, thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) authorizing the rejection of such Executory Contract or Unexpired Lease.

"***Released Party***" means each of the following in their capacity as such: (a) the Special Committee; (b) Luxe Energy; (c) the MTE Administrative Agent and MTE Term Lenders who vote to accept the Plan; (d) the Buyer Parties; (e) the Holders of Senior Secured Trade Claims who vote to accept the Plan if each of Classes 4A through 4G that are not Vacant Classes votes to accept the Plan; (f) the Senior Secured Trade Claim Negotiating Committee; (g) the Luxe Claimants Negotiating Committee; (h) the MDC RBL Lenders who vote to accept the Plan; (i) the Luxe Settlement Supporting Claimants, regardless of whether such Luxe Settlement Supporting Claimants are released as Holders of Senior Secured Trade Claims; (j) WaterBridge Texas Midstream LLC and WaterBridge Texas Operating LLC; (k) counterparties to the Assigned Contracts with respect to Causes of Action arising under or related to such counterparties' business relationship with the Debtors and solely to the extent such counterparties agree to maintain ongoing business relationships with the Buyer on terms acceptable to the Buyer; (l) each of the foregoing Person's and Entities' respective predecessors, successors and assigns, and its and their Affiliates, subsidiaries, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, chief restructuring officers, accountants, investment bankers, and consultants, in each case solely in their capacity as such, *provided, however,* that in no event shall any Non-Released Parties be deemed to be a Released Party, and *further provided* that neither the Plan Administrator nor the Litigation Trustees shall be a Released Party; (m) the Debtors' Professionals, advisors, attorneys, financial advisors, chief restructuring officers, accountants, investment bankers, and consultants, in each case solely in their capacity as such; and (n) all employees of Maefield Development who performed services for the Debtors, except for Mr. Siffin.

"***Releasing Party***" means, collectively, and in each case solely in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Special Committee; (c) Luxe Energy; (d) the MTE Administrative Agent; (e) the Buyer; (f) the MDC Administrative Agent; (g) each Holder of a Claim entitled to vote to accept or reject the Plan (including without limitation Holders of: MTE Term Loan Claims, Senior Secured Trade Claims, MDC RBL Facility Claims, and General Unsecured Claims) that (i) votes to accept or reject the Plan and does not affirmatively elect to "opt out" of being a Releasing Party by marking the box on its ballot designated for such purpose (*provided, however,* that the Luxe Claimants shall not be permitted to opt out of such releases), or (ii) abstains from voting on the Plan; (h) each Holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan, upon payment in full on account of such Claim or Interest; (i) WaterBridge Texas Midstream LLC and WaterBridge Texas

Operating LLC; (j) the Luxe Claimants; and (k) with respect to each of the foregoing Entities described in clauses (a) through (j), such Entities' respective agents that could be required by their respective principal(s) to release claims or Causes of Action under applicable law, *provided, however*, that in no event shall any Non-Released Parties besides the Debtors and Reorganized Debtors be deemed to be a Releasing Party.

"***Reorganized Debtors***" means each of the Debtors as reorganized on the Effective Date.

"***Royalty Interest Claims***" means Claims based on Royalty Interests.

"***Royalty Interests***" means the working interests granting the right to exploit oil and gas, and certain other royalty or mineral interests, including but not limited to any of the following, to the extent applicable:  (a) a mineral owner's share under a Mineral Lease of proceeds from the Debtors' sale of oil and gas production; (b) overriding royalty interests in a share of production from certain wells and properties pooled or unitized therewith that burden the Debtors' working interest in a Mineral Lease; (c) non-participating royalty interests; (d) net profits interests; and (e) production payments.

"***RSA***" means collectively, those certain restructuring support agreements, as may be amended, modified, or otherwise supplemented pursuant to their terms, dated June 18, 2021 and August [*] 2021, respectively, by and between the Debtors and the parties thereto.

"***Sale Transaction***" means the sale of the Assets to the Buyer pursuant to the terms of the Asset Purchase Agreement.

"***Schedule of Assumed Executory Contracts and Unexpired Leases***" means the schedule (including any amendments or modifications thereto) of the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Debtors or the Reorganized Debtors, as applicable, pursuant to the Plan, as set forth in the Plan Supplement, as amended, supplemented, or modified by the Debtors from time to time in accordance with the Plan, which shall be in form and substance acceptable to the MDC RBL Lenders and subject to the consent rights set forth in the RSA.

"***Schedules***" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as such may have been amended, supplemented or modified from time to time.

"***Section 363 Sale***" means a sale pursuant to Section 363 of the Bankruptcy Code.

"***Secured***" means (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the Holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code.

"***Secured Claim***" means a Claim that is Secured; provided, however, that Statutory Lien Claims shall not be considered Secured Claims.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Securities Exchange Act***" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

"***Sellers***" means, collectively, MDC, MDC Texas Operator, Ward I and MDC Reeves.

"***Senior Secured Trade Claim***" means a Statutory Lien Claim of a Holder that is a party to the Consolidated Adversary Proceeding.

"***Senior Secured Trade Claim Allocation***" means the allocation of the Senior Secured Trade Recovery Amount among Holders of Senior Secured Trade Claims under the Plan, to be determined by Holders of Senior Secured Trade Claims as an inter-creditor matter and approved by the Bankruptcy Court.

"***Senior Secured Trade Claim Cash Consideration***" means up to $27,000,000.00 in Cash, which amount shall constitute the excess of the sum of (a) the MDC Debtors' Cash on hand calculated in accordance with the Asset Purchase Agreement, plus the MDC Debtors' current Receivables calculated in accordance with the Asset Purchase Agreement, less the MDC Debtors' current payables calculated in accordance with the Asset Purchase Agreement, and (b) the Cash proceeds of the Sale Transaction, less the amount of Cash necessary to (i) fund the Wind-Down Budget, (ii) provide for the MDC RBL Facility Claim Payment, (iii) provide for the MDC Contribution, and (iv) satisfy or fund reserves for Allowed Administrative Expense Claims (including any Allowed Substantial Contribution Claims), Priority Tax Claims, and Other Priority Claims required for emergence from the Chapter 11 Cases and the Consummation of the Plan to the extent Allowed and required to be paid in Cash under the Plan.  The Senior Secured Trade Claim Cash Consideration shall be not less than $ 23,500,000 (the "*Minimum Amount*") but if the Holders of Senior Secured Trade Claims (*i.e.* Classes 4D and 4F) vote to approve the Plan, the Senior Secured Trade Claim Cash Consideration will be increased by the Professional Fee Discount, subject to the $27,000,000.00 maximum amount. For the avoidance of doubt, if the sources of consideration for the Senior Secured Trade Claim Cash Consideration exceed $27 million in the aggregate, excluding the Professional Fee Discount, such excess cash will be added to the MDC RBL Lenders' Cash recovery under the Plan until the MDC RBL Lenders are paid in full on account of their Allowed Claims against the Debtors

"***Senior Secured Trade Claim Distribution Agent***" means the Mediator, who the Senior Secured Trade Claim Negotiating Committee, with notice to the Holders of Allowed Senior Secured Trade Claims, has selected to make or facilitate distributions to the Holders of Allowed Senior Secured Trade Claims under the Plan.

"***Senior Secured Trade Claim Negotiating Committee***" means the informal committee that was formed by the Mediator in the course of the Bankruptcy Court-authorized mediation in the Chapter 11 Cases to negotiate and advocate for the Holders of Senior Secured Trade Claims

as a whole.  Where consent of the Senior Secured Trade Claim Negotiating Committee is required by the Plan, the Debtors shall seek such consent by email:  (a) if before the Effective Date, to the Mediator, or (b) if following the Effective Date, to the Senior Secured Trade Claim Distribution Agent, for delivery to the Senior Secured Trade Claim Negotiating Committee.  The Senior Secured Trade Claim Negotiating Committee shall then object by email signed by the Majority of the members of the Senior Secured Trade Claim Negotiating Committee, within five (5) Business Days of the Debtors' email to the Mediator.  Absent any such objection, the Senior Secured Trade Claim Negotiating Committee shall be deemed to consent.

**"*Senior Secured Trade Deficiency Claim*"** means, in accordance with section 506(a)(1) of the Bankruptcy Code, a General Unsecured Claim equal to the amount, if any, by which the total Senior Secured Trade Claim of any Statutory Lien Claimant exceeds the sum of (a) any setoff rights of the Statutory Lien Claimant against the applicable Debtor provided for by applicable law and preserved by section 553 of the Bankruptcy Code, plus (ii) the portion of such Senior Secured Trade Claim that is a Secured Statutory Lien Claim.

**"*Senior Secured Trade Recovery Amount*"** means the Senior Secured Trade Claim Cash Consideration plus interests in the Net Profits Interest, which Net Profits Interest shall be in an aggregate amount not to exceed $10,000,000.

**"*Settlement Stipulation*"** means the *Stipulation Authorizing Settlement Pursuant to Federal Rule of Bankruptcy Procedure Rule 9019*, Filed on February 3, 2020 [Docket No. 548].

**"*Special Committee*"** means the special committee of the board of directors of each of MDC and MTE established pursuant to the Final Order approving the Settlement Stipulation.

**"*Special Committee Report*"** means the report, dated as of May 15, 2020, of the Special Committee regarding the investigation by Milbank LLP of possible claims held by the Debtors' Estates on behalf of the Special Committee.

**"*Statutory Lien Claim*"** means a mechanics and materialmen's Lien Claim pursuant to Chapter 53 of Title 5 of the Texas Property Code, a mineral Lien Claim pursuant to Chapter 56 of Title 5 of the Texas Property Code, or a constitutional Lien Claim pursuant to the Texas constitution.

**"*Stipulation of Dismissal*"** means a writing documenting a Luxe Claimant's dismissal with prejudice of any state court litigation commenced by such Luxe Claimant against Luxe Energy and all other defendants in such litigation, on account of any obligation discharged or released under this Plan.

**"*Substantial Contribution Claim*"** means requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

**"*Taxes*"** has the meaning set forth in Section 1.01 of the Asset Purchase Agreement.

"***Trade Claim Distribution Agents***" means the Senior Secured Trade Claim Distribution Agent and the Luxe Settlement Distribution Agent, who the Senior Secured Trade Claim Negotiating Committee (with notice to Holders of Senior Secured Trade Claims), and the Luxe Settlement Negotiating Committee (with notice to Holders of Luxe Settlement Claims) have selected to be Mediator.  The fees and expenses of the Trade Claim Distribution Agents shall be paid by the Reorganized Debtors or the Plan Administrator, as applicable, as set forth in the Wind-Down Budget.

"***Transfer Taxes***" has the meaning set forth in Section 16.01 of the Asset Purchase Agreement.

"***Transferred Non-Op Working Interests***" has the meaning set forth in Article IV.D of the Plan.

"***Unexpired Lease***" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

"***Unused Professional Fee Reserve Amount***" means the remaining Cash, if any, in the Professional Fee Escrow Account after all obligations and liabilities for which such reserve was established are paid, satisfied, and discharged in full in Cash or are Disallowed by Final Order in accordance with this Plan.

"***Unused Wind-Down Amount***" means the remaining Cash, if any, in the Wind-Down Reserve after all obligations and liabilities for which such reserve was established are paid, satisfied, and discharged in full in Cash or are Disallowed by Final Order in accordance with this Plan.

"***U.S. Trustee***" means the Office of the United States Trustee for the District of Delaware.

"***Vacant Classes***" means any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing.

"***Voting Deadline***" means the deadline to vote to accept or reject the Plan, as may be set by the Debtors or by order of the Bankruptcy Court.

"***Wind-Down***" means the wind down and dissolution of the Debtors and their respective Estates on and following the Effective Date as set forth in Article IV hereof, and shall include without limitation the liquidation of Excluded Assets and post-Closing Date matters relating to the Sale Transaction.

"***Wind-Down Amount***" means the net Cash expenditures attributable to the Wind-Down of the Debtors as reflected in the Wind-Down Budget.

"***Wind-Down Budget***" means Cash in an amount to be agreed upon among the Debtors and the MDC RBL Lenders, for the purposes of (a) effectuating the Wind-Down and (b) funding the MDC Litigation Trust in an amount to be agreed upon between the Debtors and MDC RBL Lenders. For the avoidance of doubt, the Wind-Down Budget shall not be funded with any portion of the following: (x) the Luxe Settlement Fund, (y) the MDC RBL Facility Claim Payment, or (z) any contribution by the Buyer other than the Cash consideration paid to the Sellers for the purchase of the Assets as contemplated by the Asset Purchase Agreement.

"***Wind-Down Reserve***" means a reserve to be established by the Debtors on or before the Effective Date and comprised of Cash in the amount of the Wind-Down Budget.

"***Working Interest Owner Claims***" has the meaning set forth in Section 1.01 of the Asset Purchase Agreement.

"***Yucca Joint Operating Agreement***" means that certain joint operating agreement entered into on September 1, 2013, among certain parties, with Red Willow Production, LLC initially serving as the operator, subsequently succeeded by MDC Texas Operator as operator, and in which MDC Reeves and Luxe Energy subsequently became the successors to certain ownership interests.

## B.    *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to

the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Debtors, Reorganized Debtors or Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires; and (15) wherever the Plan provides that the Buyer Parties, the MTE Term Lenders, the MDC RBL Lenders, Luxe Energy, or any other Holder of a Claim or party in interest shall have consent rights including, without limitation, the right to consent to (a) the form and substance of a Plan Document, (b) the election of the treatment of a Holder of a Claim, (c) modifications and amendments to the Plan, and (d) the Professional Fee Reserve Amount, *such Plan provisions shall be interpreted to mean that such consent shall not be unreasonably withheld; provided* that notwithstanding the foregoing, in the event of any conflict between the consent rights set forth in the Plan and the consent rights set forth in the RSA, the consent rights set forth in the Plan shall control in all respects, including the unqualified consent rights set forth therein.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, and of any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

*F.      Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such document or in the Confirmation Order).  In the event of an inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

# ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

*A.      Administrative Expense Claims*

Except as otherwise provided in this Article II.A and except with respect to Administrative Expense Claims that are Professional Fee Claims or Substantial Contribution Claims, or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Administrative Expense Claims must be Filed and served on the Plan Administrator pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Expense Claims Bar Date.  Objections to such requests, if any, must be Filed and served on the Plan Administrator and the requesting party within fourteen (14) days after such request for payment of such Administrative Expense Claim is Filed.  Holders of Administrative Expense Claims that are required to, but do not, File and serve a request for payment of such Administrative Expense Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, Reorganized Debtors, or their property, and such Administrative Expense Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Expense Claims that are Professional Fee Claims or Substantial Contribution Claims, and except to the extent that an Administrative Expense Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Expense Claim has agreed to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall receive:  (1) Cash equal to the amount of such Allowed Administrative Expense Claim either (a) on the Effective Date or as soon as practicable thereafter, (b) if the Administrative Expense Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which an order allowing such Administrative Expense Claim becomes a Final Order, or as soon thereafter as reasonably practicable, or (c) if the Allowed Administrative Expense Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed Administrative Expense Claim; or (2) such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code, without any further action by the Holder of such Allowed Administrative Expense Claim, and without any further notice to, or action, order, or approval of, the Bankruptcy Court.

The MTE Debtors may use the MTE Cash Collateral, on terms substantially similar to those set forth in the Final Cash Collateral Order to the extent necessary to fund $1,000,000.00 in and to the MTE Litigation Trust and pay Administrative Expense Claims against the MTE Debtors on the Effective Date or thereafter (but subject to the reasonable allocation for the payment of Administrative Expense Claims against the MTE Debtors, provided such allocation shall not exceed $250,000.00), including, but not limited to, costs necessary to implement the Plan on behalf of the MTE Debtors.  Notwithstanding the foregoing, nothing in the Plan and Confirmation Order shall authorize the use of the MDC RBL Lenders' Cash Collateral (as defined in the Final Cash Collateral Order) to pay the Administrative Expense Claims against any Debtor that is not a "Prepetition Loan Party" (as defined in the Final Cash Collateral Order), and all parties in interest, including the MDC RBL Lenders, reserve their rights to object to the allowance of Administrative Expense Claims against any particular Debtor and the allocation of Administrative Expense Claims among Debtors, irrespective of any agreement between the MTE Term Lenders and the Debtors to restrict such use of MTE Cash Collateral to $250,000.00; *provided*, that no parties in interest, including without limitation the MDC RBL Lenders, shall object to the post-Effective Date payment of any Administrative Expense Claims that are Allowed against the Sellers, and *further provided* that Administrative Expense Claims against any Debtors may be Allowed by the Court in amounts greater than $250,000.00, notwithstanding the foregoing agreement; *provided, however,* that any Claims relating to amounts paid on account of the Administrative Expenses of MDC Texas Operator shall be the sole property of the MDC Litigation Trust.

### B.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive treatment that shall be consistent with the provisions of sections 511 and 1129(a)(9) of the Bankruptcy Code. For the avoidance of doubt, such treatment shall apply to all Priority Tax Claims which constitute Excluded Liabilities and shall not otherwise modify the terms of the Asset Purchase Agreement.  From and after the Closing Date, each Holder of an Assumed Buyer Priority Tax Claim shall have recourse for payment of such Claim solely against the Buyer and its assets and property and shall be deemed to have waived and released any recourse against the Debtors, the Reorganized Debtors, or their respective assets or property for payment of or recovery on such Claim, and such Assumed Buyer Priority Tax Claims shall be paid in accordance with section 1129(a)(9) of the Bankruptcy Code.

### C.    *Professional Compensation*

#### 1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date shall be Filed no later than forty-five (45) days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be paid within five (5)

Business Days from the Professional Fee Escrow Account (a) in the full Allowed amount as against the Sellers, and (b) in the Allowed amount up to $250,000.00 as against the MTE Debtors.

2.    Professional Fee Escrow Account

On or before the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Reserve Amount shall be sufficient to satisfy all Allowed Professional Fee Claims against the Sellers and up to $250,000.00 of Allowed Professional Fee Claims against the MTE Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or by the Plan Administrator, as applicable, within five (5) Business Days after such Professional Fee Claims are Allowed (a) in the full Allowed amount as against the Sellers, and (b) in the Allowed amount up to $250,000.00 as against the MTE Debtors. When all Allowed amounts owing to the Professionals, payable as set forth herein, have been paid in full, any amount remaining in the Professional Fee Escrow Account shall revert to the MDC RBL Lenders pursuant to Article III.B.5 of the Plan, without any further action or order of the Bankruptcy Court, except that any MTE Cash Collateral and Net MTE Cash shall revert to the MTE Administrative Agent for distribution to the MTE Term Lenders.

If the Professional Fee Reserve Amount is insufficient to pay all Professional Fee Claims Allowed by the Bankruptcy Court against the Sellers, the balance of such Allowed Professional Fee Claims shall be satisfied from the Wind-Down Budget, and if the Wind-Down Budget is insufficient to pay the balance, from Excess MDC Distributable Cash, and any unpaid Professional Fee Claims remaining after exhaustion of the foregoing shall be waived by such Professionals.  For the avoidance of doubt, the MDC RBL Lenders shall not have any Liens on Professional Fee Claims which are Allowed by the Bankruptcy Court.  The MTE Debtors shall pay such Allowed Professional Fee Claims which are Allowed against the MTE Debtors from the MTE Cash Collateral, with up to a maximum of $250,000.00 of such MTE Cash Collateral. In the event that the Allowed Administrative Expense Claims against the MTE Debtors exceed $250,000.00, the Debtors' Professionals agree to waive payment of their Professional Fee Claims to the extent of any excess.

3.    Professional Fee Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims incurred in rendering services before and as of the Effective Date pursuant to Article IV.D hereof, and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of any Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or the Plan Administrator, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.  The total amount estimated pursuant to this section shall comprise the Professional Fee Reserve Amount.  For the avoidance of doubt, the Professional Fee Reserve Amount shall not include any estimated amounts a party seeks on account of a Substantial Contribution Claim or is granted pursuant to a Final Order on account of a Substantial Contribution Claim.

4.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay in Cash from the Wind-Down Budget the reasonable and documented legal, professional, or other fees and expenses incurred by professionals providing services to the Debtors or as otherwise provided in the Plan, after the Effective Date.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date shall terminate.

D.    *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code and any interest thereon pursuant to section 3717 of Title 31 of the United States Code on or before the Effective Date shall be paid in full in Cash on the Effective Date or as soon as practicable thereafter by the Debtors or the Plan Administrator, as applicable.  On and after the Effective Date, to the extent applicable, the Plan Administrator shall pay any and all such fees and interest in full in Cash when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtors shall remain obligated to pay quarterly fees and interest, if any, to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything in the Plan to the contrary, (1) the U.S. Trustee shall not be required to File any Proof of Claim for quarterly fees and any interest thereon; and (2) the foregoing U.S. Trustee fees and any interest thereon shall not be deemed Other Priority Claims.

E.    *Mediator Fees*

All documented fees and expenses due and payable to the Mediator shall be paid in full in Cash on the Effective Date or as soon as practicable thereafter by the Debtors or the Plan Administrator, as applicable.

F.    *Substantial Contribution Claims*

The Disclosure Statement shall fix a deadline prior to the Confirmation Hearing for any applications for Substantial Contribution Claims to be Filed, and such applications shall be heard at the Confirmation Hearing.  All rights of the Debtors' parties in interest and their professionals and/or advisors to file applications for Substantial Contribution Claims are hereby preserved. The Debtors and all parties in interest reserve all of their rights to object to such applications in connection with Confirmation of the Plan.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

Claims and Interests, except for Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  Except as otherwise provided in this Plan, a Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

The Plan shall constitute a separate chapter 11 plan for each Debtor, each of which shall include the classifications set forth below.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan.

| Class | Claims and Interests[2] | Status | Voting Rights |
|---|---|---|---|
| 1A | Other Secured Claims against MTE | Unimpaired | Not entitled to vote (presumed to accept) |
| 1B | Other Secured Claims against MTE Partners | | |
| 1C | Other Secured Claims against Olam Energy | | |
| 1D | Other Secured Claims against MDC | | |
| 1E | Other Secured Claims against MDC Texas Operator | | |
| 1F | Other Secured Claims against MDC Reeves | | |
| 1G | Other Secured Claims against Ward I | | |
| 2A | Other Priority Claims against MTE | Unimpaired | Not entitled to vote (presumed to accept) |
| 2B | Other Priority Claims against MTE Partners | | |
| 2C | Other Priority Claims against Olam Energy | | |
| 2D | Other Priority Claims against MDC | | |
| 2E | Other Priority Claims against MDC Texas Operator | | |
| 2F | Other Priority Claims against MDC Reeves | | |
| 2G | Other Priority Claims against Ward I | | |
| 3A | MTE Term Loan Claims against MTE | Impaired | Entitled to vote |
| 3B | MTE Term Loan Claims against MTE Partners | | |
| 3C | MTE Term Loan Claims against Olam Energy | | |
| 3D | MTE Term Loan Claims against MDC | | |
| 3E | MTE Term Loan Claims against MDC Texas Operator | | |
| 3F | MTE Term Loan Claims against MDC Reeves | | |
| 3G | MTE Term Loan Claims against Ward I | | |
| 4A | Senior Secured Trade Claims against MTE | Impaired | Not entitled to vote (Vacant Class) |

---

[2]    Out of an abundance of caution and to avoid confusion, this Plan includes a Class for Holders for every potential category of Claim, against each Debtor.  The Debtors recognize that certain Classes are vacant and contain no Holders of Claims.  *See* Art.III.E.

| Class | Claims and Interests[2] | Status | Voting Rights |
|---|---|---|---|
| 4B | Senior Secured Trade Claims against MTE Partners | | Not entitled to vote (Vacant Class) |
| 4C | Senior Secured Trade Claims against Olam Energy | | Not entitled to vote (Vacant Class) |
| 4D | Senior Secured Trade Claims against MDC | | Entitled to vote |
| 4E | Senior Secured Trade Claims against MDC Texas Operator | | Not entitled to vote (Vacant Class) |
| 4F | Senior Secured Trade Claims against MDC Reeves | | Entitled to vote |
| 4G | Senior Secured Trade Claims against Ward I | | Not entitled to vote (Vacant Class) |
| 5A | MDC RBL Facility Claims against MTE | Impaired | Entitled to vote |
| 5B | MDC RBL Facility Claims against MTE Partners | | |
| 5C | MDC RBL Facility Claims against Olam Energy | | |
| 5D | MDC RBL Facility Claims against MDC | | |
| 5E | MDC RBL Facility Claims against MDC Texas Operator | | |
| 5F | MDC RBL Facility Claims against MDC Reeves | | |
| 5G | MDC RBL Facility Claims against Ward I | | |
| 6A | General Unsecured Claims against MTE | Impaired | Not entitled to vote (deemed to reject) |
| 6B | General Unsecured Claims against MTE Partners | Impaired | Not entitled to vote (deemed to reject) |
| 6C | General Unsecured Claims against Olam Energy | Impaired | Not entitled to vote (deemed to reject) |
| 6D | General Unsecured Claims against MDC | Impaired | Entitled to vote |
| 6E | General Unsecured Claims against MDC Texas Operator | Impaired | Entitled to vote |
| 6F | General Unsecured Claims against MDC Reeves | Impaired | Entitled to vote |
| 6G | General Unsecured Claims against Ward I | Impaired | Entitled to vote |
| 7A | Interests in MTE | Impaired | Not entitled to vote (deemed to reject) |
| 7B | Interests in MTE Partners | | |
| 7C | Interests in Olam Energy | | |
| 7D | Interests in MDC | | |
| 7E | Interests in MDC Texas Operator | | |
| 7F | Interests in MDC Reeves | | |
| 7G | Interests in Ward I | | |

B.      *Treatment of Claims and Interests*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.    Classes 1A-1G – Other Secured Claims

    a.    *Classification*:  Classes 1A through 1G consist of Other Secured Claims against each Debtor, respectively, if any.

    b.    *Treatment*:  On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive at the Debtors' or Plan Administrator's election, with the MDC RBL Lenders' written consent, except to the extent that any Holder of an Allowed Other Secured Claim agrees to less favorable treatment, either:  (i) Cash equal to the amount of such Allowed Other Secured Claim; (ii) the property that serves as security for such Allowed Other Secured Claim; or (iii) such other treatment that shall render such Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code (which may include Reinstatement).

    c.    *Voting*:  Classes 1A through 1G are Unimpaired.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 1A through 1G are not entitled to vote to accept or reject the Plan.

2.    Class 2A-2G – Other Priority Claims

    a.    *Classification*:  Classes 2A through 2G consist of Other Priority Claims against each Debtor, respectively, if any.

    b.    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall, at the option of the Debtors or the Plan Administrator, as applicable, with the consent of each Buyer Party and the MDC RBL Lenders, (i) be paid in full in Cash, or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.

    c.    *Voting*:  Classes 2A through 2G are Unimpaired.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2A through 2G are not entitled to vote to accept or reject the Plan.

3.    Classes 3A-3G – MTE Term Loan Claims

    a.    *Classification*:  Classes 3A through 3G consist of all MTE Term Loan Claims against each Debtor, respectively, if any.

b.   *Allowance of MTE Term Loan Claims*:  MTE Term Loan Claims are deemed Allowed in the aggregate principal amount of $410,000,000.00, solely against the MTE Debtors.  The MTE Administrative Agent and the Holders of MTE Term Loan Claims shall not be required to file proofs of Claim on account of any MTE Term Loan Claims.

c.   *Treatment*:  Each Holder of an Allowed MTE Term Loan Claim shall receive its *Pro Rata* share of (i) all Net MTE Cash, and (ii) the applicable units issued by the MTE Litigation Trust.  All distributions on account of Allowed MTE Term Loan Claims shall be indefeasibly paid to, unconditionally and fully vested in, and not subject to any clawback from, the MTE Administrative Agent for distribution in accordance with the MTE Credit Documents, and the MTE Administrative Agent shall retain all of its rights and privileges under the MTE Term Loan Facility and the other MTE Credit Documents, all of which are preserved.

For the avoidance of doubt, the foregoing treatment is on account of the MTE Term Loan Secured Claims, and the MTE Term Loan Deficiency Claims shall receive the treatment prescribed in Article III.B.6 of the Plan.

d.   *Voting*:  Classes 3A through 3G are Impaired.  Holders of MTE Term Loan Claims are entitled to vote to accept or reject the Plan.

4.   Classes 4A-4G – Senior Secured Trade Claims

a.   *Classification*:  Classes 4A through 4G consist of all Senior Secured Trade Claims against each Debtor, respectively, if any.

b.   *Treatment*:  Each Holder of an Allowed Senior Secured Trade Claim shall receive its *Pro Rata* share of the Senior Secured Trade Recovery Amount. Regardless of whether Classes 4A through 4G vote to accept the Plan, the consideration included in such distributions shall not include the Luxe Contribution, the Buyer Contribution or the MDC Contribution in accordance with the Luxe Settlement.  Furthermore, the Senior Secured Trade Claim Allocation shall be determined by the Holders of Senior Secured Trade Claims in mediation and approved by the Bankruptcy Court, and such process shall not hinder or delay Confirmation under the Bankruptcy Code.

c.   If each of Classes 4A through 4G, without regard to Vacant Classes, votes to accept the Plan, all Litigation Claims (except for Excess Claims and Non-Released Claims and Causes of Action, if any) against Holders of Senior Secured Trade Claims that vote in favor of the Plan shall be waived and released by the Debtors and the Plan Administrator, and the Debtors and the MDC RBL Lenders shall withdraw their objections and counterclaims to Claims subject to the Consolidated Adversary Proceeding.  If any of Classes 4A through 4G that are not Vacant Classes

votes to reject the Plan, all Litigation Claims against Holders of Senior Secured Trade Claims, including without limitation Avoidance Actions, shall vest in the MDC Litigation Trust.

d.    *Voting*:  Classes 4A through 4G are Impaired.  For the avoidance of doubt, Classes 4A, 4B, 4C, 4E, and 4G are Vacant Classes such that only Classes 4D and 4F are entitled to vote to accept or reject the Plan.  Holders of Senior Secured Trade Claims **in Classes 4D and 4F** are entitled to vote to accept or to reject the Plan.

5.    Classes 5A-5G – MDC RBL Facility Claims

a.    *Classification*:  Classes 5A through 5G consist of all MDC RBL Facility Claims.

b.    *Allowance of MDC RBL Facility Claims*:  MDC RBL Facility Claims are deemed Allowed in the aggregate principal amount of $56,965,371.26 minus the aggregate amount of all MDC Adequate Protection Payments received by the MDC RBL Lenders.  The MDC Administrative Agent and the Holders of MDC RBL Facility Claims shall not be required to file Proofs of Claim on account of any MDC RBL Facility Claims.

c.    *Treatment*:

(1)    each Holder of an MDC RBL Facility Claim shall have received its *Pro Rata* share of the MDC RBL Facility Claim Payment, which distribution shall be indefeasibly paid to, unconditionally and fully vested in, and not subject to any clawback from, the MDC Administrative Agent on the earlier of the Closing Date or the Effective Date of the Plan;

(2)    each Holder of an MDC RBL Facility Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its *Pro Rata* share of 100% of the Excess MDC Distributable Cash, up to satisfaction in full of its MDC RBL Facility Claim (with any Unused Professional Fee Reserve Amount or Unused Wind-Down Amount that later becomes Excess MDC Distributable Cash distributed *Pro Rata* to each Holder of an MDC RBL Facility Claim as soon as practicable after such later time);

(3)    each Holder of an MDC RBL Facility Claim shall receive its *Pro Rata* share of any and all proceeds from the liquidation of any MDC RBL Remaining Collateral, including without limitation proceeds of MDC Litigation Trust Assets on account of claims or Causes of Action held by the MDC Debtors and any other Seller immediately prior to the Effective Date;

(4)    to the extent such MDC RBL Facility Claim has not been satisfied

in full under the foregoing sections (c)(1)-(3), each Holder of an MDC RBL Facility Claim shall receive, upon the conclusion of the Plan Administration Process or as soon as reasonably practicable thereafter, its *Pro Rata* share of 100% of the Excess MDC Distributable Cash, up to satisfaction in full of its MDC RBL Facility Claim.

d.    For the avoidance of doubt, the foregoing treatment is on account of the MDC RBL Facility Secured Claims, and the MDC RBL Facility Deficiency Claims shall receive the treatment prescribed in Article III.B.7 of the Plan.

e.    *Voting*:  Classes 5A through 5G are Impaired.  Holders of MDC RBL Facility Claims are entitled to vote to accept or reject the Plan.

6.    <u>Classes 6A-6C – MTE General Unsecured Claims</u>

a.    *Classification*:  Classes 6A through 6C consist of all MTE General Unsecured Claims, if any.

b.    *Treatment*:  Each Holder of an Allowed MTE General Unsecured Claim shall not receive or retain any distribution under the Plan.

c.    *Voting*:  Holders of MTE General Unsecured Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of MTE General Unsecured Claims in Classes 6A through 6C are not entitled to vote to accept or reject the Plan.

7.    Classes 6D-6G– MDC General Unsecured Claims and
<u>MDC Texas Operator General Unsecured Claims</u>

a.    *Classification, Classes 6D, 6F, and 6G*:  Classes 6D, 6F, and 6G consist of all MDC General Unsecured Claims, if any.

b.    *Treatment, Classes 6D, 6F, and 6G*:  Each Holder of an Allowed MDC General Unsecured Claim shall receive its *Pro Rata* share of the applicable units issued by the MDC Litigation Trust.

d.    *Classification, Class 6E*:  Class 6E consists of all MDC Texas Operator General Unsecured Claims, if any.

e.    *Treatment, Class 6E*:  Each Holder of an Allowed MDC Texas Operator General Unsecured Claim shall receive its *Pro Rata* share of the applicable units issued by the MDC Litigation Trust, on account of only those recoveries from any MDC Texas Operator Litigation Trust Assets included in the MDC Litigation Trust.

f.    *Voting*:  Holders of MDC General Unsecured Claims and MDC Texas

39

Operator General Unsecured Claims are Impaired.  Holders of MDC General Unsecured Claims in Classes 6D, 6F, and 6G, and Holders of MDC Texas Operator General Unsecured Claims in Class 6E, are entitled to vote to accept or reject the Plan.

8.      Classes 7A-7G – Interests

a.      *Classification*:  Classes 7A through 7G consist of all Interests in each Debtor, respectively.

b.      *Treatment*:  All Interests held by any of the MTE Debtors shall be transferred to the MTE Litigation Trust and all Interests held by any of the MDC Debtors shall be transferred to the MDC Litigation Trust on the Effective Date.  All Interests in MDC Texas Operator shall be transferred on the Effective Date to the MTE Litigation Trust.  No Holder of Interests shall receive or retain any property under the Plan.  The Interests shall be cancelled by the Litigation Trusts in connection with the dissolution of the Litigation Trusts or otherwise treated in accordance with the relevant Litigation Trust Agreement.

c.      *Voting*:  Holders of Interests are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Interests in Classes 7A through 7G are not entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', Reorganized Debtors', Plan Administrator's, or Litigation Trustees' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.      *Confirmation Pursuant to Section 1129(a)(10) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims, determined without including any acceptance of the Plan by any insider (as such term is defined in the Bankruptcy Code).  If any Impaired Class of Claims entitled to vote shall not accept the Plan by the statutory majority required under section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to modify the Plan in accordance with Article XI hereof, including but not limited to the treatment applicable to any Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.      *Elimination of Vacant Classes*

Each Vacant Class shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

*F.*     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

*G.*     *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Plan Administrator, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

*H.*     *Confirmation of MTE Debtors' Plans Not a Condition*

Confirming the Plan or any chapter 11 plan as to the MTE Debtors shall not be a condition to confirming the Plan as to the MDC Debtors or as to MDC Texas Operator.

For the avoidance of doubt, nothing in the Plan shall prevent Consummation of the Plan and the Closing Date of the Sale Transaction, if the Plan is not confirmed as to the MTE Debtors, but the Plan is confirmed as to the Sellers.

In the event that the Plan is not confirmed as to the MTE Debtors, then, no later than the Effective Date of this Plan as to the Sellers and prior to any voluntary conversion by the MTE Debtors of their Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, at the option of the MTE Administrative Agent, (1) the MTE Debtors shall use best efforts to irrevocably transfer the MTE Cash Collateral to, or as directed by, the MTE Administrative Agent, *provided* that the MTE Debtors shall be authorized to use MTE Cash Collateral to pay Allowed Administrative Expense Claims against the MTE Debtors up to a maximum amount of $250,000.00, and (2) the MTE Debtors shall use their best efforts to transfer, retain or otherwise treat the MTE Litigation Trust Assets as directed by the MTE Administrative Agent, including, if directed by the MTE Administrative Agent, by transferring all or part of the MTE Litigation Trust Assets to a trust or other vehicle for the purpose of prosecuting any Litigation Claims owned by the MTE Debtors, and the MTE Debtors will reasonably cooperate with the MTE Administrative Agent and take such actions from and after the Effective Date (including, without limitation, agreeing to relief from the automatic stay, a structured dismissal with respect to one or more MTE Debtors or other mechanism) for the purpose of providing to the MTE Term Lenders substantially the same benefits with respect to such MTE Litigation Trust Assets and otherwise with respect to the MTE Debtors as if the Plan was confirmed as to the MTE Debtors. For the avoidance of doubt, the provisions in this paragraph shall not be deemed to permit the Debtors to use the MDC RBL Lenders' Cash Collateral (as defined in the Final Cash Collateral Order) to effectuate or defend the foregoing provisions (and the MDC RBL Lenders explicitly

41

reserve the right to object to any such use), shall not be binding on a chapter 7 trustee of any of the Debtors, and, subject to the terms of the RSA, shall not restrict the right of any party in interest to object to any relief sought by the MTE Debtors in furtherance of the provisions of this paragraph.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.       *Settlement of Claims as Set Forth in Plan*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies expressly released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

B.       *Sale Transaction*

On the Effective Date, the Debtors will effectuate the Sale Transaction as set forth in the Asset Purchase Agreement, and will take any actions as may be necessary or advisable to effect the transfer of the Sellers' Assets to the Buyer.  The actions to implement the Sale Transaction may include, with the consent of each Buyer Party pursuant to the consent rights of each Buyer Party set forth in the RSA, the Asset Purchase Agreement, and this Plan:  (1) the execution and delivery of appropriate agreements or other documents that are consistent with the terms of the Plan and the Asset Purchase Agreement and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, Lien release, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Asset Purchase Agreement and applicable law and having other terms for which the applicable Persons agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable state law; and (4) all other actions that the applicable Persons determine to be necessary or advisable, including making filings or recordings that may be required by law in connection with the Plan, in each case with the consent of, and in form and substance reasonably acceptable to, each Buyer Party. The Senior Secured Trade Claim Distribution Agent shall hold the Net Profits Interest pursuant to the terms of the Net Profits Interest Agreement and the Plan, and payments received thereunder by the Senior Secured Trade Claim Distribution Agent from the Buyer shall be made to the Holders of Allowed Senior Secured Trade Claims in accordance with the Plan (including the Senior Secured Trade Claim Allocation).

The Confirmation Order shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Sale Transaction.  Notwithstanding the foregoing and for the avoidance of doubt, the Debtors reserve the right, with the consent of the Buyer, to effectuate the Sale Transaction as a Section 363 Sale along with various settlements pursuant to Bankruptcy Rule 9019 via a Sale Order (as defined in the *Debtors' Motion for an Order (I)(A) Establishing Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Scheduling Auction for and Hearing to Approve Sale of Debtors' Assets, (C) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (D) Approving Assumption and Assignment Procedures, and (E) Granting Related Relief and (II)(A) Approving Sale of Debtors' Assets, (B) Authorizing Assumption and Assignment of Executory Contracts and Leases, and (C) Granting Related Relief*, dated September 11, 2020 [Docket No. 1546]), which Sale Order shall be in form and substance acceptable to the Buyer and the MDC RBL Lenders.  The Sale Order shall provide that the MDC RBL Facility Claim Payment shall be paid to the MDC RBL Lenders at the closing of such Section 363 Sale.

C.      Settlement of Consolidated Adversary Proceeding

The Plan shall be deemed a motion pursuant to Bankruptcy Rule 9019 to approve the Consolidated Adversary Proceeding Settlement, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  On the Effective Date, the Consolidated Adversary Proceeding shall be deemed dismissed against the Debtors and the MDC Administrative Agent and MDC RBL Lenders, with prejudice, by virtue of the Confirmation Order.  For the avoidance of doubt, subject to payment of the MDC RBL Lender Fees under the Cash Collateral Orders, all costs and attorneys' fees in connection with the Consolidated Adversary Proceeding shall be borne by the respective parties. Regardless of any other provision herein, Holders of Senior Secured Trade Claims are not precluded from filing additional adversary proceedings against other Holders of Senior Secured Trade Claims to challenge the validity, priority, or amount of another Senior Secured Trade Claim being classified as Allowed or to object to a claim asserted by a Luxe Claimant with respect to the Luxe Allocation; *provided, however*, that the Debtors, the Reorganized Debtors, the Plan Administrator, the Litigation Trustees, and the Buyer shall be reimbursed, indemnified and held harmless by any Holder of Senior Secured Trade Claims asserting any such challenge for all reasonable, documented costs, expenses, claims and liabilities incurred in connection with any such adversary proceedings or objections that are lodged outside of the mediation process. Also on the Effective Date, all objections to Proofs of Claim Filed by Holders of Senior Secured Trade Claims who have voted in favor of the Plan shall be deemed withdrawn with prejudice.

D.      Luxe Settlement

The Luxe Settlement Fund shall be funded on the Effective Date as a condition to occurrence of the Effective Date.  On the Effective Date, all Liens of the Luxe Claimants against the Luxe Working Interests, and all Claims of the Luxe Claimants against Luxe Energy and the properties and obligations of Luxe Energy, shall be irrevocably released and of no further force

or effect without need for any further filing or action, and such release shall be evidenced in the applicable land records pursuant to a mechanism acceptable to Luxe Energy in its sole and absolute discretion, which mechanism shall be outlined in the Plan Supplement or the Confirmation Order.  The Luxe Claimants shall also release their Liens and Claims against the Other Non-Debtor Working Interest Owners and the Other Non-Debtor Working Interest Owners' working interests which are subject to the MDC Joint Operating Agreements.  The Luxe Claimants' Liens against the Luxe Working Interests and the Other Non-Debtor Working Interest Owners' working interests which are subject to the MDC Joint Operating Agreements shall upon the Effective Date attach solely to the proceeds of the Luxe Settlement Fund.  The Luxe Claimants will thereafter have no further rights against Luxe Energy or the Luxe Working Interests, or Luxe Energy's property, or against any Person or Interest, in respect of such Luxe Claimants' Claims and Liens related to the Joint Operating Agreements or Luxe Energy, and Luxe Energy and the Luxe Working Interests shall be released from any claims and Liens asserted by the Debtors, the Debtors' Estates or any Holders of Claims against the Debtors.

On the Effective Date, the Debtors shall assume and assign to the Buyer, pursuant to section 365 of the Bankruptcy Code, all Joint Operating Agreements.  All accrued but unpaid claims and obligations (whether known or unknown, of whatever kind or character) between Luxe Energy and any Debtors (including, without limitation, (i) claims and obligations relating to joint interest billings, royalties, and revenues under the Joint Operating Agreements, and (ii) claims and obligations relating to Transferred Non-Op Working Interests (as defined herein)) as of 12:01 a.m. Central Time on June 1, 2021 (the "*Luxe Deemed Assignment Date*") shall be deemed "zeroed out" and mutually released, such that no amounts (whether known or unknown, of whatever kind or character) accruing on or prior to the Luxe Deemed Assignment Date shall be payable to Luxe Energy by the Debtors or the Buyer, and no amounts (whether known or unknown, of whatever kind or character) accruing on or prior to the Luxe Deemed Assignment Date shall be payable by Luxe Energy to the Debtors or the Buyer.  On the Effective Date, effective as of the Luxe Deemed Assignment Date the Buyer shall assume all rights and obligations of the Debtors under the Joint Operating Agreements, and all obligations accruing or arising after the Luxe Deemed Assignment Date under the Joint Operating Agreements shall be paid and performed by the Buyer or Luxe Energy, as the case may be, pursuant to the terms and conditions of the respective Joint Operating Agreements.  Also on the Effective Date, all objections to Proofs of Claim Filed by the Luxe Claimants shall be deemed withdrawn with prejudice.

On the Closing Date, and conditioned upon the occurrence of the Effective Date, Luxe Energy or its designee shall purchase from the Debtors free and clear of all Liens, Claims, encumbrances, and other interests, forty-five (45%) percent of the Debtors' working interests in certain Luxe Energy-operated wells and leasehold interests associated therewith that are subject to the Non-Op Joint Operating Agreements (the "*Transferred Non-Op Working Interests*"), for a purchase price of $4,500,000.00 to be paid solely as directed by the Buyer pursuant to a separate transaction agreement, and Luxe Energy and the Buyer shall enter into certain consensual amendments to the Joint Operating Agreements, all as further described in definitive documentation mutually acceptable to Luxe Energy and the Buyer to be included in the Plan Supplement.  For the avoidance of doubt, the releases described in Article IX.D shall not release any obligations of Luxe Energy to the Buyer, or of the Buyer to Luxe Energy, arising or accruing at or after 12:01 a.m. Central Time on June 1, 2021.

The Luxe Settlement, including without limitation the creation and treatment of the Luxe Settlement Fund and the third-party releases, bar order, and injunctions contemplated by this Plan to implement the Luxe Settlement, is a necessary, integral, and non-severable component of this Plan. The Plan shall be deemed a motion pursuant to Bankruptcy Rule 9019 to approve the Luxe Settlement, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise, including the third-party releases, and settlement under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates, is necessary and integral to the reorganization of the Debtors, affords fair and adequate consideration to the Luxe Claimants on account of the Claims and Liens against Luxe Energy and its assets that are released by the Plan, and is binding on all Luxe Claimants and all other Holders of Claims against the Debtors, regardless of whether any such Person has voted to accept the Plan or otherwise consented to the Luxe Settlement. Furthermore, the Plan shall be deemed a finding by the Bankruptcy Court that (1) there is an identity of interest between Luxe Energy and the Debtors based on Luxe Energy's contractual indemnification claims against certain of the Debtors, which would result in non-released Luxe Claimants' Liens and Claims against Luxe Energy asserted back against the Debtors on a dollar-for-dollar basis; and (2) the Luxe Contribution is a substantial contribution by Luxe Energy to the Debtors' reorganization. If the Luxe Claimants are able to agree on the Luxe Allocation in mediation or otherwise prior to the Effective Date, the Luxe Settlement Distribution Agent shall distribute the Luxe Settlement Fund to the Luxe Claimants in accordance with the Luxe Allocation on the Effective Date or as soon as practicable thereafter. If the Luxe Claimants are unable to agree on the Luxe Allocation in mediation or otherwise, the Luxe Settlement Distribution Agent may elect to commence a contested matter, interpleader action, or other adversary proceeding in the Bankruptcy Court, and shall distribute the Luxe Settlement Fund in accordance with the Bankruptcy Court's decision in any such action. The Luxe Settlement Distribution Agent shall hold the Non-Op Net Profits Interest pursuant to the terms of the Non-Op Net Profits Interest Agreement, and shall make payments thereunder received from the Buyer to the Luxe Claimants in accordance with the Plan, the Luxe Allocation and the Bankruptcy Court's decision in any interpleader action.

Pursuant to Tex. Prop. Code § 56.041 and Tex. Prop. Code § 53.152, each Luxe Claimant that has recorded a lien affidavit against Luxe Energy or any of Luxe Energy's assets or obligations on account of any obligation discharged or released under this Plan shall, within ten (10) days after the Effective Date, furnish to Luxe Energy a fully completed and properly executed and notarized Luxe Lien Release using the form filed with the Plan Supplement, and Luxe Energy is authorized to record the same with the relevant governmental authority. Each Luxe Claimant that has commenced state court litigation against Luxe Energy on account of any obligation discharged or released under this Plan shall (X) within ten (10) days after the Effective Date, execute and deliver to Luxe Energy and all other defendants in such litigation (or their respective counsel of record in such litigation) a completed and executed Stipulation of Dismissal of such state court litigation, using the form filed with the Plan Supplement, and (Y) within ten (10) days following receipt of counter-signatures on such Stipulation of Dismissal from all defendants or their counsel of record, file such Stipulation of Dismissal with the relevant court in accordance with all applicable rules of that court. Each defendant in such litigation shall execute and return such Stipulation of Dismissal to the applicable Luxe Claimant within ten (10) days following its receipt of the same from the applicable Luxe Claimant. To the extent that a Debtor is named as a defendant in any such litigation, the Plan Administrator or its counsel is

authorized to and shall execute such Stipulation of Dismissal on behalf of the applicable Debtor. Luxe Claimants must timely comply with the foregoing directives as a precondition to receiving any share of the Luxe Settlement Fund.  Each Luxe Claimant shall promptly take such additional action as may be necessary to evidence with the relevant governmental authorities the discharge and release of its Claims and Liens pursuant to this Plan.  Additionally, as of the Effective Date, all demands and notices sent to Luxe Energy for which lien affidavits and/or lawsuits were not filed are automatically deemed withdrawn and of no force and effect.

The provisions of Article IX of this Plan relating to Luxe Energy may not be modified or waived without the prior written consent of Luxe Energy.  Any other provisions of the Plan relating to the Luxe Settlement, including without limitation this Article IV.D., may not be modified or waived without the prior written consent of Luxe Energy and each Buyer Party.

E.      *Cancellation of Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except as otherwise specifically provided for in the Plan, the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered as to the Debtors, and the Debtors and Reorganized Debtors shall not have any continuing obligations thereunder.  For the avoidance of doubt, (a) the rights and privileges of the MTE Administrative Agent and inter-creditor provisions with respect to the MTE Term Lenders in the MTE Credit Documents and (b) the rights and privileges of the MDC Administrative Agent and inter-creditor provisions with respect to the MDC RBL Lenders in the MDC RBL Credit Documents, shall not be cancelled under the Plan.

F.      *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, or the issuance, transfer or exchange of any security under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments or other documents related to or in connection with such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

G.      *Establishment and Funding of Litigation Trusts*

On the Effective Date, the Litigation Trusts shall be established in accordance with Article V hereof.  The MTE Litigation Trust will be funded from the MTE Cash Collateral in accordance with this Plan and in accordance with the MTE Litigation Trust Agreement or as otherwise determined by the MTE Administrative Agent and the MTE Term Lenders.  The MDC

Litigation Trust will be funded out of the Wind-Down Budget in an amount to be agreed upon by the MDC RBL Lenders, and in accordance with the MDC Litigation Trust Agreement.

H.   *Effectuation of the Plan*

The following provisions shall govern the effectuation of the Plan:

1.   <u>Vesting of Assets in the Plan Administrator and Litigation Trusts</u>

Except as otherwise provided in the Plan or the Plan Supplement, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) and (c) of the Bankruptcy Code, on the Effective Date, all property of each Estate remaining after the Closing Date of the Sale Transaction, other than Litigation Trust Assets (which, for the avoidance of doubt, do not include the Senior Secured Trade Recovery Amount, the MDC RBL Facility Claim Payment, and the Luxe Settlement Fund), shall vest in the Plan Administrator, free and clear of all Liens, Claims, charges, or other encumbrances, including without limitation Receivables and proceeds collected from the Buyer as a result of the Sale Transaction before, on, or after the Closing Date; *provided, however*, that the MDC RBL Facility Secured Claims, including MDC Adequate Protection Claims and MDC Adequate Protection Liens, shall attach to the MDC RBL Remaining Collateral (including without limitation, Receivables not being used to satisfy the distributions and payments required under the Plan, and Excess Claims).  The respective Litigation Trust Assets shall vest in the respective Litigation Trusts on the Effective Date.  As of the Effective Date, the Plan Administrator may use and dispose of such property, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order, and the Plan Administrator shall take all steps he/she/it deems necessary to liquidate the Debtors, including, but not limited to, abandoning any property that cannot be distributed under the Plan, and paying Wind-Down Expenses from the Wind-Down Budget.

All privileges with respect to the property of the Estates, including the attorney/client privilege, to which the Debtors are entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Reorganized Debtors and Plan Administrator, or the Litigation Trustees, as applicable.

2.   <u>Sources of Consideration for Plan Distributions</u>

The Reorganized Debtors will fund distributions under the Plan with proceeds from the Sale Transaction and with Excluded Assets.  Distributions to be made by the respective Litigation Trusts shall be paid from recoveries on the respective Litigation Trust Assets.  The Wind-Down Expenses shall be paid by the Plan Administrator from the Wind-Down Budget.

3.   <u>Board of Directors</u>

As of the Effective Date, the existing board of directors or managers, as applicable, of each of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or members of any Debtor shall be dismissed without any further action required on the part of any such Debtor.  Pursuant to the Settlement

Stipulation, as of the Effective Date, each Reorganized Debtor shall revert back to member operation, in accordance with its operating agreement, and the respective Litigation Trustee shall become the sole member of each Reorganized Debtor, as applicable.  In addition, the interests in MTE Holdings II LLC shall be transferred to the MTE Litigation Trust and the MTE Litigation Trustee shall be the sole member of MTE Holdings II LLC.  The MTE Term Lenders and the MDC RBL Lenders have agreed that the membership interests in MDC Texas Operator shall be transferred to the MTE Litigation Trust and the MTE Litigation Trustee shall be the sole member of MDC Texas Operator as of the Effective Date; provided that any Litigation Claims owned by and belonging to MDC Texas Operator, if any, shall be exclusively vested in the MDC Litigation Trust and shall constitute MDC Litigation Trust Assets.

4.      Management

Solely for the purposes of the Wind-Down, the Reorganized Debtors will be managed by the Plan Administrator.  The Maefield Services Agreement shall be rejected and deemed terminated on the Effective Date.  The respective Litigation Trustee shall have the exclusive right to exercise all rights and powers of the members and managers of the respective Reorganized Debtors with respect to any and all of the Litigation Trust Assets, subject to approval of the Litigation Trust Boards, as applicable.

5.      Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan and corporate structure of the Debtors or Reorganized Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, members, or officers of the Debtors or the Reorganized Debtors.  Before, on, or after the Effective Date, the appropriate officers, members, or managers of the Debtors or the Reorganized Debtors, or any subsidiary of a Debtor, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors.  The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

## ARTICLE V.
## LITIGATION TRUSTS

*A.    Summary*

The Litigation Trusts shall be formed on the Effective Date, and shall continue in existence for the benefit of the respective Litigation Trust Beneficiaries.  The powers, authority, responsibilities, and duties of the Litigation Trusts and the Litigation Trustees are set forth in and shall be governed by the Plan and the respective Litigation Trust Agreements.  The Litigation Trust Agreements shall contain provisions customary to trust agreements utilized in comparable

circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Litigation Trusts as grantor trusts and the respective Litigation Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes. The Litigation Trust Agreements may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the respective Litigation Trusts as "liquidating trusts" for United States federal income tax purposes.

On the Effective Date, the Litigation Trustees, on behalf of the Debtors, shall execute the respective Litigation Trust Agreements and shall take all other steps necessary to establish the respective Litigation Trusts pursuant to the Litigation Trust Agreements and consistent with the Plan.

B.      *Creation and Governance of the Litigation Trusts*

On the Effective Date, the respective Litigation Trustees, on behalf of the Debtors, shall execute the respective Litigation Trust Agreements and shall take all other steps necessary to establish the respective Litigation Trusts pursuant to the Litigation Trust Agreements and consistent with the Plan in each case for the benefit of the respective Litigation Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the MDC Litigation Trust all of their rights, title, and interest in and to all of the MDC Litigation Trust Assets and to the MTE Litigation Trust all of their rights, title, and interest in and to all of the MTE Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the respective Litigation Trust Assets shall automatically vest in the respective Litigation Trusts, free and clear of all Liens, Claims, charges, or other encumbrances, for the benefit of the respective Litigation Trust Beneficiaries; *provided, however*, that the MDC RBL Facility Secured Claims, including MDC Adequate Protection Claims and MDC Adequate Protection Liens, shall attach to the MDC RBL Remaining Collateral, including without limitation all MDC Litigation Trust Assets. The Debtors shall initially fund the MDC Litigation Trust out of the Wind-Down Budget in an amount to be agreed upon with the MDC RBL Lenders. For the avoidance of doubt, neither the Luxe Settlement Fund nor the MDC RBL Facility Claim Payment shall be impacted or reduced by amounts necessary to fund the Litigation Trusts. For the further avoidance of doubt, the respective Litigation Trust Assets shall only include those Litigation Claims that are Litigation Trust Assets of the respective Litigation Trust. The Litigation Trusts shall assume all of the respective Debtors' rights, claims, and privileges with respect to Litigation Claims to be evaluated and, if applicable, brought by the respective Litigation Trust.

The Litigation Trusts shall be governed by the respective Litigation Trust Agreement and administered by the respective Litigation Trustee, subject to required approval of the respective Litigation Trust Board as set forth in the respective Litigation Trust Agreement. The powers, rights, and responsibilities of the Litigation Trustees shall be specified in the relevant Litigation Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article V, subject to any required approval of the Litigation Trust Boards and any required reporting, each as set forth in the Litigation Trust Agreements. The Litigation Trusts shall investigate, prosecute, settle, or otherwise resolve the Litigation Claims owned by and belonging to them in accordance with the provisions of the Plan and the Litigation

Trust Agreements, and subject to the approval of the Litigation Trust Boards as set forth in the Litigation Trust Agreements, and shall distribute the net proceeds therefrom to the Litigation Trust Beneficiaries in accordance with the respective Litigation Trust Agreements.  Other rights and duties of the Litigation Trusts, Litigation Trustees and Litigation Trust Boards shall be set forth in the respective Litigation Trust Agreements.

The Debtors, the MTE Term Lenders, and the MDC RBL Lenders have agreed that (1) the MDC Texas Operator Litigation Trust Assets that consist of Litigation Claims owned by and belonging to MDC Texas Operator shall vest exclusively in the MDC Litigation Trust and (2) the MDC Texas Operator Litigation Trust Assets that consist of the membership interests in MDC Texas Operator shall vest exclusively in the MTE Litigation Trust.

C.    *Assignment of Debtor Membership Interests to Litigation Trustees*

On or prior to the Effective Date, the Debtors shall irrevocably assign and shall be deemed to have irrevocably assigned to the respective Litigation Trust the membership interests of each of the relevant Debtors, as provided in this Plan, and the Litigation Trustees shall become the sole member of each of the respective Reorganized Debtors assigned to their respective Litigation Trust.  All such interests shall constitute MDC Litigation Trust Assets or MTE Litigation Trust Assets as the case may be.  Membership interests of MDC Texas Operator shall be so assigned on or prior to the Effective Date to the MTE Litigation Trust as provided in this Plan.

D.    *Purpose of the Litigation Trusts*

The Litigation Trusts shall be established pursuant to the Litigation Trust Agreements for the purpose of investigating, prosecuting, settling, or otherwise resolving the Litigation Trust Assets that are Litigation Claims or otherwise, and liquidating and administering recoveries on such Litigation Trust Assets.  Any net proceeds therefrom shall be distributed to the Litigation Trust Beneficiaries pursuant to the terms of the Litigation Trust Agreements.  For the avoidance of doubt, the Litigation Trusts shall not be deemed successors in interest of the Debtors for any purpose other than as specifically set forth herein or in the Litigation Trust Agreements.

E.    *The Litigation Trust Agreements*

The Litigation Trust Agreements will provide for, among other things:

(1)    the payment of Litigation Trust Expenses;

(2)    the payment of other reasonable expenses of the Litigation Trusts;

(3)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(4)    the investigation and prosecution of Litigation Trust Assets of the relevant Litigation Trust that are Litigation Claims, which may include the prosecution, settlement, abandonment, sale, assignment, or dismissal of any such Litigation

Claims, subject to reporting and oversight, and approval of the Litigation Trust Boards as set forth in the Litigation Trust Agreements.

Except as otherwise ordered by the Bankruptcy Court, the Litigation Trust Expenses shall be paid from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreements. The Litigation Trust Agreements may establish reserves for the payment of Litigation Trust Expenses (including, without limitation, any reserves for potential indemnification claims as authorized and provided under the Litigation Trust Agreements), and shall periodically replenish such reserves, as necessary.

In furtherance of, and consistent with the purpose of, the Litigation Trusts and the Plan, the Litigation Trustees shall: (1) hold the respective Litigation Trust Assets for the benefit of the respective Litigation Trust Beneficiaries, (2) make distributions to the respective Litigation Trust Beneficiaries as provided herein and in the relevant Litigation Trust Agreement, and (3) have the sole power and authority to prosecute and resolve Litigation Trust Assets that are Litigation Claims, and objections to Claims and Interests relating to the respective Litigation Trust, subject to approval of the Litigation Trust Boards as set forth in the Litigation Trust Agreements. Except as otherwise provided in the Litigation Trust Agreements, the respective Litigation Trustees shall be responsible for all decisions and duties with respect to the respective Litigation Trusts and the respective Litigation Trust Assets, subject to approval of the Litigation Trust Boards, as applicable.

The Litigation Trust Agreements may provide mechanisms for borrowing or otherwise obtaining funding of Litigation Trust Expenses. Additionally, the MTE Litigation Trust Agreement may provide mechanisms for making priority, preferred or otherwise tiered distributions in respect of proceeds or other amounts realized from the MTE Litigation Trust Assets as may be determined by the MTE Litigation Trust Board in order to, among other things, facilitate the funding of Litigation Trust Expenses or in connection with the funding by the MTE Term Lenders of expenses and other amounts outstanding under the MTE Credit Documents.

### F.    Employment of Professionals

The Litigation Trustees may employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtors) to assist in carrying out the Litigation Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreements.

### G.    Compensation and Duties of Litigation Trustees

The salient terms of the Litigation Trustees' employment, including such Litigation Trustees' duties and compensation, shall be set forth in the Litigation Trust Agreements. The Litigation Trustees shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

## H.    *Litigation Trust Assets*

The Litigation Trustees shall have the exclusive right, subject to approval of the Litigation Trust Boards as set forth in the Litigation Trust Agreements, on behalf of their respective Litigation Trusts to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Litigation Trust Assets of their respective Litigation Trusts which are Litigation Claims, without any further order of the Bankruptcy Court.

Upon the transfer of the Litigation Trust Assets, the Debtors shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trusts.  Upon delivery of the Litigation Trust Assets to the Litigation Trusts, the Debtors and their predecessors, successors, and assigns shall be discharged and released from all liability with respect to the delivery of such distributions and shall have no reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trusts.  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trusts shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Litigation Trustees shall agree to accept and hold the Litigation Trust Assets in the Litigation Trusts for the benefit of the Litigation Trust Beneficiaries, subject to the terms of the Plan and the Litigation Trust Agreements.

The Debtors, the Litigation Trustees, the Litigation Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as reasonably necessary to cause title to the Litigation Trust Assets to be transferred to the Litigation Trusts.

## I.    *Prosecution and Resolution of Litigation Trust Assets that are Litigation Claims*

From and after the Effective Date, the Litigation Trustees shall be the exclusive trustees of their respective Litigation Trust Assets, and prosecution, disposition, resolution, and settlement of all Litigation Claims transferred to the Litigation Trusts shall be the sole responsibility of the Litigation Trusts and Litigation Trustees pursuant to this Plan and the Confirmation Order, subject to approval of the respective Litigation Trust Board as set forth in the respective Litigation Trust Agreement.  The Litigation Trusts may obtain financing, subject to approval of their respective Litigation Trust Boards (or Bankruptcy Court approval if no agreement can be reached) to assist in the pursuit of all Litigation Trust Assets, and may provide such financing sources with a priority distribution of units issued by the respective Litigation Trusts, subject to the approval of the respective Litigation Trust Boards, as shall be outlined in the Litigation Trust Agreements.   The MTE Litigation Trust may also provide priority distributions in connection with the funding of expenses and other amounts outstanding under the MTE Credit Documents.

From and after the Effective Date, subject to approval of the respective Litigation Trust Boards, as applicable, the Litigation Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Litigation Trusts, shall serve as representatives of their respective Debtors, Reorganized Debtors, and Debtors' Estates with respect to any and all

Litigation Trust Assets, including the Litigation Claims that are their respective Litigation Trust Assets, as appropriate, and shall retain and possess the right to (1) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Litigation Claims within their respective Litigation Trusts in any court or other tribunal and (2) sell, assign, liquidate, or otherwise monetize all Litigation Trust Assets in their respective Litigation Trusts.  Proceeds recovered from all Litigation Trust Assets will be deposited into a Distribution Account and will be distributed by the Litigation Trustees to their respective Litigation Trust Beneficiaries in accordance with the provisions of the Plan and Litigation Trust Agreements.  No Person may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any particular Cause of Action against it as any indication that the Plan Administrator or Litigation Trustees do not own or control or will not pursue any and all available Causes of Action, including any Litigation Trust Asset, against such Person.  The Litigation Trustees expressly reserve all their respective Litigation Trust Assets, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Litigation Trust Assets upon, after, or as a consequence of Confirmation or Consummation of this Plan.  No claims or Causes of Action against the Released Parties (other than Non-Released Claims and Causes of Action) shall be transferred to the Litigation Trusts, the Litigation Trustees shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

Litigation Trust distributions shall be made in accordance with the formulas and claims reconciliation processes set forth herein and in the Confirmation Order and Litigation Trust Agreements.

## J.    *Preservation of Documents*

Nothing in this Plan or the Confirmation Order shall affect the obligations of the Reorganized Debtors, the Litigation Trustees, and/or any transferee or custodian to maintain all books and records that relate to the Litigation Trust Assets.  Until the entry of a Final Order or settlement with respect to all Litigation Trust Assets, the Reorganized Debtors, Litigation Trustees, and any transferee or custodian of the Debtors' books, records, documents, files, electronic data (in whatever format, including native format), or any tangible object or other item of evidence potentially relevant to the Litigation Trust Assets, wherever stored, shall preserve and maintain such materials as though they were the subject of a continuing request for production of documents and/or a subpoena, shall not destroy, abandon, transfer, or otherwise render unavailable such documents and shall turn over any such materials to the Litigation Trustees promptly upon request of the Litigation Trustees.

## K.    *Preservation of Privileges and Defenses*

No action taken by the Debtors or Reorganized Debtors in connection with this Plan, shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors or Reorganized Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral) and all such privileges and immunities shall be transferred to the respective Litigation Trusts.  The

Confirmation Order shall provide that, notwithstanding the Reorganized Debtors' providing any privileged information to the Litigation Trustees, the Litigation Trusts, or any party or Person associated with the Litigation Trusts, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting any Litigation Trust Assets on behalf of the Estates and shall remain privileged.

L.      *Federal Income Tax Treatment of the Litigation Trusts for the Litigation Trust Assets*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustees), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Litigation Trustees and the Litigation Trust Beneficiaries) shall treat the transfers of Litigation Trust Assets to the Litigation Trusts as (1) transfers of Litigation Trust Assets (subject to any obligations relating to those assets) directly to Litigation Trust Beneficiaries, followed by (2) transfers by such beneficiaries to the Litigation Trusts of Litigation Trust Assets in exchange for interests in the Litigation Trusts.  Accordingly, except in the event of contrary definitive guidance, Litigation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of Litigation Trust Assets (other than such Litigation Trust Assets as are allocable to Disputed Claims).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

Allocations of Litigation Trust taxable income among Litigation Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trusts had distributed all their respective assets (valued at their tax book value, other than assets allocable to Disputed Claims) to the holders of interests in the Litigation Trusts, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trusts.  Similarly, taxable loss of the Litigation Trusts shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets.  The tax book value of Litigation Trust Assets for purposes of this paragraph shall equal their fair market value on the date Litigation Trust Assets are transferred to the Litigation Trusts, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustees of a private letter ruling if the Litigation Trustees so request one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Litigation Trustees), the Litigation Trustees (1) may timely elect to treat any Litigation Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the Litigation Trustees and Litigation Trust Beneficiaries) shall

report for United States federal, state and local income tax purposes consistently with the foregoing.

The Litigation Trusts shall be responsible for payment, out of their respective Litigation Trust Assets, of any Taxes imposed on the Litigation Trusts or the Litigation Trust Assets.

M.      *Indemnification*

The Litigation Trusts shall indemnify the Indemnified Persons for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including, without limitation, the reasonable fees and expenses of their respective professionals) incurred without gross negligence, willful misconduct, or fraud on the part of the Indemnified Persons (which gross negligence, willful misconduct, or fraud, if any, must be determined by Final Order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Indemnified Persons in connection with the acceptance, administration, exercise, or performance of their duties under the Plan or the Litigation Trust Agreements, as applicable.  An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will conclusively be deemed not to constitute gross negligence, willful misconduct or fraud.  For the avoidance of doubt, the Litigation Trusts shall not indemnify the Litigation Trustees for any losses incurred in the Litigation Trustees' capacity as Litigation Trustee if such losses were the result of the relevant Litigation Trustee's gross negligence, willful misconduct, or fraud, as determined by Final Order.  In addition, the Litigation Trusts shall, to the fullest extent permitted by law, indemnify and hold harmless the Indemnified Persons from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, without limitation, attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Litigation Trusts or the implementation or administration of the Plan if the Indemnified Person acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Litigation Trusts.  To the extent that the Litigation Trusts indemnify and hold harmless the Indemnified Persons as provided above, the legal fees and related costs incurred by counsel to the Litigation Trustees in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as expenses of the respective Litigation Trust.  The costs and expenses incurred in enforcing the right of indemnification in this section shall be paid by the respective Litigation Trust.  This provision shall survive the termination of the Litigation Trust Agreements and the resignation, replacement or removal of the Litigation Trustees.

N.      *No Bonding of Litigation Trust Claims*

There shall be no bonding of the Litigation Trustees.

O.      *Litigation Trust Expenses*

From and after the Effective Date, the Litigation Trusts shall, in the ordinary course of business and without the necessity of any approval of the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Litigation Trusts and any professionals retained

by such parties and entities from the Litigation Trust Assets, except as otherwise provided in the Litigation Trust Agreements.

P.      *Trust Distributions to Litigation Trust Beneficiaries*

The Litigation Trustees, in their respective discretions, may make distributions to the Litigation Trust Beneficiaries at any time and/or use the Litigation Trust Assets or proceeds thereof, provided that such distributions or use is otherwise permitted under the terms of the Plan, the Litigation Trust Agreements (including with respect to any approval of the Litigation Trust Boards required therein) and applicable law.

Q.      *Dissolution of the Litigation Trusts*

Each of the Litigation Trustees and the Litigation Trusts shall be discharged or dissolved, as the case may be, at such time as:  (1) the respective Litigation Trustee determines that the pursuit of Litigation Trust Assets that are Litigation Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Litigation Claims, and (2) all distributions required to be made by the Litigation Trustees to the Litigation Trust Beneficiaries under the Plan have been made, but in no event shall the Litigation Trusts be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six (6) months before the end of the preceding extension), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable letter ruling from the IRS or an opinion of counsel that any further extension would not adversely affect the status of the respective Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets; *provided, however,* that each extension to the MTE Litigation Trust must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the MTE Litigation Trust Assets, by the Bankruptcy Court within six (6) months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed five (5) years without a favorable letter ruling from the IRS or an opinion of counsel that any further extension would not adversely affect the status of the MTE Litigation Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Litigation Trusts, and pursuant to the Litigation Trust Agreements, any remaining Litigation Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the relevant Litigation Trustee, subject to any required approval of the relevant Litigation Trust Board set forth in the relevant Litigation Trust Agreement) in Cash or in-kind to the Holders of the interests in the Litigation Trusts as provided by the Litigation Trust Agreements.

R.      *Inconsistencies or Conflicts Between the Litigation Trust Agreements and the Plan*

In the event of any inconsistencies or conflicts between the Plan and the Litigation Trust Agreements, the terms and provisions of the Plan shall control.

# ARTICLE VI.
## TREATMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, except as otherwise provided in the Plan or in any Plan Document (such as, with respect to the Joint Operating Agreements, discussed herein), each of the prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are Executory Contracts or Unexpired Leases, shall be deemed rejected by the applicable Debtor effective on and subject to the occurrence of the Effective Date, pursuant to the Plan, *unless* such contract or lease is separately identified as a contract or lease to be assumed or terminated pursuant to the Plan, Plan Supplement, or Asset Purchase Agreement, or is assumed by a separate motion Filed with and granted by the Bankruptcy Court, in each case, with the consent of each Buyer Party; *provided*, however, that nothing contained in this Article VI shall constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor or its successors and assigns has any liability thereunder.

Notwithstanding the foregoing, the Debtors shall assume the Joint Operating Agreements and assign them to the Buyer, in accordance with the Asset Purchase Agreement and as identified on Schedule 2.04(b) to the Asset Purchase Agreement.  No Cure Cost or other consideration shall be due on account of such assumption and assignment of the Joint Operating Agreements (besides the amounts contributed to the Luxe Settlement Fund).  This Plan shall constitute a motion seeking:  (1) for purposes of section 365(a) and (b) of the Bankruptcy Code, (a) *assumption* of the Joint Operating Agreements and assignment of the Joint Operating Agreements to the Buyer, and (b) *rejection* of all Executory Contracts and Unexpired Leases to which any Debtor is a party and which are not excepted from rejection pursuant to this Article VI.A; and (2) for purposes of Bankruptcy Rule 9019, authority to enter into the Luxe Settlement. Cure Costs shall be inapplicable to the Luxe Settlement.  The assumption and assignment of the Joint Operating Agreements shall be subject to definitive documentation to be agreed to among the Buyer, Luxe Energy, and the Debtors, and included in the Plan Supplement.

Entry of the Confirmation Order shall, subject to and effective upon the occurrence of the Effective Date, constitute approval of the assumptions, assignments, rejections, and Luxe Settlement described in this Article VI pursuant to sections 365(a) and (b) and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed by the Rejection Damages Bar Date.  The Debtors' or Reorganized Debtors', as applicable, rights to object to Proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases which are not Filed by the Rejection Damages Bar Date, including without limitation on the basis that such Proofs of Claim are untimely, shall be preserved.  Claims arising from the rejection of the Debtors' Executory

Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.6 of the Plan.

Counterparties to Executory Contracts or Unexpired Leases shall be served with a notice of the Rejection Damages Bar Date, which notice shall be substantially in the form approved by the Bankruptcy Court, pursuant to the Confirmation Order, as soon as reasonably practicable following entry of the Confirmation Order.

*C.    Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.  In the event of a dispute regarding:  (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment of an Executory Contract or Unexpired Lease, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment.  Notwithstanding the foregoing, nothing herein shall (x) prevent the Plan Administrator from settling any Cure Claim without further notice to, or action, order, or approval of, the Bankruptcy Court, or (y) obligate the Buyer to pay any Cure Costs not expressly set forth in the Asset Purchase Agreement or otherwise without the consent of each Buyer Party.

Unless otherwise provided by an order of the Bankruptcy Court, at least seven (7) days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties who were not previously listed on and provided notice of the Initial Cure Notice, and to such third parties with respect to whom the Debtors desire to modify the Initial Cure Notice.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Notice must be Filed by the Cure/Assumption Objection Deadline.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have consented to such assumption or assumption and assignment, and amount to be paid on account of such Cure Claim.  To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the

full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of, the Bankruptcy Court.

For the avoidance of doubt, as set forth herein, the Debtors shall assume the Joint Operating Agreements and assign them to the Buyer in accordance with this Plan on the Effective Date and no Cure Costs or other consideration shall be due from the Debtors or any other Person on account of such assumption and assignment (besides the amounts required to be contributed to the Luxe Settlement Fund pursuant to the Luxe Settlement, and the releases, injunction and other benefits afforded to Luxe Energy under this Plan).

D.      *Indemnification Obligations*

All indemnification obligations in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, members, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed by the Debtors and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose; *provided, however*, for the avoidance of doubt, the Reorganized Debtors shall be the only source of recovery for any Claims for indemnification and the Buyer shall have no liability whatsoever with respect to any such indemnification obligations.

E.      *Director and Officer Liability Insurance*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Liability Insurance Policies shall remain available to all individuals and Entities covered thereby, including, but not limited to, those within the definition of "Insured Person" in any of the D&O Liability Insurance Policies.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

*F.*      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*G.*      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

*H.*      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

*I.*      *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any assumed Executory Contracts or Unexpired Leases, will be performed by the applicable Debtor or Reorganized Debtor, liable thereunder in the ordinary course of their business.

## ARTICLE VII.
## PROVISION GOVERNING DISTRIBUTIONS

*A.*      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (or such Holder's Affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class.  In the event that any payment or act under the Plan is required to be made or

performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article X hereof.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    *Reorganized Debtors*

Distributions under the Plan shall be made by the Plan Administrator, other than distributions specified in the Plan to be made by the Trade Claim Distribution Agents.  The Mediator has served as Mediator in connection with the Consolidated Adversary Proceeding since October 13, 2020, and the Senior Secured Trade Claim Negotiating Committee and Luxe Settlement Negotiating Committee have determined that he is best suited from an institutional knowledge perspective and otherwise to effectively and efficiently serve as the Trade Claim Distribution Agents.

C.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    <u>Record Date for Distribution</u>

On the Distribution Record Date, the Claims Register shall be closed and the Plan Administrator shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.    <u>Delivery of Distributions</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Plan Administrator: (a) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or Notice and Claims Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors and Notice and Claims Agent have not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf.  Subject to this Article VII.C, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, Reorganized Debtors, and Plan Administrator, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence or willful misconduct.

The Debtors shall transfer the Senior Secured Trade Claim Cash Consideration and the Net Profits Interest to the Senior Secured Trade Claim Distribution Agent on the Effective Date or as soon as practicable thereafter.  The Senior Secured Trade Claim Distribution Agent shall hold the Senior Secured Trade Recovery Amount, including the Senior Secured Trade Claim Cash Consideration, in an interest-bearing account.  The Senior Secured Trade Claim Distribution Agent shall make distributions, on the Effective Date or as soon thereafter as is practicable, to Holders of Allowed Senior Secured Trade Claims pursuant to the Senior Secured Trade Claim Allocation.

The Debtors shall transfer the Luxe Settlement Fund to the Luxe Settlement Distribution Agent on the Effective Date.  The Luxe Settlement Distribution Agent shall hold the Luxe Settlement Fund in an interest-bearing account and shall make distributions, on the Effective Date or as soon thereafter as is practicable, to the Luxe Claimants pursuant to the Luxe Allocation.  With respect to each Luxe Claimant, unless and until such Luxe Claimant has complied with the directives of the penultimate paragraph of Article IV.D of the Plan, the Luxe Settlement Distribution Agent shall not distribute any portion of the Luxe Settlement Fund to such Luxe Claimant.

The MDC RBL Facility Claim Payment shall be indefeasibly paid to, unconditionally and fully vested in, and not subject to any clawback from, the MDC Administrative Agent on the earlier of the Closing Date or the Effective Date of the Plan.

3.     Distribution

Unless otherwise provided for in the Plan or agreed to by the Holder of a Claim and the Debtors, on the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.

4.     Minimum Distributions

Holders of Allowed Claims entitled to distributions of $50.00 (whether Cash or otherwise) or less shall not receive distributions, and each such Claim shall be discharged and its Holder shall be forever barred pursuant to Article IX hereof from asserting that Claim against the Debtors or the Reorganized Debtors, as applicable, or their property; *provided*, *however*, that distributions that would otherwise be made to such Holder shall carry over until the next date of a distribution to such Holder (on account of a Disputed Claim or otherwise) until the cumulative amount of Allowed Claims held by such Holder is more than $50.00, at which time such cumulative amount shall be paid to such Holder.

5.     Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Plan Administrator has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the

Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

D.    *Manner of Payment*

Unless otherwise set forth herein, all distributions of Cash to the Holders of Allowed Claims under the Plan shall be made by the Plan Administrator.  At the option of the Plan Administrator, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

E.    *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Any Taxes withheld and deposited with the appropriate Governmental Unit shall be treated as if distributed to the applicable Holder for purposes of determining the distributions to which such Holder is entitled to receive.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including (1) liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding Taxes, (2) withholding distributions pending receipt of information necessary to facilitate such distributions, (3) establishing any other mechanisms they believe are reasonable and appropriate, or (4) obtaining, if such information is not already in the possession of the Reorganized Debtors, (a) in the case of a U.S. Holder, a properly executed IRS Form W-9, and (b) in the case of a non-U.S. Holder, a properly executed applicable IRS Form W-8 and any other forms required by any applicable law (or in each of the cases of clauses (a) and (b) above, such Holder otherwise establishes eligibility for an exemption).  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens and encumbrances.

F.    *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

G.    *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall

not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

H.    *Setoffs and Recoupment*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup any payments or distributions to be made pursuant to the Plan in respect of any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or their successors of any such claim it may have against the Holder of such Claim; *provided, however*, there shall be no retained setoff and recoupment rights with respect to any Claims of the MDC RBL Lenders.

I.    *Claims Paid or Payable by Third Parties*

1.    <u>Claims Paid by Third Parties</u>

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor, such Claim shall be Disallowed upon notice to the Holder of such Claim, without an objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.    <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court.

3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, payments to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Other than as set forth

in this Plan, nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance, including the D&O Liability Insurance Policies, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VIII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims*

After the Effective Date, the Plan Administrator shall have and retain any and all rights and defenses the Debtors had with respect to any Claim immediately before the Effective Date; *except* that the Litigation Trustees shall have the rights and powers of each of their respective Debtors in the Litigation Trust Assets and shall retain any and all rights and defenses the Debtors had with respect to any Claims of the Litigation Trust Beneficiaries immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  For the avoidance of doubt, neither the Debtors, the Reorganized Debtors, the Litigation Trustees, nor the Plan Administrator shall have the right to object to (1) the allowance of any Senior Secured Trade Claim, which allowance shall be governed by the Senior Secured Trade Claim Allocation, or (2) the Luxe Claimants' claims which are subject to the Luxe Settlement.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, including as it relates to the rights and powers of the Litigation Trustees, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Plan Administrator shall have the authority to File and prosecute objections to Claims (other than MTE Term Loan Claims and MDC General Unsecured Claims), and the Plan Administrator shall have the authority, with written consent of the MDC RBL Lenders and the MTE Term Lenders, to:  (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to, or action, order, or approval of, the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court; *provided*, *however*, that the Litigation Trustees shall have such authority, with written consent of the MDC RBL Lenders and the MTE Term Lenders, as applicable, with respect to Claims of the Litigation Trust Beneficiaries, and *further provided*, that nothing herein shall preclude the U.S. Trustee or other parties with requisite standing, including without limitation, the MDC RBL Lenders and the MTE Term Lenders, from objecting to any Claim. On and after the Effective Date, the Plan Administrator and the Litigation Trustees shall use

commercially reasonable efforts to advance the Claims resolution process through estimation or otherwise.  Notwithstanding any provision in the Plan to the contrary, in the event that an objection to a Claim is Filed, the Plan Administrator shall not make any distribution on account of any disputed portion of such Claim.

C.      *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Claim, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision in the Plan to the contrary, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven days (7) after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.  For the avoidance of doubt, this Article VIII.C shall not apply to parties seeking estimation of Claims pursuant to Bankruptcy Rule 3018 solely for purposes of voting on the Plan.

D.      *Disputed Claims*

On or after the Effective Date, the Debtors, Reorganized Debtors, Plan Administrator, or Litigation Trustees, as applicable, shall retain the Disputed Claims Reserve.  The Disputed Claims Reserve shall be funded by the Wind-Down Budget, and, for the avoidance of doubt, shall not be funded by any portion of the MDC RBL Facility Claim Payment or the Luxe Settlement Fund.  Any funds remaining in the Disputed Claims Reserve after completion of the Wind-Down shall constitute Unused Wind-Down Amount.

E.      *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, upon Filing a notice of satisfaction with the Bankruptcy

Court.  However, if the Holder of such Claim Files a timely objection to such notice of satisfaction, the status of the Claim will be determined by the Bankruptcy Court.

F.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Deadline.  If the Debtors, the Reorganized Debtors, or the Litigation Trustees, as applicable, File a motion to extend the Claims Objection Deadline, the Claims Objection Deadline shall be automatically extended until the Bankruptcy Court acts on such motion, without the necessity for the entry of a bridge order.

G.      *Disallowance of Claims*

Pursuant to section 502(d) of the Bankruptcy Code, any Claims held by an Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall not be deemed Allowed, and Holders of such Claims may not receive any distributions on account of such Claims until such time as (1) such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable, or (2) such Claims are Allowed by a Final Order of the Bankruptcy Court.  All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

H.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Plan Administrator.

I.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator, shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

## ARTICLE IX.
## RELEASE, INJUNCTION, EXCULPATION AND RELATED PROVISIONS

A.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect through the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

B.    *Release of Liens*

**Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, including but not limited to MTE Term Loan Claims, MDC RBL Facility Claims, and Statutory Lien Claims, shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests, including but not limited to those of the MTE Administrative Agent, MTE Term Lenders, MDC RBL Lenders, and Holders of Statutory Lien Claims, shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors, as applicable. Notwithstanding the foregoing, (1) the Liens on the Debtors' property held by the Holders of Senior Secured Trade Claims shall attach to the Senior Secured Trade Recovery Amount, including the Senior Secured Trade Claim Cash Consideration, and (2) the Liens on the Luxe Working Interests or property of the Other Non-Debtor Working Interest Owners held by the Luxe Claimants shall attach to the Luxe Settlement Fund.  On the Effective Date, all Liens and Claims of Luxe Claimants on and to Luxe Working Interests, and all Liens and claims of Luxe Claimants on and to Other Non-Debtor Working Interest Owners' working interests which are subject to the MDC Joint Operating Agreements, shall be fully released and discharged.  For the avoidance of doubt, the MDC RBL Facility Secured Claims (including MDC Adequate Protection Claims and MDC Adequate Protection Liens) shall not be released against MDC RBL Remaining Collateral by this Article IX.B or otherwise under the terms of the Plan or Confirmation Order.**

C.    *Release by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates, and the Reorganized Debtors, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, their Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of**

any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, running from the beginning of time until the Effective Date, including Causes of Action based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Plan Documents;

2. any Plan Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the Asset Purchase Agreement, the MTE Term Loan Facility, the MDC RBL Facility, Statutory Lien Claims, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement; or

4. the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release:  (a) any post-Effective Date obligations of any party or Entity under the Plan, any Plan Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (b) any Non-Released Claims and Causes of Action against any Person or Entity; or (c) Litigation Claims (i) against (1) Non-Released Parties, (2) Holders of Senior Secured Trade Claims, if any of Classes 4A through 4G votes to reject the Plan (without regard to Vacant Classes), or (3) any Preference Defendant that does not affirmatively vote to accept the Plan, regardless of whether its Class votes overall to accept the Plan, or (ii) that are Excess Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth above, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases set forth above are:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the claims released by the releases set forth above; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (f) a bar to

any of the Debtors or their successors asserting any claim or Cause of Action released by the releases set forth above against any of the Released Parties.

D.    *Release by Holders of Claims or Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), running from the beginning of time until the Effective Date, including Causes of Action based on or relating to, or in any manner arising from, in whole or in part:

1.    the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Plan Documents;

2.    any Plan Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

3.    the Chapter 11 Cases, the Disclosure Statement, the Plan, the Asset Purchase Agreement, the MTE Term Loan Facility, the MDC RBL Facility, Statutory Lien Claims, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement;

4.    the business or contractual arrangements between any Debtor and any Releasing Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing; or

5.    Claims or Liens against Luxe Energy, its successors or assigns, or any of their respective assets or obligations.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release:  (a) any post-Effective Date obligations of any party or Entity under the Plan, any Plan Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (b) any Non-Released Claims and Causes of Action against any Person or Entity, including, subject to Article IX.F hereof, Claims against any Exculpated Party related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence; or (c) Litigation Claims (i) against (1) Non-Released Parties, (2) Holders of Senior Secured Trade Claims, if any of Classes 4A through 4G votes to reject the Plan

**(without regard to Vacant Classes), or (3) any Preference Defendant that does not affirmatively vote to accept the Plan, regardless of whether its Class votes overall to accept the Plan, or (ii) that are Excess Claims.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release set forth above, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the third-party release set forth above is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the claims released by the Releasing Parties; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) necessary and integral to the Consummation of the Plan, (f) given and made after notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties asserting any claim or Cause of Action released by the third-party release set forth above against any of the Released Parties.**

E.    *Releases Under Asset Purchase Agreement*

**In addition to the releases set forth in this Article IX, the releases set forth in the Asset Purchase Agreement shall go into effect on the Effective Date, provided that the Sale Transaction is consummated on the Effective Date.**

F.    *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission occurring from the Petition Date through the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Asset Purchase Agreement, or any Plan Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of the Sale Transaction, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**Notwithstanding the foregoing, nothing in this Article IX.F shall exculpate any Exculpated Party on account of Non-Released Claims and Causes of Action.**

G.    *Injunction*

**Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties or their respective properties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action, including but not limited to any Statutory Lien Claim, MTE Term Loan Claim, or MDC RBL Facility Claim; (4) asserting any right of setoff or subrogation of any kind against any obligation due to or from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action, unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim, Interest, or Cause of Action or otherwise that such Entity asserts, has, or intends to preserve, any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

H.    *Allocation Disputes*

Notwithstanding anything set forth in this Article IX, the Plan shall not release or enjoin the Allocation Disputes.  The Allocation Disputes are hereby reserved and preserved, as are all defenses in connection therewith.

I.    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

*J.      Setoffs and Recoupment*

In no event shall any Holder of a Claim be entitled to set off or recoup against such Claim any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has provided notice of such setoff or recoupment in writing to the Debtors on or before the Effective Date, which notice may be provided in a timely filed Proof of Claim.

*K.      Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

*A.      Conditions Precedent to Confirmation*

Unless waived pursuant to the provisions of this Article X, it shall be a condition to Confirmation that:

(1)      The Debtors' final Budget, as approved by the Bankruptcy Court in the Cash Collateral Order, has been updated to include amounts projected to be disbursed on the Effective Date in accordance with the Plan, and is satisfactory to the MDC RBL Lenders in their sole discretion;

(2)      Both the Asset Purchase Agreement and RSA shall not have been terminated in accordance with their respective terms and no event shall have occurred or be occurring that would allow for termination of the Asset Purchase Agreement or RSA, respectively, as to all parties, with or without the passage of time or any cure period;

(3)      The Buyer's deposit tendered in connection with the Asset Purchase Agreement shall not be diminished, withdrawn or refunded in whole or in part, and no demand from the Buyer, if any, to return of all or part of such deposit shall remain pending; and

(4)      The Confirmation Order has been entered by the Bankruptcy Court and shall provide that:

(a)     the Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, and other agreements or documents to be executed and/or delivered in connection with the Plan;

(b)     the provisions of the Confirmation Order are non-severable and mutually dependent; and

(c)     Working Interest Owner Claims shall be resolved to the Buyer's reasonable satisfaction, including with no cost or liability to the Buyer, as described further in the Asset Purchase Agreement.

B.     *Conditions Precedent to the Effective Date*

Unless waived pursuant to the provisions of this Article X, each of the following shall be a condition to the Effective Date of the Plan:

(1)     the Confirmation Order as to the Sellers shall be a Final Order of the Bankruptcy Court and shall not have been subject to any reversal, stay, modification, or vacatur;

(2)     all actions, documents, authorizations, consents, regulatory approvals, rulings or agreements necessary to implement the Plan shall have been obtained, effected or executed;

(3)     all Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;

(4)     the Confirmation Order shall include language, satisfactory to each Buyer Party and Luxe Energy, providing for:  the approval of the Luxe Settlement and for the third party releases, injunction, and bar order necessary to effectuate the same; the funding of the Luxe Settlement Fund and the transfer of the Luxe Settlement Fund to the Luxe Settlement Distribution Agent on the Effective Date; the Debtors' assumption and assignment to the Buyer of the Joint Operating Agreements on the Effective Date; and the Debtors' sale of the Transferred Non-Op Working Interests to Luxe Energy or its designee on the Effective Date free and clear of all Liens, Claims, encumbrances and other interests;

(5)     the Net Profits Interest shall be turned over to the Senior Secured Trade Claim Distribution Agent concurrently with the Effective Date;

(6)     the Confirmation Order shall include language, satisfactory to each Buyer Party, providing, *inter alia*, that MDC RBL Facility Deficiency Claims, Royalty Interest Claims, and Junior Secured Trade Claims shall be treated as General Unsecured

Claims and that such treatment shall not impair or diminish, and the Debtors shall fully retain and preserve, all rights, title and interest to their Assets notwithstanding any such treatment and neither the Assets nor Buyer shall be subject to any such Claims;

(7)     both of the Asset Purchase Agreement and RSA shall not have been terminated in accordance with their respective terms and no event shall have occurred or be occurring that would allow for termination of the Asset Purchase Agreement or RSA, respectively, as to all parties, with or without the passage of time or any cure period;

(8)     the MDC RBL Facility Claim Payment shall have been distributed to and received by the MDC RBL Lenders;

(9)     all MDC Adequate Protection Payments, including MDC RBL Lender Fees, required under the Cash Collateral Orders shall have been paid in full through the Effective Date;

(10)    the Confirmation Order shall include language, satisfactory to the MDC RBL Lenders, providing that the MDC RBL Lenders shall maintain the MDC RBL Facility Secured Claims (including MDC Adequate Protection Claims and MDC Adequate Protection Liens) against the MDC RBL Remaining Collateral (including the MDC Litigation Trust Assets);

(11)    the Closing Date shall have occurred, or will occur concurrent with the occurrence of the Effective Date, on terms consistent with, and pursuant to, the Asset Purchase Agreement;

(12)    the Plan and all documentation with respect to the Plan and all documents contained in any supplement thereto, including any exhibits, schedules, amendments, modifications or supplements thereto, shall have been executed and/or Filed and shall be subject to the consent rights set forth in the RSA and the consent rights of the MDC RBL Lenders; and

(13)    the Effective Date shall have occurred by September 17, 2021.

C.     *Waiver of Conditions*

The conditions to the Confirmation and the Effective Date of the Plan set forth in this Article X may be waived by the Debtors, with the written consent of the MDC RBL Lenders, and each Buyer Party, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that the waiver of the provisions of Article X.B.4 and X.B.11 shall also require the written consent of Luxe Energy and the waiver of the provisions of Article X.B.5 shall also require the written consent of the Senior Secured Trade Claim Negotiating Committee.

D.    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date with respect to each Debtor.

E.    *Effect of Nonoccurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments*

Subject to the limitations contained in the Plan, and in all cases subject to the consent rights set forth in the RSA and of the MDC RBL Lenders, the Debtors reserve the right to modify the Plan, including, but not limited to, by changing the treatment applicable to any Class of Claims.  Notwithstanding the foregoing or anything contained herein to the contrary, (1) to the extent any modifications or amendments to the Plan impact the Senior Secured Trade Recovery Amount or the releases by and of the Holders of Senior Secured Trade Claims pursuant to Article IX hereof, such modifications or amendments shall also be subject to the reasonable consent of a Majority of the members of the Senior Secured Trade Claim Negotiating Committee, and/or (2) to the extent any modifications or amendments to the Plan impact the releases by and of the Luxe Claimants pursuant to Article IX hereof, such modifications or amendments shall also be subject to the reasonable consent of a Majority of the members of the Luxe Claimants Negotiating Committee.  For the avoidance of doubt, any modification of the terms of the Luxe Settlement implemented pursuant to and incorporated into the Plan that affects the economic value of the settlement to the Estates and/or the MDC RBL Lenders shall likewise require the MDC RBL Lenders' written consent.  The Debtors also reserve the right to seek substantive consolidation of the Chapter 11 Cases of the Debtors.

The Debtors further reserve the right to seek Confirmation of a modified Plan consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their right to alter, amend, or modify materially the Plan, one or more times, after Confirmation and before the Effective Date, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, in each case subject to the consent rights set forth in the RSA and of the MDC RBL Lenders.  For the avoidance of doubt, any modifications that affect (1) the Senior Secured Trade

Recovery Amount or otherwise impact Senior Secured Trade Claims, and (2) impact the Luxe Settlement, are material in nature.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Effective Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan to the fullest lawful extent, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to:  (a) the assumption or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying or

supplementing, after the Effective Date, pursuant to Article VI hereof, the Schedule of Assumed Executory Contracts and Unexpired Leases; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.      adjudicate, decide, or resolve any and all matters related to the MDC RBL Facility Claim Payment, Senior Secured Trade Claim Allocation, the Luxe Settlement and/or the Luxe Settlement Fund;

9.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

10.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code, and enforce the Asset Purchase Agreement;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan or Asset Purchase Agreement;

12.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article IX hereof and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

14.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts

owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII hereof;

15.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

17.    adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

18.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.    hear and determine matters concerning state, local, and federal Taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.    hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan;

22.    enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

23.    hear and determine any action commenced by the Litigation Trustees to recover Litigation Trust Assets;

24.    hear and determine any dispute regarding the Litigation Trust Assets;

25.    hear and determine any motion for, and enter any order approving, any settlements relating to the Litigation Trust Assets;

26.    enter any order upon motion of the Litigation Trustees to extend or wind-up their respective Litigation Trusts;

27.    hear any other matter not inconsistent with the Bankruptcy Code;

28.    enter an order closing the Chapter 11 Cases; and

29.    enforce the injunction, release, and exculpation provisions provided in Article IX hereof.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order, shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors or Reorganized Debtors.  All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Plan Administrator, as applicable, all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights*

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or Reorganized Debtor with respect to any Claims or Interests.

D.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to, the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.      *Service of Documents*

All notices, requests, and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing (including by email transmission) and, unless otherwise expressly

provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email transmission, when received, addressed as follows:

If to the Reorganized Debtors, to:

>Plan Administrator:
>Ankura Consulting Group, LLC
>485 Lexington Avenue
>10th Floor
>New York, NY 10017
>Attn:  Scott J. Davido (Scott.Davido@ankura.com)
>
>with copies to:
>
>Kasowitz Benson Torres LLP
>1633 Broadway
>New York, NY 10019
>Attn:    Matthew B. Stein (mstein@kasowitz.com)
>         David J. Mark (dmark@kasowitz.com)
>
>-and-
>
>Morris, Nichols, Arsht & Tunnell LLP
>1201 North Market Street, 16th Floor
>P.O. Box 1347
>Wilmington, DE 19899
>Attn:    Robert J. Dehney (rdehney@mnat.com)
>         Eric D. Schwartz (eschwartz@mnat.com)
>         Daniel Butz (dbutz@mnat.com)

If to the Buyer Parties, to:

>Maple Energy Holdings, LLC
>c/o Riverstone Holdings, LLC
>Attn: General Counsel
>712 Fifth Avenue
>36th Floor
>New York, NY 10019
>Phone: (212) 993-0076
>Email: Legal@riverstonellc.com
>
>with copies (which will not constitute notice) to:
>
>Vinson & Elkins LLP
>Attention: David Meyer, Steven Abramowitz
>1114 Sixth Avenue

32nd Floor
New York, NY 10036
Email: dmeyer@velaw.com;
sabramowitz@velaw.com

-and-

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attn: Edmon Morton and Kenneth Enos
Email: emorton@ycst.com; kenos@ycst.com

If to the Senior Secured Trade Claim Negotiating Committee and/or
the Luxe Claimants Negotiating Committee, to:

Senior Secured Trade Claim Distribution Agent /
Luxe Settlement Distribution Agent
Stutzman, Bromberg, Esserman & Plifka
2323 Bryan Street,
Suite 2200
Dallas, Texas 75201-2689
Attn:  Judge Steven A. Felsenthal
Email:  felsenthal@sbep-law.com

After the Effective Date, the Plan Administrator shall have the authority to send a notice to parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to (1) those Entities who have Filed such renewed requests; (2) Entities whose rights are affected by such documents; and (3) the U.S. Trustee.

F.    *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

G.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available for free at https://cases.stretto.com/mte/court-docket/ or for a fee via PACER at: https://www.pacer.gov.

H.      *Nonseverability of Plan Provisions*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or the Plan Administrator's consent, as applicable; and (3) nonseverable and mutually dependent.

I.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan, if applicable, and, therefore, neither any of such parties or individuals nor the Reorganized Debtors or Plan Administrator, as applicable, shall have any liability for the violation of any applicable law (including the Securities Act or Securities Exchange Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of any securities offered and sold under the Plan, if applicable.

J.      *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Effective Date.

Dated: September 3, 2021

MTE Holdings LLC
(on behalf of itself and the Debtors)


By:___*Scott J. Davido*_____
Name: Scott J. Davido
Title:   Chief Restructuring Officer